JDL:TJS/TAD
F. # 2013R00381

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                                        Docket No.  13–CR-220 (RJD)

BEBARS BASLAN, *et al.*,

              Defendant.

– – – – – – – – – – – – – – – – –X


MEMORANDUM OF LAW IN OPPOSITION TO
<u>BEBARS BASLAN'S OMNIBUS PRETRIAL MOTIONS</u>



LORETTA E. LYNCH
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201



Tyler J. Smith
Tiana A. Demas
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 3

FACTS ..................................................................................................................... 6

    A.  Background to the FBI's Investigation of Baslan and Henry ....................... 6

    B.  Consensually-Monitored Telephone Calls and Meetings Between CS 1, Baslan and Henry ..................................................................................... 6

    C.  Baslan's Post-Arrest Statement ................................................................ 11

    D.  Henry's Post-Arrest Statements ............................................................... 16

    E.  The Search Warrant for Baslan's Apartment ........................................... 19

    F.  The Consent to Search for Two Numbers in Baslan's Cellular Phone for Purposes of Contacting Sureties ........................................................ 20

    G.  The Search Warrant for Items Found in Baslan and Henry's Possession During Their Arrests ............................................................. 21

    H.  Baslan's Obstruction of Justice ............................................................... 21

ARGUMENT .......................................................................................................... 30

I.  BASLAN'S INDICTMENT SHOULD NOT BE DISMISSED BECAUSE THE GOVERNMENT INVESTIGATED HIS ATTEMPTED OBSTRUCTION OF JUSTICE ......................................................................... 30

    A.  The Government Did Not Place a "Spy in the Defense Camp" and Did Not Improperly Encroach on the Defendant's Attorney-Client Relationship .................. 32

    B.  The Government Is Entitled to Use Baslan's Incriminating Statements to the Informant For Impeachment Purposes ........................................ 35

        1.  The Government Is Entitled to Use Baslan's Incriminating Statements to Impeach Baslan Should He Testify at Trial ........................................ 35

        2.  The Government Is Entitled to Use Baslan's Incriminating Statements to Impeach Baslan Should His Co-Defendant Kristen Henry or a Defense Witness Testify at Trial ........................................ 43

II.  BASLAN'S CONFESSION WAS KNOWING AND VOLUNTARY ........... 51

    A.  A Waiver of *Miranda* Rights Is Effective If Done Voluntarily ................. 52

B.  Baslan Knowingly and Voluntarily Waived His *Miranda* Rights .............................. 55

III. THERE IS NO BASIS TO SUPPRESS THE EVIDENCE SEIZED FROM BASLAN'S APARTMENT AND BACKPACK BECAUSE BOTH SEARCHES WERE CONDUCTED PURSUANT TO VALID WARRANTS................................................. 55

IV. ADMISSION OF KRISTEN HENRY'S REDACTED STATEMENTS AT A JOINT TRIAL DOES NOT VIOLATE *BRUTON* ....................................................... 58

A.  *Bruton* Only Prohibits Statements Directly Referencing a Co-Defendant................. 58

B.  Redacted Statements Comply with *Bruton*'s Requirements ....................................... 60

V.  BASLAN IS NOT ENTITLED TO A BILL OF PARTICULARS IDENTIFYING THE EVIDENCE THE GOVERNMENT INTENDS TO USE AT TRIAL............................. 62

A.  A Bill of Particulars Is Not an Evidentiary Tool........................................................ 62

B.  Baslan Is Not Entitled to a Bill of Particulars .......................................................... 63

VI. EVIDENCE OF BASLAN'S POSSESSION OF CHILD PORNOGRAPHY SHOULD BE ADMITTED................................................................................................. 66

A.  The Government Should be Allowed to Present Direct Evidence of a Charged Crime ......................................................................................................................... 67

B.  The Child Pornography Is Admissible Under Rule 414 to Show Baslan's Propensity to Sexually Abuse a Child............................................................................................. 69

C.  Baslan's Child Pornography is Also Admissible Under Rule 404(b) to Show His Intent to Commit the Other Charged Crimes ............................................................ 74

D.  The Child Pornography Is Not Unfairly Prejudicial ................................................... 76

VII. THE GOVERNMENT WILL PROVIDE DISCOVERY UNDER RULE 16 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE ....................................................... 79

VIII. THE GOVERNMENT WILL DISCLOSE BRADY INFORMATION, BUT THE COURT SHOULD NOT ORDER EARLY DISCLOSURE OF GIGLIO INFORMATION................................................................................................. 81

CONCLUSION.............................................................................................................. 84

PRELIMINARY STATEMENT

The government respectfully submits its opposition to the defendant Bebars Baslan's ("defendant" or "Baslan") pretrial motion, filed on April 1, 2014 (the "Motion").  In the Motion, Baslan seeks: (1) to dismiss the indictment on the grounds that the defendant's Sixth Amendment right to counsel was violated when a jailhouse informant recorded conversations with Baslan during which Baslan discussed, among other things, his plan to enlist friends to destroy a computer hard drive that was in Baslan's apartment on the day of his arrest but was not seized by the FBI; (2) to suppress his post-arrest statements on the grounds that FBI violated Baslan's Miranda rights by allegedly threatening Baslan (after Baslan admits that he had been informed of his Miranda rights and had waived his right to an attorney) to expose him in the press as a pedophile and to notify Baslan's parents of the charges against him, unless Baslan cooperated; (3) to suppress all evidence obtained during a of search Baslan's apartment, which search was conducted pursuant to a valid search warrant that permitted agents to search and seize all electronic devices capable of storing child pornography, and pursuant to which agents discovered over 74,000 images of child pornography and 2,000 videos containing child pornography on an encrypted hard drive; (4) to suppress all evidence obtained during a search of electronic items in Baslan's possession on the day of his arrest, which items were searched pursuant to a valid warrant; (5) to exclude the post-arrest statement made by Baslan's co-defendant, Kristen Henry, on the theory that the admission of this statement violates the Sixth Amendment; (6) a bill of particulars itemizing the evidence that the government intends to introduce at trial; (7)  exclusion of Baslan's images and videos containing child pornography at trial; (8) production of discovery pursuant to Rule 16; and (9) early disclosure of Giglio material.

3

As explained in more detail below, the Court should deny Baslan's motion in its entirety.  Baslan's claims that his case must be dismissed due to a Sixth Amendment violation fail because the government was entitled to investigate Baslan's obstruction of justice following his arrest and indictment.  The appropriate remedy for the government's use of a jailhouse informant who elicited non-privileged information is that the government cannot use that information in its case-in-chief.

Regarding Baslan's post-arrest statement, Baslan does not contest that he was both informed of his <u>Miranda</u> rights and that he waived his rights before speaking to agents.  The government disputes that the agents ever threatened to "expose" Baslan to the press or to his parents as a pedophile or otherwise threatened him.  Following a hearing, the record will be clear that agents took no actions that coerced Baslan into making statements.

The Court also should deny Baslan's motion to suppress evidence obtained pursuant to two valid search warrants.  Contrary to Baslan's assertions, neither the electronic evidence seized from his apartment nor the laptop he had on his person at the time of his arrest were searched pursuant to his consent.  Rather, all items were searched pursuant to valid warrants, and the search warrant for Baslan's apartment (and all electronic devices capable of containing child pornography) was obtained <u>before</u> Baslan's arrest.  Whether or not Baslan consented to a search of these items is irrelevant in the face of the two warrants.

Baslan's claim that any statement by his co-defendant must be excluded fails because her statements can be redacted so that they do not immediately incriminate Baslan.  That is all that is required under the law.  The defendant's request for a bill of particulars should also be denied.  As he makes clear in his motion, he does not seek further information about the charges, but rather information about how the government will prove its case.  That

4

is not an appropriate use of a bill of particulars.  Baslan's request to exclude the child pornography he possessed from trial should also fail.  Baslan is charged with possession of child pornography, and the government is entitled to prove its case.  Further, Baslan's possession of child pornography is admissible to show his propensity and intent to engage in the other charged crimes.

Baslan's request for an order directing the government to produce Rule 16 discovery should be denied as moot because the government is already obligated to do so and is complying with its obligations.  Similarly, the government is already aware of its obligations under Brady v. Maryland, 373 U.S. 83 (1963).  Finally, the Court should deny Baslan's motion for early disclosure of Giglio material because the defendant has already demonstrated his willingness to obstruct justice and early disclosure of this material may aid him in further schemes to subvert the process of justice.

<u>FACTS</u>

A.    <u>Background to the FBI's Investigation of Baslan and Henry</u>

In mid-February 2013, the Federal Bureau of Investigation ("FBI") received information from an individual (referred herein as "Confidential Source 1" or "CS 1") that the defendants, Bebars Baslan and Kristen Henry, possessed child pornography and were preparing to sexually exploit children.  CS 1 indicated that Baslan and Henry had talked about opening a babysitting business as a cover to drug and sexually abuse children.  CS 1 told the FBI that Baslan wanted to make sure that Henry did not go to the police, so Baslan asked CS 1 to provide an eighteen month-old child to whom CS 1 was related so that Baslan could photograph Henry giving oral sex to the child.

B.    Consensually-Monitored Telephone Calls
       <u>and Meetings Between CS 1, Baslan and Henry</u>

Following this meeting, CS 1 made numerous consensually recorded telephone calls with Baslan and recorded several meetings with Baslan and Henry, all under the direction and supervision of the FBI.  During these recorded telephone calls and meetings, Baslan described a detailed plan to have Henry take sexually explicit photographs with the eighteen month-old child.  Eventually, Baslan asked CS 1 instead to provide a three-month-old child for Henry to sexually abuse while Baslan took pictures.  Baslan also indicated that Henry was interested in sexually abusing an eight-year-old girl known to CS 1.  Baslan indicated that they could drug the girl with Dramamine or Benadryl so that the child would not be aware of the abuse.   After several calls, Baslan and CS 1also agreed that CS 1 would bring a three-month-old boy, a one-and-a-half-year-old boy and an eight-year-old girl to a

meeting with Baslan and Henry at a New Jersey hotel, so that Baslan and Henry could take pictures of them being sexually abused.

On March 7, 2013, CS 1, who had been equipped by the FBI with audio recorders and a video recorder, met with Baslan and Henry at an apartment in Brooklyn that Baslan and Henry shared. During the meeting, CS 1 recorded Baslan and Henry discussing the plan to babysit children so that Baslan and Henry could sexually molest them. During the meeting, Henry described her interest in children and her ability to gain access to children using her references as a babysitter. During that meeting, Baslan also used his computer to access child pornography, which he played on his television while Henry and CS 1 were present. The videos, some of which were captured on CS 1's video recording, appeared to depict prepubescent girls being vaginally and orally penetrated by adult men's penises. Henry commented regarding one of the child pornography videos that it was the "hottest one." Baslan described to CS 1 that the child pornography in his residence could be accessed on his iPad, iPhone, and television, and that the devices were accessing the child pornography from a central location. Baslan also told CS 1 that had created an encryption system for the child pornography that was "unhackable."

CS 1 later canceled the planned meeting in New Jersey with Baslan and Henry at which Baslan and Henry were to sexually abuse and photograph the children. The meeting was reset for March 19, 2013 at a hotel in Jersey City, New Jersey. On March 18, 2013, CS 1 met with Baslan and again recorded the meeting. During the conversation, they discussed plans regarding their meeting in New Jersey. CS 1 indicated that he would be bringing the three victims. During the course of the conversation, Baslan and CS 1 had the following exchange:

CS 1:        What's the game plan? What's Kristen [Henry] into?

BASLAN:      She's going to come and do whatever we tell her to do. That's it.

CS 1:        She's going to do whatever we tell her to do?  Really, it's like that?

BASLAN:      Well, yeah.

CS 1:        So, we're going to have a whole lot of fun?

BASLAN:      Yeah.  That's really about it.  We're just going to have fun and then I don't know.  We'll finish having fun and we'll come back.

CS 1:        Yeah, I have to leave there because I have work in the morning.

BASLAN:      We won't stay there overnight.  Because we don't want to risk her waking up and seeing us.  Once we're done, we'll leave.

CS 1:        I'm not kicking you out or anything.

BASLAN:      No, no, no, I wouldn't want to. I mean why should she even see us.

CS 1:        Yeah, exactly, how am I going to explain that?

BASLAN:      Right, right.  And I was thinking that when we do that deed, we'll all wear, like, ski masks and then we'll have a movie with ski masked robbers running playing in the living room, so if she gets scared we just pull out turn off the light, disappear and then you'll be sitting on the couch watching a ski mask movie.  Oh honey what happened did this movie get in your head again?

CS 1:        Um, you're going to bring the camera, by the way?

BASLAN:      Of course.

CS 1:        The HD one, right?

BASLAN:      Of course, I have a DSLR HD I'm going to bring, fully charged, fully loaded.

CS 1:        What's DLL-uh-uh?

BASLAN:      It's like a photo camera that takes videos.

CS 1:        But no faces.

BASLAN:      Of course not, well except Kristen.

CS 1:        Ok. Not even accidentally, alright?

BASLAN:      Don't worry, man, like I said, just Kristen's and my dick's face.

Later during the conversation, Baslan asked CS 1 to bring the three-month-old child to his apartment, so that he could take a sexually explicit photograph of Henry with the child before the meeting at the New Jersey hotel. Baslan and CS 1 then discussed what Baslan planned to do with the eight-year-old girl, stating:

BASLAN: Like I said, we can take it easy tomorrow, just get, I'm going to bring her and we get [the eight-year-old girl], take a few pictures, something like that or whatever and we just, that would be our first time and we'll take it further next one.

CS 1: How far do you want to go?

BASLAN: Not too far. Take pictures. Touch and then go down on her. That's pretty much what I want out of it.

CS 1: You just want to go down on her?

BASLAN: Yeah. Nothing else, I mean.

CS 1: For now?

BASLAN: Because I don't know anything else about her, she's you know, what else can I do, we'll figure out as we get more advanced in this but the first time around, that's more than enough.

Baslan also indicates during the conversation that sexually abusing the eight-year-old was more of a "stepping stone" and that he would "take a lot of pictures and videos." He also said that: "We'll have a good amount of pictures and videos of [the eight-year-old] herself and then we can just use it as jerk-off material or whatever." When asked about whether he would be moving forward with gaining access to other children, Baslan indicated that he was "working on it" and that Henry would be meeting a woman about babysitting in a few days.

On March 19, 2013, CS 1 placed a recorded call to Baslan at the direction of the FBI and indicated that he would not have time to bring the children to Baslan's residence, so that Henry could take a sexually explicit photograph with one of them. Baslan and CS 1 agreed that CS 1 would go to Baslan's residence to pick up the drugs that would be used to

incapacitate the eight-year-old, then Baslan, Henry and CS 1 would meet at the New Jersey

hotel.  During recorded conversations that day, Baslan and CS 1 also agreed on a code word

that would indicate that CS 1 had the children at the hotel and that Baslan and Henry could

travel to New Jersey to sexually abuse them.

During the early evening of March 19, 2013, CS 1 drove to Baslan's and

Henry's residence in Brooklyn, which was under surveillance by law enforcement.  CS 1 was

equipped by the FBI with electronic monitoring devices including audio recorders and a

video recorder.  After CS 1 arrived, BASLAN indicated to CS 1 that Henry would be

arriving with the drugs.  Shortly after that, law enforcement officers observed Henry driving

back to Baslan's residence.  Baslan, Henry, and CS 1 went inside Baslan's residence and had

a short discussion regarding the drugs.  CS 1 then left and immediately met with law

enforcement officers.  CS 1 gave law enforcement officers Benadryl and orange juice that

Henry had just provided to him.

Later during the evening of March 19, 2013, CS 1 placed a recorded call to

Baslan and provided the code word indicating he was with the children.  CS 1 also indicated

the address of the hotel and room number.  Law enforcement officers who were conducting

surveillance of Baslan's residence observed Baslan's car leave the area.  At approximately

9:15 p.m. on March 19, 2013, Baslan and Henry arrived at the hotel in Jersey City, New

Jersey.  Shortly after Baslan and Henry arrived at the room, law enforcement officers entered

the room and arrested Baslan and Henry.

Unbeknownst to Baslan and Henry, no children were present in the room.  At

the time of Baslan's arrest, Baslan was carrying a backpack.  During a search of the

backpack incident to Baslan's arrest, agents discovered, among other things, a Sony digital camera and a laptop computer.

     C.    <u>Baslan's Post-Arrest Statement</u>

     After Baslan and Henry had been placed under arrest, agents took Henry to another area of the hotel so that each defendant could be advised of his or her <u>Miranda</u> rights separately. Once Baslan had been separated from Henry, the case agent, Special Agent Aaron Spivack, told Baslan that the agents were going to inform him of his rights before any questioning occurred. Baslan stated that he knew his rights and wanted to speak to the agents. At approximately 9:25 p.m., Agent Spivack began reading Baslan his <u>Miranda</u> rights in the presence of another agent, using an "Advice of Rights" form FD-395. (<u>See</u> Exhibit 1 hereto.) The Advice of Rights form reads:

**YOUR RIGHTS**

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.


I have read this statement of my rights and understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

(Ex. 1.)

        SA Spivack read each line of the "Advice of Rights" form to Baslan.   After reading each line, SA Spivack asked Baslan if he understood.  Baslan affirmed that he understood each line.  At approximately 9:27 p.m., Baslan agreed to waive his <u>Miranda</u> rights and speak to the agents without an attorney.

        Baslan made the following statements, in sum and substance and in part. Baslan advised that he and Henry had gone to the hotel in New Jersey that night to meet Baslan's friend, CS 1.  Baslan stated that he, CS 1 and Henry party and "swing" together and smoke marijuana.  Baslan said that he and Henry came to the hotel to party with CS 1. Baslan initially stated that CS 1 had brought the children to the hotel because CS 1 had to watch them.  When agents first asked Baslan if he, Henry and CS 1 planned to have sex with the children in the hotel, Baslan responded "not that I know of."  When agents then asked if Baslan, Henry and CS 1 were going to abuse the children, Baslan stated: "We didn't do it. You should have waited," and seen that nothing would have happened.  When asked why Baslan and Henry bought Benadaryl to drug the children, Baslan responded that CS 1's wife was abusive, and CS 1 wanted the kids to sleep so that CS 1 could hang out with Baslan and Henry.  When asked why Baslan had brought camera equipment to the hotel, Baslan stated that he is a videographer, so he always has his camera with him.  Baslan then stated that "hypothetically," someone might agree to do something and then change their mind; Baslan again stated that "nothing happened" that night.

        After being advised that it was a federal crime to lie to federal agents, Baslan stated that he was not going to do anything to the children that night, and if something were going to happen, he would have stopped it.  Baslan stated that the intent that evening was to

party and use the children as "props" but not to touch them. Baslan stated he got cold feet and did not want to do anything. Baslan advised that he and CS 1 fantasized together about children. He said that nothing had happened in the past, but they did plan something. Baslan stated that once in the hotel that night, he planned to tell CS 1 that he did not want to do it.

          The interviewing agents then advised Baslan that they had listened to phone calls where Baslan had planned to abuse and photograph the children in the hotel. Baslan then stated that he gave CS 1 the Benadryl because Baslan did not want CS 1 to give the kids anything worse than Benadryl. He stated that the plan was to give the children the Benadryl and then take pictures with them. Baslan stated that he wanted to take pictures of the eight-year-old, but did not intend to touch her. Baslan stated that he and CS 1 had planned the night at the hotel together.

          Baslan admitted that he told CS 1 that Baslan planned to arrange a babysitting service, but Baslan advised that this talk was "bullshit"; Baslan said that he never had created and did not intend to create, a babysitting service. Baslan stated that he had talked about babysitting, but it was just fantasizing.

          Baslan stated that he had never touched a child inappropriately, nor did he have access to children. Baslan advised that he had seen child pornography at work. Baslan stated that he had downloaded child pornography at his home and had looked at child pornography at home. Baslan stated that his hard drive, which was encrypted, was at his home, and had child pornography on it. Baslan stated that he had files on his laptop that contained the password for his encrypted hard drive. Baslan admitted that he knew that possessing child pornography at his home was illegal. Baslan stated he was willing to show the agents where the child pornography was on his home computer. Baslan then provided his

username and password for his home computer. Baslan also provided the password to his iPhone.

Baslan then explained how he downloaded child pornography to his home computer. Baslan stated that on one or two occasions, he, Henry and CS 1 all masturbated to child pornography together.

Baslan advised that the laptop computer in the backpack that he had brought to the New Jersey hotel belonged to him, but Henry used the laptop. Baslan gave the agents verbal consent to search his laptop and provided the password to the laptop.[1]

Baslan told the agents that he is a Russian citizen, but that he had a valid U.S. green card and was legally in the country. Baslan stated that he knew he was in trouble, and he volunteered to return to Russia immediately to avoid any further trouble in the United States. Baslan stated he did not want his family finding about any of the things he had discussed with the agents.[2]

---

[1] Although Baslan gave the agents consent to search his laptop, the agents did not perform a consent search of the laptop. Instead, they obtained a search warrant for the laptop. The agents did check, in Baslan's presence, to see if the laptop was encrypted. They did so to determine whether the laptop needed to be kept powered on. If the laptop was encrypted and the agents had turned the laptop off, it may have been significantly more difficult to retrieve information from the laptop. Agents did not find an indication that the laptop was encrypted and took the laptop into their custody pending issuance of a search warrant.

[2] Contrary to Baslan's assertion in his declaration that agents threatened "that if I refused to confess that I was going to sexually abuse [redacted to remove victim information]'s niece and young sons, they would expose me as a child molester to my parents, who live in Russia, and would 'leak' that accusation to the press," agents did not threaten to tell Baslan's parents that Baslan was a child molestor or to leak any information to the press. Rather, Baslan repeatedly and unprompted told the agents that he was concerned his family would find out about the crimes for which he had been arrested.

The interviewing agents advised Baslan that they had a search warrant for Baslan's residence.  Baslan requested that the agents not make a scene by breaking down his door; he then gave agents the code to his apartment door to enable the FBI to enter Baslan's apartment and execute the search warrant.

Agents then asked Baslan if they could memorialize the interview on paper so that it was clear that what Baslan told the agents was accurate.  Baslan agreed.  Agent Spivack handwrote a statement, which he provided to Baslan to review.  Baslan read the statement aloud.  Agents also informed Baslan that he could make any changes, corrections, or additions to the handwritten statement.  Baslan made four changes and one addition. Baslan signed the written statement, which was two pages long, and reads as follows:

> I, Bebars Baslan, was arrested at the Hyatt hotel in Jersey City, NJ.  I have been told that I have been placed under arrest and have been advised of my rights, which I have waived.  I agree to talk to the FBI voluntarily and have not been made any threats or promises.
>
> I came to the Hyatt with the intent to engage and have Kristen engage [CS 1]'s 2 month old boy, his one and a half year old boy, and his 8 year old [redacted to remove victim information] in sexually explicit conduct.  However, I had cold feet and was not going to go through with it.  I suggested Benedryl (sic) so that the kids would be sleeping.
>
> I planned on "going down" on [redacted to remove victim's name], the 8 year old, but had cold feet.  We were also going to take photos and videos.
>
> I have a sexual interest in children, and have watched child porn on few occasions, and have masturbated to the child porn.
>
> I have links on my computer to the child porn which I will provide to the FBI.  My child porn is on an encrypted hard drive at home.  I also use a 256 bit encryption, but I can't provide the password at this time.  I have provided the FBI with passwords to my computer and phone.

15

I have never harmed a child nor have I sexually abused a child in the past.

I want to talk to someone about my options, I am fully willing to cooperate.

The changes Baslan made were as follows: in the first paragraph, Baslan corrected the spelling of his last name from "Basslan" to Baslan, which change he initialed with a "BB." In the fourth paragraph, Baslan changed "have watched child porn on many occasions" to "few occasions," by crossing out "many" and writing "few." Baslan did not initial this change. In the sixth paragraph, Baslan changed "but I don't want to provide the password unless I get a plea," to "but I can't provide the password at this time." Baslan initialed both of these changes by writing "BB." Baslan also added the final paragraph of his confession (which he initialed) and signed the confession.

        D.      <u>Henry's Post-Arrest Statements</u>

Following the arrest, Henry was taken to a separate room. After Henry was advised that she was under arrest for conspiracy to sexually exploit a child, at approximately 9:28 p.m., Special Agent John Robertson read Henry her <u>Miranda</u> rights, using an "Advice of Rights" form FD-395. (<u>See</u> Exhibit 2 hereto.) The form is identical to the one read to Baslan, which is quoted above. Agent Robertson read each line of the form and then provided it to Henry to read. After she read the form and indicated she understood it and was willing to speak to agents, Henry signed the form. It was then witnessed by Agent Robertson and another agent.

Henry then indicated, in sum and substance and in part, that she is originally from Buffalo and had moved to Brooklyn approximately a year beforehand. She indicated that she resided at 1153 Ocean Parkway in Brooklyn with Baslan, whom she identified as her

16

boyfriend of three years. Henry stated that she and Baslan came to the hotel to meet the children that CS 1 was bringing. She said that she had purchased the Benadryl because CS 1 needed it for the children's allergies. After being challenged by agents that the purpose of the Benadryl was to render the eight-year-old child unconscious so she could be raped, Henry stated that she did not want to speak for fear of being "flustered" and then indicated that she wanted to speak to someone before proceeding. Agents stopped questioning Henry.

Approximately five minutes later, Henry advised the agents that she was willing to answer questions. Before questioning resumed, the agents again provided Henry with her Miranda rights using a new "Advice of Rights" form FD-395, which was executed at approximately 9:44 p.m.,. (See Exhibit 3 hereto.) Henry signed the form, as did the agents. Henry then told the agents that she and Baslan were visiting CS 1 because Henry was supposed to have her picture taken with a nude or semi-nude seven-year-old girl. She said that CS 1 called Baslan and asked Baslan to buy Benadryl, and Baslan asked Henry to buy the Benadryl. Henry then admitted that the Benadryl was going to be given to the girl so she would be asleep and not remember having her photographs taken. Henry also admitted that perhaps photos of her and a two-month-old infant would be taken.

Henry also told agents that she had viewed child pornography with Baslan at least two times and that her interest in child pornography started when she was in high school. She said that she had watched a movie on television about a pedophile, which had triggered her interest in child pornography. Henry expressed this interest to Baslan, who told Henry that is was okay. Henry stated that she asked Baslan to download child pornography. Henry indicated that the child pornography aroused her and that she masturbated to it. She said that she preferred girls who were approximately ten years old. She also advised that she

17

had never touched a minor in a sexual or inappropriate manner and stated that her father had

never touched her in a sexual or inappropriate manner.

       Henry was then asked if she would complete a signed statement summarizing

the information that she had provided.  She agreed. Agent Robertson handwrote a written

statement, which he provided to Henry.  Henry read the statement aloud.  Henry was also

advised that she could make changes, corrections, or additions to the statement.  She made

several changes, which she initialed.  Henry signed the written statement, which reads:

> I Kristen N Henry, date of birth April 1, 1987 developed an
> interest in viewing child pornography several months ago.  I
> expressed this interest to Bebars Baslan, who wanted to explore
> child pornography when I asked him to.
>
> Bebars Baslan and I downloaded child pornography together on
> at least 2 occasions.  Bebars and I masturbated to child
> pornography downloaded from the internet.
>
> On March 19, 2013, I traveled to NJ (Jersey City) with Bebars
> Baslan to take photos with an approximately 2 month old boy
> and 7 year old girl.  I heard [CS 1] asked over the phone that I
> purchase Benadryl to administer to the girl so that she would
> stay asleep and not be traumatized.
>
> At no time did I myself or did I witness Bebars molest any
> children.  During the visit to the hotel, it was possible that I
> would be photographed with a nude or semi-nude 7 year old girl
> and with my face near the penis of the 2 month old boy,
> simulating oral sex, at the request of [CS 1].  The hotel location
> was determined by [CS 1.]

       The changes Henry made were as follows: in the first paragraph she changed

her birth year from "1988" to "1987" and added the phrase "when I asked him to."  In the

third paragraph she changed the statement to read that "I heard [CS 1] asked over the phone

that."  In the last paragraph, she added "at the request of [CS 1]" to the second to last

sentence and added the last sentence which reads "The hotel location was determined by [CS 1]." Henry initialed each of these changes and the statement was then signed by three agents.

     E.     <u>The Search Warrant for Baslan's Apartment</u>

On March 19, 2013 at approximately 11:25 a.m., ten hours before Baslan and Henry's arrest, the Honorable Roanne L. Mann signed a search warrant authorizing the search of Baslan's apartment in Brooklyn for evidence or instrumentalities of violations of Title 18, United States Code, Sections 2251, 2252 and 2252A and Title 21, United States Code, Section 844. The search warrant permitted agents to search and seize, among other things: Dramamine, Benadryl, Valium, or other drugs that could be used to alter the consciousness of a child, images of child pornography and files containing images of child pornography, motion pictures, videos and other recordings of minors engaged in sexually explicit conduct, cameras and digital recording devices such as camera-enabled cell phones and tablet computers, computers, computer hard drives, or other physical objects upon which computer date can be recorded, including tablet computers, cellular telephones capable of acting as computers and media servers such as iPads, iPhones and AppleTVs that were or could be used as a means to commit violations of 18 United States Code, Sections 2252 and 2252A. (The search warrant is attached as Exhibit 4 hereto.)

FBI agents executed the search warrant after Baslan and Henry's arrest on March 19, 2013, immediately after the arrests of Baslan and Henry. Pursuant to the warrant, agents seized numerous items, including:

- An Apple desktop computer

- A Macbook laptop computer

- An Apricorn external hard drive

19

- Several other external and internal hard drives

- Numerous pieces of electronic storage media

- An iPhone

- A video camera

- A Nokia cellular telephone

- Numerous CD-ROMs

- 1 Walgreens receipt dated March 19, 2013 at 5:47 p.m., for Benadryl, orange juice, "life like animals," Strawberry Nesquik and trash bags;

- 1 video camera

Computer forensic specialists found numerous encrypted files on the seized items.  The specialists were able to decrypt the Apricorn hard drive, which was encrypted.  On the drive, agents discovered approximately 74,000 images of child pornography and 2,000 videos containing child pornography.

F.     The Consent to Search for Two Numbers in Baslan's
       Cellular Phone for Purposes of Contacting Sureties

Baslan was arraigned the day following his arrest before the Honorable Roanne L. Mann.  Prior to the arraignment, Baslan's counsel indicated that Baslan sought two telephone numbers stored in the cellular telephone seized by agents the night before so Baslan could contact those people to act as sureties.  Since the government had not yet received a search warrant for that phone, the government requested that Baslan execute a limited consent to search his phone for those two numbers.  Baslan executed that consent form and the government provided his counsel with the telephone numbers.

G.    The Search Warrant for Items Found in Baslan's and
      Henry's Possession During Their Arrests

On April 1, 2013, the Honorable Robert M. Levy signed a search warrant authorizing the search of the computer, cameras, telephones, and other digital equipment seized from Baslan and Henry at the time of their arrests.  The warrant also authorized the search of a paper notebook that was in Henry's possession at the time of the arrest. Following receipt of the search warrant, the government reviewed those items.  (The search warrant is attached as Exhibit 5.)

H.    Baslan's Obstruction of Justice

Following Baslan's arrest, the government learned that he had engaged in activities to obstruct justice while incarcerated.  In June 2013, an inmate ("CS 2") at the Metropolitan Detention Center ("MDC") who was located in the same residential unit as Baslan approached the government indicating that he had information regarding Baslan's efforts to obstruct justice.  The government debriefed CS 2 on June 26, 2013.  During the debriefing, CS 2 advised the government that Baslan had told him, among things, that the FBI had left an electronic storage device, known by the brand name "DROBO," which is comprised of 5-hard drive bays and is capable of storing 16 Terabytes of data, in his apartment.  CS 2 indicated that a friend of Baslan's had gone to his apartment and taken the DROBO, and that Baslan wanted to know what would happen to him if he instructed the friend to destroy it.  CS 2 also told the government that Baslan was considering multiple ways to frame the government's cooperating witness so that the witness's credibility could be attacked at trial.  One of Baslan's plans involved having friends file false affidavits with the Court claiming that the cooperating witness had embezzled money from them.  Another

one of Baslan's plans involved having a friend claim that the cooperating witness had
inappropriate sexual contact with her young children.

    After the initial debriefing, the government, concerned that Baslan was
destroying evidence and suborning perjury, provided the informant with a recording device
on July 1, 2013, and then again on July 31, 2013, and instructed him to record his discussions
with Baslan.  During these two recorded conversations, Baslan discusses several plans to
obstruct justice.  For example, Baslan discussed his plan to have friends file affidavits falsely
claiming that CS 1 had embezzled money from them.  Baslan also discussed trying to falsely
link CS 1 to a child molestation ring in Virginia.  Specifically, Baslan was planning to have
the remains of two dead children who were purportedly buried in Virginia dug up and
planted in CS 1's home.  Once the remains were planted in the witness's home, Baslan was
going to place an anonymous call to law enforcement.

    Baslan also took action in furtherance of these schemes.  On August 30, 2013,
Baslan filed a "Motion for MD Hash Analysis of All Electronic Data Storage Devices [in]
the Possession of the United States Government Pursuant to a Search and Seizure Conducted
at 11533 Ocean Parkway and Other Locations on March 13, 2013" ("MD5 Hash Motion").
See Docket No. 38.  In the MD5 Hash Motion, Baslan requested that the Court order the
government to conduct an MD5 hash analysis of all of the electronic storage devices, i.e.,
computers and hard drives, that FBI agents recovered from Baslan's residence on March 13,
2013.  According to Baslan's motion, a MD5 hash analysis is "an algorithm that measures
all of the data contained on electronic storage devices, and transforms the data into a number
known as a Hash or Hash value."  (See MD5 Hash Motion ¶14.)  In general terms, a hash
value is a computer file's fingerprint or DNA profile.  Any change to a computer file will

change the file's hash value; knowing the hash value for a computer file would therefore be useful in determining whether the file is subsequently tampered with or manipulated in any way.

Baslan purportedly requested the hash analysis because he was concerned that the FBI was tampering with his computer files.  (MD5 Hash Motion ¶ 12  (alleging that either "by error or design" the government had not accounted for several of the devices that the FBI had seized from his apartment and suspecting that the FBI was tampering with the files)).  In particular, Baslan alleged that although the FBI had seized from his apartment and possessed a "major Electronic Data Storage Device," which he also referred to as a "16 Terabyte storage device," and a "5-Bay External Storage Device," the device was not listed anywhere on the government's search warrant inventory list.  (See, e.g., MD5 Hash Motion ¶ 5.)  The device or "DROBO," was, according to Baslan, a "crucial component of the defense in this case" because it contained "exculpatory defense data" that Baslan would need to access as part of his defense.  Baslan claimed that because the DROBO was in the government's sole possession, Baslan needed the Court to order the government to perform a MD5 hash analysis of the DROBO so that he would be able to determine whether the FBI had tampered with or manipulated the computer files contained on the DROBO.

This motion was part of Baslan's scheme to destroy the DROBO and falsely accuse the FBI of destroying exculpatory evidence.  His allegations in the MD5 Hash Motion to the contrary, Baslan knew that the FBI had not recovered the DROBO from his apartment and did not possess it because two months before filing his motion, Baslan had instructed a friend to destroy the DROBO.  Once the DROBO was destroyed and Baslan was confident that it would never be found, Baslan planned to accuse the FBI of taking it from his

apartment and destroying it when agents discovered that it contained evidence that proved he was innocent of the child pornography production charges filed against him.  Baslan then planned to argue that because of the FBI's egregious conduct in intentionally destroying exculpatory evidence contained on the DROBO, the case against him should be dismissed.

Baslan's MD5 Hash Motion was completely consistent with one of the schemes he described in CS 2's recordings.  Specifically, on the July 1, 2013 recording, Baslan told the informant that his friend Tobala Tessler had just visited him at the MDC, and that he had instructed her to destroy the DROBO, including directing her to remove the serial plate to ensure that there was no way that, if found, it could ever be traced back to him.   On the July 31, 2013 recording, Baslan confirmed that Tessler had destroyed the DROBO as he instructed.

Baslan also told the informant on the July 1, 2013 recording that earlier in the day he told a rabbi ("Rabbi"),[3] who was helping raise money for Baslan's defense, that the FBI "had fucked up the evidence" and that the MD5 Motion he was intending to file, which would set forth Baslan's allegations that the FBI did "not have all the evidence," was a "very good motion."  Baslan also made clear that he was being careful not to tell his lawyer Ephraim Savitt the details of his MD5 Hash Motion because he did not want to admit to Mr. Savitt that he possessed the very evidence (i.e., the DROBO), that he was planning on accusing the FBI of destroying.  During the July 1, 2013 recording, Baslan and CS 2 had the following conversation:

CS 2:        What's the bad news?

---

[3] MDC records confirm that the Rabbi visited Baslan at the MDC on July 1, 2013.

24

BASLAN:     Well he spoke to, he spoke to Ephraim after meeting me which is . . . uh, I mean the bad news we will be able to fix.  The bad news we will be able to fix.  They spoke to Ephraim after he visited me.

CS 2:       They what?

BASLAN:     Spoke to Ephraim . . . Savitt . . .the lawyer

CS 2:       What about him?

BASLAN:     They spoke to him after he visited me.

CS 2:       Yeah?

BASLAN:     And they got the um, the impression that, he, his mind is set on trial and he thinks I'm completely delusional.  There is no hope for me before trial.

CS 2:       So Ephraim Savitt . . .

BASLAN:     No, he wants to take my case but he is worried about the money because he said that there is no way, there is no hope in my case whatsoever before trial.  He looked at it, he looked at everything, there is no way.

CS 2:       Ohhh.  Fuck.  He's not saying he doesn't think he can't win the case, he is saying it can't be disposed of prior to trial?

BASLAN:     Right.

CS 2:       Oh, well, so what?

BASLAN:     True, but I told, I explained to [the Rabbi] what I . . .

CS 2:       He doesn't know what your, what all your plans are . . .

BASLAN:     Right.

CS 2:       So don't worry about it.

BASLAN:     So I, so what I told [the Rabbi], I said to him [IU] are you close, he said, "yeah we are very close."  I said, "Look I don't want you to discuss any details with him but you have to understand my motion for the MD5 motion, is a very good motion. " And he was like, 'what'?  He said, I I told him I I didn't tell him how, I said, "I'm pretty sure that they fucked up the evidence."

25

> He was like "how do you know that?" I said, "I just know that, trust me." He's like, he's like "You're sure?" I said, "they fucked up the evidence." [The Rabbi] lit up like a Christmas tree. He's like, "you mean, do do you, are you saying what I think you're saying?" I said, "whatever you think I'm saying, take it as that. They don't have all the evidence." He's like, "aaaaahhhhhhh". He said, but I told him, "I don't know if I should tell Ephraim that."

CS 2:       Did you tell [the Rabbi] that you had--?

BASLAN:    No, I didn't tell him I had the

CS 2:       The what is it, DROBO?

BASLAN:    DROBO. I didn't tell him I had it, I told him I know it's gone. I don't want to say anything.

CS 2:       He knows it's gone.

BASLAN:    Yeah, I don't want to say anything.

CS 2:       Did you mention the chinese DROBO?

BASLAN:    I didn't mention anything. You told me it was it on a need to know basis. I just explained to him the abstract thoughts and maybe he would relay it to Ephraim. [Be]cause I don't want to admit to Ephraim at this time that I have the evidence. I just want to tell him that I believe it's gone.

Despite his plans to avoid trial by obstructing the proceedings, Baslan knew that trial was still a possibility and that he would need to come up with a plausible explanation to convince a jury that he did not intend to harm any children despite his possession of tens of thousands of videos and images containing child pornography, the several recorded conversations with CS 1 detailing his plans to sexually abuse young children, and his agreement to meet up with CS 1 at a Jersey City hotel room so that they could sexually abuse CS 1's infant sons and 8-year-old niece. In other words, he needed a story to convince a jury that, despite all of the evidence to the contrary, he was not guilty. To

that end, Baslan contemplated two stories to tell a jury:  the "Nancy Drew" idea and the "documentary" idea.

Baslan first discussed the "Nancy Drew" idea with the Rabbi.  In essence, Baslan would claim that the reason he agreed to meet with CS 1 at the New Jersey hotel was because he was "investigating" CS 1's  criminal activities; in his words, he was a modern-day Nancy Drew.  Baslan told the informant that when he proposed the idea to the Rabbi, the Rabbi was not convinced that it was the best defense; in particular, the Rabbi was concerned that Baslan would not be able to convince someone to testify at trial that Baslan was investigating CS 1.

Undeterred, Baslan kicked around a new idea:  Baslan would claim that he was producing a documentary to memorialize CS 1's interest in child pornography.  In other words, Baslan would claim that the reason why he possessed thousands of computer files containing child pornography, discussed with CS 1 the sexual abuse of young children and agreed to meet up with CS 1 at the hotel was not because he intended to harm children but because he was producing a documentary concerning CS 1's interest in child pornography. According to Baslan, the Rabbi thought the idea was "brilliant" because, unlike the "Nancy Drew" idea, it enabled the Rabbi to help Baslan.  On the July 1, 2013 recording, Baslan and CS 2 discuss these plans:

CS 2:  If you have to explain to [the Rabbi] or Toby or . . . how would you explain it?  How would you talk about the two dead kids in Virginia?  What would you say?  How did you hear about it? Because you have to be able to cover your involvement in this.

BASLAN:  I'll simply, I'll tell him the following.  I already kinda explained to them, gave them a heads- up of what's going to happen without telling them what's going to happen.  Oh, by the  way before I go, I told him about the documentary idea.  He looked

27

at me and he said "it's brilliant." He said that "I couldn't figure out . . . the Nancy Drew shit won't . If they even believe you, you'll get obstruction of justice and this and this and that. This one you're. . . " So, I told him, here's the thing. When I started investigating [CS 1] I knew that he was up to something.

CS 2:        Oh, wait, let me get this straight. [The Rabbi] says . . .

BASLAN:    That the documentary is brilliant.

CS 2:        That the Nancy Drew thing where supposedly someone told you to tape [CS 1] sounded like horseshit.

BASLAN:    No. He said that even if they believed you they could still charge you with a crime because its obstruction of this and this and that.

CS 2:        But he liked the new idea better?

BASLAN:    He said he liked it because it's first - First Amendment because you you you you can do it all you want.  He said we like the Nancy Drew shit because it's true. He said, "We verified the people you were talking to. We believe you.  The problem is that its gets us in trouble too.  We don't want one of our rabbis to go to jail for you know to tell that told you to investigate this guy." I said, "what do you mean?" He's like "They're gonna ha-, they're gonna arrest us for interfering with justice and doing this and doing that." He said, "We're under a lot of heat as it is." He said, "The documentary style allows me to help you now. Because First Amendment, I have no liability."

            . . .

CS 2:        Have you told - you told [the Rabbi] about the fact that as far as [CS 1] tapes that [CS 1] made of you and Kristen and him talking and all of that shit that it was part of the documentary that you were filming?

BASLAN:    He loved it.

CS 2:        He loves that?

BASLAN:    He said "I'm in love."  And I told him that "I'm not lying, I was really investigating him." He said Bebars "I understand.  The difference is you're obstructing justice or First Amendment." You understand?  Does that sound right?

28

CS 2:        I don't know.

BASLAN:    What do you mean?  The difference between I'm investigating
            him, I'm Nancy Drew, even if they believe me I'll still get hit
            with obstruction of justice.

CS 2:        But the Nancy Drew story is bullshit.  It's not going to fly in a
            courtroom whereas the  . . .

BASLAN:    But to him even if it flew, they would hit me with obstruction of
            justice.

CS 2:        What do you call it?  I lost my train of thought . . .

BASLAN:    The documentary.

CS 2:        The documentary will fly in a courtroom .  Because you have to
            understand that if you're going to obstruct justice, you have to
            be creative about it.

BASLAN:    But that's what he said.  He said the Nancy Drew  shit even
            though they believed me they talked to the rabbi I told that I was
            tracking [CS 1] that this that it was [U/I] [CS 1].  He said the
            problem with it is no one is going to come to you, even in the
            community and you're going to get hit with additional charges
            because you're obstructing justice.  Even if they let you go.  He
            said with this  one, it's solid.  Documentary.  It's First
            Amendment.

CS 2:        Alright.  We have a lot we gotta go over.

BASLAN:    But what if she, if your friends in Virginia help a little bit, why
            are we even worried about getting into the documentary shit?

CS 2:        We're not.  I'm just trying to have all the ducks in line.  You
            give me a thousand different plans for a thousand different ideas
            and I want to know where the hell we're concentrating on.  You
            understand when you're gonna create a story to tell in a
            courtroom, you . . .

BASLAN:    You don't want to be caught with your pants down.

CS 2:        There you go champ.

BASLAN:    Even if the judge says well just explain this to me and I'll let
            you go.

In addition to discussing the documentary idea with CS 2 and the Rabbi, Baslan started discussing the idea with other individuals outside of the MDC. The government believes that Baslan did so in an effort to start laying the groundwork to have friends later testify at trial that it was their understanding that Baslan was producing a documentary. For example, in a series of emails beginning on July 5, 2013— just a few days after Baslan discussed the documentary idea with the Rabbi—Baslan began asking a friend to research some topics for the "investigative documentary" that he was working on before he was arrested. Despite having been detained at the MDC since March 2013, these were the first emails in which Baslan mentioned the purported documentary. Ultimately, none of Baslan's plans came to fruition because of the government's investigation.

ARGUMENT

I.    BASLAN'S INDICTMENT SHOULD NOT BE DISMISSED BECAUSE THE GOVERNMENT INVESTIGATED HIS ATTEMPTED OBSTRUCTION OF JUSTICE

In his motion, Baslan argues that the government's conduct in recording his conversations with the informant was so egregious that dismissal of the indictment with prejudice is the only remedy. Specifically, Baslan claims that the Court must dismiss the indictment because the government violated his Sixth Amendment right to counsel when it placed a "spy in [his] defense camp," who tricked him into divulging his "defense positions and his overall trial strategy as to the existing charges," including his "plans to fight his case with specific pretrial motions and his privileged conversations with his attorneys of record," and his "central strategic defense as to the reason why he and Henry pursued [the cooperating witness's] plan to meet up in a Jersey City hotel room where they would take photos of [CS 1's] two baby sons and his niece in poses suggesting inappropriate contact

30

with the children's sexual organs."  (Baslan Omnibus Pretrial Motion ("Baslan Mot."),

Docket # 73, at 11-15.)  Baslan's argument is without merit.

    The Supreme Court has repeatedly recognized that the government is entitled,

indeed obligated, to continue to investigate crimes for which formal charges have been filed

and to investigate new or additional crimes being committed by an indicted defendant.

United States v. Massiah, 377 U.S. 201, 207 (acknowledging that it is "entirely proper [for

the prosecution] to continue an investigation of the suspected criminal activities of the

defendant and his alleged confederates, even though the defendant had already been

indicted"); see also Maine v. Moulton, 474 U.S. 159, 179  (1985) (holding that law

enforcement has "an interest in the thorough investigation of crimes for which formal

charges have already been filed. They also have an interest in investigating new or additional

crimes.").  The investigations of either type of crime may require surveillance of an indicted

defendant, including the use of an undercover agent, cooperating co-defendant, or, as in this

case, a jailhouse informant.  See Kansas v. Ventris, 556 U.S. 589, 588 (2009) (jailhouse

informant); Moulton, 474 U.S. at 179 (cooperating witness).

    At the same time, the Supreme Court has recognized that the government's

significant interest in investigating crimes must be weighed against an indicted defendant's

Sixth Amendment guarantee to the assistance of counsel, which includes the right to rely on

counsel as a "medium" between him and the prosecution at various pretrial "critical"

interactions, including when the government deliberately elicits from him incriminating

statements pertaining to the indicted charges.  Moulton, 474 U.S. at 179.  Thus, starting in a

line of cases beginning with Massiah, the Supreme Court has attempted to strike the

appropriate balance between these two competing rights.  As explained below, based on the

31

Supreme Court's pronouncements in <u>Massiah</u> and its progeny, the government submits that: (1) dismissal of the indictment is not warranted; (2) although the government cannot introduce Baslan's statements to CS 2 in its case-in-chief, the government can introduce Baslan's admissions to impeach Baslan should Baslan testify at trial; and (3) the government can introduce, pursuant to Federal Rule of Evidence 806, Baslan's admissions to CS 2 to impeach Baslan should Baslan's co-defendant Kristen Henry or a defense witness testify as to an out-of-court statement made by Baslan.

A.    <u>The Government Did Not Place a "Spy in the Defense Camp" and Did Not Improperly Encroach on the Defendant's Attorney-Client Relationship</u>

As an initial matter, the Court should give short shrift to Baslan's accusation that the government violated his Sixth Amendment right to counsel when it interfered with his attorney-client relationship by placing a "spy in his defense camp." The government improperly places a spy in the defense camp when it arranges for a co-defendant, confidential informant or undercover agent to attend defense meetings with an unwitting defendant and his counsel such that the "spy" becomes privy to attorney client communications that are made in a setting that is meant by the defendant and his attorney to be kept confidential. <u>See</u> Gordon Mehler, John Gleeson and David C. James, <u>Federal Criminal Practice</u>, Eleventh Ed. 2011 § 12-10 (citing <u>Hoffa v. United States</u>, 385 U.S. 293 (1966)); <u>see</u> <u>also</u> <u>United States v. Melvin</u>, 650 F.2d 641, 646 (5th Cir. 1981) (noting that in cases where the courts have found an unconstitutional intrusion into the attorney-client relationship, the government has either: (i) conducted surreptitious electronic surveillance of the defendant and his attorney; (ii) used paid informants to gain positions of trust in the defense camp, such as using a paid informant to act as defense counsel's secretary; or (iii)

permitted a cooperating witness to participate in joint defense strategy sessions with his co-defendants and their counsel); <u>Klein v. Smith</u>, 559 F.2d 189, 199 (2d Cir. 1977) (same).

Nothing of the sort happened here.  The informant was not instructed to and did not listen in on or record any privileged discussions between Baslan and Baslan's lawyer.  Nor did the informant attend any meetings that Baslan had with his lawyer.  In fact, Baslan admits that his lawyer was not even aware of his "relationship" with the informant.  (<u>See</u> Baslan Affidavit in Support of Motion to Dismiss Indictment ("Baslan First Aff." ), Docket # 73, ¶ 4.)  And while Baslan alleges that the informant was privy to privileged communications, Baslan does not point the Court to even one privileged communication between him and his attorney that he shared with the informant.  Rather, as Baslan makes clear in his affidavit, he discussed with the informant not the ideas and trial strategies of his attorney but rather his own ideas.  (<u>See</u> Baslan First Aff. ¶ 6 ("I confided to him my ideas about how to defend my case." ).)  Simply put, the government did not place a spy in his camp who intruded upon Baslan's confidential attorney-client relationship.[4]

Moreover, even if Baslan could show that the government impermissibly intruded on his confidential attorney-client relationship, Baslan's claim that the indictment should be dismissed should still be rejected because he has not established that he suffered any prejudice.  <u>See</u> <u>United States v. Dien</u>, 609 F.2d 1038, 1043 (2d Cir. 1979) (noting that the Supreme Court has held that to establish a Sixth Amendment violation "where an informant sat in on defense strategy sessions defendants were required to establish that

---

[4] To the extent that Baslan is arguing that the informant was offering legal advice and that Baslan considered the informant to be his lawyer, the recordings made clear that Baslan fully understood that the informant was not currently a lawyer and that he never had been a lawyer.

privileged information had been passed to the government or that the government had

intentionally invaded the attorney client relationship, and resulting prejudice occurs").  Here,

while Baslan claims that he has been prejudiced because the government has learned his

entire defense strategy, the recordings reveal that Baslan's "defense strategy" consisted

entirely of his attempts to destroy evidence, falsely accuse the FBI of destroying exculpatory

evidence, and committing, and having others commit, perjury on his behalf.  The Court

should not countenance Baslan's perverse argument that he has somehow been prejudiced by

the government uncovering these schemes.  See Hoffa, 385 U.S. at 308-09 (rejecting

petitioner's attempt to invoke Sixth Amendment protection where his incriminating

statements to confidential informant concerning his attempted bribery of jurors "were all

made out of the presence or hearing of any of the petitioner's counsel and embodied the very

antithesis of any legitimate defense").

     Finally, even if Baslan could show that the government improperly encroached

on his attorney client relationship, and even if he could show that he has been prejudiced, the

dismissal of the indictment still would not be warranted.  Indeed, Baslan does not point to

one case where an indictment was dismissed because of the government's intrusion into the

defendant's attorney-client relationship.  Baslan's failure to do so is not surprising given that

"cases involving Sixth Amendment deprivations are subject to the general rule that remedies

should be tailored to the injury suffered from the constitutional violation and should not

unnecessarily infringe on competing interests," such as the necessity for preserving society's

interest in the administration of criminal justice.  United States v. Morrison, 449 U.S. 361,

365 (1981).  Thus, "when before trial but after the institution of adversary proceedings, the

prosecution has improperly obtained incriminating information from the defendant in the

absence of his counsel, the remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongfully admitted and the defendant convicted." Id. To take "[s]o drastic a step [of dismissing the indictment] might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book." Id.

Accordingly, the Court should deny Baslan's motion to dismiss the indictment on the ground that the government impermissibly interfered with his attorney client relationship for all of the above reasons.[5]

B.    The Government Is Entitled to Use Baslan's Incriminating
      Statements to the Informant for Impeachment Purposes

The government submits that although it cannot introduce Baslan's admissions to CS 2 in its case-in-chief, it should be permitted to introduce the admissions to impeach Baslan should he testify at trial. In addition, the government should be permitted to introduce the admissions to impeach Baslan should his co-defendant Kristen Henry or any defense witness testify at trial as to an out-of-court statement made by Baslan.

1.    The Government is Entitled to Use Baslan's Incriminating
      Statements to Impeach Baslan Should He Testify At Trial

In Massiah v. United States, 377 U.S. 201, 207 (1964), Massiah was indicted with his accomplice Colson for conspiracy to possess and distribute cocaine. Massiah

---

[5] Even irrespective of the other shortcomings of Baslan's motion to dismiss based on any purported Sixth Amendment violation, he is not entitled to an evidentiary hearing on this issue because he has not identified with specificity any prejudice that he has suffered. See United States v. Ginsburg, 758 F.2d 823, 833 (1985) ("To require a hearing on his sixth amendment claim, [the defendant's] proffer would need to allege facts which, if proven, would constitute a violation under this standard.").

retained a lawyer, pleaded not guilty, and was released on bail.  Colson started cooperating

with the government.  The government, suspecting that Massiah, despite having been

indicted, was still trafficking in narcotics, hoped to identify some of his accomplices.  To do

so, the government installed a recording device in Colson's car and instructed him to record

any conversations he had with Massiah regarding Massiah's criminal activities.  The

government's suspicions that Massiah was continuing to traffic in narcotics proved correct:

Massiah met with Colson and made incriminating statements while the two men sat in

Colson's car.  The government introduced Massiah's incriminating statements at trial during

its case-in-chief, and Massiah was convicted.

        The Supreme Court reversed Massiah's conviction.  The Court noted that its

decision rested on its balancing of two significant interests.  First, the Court acknowledged

that it was "entirely proper [for the government] to continue an investigation of the suspected

criminal activities of the defendant and his alleged confederates, even though the defendant

had already been indicted." Massiah, 377 U.S. at 207.  The government's significant interest

in investigating crimes, however, had to be weighed against an indicted defendant's Sixth

Amendment guarantee to the assistance of counsel "during perhaps the most critical period

of the proceedings that is to say from the time of their arraignment until the beginning of

their trial, when consultation, thorough-going investigation and preparation are vitally

important, the defendants are as much entitled to aid of counsel during that period as at the

trial itself." Id. at 205.  On balance, the Court held that the accused's Sixth Amendment

right to counsel trumped the government's interest in investigating crime and held that the

defendant's incriminating statements, "obtained by federal agents under the circumstances

here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial." Id. at 207.

The Supreme Court reaffirmed its holding in Massiah in Maine v. Moulton, 474 U.S. 159 (1985). Moulton was indicted for several car thefts, retained a lawyer, and pleaded guilty. Colson[6] was Moulton's co-defendant. Colson agreed to cooperate. Colson told the police that he had met with Moulton to discuss defense strategy and that during the meeting Moulton had suggested the possibility of killing a government witness. As part of his cooperation, Colson agreed to wear a recording device and to meet with Moulton. During several surreptitiously recorded meetings, the two men discussed trial strategy, including creating fake alibis for the dates of the thefts and Moulton, urged on by Colson who claimed to not remember all of the details of the thefts, made incriminating statements regarding the indicted charges. Moulton also discussed the idea of killing witnesses. The government introduced the portions of the recordings in which Moulton made incriminating statements regarding the indicted thefts during trial; he was convicted. Id. at 481-82.

Moulton appealed his convictions on the ground that in light of the Supreme Court's holding in Massiah, the admission into evidence of his incriminating statements to Colson violated the Sixth Amendment. The Supreme Judicial Court of Maine agreed and ordered a new trial. Id. at 483. The state appealed to the Supreme Court, arguing , among other things, that unlike in Massiah, where law enforcement was focused solely on further investigating the criminal activities that Massiah had been indicted on, the police in Moulton had other, legitimate reasons for secretly recording Moulton's conversations with Colson,

---

[6] This Colson is not the same individual associated with the Massiah case.

specifically to investigate Moulton's plan to kill the witness, and therefore Moulton's incriminating statements should not be suppressed. The Moulton Court held that the distinction was not significant because the Sixth Amendment was violated as soon as Colson discussed the indicted charges with Moulton even if the government had a legitimate purpose in investigating Moulton's plan to kill the witness. Id. at 178-80 n. 14. The Court went on to hold that the government's investigative powers are limited by the Sixth Amendment rights of the accused and that Moulton's incriminating statements pertaining to the pending charges were inadmissible at the trial of those charges, even though the police were also investigating other crimes, because in obtaining the evidence, the government violated the Sixth Amendment by knowingly circumventing Moulton's right to counsel on the indicted charges. The Moulton Court noted, however, that the government would be permitted to introduce the incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, at a trial of the new offenses. The Court stated that its holding was a "sensible solution to a difficult problem." Id. at 179. See also Mealer v. Jones, 741 F.2d 1451 (2d Cir. 1984) (holding that trial court erred in permitting introduction in evidence at defendant's murder trial the defendant's post-indictment attempt to bribe witness where defendant discussed bribery plan with confidential source who had been instructed by prosecution to elicit incriminating statements from defendant but that prosecution could introduce defendant's statements at different trial on obstruction of justice charges; in addition, holding that trial court's error in admitting statements to confidential source was harmless in light of overwhelming evidence against defendant).

      In light of the Supreme Court's rulings in Massiah and Moulton and the Second Circuit's decision in Mealer, the government will not seek to introduce into evidence

during its case-in-chief Baslan's incriminating statements to CS 2.  That the government is prevented from introducing Baslan's incriminating statements to CS 2 into evidence during its case-in-chief does not mean that the government cannot use the statements for other purposes.  Indeed, the Supreme Court's decision in <u>Kansas v. Ventris</u>, 556 U.S. 586 (2009), makes clear that the government <u>is</u> entitled to use the incriminating but illegally obtained statements to impeach the defendant should he testify at trial.

In <u>Ventris</u>, Ventris and his co-defendant were on trial for the robbery and murder of Ernest Hicks.  Hicks was shot and killed when his home was robbed.  After killing Hicks, the robbers drove off in his truck and with approximately $300 of his money.  Ventris was indicted and was detained pending trial.  Before trial, the prosecution placed an informant in Ventris's holding cell and instructed him to listen for incriminating statements.  According to the informant, in response to his statement to Ventris that Ventris appeared to have "something more serious weighing on his mind," Ventris confessed that "he'd shot this man in his hand and in his chest" and taken "his keys, his wallet, about $350.00, and . . . a vehicle."  <u>Id.</u> at 589.

Ventris testified at trial.  He admitted that he and his co-defendant had visited Hicks's home but that he went to the home only to investigate rumors that Hicks abused children.  He then blamed the robbery and shooting on his co-defendant.  The prosecution conceded that, in light of <u>Massiah</u>, Ventris's confession was inadmissible during its case-in-chief.  The prosecution argued, however, that its Sixth Amendment violation did not "give [Ventris] a license to just get on the stand and lie," and that it should be permitted to introduce Ventris's confession to the jailhouse informant that he had shot a man and taken his cash and vehicle to impeach his contradictory trial testimony that Theel committed the

robbery and shooting.  Id.  The trial court agreed, and Ventris was convicted of aggravated robbery.  The Kansas Supreme Court reversed the conviction, holding that "[o]nce a criminal prosecution has commenced, the defendant's statements made to an undercover informant surreptitiously acting as an agent for the State are not admissible at trial for any reason, including the impeachment of the defendant's testimony."  Id.

The Supreme Court reversed.  The Court noted that the prosecution's Massiah violation prevented it from introducing Ventris's confession during its case-in-chief. However, the Court held that whether the prosecution should also have to bear the consequence of not being able to impeach Ventris's trial testimony with reliable and probative but illegally-obtained evidence is a different question that turns on nature of the constitutional guarantee that is violated.  Id. at 590.  Whereas the Fifth Amendment "expressly guarantees that no person shall be compelled to give evidence against himself, and so is violated whenever a truly coerced confession is introduced at trial, whether by way of impeachment or otherwise, id. (citing New Jersey v. Portash, 440 U.S. 450, 458-59 (1979)), the Sixth Amendment, like the Fourth Amendment, is silent about excluding the fruit of constitutional violations from trial.  Instead, "exclusion comes by way of deterrent sanction rather than to avoid the violation of the substantive guarantee," and "[i]nadmissiblity [of illegally obtained evidence] has not been automatic, therefore, but we have instead applied an exclusionary-rule balancing test," id. (citing Walder v. United States, 347 U.S. 62, 65 (1954), Harris v. New York, 401 U.S. 222, 225-26 (1971), and Michigan v. Harvey, 494 U.S. 344, 348 (1990)).

The Ventris Court held that the proper balancing test is one that weighs the "need to prevent perjury and to assure the integrity of the trial process," against the need to

deter certain pretrial police conduct.  Id. at 593.  The Court began its analysis by noting that
in every other context where it faced the question of whether to permit the introduction of
illegally obtained evidence to impeach a defendant, it had decided that society's interest in
preventing the defendant from committing perjury at trial outweighed the need to provide for
additional deterrence of impermissible police conduct:

> Our precedents make clear that the game of excluding tainted
> evidence for impeachment purposes is not worth the candle.
> The interests safeguarded by such exclusion are outweighed by
> the need to prevent perjury and to assure the integrity of the trial
> process.  It is one thing to say that the Government cannot make
> an affirmative use of evidence unlawfully obtained.  It is quite
> another to say that the defendant can provide himself with a
> shield against contradiction of his untruths.  Once the defendant
> testifies in a way that contradicts prior statements, denying the
> prosecution use of the traditional truth-testing devices of the
> adversary process is a high price to pay for vindication of the
> right to counsel at the prior stage.

Id. (internal citations omitted).

While society's interest in making sure that that the truth comes out at trial is
furthered by permitting the introduction of tainted evidence to impeach a testifying
defendant, the Court noted that because its holding in Massiah already prohibited the
prosecution from using the illegally obtained statements during its case-in-chief, preventing
the prosecution from also using the statements to impeach a testifying defendant would have
little appreciable deterrent effect for several reasons.  First, the Court held that investigators
already have significant incentive to ensure that they and their informants comply with the
Constitution since statements lawfully obtained can be used for all purposes rather than
merely impeachment.  Id.  Moreover, the Court held that the *ex ante* possibility that
evidence gained in violation of Massiah would be of use for impeachment purposes was

exceedingly small because an investigator would have to anticipate that a defendant would choose to testify at trial <u>and</u> that the defendant would testify inconsistently despite the admissibility of his prior statement for impeachment.  <u>Id.</u> (emphasis in <u>Ventris</u>).  The Court found that his scenario was "[n]ot likely to happen – or at least not likely enough to risk squandering the opportunity of using a properly obtained statement for the prosecution's case in chief."  <u>Id.</u>  Finally, the Court held that the "speculative possibility" that an investigator might engage in illegal behavior to possibly uncover impeachment material should not trump the costs of allowing perjurious statements to go unchallenged.  <u>Id.</u> at 593-94.

Accordingly, pursuant to the Supreme Court's holding in <u>Ventris</u>, the government submits that it should be permitted to introduce Baslan's recorded admissions to CS 2 if Baslan testifies at trial inconsistently with those admissions.  By way of example,[7] the government anticipates that if Baslan were to testify at trial, he will testify that he had no intention of producing child pornography when he agreed to meet with the cooperating witness at the New Jersey hotel.  Rather, the government expects that he will testify that the reason he went to the hotel room was because he and his co-defendant Kristen Henry were producing a documentary regarding the cooperating witness's involvement in child pornography.  If Baslan testifies as such, the government should be permitted to introduce Baslan's recorded admissions to CS2 that clearly indicate that the documentary is a "new idea," a post-indictment fabrication that Baslan  discussed with CS2 and the Rabbi when trying to construct the best story  to explain away his actions.  Because Baslan's admission

_____

[7] The government submits that it should be permitted to use all of Baslan's admissions to CS2 to impeach Baslan to the extent that any statement is inconsistent with his trial testimony and provides Baslan's statements concerning the fabricated documentary simply as an example.

that the documentary is a "new idea" would be inherently inconsistent with any trial

testimony that at the time he was arrested he was producing a documentary, the government

should be permitted to introduce his recorded admissions so that the jury can determine

whether his testimony is credible.  See United States v. Trzaska, 111 F.3d 1019, 1024-25 (2d

Cir. 1997) (noting that "it is well settled that for two statements to be inconsistent, they 'need

not be diametrically opposed,'" and that statements are inconsistent if there is "any variance

between the statement and the testimony that has a reasonable bearing on credibility,"

(quoting Charles A. Wright & Victor J. Gold, 28 Federal Practice and Procedure § 6203, at

514), or if the jury could "reasonably find that a witness who believed the truth of the facts

testified to would have been unlikely to make a statement of this tenor" (quoting John W.

Strong et al., 1 McMormick on Evidence § 34, at 115 (4th ed. 1992) (emphasis added in

Trzaska).  Otherwise, the jury might be left with the false impression that Baslan did not

intend to produce child pornography.

> 2.    The Government Is Entitled to Use Baslan's Incriminating
>        Statements to Impeach Baslan Should His Co-Defendant
>        Kristen Henry or a Defense Witness Testify at Trial

In addition, the government submits that should Baslan's co-defendant Kristen

Henry or any defense witness testify at trial as to Baslan's out-of-court statements, the

government should be permitted to introduce Baslan's recorded admissions to CS 2 pursuant

to Federal Rule of Evidence 806 to prevent Baslan from committing "perjury by proxy."

Federal Rule of Evidence 806 provides that:

> When a hearsay statement – or a statement described in Rule
> 801(d)(2)(C), (D), or (E) – has been admitted in evidence, the
> declarant's credibility may be attacked, and then supported, by
> any evidence that would be admissible for those purposes if the
> declarant testified as a witness.  The court may admit evidence

of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it.  If the party against whom the statement was admitted calls the declarant as a witness, the party may examine the declarant on the statement as if on cross-examination.

The Advisory Committee Notes to the rule make clear that the reason behind the rule is because "the declarant of a hearsay statement which is admitted in evidence is in effect a witness," and therefore "[h]is credibility should in fairness be subject to impeachment and support as though he had in fact testified."  Thus, a hearsay declarant may therefore be impeached by showing that the declarant made inconsistent statements.  Trzaska, 111 F.3d at 1024.  Here, Baslan, as the hearsay declarant, should be impeached by showing that he has made inconsistent statements.  Should Henry or any other defense witness testify at trial that Baslan discussed producing a documentary, it is the government's position that because Baslan fabricated the documentary "idea" after his arrest, the government should be entitled to introduce Baslan's admissions to the informant pursuant to Federal Rule of Evidence 806 to prevent Baslan from committing perjury through Henry.

To the extent that Baslan argues that the Supreme Court's decision in United States v. James, 493 U.S. 307 (1990), prohibits the government from introducing his admissions to the informant in the event that Henry or any other defense witness testifies as to her discussions with Baslan, the government disagrees.  In James, the police were investigating a shooting murder.  The day after the murder, police officers arrested James based on information received from eyewitnesses.  At the time of his arrest, James was sitting under a hair dryer at a beauty salon.  His hair was black and curly when he was arrested but he told police that on the previous day, i.e., the day of the shooting, it was

reddish-brown and straight.  He further stated that he had dyed and curled his hair to change

his appearance.  The trial court excluded these statements at trial finding they were the

product of an arrest without probable cause.  At trial, five eyewitnesses to the murder

identified James as the shooter.  In addition, each witness testified that the shooter had

"reddish" shoulder length hair that was worn in a slicked-back "butter" style.  Each witness

also testified that several weeks before the shooting James had the aforementioned hair color

and style.  Id. at 309-10.

      James did not testify in his own defense.  However, he called as a witness

Jewel Henderson, a friend of his family.  Henderson testified that on the day of the shooting ,

she had taken James to register for high school and that his hair was black.  After

Henderson's testimony, the trial court permitted the government to introduce James's

illegally-obtained but voluntary statements that he had reddish hair the night of the shooting

and that he dyed and curled his hair the day after the shooting in order to change his

appearance.  Id. at 310.

      On appeal, the Illinois intermediate appellate court reversed James's

conviction and ordered a new trial, holding that the exclusionary rule barred admission of

James's illegally-obtained statements for the purpose of impeaching a defense witness's

testimony.  The Illinois Supreme Court reversed and reinstated the conviction, holding that in

order to deter the defendant from engaging in "perjury by proxy," the impeachment

exception to the exclusionary rule should be expanded to allow the State to introduce

illegally obtained evidence to impeach the testimony of all defense witnesses other than just

the defendant.  Id. at 311.

The Supreme Court, in a 5-4 decision authored by Justice Brennan, and over a strong dissent, reversed, holding that the Illinois Supreme Court's expansion of the impeachment exception to the exclusionary to permit the government to use illegally-obtained evidence to impeach all defense witnesses went too far.  The James Court noted, as the Ventris Court did more recently, that "[t]here is no gainsaying that arriving at the truth if a fundamental goal of our legal system, id. at 311, and that it had previously carved out exceptions to the exclusionary rule where the introduction of reliable and probative but illegally obtained evidence would significantly further this truthseeking function by preventing a defendant from turning the exclusionary rule "into a license to use perjury by way of defense" while at the same time permitting the use of such evidence would only create a "speculative possibility that impermissible police conduct will be encouraged."  Id. The Court concluded, however, that approving the use of illegally-obtained evidence to impeach all defense witnesses would frustrate rather than further the purposes of the exclusionary rule for several reasons.[8]

First, the Court held that the mere threat of a subsequent criminal prosecution for perjury is more likely to deter a witness from testifying falsely on a defendant's behalf than to deter a defendant, who is already facing conviction for the underlying charge, from

[8] At least one court of appeals has held that the James Court did not pronounce a bright line rule that only a defendant can be impeached by excluded evidence.  Rather, the D.C. Circuit Court of Appeals has interpreted James as simply rejecting the idea advanced by the Illinois Supreme Court that "all defense witnesses can be treated as a homogenous group for the purpose of determining the scope of the impeachment exception."  See Wilkes v. United States, 631 A.2d 880, 887-88 (D. C. Cir. 1993) (holding that after balancing the truth-seeking function of a trial with the deterrent function of the exclusionary rule, the prosecution was entitled to offer illegally obtained evidence to cross-examination expert defense witness whose opinion that defendant was insane was based, in part, on defendant's out-of-court statement to expert).

lying on his own behalf, and therefore the threat of a defendant committing perjury by proxy was "suspect." Id. at 315.

Second, the Court was concerned that if the impeachment exception were expanded to all defense witnesses, defendants might be dissuaded from presenting their best defense through witnesses. In other words, defendants might fear that a witness, who is in a position to provide truthful and favorable testimony, would also make a statement on the stand that is in tension with the government's illegally obtained evidence. This concern, the Court noted, is "magnified in those occasional situations when defendants must call witnesses to testify despite having had only a limited opportunity to consult with or prepare them in advance." Id.

Third, the Court concluded that expanding the use of illegally obtained evidence to impeach all defense witnesses would significantly weaken the exclusionary rule's deterrent effect on police misconduct. Specifically, the Court held that, although law enforcement officers will think that it is unlikely that a defendant will testify at trial and testify inconsistently with his prior statements, it was far more than a "speculative possibility" that police misconduct will be encouraged by permitting such an expanded used of illegally obtained evidence because the expected value, including the number of occasions to use the illegally-obtained evidence, would be significantly enhanced. Id. at 317. Thus, on balance, because "expanding the exception to encompass the testimony of all defense witnesses would not further the truth-seeking value with equal force but would appreciably undermine the deterrent effect of the exclusionary rule," the Court held that the impeachment exception would remain limited to the testimony of defendants. Id. at 320.

The concerns that led the James Court to reject the Illinois Supreme Court's decision permitting the prosecution to introduce a defendant's illegally obtained statements to impeach all defense witnesses are not present where, as here, the government seeks to introduce a non-testifying defendant's prior inconsistent statement to impeach him when he offers his hearsay statement through a co-defendant for several reasons.  First, Baslan's co-defendant Henry faces the possibility of being convicted for crimes that carry serious penalties, including a 30-year mandatory sentence.  She, like any other defendant, has the incentive to lie.  Thus, unlike the witness in James, because Henry has serious incentives to lie, the threat of a perjury charge that would keep an uninterested witness from lying is simply not an adequate deterrent.

Second, unlike the witness in James, Henry and Baslan have had ample time to prepare for their direct testimony.  Based on the representations by defense counsel throughout the course of these proceedings, the government anticipates that Baslan and Henry will be raising a joint defense at trial and have in fact been meeting regularly to prepare their defense.  In addition, Henry's legal fees have been paid in part, if not in full, by Baslan.  Accordingly, the James Court's concern that a witness—even a friendly one—might unknowingly make a statement in tension with tainted evidence is not applicable here.

Third, the James Court's concern that permitting the use of illegally obtained evidence to impeach all defense witnesses would significantly weaken the exclusionary rule's deterrent effect by increasing the ways in which the government could use evidence is not present here.  In permitting the use of illegally obtained evidence to impeach a testifying defendant, the Ventris Court concluded that the deterrent effect of the exclusionary rule would not be weakened because an investigator would have to anticipate that the defendant

48

would choose to testify at trial <u>and</u> would testify inconsistently despite the admissibility of

his prior statement for impeachment.  <u>Id.</u> (emphasis in Ventris).  The <u>Ventris</u> Court rejected

the argument that this "'speculative possibility can trump the costs of allowing perjurious

statements to go unchallenged" and that this scenario was "[n]ot likely to happen – or at least

not likely enough to risk squandering the opportunity of using a properly obtained statement

for the prosecution's case in chief."  <u>Id.</u>   Because the same rationale should apply to co-

defendants, the government submits that the exclusionary rule's deterrent effect would not be

weakened in any appreciable amount by impeaching Baslan if co-defendant Henry testifies at

trial.

     Finally, and most importantly, as Judge Korman noted in <u>United States v.</u>

<u>Trzaska</u>, 885 F. Supp. 46 (1995), *reversed on other grounds*, <u>United States v. Trzaska</u>, 111

F.3d 1019 (2d Cir. 1997),[9] the <u>James</u> Court's concern that permitting impeachment of all

defense witnesses would significantly undermine the deterrent effect of the exclusionary rule

is not a significant concern when the prosecution uses the illegally seized evidence to

---

    [9] In <u>Trzaska</u>, Judge Korman permitted the government to impeach a non-testifying
defendant with the defendant's illegally obtained inculpatory admissions pursuant to Rule
806 after the defendant called his son as a witness and the son testified on direct examination
as to the defendant's false exculpatory hearsay statements.  The Second Circuit reversed the
conviction and ordered a new trial finding that Judge Korman erred in permitting the
introduction of the defendant's incriminating statements to impeach the defendant pursuant
to Rule 806 because the defendant's out-court-statements were not inconsistent.  In reversing
on that ground, the Circuit expressly recognized that it did not have to decide the open
question whether in light of the Supreme Court's holding in <u>James</u> that a defense witness
(other than the defendant) may not be impeached by illegally acquired evidence, illegally
acquired evidence can be used to impeach a defendant when a hearsay statement of the
defendant comes in through a defense witness.  <u>See</u> <u>Trzaska,</u> 111 F.3d at 1025-26 (citing
Rule 806).

impeach a defendant who attempts to offer his out-of-court statement through either a co-defendant or a defense witness:

> Because illegally seized evidence can already be used to impeach the in-court testimony of a defendant, allowing its use to impeach an out-of-court statement by the defendant does not provide an additional incentive for law enforcement officers to obtain evidence illegally.

Id. at 50.

Here, Baslan has demonstrated the great lengths he will go in order to escape the consequences of his actions, including perjuring himself and recruiting others to destroy evidence and file false affidavits with the Court. The government is concerned that, given this conduct, Baslan will not hesitate to attempt to commit perjury by proxy by eliciting from Henry or a defense witness a false exculpatory statement (e.g., "Baslan told me that he was producing a documentary"). Indeed, as Judge Korman noted in Trzaska, when a defendant tries to introduce his out-of-court statement into evidence at trial through a defense witness, the defendant is the real witness and his credibility should in fairness be subject to impeachment. While noting the James Court's warning that "the inadmissibility of illegally obtained evidence must remain the rule and not the exception," the government agrees with Judge Korman and submits that the protections of the exclusionary rule must give way to the truth-seeking function of the trial if Baslan attempts to offer his own false exculpatory statements through either his co-defendant or a defense witness. Accordingly, the government submits that should co-defendant Kristen Henry or a defense witness testify as to a false exculpatory statement purportedly made by Baslan, the government should be permitted, pursuant to Rule 806, to impeach Baslan and introduce his recorded admissions to

CS2 which indicate that the documentary idea is a recent fabrication he came up with post-indictment.   Otherwise, Baslan will be able to commit perjury by proxy.

II.    BASLAN'S CONFESSION WAS KNOWING AND VOLUNTARY

   Following a hearing, the Court should deny Baslan's motion to suppress his post-arrest statement because his waiver of his Miranda rights was knowing and voluntary and his statement was made without coercion.

   As is clear from Baslan's "Affidavit in Support of Motion to Suppress Statements" ("Baslan Second Aff."), Baslan does not contest that he was informed of his Miranda rights or that he knowingly and voluntarily waived his rights.   Specifically, Baslan admits:

> Although an agent was reciting from a form that I had the right to remain silent and, the right to consult an attorney and other passages about my rights, I was not paying much attention to what he was saying.  My thoughts were focused [on] my girlfriend Kristen, and I was concerned for her.

Baslan Second Aff. ¶ 6.  Baslan also admits that immediately after having been informed of his Miranda rights, he began speaking to agents:

> When I began to explain to the agents that they had the wrong idea about what was supposed to happen to happen in the hotel that evening, Agent Spivack and some of the other agents threatened me that if I refused to confess that I was going to sexually abuse [CI 1's] niece and young sons, they would expose me as a child molester to my parents, who live in Russia, and would "leak" that accusation to the press.

Id. at ¶ 7.  As is clear from the above two paragraphs of the Affidavit, Baslan was both informed of his Miranda rights and made a knowing and voluntary waiver of those rights. Contrary to Baslan's claims, the agents made no statements to Baslan that overbore his voluntary consent to make statements.

A.    A Waiver of Miranda Rights Is Effective If Done Voluntarily

      A waiver of the Miranda rights is valid when: (1) "the defendant had a full awareness of the right being waived and of the consequence of waiving the right"; and (2) "the relinquishment of the defendant's rights was voluntary."  United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995).  The Supreme Court has held that with respect to whether a waiver of the right to remain silent was knowing and voluntary, "first, the relinquishment of the right must have been voluntary in that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  Morane v. Burbine, 475 U.S. 412, 421 (1986).  "Second, the waiver must have been made with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it."  Id.  Where the "totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension," a court may properly conclude that the Miranda rights have been waived.  Id.  Applying this two-pronged inquiry, the Supreme Court has held that a 16-year-old juvenile defendant's post-Miranda statement was knowingly and voluntarily made where the defendant had been advised of his Miranda rights, affirmed that he wanted to speak to the police, and then made a statement to the police.  Fare v. Michael C., 442 U.S. 707, 723-24  (1979) (holding that defendant's request to speak to probation officer did not constitute an invocation of the right to counsel).  In Michael C., the Court explained that in the case of a juvenile defendant, the "totality of the circumstances" inquiry includes "evaluation of the juvenile's age, education, background, and intelligence . . ."  Id.  In addition, courts in the Second Circuit consider the conduct of the police, language barriers, and the suspect's prior experience with the criminal justice system in determining whether there has been a valid waiver of Miranda rights.  See United States v. Anderson, 929

52

F.2d 96 (2d Cir. 1991) (suppressing defendant's post-arrest statement where agents falsely told defendant that he had to choose between having an attorney present during questioning or cooperating with the government); Campaneria v. Reid, 891 F.2d 1014, 1020 (2d Cir. 1989) (finding that defendant had knowingly voluntarily waived his Miranda rights by indicating that he understood his rights while questioned in the hospital, even though he was foreign-born, spoke in broken English, and occasionally lapsed into Spanish during the interrogation); United States v. Scarpa, 897 F.2d 63, 69 (2d Cir. 1990) (considering defendant's previous experience with criminal justice system under the "totality of the circumstances" analysis).

To challenge the voluntariness of a confession, a defendant must allege misconduct by a state actor that "was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined."  Rogers v. Richmond, 365 U.S. 534, 544 (1961); see also Green v. Scully, 850 F.2d 894, 900 (2d Cir. 1988) ("Is the confession the product of an essentially free and unconstrained choice by its maker?").  "The factors to be considered include 'the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation.'"  United States v. Alvarado, 882 F.2d 645, 649 (2d Cir. 1989)  (quoting United States v. Mast, 735 F.2d 745, 749 (2d Cir. 1984)), *overruled on other grounds by* Bailey v. United States, 516 U.S. 137 (1995).  To find a defendant's post-Miranda statement involuntary on account of improper police conduct, the Supreme Court and the Second Circuit have required "traces of [] brutality, psychological duress, threats, [or] unduly prolonged interrogation."  United States v. Moore, 670 F.3d 222, 233 (2d Cir. 2012) (citing United States v. Verdugo, 617 F.3d 565, 575-76 (1st Cir. 2010)); see also Colorado v. Connelly, 479 U.S. 157, 167 (1986) (only admissions procured by

coercive police tactics are to be excluded as involuntary); Greenwald v. Wisconsin, 390 U.S. 519 (1968) (confession involuntary where defendant interrogated for over 18 hours without food, sleep, or necessary medication); Beecher v. Alabama, 389 U.S. 35 (1967) (confession coerced where police held gun to defendant's head and interrogated him while he was in the hospital and under the influence of morphine).

 In evaluating the voluntariness of a statement, "[t]he fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative."  Oregon v. Elstad, 470 U.S. 298, 312 (1985); see also North Carolina v. Butler, 441 U.S. 369, 373 (1979) ("[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver).  In addition, a "necessary predicate to the finding that a confession is not 'voluntary'" is "coercive police activity."  Colorado, 479 U.S. at 167.   "A valid waiver can be inferred 'from the actions and words of the person interrogated,'" and the Second Circuit has held that a Miranda waiver was voluntary where the suspect "did not claim to misunderstand the warnings" and answered all questions addressed to her.  United States v. Silva, 715 F.2d 43, 49 (2d Cir. 1983) (quoting Butler, 441 U.S. at 373), *abrogated on different grounds by* United States v. FNU LNU, 653 F.3d 144, 151 (2d Cir. 2011).

 A waiver is not made involuntary merely because law enforcement tells a defendant the potential penalties they face or the possible benefits of cooperation.  See United States v. Alvarado, 882 F.2d 645, 649 (2d Cir. 1989) (statements not involuntary where agent told the defendant that "if she does not cooperate she is going to get ten years, just like Scoobie"); United States v. Pomares, 499 F.2d 1220, 1222 (2d Cir. 1974) ("[i]t was quite proper . . . to mention the situation which Pomares faced," including informing the

54

defendant he faced heavy penalties for drug smuggling); Green v. Scully, 850 F.2d 894, 903–

04 (2d Cir. 1988) (police officials' references to the electric chair, while improper, did not

render a confession involuntary); United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995)

("Certainly, statements to the effect that it would be to a suspect's benefit to cooperate are

not improperly coercive.").

      B.     Baslan Knowingly and Voluntarily Waived His Miranda Rights

          Following a hearing, the record will be clear that Baslan knowingly and

voluntarily waived his Miranda rights.  Baslan does not dispute that Agent Spivack read

Baslan his Miranda rights, and in spite of Baslan's allegations to the contrary, it is clear from

Baslan's affidavit that he both heard and understood those rights.  See Baslan Second Aff. ¶

6 ("[A]n agent was reciting form a form that I had the right to remain silent, the right to

consult an attorney, and other passages about my rights . . .").  Baslan's claims that Agent

Spivack then "threatened that Kristen and [Baslan] would be locked up for 30 years unless

[he] confessed," told him that "if [he] waited to seek advice it would be too late for [him] to

help [himself]" and threatened to tell his parents that he was a child molester are false and

the government will establish that at a hearing.

III.     THERE IS NO BASIS TO SUPPRESS THE EVIDENCE SEIZED FROM
        BASLAN'S APARTMENT AND BACKPACK BECAUSE BOTH SEARCHES
        WERE CONDUCTED PURSUANT TO VALID WARRANTS

          Baslan also argues that all evidence obtained from the searches of his cell

phone and computer should be suppressed as fruit of the poisonous tree because Baslan's

consent to search these items was involuntary insofar as his consent was only given during

his post-arrest statement, which Baslan contends was illegally obtained.  The Court should

deny this portion of Baslan's motion because the agents did not perform any consent

searches, apart from searching for two phone numbers in Baslan's cellular telephone at his own request so that he could contact potential sureties.

   The searches of Baslan's apartment and all items found in his possession when he was arrested were conducted pursuant to valid search warrants. The search warrant for Baslan's apartment (including all devices capable of storing child pornography) had been issued before Baslan was arrested. Thus, nothing Baslan said during interrogation had any effect on the validity of that warrant. Furthermore, for the reasons discussed above, Baslan's statements were voluntary and were not the product of coercion.

   In addition, even if agents had performed a search based on Baslan's consent, the evidence on these devices would inevitably have been discovered by virtue of the search warrants.[10]  Under the inevitable discovery doctrine, "evidence that was illegally obtained will not be suppressed 'if the government can prove that the evidence would have been obtained inevitably' if there had been no statutory or constitutional violation." United States v. Roberts, 852 F.2d 671, 675-76 (2d Cir. 1988) (quoting Nix v. Williams, 467 U.S. 431, 447 (1984)); see also United States v. Heath, 455 F.3d 52, 55 (2d Cir. 2006) ("Would the disputed evidence inevitably have been found 'but for' the constitutional violation?  If the answer is 'yes,' the evidence seized will not be excluded.").  Deciding whether the inevitable discovery doctrine applies "requires the district court to determine, viewing affairs as they existed the instant before the unlawful search, what would have happened if the unlawful search never occurred." United States v. Eng, 971 F.2d 854, 861 (2d Cir. 1992) (emphasis in

---

[10] In addition, it bears noting that Baslan did not provide any password for the Apricorn hard drive in his apartment that contained the 74,000 images and 2,000 videos containing child pornography.  The FBI decrypted that drive to discover the contraband.

original).  Thus, courts have upheld the admission of evidence obtained during an illegal

search where the evidence would inevitably have been obtained pursuant to a search warrant.

United States v. Whitehorn, 829 F.2d 1223, 1230 (2d Cir. 1987); see also United States v.

Donaldson, No. 04:10-CR-047-01-HLM, 2011 WL 1597685, at *9 (N.D. Ga. April 26, 2011)

(finding that government would inevitably have discovered information on defendant's

computer where defendant first provided password—allegedly under coercion—and law

enforcement subsequently received a search warrant).

       Here, all of the electronic items were searched pursuant to valid search

warrants, one of which had been obtained before the defendant was arrested.  With respect to

the search of the laptop that Baslan had in his possession when he was arrested, the only

thing agents did with the password Baslan provided was to quickly confirm whether the

laptop was encrypted to determine whether to keep it powered on.  Upon determining that the

laptop did not appear to be encrypted, the agents turned it off, and did not search the laptop

until they obtained a search warrant.[11]  Baslan's allegation that the agents conducted a full

search of Baslan's laptop prior to obtaining a search warrant is incorrect, as is his allegation

that agents searched his "home computer" before obtaining a search warrant. With respect to

the home computer, the agents had a search warrant based on probable cause that existed

before Baslan made any statements as the warrant was issued before Baslan's arrest. With

respect to the laptop, the agents did not search the laptop until obtaining a search warrant,

---

[11] Law enforcement is entitled to take steps to secure evidence from potential
destruction.  See Segura v. United States, 468 U.S. 796, 811-12 (1984) ("We hold, therefore,
that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal
of evidence while a search warrant is being sought is not itself an unreasonable seizure of
either the dwelling or its contents.").

and the warrant was based on the same probable cause as the warrant for Baslan's home computer. There is, therefore, no basis to suppress the fruits of either of these searches.

IV.    ADMISSION OF KRISTEN HENRY'S REDACTED STATEMENTS
       AT A JOINT TRIAL DOES NOT VIOLATE BRUTON

Next, Baslan argues that Kristen Henry's inculpatory post-arrest statements should not be admitted in a joint trial. While he acknowledges that <u>Bruton v. United States</u>, 391 U.S. 123 (1968), authorizes the admission of one co-defendant's statements at a joint trial if the statements are redacted of specific references to other co-defendants, Baslan claims that no redaction would be sufficient because Henry's confession would obviously implicate Baslan. However, neither <u>Bruton</u> nor its progeny prevent the admission of a redacted statement, subject to a limiting instruction that it is admitted only to show Henry's guilt.

A.    Bruton Only Prohibits Statements Directly Referencing a Co-Defendant

It has long been held that the law "almost invariabl[y] assum[es]" that jurors follow instructions limiting evidence so that it is considered as to the guilt or innocence of only one defendant at a joint trial. <u>Richardson v. Marsh</u>, 481 U.S. 200, 206 (1987) (collecting cases). In <u>Bruton</u>, the Supreme Court established an exception to this assumption to protect a defendant's rights under the Confrontation Clause in a joint trial. The Court held that, where a non-testifying defendant's confession specifically inculpates a co-defendant, "the risk that the jury will not, or cannot, follow instructions" to limit its consideration of the evidence only as against the declarant "is so great and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." <u>Bruton</u>, 391 U.S. at 135. In <u>Richardson v. Marsh</u>, the Supreme Court

clarified that "the Confrontation Clause is not violated by the admission of a nontestifying

codefendant's confession with a proper limiting instruction when . . . the confession is

redacted to eliminate not only the defendant's name, but any reference to his or her

existence."  481 U.S. at 211.  Following Richardson, the Second Circuit has held that the

Confrontation Clause is satisfied by the replacement of a co-defendant's name with a neutral

pronoun.  United States v. Tutino, 883 F.2d 1125, 1135 (2d Cir. 1989); United States v.

Yousef, 327 F.3d 56, 149 (2d Cir. 2003); United States v. Kyles, 40 F.3d 519, 526 (2d Cir.

1994); United States v. Williams, 936 F.2d 698, 701 (2d Cir. 1991); United States v. Benitez,

920 F.2d 1080, 1087 (2d Cir. 1990).

        To determine whether a redacted confession may be admitted, the Court

"examine[s] first whether [the] redacted confession indicated to the jury that the original

statement contained actual names and, second, whether the redacted confession, even if the

very first item introduced at trial[,] would immediately inculpate [the non-declarant

defendant] in the crime."  United States v. Jass, 569 F.3d 47, 61 (2d Cir. 2009).  "The

appropriate analysis to be used when applying the Bruton rule requires that [the Court] view

the redacted confession in isolation from the other evidence introduced at trial."  United

States v. Williams, 936 F.2d 698, 700 (2d Cir. 1991).  "Under this holding, so long as the

confession standing alone is not incriminating, even if the confession taken together with

other evidence implicates the defendant, the confession may be admitted."  United States v.

Wimbley, 18 Fed. Appx 24, 28 (2d Cir. 2001).  For this reason, even confessions that clearly

implicate another defendant when all the evidence is considered are admissible.  See

Williams, 936 F.2d at 701 (no error in admitting confession even where "[t]he interlocking of

the confessions thus all but insured that a jury could identify the person referred to in [the declarant's] confession as [the non-declarant defendant.]).

      B.     <u>Redacted Statements Comply with Bruton's Requirements</u>

Following her arrest, Kristen Henry made two distinct statements, an oral and written statement.  Both statements can be redacted to comply with <u>Bruton</u>.

The government suggests that Henry's oral statement can be offered with the following changes:

| <u>Original Statement</u> | <u>Suggested Altercation</u> |
|---|---|
| She and Baslan came to the hotel to meet the children CS 1 was bringing | Henry and another person came to the hotel to meet the children CS 1 was bringing |
| She and Baslan were visiting CS 1 because Henry was supposed to have her picture taken with a nude or semi-nude seven-year-old girl | Henry and someone else were visiting [CS 1] because Henry was supposed to have her picture taken with a nude or semi-nude seven-year-old girl |
| CS 1 called Baslan and asked Baslan to buy Benadryl and Baslan asked Henry to buy the Benadryl | Someone asked Henry to buy the Benadryl |
| She has viewed child pornography with Baslan at least two times | She viewed child pornography with someone else at least two times |
| Henry expressed this interest [in child pornography] to Baslan, who told Henry that it was ok | Henry expressed this interest [in child pornography] to someone else, who told Henry that it was ok |
| Henry stated that she asked Baslan to download child pornography. | Henry stated that she asked someone else to download child pornography. |

The government suggests that Henry's written statement can be altered to read as follows:

> I Kristen N Henry, date of birth, 1987 developed an interest in viewing child pornography several months ago.  I expressed this interest to [someone else], who wanted to explore child pornography when I asked him to.

[We] downloaded child pornography together on at least 2 occasions. [We] masturbated to child pornography downloaded from the internet.

On March 19, 2013, I traveled to NJ (Jersey City) with [that person] to take photos with an approximately 2 month old boy and 7 year old girl. I heard [CS 1] asked over the phone that I purchase Benadryl to administer to the girl so that she would stay asleep and not be traumatized.

At no time did I myself or did I witness [that other person] molest any children. During the visit to the hotel, it was possible that I would be photographed with a nude or semi-nude 7 year old girl and with my face near the penis of the 2 month old boy, simulating oral sex, at the request of [CS 1]. The hotel location was determined by [CS 1.]

Both of these proposed redactions comply with Bruton's requirements. They remove any direct references from Baslan, while still maintaining the completeness of the statements. They also preserve the potentially exculpatory facts that Henry indicated that no children were molested and that CS 1 was the driving force behind the trip to New Jersey. Taken in isolation, neither statement would "immediately inculpate" Baslan. Jass, 569 F.3d at 61. Indeed, in many instances the redactions make it possible that Henry is referring to CS 1. The redacted statements should, therefore, be admitted at a joint trial subject to an appropriate limiting instruction. See Williams, 936 F.2d at 699, 701 (affirming admission of redacted statement that "interlocked" with defendant's confession, even though "the jury could easily have concluded that [the non-declarant defendant] was the other 'guy' referred to in [declarant's] confession"); United States v. Wimbley, 18 Fed. Appx. 24, 27 (2d Cir. 2001) (admission of plea proper where it referred to "another person" being involved in conspiracy and the non-declarant defendant was the only other person named in the indictment); United States v. Brown, 374 Fed. Appx. 208, 210-11 (2d Cir. 2010) (admission

of confessions were proper even where the revised statements were "stilted by the removal of so many appellations and the substitution of generic references" because the "redacted statements . . . did not immediately inculpate" the defendant).

V.    BASLAN IS NOT ENTITLED TO A BILL OF PARTICULARS IDENTIFYING THE EVIDENCE THE GOVERNMENT INTENDS TO USE AT TRIAL

Baslan also seeks a bill of particulars "specifying which computer digital and hard copy images and text it intends to use at trial." (Baslan Mot. at 22.)  However, as set forth below, the government has provided sufficient information for Baslan to understand the charges against him.  A defendant is not entitled to a bill of particulars because he wishes to know "the manner in which [the government] will prove the charges or preview its evidence or legal theory." United States v. Facciolo, 753 F. Supp. 449, 451 (S.D.N.Y. 1990), aff'd, 968 F.2d 242 (2d Cir. 1992).  As a result, Baslan's request should be denied.

A.    A Bill of Particulars Is Not an Evidentiary Tool

Federal Rule of Criminal Procedure 7(f) provides that "[t]he court may direct the government to file a bill of particulars."  However, a bill of particulars "is not a discovery tool and is not intended to allow a defendant a preview of the evidence." United States v. Volpe, 42 F. Supp. 2d 204, 224 (E.D.N.Y. 1999); see also United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990)("Acquisition of evidentiary detail is not the function of the bill of particulars.").  As explained in United States v. Taylor, 707 F. Supp. 696, 699 (S.D.N.Y. 1989), "the question is not whether the information sought is useful to the defendant, but instead whether it is necessary to the defense." See also United States v. Matos-Peralta, 691 F. Supp. 780, 791 (S.D.N.Y. 1988) (same); United States v. Guerrerio, 670 F. Supp. 1215, 1224 (S.D.N.Y. 1987)(same).

Thus, "[a] bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." United States v. Chen, 378 F.3d 151, 163 (2d Cir.), cert. denied, 543 U.S. 994 (2004) (citations and quotation marks omitted). The Second Circuit has repeatedly held that if a defendant has received adequate notice of the charges against him in the indictment or in some other pretrial disclosure, a bill of particulars is not necessary. See United States v. Ojeda, 412 Fed. Appx. 410, 411 (2d Cir. 2011) ("a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means"); see also United States v. Salazar, 485 F.2d 1272, 1277 (2d Cir. 1973) (finding sufficient "indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms"). Moreover, "a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." See Chen, 378 F.3d at 163.

B.    Baslan Is Not Entitled to a Bill of Particulars

Baslan premises his request for a bill of particulars on United States v. Bortnovsky, 820 F.2d 572 (2d Cir. 1987), in which the Second Circuit held that a district court abused its direction by denying the defendant's request for a bill of particulars. In Bortnovsky, the defendant was charged with mail fraud for submitting "false claims for burglary losses" and "false claims for fire damage" to insurers. Id. at 574. However, while the indictment provided a list of mailings alleged to be fraudulent, it did not "specify the staged burglaries or enumerate which of numerous documents were falsified." Id. Following indictment, the defendant's request for a bill of particulars was denied. At trial, the government introduced evidence regarding twelve burglaries, but then contended that

only four were fabricated.  The government also introduced "numerous documents regarding these twelve burglaries" although only three of the documents were alleged to be false.  Id.

In determining that the district court had erred in denying the defense request for a bill of particulars, the Second Circuit held that the defendants "were hindered in preparing their defense" because the government had not revealed "the dates of the fake burglaries and the identity of the three fraudulent documents."  Id.  As a result, the defendants were "forced to explain events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges pending."  Id. at 574-75.  The court noted that the government "did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged."  Id. at 575.  In short, the court found that a bill of particulars was necessary in Bortnovsky because that information "was vital to [the defendants'] understanding of the charges pending."  Id.  The same situation does not obtain here.

Unlike in Bortnovsky, the defendant here does not claim that he fails to understand the charges against him, nor could he given the detailed charges set forth in the complaint in the matter, which over its 22 pages describes in detail the criminal acts that the defendant is accused of committing.  The defendant has also received multiple search warrant affidavits describing the alleged acts and the recorded conversations that form the backbone of the government's case.  A bill of particulars is unnecessary given this discovery. See Chen, 378 F.3d at 163 ("a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means"); United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999) (same); United States v. Panza, 750 F.2d

1141, 1148 (2d Cir. 1984) (court may consider information provided during discovery when considering the need for a bill of particulars); United States v. Canty, 971 F. Supp. 687, 690 (N.D.N.Y. 1997) ("the Indictment, coupled with the discovery information the government has thus far provided to defendants, sufficiently apprises [the defendants] of the crime charged and the general outline of the government's case against them making defendants' request for a bill of particulars unnecessary.").

Moreover, the defendant does not even claim that he does not understand the charges against him, but instead indicates that he wants to know the "evidence [the government] will seek to put into play at the trial."  (Baslan Mot. at 22.)  This is not a proper basis to request a bill of particulars.  Courts have consistently rejected defendants' requests for bills of particulars where they are merely attempts to force the government to "particularize its evidence." United States v. Cephas, 937 F.2d 816, 823 (2d Cir. 1991).  A defendant is not entitled to compel the government "through a bill of particulars to disclose the manner in which it will prove the charges or preview its evidence or legal theory." United States v. Facciolo, 753 F. Supp. 449, 451 (S.D.N.Y. 1990), aff'd, 968 F.2d 242 (2d Cir. 1992); see also United States v. Mitlof, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001); United States v. Tripp, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) ("demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied").  As succinctly stated by Judge Spatt, a bill of particulars is not "a device to give the defense a road map to the government's case."  See United States v. Heil, No. 06 CR 00749 (ADS), 2007 WL 4125124, at *3 (E.D.N.Y. Nov. 16, 2007) (citing United States v. Pignard, No. 06 Cr. 718(CM), 2007 WL 431863, at *25

(S.D.N.Y. Feb. 6, 2007)).  For these reasons, the defendant's request for a bill of particulars should be denied.

VI.    UNDERLINE[EVIDENCE OF BASLAN'S POSSESSION OF CHILD PORNOGRAPHY SHOULD BE ADMITTED]

Baslan also asks that the Court exclude from trial the child pornography images and videos that were found on his computer.  Baslan argues that the evidence of Baslan's possession of massive quantities of hardcore child pornography has no probative value and that the images are too prejudicial.  However, while Baslan claims that "there will be no contested issue as to the possession of child pornographic images in Baslan's computer," Baslan remains charged with possession of child pornography, and the government should be allowed to admit evidence to prove this charged crime.  In addition, even absent a charge of possession of child pornography, the child pornography evidence would be admissible under Federal Rules of Evidence 404(b) and 414 to show Baslan's intent to commit the other charged offenses.

As an initial matter, the government will not seek publication of all 74,000 images and 2,000 videos containing child pornography, but will instead select a representative subset of fewer than 50 images and videos in advance of trial.  The government will provide these selected images and videos to the Court, so that it may review them prior to trial.  See United States v. Cunningham, 694 F.3d 372, 286-87 (3rd Cir. 2012) (finding that district court abused its discretion in not reviewing child pornography videos before performing Rule 403 balancing test and indicating that "speaking generally, a district court should personally examine challenged evidence before deciding to admit it under Rule

66

403").  The admission of a subset of images and videos is appropriate given the highly probative nature of this evidence, which outweighs the risk of unfair prejudice.

    A.    <u>The Government Should Be Allowed to Present Direct Evidence of a Charged Crime</u>

        Baslan is charged in Count Five of the indictment with possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).  Baslan claims that there will "be no contested issue as to the possession of child pornographic images."  (Baslan Mot. at 22.)  However, Baslan declines to indicate why that issue will be uncontested and, regardless, the government is required to prove each element of the offense beyond a reasonable doubt.  By far the best evidence of Baslan's possession of child pornography is the child pornography that he possessed.

        As the Supreme Court has explained, a defendant's offer "to concede a point generally cannot prevail over the government's choice to offer evidence showing guilt and all the circumstances surrounding the offense."  <u>Old Chief v. United States</u>, 519 U.S. 172, 183 (1997).  Rather, the government "is entitled to prove its case by evidence of its own choice," and "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the government chooses to present it."  <u>Id</u>. at 186-87.  As the Court said:

> In sum, the accepted rule that the prosecution is entitled to prove
> its case free from any defendant's option to stipulate the
> evidence away rests on good sense.  A syllogism is not a story,
> and a naked proposition in a courtroom may be no match for the
> robust evidence that would be used to prove it.  People who hear
> a story interrupted by gaps of abstraction may be puzzled at the
> missing chapters, and jurors asked to rest a momentous decision
> on the story's truth can feel put upon at being asked to take
> responsibility knowing that more could be said than they have
> heard.  A convincing tale can be told with economy, but when

> economy becomes a break in the natural sequence of narrative
> evidence, an assurance that the missing link is really there is
> never more than second best.

Id. at 187-89.  Far from seeking to shield the jury from the very evidence upon which it must

rest its decision, the law recognizes that the government must be permitted to tell its story in

a manner that will meet the jurors' expectations:

> This persuasive power of the concrete and particular is often
> essential to the capacity of jurors to satisfy the obligations that
> the law places on them.  Jury duty is usually unsought and
> sometimes resisted, and it may be difficult for one juror
> suddenly to face the findings that can send another human being
> to prison, as it is for another to hold out conscientiously for
> acquittal.  When a juror's duty does seem hard, the evidentiary
> account of what a defendant has thought and done can
> accomplish what no set of abstract statements ever could, not
> just to prove a fact but to establish its human significance, and
> so to implicate the law's moral underpinnings and a juror's
> obligation to sit in judgment.  Thus, the prosecution may fairly
> seek to place its evidence before the jurors, as much to tell a
> story of guiltiness as to support an inference of guilt, to
> convince the jurors that a guilty verdict would be morally
> reasonable as much as to point to the discrete elements of a
> defendant's legal fault. [citation omitted]

> But there is something even more to the prosecution's interest in
> resisting efforts to replace the evidence of its choice with
> admissions and stipulations, for beyond the power of
> conventional evidence to support allegations and give life to the
> moral underpinnings of law's claims, there lies the need for
> evidence in all its particularity to satisfy the jurors' expectations
> about what proper proof should be.  Some such demands they
> bring with them to the courthouse, assuming, for example, that a
> charge of using a firearm to commit an offense will be proven
> by introducing a gun in evidence.  A prosecutor who fails to
> produce one, or some good reason for his failure, has something
> to be concerned about.

Id. at 187-89.  For precisely the reasons outlined by the Supreme Court, the jury should be

allowed to see for themselves evidence of Baslan's possession of child pornography.

In addition, the child pornography is direct evidence of the other charged crimes.  As indicated, a significant portion of the government's evidence of Baslan's intent to sexually abuse children will come through recorded audio and video involving conversations between Baslan and CS 1.  The government expects that Baslan will argue at trial that he did not mean what he said when he talked in about sexually abusing children and created a detailed plan so that he could have access to children he could sexually abuse.  During Baslan's recorded conversations, he also discussed downloading child pornography and storing it in an encrypted manner.  The evidence that the government found child pornography stored on an encrypted hard drive is direct evidence that Baslan was telling CS 1 the truth and is highly probative of the fact that Baslan was also telling the truth when he talked about his plans to sexually abuse children.  The government should be allowed to present the child pornography to establish the charged crimes.

> **B.**    The Child Pornography Is Admissible Under Rule 414 to Show Baslan's Propensity to Sexually Abuse a Child

Even if Baslan were not charged with possessing child pornography, his possession of explicit sexual material involving children would be admissible pursuant to Federal Rule of Evidence 414.  Rule 414 ("Similar Crimes in Child-Molestation Cases") provides, in pertinent part:

> In a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation. The evidence may be considered on any matter to which it is relevant.

The rule defines "child molestation" as, among other things, any "conduct prohibited by 18 U.S.C. chapter 110."  Fed. R. Evid. 414(d)(2)(B).  It also considers an attempt to commit the same conduct as a "child molestation."  Fed. R. Evid. 414(d)(2)(F).

Count One (Travel with Intent to Commit Aggravated Sexual Abuse of a Minor Less Than

12 Years of Age), Count Two (Conspiracy to Sexually Exploit a Child), Count Three (Sexual

Exploitation of a Child), and Count Five (Possession of Child Pornography) all consist of

conduct prohibited by 18 U.S.C. chapter 110.

Congress enacted Federal Rule of Evidence 414 (and analogous Rules 413 and

415) as part of the Violent Crime Control and Law Enforcement Act of 1994. Pub. L. No.

103-322, 108 Stat. 1796 (1994). These Rules are designed to "supersede in sex offense cases

the restrictive aspects of Federal Rule of Evidence 404(b)" and to create a presumption that

"evidence admissible pursuant to the proposed rules is typically relevant and probative, and

that its probative value is normally not outweighed by any risk of prejudice or other adverse

effects." 140 Cong. Rec. H8991-92 (1994) (remarks of principal House sponsor, Rep.

Molinari); see also 140 Cong. Rec. S12990; David J. Karp, Evidence of Propensity and

Probability in Sex Offense Cases and Other Cases, 70 Chi.-Kent. L. Rev. 15, 19 (1994). [12]

The legislative sponsors of Rules 413-415 further noted that:

> The reform effected by these rules is critical to the protection of
> the public . . . [a]nd is justified by the distinctive characteristics
> of the cases to which it applies. In child molestation cases, for
> example, a history of similar acts tends to be exceptionally
> probative because it shows an unusual disposition of the
> defendant -- a sexual or sado-sexual interest in children -- that
> simply does not exist in ordinary people.
>
> Moreover, such cases require reliance on child victims whose
> credibility can readily be attacked in the absence of substantial

---

[12] The principal sponsors of Rules 413-415 noted that an address delivered to the
Evidence Section of the Association of American Law Schools by David J. Karp—then
Senior Counsel at the Office of Policy Development at the Department of Justice and the
drafter of Rules 413-415—was to serve as an "authoritative" part of the Rules' legislative
history. See 140 Cong. Rec. 23,602 (1994); Johnson, 283 F.3d at 153-56.

> corroboration. In such cases, there is a compelling public
> interest in admitting all significant evidence that will shed some
> light on the credibility of the charge and any denial by the
> defense.
>
> Similarly, sexual assault cases, where adults are the victims,
> often turn on difficult credibility determinations . . . Knowledge
> that the defendant has committed rapes on other occasions is
> frequently critical in assessing the relative plausibility of these
> claims and accurately deciding cases that would otherwise
> become unresolvable swearing matches. The underlying
> legislative judgment is that the evidence admissible pursuant to
> [Rules 413–415] is typically relevant and probative, and that its
> probative value is normally not outweighed by any risk of
> prejudice or other adverse effects.

Id. (emphasis added)

In adopting these rules, Congress built upon a large body of precedent

favoring a permissive approach to similar crimes evidence in sex offense cases. Many

jurisdictions have recognized the need for special evidence rules to ensure fully informed

decisions by juries in cases involving sexually violent crimes or the sexual abuse of children.

Such jurisdictions have historically allowed such evidence through the adoption of special

"lustful disposition" rules. See Thomas J. Reed, Reading Gaol Revisited: Admission of

Uncharged Misconduct Evidence in Sex Offender Cases, 21 Am. J. Crim. L. 127, 188 (1993)

(characterizing 29 states as allowing propensity evidence in some category or categories of

sex offense cases). Other jurisdictions achieved similar results by interpreting standard

exception categories like those found in Rule 404(b) with unusual liberality in sex offense

cases. See, e.g., IA Wigmore's Evidence § 62.2, at 1334-35 (Tillers rev. 1983) (rule against

propensity evidence often not honored in sex offense cases). Furthermore, Congress

recognized and intended that this approach would make the admission of similar crimes

71

evidence in federal sex offense cases the norm, and its exclusion the exception. The

legislative sponsors noted:

> The practical effect of the new rules is to put evidence of
> uncharged offenses in sexual assault and child molestation cases
> on the same footing as other types of relevant evidence that are
> not subject to a special exclusionary rule. The presumption is in
> favor of admission. The underlying legislative judgment is that
> the evidence admissible pursuant to the proposed rules is
> typically relevant and probative, and that its probative value is
> normally not outweighed by any risk of prejudice or other
> adverse effects.
>
> In line with this judgment, the rules do not impose arbitrary or
> artificial restrictions on the admissibility of evidence. Evidence
> of offenses for which the defendant has not previously been
> prosecuted or convicted will be admissible, as well as evidence
> of prior convictions. No time limit is imposed on the uncharged
> offenses . . . as a practical matter, evidence of other sex offenses
> by the defendant is often probative and properly admitted,
> notwithstanding substantial lapses of time in relation to the
> charged offense or offenses.

140 Cong. Rec. H8992 (1994) (Statements of Rep. Molinari and Senator Dole) (emphasis

added); see also 137 Cong. Rec. S3212, S338-3242 (1991); Karp, 70 Chi.-Kent L. Rev. at 19.

Based on this Rule, courts have routinely admitted evidence of prior child

molestation offenses—including possession of child pornography—in cases involving child

molestation.  See United States v. Lewis, No. 07-3143, 2009 WL 377302 (D.C. Cir. Jan. 23

2009) (evidence that defendant possessed child pornography admissible in prosecution for

attempted coercion and enticement of a minor); United States v. Levy, 594 F. Supp. 2d 427,

440 (S.D.N.Y. 2009) (admitting evidence pursuant to Rule 414 and noting that the fact that

the defendant "had previously possessed child pornography was relevant to show his sexual

interest in children and his propensity or disposition of character to engage in sexual acts

involving children"); United States v. Majeroni, No. 2:13-cr-37-GZS, 2013 WL 4852317, at

72

*1-2* (D. Maine Sept. 10, 2013) (admitting prior conviction for possession of child pornography in case charging possession of child pornography);  see also United States v. Kelly, 510 F.3d 433 (4th Cir. 2007) (admission of prior attempted rape conviction of 12-year-old warranted in prosecution for traveling in interstate commerce for purpose of engaging in illicit sexual conduct even though prior offense occurred 22 years earlier); United States v. Guidry, 456 F.3d 493 (5th Cir. 2006) (admission of uncharged sexual assaults including forced oral copulation of woman admissible in trial of police officer charged with multiple sexual assaults against women); United States v. Seymour, 468 F.3d 378 (6th Cir. 2006) (defendant's uncharged prior sexual assaults against adult females admissible in case charging child molestation offenses); United States v. Lemay, 260 F.3d 1018, 1028 (9th Cir. 2001) (upholding admission of evidence of defendant's prior acts of molestation and conviction for child molestation 11 years before the charged conduct because such Rule 414 evidence serves to "corroborate testimony of the victims," and is "exactly the sort of use of prior acts evidence that Congress had in mind when enacting Rule 414.") (citing 140 Cong. Rec. H899192 (1994); United States v. Gabe, 237 F.3d 954 (8th Cir. 2001) (witness testimony that defendant had sexually abused victim 20 years prior to instant charge); United States v. Sioux, 362 F.3d 1241 (9th Cir. 2004) (district court properly admitted evidence of the defendant's prior act of sexually assaulting a minor victim in a child molestation case); United States v. Drewry, 365 F.3d 957, 957 (10th Cir. 2004) (testimony from victim regarding acts of child molestation that occurred 25 years earlier admissible where defendant charged with several counts of aggravated sexual abuse against minor), vacated on other grounds, 543 U.S. 1103 (2005); United States v. Breitweiser, 357 F.3d 1249 (11th Cir. 2004) (prior sexual conduct against minors admissible).

C.    <u>Baslan's Child Pornography Is Also Admissible Under Rule 404(b) to Show His Intent to Commit the Other Charged Crimes and the Absence of Mistake or Accident</u>

Baslan's possession of tens of thousands of images and videos containing child pornography is also admissible to show his intent to commit the other crimes charged, which involved attempts to actually sexually abuse children and to show the absence of mistake or accident.  Rule 404(b) provides that evidence of "other crimes, wrongs or acts" may not be admitted to prove bad character, but may be admissible for other purposes, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b).  The standards governing the admissibility of evidence under Rule 404(b) are well established:

> First, the district court must determine if the evidence is offered for a proper purpose, one other than to prove the defendant's bad character or criminal propensity.  If the evidence is offered for a proper purpose, the district court must next determine if the evidence is relevant to an issue in the case, and, if relevant, whether its probative value is substantially outweighed by the danger of unfair prejudice.  Finally, upon request, the district court must give an appropriate limiting instruction to the jury.

<u>United States v. Pitre</u>, 960 F.2d 1112, 1119 (2d Cir. 1992) (citation omitted); <u>see also</u> <u>Huddleston v. United States</u>, 485 U.S. 681, 685 (1988); <u>United States v. Tarricone</u>, 996 F.2d 1414, 1421 (2d Cir. 1993).

Although under Rule 404(b) evidence of other crimes or wrongs is "not admissible to prove the character of a person in order to show action in conformity therewith, [the Rule] . . . permits admission of such evidence for other purposes, such as to show knowledge or intent."  <u>United States v. Aminy</u>, 15 F.3d 258, 260 (2d Cir. 1994); <u>Huddleston</u>, 485 U.S. at 687-88.  The Second Circuit has long viewed Rule 404(b) as an inclusive rule

allowing "other acts" evidence if the evidence is offered to prove something other than

criminal propensity, is relevant to the crime for which the defendant stands trial and satisfies

the balancing test of Federal Rule of Evidence 403.  See, e.g., United States v. Carboni, 204

F.3d 39, 44 (2d Cir. 2000); United States v. Germosen, 139 F.3d 120, 127 (2d Cir. 1998).

       The Second Circuit has long acknowledged that "prior act evidence is

generally admissible to prove that the defendant acted with the state of mind necessary to

commit the offense charged."  United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir.1993).

Here, evidence that the defendant possessed child pornography is highly probative that he

acted with the necessary intent to violate 18 U.S.C. §§ 2241(c), 2251, and 2422(b), which

prohibit, respectively, traveling across state lines with the intent to engage in sexual acts with

a child under twelve years old, attempting or conspiring to sexually exploit a child, and

attempting to solicit or coerce a child to have illegal sexual relations.

       In United States v. Brand, 467 F.3d 179 (2d Cir. 2006), the Second Circuit

addressed almost precisely the same issue that the present case poses.  In Brand, the

defendant was charged with soliciting a minor to engage in illegal sexual conduct, in

violation of 18 U.S.C. § 2422(b), and traveling in interstate commerce to engage in an illegal

sexual act with a minor, in violation of 18 U.S.C. § 2423(b).  In that case, the defendant had

electronic chats and telephone conversations with individuals he believed to be minors, but

who were actually special agents with the FBI, in which he discussed sexual acts.  The

defendant was arrested after traveling to meet one of the minors.  After his arrest, the

defendant confessed to having received child pornography and the FBI subsequently seized

his computer and located child pornography on it.

In determining that the defendant's child pornography was admissible under Rule 404(b), the court reasoned that "the fact that Brand had images of child pornography on his computer made it 'more probable than it would be without the evidence' . . . that Brand's intent was to travel to New York to engage in illicit sexual activity and to attempt to entice a minor to engage in sexual activity." Id. at 197 (quoting Fed. R. Evid. 401). The court went on to note that "a direct connection exists between child pornography and pedophilia" that establishes the link between the images and the charged crimes. Id.  As a result, the court held that "under the 'inclusionary approach' that our Court has adopted, the district court did not abuse its discretion in holding that evidence that [the defendant] possessed child pornography was admissible under Rule 404(b) to show whether [the defendant's] intent in attempting to entice [a minor] and traveling across state lines to meet with her involved an intent to engage in sexual activity with a minor or, alternatively, for a more benign reason." Id. at 199 (internal citations omitted).

The current case presents the same issues and Brand counsels that it should have the same result.  The defendant's intent is likely to be a significant issue at trial and this evidence is highly probative on that point.  The evidence is also probative to rebut a defense that Baslan's conversations with CS 1 and travel to New Jersey was some accident or mistake.  The child pornography should be admitted under Rule 404(b) for those permitted bases.

D.    The Child Pornography Is Not Unfairly Prejudicial

Federal Rule of Evidence 403 provides that even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.  The Second Circuit has noted that "[b]ecause virtually all

evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be <u>unfair</u>." <u>Costantino v. Herzog</u>, 203 F.3d 164, 174 (2d Cir. 2000). While the massive quantities of child pornography present on Baslan's computer are certainly prejudicial, any <u>unfair</u> prejudice is mitigated by publication of only a subset of images.

As detailed above, the child pornography is highly probative in three ways. First, it is direct evidence of both the charged possession of child pornography offense and other offenses. Second, it is probative of Baslan's propensity to commit child molestation offenses, which is admissible evidence pursuant to Rule 414. Third, it is probative of that he intended to commit the charged offenses and that his actions were not the result of a mistake or accident.

The admission of a sample of child pornography has been approved by courts across the country time and again in the face of Rule 403 objections. <u>See</u>, <u>e.g.</u>, <u>United States v. Polizzi</u>, 564 F.3d 142, 153 (2nd Cir. 2009) (upholding admission of images and videos despite defendant's stipulation that they constituted child pornography); <u>United States v. Sewell</u>, 457 F.3d 841, 844 (8th Cir. 2006) (finding that district court abused its discretion in accepting defendant's offer to stipulate and forbidding the United States from publishing a representative sample of the images of child pornography to the jury); <u>United States v. Forrest</u>, 429 F.3d 73, 80 (4th Cir. 2005) (upholding district court's decision to admit evidence of child pornography in the face of a Rule 403 challenge); <u>United States v. McCourt</u>, 468 F.3d 1088, 1093 (8th Cir. 2006) (not unfairly prejudicial to show clips of videos despite defendant's stipulation that they contained child pornography); <u>United States v. Dodds</u>, 347 F.3d 893, 899 (11th Cir. 2003) (no abuse of discretion where trial court admitted 66 child pornography images); <u>United States v. Becht</u>, 267 F.3d 767 (8th Cir. 2001)

(affirming admission of 39 child pornography images even though defendant offered to stipulate to illegality of images); United States v. Hay, 231 F.3d 630, 639 (9th Cir. 2000) (allowing jury to view child pornography was not unduly prejudicial); United States v. Campos, 221 F.3d 1143, 1149 (10th Cir. 2000) (no abuse of discretion to publish pornographic materials to jury, despite defendant's offer to stipulate that images constituted child pornography); United States v. Zacherle, 2008 WL 5000145 (E.D. Wash. 2008) (permitting United States to show images despite offer of defendant to stipulate, because "[t]he government bears the burden of proving each element of the offense and publishing select images to the jury is the best method . . . for the government to prove its case."); United States v. Pabon-Cruz, 255 F.Supp.2d 200, 214 (S.D.N.Y. 2003) (child pornography images "legally and morally relevant" to conduct, despite proposed stipulation); United States v. Dean, 135 F.Supp.2d 207, 211 (D. Me. 2001) (admit 16 child pornography images despite defendant's stipulation that images were child pornography).

The admission of child pornography has also been approved over Rule 403 objections where it was admitted pursuant to Rule 414.   In Levy, a court in the Southern District of New York noted in admitting child pornography that "that much of this evidence was highly prejudicial. Many of the videos, for example, were immensely disturbing, as they showed young girls—some only six years old or even younger—being subjected to horrendous acts. But the evidence was not unfairly prejudicial, as this was conduct that [the defendant] chose to engage in, and this was evidence that showed, convincingly, that [the defendant] had a sexual interest in children and the intent and desire to commit the charged crimes."  Levy, 594 F. Supp. 2d at 440.

The child pornography evidence the government seeks to admit also does "not involve conduct more serious that the [other] charged crime[s]."  United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000).  Baslan is charged with attempting to sexually abuse three-month old, 18-month-old, and 8-year-old children.  The jury will be presented with recordings in which he describes in detail drugging children so that they can be sexually abused; in which he describes how one could have anal sex with a child, but not vaginal sex because vaginal sex would lead to tearing; in which he discusses having his co-defendant fellate a three-month-old baby.  The pictures and videos of other people sexually abusing children are simply no worse than the discussion Baslan himself had at length about sexually abusing children himself.  For those reasons, the child pornography evidence should be admissible at trial.

VII.    THE GOVERNMENT WILL PROVIDE DISCOVERY UNDER RULE 16 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

Baslan asks that the Court order the government to comply with Rule 16 of the Federal Rules of Criminal Procedure.  He also indicates that the defense needs to review the material that the government cannot provide to the defense due to the Adam Walsh Act.  See 18 U.S.C. § 3059(m) ("any property or material that constitutes child pornography . . . shall remain in the care, custody, and control of either the Government or the court").

The government is aware of its obligations under Rule 16, has heretofore complied with its obligations, and will continue to comply with that rule.  A court order is unnecessary.  As the defendant notes, "the government has turned over considerable Rule 16 materials."  (Baslan Mot. at 25.)  The government will review the material in its possession

and promptly disclose any additional materials that it is not prohibited from disclosing due to the Adam Walsh Act.

Regarding the materials that the government is prohibited from disclosing, which include the electronic evidence in the case, the government will make those items "reasonably available" to the defendant as required by the Adam Walsh Act. On May 9, 2013, the government first identified for the defendant the electronic evidence it has seized and which was available for the defendant's review. In a letter brief to the Court, dated June 21, 2013, the government set forth the procedure that had to be utilized for the defendant to review those materials. Specifically, the letter stated:

> The government has provided the defense with an itemized list of electronic evidence in its possession. If the defense indicates any item or items on the list and provides hard drives of equal size, the government will make a forensic copy of the evidence onto those hard drives. The government will then arrange for the defendant and his attorney to view the evidence at the government's proffer rooms during business hours. Following any review, the government will maintain possession of the hard drives and any computer used to review the hard drives. At the conclusion of the case or at whatever time requested by the defendant, the government will erase the hard drives provided by the defense and the computer used to view the evidence and return them to the defense.

This is the same procedure used in other child pornography in this district and around the country.

On March 11, 2014, defense counsel indicated that he would like to set up a time to review the Adam Walsh Act material. The government indicated that it would be happy to do so and asked the defendant to specify what items he wished to review. The defendant did not designate any particular items. By letter dated April 18, 2014, the government again identified electronic evidence in its possession and reiterated the

80

procedures through which the defendant could review that evidence. In addition, the government indicated that to expedite the defendant's review "the government [could] make a copy of any of the [electronic] evidence which has been processed by forensic software available" to defense counsel or a defense expert, without the need for it to be copied onto other hard drives. This unusual accommodation will allow the defense to review the electronic material using the same tools employed by the government, so that they can narrow the list of items they sought to focus on. The government has not received a response to this offer. The government will continue to work with the defense counsel to facilitate the defense's review of the electronic evidence and a court order to that effect is simply unnecessary given the good faith the government has already shown.

VIII.    THE GOVERNMENT WILL DISCLOSE BRADY INFORMATION, BUT THE COURT SHOULD NOT ORDER EARLY DISCLOSURE OF GIGLIO INFORMATION

Baslan requests that the Court direct the government to disclose material "favorable to the accused" pursuant to Brady v. Maryland, 373 U.S. 83 (1963). Baslan also asks that the Court order the immediate disclosure of impeachment material, which the government is required to provide in advance of trial, pursuant to Giglio v. United States, 405 U.S. 150 (1972). The Court should deny Baslan's request. The government needs no order from the Court in order to produce Brady material, and the early disclosure of Giglio material is both unnecessary under the law and inappropriate given the defendant's numerous attempts to obstruct justice.

Pursuant to Brady, the government must disclose material exculpatory evidence known to the government. It is the policy of the Department of Justice to make disclosures of Brady material even beyond that which is constitutionally required. See

81

United States Attorney's Manual, Section 9-5.001, available at http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/5mcrm.htm.  Pursuant to this policy, exculpatory information must be made "reasonably promptly after it was discovered."  Id.  In line with this policy and its constitutional requirements, the government will provide the defense with any exculpatory information as soon as practicable after the government learns of it.  The Court need not order the government to comply with the Constitution or Department of Justice policies.

                    With respect to impeachment information, the government fully acknowledges that the Court has "the discretion to order Brady/Giglio disclosure at any time as a matter of sound case management."  United States v. Saliba, No. 08–CR–792, 2010 WL 680986, at *4 (E.D.N.Y. Feb. 24, 2010).  However, here the need to prevent further obstruction of justice counsels against the disclosure of Giglio material far in advance of trial.  The government, therefore, asks that it be ordered to disclose impeachment information no earlier than one week before trial.

                    The Supreme Court in United States v. Nixon, 418 U.S. 683, 701 (1974), specifically addressed the appropriate timing of disclosure for impeachment material, and observed that "[g]enerally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."  Numerous cases have reached this same conclusion.  See, e.g., United States v. Martinez-Perez, 941 F.2d 295, 301 (5th Cir. 1991) ("Giglio violation does not occur when the matter was disclosed to the defense before the end of the trial"); United States v. Presser, 844 F.2d 1275, 1283 (6th Cir. 1988) (Giglio does not require pretrial disclosure of impeachment material that is not exculpatory); United States v. Yu, 1998 WL 57079, at *5 (E.D.N.Y. 1998) ("Brady material of an impeachment nature,

commonly referred to as <u>Giglio</u> material, is not required to be produced before trial."); <u>United States v. Velasquez</u>, 1997 WL 414132, at *6 (S.D.N.Y. 1997) (same); <u>United States v. Perez</u>, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same); <u>United States v. Taveras</u>, 1995 WL 390167, at *11 (S.D.N.Y. 1995) (same).

Here, there is good cause not to order early production of <u>Giglio</u> material. During his incarceration, the defendant has already engaged in several schemes to destroy evidence and falsely impugn a government witness. As indicated above, the government has already learned that Baslan planned to have friends file false affidavits claiming that CS 1 had embezzled their money. He planned to have a friend claim that CS 1 had sexually abused her young children. He filed false papers with the Court in order to claim that the FBI had destroyed evidence that he himself had destroyed. In these plans, he also did not act alone. He enlisted multiple other people in these schemes. One has provided information to the government that he/she destroyed evidence at Baslan's request. Another has indicated that he/she sent messages at his direction. And another fled the country to Israel shortly after the government's obstruction of justice investigation became known to him.

There can be little doubt that Baslan seeks information about government witnesses, not just to prepare a defense, but also to engage in further plots to subvert the criminal justice system through lies and fraud. Courts have previously refused requests for early disclosure of <u>Giglio</u> material when there was evidence that material may be used to obstruct justice. <u>See</u> <u>United States v. Rodriguez</u>, 496 F.3d 221, 228 n.6 (2d Cir. 2007) (indicating that fears of witness intimidation and destruction of evidence may justify even mid-trial disclosure of <u>Giglio</u> material). <u>United States v. Medina</u>, 854 F. Supp. 148, 150 (E.D.N.Y. 1994) (denying motion for witness list and early disclosure of Giglio material

where there were concerns as to witness safety and intimidation); <u>United States v. Pray</u>, 764

F. Supp.2d 184, 190 (D.D.C. 2011) (noting that timing of <u>Giglio</u> disclosure may be

constrained by witness intimidation or even the government's "need to complete  related

investigations").   For those reasons, the Court should deny Baslan's request for early

disclosure of <u>Giglio</u> material.

<u>CONCLUSION</u>

For the foregoing reasons, the defendant's motion should be denied.

Dated:    Brooklyn, New York
          May 12, 2014

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:    /s/ Tyler J. Smith
       Tyler J. Smith
       Tiana A. Demas
       Assistant United States Attorneys
       (718) 254-6186/6144