TJS:TAD
F. # 2013R00381

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                     Docket No.  13-CR-220 (RJD)

BEBARS BASLAN,

             Defendant.

– – – – – – – – – – – – – – – – –X


# GOVERNMENT'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTIONS IN LIMINE


LORETTA E. LYNCH
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Tyler J. Smith
Tiana A. Demas
Assistant U.S. Attorneys
    (Of Counsel)

<u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ......................................................................... 3

FACTS ................................................................................................................ 3

    A. Background to the FBI's Investigation of Baslan and Henry ..................... 3

    B. Baslan's Post-Arrest Statements ............................................................... 4

    C. The Encrypted Computer Evidence ........................................................... 8

    D. Baslan's Proffer Statements ..................................................................... 9

    E. Baslan's History of Sexually Abusing Minors......................................... 11

ARGUMENT .................................................................................................... 14

I.  BASLAN SHOULD BE PRECLUDED FROM OFFERING HIS OWN
    EXCULPATORY HEARSAY STATEMENTS ............................................ 14

II.  BASLAN'S PROFFER STATEMENTS ARE ADMISSIBLE IF HE OR HIS
    ATTORNEY MAKE CONTRARY CLAIMS AT TRIAL ............................. 18

    A. A Proffer Agreement is Valid and Enforceable ....................................... 18

    B. The Court Should Permit the Government to Submit the Defendant's Proffer
       Statements at Trial Should the Defendant Make Arguments Inconsistent with His
       Proffer Statements ..................................................................................... 20

    C. The Government Should Be Permitted to Submit the Defendant's False Exculpatory
       Admissions as Evidence of the Defendant's Consciousness of Guilt ........................ 21

III. THE COURT SHOULD PRECLUDE ANY REFERENCE TO POSSIBLE
     PUNISHMENTS.......................................................................................... 22

IV. THE COURT SHOULD LIMIT DISSEMINATION OF CHILD PORNOGRAPHY .... 26

V.  THE COURT SHOULD PROTECT THE INTENDED VICTIMS BY PRECLUDING
    REFERENCE TO THEIR LAST NAME........................................................ 29

VI. THE COURT SHOULD PRECLUDE QUESTIONING ON SENSITIVE LAW
     ENFORCEMENT TECHNIQUES ............................................................... 32

    A. Courts Recognize a Law Enforcement Privilege ....................................... 32

    B. The Methods Used to Decrypt the Defendant's Computer Equipment are Sensitive
       Investigatory Techniques Protected by the Law Enforcement Privilege ................... 33

C. The Defendant Has No "Compelling Need" for Details About FBI Decryption Methods ............................................................................................... 34

VII. FEDERAL RULE OF EVIDENCE 413 ALLOWS FOR THE ADMISSION OF THE DEFENDANT'S PRIOR SEXUAL ASSAULTS ON CHILDREN ............................... 35

A. Background on Federal Rule of Evidence 413 .......................................... 36

B. Evidence of the Defendant's Prior Sexual Assaults of Minors Is Admissible Under Federal Rule of Evidence 413 ............................................................. 40

1. The Defendant Is Charged with a Sexual Assault for Purposes of Rule 413 ........ 41

2. The Defendant's Prior Acts Are Sexual Assaults ................................... 42

3. The Evidence is Relevant and Presumptively Admissible .................................. 42

4. The Evidence is Not More Prejudicial Than Probative ......................................... 43

VIII. ALTERNATIVELY, THE DEFENDANT's PRIOR SEXUAL ASSAULTS ON CHILDREN ARE ADMISSIBLE UNDER RULE 404(b) ............................................. 44

A. Federal Rule of Evidence 404(b) Permits Admission of Evidence to Show Intent .... 44

B. The Defendant's Prior Sexual Assaults Show His Motive and Intent and Modus Operandi ........................................................................................... 45

C. The Defendant's Prior Conduct is Not More Prejudicial Than Probative .................. 46

IX. THE COURT SHOULD PROTECT THE IDENTITIES OF VICTIMS 1 AND 2 ........ 47

CONCLUSION ................................................................................................ 48

## PRELIMINARY STATEMENT

The government respectfully submits this motion to: (1) preclude the defendant from offering his own false exculpatory hearsay statements at trial; (2) permit the government to use proffer-protected statements to rebut contrary defenses; (3) preclude any reference to possible punishment; (4) limit the dissemination of child pornography evidence; (5) protect the identities of the intended victims of the charged crimes by precluding reference to their last names; (6) preclude questioning on the sensitive decryption techniques used by the Federal Bureau of Investigation during the investigation; (7) admit evidence of the defendant's prior sexual assaults of teenagers pursuant to Rules 413 and 404(b) of the Federal Rules of Evidence; and (8) protect the identities of the defendant's prior victims. Each of these requests is appropriate for the reasons set forth below.

## FACTS

A.    Background to the FBI's Investigation of Baslan and Henry

In mid-February 2013, the Federal Bureau of Investigation ("FBI") received information from an individual (referred herein as "Confidential Source 1" or "CS 1") that the defendants Bebars Baslan and Kristen Henry possessed child pornography and were preparing to sexually exploit children.  CS 1 indicated that Baslan and Henry had talked about opening a babysitting business as a cover to drug and sexually abuse children. Thereafter, at the direction of the FBI, CS 1 recorded conversations with Baslan and Henry and set up a meeting with Baslan and Henry on March 19, 2013 at a New Jersey hotel where CS 1 was to provide three children for Baslan and Henry to sexually abuse.  On that day, Baslan and Henry traveled to New Jersey and were arrested.

3

B.     Baslan's Post-Arrest Statements

After Baslan and Henry had been placed under arrest, agents took Baslan and Henry to separate rooms in the hotel so that each defendant could be advised of his or her Miranda rights separately.  Once Baslan had been separated from Henry, the case agent, Special Agent Aaron Spivack, told Baslan that the agents were going to inform him of his rights before any questioning occurred.  Baslan stated that he knew his rights and wanted to speak to the agents.  At approximately 9:25 p.m., Agent Spivack began reading Baslan his Miranda rights in the presence of another agent, using an "Advice of Rights" form FD-395. Baslan waived his rights and agreed to make statements.

Baslan made the following statements, in sum and substance and in part. Baslan advised that he and Henry had gone to the hotel in New Jersey that night to meet Baslan's friend, CS 1.  Baslan stated that he, CS 1 and Henry party and "swing" together and smoke marijuana.  Baslan said that he and Henry came to the hotel to party with CS 1. Baslan initially stated that CS 1 had brought the children to the hotel because CS 1 had to watch them.  When agents first asked Baslan if he, Henry and CS 1 planned to have sex with the children in the hotel, Baslan responded "not that I know of."  When agents then asked if Baslan, Henry and CS 1 were going to abuse the children, Baslan stated: "We didn't do it. You should have waited," and seen that nothing would have happened.  When asked why Baslan and Henry bought Benadaryl to drug the children, Baslan responded that CS 1's wife was abusive, and CS 1 wanted the kids to sleep so that CS 1 could hang out with Baslan and Henry.  When asked why Baslan had brought camera equipment to the hotel, Baslan stated that he is a videographer, so he always has his camera with him.  Baslan then stated that

"hypothetically," someone might agree to do something and then change their mind; Baslan again stated that "nothing happened" that night.

After being advised that it was a federal crime to lie to federal agents, Baslan stated that he was not going to do anything to the children that night, and if something were going to happen, he would have stopped it. Baslan stated that the intent that evening was to party and use the children as "props" but not to touch them. Baslan stated he got cold feet and did not want to do anything. Baslan advised that he and CS 1 fantasized together about children. He said that nothing had happened in the past, but they did plan something. Baslan stated that once in the hotel that night, he planned to tell CS 1 that he did not want to do it.

The interviewing agents then advised Baslan that they had listened to phone calls where Baslan had planned to abuse and photograph the children in the hotel. Baslan then stated that he gave CS 1 the Benadryl because Baslan did not want CS 1 to give the kids anything worse than Benadryl. He stated that the plan was to give the children the Benadryl and then take pictures with them. Baslan stated that he wanted to take pictures of the eight-year-old, but did not intend to touch her. Baslan stated that he and CS 1 had planned the night at the hotel together.

Baslan admitted that he told CS 1 that Baslan planned to arrange a babysitting service, but Baslan advised that this talk was "bullshit"; Baslan said that he never had created and did not intend to create, a babysitting service. Baslan stated that he had talked about babysitting, but it was just fantasizing.

Baslan stated that he had never touched a child inappropriately, nor did he have access to children. Baslan advised that he had seen child pornography at work. Baslan stated that he had downloaded child pornography at his home and had looked at child

5

pornography at home.  Baslan stated that his hard drive, which was encrypted, was at his home, and had child pornography on it.  Baslan stated that he had files on his laptop that contained the password for his encrypted hard drive.  Baslan admitted that he knew that possessing child pornography at his home was illegal.  Baslan stated he was willing to show the agents where the child pornography was on his home computer.  Baslan then provided his username and password for his home computer.  Baslan also provided the password to his iPhone.

Baslan then explained how he downloaded child pornography to his home computer.  Baslan stated that on one or two occasions, he, Henry and CS 1 all masturbated to child pornography together.

Baslan advised that the laptop computer in the backpack that he had brought to the New Jersey hotel belonged to him, but Henry used the laptop.  Baslan gave the agents verbal consent to search his laptop and provided the password to the laptop.

Baslan told the agents that he is a Russian citizen, but that he had a valid U.S. green card and was legally in the country.  Baslan stated that he knew he was in trouble, and he volunteered to return to Russia immediately to avoid any further trouble in the United States.  Baslan stated he did not want his family finding out about any of the things he had discussed with the agents.

The interviewing agents advised Baslan that they had a search warrant for Baslan's residence.  Baslan requested that the agents not make a scene by breaking down his door; he then gave agents the code to his apartment door to enable the FBI to enter Baslan's apartment and execute the search warrant.

Agents then asked Baslan if they could memorialize the interview on paper so that it was clear that what Baslan told the agents was accurate.  Baslan agreed.  Agent Spivack handwrote a statement, which he provided to Baslan to review.  Baslan read the statement aloud.  Agents also informed Baslan that he could make any changes, corrections, or additions to the handwritten statement.  Baslan made four changes and one addition. Baslan signed the written statement, which was two pages long, and reads as follows:

> I, Bebars Baslan, was arrested at the Hyatt hotel in Jersey City, NJ.  I have been told that I have been placed under arrest and have been advised of my rights, which I have waived.  I agree to talk to the FBI voluntarily and have not been made any threats or promises.
>
> I came to the Hyatt with the intent to engage and have Kristen engage [CS 1]'s 2 month old boy, his one and a half year old boy, and his 8 year old [redacted to remove victim information] in sexually explicit conduct.  However, I had cold feet and was not going to go through with it.  I suggested Benedryl (sic) so that the kids would be sleeping.
>
> I planned on "going down" on [redacted to remove victim's name], the 8 year old, but had cold feet.  We were also going to take photos and videos.
>
> I have a sexual interest in children, and have watched child porn on few occasions, and have masturbated to the child porn.
>
> I have links on my computer to the child porn which I will provide to the FBI.  My child porn is on an encrypted hard drive at home.  I also use a 256 bit encryption, but I can't provide the password at this time.  I have provided the FBI with passwords to my computer and phone.
>
> I have never harmed a child nor have I sexually abused a child in the past.
>
> I want to talk to someone about my options, I am fully willing to cooperate.

The changes Baslan made were as follows: in the first paragraph, Baslan corrected the spelling of his last name from "Basslan" to Baslan, which change he initialed with a "BB."  In the fourth paragraph, Baslan changed "have watched child porn on many occasions" to "few occasions," by crossing out "many" and writing "few."  Baslan did not initial this change.  In the sixth paragraph, Baslan changed "but I don't want to provide the password unless I get a plea," to "but I can't provide the password at this time."  Baslan initialed both of these changes by writing "BB."  Baslan also added the final paragraph of his confession (which he initialed) and signed the confession.

C.      The Encrypted Computer Evidence

Just after Baslan and Henry were arrested, other FBI agents executed a search of Baslan and Henry's shared residence pursuant to a search warrant.  The search warrant permitted agents to search and seize, among other things: computers, computer hard drives, or other physical objects upon which computer date can be recorded, including tablet computers, cellular telephones capable of acting as computers and media servers such as iPads, iPhones and AppleTVs that were or could be used as a means to commit violations of 18 United States Code, Sections 2252 and 2252A.  Pursuant to the warrant, agents seized numerous items, including an encrypted external hard drive.  During recorded conversations between Baslan and CS 1, Baslan had referenced the fact that he downloaded child pornography and stored it on computer equipment in an encrypted format that he believed could not be accessed by anyone other than himself.[1]  On such piece of equipment that the defendant had was an encrypted external hard drive ("Encrypted Drive").  The Encrypted

---

[1]      Encryption is the process of encoding a set of data, so that its contents may only be viewed by someone with the proper authentication (such as a password).

Drive a key pad on its exterior on which a passcode must be entered before the hard drive can be read.  The manufacturer of the Encrypted Drive purports that it can only be opened if the correct passcode is entered.

Following its seizure, FBI computer forensic specialists attempted to access information on the Encrypted Drive, but found that it was completely encrypted.  The hadrive was transferred to the FBI's forensic computer laboratory in Washington, D.C., where it was decrypted using sensitive law enforcement techniques.

D.    Baslan's Proffer Statements

At the request of Baslan's attorney, on October 31, 2013, pursuant to a written proffer agreement and in the presence of his attorney, Ephraim Savitt, Esq., Baslan was interviewed by the government.  During the course of the interview, Baslan, in sum and substance and in part, made the following admissions that are relevant to the charged crimes:

- Baslan downloaded an extremely large volume of child pornography videos and images;

- Baslan showed child pornography to CS 1, which was recorded on video taken by CS 1 at the FBI's direction;

- Baslan's child pornography files were encrypted.  They were located on an encrypted hard drive and on his Apple computer.  Baslan transferred the files from his computer to the encrypted hard drive to test the drive's performance;

- The DSLR camera that Baslan was seized with at the time of arrest would have been sufficient for "low light" recording and photographs and was capable of recording video;

Baslan also provided the following false exculpatory statements:

- In approximately December 2012, Baslan started to investigate a new form of Internet file sharing in which separate servers are used to facilitate the upload, sale, and download of files, particularly child pornography;

- There are websites, located overseas, from which a person can purchase "credits," which can then be used at another website to purchase child pornography. Those who upload the files can offer them for sale using this system, but neither the credit website nor repository website would necessarily have knowledge of the contents of the files;

- A lot of child pornography is currently produced in Ukraine, Romania, and in Atlanta, Georgia;

- Baslan downloaded a lot of "data" based on statements from CS 1;

- The DROBO device that Baslan possessed contains materials for documentaries that he produced. One such documentary was one that Baslan was producing with Kristen Henry regarding CS 1 and child pornography;

- After CS 1 confessed sexual experiences with minors, Baslan and Henry initially wanted CS 1 to get help. They later decided to produce a documentary to memorialize CS 1's interest in child pornography and sex with children. Henry and Baslan eventually wanted to "expose" CS 1.

- Baslan did not go to the police or FBI regarding CS 1 for three reasons: (1) Baslan and Henry were using a significant amount of drugs, including cocaine, at that time; (2) Baslan is part of a Jewish community that does not go to the cops; (3) initially, Baslan and Henry wanted CS 1 to get help, and later, only wanted to expose CS 1;

- Baslan has several e-mails he sent to himself regarding recordings he made of CS 1 for the documentary. CS 1 does not make any inculpatory statements on these recordings. Baslan did not record any of the conversations he had with CS 1, which CS 1 recorded at the FBI's direction;

- Baslan downloaded child pornography as part of this documentary;

- CS 1 constantly asked Baslan about "securing" Henry. CS 1 was concerned that Henry would talk to other people about Baslan, Henry, and CS 1's involvement in sexual activity with children. CS 1 wanted Baslan and Henry to meet at the hotel in New Jersey to "secure" Henry.

- Baslan has physical evidence proving that he did not intend to stay long at the hotel where he was arrested, but was unwilling to reveal it;

10

- Balsan planned to photograph CS 1 at the hotel for his documentary. Baslan planned to use this photograph of CS 1 to either compel CS 1 to get help or Baslan would provide it to law enforcement;

- Baslan did not bring the right type of camera equipment to produce child pornography at the hotel, the night that he was arrested. Baslan brought only an iPhone and DSLR camera. The iPhone is not HD quality and the DSLR camera would have required him to capture an image from a distance.

- Baslan has never had sex with a person under the age of 18;

- Baslan has never produced, performed in, or distributed child pornography.

E.    Baslan's History of Sexually Abusing Minors

During the course of its investigation, the government has learned that Baslan previously sexually abused at least two minors, while he resided in Buffalo, New York. The first victim (referred to herein as VICTIM 1) told law enforcement officers, in sum and substance and in part, the following: She met Baslan in 2004, when she was 14. At the time, Baslan ran a photography studio called Art of Imaging in Buffalo, New York. VICTIM 1 had been told that Baslan was someone she should talk to if she wanted to be a model.

Baslan then met VICTIM 1's family. Baslan told VICTIM 1's mother that he would build a portfolio for VICTIM 1. Baslan offered that he would not have to be paid to produce the portfolio, but would make commissions off of VICTIM 1's photographs if they were used in publications. VICTIM 1 then began to go to Baslan's studio regularly for photographs. At the start, VICTIM 1's mother and sister accompanied VICTIM 1 to the photo shoots, but eventually her mother stopped attending. Baslan then convinced VICTIM 1's sister that VICTIM 1 could not focus with the sister there, and the sister began to drop

VICTIM 1 off at Baslan's studio alone and then pick VICTIM 1 up approximately an hour later.

Over Columbus Day weekend 2005, Baslan took VICTIM 1 and her sister to New York for a photo shoot.  Baslan paid for both of them and gave VICTIM 1 approximately $500 in spending money.  During the course of the weekend, Baslan took VICTIM 1 to a warehouse in Brooklyn for a photo shoot with some other young girls.  There was a crew present inside during the shoot.  However, Baslan then took VICTIM 1 and the two other models outside into a field alone.  He directed them to kiss and touch one another in a sexual manner while he took photographs.  When they were done, Baslan took them back inside and showed the crew only the non-sexual photographs.  VICTIM 1 was 15 years old at the time.

After that weekend, VICTIM 1's photo shoots with Baslan changed.   Baslan would pick VICTIM 1 up from school and take her back to his studio.  He would provide her with vodka and give her a white pill before the photo shoots.  The combination made VICTIM 1 feel drunk and uninhibited.  Baslan then took photographs of VICTIM 1 with only a sheet or single garment partially covering her.  In approximately November 2005, while she was 15, Baslan first engaged in sexual conduct with VICTIM 1.  After he had given VICTIM 1 vodka and a white pill, Baslan performed oral sex on VICTIM 1.

Following that assault, Baslan began to take VICTIM 1 to hotels in upstate New York.  He continued to pick her up from school.  He would then take her to the hotel, where he would go in first to get a room.  VICTIM 1 would then go straight to the room through a different hotel entrance, as Baslan had instructed her to do.  First, they conducted photo shoots in the hotel rooms, but then Baslan began having sex with VICTIM 1 at the

12

hotels.  Baslan would set up a video camera to record the sex.  Baslan also took VICTIM 1 to an office that he had access to and had sex with her there approximately 6 to 8 times.

Baslan eventually began using the recordings of the sexual assaults to blackmail VICTIM 1 into continuing to have sex with him.  Baslan threatened to show the videos to VICTIM 1's parents.  VICTIM 1 also became addicted to the pills that Baslan was providing, and he told her that he would stop providing them unless she continued to have sex with him on camera.

Baslan videotaped himself and VICTIM 1 having sex on numerous occasions. Each time, Baslan would transfer the videos from the video camera to his computer.  He would then name the files with random characters.  Baslan told VICTIM 1 that all of his computers were encrypted and that he used a pattern-based 16 digit password.

Law enforcement officers also spoke to VICTIM 2 who told them, in sum and substance, and in part the following: VICTIM 2 was a friend of VICTIM 1.  She saw VICTIM 1 and Baslan having sex.  However, VICTIM 1 asked her not to tell anyone because VICTIM 1 believed that she was in love with Baslan.

VICTIM 2 was also an aspiring model.  Shortly after meeting Baslan, she and VICTIM 1 did a photo shoot for Baslan, while they were approximately 15.  VICTIM 1 and VICTIM 2 were wearing white tank tops and underwear.  Baslan poured water on them and told VICTIM 2 to touch VICTIM 1's vagina through her underwear while he took photographs.

VICTIM 2 saw Baslan regularly after that.  Baslan would photograph VICTIM 2 for fashion photography shoots, and VICTIM 2 also considered Baslan to be a close friend. In late summer or early fall of 2005, VICTIM 2 confided in Baslan that she had been

13

sexually abused between the ages of 7 and 10.  Shortly after that Baslan took VICTIM 2 to a bar.  Since VICTIM 2 was only 15, Baslan told her to wait in the bar's bathroom while he purchased drinks.  After Baslan bought drinks, VICTIM 2 joined him at a table in the bar.  VICTIM 2 drank the alcoholic beverage.  Her next memory is waking up in Baslan's photography studio as Baslan was having sexual intercourse with her.  When Baslan saw that VICTIM 2 was awake, he removed his penis from her.

Baslan would also give VICTIM 2 and her friends drugs and alcohol.  On her seventeenth birthday, Baslan gave VICTIM 2 and her friends cocaine.  Baslan then had VICTIM 2 and another friend give him oral sex while he recorded it.  VICTIM 2 also witnessed Baslan having sexual intercourse with VICTIM 1, when VICTIM 1 was 15.  VICTIM 2 also witnessed Baslan performing anal sex on another friend of hers, who was also a minor.

<u>ARGUMENT</u>

I.    <u>BASLAN SHOULD BE PRECLUDED FROM OFFERING HIS OWN EXCULPATORY HEARSAY STATEMENTS</u>

The defendant should be precluded from introducing his own exculpatory hearsay statements through cross-examination of other witnesses, even if the government elicits testimony from these witnesses about the defendant's other statements.   Specifically, the government may seek to introduce the written statement, signed by the defendant following his post-arrest interview.

It is well established that the defendant's own statements are hearsay when he seeks to offer them.  "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Fed. R. Evid. 801(c).  "Hearsay is not admissible except as provided by [the Federal Rules of Evidence] or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress."  Fed. R. Evid. 802.  Therefore, a defendant is generally prohibited from introducing his own out-of-court, exculpatory statements at trial.  United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible.").

The government, however, may introduce a defendant's statements, because when introduced by the government, the statements are not hearsay.  Under Federal Rule of Evidence 801(c), a statement is hearsay if and only if it is "offered in evidence to prove the truth of the matter asserted."  In this case, the statements the government may seek to introduce would not be offered for their truth.  In addition, a statement is not hearsay if it is "offered against a party and is [] the party's own statement."  Fed. R. Evid. 801(d)(2)(A). Therefore, the government may clearly introduce the written post-arrest statement signed by Baslan.  Marin, 669 F.2d at 84 ("[T]he government may wish to offer the [defendant's] statement to show that the defendant made false representations to the authorities, from which the jury could infer a consciousness of guilt, and hence guilt.  In these circumstances the statement obviously is not offered for the truth of the matter asserted, and therefore is non hearsay under Rule 801(c), as well as non hearsay under Rule 801(d)(2)(A) as the statement of an opposing party.").

In some instances, pursuant to the "rule of completeness," which is codified by Rule 106 of the Federal Rules of Evidence, the government's decision to introduce the defendant's out-of-court statements will open the door to the defendant introducing some of his own such statements.  The Second Circuit has explained that rule as follows:

> We have interpreted this Rule to require that a statement be admitted in its entirety when this is necessary to explain the admitted portion, to place it in context, or to avoid misleading the trier of fact, or to ensure a fair and impartial understanding of the admitted portion.

Marin, 669 F.2d at 84 (citations and quotation marks omitted).

The defendant's prior oral statements are "neither explanatory of nor relevant to the" statement that the government seeks to admit.  Id.  Indeed, "the common-law doctrine of completeness . . . requires that a full document or set of documents be introduced: '[W]hen one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is ipso facto relevant and therefore admissible.'"  Phoenix Assoc. III v. Stone, 60 F.3d 95, 102 (2d Cir. 1995).  Here, the government would seek to admit the entire written statement signed by the defendant.  This statement even contains the potentially exculpatory claim that Baslan "had cold feet" and was "not going to go through with it."

Courts have routinely concluded that the rule of completeness does not bar admission of only the inculpatory parts of a defendant's statement.  In United States v. Jackson, 180 F.3d 55, 73 (2d Cir. 1999), the Second Circuit affirmed a district court's decision to admit only the ninety second portion of a forty-five minute tape that the government offered as inculpatory evidence.  In affirming the district court, the Second Circuit found that the doctrine of completeness did not "require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages," and noted that "the portions of the tape proffered by [the defendant] consisted largely of [his] own self-serving statements, which, as offered by him, are inadmissible hearsay."  Id. at 73.  Similarly, in United States v. Harper, a district court granted the government's motion to preclude a

defendant from introducing his own exculpatory statements, even if the government

introduced other of his statements.  The court explained its decision as follows:

> A defendant's self inculpatory statements [] are admissible as
> non hearsay admissions by a party opponent; <u>see</u> Fed. R. Evid.
> 801(d)(2).
>
> Self serving, exculpatory statements, on the other hand, are
> hearsay, and are therefore generally not admissible, unless their
> exclusion would unfairly distort the meaning of the declarant's
> non hearsay statements that are in evidence.  Where the danger
> of such distortion does not exist, however, a defendant may not
> rely on the rule of completeness to put his out of court
> exculpatory statements before the jury through the testimony of
> another witness . . . while at the same time maintaining his own
> Fifth Amendment privilege so as to avoid being cross examined
> about his prior statements.

<u>United States v. Harper</u>, 05 CR 6068 (DGL), 2009 WL 140125, at *5 (W.D.N.Y. Jan. 20,

2009) (some citations omitted); <u>see also</u> <u>United States v. Ortega</u>, 203 F.3d 675, 682 (9th Cir.

2000) (stating that defendant's "non self-inculpatory statements are inadmissible hearsay,"

and that "[i]f the district court were to have ruled in his favor, Ortega would have been able

to place his exculpatory statements 'before the jury without subjecting [himself] to cross

examination, precisely what the hearsay rule forbids'") (quoting <u>United States v. Fernandez</u>,

839 F.2d 639, 640 (9th Cir. 1989)); <u>see also</u> <u>Williamson v. United States</u>, 512 U.S. 594, 599

(1994) ("[t]he fact that a person is making a broadly self inculpatory confession does not

make more credible the confession's non self inculpatory parts [which are hearsay]"); <u>United</u>

<u>States v. Mitchell</u>, 502 F.3d 931, 964 (9th Cir. 2007) (defendant was properly precluded from

eliciting, on cross examination of government agents, exculpatory statements that he had

made during interviews with agents, since those statements were inadmissible hearsay);

<u>United States v. Mahaffy</u>, No. 05 CR 613, 2007 WL 1094153, at *2 (E.D.N.Y. Apr. 10,

2007) ("A court may . . . exclude any portion that consists largely of a defendant's 'own self serving statements, which, as offered by him, are inadmissible hearsay.'") (quoting United States v. Jackson, 180 F.3d 55, 73 (2d Cir. 1999)).

The written statement signed by the defendant is complete in itself. No additional statement is necessary to "explain [that statement], to place it in context, or to avoid misleading the trier of fact, or to ensure a fair and impartial understanding of the admitted portion." Marin, 669 F.2d at 84 (citations and quotation marks omitted). As a result, if the government introduces the written statement, the government requests that the defendant be precluded from examining any witness about his other statements.

## II.   BASLAN'S PROFFER STATEMENTS ARE ADMISSIBLE IF HE OR HIS ATTORNEY MAKE CONTRARY CLAIMS AT TRIAL

During a proffer, the defendant made numerous inculpatory and falsely exculpatory statements. Pursuant to the terms of the agreement governing the proffer, the government may seek to admit evidence of those statements if the defendant, his counsel, or witnesses on his behalf, make any factual assertions or present any defense at trial that conflicts with the statements.

### A.   A Proffer Agreement is Valid and Enforceable

Statements made by a defendant during a proffer session are admissible at trial pursuant to the terms of the proffer agreement. See United States v. Velez, 354 F.3d 190, 194 (2d Cir. 2004) (enforcing proffer agreement which allowed admission of proffer statements if the defense presented "contradictory testimony, evidence, or arguments"); United States v. Barrow, 400 F.3d 109, 116 (2d Cir. 2005) (enforcing proffer agreement that allowed government to use proffer statements to rebut defense

arguments); United States v. Torres, No. 06 Cr. 808, 2008 WL 2977884, at *1 (S.D.N.Y.

Aug. 4, 2008). The agreement is enforceable as long as there is no showing that the

defendant entered into the proffer agreement unknowingly or involuntarily. See United States

v. Mezzanatto, 513 U.S. 196, 210 (1995) (holding that "absent some affirmative indication

that the agreement was entered into unknowingly or involuntarily, an agreement to waive the

exclusionary provisions of the plea-statement Rules is valid and enforceable."); Velez, 354

F.3d at 196 (holding that where the proffer agreement was entered into knowingly and

voluntarily, the government could introduce defendant's proffer statements to rebut

defendant's contrary evidence or arguments.); United States v. Marmolejas, 112 Fed. App'x

779, 781 (2d Cir. 2004) (affirming enforcement of the proffer agreement where defendant

did not show that entrance into agreement was anything but knowing or intelligent).

   The proffer agreement the defendant signed contains a waiver that clearly

states that the government can use any statements made by the defendant during his proffer

"as substantive evidence to cross-examine" the defendant should he testify and also as

"substantive evidence to rebut, directly or indirectly, any evidence offered or elicited, or

factual assertions made, by or on behalf of [the defendant] at any stage of a criminal

prosecution (including but not limited to detention hearing, trial or sentencing)." This

agreement, including the waiver, is enforceable. In executing the proffer agreement the

defendant acknowledged that he had read and understood the agreement, had discussed it

with his attorney and had entered into the agreement knowingly and voluntarily.

B.     The Court Should Permit the Government to Submit the Defendant's Proffer Statements at Trial Should the Defendant Make Arguments Inconsistent with His Proffer Statements

In the proffer, the defendant admitted to downloading a large volume of child pornography.  The defendant also conceded that the camera that he had at the time of his arrest could be used to make videos and would take pictures in low light.  If the defendant testifies otherwise at trial, or makes any defense inconsistent with this statement or his other proffer statements, the Court should allow the government to introduce the defendant's previous admissions to rebut that argument. See Mezzanatto, 513 U.S. at 110 (finding that the government could use defendant's plea statements to impeach defendant's inconsistent testimony at trial pursuant to waiver agreement); Velez, 354 F.3d at 195 (finding that the waiver provision in a similar agreement to that in the instant case was triggered "...in all circumstances in which the defense presents contradictory testimony, evidence, or arguments—whether or not defendant himself testifies."); Barrow, 400 F.3d 109, 120-21 (holding waiver was not limited to factual assertions by defense counsel that directly contradicted proffer statements).  Furthermore, to the extent necessary, the government should be allowed to call witnesses to offer evidence of any proffer statement that is inconsistent with defendant's defense and which the defendant denies. See Mezzanatto, 513 U.S. at 199; see also United States v. Chan, 185 F. Supp. 2d 305, 308 (S.D.N.Y. 2002) (holding that the government should be allowed to introduce extrinsic evidence of defendant's proffer statements should the defendant deny having made the proffer statements).

C.     The Government Should Be Permitted to Submit the Defendant's False
       Exculpatory Admissions as Evidence of the Defendant's Consciousness of
       Guilt

The defendant also made a number of false exculpatory statements during his

proffer session, and the government should be entitled to submit these statements if the

defendant advances a defense inconsistent with those false exculpatory statements. For

example, during the proffer the defendant claimed that he was making a documentary

regarding child pornography and CS 1's sexual interest in children.  In his motions, Baslan

has stated that his "true defense" is that he was investigating CS 1 and that he was not

producing a documentary.  (See Reply in Support of Motion to Dismiss Indictment, Docket

No. 84, dated 05/25/14 at 24-25 (indicating that what the jailhouse recordings of Baslan

reveal is "that Baslan was seeking guidance from [CS 2, the government's confidential

informant in the Metropolitan Detention Center] as to whether to follow the true

'investigation' defense, or whether . . . he should reformulate his defense as his intent to

produce a documentary about child molestation in the community, with [CS 1] as a prime

example of such an offender.").

It is well settled in the Second Circuit that false exculpatory statements such as

this are admissible as evidence of a defendant's guilty conscious. See United States v. Glenn,

312 F.3d 58, 69 (2d Cir. 2002) (false exculpatory statements may be circumstantial evidence

of consciousness of guilt); United States v. Nusraty, 867 F.2d 759, 765 (2d Cir. 1989)

(citing United States v. Di Stefano, 555 F.2d 1094, 1104 (2d Cir 1977)) (stating that while

false exculpatory statements are not admissible as evidence of guilt, they are as evidence of

consciousness of guilt); United States v. Parness, 503 F.2d 430, 438 (2d Cir. 1974) ("It is

axiomatic that exculpatory statements, when shown to be false, are circumstantial evidence

21

of guilty consciousness and have independent probative force.").  As such, the government

should be allowed to admit the defendants proffer statements as evidence of a changing story

in the event that he now offers a defense inconsistent with his earlier claims.

III.   THE COURT SHOULD PRECLUDE ANY
       REFERENCE TO POSSIBLE PUNISHMENT

        The Court should preclude any reference to the possible punishment the

defendant might face—especially mandatory minimum sentences—as irrelevant and unfairly

prejudicial.  See Fed. R. Evid. 402, 403.

        Count One of the indictment carries a mandatory minimum sentence of 30

years' incarceration; Counts Two and Three each carry mandatory minimum sentences of 15

years' incarceration; and Count Four carries a mandatory minimum sentence of ten years'

incarceration.

        Evidence or argument concerning these mandatory minimum sentences and to

the possible punishments the defendant might face if convicted is irrelevant to the jurors'

fact-finding task.  As the Supreme Court has explained, this is because "of the basic division

of labor in our legal system between judge and jury":

> The jury's function is to find the facts and to decide whether, on
> those facts, the defendant is guilty of the crime charged.  The
> judge, by contrast, imposes sentence on the defendant after the
> jury has arrived at a guilty verdict.  Information regarding the
> consequences of a verdict is therefore irrelevant to the jury's
> task.

Shannon v. United States, 512 U.S. 573, 579 (1994); see also United States v. Glick, 463

F.2d 491 (2d Cir. 1972) (jury's "function was to decide guilt or innocence and [] sentencing

was the judge's province and his alone").  For this reason, "juries are not to consider the

consequences of their verdicts" and should reach their verdicts "without regard to what

sentence might be imposed."  Shannon, 512 U.S. at 579 (internal quotation marks omitted);

see United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992).  Thus, "as a general matter,

jurors are not informed of mandatory minimum or maximum sentences."  Shannon, 512 U.S.

at 586; see also United States v. Johnson, 62 F.3d 849, 850-51 (6th Cir. 1995) ("every circuit

to address this issue has held that a defendant is not entitled to an instruction about a

mandatory sentence"); United States v. Harrison, 179 Fed. Appx. 411, 412-13 (9th Cir. 2006)

(district court properly refused to inform jury about 15-year mandatory minimum sentence);

United States v. Broxton, 926 F.2d 1180, 1183 (D.C. Cir. 1991) (no error in refusing to

inform jury about mandatory minimum sentence); United States v. Parrish, 925 F.2d 1293,

1299 (10th Cir. 1991) (jury instruction about mandatory minimum sentences properly

omitted); United States v. Thomas, 895 F.2d 1198, 1200 (8th Cir. 1990) (need not instruct

jury on mandatory sentence); United States v. McCracken, 488 F.2d 406, 425 (5th Cir. 1974)

(it is "error to tell the jury about the consequences of a certain verdict even if they are

mandatory"); United States v. Goodface, 835 F.2d 1233, 1237 (8th Cir. 1987) (denying

request to inform the jury of the mandatory minimum sentenced faced by the defendant

because "the penalty to be imposed upon a defendant is not a matter for the jury"); United

States v. Delgado, 914 F.2d 1062, 1066-67 (8th Cir. 1990) (no error in refusing to inform

jury of mandatory minimum sentence); United States v. Cox, 696 F.2d 1294, 1298 (11th Cir.

1983) (disapproving of informing a jury of a minimum or maximum punishment).

      The only exceptions are where the jury plays a role in sentencing (for example,

in death penalty cases) or where the jury has been affirmatively misled about sentencing

consequences (for example, by being told that a defendant would "go free" if found not

guilty by reason of insanity), in which case their misperceptions would need to be corrected.

See Shannon, 512 U.S. at 579, 587-88; Pabon-Cruz, 391 F.3d at 95; Polouizzi, 564 F.3d at

162.  Neither exception applies here.  In a non-capital case such as this, the jury does not

have a role in determining the defendant's sentence; rather, the mandatory minimum

penalties applicable to four of the crimes charged here have already been determined by

Congress.  The government will not make any representations to the jury regarding the

sentencing consequences of a conviction or acquittal.  Thus, the possible punishment the

defendant might face is simply not the jury's concern and is entirely irrelevant.

        Moreover, providing information about possible punishment to the jury would

create a danger of unfair prejudice and confusion that would substantially outweigh its null

probative value.  Such information "invites [jurors] to ponder matters that are not within their

province, distracts them from their factfinding responsibilities, and creates a strong

possibility of confusion."  Shannon, 512 U.S. at 579.  In particular, information about

possible punishment poses the obvious danger that the jury will decide guilt not on the

evidence presented but on whether the jury believes that the punishments fit the alleged

crimes.  In other words, such information would serve to facilitate jury nullification, a danger

that this Court has an affirmative "duty to forestall or prevent."  United States v. Thomas,

116 F.3d 606, 614-16 (2d Cir. 1997) (jury nullification is a violation of a juror's oath and

courts may not permit jury nullification to occur "when it is within their authority to

prevent").  For this reason, courts have repeatedly precluded evidence and argument about

potential punishment on the grounds that it is irrelevant and unduly prejudicial.  See, e.g.,

United States v. Pabon-Cruz, No. 02-3080 (2d Cir. Oct. 11, 2002) (where district court

proposed to inform jury of mandatory minimum sentence applicable to advertisement of

child pornography, Second Circuit granted government's motion for emergency stay and

petition for writ of mandamus, and held that the "District Judge's proposed jury instruction regarding the penalties the defendant faces if convicted is a clear abuse of discretion in light of binding authority"); United States v. Graziano, 558 F. Supp. 2d 304, 326-27 (E.D.N.Y. 2008) (reference to mandatory minimum sentence should be precluded under Rule 403 because such information "creates a substantial danger that the jury will consciously or subconsciously allow knowledge of such punishment to impact on their deliberations on the question of the defendant's guilt or innocence" and thereby presents a "danger of unfair prejudice"); see also United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997) (holding that district court correctly refused to permit defendant to argue about the severity of his possible punishment); United States v. DiMarzo, 80 F.3d 656, 660 (1st Cir. 1996) (district court "soundly excluded" evidence of a potentially harsh sentence because such evidence "would have necessitated an unwarranted departure from the fundamental division of responsibilities between judge and jury"); United States v. McDonald, 933 F.2d 1519, 1526 (10th Cir. 1991) ("The trial court properly instructed the jury that punishment was within the province of the statutes and the court and should not be considered in arriving at impartial verdicts."); United States v. Maisonneuve, 954 F. Supp. 114, 116 (D. Vt. 1997) (granting government's motion to preclude evidence of minimum and maximum sentence faced by defendant on the grounds that such information is prejudicial).

      The Second Circuit has addressed this issue in the specific context of cases involving the abuse of children. In United States v. Pabon-Cruz, 391 F.3d 86, 94- 95 (2d Cir. 2004), the Court relied on Shannon in concluding that a defendant facing a mandatory minimum sentence in a child pornography prosecution had "no legal right to a charge informing the jury of the sentencing consequences of its decisions." The Pabon-Cruz Court

left open the theoretical possibility that such an instruction might be warranted in certain cases, but cited only the circumstance that had been hypothesized (but not actually found) in Shannon, namely, a case in which "the jury has been affirmatively misled by counsel or a witness." Id. at 95.  More recently, in United States v. Polouizzi, 564 F.3d 142 (2d Cir. 2009), the Court held that "[o]ur precedent forecloses the conclusion that [a defendant] had a Sixth Amendment right to trial by a jury that had been instructed on the applicable mandatory minimum sentence." Id. at 160 (citing Pabon-Cruz, 391 F.3d at 94-95). The Court went on to explain that, while a district court might have discretion in certain circumstances to provide jurors with an instruction regarding the applicable mandatory minimum sentence, such an instruction would be appropriate only where "instructing the jury on the consequences of its verdict will better ensure that the jury bases that verdict solely on the evidence and will better discourage nullification." Polouizzi, 564 F.3d at 162.  Even assuming that a district court had the discretion to give such an instruction, the Court concluded that it would not be an abuse of discretion "to decline to instruct the jury on the mandatory minimum sentence." Id. at 161-63.

In the present case, the insertion of evidence or instructions regarding the penalties faced by the defendant will not discourage jury nullification, but will instead distract them from determining the defendant's guilt or innocence.  As such, the Court should preclude any mention to the potential penalties that the defendant faces.

IV.    THE COURT SHOULD LIMIT DISSEMINATION OF CHILD PORNOGRAPHY

As indicated in its May 12, 2014 Response to Baslan's Motion to Dismiss, the government intends to introduce in its case-in-chief a sample of the child pornography

26

Baslan is charged with possessing pursuant to Rules 414 and 404(b) of the Federal Evidence. Due to the nature of this evidence, the government seeks to restrict dissemination of child pornography evidence and protect the victims by asking that such evidence be displayed in a specific manner.

Federal law provides for special restrictions regarding evidence containing child pornography.  Pursuant to 18 U.S.C. § 3509(m)(1), such evidence "shall remain in the care, custody, and control of either the Government or the court."  In addition, the government seeks special procedures regarding the presentation of child pornography at trial as even accessing media with intent to view child pornography is a crime.  See 18 U.S.C. § 2252(a)(4).

The government intends to offer images of child pornography evidence in the following manner:

    a.    color copies of the images will be printed identified by exhibit number, and placed in a binder; a CD-ROM containing copies of videos, each marked by exhibit, will be placed in the binder; this binder  will be marked as containing the original trial exhibits;

    b.    prior to trial, the defense will be permitted to review the contents of the binder;

    c.    a copy of the binder will be provided to the Court;

    d.    as exhibits are admitted into evidence, they will be displayed on the Court's audiovisual system; however, the government requests that the Court control the audiovisual system so that the images and videos may be viewed only on the monitors at the bench, counsel tables, and jury chairs, and not on the public monitors or overhead projector; the government further requests that the monitors at the counsel tables be angled or positioned so that display of the images is minimized to onlookers;

27

     e.     the government will retain each binder during trial recesses and overnight;

     f.     during jury deliberations, the binder marked as containing the original trial exhibits will be provided to the jury in the jury room; if the jury requests additional display of any videos, they will be brought into the courtroom and the government will request that they be displayed as referenced above; and

     g.     after the conclusion of the trial, the government will retain the binder marked as containing the original trial exhibits and destroy the remaining binder.

These limitations are appropriate and pass constitutional muster. The Supreme Court has long recognized the continuing harm associated with the publication of pornographic materials involving children. See New York v. Ferber, 458 U.S. 747, 759–60 n.10. (1982) ("the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. . . . Pornography poses an even greater threat to the child victim than does sexual abuse."). Like a defamatory statement, "each new publication of the speech would cause new injury to the child's reputation and emotional well-being." Ashcroft v. Free Speech Coalition, 535 U.S. 234, 249 (2002).

The fact that a member of the public cannot see or hear all evidence presented does not violate an individual's Sixth Amendment right to a public trial. The Supreme Court has declared that the Constitutional right to a public trial "is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed." Nixon v. Warner Commc'n Inc., 435 U.S. 589, 590 (1978); see also United States v. Toschiaddi, NMCCA 200800044, 2009 WL 2151149 (N-M. Ct. Crim. App. 2009) ("Allowing the spectators to view the images of child pornography would not have fostered either the [defendant's] right to or the public's interest in a public trial."); United States v.

Gaitan-Ayala, No. 07-268, 2009 WL 948342 (D. Haw. Apr. 3, 2009) (failure to play audio recordings to the entire courtroom is not a violation of the right to a public trial).

The Court has the sole authority to control the mode of presenting evidence. See Fed. R. Evid. 611(a). By limiting the dissemination of images of child pornography, the Court will be protecting the identity of the abused children and limiting further victimization, while at the same time guaranteeing the defendant a fair trial. For these reasons, the Court should limit the dissemination of child pornography in the manner requested herein.

V.     THE COURT SHOULD PROTECT THE INTENDED VICTIMS BY
       PRECLUDING REFERENCE TO THEIR LAST NAME

The intended victims in this case are a 3-month-old, one-and-a-half year old, and seven-year-old child. They are each real children who are related to the government's confidential source ("CS 1") and share his last name. To protect the privacy of these intended victims, the government requests that the Court preclude any reference to the victims' last names and that CS 1 be permitted to testify using only his first name. The government also requests that the Court order that any future filings omit the last name of the intended victims and CS 1 and that previous filings referencing that name be sealed and replaced with redacted versions.

The consensually recorded conversations between CS 1 and the defendant identify each of the intended victims by their first name. The recordings also identify their relationship to CS 1. The evidence of the victims' first names and their relationship is important to the case because it will both establish that the victims are minors and explain why the defendant believed that CS 1 would have access to the children. There is, however, no need for the victims' last names to be revealed in Court during a trial that is likely to

garner press attention.[2]  Given their relationship to CS 1, revealing his last name is also tantamount to identifying the intended victims.

Courts routinely preclude reference to the names of victims in sexual assault cases.  See e.g., United States v. Kelly, No. 07-CR-374 (SJ), 2008 WL 5068820 (E.D.N.Y. Jul. 10, 2008). (granting protective order with respect to victims' names in sex trafficking case due to the potentially explicit nature of the expected testimony); United States v. Patkar, 2008 WL 233062, *4-5 (D. Haw. Jan. 28, 2008) (citing Section 3771(a)(8) to justify limiting the disclosure of documents that "would cause damage to the reputation of the victim" based on his "statutory right to be treated with fairness and with respect for his privacy"); United States v. Doe, 655 F.2d 920, 922, n.1 (9th Cir. 1981) (use of pseudonyms justified when necessary to protect individuals from "harassment, injury, ridicule, or personal embarrassment").

Appellate courts addressing the issue have routinely held that allowing a witness to testify using a pseudonym does not violate a defendant's Sixth Amendment right to confront witnesses where, as here, the defendant is aware of the witness's true name.  See United States v. Maso, No. 07-10858, 2007 WL 3121986, at *4 (11th Cir. Oct. 26, 2007) ("The district court did not violate [the defendant's] right to confront witnesses by allowing the CW to testify using a pseudonym."); Clark v. Ricketts, 958 F.2d 851, 855 (9th Cir. 1991) ("[T]here is no absolute right of an accused to have a jury hear a witness's true name and address."); Miller v. United States, 28 F.3d 1213, at *8 (6th Cir. 1994) (same);  United States v. Mohamed, 727 F.3d 832, 838 (8th Cir. 2013) (holding that witness's "use of a pseudonym

---

[2] The defendant's arrest was reported in the New York Daily News, New York Post, Jersey Journal, and on several nightly news programs.

did not deny [the defendant] the opportunity to effectively conduct cross-examination" where defense counsel was aware of the witness's real name").  Judges have wide latitude to impose reasonable limits on cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant."  Delaware v. Van Arsdall, 475 U.S. 673, 679, (1986); United States v. Cuti, 528 Fed. Appx. 84, 86-87 (2d Cir. 2013) (same); see also Smith v. Illinois, 390 U.S. at 133-34, (questions tending to endanger personal safety of a witness go beyond proper bounds of cross-examination) (White, J., concurring).

   In a similar situation, the court in United States v. Jacobsen, 785 F. Supp. 563 (E.D. Va. 1992), determined that its inherent authority allowed it to permit witnesses to testify using pseudonyms.  In that case, the defendant had defrauded numerous women and their husbands by claiming that each woman would be inseminated with sperm from an anonymous donor, but instead the defendant instead inseminated each woman with his own sperm.  Id. at 566.  The court granted the government's motion to allow the parents to testify using pseudonyms to protect their privacy and the privacy of their children.  Id. at 568-69.  The court also ordered that all filings relating to those parents would be sealed.  Id. at 569.

   As in Jacobsen, it would be appropriate in this case to restrict any mention of the intended victims' last name and CS 1's last name in open court and in court filings.  Such an order would protect the privacy of the intended victims, but would not restrict the defense in any way.  For these reasons, the government respectfully requests that the Court order that the last name of the intended victims not be used at trial or in filings and that CS 1 be referred to only by his first name.

VI.   THE COURT SHOULD PRECLUDE QUESTIONING ON SENSITIVE LAW
ENFORCEMENT TECHNIQUES

The government moves to preclude testimony on the particular methods the

FBI used to decrypt the defendant's computer equipment on the grounds that any such

testimony is protected by the law enforcement privilege.  Furthermore, the defendant cannot

demonstrate any "compelling need" for disclosure of the manner in which the FBI decrypted

the defendant's computer.  The court should therefore preclude any testimony on this issue.

A.   Courts Recognize a Law Enforcement Privilege

Courts have routinely recognized that a defendant is not entitled to disclosure

of sensitive law enforcement techniques based on the "law enforcement privilege."  That

privilege is intended to "prevent disclosure of law enforcement techniques and procedures, to

preserve confidentiality of sources, to protect witness and law enforcement personnel, to

safeguard the privacy of individuals involved in an investigation, and otherwise to prevent

interference with an investigation." United States v. Amodeo, 44 F.3d 141, 147 (2d Cir.

1995) (quoting In re Department of Investigation of City of New York, 856 F.2d 481, 484

(2d. Cir. 1988)); see also Commonwealth of Puerto Rico v. United States, 490 F.3d 50, 62-63

(1st Cir. 2007) (acknowledging the existence of the law enforcement privilege and its

applicability to a variety of law enforcement techniques and information); Roviaro v. United

States, 353 U.S. 53 (1957) (recognizing a government privilege to withhold the identities of

persons who furnish information to law enforcement officers in certain cases).

The party invoking the privilege must demonstrate that it applies to the

information sought to be protected.  In re Department of Investigation at 484; see also In re

The City of New York, 607 F.3d 923, 944 (2d Cir. 2010). Once the applicability of the law

enforcement privilege is established, there is a strong presumption against lifting it.  Id.  The party seeking disclosure of material covered by the law enforcement privilege must demonstrate that the information sought is important to their case.  Id.  In determining whether the information is important, the Second Circuit requires proof of a "compelling need."  Id.  However, the demonstration of a "'compelling need' does not automatically entitle a litigant to privileged information."  Id.  Rather, courts employ a balancing approach and order disclosure only where the need for privileged information "outweighs the need for secrecy."  Miller v. Mehltretter, 478 F. Supp. 2d 415, 424 (W.D.N.Y. 2007) (quoting In re Search of Premises Known as 1182 Nassau Averill Park Rd., 203 F.Supp.2d 139, 140 (N.D.N.Y. 2002)); see also In re City of New York, 607 F.3d at 945 (adopting balancing approach).

      B.      The Methods Used to Decrypt the Defendant's Computer Equipment are Sensitive Investigatory Techniques Protected by the Law Enforcement Privilege

The techniques used by the FBI to decrypt the defendant's encrypted hard drive are sensitive investigative techniques, and any testimony disclosing those methods should be precluded.  These techniques are unknown to the public at large.  Furthermore, if the exact methods that the FBI used to decrypt encrypted electronic evidence were known, criminals could take steps to defeat the FBI's techniques.  For those reasons, the information at issue here undoubtedly falls under the purview of the law enforcement privilege, whose "chief goal is to prevent disclosure of law enforcement techniques and procedures."  Nat'l Cong. for Puerto Rican Rights ex rel. Perez v. City of New York, 194 F.R.D. 88, 94 (S.D.N.Y. 2000).

While the Second Circuit has not specifically addressed whether the law enforcement privilege extends to computer decryption techniques, courts have generally held that electronic investigative techniques are privileged.  See United States v. Chiaradio, 684 F.3d 265, 276-77 (1st Cir. 2012) (holding that defendant was not entitled to technical details of confidential FBI program); United States v. Cintolo, 818 F.2d 980, 1002 (1st Cir. 1987) (finding that the defense was not permitted to ask witnesses questions concerning the precise location of electronic surveillance devices); United States v. Van Horn, 789 F.2d 1492, 1507-08 (11th Cir. 1986) ("We recognize a qualified government privilege not to disclose sensitive investigative techniques."); United States v. Fernandez, 797 F.2d 943, 952-953 (11th Cir. 1986) (defendants were not entitled to privileged information regarding the location of a surveillance transmitter, means of transmission, and other related technical information); United States v. Briggs, 831 F. Supp. 2d 623, 630 (W.D.N.Y. 2011) (law enforcement privilege protected information regarding the "VoiceBox" system used to interpret call data); United States v. Rigmaiden, 844 F. Supp. 2d 982, 987, 998 (D. Ariz. 2012) (defendant not entitled to information related to the technology and methods used by law enforcement officers to electronically locate a computer because such "disclosure would hamper future law enforcement efforts by enabling adversaries of law enforcement to evade detection.")

C.     The Defendant Has No "Compelling Need" for Details About FBI Decryption Methods

The defendant has no "compelling need" for the disclosure of details about the decryption methods used to decode the Encrypted Drive.   Indeed, the defendant has already indicated that he does not intend to challenge that he possessed child pornography.  See Defendant's Omnibus Motion, dated May 25, 2014, Docket No. 84 at 25-26.  Even if the

defendant asserted a need for this information, the public interest in protecting FBI

decryption techniques outweighs any such need. See e.g., Chiarido, 684 F.3d at 277 (defense

request for source code of FBI program properly denied even where defendant claimed that

source code was needed to "challenge the reliability of the technology); Fernandez, 797 F.2d

at 952 (defense request for technical details of voice identification system properly denied).

It is accepted that disclosure of sensitive law enforcement techniques and procedures may

potentially "thwart future FBI operations by publicizing internal operations of that agency."

Commonwealth of Puerto Rico at 67 (rejecting the Puerto Rican Department of Justice's

request for general FBI protocols and operating procedures on the grounds that disclosure

would jeopardize future criminal investigations).  These precise concerns justify the court in

precluding the public disclosure of confidential FBI decryption techniques which would,

"educate criminals on how to protect themselves," and teach persons how to circumvent

investigations and utilize law enforcement tools to their benefit.  See Fernandez 797 F.2d at

952.  For these reasons, the government respectfully asks the court to preclude questioning

on FBI decryption methods used on the defendant's computer equipment.

VII.  FEDERAL RULE OF EVIDENCE 413 ALLOWS FOR THE ADMISSION OF THE
      DEFENDANT'S PRIOR SEXUAL ASSAULTS ON CHILDREN

At trial, the government may seek to introduce evidence of Baslan's prior

sexual assaults of VICTIM 1 and VICTIM 2, who were fifteen and sixteen-year-old girls,

and their minor friends in approximately 2005.  This evidence is "presumptively admissible"

pursuant to Federal Rule of Evidence 413 and highly probative as it counters Baslan's

expected defense that he had no intent to commit the charged crimes because he had no

interest in sexual contact with children.  It should, therefore, be admissible at trial.

A.    <u>Background on Federal Rule of Evidence 413</u>

Federal Rule of Evidence 413 ("Similar Crimes in Sexual Assault Cases")

provides, in pertinent part:

> In a criminal case in which a defendant is accused of a sexual
> assault, the court may admit evidence that the defendant
> committed any other sexual assault. The evidence may be
> considered on any matter to which it is relevant.

The rule defines a "sexual assault" as, among other things, "any conduct prohibited by 18

U.S.C. Chapter 109A" and any "contact, without consent between" 1) "any part of the

defendant's body . . . and another person's genitals or anus" or  2) "the defendant's genitals

or anus and any part of another person's body." Fed. R. Evid. 413.  It also considers an

attempt or conspiracy to commit the same conduct as a "sexual assault."  Fed. R. Evid.

413(d)(5).

Congress enacted Federal Rule of Evidence 413 (and analogous Rules 414 and

415) as part of the Violent Crime Control and Law Enforcement Act of 1994. Pub. L. No.

103-322, 108 Stat. 1796 (1994). These Rules are designed to "supersede in sex offense cases

the restrictive aspects of Federal Rule of Evidence 404(b)" and to create a presumption that

"evidence admissible pursuant to the proposed rules is typically relevant and probative, and

that its probative value is normally not outweighed by any risk of prejudice or other adverse

effects." 140 Cong. Rec. H8991-92 (1994) (remarks of principal House sponsor, Rep.

Molinari); <u>see</u> <u>also</u> 140 Cong. Rec. S12990; David J. Karp, <u>Evidence of Propensity and</u>

Probability in Sex Offense Cases and Other Cases, 70 Chi.-Kent. L. Rev. 15, 19 (1994).[3]

The legislative sponsors of Rules 413-415 further noted that:

> The reform effected by these rules is critical to the protection of the public . . . [a]nd is justified by the distinctive characteristics of the cases to which it applies. In child molestation cases, for example, a history of similar acts tends to be exceptionally probative because it shows an unusual disposition of the defendant -- a sexual or sado-sexual interest in children -- that simply does not exist in ordinary people.

> Moreover, such cases require reliance on child victims whose credibility can readily be attacked in the absence of substantial corroboration. In such cases, there is a compelling public interest in admitting all significant evidence that will shed some light on the credibility of the charge and any denial by the defense.

> Similarly, sexual assault cases, where adults are the victims, often turn on difficult credibility determinations . . . Knowledge that the defendant has committed rapes on other occasions is frequently critical in assessing the relative plausibility of these claims and accurately deciding cases that would otherwise become unresolvable swearing matches. The underlying legislative judgment is that the evidence admissible pursuant to [Rules 413–415] is typically relevant and probative, and that its probative value is normally not outweighed by any risk of prejudice or other adverse effects.

Id. (emphasis added)

In adopting these rules, Congress built upon a large body of precedent favoring a permissive approach to similar crimes evidence in sex offense cases. Many jurisdictions have recognized the need for special evidence rules to ensure fully informed

---

[3] The principal sponsors of Rules 413-415 noted that an address delivered to the Evidence Section of the Association of American Law Schools by David J. Karp—then Senior Counsel at the Office of Policy Development at the Department of Justice and the drafter of Rules 413-415—was to serve as an "authoritative" part of the Rules' legislative history. See 140 Cong. Rec. 23,602 (1994); Johnson, 283 F.3d at 153-56.

decisions by juries in cases involving sexually violent crimes or the sexual abuse of children. Such jurisdictions have historically allowed such evidence through the adoption of special "lustful disposition" rules. See Thomas J. Reed, Reading Gaol Revisited: Admission of Uncharged Misconduct Evidence in Sex Offender Cases, 21 Am. J. Crim. L. 127, 188 (1993) (characterizing 29 states as allowing propensity evidence in some category or categories of sex offense cases). Other jurisdictions achieved similar results by interpreting standard exception categories like those found in Rule 404(b) with unusual liberality in sex offense cases. See, e.g., IA Wigmore's Evidence § 62.2, at 1334-35 (Tillers rev. 1983) (rule against propensity evidence often not honored in sex offense cases). Furthermore, Congress recognized and intended that this approach would make the admission of similar crimes evidence in federal sex offense cases the norm, and its exclusion the exception. The legislative sponsors noted:

> The practical effect of the new rules is to put evidence of uncharged offenses in sexual assault and child molestation cases on the same footing as other types of relevant evidence that are not subject to a special exclusionary rule. The presumption is in favor of admission. The underlying legislative judgment is that the evidence admissible pursuant to the proposed rules is typically relevant and probative, and that its probative value is normally not outweighed by any risk of prejudice or other adverse effects.
>
> In line with this judgment, the rules do not impose arbitrary or artificial restrictions on the admissibility of evidence. Evidence of offenses for which the defendant has not previously been prosecuted or convicted will be admissible, as well as evidence of prior convictions. No time limit is imposed on the uncharged offenses . . . as a practical matter, evidence of other sex offenses by the defendant is often probative and properly admitted, notwithstanding substantial lapses of time in relation to the charged offense or offenses.

140 Cong. Rec. H8992 (1994) (Statements of Rep. Molinari and Senator Dole) (emphasis

added); See also 137 Cong. Rec. S3212, S338-3242 (1991); Karp, 70 Chi.-Kent L. Rev. at 19.

In addressing the admissibility of evidence under Rule 414, the Second Circuit has cited this legislative history with approval.  See United States v. Larson, 112 F.3d 600, 604-05 (2d Cir. 1997) (finding no abuse of discretion where district court admitted prior acts, under Rule 414, that took place over 15 years before the tried offense).  Another court in this district has also noted that Rule 413 "renders evidence of prior sexual assaults presumptively admissible in a federal prosecution for sexual assault."  Morris v. New York, 2008 WL 850679, at *6 (E.D.N.Y. Mar. 29, 2008)..

These decisions are in line with the vast body of cases in other circuits confirming Rules 413-414's broad principles of admissibility.  Indeed, every circuit that has considered the applicability of Rules 413 and 414 has found that trial courts properly admitted evidence of prior sex offense and child molestation offenses pursuant to these rules. See, e.g., United States v. Kelly, 510 F.3d 433 (4th Cir. 2007) (admission of prior attempted rape conviction of 12-year-old warranted in prosecution for traveling in interstate commerce for purpose of engaging in illicit sexual conduct even though prior offense occurred 22 years earlier); United States v. Guidry, 456 F.3d 493 (5th Cir. 2006) (admission of uncharged sexual assaults including forced oral copulation of woman admissible in trial of police officer charged with multiple sexual assaults against women); United States v. Seymour, 468 F.3d 378 (6th Cir. 2006) (defendant's uncharged prior sexual assaults against adult females admissible in case charging child molestation offenses); United States v. Lemay, 260 F.3d 1018, 1028 (9th Cir. 2001) (upholding admission of evidence of defendant's prior acts of molestation and conviction for child molestation 11 years before the charged conduct

because such Rule 414 evidence serves to "corroborate testimony of the victims," and is "exactly the sort of use of prior acts evidence that Congress had in mind when enacting Rule 414." (citing 140 Cong. Rec. H899192 (1994) (emphasis added)); United States v. Gabe, 237 F.3d 954 (8th Cir. 2001) ( witness testimony that defendant had sexually abused victim 20 years prior to instant charge); United States v. Sioux, 362 F.3d 1241 (9th Cir. 2004) (district court properly admitted evidence of the defendant's prior act of sexually assaulting a minor victim in a child molestation case); United States v. Drewry, 365 F.3d 957, 957 (10th Cir. 2004) (testimony from victim regarding acts of child molestation that occurred 25 years earlier admissible where defendant charged with several counts of aggravated sexual abuse against minor), vacated on other grounds, 543 U.S. 1103 (2005); United States v. Breitweiser, 357 F.3d 1249 (11th Cir. 2004) (prior sexual conduct against minors admissible); United States v. Lewis, No. 07-3143, 2009 WL 377302 (D.C. Cir. Jan. 23 2009) (evidence that defendant possessed child pornography admissible in prosecution for attempted coercion and enticement of a minor).

    B.    Evidence of the Defendant's Prior Sexual Assaults of Minors Is Admissible Under Federal Rule of Evidence 413

The evidence that the defendant previously sexually assaulted children meets all of the requirements of Rule 413.  First, the defendant is accused of a sexual assault, under the language of the rule.  Second, the evidence the government seeks to admit pertains to prior sexual assault offenses committed by the defendant.  Third, the evidence is relevant. Fourth, the probative value of the evidence does not outweigh the prejudicial effects.  As a result, the evidence should be admitted at trial.

1.     The Defendant Is Charged with a Sexual Assault for Purposes of Rule 413

The defendant is charged traveling across state lines with the intent to commit sexual acts with a child under 12 years of age, in violation of 18 U.S.C. § 2241(c), conspiring and attempting to produce child pornography, in violation of 18 U.S.C. § 2251, and attempting to coerce and entice a child to engage in illegal sexual acts, in violation of 18 U.S.C. § 2422(b).   These offenses are "sexual assault" as defined by Rule 413.

The violation of 18 U.S.C. § 2241(c) is a sexual assault by definition as that charge is based on conduct "prohibited by 18 U.S.C. Chapter 109A."  Fed. R. Evid. 413(d)(1); see also United States v. Seymour, 468 F.3d 378, 385 (6th Cir. 2006) (affirming the district court's decision to admit evidence pursuant to Federal Rule of Evidence 413 where the defendant was charged with violating 18 U.S.C. § 2241(c)).  The remaining charges constitute "sexual assaults" because they were each attempts or conspiracies with the object of committing sexual acts on non-consenting children.  See United States v. Foley, 740 F.3d 1079, 1086-87 (7th Cir. 2014) (affirming the district court's admission of evidence pursuant to Federal Rule of Evidence 413 where defendant was charged with production of child pornography);  United States v. Schaffer, No. 12-CR-430 (ARR), 2014 WL 1515799, at *10 (E.D.N.Y. April 18, 2014) ("[O]ffenses under 18 U.S.C. § 2422 involving the enticement of a minor to engage in illegal sexual activity, as charged in this case, fall within the realm of crimes involving nonconsensual sexual contact defined as 'sexual assault' under [Federal Rule of Evidence 413].); see also United States v. Rogers, 587 F.3d 816, 820 (7th Cir. 2009) (finding that "attempt to entice a minor to engage in sexual activity" was a "sexual assault" under Rule 413).

2.     <u>The Defendant's Prior Acts Are Sexual Assaults</u>

The government may seek to introduce testimony that the defendant previously engaged in sexual contact with girls who were at the time 15 or 16 years of age. These involve both encounters in which the defendant drugged and raped minors and also encounters that would have been consensual, but for the age of the victims.

Non-consensual sexual contact is clearly a "sexual assault" because it is "without consent."  However, even encounters that would otherwise have been consensual are "sexual assaults."  As the Seventh Circuit explained in <u>United States v. Rogers</u>, 587 F.3d at 820,  "[r]ule 413 uses [the word consent] without qualifying it as actual or literal, and nothing suggests that Congress meant 'consent' to mean anything other than its general legal definition. Minors lack the capacity to consent; sexual contact with a minor is always 'without consent.'"  In New York, a sixteen year old may not consent to sexual contact with an adult.  <u>See</u> New York Penal Law Section 130.25 (criminalizing sexual intercourse between a person over 21 and a person under 17).  Baslan's sexual contacts with sixteen year olds are, therefore, sexual assaults pursuant to Rule 413.

3.     <u>The Evidence is Relevant and Presumptively Admissible</u>

The government expects that a primary issue at trial will be the defendant's intent in committing sexual acts with minors.  The evidence that Baslan previously committed sexual assaults on other minors is strongly probative of the fact that he intended to sexually assault Jane Doe 1 and John Doe 1 and that he conspired to sexually exploit Jane Doe 1, John Doe I and John Doe II.  As indicated above, where evidence is relevant under Rule 413, it is presumptively admissible.

4.      The Evidence is Not More Prejudicial Than Probative

While Rules 413 and 414 are uniquely permissive regarding admissibility of the covered evidence, an analysis under Rule 403 that the evidence is not more prejudicial than probative must still be conducted.  See O'Connor, 650 F3d at 853.  However, the analysis under Rule 403 is unique because Rules 413 and 414 specifically "permit[] evidence of . . . 'propensity' to commit" a child molestation offense or sexual assault . Larson, 112 F.3d at 604.  The Second Circuit has explained that Rule 403 should be used to bar only evidence where the unfair inferences are "highly prejudicial."  Id. at 604.  The court has cautioned, though, that evidence of a defendant's prior sex crimes "may be 'highly prejudicial' but not necessarily 'unfairly prejudicial.'"  United States v. Davis, 624 F.3d 508, 512 (2d Cir. 2010).  In each of the three cases in which the Second Circuit has confronted the issue, it affirmed the admission of a defendant's prior sex acts following a Rule 403 analysis.  See O'Connor, 650 F.3d at 853; Larson, 112 F.3d at 604; Davis, 624 F.3d at 512.  Here, there can be little question that the defendant's prior crimes "did not involve conduct more serious than the charged crime[s]."  United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000).  In the present case, the defendant intended to engage in sexual conduct with and take sexual explicit photographs of a 3-month old, a one-and-a-half year old and a seven-year old.  He also planned to drug them so that they would not remember the incident.  His prior acts, while heinous, involve sexual contact with significantly older children.  For that reasons, the evidence of Baslan's sexual assaults of VICTIM 1 and VICTIM 2 should be admitted.

## VIII.   ALTERNATIVELY, THE DEFENDANT'S PRIOR SEXUAL ASSAULTS ON CHILDREN ARE ADMISSIBLE UNDER RULE 404(B)

The defendant's prior sexual assaults of VICTIMS 1 and 2 are admissible under Rule 404(b) of the Federal Rules of Evidence to show his motive and intent and modus operandi.  Specifically, the defendant's use of narcoleptic drugs to incapacitate his victims before abusing them.  The prior sexual assaults are not more prejudicial than probative because they entail conduct less serious that the attempt to sexually abuse children as young as three months old.

### A.   Federal Rule of Evidence 404(b) Permits Admission of Evidence to Show Intent

Rule 404(b) provides that evidence of "other crimes, wrongs or acts" may not be admitted to prove bad character, but may be admissible for other purposes, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b).  The standards governing the admissibility of evidence under Rule 404(b) are well established:

> First, the district court must determine if the evidence is offered for a proper purpose, one other than to prove the defendant's bad character or criminal propensity.  If the evidence is offered for a proper purpose, the district court must next determine if the evidence is relevant to an issue in the case, and, if relevant, whether its probative value is substantially outweighed by the danger of unfair prejudice.  Finally, upon request, the district court must give an appropriate limiting instruction to the jury.

United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) (citation omitted); see also Huddleston v. United States, 485 U.S. 681, 685 (1988); United States v. Tarricone, 996 F.2d 1414, 1421 (2d Cir. 1993).

Although under Rule 404(b) evidence of other crimes or wrongs is "not admissible to prove the character of a person in order to show action in conformity therewith, [the Rule] . . . permits admission of such evidence for other purposes, such as to show knowledge or intent."  United States v. Aminy, 15 F.3d 258, 260 (2d Cir. 1994); Huddleston, 485 U.S. at 687-88.  The Second Circuit has long viewed Rule 404(b) as an inclusive rule allowing "other acts" evidence if the evidence is offered to prove something other than criminal propensity, is relevant to the crime for which the defendant stands trial and satisfies the balancing test of Federal Rule of Evidence 403.  See, e.g., United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000); United States v. Germosen, 139 F.3d 120, 127 (2d Cir. 1998).

B.      The Defendant's Prior Sexual Assaults Show His Motive and Intent and Modus Operandi

The Second Circuit has long acknowledged that "prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged."  United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir.1993).  Similarly, "modus operandi" evidence may be admitted to prove the identity of the perpetrator of a crime.  The government anticipates that the defendant will raise a defense that he did not have the necessary intent to commit the charged crimes and also that he was not the driving force behind the plan to drug and sexually abuse children.  Evidence of his prior sexual abuse of teenagers, whom he had drugged, is relevant to counter these arguments.

Courts have routinely allowed evidence of prior sexual assaults in cases involving sexual assault to show both intent and modus operandi. United States v. Dhingra, 371 F.3d 557 (9th Cir. 2004) (where defendant was charged with using the Internet to entice

a minor to engage in illicit sexual activity, "prior incident was highly probative of [defendant's] intent and modus operandi with respect to the present act"); United States v. Hersh, 297 F.3d 1233, 1254, n. 31 (11th Cir. 2002) (holding that evidence of the defendant's uncharged sexual activity with minors was admissible under Rule 404(b) in a prosecution under 18 U.S.C. § 2423(b), to show state of mind and modus operandi, and to rebut an attack on witness credibility); United States v. Kapordelis, 569 F.3d 1291, 1313 (11th Cir. 2009) (admitting evidence that defendant previously traveled abroad to engage in sexual acts with underage boys in trial for child pornography offenses as relevant to knowledge, identity, and absence of mistake). Here, the proffered evidence would show that the defendant intended to commit the acts of sexual abuse on children, which he described in the conversations recorded by the government's confidential source. It would also establish that the idea to drug the victims was Baslan's own plan, not one inserted by the government. The VICTIMS' testimony should be admitted for those reasons.

   C.    The Defendant's Prior Conduct is Not More Prejudicial Than Probative

        Regardless of its relevance, the proffered evidence must also be more probative than prejudicial pursuant to Rule 403 of the Federal Rules of Evidence in order to be admitted. The Second Circuit has held that evidence meets this requirement if it does "not involve conduct more serious than the charged crime[s]." United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000). There is no doubt that, while heinous, the defendant's prior crimes of drugging and raping teenagers is not more serious than his attempts to produce child pornography involving the molestation of children as young as three months. For that reason, the proffered evidence is admissible.

IX.    THE COURT SHOULD PROTECT THE IDENTITIES OF VICTIMS 1 AND 2

   VICTIMS 1 and 2, while adults now, were approximately 15 years old at the time of their sexual abuse by Baslan.  As the trial is open to the public, the government respectfully requests that the VICTIMS be referred to by only their first names.

   Title 18, United States Code Section 3771, governing crime victims' rights, affords a victim with "[t]he right to be treated … with respect for the victim's dignity and privacy."  18 U.S.C. §§ 3771(a)(8).  In addition, the privacy rights of child victims of sex crimes are guaranteed by the Child Victims' and Child Witnesses' Rights Act (hereafter "the Act").  18 U.S.C. §3509.  The Act requires that certain information, including the names and other information about child victims, be kept confidential, and it limits disclosure of such information only to those who "by reason of their participation in the proceeding, have reason to know such information." Id.  It is humiliating enough to have to publicly testify about such personal, sensitive subjects, but to force the victim to identify herself by her full name risks causing additional, permanent damage to her reputation, especially in this digital age. As indicated above, other courts have granted similar requests by the government in similar cases.  See infra at 30.

   The government will identify VICTIMS 1 and 2 to the defendant.  The use of only their first names during trial will not impair the defendant's in-court examination or out-of-court investigation, nor will it impair the defendant's ability to cross-examine any of these witnesses at trial.  Therefore, the Government respectfully requests that this Court issue a Protective Order directing that throughout the trial, VICTIMS 1 and 2 will be referred to only by their first names both at trial and in any unsealed filings.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the court: preclude the defendant from offering his own false exculpatory hearsay statements; permit the government from using proffer-protected statements to rebut contrary defenses; preclude any reference to possible punishments; limit the dissemination of child pornography; protect the identities of the intended victims by precluding reference to their last name; preclude questioning on the sensitive decryption techniques used by the Federal Bureau of Investigation; admit evidence of the defendant's prior sexual assaults of teenagers pursuant to Rules 413 and 404(b); and protect the identities of the defendant's prior victims.

Dated: June 27, New York

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:      /s/_____
Tyler J. Smith
Tiana A. Demas
Assistant United States Attorneys
718-254-6186/6116