# EPHRAIM SAVITT
*Attorney at Law*

260 MADISON AVENUE
SUITE 2200
NEW YORK, NEW YORK 10016
WWW.SAVITTESQ.COM

(212) 679-4470
FAX: (212) 679-6770
EPHRAIM@SAVITTESQ.COM

July 02, 2014

**BY ECF**

HONORABLE RAYMOND J. DEARIE
U. S. District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   **United States v. Bebars Baslan**
                  **Docket No. 13 CR 220 (RJD)**

Dear Judge Dearie:

      Please accept this letter as a motion by Defendant Bebars Baslan for the following alternative relief: 1) a substantial adjournment of his trial to a future date that is convenient for the Court and the parties so that the defense has had sufficient opportunity to prepare for an entirely different type of trial (courtesy of the government's omnibus pretrial motion filed a few days ago) than the one formerly envisioned by the Court and counsel, or alternatively 2) the preclusion of the government's proposed extrinsic evidence under Fed. R. Evid. 403 and 414, as discussed below. Undersigned counsel has a trial commitment in this district beginning on September 22nd before Judge Block, in a trial scheduled months before this one, involving a trial on six murder charges and multiple Hobbs Act robberies that is expected to take at least a month, at a minimum, to try, and which has a 2011 docket number. For that reason, my availability to effectively try this case, as the government seeks to expand the Baslan trial in its recent in limine motion, will not be feasible until the early part of fiscal 2015.

a) <u>Why it is now impossible to be ready by July 14, 2014:</u>

After some serious review of my options and for the first time in a career as a trial lawyer that has spanned over 33 years, I am forced to admit that I cannot possibly be ready by July 14th to provide an adequate and competent defense of Bebars Baslan if the government has its way and is permitted to introduce its proposed "other act" evidence involving serious allegations of statutory and forced rapes that purportedly occurred nearly a decade ago. I say this not because I haven't devoted, over the past 9 months since I began to represent Mr. Baslan, considerable time and effort to learn the case, review mountains of computer entries and images, seemingly endless correspondence, emails and other physical exhibits, analyze the law, prepare pretrial motions, prepare for pretrial hearings. I also spent many hours of consultations with my team members and with Mr. Baslan to develop strategy and investigative check lists. Being ready for the Bastille Day start of trial was a mission that, despite some roadblocks and considerable difficulties, seemed to be, as the grave robbers in a "Tale of Two Cities" could have described it, "in the bag."

All this changed at about 7:34 this past Friday evening, as the sun was setting and the Sabbath was being heralded in. For at that time, the government was kind enough to unload a 49 page missive, in strictly orthodox accordance with the *at least* 2 weeks prior to trial time limit for disclosure under Fed. R. Evid. 413, which it called its omnibus *in limine* motions. If the government has its way, it will be permitted to engraft alleged statutory rapes purportedly committed by Mr. Baslan in or about 2004-06, over 9 to 10 years before he was charged in this case and for which he was never the subject of any prior criminal allegations or charges. I have also received the recently-disclosed 3500 materials from the government pertaining to the testimony of "Victim A" and "Victim C" (the first letters of their names, as disclosed in the government's discovery notes), who were 15-to-16 year old models at the time they were allegedly victimized. Those materials, to

2

accurately describe their potential impact on a jury, are nothing short of devastating, should the government be permitted to introduce the extrinsic evidence described in those materials and to argue at trial, as it proposes, that the alleged statutory rapes of teenage post-pubescent models expose, if you will, his propensity to sexually abuse babies and pre-pubescent children.

### a) Why the extrinsic evidence is inadmissible and should be precluded from introduction in the government's case-in-chief and its rebuttal case:

That type of rationale is flawed on two different levels. On a scientific level, there is a marked distinction between a sex offender committing statutory rape because of a sexual attraction to post-pubescent teenagers and a pedophile, described in psychological literature as an adult sexually attracted to pre-pubescent children, defined as those who are 13 years or younger. I do not profess to be an expert in psychology, statutory rape motivations or child sex attraction, and cannot claim anywhere near the level of experience as my adversary counsel has in these fields. But simple Google and Wikipedia searches disclose the difference, not only in degree, but in kind, between the two offender classes. In fact, it appears that, at least more often than not, if not in almost all cases, that the two offender classes are mutually exclusive. Should the government prevail in its motion to allow the extrinsic evidence, I will not be able to effectively meet those allegations without two additional elements that are both time-consuming and costly, as follows:

1) a complete psychological testing and analyses of Mr. Baslan by a court-appointed and well-qualified psychologist, who will become a defense witness whose testimony addresses the scientific issues raised by the government's *in limine* motions, who will need multiple sessions over an extended period of time with Mr. Baslan, which will prompt a counter-psych evaluation by a government expert, a *Daubert* hearing if the government is dissatisfied with the conclusions of the defense expert and, depending on the outcome of the hearing, a battle of the experts over the proper inferences to be drawn at trial from extrinsic evidence of events occurring 10 years ago; and

3

2) an extensive fact investigations by Mr. Gardner, and perhaps assisted another private investigator in Buffalo, and perhaps even more exotic locations, and in the greater New York City metro area of potential defense rebuttal witnesses---and I have a good faith basis, based on my personal investigation, to believe that such witnesses exist---which will require multiple interviews, and a number of trips to areas outside our district to conduct those interviews, of potential defense witnesses to develop a complete and accurate basis to attack the extrinsic witnesses' motivations, veracity and capacity to remember events accurately, even without delving in the prohibited areas of their other sexual escapades.

All this will require substantial additional expenditure of funds, substantial delay of the trial and substantial litigation over issues spawned by the government's decision to interject a completely new and previously undisclosed contest into the trial. It will transform a trial that focuses on the charges in the indictment to one where the extrinsic evidence swallows up the evidence as to the charges. It will produce a trial where extrinsic evidence becomes the focal point of the contest, requiring a dreaded and dreadful battle of competing expert testimony, and the introduction of a slew of witnesses for both sides whose testimony has nothing to do with the actual charges. And it will result in a trial where the question of whether the government has proved the actual charges beyond a reasonable doubt becomes muddled in the morass of extrinsic evidence for which no limiting instruction can possibly be effective.

The government claims, in its motions memo, that the "other act" evidence is less sensational and shocking than the charges in the indictment. That argument is pure, unadulterated rubbish. It is one thing to present evidence of a plot to purportedly commit child molestation, where no molestation could possibly have actually occurred, where the conversations between Jack Massre, the government's informant, and Mr. Baslan are subject to conflicting interpretations and

4

arguments and where, most significantly, not one iota of proof of any prior similar acts involving pre-pubescent babies and children has been uncovered by the government, despite extensive investigation, interviews of numerous witnesses and a sophisticated computer analysis of multiple terabytes of electronic messages, images and videos in Mr. Baslan's seemingly limitless storage devices. The FBI computer analysis, in fact, is so sophisticated and secret that the government seeks a protective order precluding the defense from inquiring into its workings and technology.

What the government seems to overlook is that its state of the sophisticated technology has not produced anything akin to misconduct aimed at prepubescent children. It is for that reason, perhaps, that the government was compelled to trot out decade –old allegations of post-pubescent charges to bolster its case, which it has always presented as unassailable even without any extrinsic help.

Which brings me to my legal point as to the reason the extrinsic evidence should be precluded. Fed. R. Evid. 403, by it terms and as interpreted by the Supreme Court in the *Zafiro* opinion, confers the Court with almost limitless discretion, in exercising its gatekeeper authority to exclude evidence, even with relevance, if that evidence tends either to confuse the issues, inflame the jury or cause substantial delay in the trial proceedings. The "other act" evidence proposed by the government manages to do all three evils that Rule 403 is designed to prevent.

The government also relies on Fed. R. Evid. 413 which, by its terms, seems to allow any extrinsic evidence of underage sex in a case involving child sex charges. Although it mentions Rule 414 in passing in its memo, the government, quite understandably prefers to omit the fact that Rule 414, which allows extrinsic evidence of "child molestation" in child molestation cases, expressly limits such extrinsic evidence to sex acts on children under the age of 14. This case is, according to the charges, actually about a purported "child molestation" scheme to which Rule 414 squarely applies. The extrinsic act evidence the government seeks to introduce involves allegations of sex

5

acts with post-pubescent models who were at least 15 or 16 years at the time the alleged acts occurred. As such, by the terms of the rule that actually applies, the government should be precluded from offering the extrinsic evidence on that basis alone.

### c. Why did the government sit tight for 15 months on the extrinsic evidence it knew and intended to offer at trial?

The FBI 302 investigative reports disclose that the government had already developed the "other act" information in March 2013, just days after Mr. Baslan's arrest and, more significantly, **over 15 months ago.** Yet, the government chose to keep this information, which it had every reason to know, well over a year ago, would become evidence that it intended to introduce under Rule 413, until just two weeks before the scheduled trial and disclosed the 3500 pertaining to this evidence just 10 days before the trial. The 3500 materials, which cover allegations of multiple events occurring over the span of several years, that include generalized information from the two informational sources about other putative underage victims, are redacted to eliminate the names of Victim A and Victim C, which I have no problem with.

My real concern is that the engrafting of decade old allegations of sexual exploits with, and uncharged sexual exploitation of, post- pubescent girls who, as their photos will reveal, look like 20-something year old women will mislead and confuse the jury into convicting Mr. Baslan of the charges in the indictment---which are inchoate crimes of an alleged child molestation scheme that never could have been realized, which is the main contested factual issue for the jury to determine and for which the government, in its extensive and inexhaustible 15 plus month investigation, has come up with no prior similar acts---based on the testimony of 2 women that they were raped as teenaged models almost a decade ago. Not only will such extrinsic evidence effectively become the proverbial "tail that wags the dog," but it will transform an already complex and tension-filled case into a tame-less monster that focuses on "other act" evidence, in the form of the testimony of two

6

women from Buffalo whose identities the government refuses to reveal, and whose existence and accounts the government has never before disclosed until just days before the scheduled trial.

Without the ability to conduct any, much less meaningful, investigation of the motivations of the two "victims," and their propensity to make up stories and embellish the facts, which, I have a good faith basis to believe, would yield other witnesses for the defense who would undercut those allegations, Mr. Baslan would not receive a fair trial. This "trial by ambush" is precisely the evil prohibited by both the Due Process protection of the Fifth Amendment and the Right to a Fair Trial guaranteed by the Sixth Amendment. Additionally, because the events that occurred in Buffalo in the middle of the first decade of this century became the subject of inquiries by the government's jailhouse informant Frederick Celani, and Celani undoubtedly conveyed that information to his FBI handlers, the government's admitted Messiah violation extends to the extrinsic evidence the government seeks to introduce, as well.

### d. Why this last minute disclosure is a continuation of a course of conduct that deprives the defendant of his ability to defend himself properly:

Although the government will most likely piously proclaim that it has followed the required time limits of disclosure for prior sexual assaults under Rule 413, and for that reason, the defense cannot claim any last minute ambush, such an excuse is just another example of how the government has managed to take a steady series of unfair advantages in the pretrial phase of this case. It may seem honorable for the government to graciously decline to introduce any of the Celani evidence in its case-in-chief, the truth remains that it had no option but to admit the obvious---that Celani was a vehicle for a Messiah violation. In the course of that concession, the government deftly managed to look good, avoid an evidentiary hearing with Celani as the star witness, avert any disclosure of the instructions that its agents gave its jailhouse informant and move to introduce the testimony of two women about alleged statutory rapes whose existence became known directly as a

7

result of the Celani-borne Messiah violations. That hydra-headed victory is a testament to clever and capable advocacy skills.

But the flip side of that coin is that these results are about to deprive my client, whom I am responsible to defend zealously, to the best of my ability within the bounds of the law, and to protect against unfairness in the trial process when I see it, will be deprived of a fair trial. If we proceed on July 14th with a trial in which the government is permitted to interject evidence in the form of testimony by witnesses about claimed statutory rapes that occurred nearly a decade ago, there is no way that I can defend my client competently or even adequately. The reason for this is not my own competence, experience or skills as a trial lawyer. I will set aside false modesty and claim in the public record and unabashedly that I can hold my own with the best of them and, if the situation presents itself, with the worst of them, as well.

Nor does the reason lie either with the kind of case this is, although it is a difficult one, to say the least from the defense perspective, simply by virtue of the nature of the charges. I cannot blame my client for this conclusion either. He has been very cooperative and helpful to me and my team in preparing his defense. I have interviewed potential witnesses that put the lie to the government's theory that he is manipulative to the detriment of others and represents evil incarnate. True, the government has demonized him at every turn, pounced on every prospective defense witness with interviews that resulted, perhaps inadvertently, perhaps otherwise, with creating a "chilling effect" to rival the winters in Buffalo. No doubt that the public service cautionary instructions to young women and their mothers that he was manipulative and had a Svengali effect on their daughters could hardly have endeared him to those folks. Indeed, it is not farfetched to infer that some of the recipients of this description might have been affected by it, at least sufficiently to turn them away from becoming either potential or putative witnesses who are truly impartial. It could not help matters if some of the acquaintances and friends of Mr. Baslan whom Celani brought

8

to the government's attention were shown nude or seminude photos of young women and were asked questions that plainly implied that he was a pedophile, a puppet master of teen aged women who drugged and took liberties with them and a sex fiend being prosecuted for charges involving sexual attacks on babies.

The best examples of how the government managed to hermetically seal off potential defense witness is evident in an obstruction prosecution of one such witness, a good friend of Mr. Baslan, and the grand jury subpoena of another potential witness, another good friend of his. The obstruction prosecution, which has persisted for over a half year but never went beyond the criminal complaint phase in Magistrate's Court. It did however achieve a significant result for the government and, at the same time, created a significant roadblock for the defense. The witness's bail conditions forbade any contact, directly or otherwise, between her and Mr. Baslan and, at the government's insistence, the Magistrate –Judge released her on the condition that the slightest contact, however indirect or innocent, and irrespective of whoever initiated it, would result in her remand. And the grand jury subpoena served shortly after the obstruction prosecution commenced on the other witness was never followed through by the government, and it is a safe bet that no grand jury investigation that produced that subpoena continues as the time to the scheduled trial dwindles to just days. The incidental benefit to the government, however, is tangible because her lawyer, quite properly from her perspective, has instructed that she have no contact with Mr. Baslan.

Although the obstruction case against the first witness may have initially rested on probable cause, as supplied by Celani, that Mr. Baslan instructed her to "destroy" hard drives in a Drobo device, it is beyond doubt, at this point, and it has been for some period of time, that there was no obstruction. Not only do the Celani-Baslan jailhouse recordings negate that Mr. Baslan instructed the witness to do such a thing, the witness apparently gave the Drobo hard drives to the government.

9

Although the hard drives contained terabytes of videos and images depicting Hassidic and Orthodox Jewish weddings, events, dinners and assorted other non-prosecutable activities, there has been no discovery of even one image, much less multiple images or videos, of child pornography. If Hassidic dancing were the subject matter of the prosecution, a convincing case for obstruction could have been considered reasonable. Given that the government was confident that child porn would permeate the Drobo- framed hard drives and the added fact that not one such image or anything, to our knowledge, of even tangential evidentiary value was discovered by FBI computer experts analyzing the drives for months in Washington, the continuation of the now frozen criminal obstruction case against the first witness, and the continued grand jury subpoena of the second witness, have become naked attempts to deprive my client of his ability to have any contact with witnesses who would have relevant testimony to offer in his defense at trial. That deprivation is not rooted any longer on assumed prosecutorial needs: instead, they serve no purpose other than to assist in cutting off any meaningful access to witnesses who are essential to his defense.

I will address other points in the government's *in limine* motions memo in detail in a submission to be filed over the weekend or at a hearing the Court may schedule for early next week. For instance, the defense strongly opposes the government's last-minute decision to "protect" its informant's children and niece by precluding the jury from knowing his name. Massre's name is all over the motions documents that have been part of the public record, without objection by the government, for the past 9 months. His full name is heard throughout the Celani-Baslan tapes. The choice of using his children and niece as bait lies with the government, which could have concocted a similar scheme with fictitious children as bait. And, as a sex predator, Massre's full name will be published in the publicly available government website disclosing the list of sex offenders. Indeed, given what the government knows about Massre, it should have included his name in that publicly disseminated honor roll already.

      I did not choose to make this application for a delay in the trial. Without the extrinsic evidence, I will be ready in time, and will be able to meet the charges against my client in a competent and effective manner. I cannot possibly make the same assertion if the government is permitted to introduce the extrinsic matters it decided not to disclose until nearly the midnight hour. The choice was the government's. I am merely reacting to that choice appropriately, as I am obligated legally and ethically as an officer of the Court and as a defense attorney whose job it is to protect his client's right to a fair trial.

      I thank Your Honor for Your courtesy and consideration.

      Respectfully submitted,

Ephraim Savitt

Cc By ECF:

Clerk of the Court (RJD)
AUSA Tyler Smith
AUSA Tiana Demas
Ying Stafford, Esq.

11