## EPHRAIM SAVITT
*Attorney at Law*

260 MADISON AVENUE
SUITE 2200
NEW YORK, NEW YORK 10016
WWW.SAVITTESQ.COM

(212) 679-4470
FAX: (212) 679-6770
EPHRAIM@SAVITTESQ.COM

July 06, 2014

**BY ECF**

**HONORABLE RAYMOND J. DEARIE**
**U. S. District Court**
**Eastern District of New York**
**225 Cadman Plaza East**
**Brooklyn, New York 11201**

Re:    **United States v. Bebars Baslan**
**Docket No. 13 CR 220 (RJD)**

Dear Judge Dearie:

Nearly 80 years ago, U.S. Supreme Court Justice Sutherland, writing for the unanimous Court, observed:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

United States v. Berger, 295 U.S. 78, 88 (1935).

Regrettably, the government in this case, staffed by young, eager and very capable prosecutors, has apparently never read the Berger case, or become aware of Justice Sutherland's admonition, written for the entire Court 80 years ago and hopefully, still good law. Berger has been quoted with emphasis and approval, both in all editions of the United States Attorney's Manual, certainly during the golden era of the U.S. Attorney's office in this district in the 1980's and hopefully into the present, as well as in case law precedents over the following 8 decades, which rings as an admonition to the prosecutor that he "may prosecute with earnestness and vigor – indeed he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones." Id. In its July 3rd letter opposing our motion for an adjournment of the trial or, alternatively, for preclusion of the extrinsic act evidence ("G.O."), the government defends its deliberately calculated strategic plan to transform this trial, at virtually the last minute before jury selection, into an entirely new, completely dissimilar and markedly broader trial displays a conflation in the government's mind of its duty to prosecute vigorously, as it should, with its erroneously assumed right to use unfair methods in "strik[ing] foul blows" by catching a defendant facing the nightmarish potential of 75 years of cumulative mandatory minimum sentences with literally no time and insufficient resources to defend himself properly.

a) **What did the government know, and when did it know it?**

As its belatedly produced, and apparently incomplete, 3500 materials disclose, by references in those materials to other, undisclosed documents pertaining to the subject matter of the girls from Buffalo, the government knew about the allegations concerning the 10- year old uncharged crimes as early as 15 months ago, about a half year before the undersigned became Baslan's attorney. It chose to sit on this potential highly inflammatory evidence purely for trial strategic reasons and to gain an unfair litigation advantage over the defense. Even the government

2

doesn't have the temerity to suggest, in its opposition letter, that it decided to keep its playing cards firmly clutched to the vest because of any concern for the welfare or safety of its putative extrinsic witnesses. Instead, it adamantly avers, and perhaps actually believes, that it is justified in disclosing the extrinsic and uncharged 10-year old allegations no earlier than the minimum allowable disclosure period in Rule 413, rather than on giving a fair amount of notice to the Court and the defense that it had intended, for more than a year, to substantially increase the trial in terms of both time and complexity at the last possible moment before jury selection.

Certainly, Rule 413 provides for a minimum 15 day period prior to trial to disclose its intention to introduce other act evidence and produce 3500 materials related to such evidence. But the rule neither mandates that disclosure cannot be made earlier nor does it give license to the government to take the defense by surprise with a 12th hour injection of allegations involving crimes that, contrary to its portrayal as "involving only two witnesses" and less sensational allegations, instead will substantially enlarge the trial with dissimilar extrinsic evidence and matters that will confuse the issues, inflame and mislead the jury and compel a conviction that rests principally on the extrinsic evidence to prove Baslan's "propensity".

The government is trying to inject extrinsic "proof", without even giving the defense a chance to develop a defense against that "proof", of Baslan's alleged commission of sex offenses wholly dissimilar in terms of putative victims, modus operandi, temporal proximity and scope and, more significantly, about conduct that is considerably more disturbing and sensational than an unaccomplished first-time plan to take "compromising" photos of babies and a prepubescent child, and certainly without actual rape or penetration of sexual organs.  Unlike the charged conduct, the uncharged conduct with which the government desires to make Baslan's conviction automatic involves allegations of  multiple statutory and drug-induced rapes, blackmail of victims and threats

to keep them silent, creation of false sworn affidavits to obstruct justice and suborn perjury, and a course of such conduct over a period of years that occurred between 9 and 11 years ago in upstate New York for which no criminal complaint, no indictment and no prosecution was ever filed and which, for good measure, is no longer prosecutable because it is barred by the statute of limitations twice-over. And the government plaintively protests that the rules allow it to conduct a trial by ambush without considering, for even a nanosecond, that the Due Process and Fair Trial Rights clauses of the Fifth and Sixth Amendments were added by our forebears to the Constitution precisely to prevent the kind of unfair prosecution that the government urges the Court to permit in this case.

In attempting to persuade the court of its absolute right to trial by ambush, the government relies on its selective and inaccurate description of case law precedents, but which actually are more supportive of our argument for preclusion. The government then tries to turn the tables in blaming the defense for having the effrontery to complain that it was blindsided with the unfairness of the government's tactical actions by making the obtuse argument that because, over a year ago, its jailhouse informant Celani had asked Baslan about his prior conquests of young women, the defense should have divined that it would pull this stunt at the last moment before the scheduled trial (G.O. at 4-5). Nothing in the evidence disclosure rules or the case law precedents sanction this obtuse argument that the government can provide sufficient notice if the defendant unwittingly makes disclosures to a jailhouse snitch who, as the government innocently claims, was not even its informant at the time.

The government's related argument is that we have pointed out, as it must concede, that its knowledge about Baslan's discussions about the Buffalo events with its jailhouse informant Celani is at least over a year old, just as "yet another attempt to draw the jailhouse informant into a

trial at which the government agrees he has no place" (G.O. at 5). What balderdash, as our British cousins like to say, although a more bullish term comes to mind! We did not "draw the jailhouse informant" into this case: the government did. We did not withhold production of the jailhouse informant's tapes, in plain violation of the government's Rule 16(a) requirements, until over 4 months later; the government did. We are not keeping potential defense witnesses from communicating with Baslan; the government is. We are not keeping an obstruction prosecution as a sword of Damocles over the head of one of those witnesses, despite the fact, as the government well knows, at least for several months, that there is no basis for that prosecution; the government is. We are not keeping a grand jury subpoena open as to the other witness, despite the obvious fact, as the government well knows, that there is no longer any viable grand jury investigation; the government is. And we did not violate the defendant's <u>Massiah</u> rights, in contravention of the Fifth and Sixth Amendments; the government did that all on its own. Merely because it had no option but to finally admit that in the face of our <u>Massiah</u> motion should not give it license to commit further acts to deprive the defendant of a fair trial.

### b) <u>Whose fault is it, anyway?</u>

The government in this case has the unmitigating *chutzpah* to accuse the defense of gamesmanship in seeking preclusion of the extrinsic evidence or an adjournment of the trial, so that we can properly conduct our own investigation of that evidence. The government contends, in effect, that it is unnecessary to afford the Court, as the gatekeeper of permissible evidence, sufficient opportunity to conduct necessary hearings in advance of trial and to properly conduct the Rule 403 balancing test to which the government merely offers lip-service in its opposition letter. It has the unbridled gall to suggest, in its opposition letter, that the defense has no right to ask for a third adjournment of the trial (G.O. at 1, note 1), in a case that has a 2013 docket and is less than a

year and a half old, in which the government is determined that the defendant be sentenced, at the minimum, to the draconian punishment reserved for murderers.

What impudence! As the author of the government letter is well aware, the first adjournment was necessary because Ms. Stafford had just become co-defendant Kristen Henry's trial counsel, and the second involved the need of Ms. Stafford to undergo still-pending <u>Curcio</u> proceedings <u>that the government insisted upon</u>. Who is afraid to go to trial? The defense, which is perfectly willing to proceed in a week with Bastille Day jury selection, of a trial of the actual charges, unadorned by unrelated events which it only learned about a few days ago and which it cannot defend against without meaningful and time-consuming and CJA-costly investigation ---- or the prosecution, which does not wish to have a trial without its calculated last-minute injection of ten-year old activities of dissimilar, unproven and unprosecuted crimes for which it wants the defense to be totally unprepared?

Why is the government in this case so determined to see to it that a defendant, who has no criminal record, who murdered no one and about whom there is literally no proof, despite the FBI's best efforts and exhaustive investigation and months-long computer searches with the latest technology that the government seeks to protect, at all costs, in its <u>in limine</u> motions, of even one molestation, much less sexual assault, of a prepubescent child, gets to rot in jail for substantially the balance of his life? Why did the government refuse repeatedly, both  in the early stages of my representation 9 months ago, and persistently throughout the ensuing period to the present, to entertain the possibility of a plea disposition to even half the mandatory minimum punishment prescribed by Count Two, or the more appropriate punishment, if the defendant is guilty of a plan to take photos of children as their genitalia are touched by an adult, of the 10-year mandatory minimum for the crimes alleged in Counts Three and Four?

To be sure, the government has the prosecutorial discretion to engage in this type of blood-lust because the draconian statutes under which it brought the charges against Baslan provide the same penalties for convicted prepubescent and post-pubescent child rapists and for those accused of a plan to take photos of children's private parts without any awareness or psychological consequences to the children. That, sadly, is the discretion that the statutory mandatory minimums assign to the prosecution rather than to the more reasoned and judicious judgment of an impartial and fair sentencing court. I will not belabor the record with the scholarly dicta, articles and literature, including the well-reasoned and just criticism, including, most prominently, by Judge Weinstein and Judge Gleeson, among other universally-respected judges, of such anomalous and unfair shift of sentencing discretion, imposed by the mandatory minimum sentencing statutes, away from the judiciary to the often immature judgment of prosecutors whose "win at all costs" stratagems come at a high cost to our system of justice and, on a much lesser level of importance, to the ever- dwindling Criminal Justice Act allotment.

No one can put it better than Judge Weinstein, who observed, with both understandable sadness and justifiable, yet dignified, anger, in another prosecution brought under the federal child protection statutes, that "[t]his case exemplifies the sometimes unnecessary cruelty of our federal criminal law." United States v. C.R., Docket No. 09 CR 155 (JBW) (E.D.N.Y. filed September 26, 2013) Memorandum and Order at 1. Quoting such disparate, but equally well-reasoned and respected sources as Genesis, Leviticus, Maimonides, Gunther Plaut and Rabbi Elijah of Vilna (both of whom, for the government's edification, scholars and commentators on the Bible, although separated in life spans, by over 250 years), as well as law review articles and case dicta that Judges Calabrese, Wysanski and he had published (which I humbly commend to the government for its summer reading list), Judge Weinstein pointed out that , "[a]n important duty of an Article III

district judge is to prevent injustices by the government in individual cases." <u>C.R.</u> at 2. But, in words that best describe the aim of the prosecution in this case, Judge Weinstein lamented, "[y]et we continue using the criminal law to unnecessarily crush the lives of our young." <u>Id</u>.

   c) <u>**What is this case really about, and why does the government want to change the rules of the game just before it starts?**</u>

The government also misstates the evidence pertaining to the actual charges in this case by asserting that "the defendant's prior acts are strong evidence that when the defendant talked, in the present case, about plans to drug and rape minors, he actually intended to do it." G.O. at 6. As the taped conversations between its wired informant Jack Massre and Baslan disclose, the government's description of its evidence to the Court is nothing short of misleading. There is no discussion about a plan to "rape" anyone, and certainly not Massre's two baby sons and his 8-year old niece whom the government used as bait in this case. By describing the discussions as including a plan to "drug" the children, the government deliberately conceals the fact that it was Massre, undoubtedly at the government agents' direction, who pushed Baslan to sedate the children because he, Massre, purportedly did not want his sons to be conscious and suffer any psychological damage in the future. That description also masks the fact that the "drugs" discussed in the "plan" were children's over-the-counter Dramamine and, as it turned out, resulted in the seizure of children's over-the-counter Benadryl, neither of which are a controlled substance or without FDA approval for children. Yet, as Agent Spivack, for whom I have a great deal of respect, testified at the recent suppression hearing, the government seeks to equate children's over-the-counter medications with narcotic drugs. The reason for this deliberate, but unwarranted equation became clear several weeks later when the government pulled the Buffalo rabbit out of its hat.

This also explains why the government suddenly objected to my cross examination question of Agent Spivack at the hearing, as to whether there any evidence of any prior similar acts of child sex offenses by Baslan. The Court, quite properly, sustained the objection, because I concededly digressed from the principal issue at the hearing in asking that question. But the government's motive in objecting to that question is now obvious, although I frankly did not see it at the time. It wanted to keep the Buffalo extrinsic evidence confidential from the defense until the last possible moment permitted by its seemingly favorite evidence rule, Rule 413. Although the correct answer, had that question been permitted, would have been "no", the government was concerned that the agent would have to prematurely reveal the Buffalo evidence 2 weeks earlier than planned, thereby taking away its Buffalo surprise. To paraphrase a well-worn adage pertaining to America's premier Sin City, the government wanted to make sure that "what happened in Buffalo, stayed in Buffalo", at least until 2 weeks prior to trial.

Unquestionably, the government has both the right and the obligation to prosecute vigorously. When appropriate, it also has the right to introduce "other act" evidence under Rules 404(b), 413 and 414 (which sets the difference between cases of alleged child molestation, such as this one, and the introduction of extrinsic similar evidence involving children under 14 years of age, which the recently proffered extrinsic evidence plainly does not). But it cannot be permitted to end run the basic constitutional Due Process and Fair Trial protections of the Fifth and Sixth Amendments. It cannot be permitted to get its way by having a trial of a criminal defendant accused of serious crimes for which it seeks maximal punishment on the level of murder infected with the unfairness of its obvious and ill-conceived plan to inject the proceedings with previously-undisclosed and unproven charges for which the defense cannot possibly mount a successful defense without proper investigation, preparations and evidentiary hearings. To quote no less an

authority than the author of the government's opposition letter, in the context of the astonishing argument that the defendant should not be permitted to invoke Rule 403's prohibition against "undue delay" merely by claiming "that he would call a legion of witnesses to counter the extrinsic evidence", "[t]hat cannot be correct" (G.O. at 6).

As to the government's Rule 403 counter-argument, it misconceives the point we made in our July 2nd motion letter. We have no way of knowing, without proper investigation, whether we can offer a "legion" of rebuttal and/or character witnesses, or whether just a handful would be sufficient. Although we know that such witnesses exist and some would be ready to testify, we cannot put together a properly presented defense to the extrinsic allegations without re-interviewing those witnesses with the government's recently-announced determination to use any extrinsic evidence and without shuffling off to Buffalo to interview additional potential rebuttal witnesses. Is the government seriously contending that the defense has no right to call witnesses on the issues of "propensity" and "prior similar acts" because it decided to throw those issues into contention at the last moment under rule 413? Perhaps we should consider the Due Process and Fair Trial Right protections to be suspended in this case? Apparently, the government would not be troubled at all by such a result. What it fails to consider is that, should it have its way,  in that inscrutable and exalted world of the Second Circuit, there will be a panel that, after reviewing the government's contentions, will teach it, certainly in more elegant and authoritative terms, that "enough is enough! You wanted to save time, now, you can spend more time, resources and funds retrying this case on remand."

Although low on the totem-pole in the realm of governmental excuses and misstatements, the government really goes out on the limb, much like Wiley Coyote in those hilarious Road Runner cartoons, by asserting that "despite his exhaustive pretrial motions, in which he requested early

10

disclosure of <u>Giglio</u> materials, the defendant did not request early disclosure of 413, 414 or even 404(b) evidence (See Defendant's Omnibus Pretrial motions, dated April 1, 2014, Docket No. 73)" (G.O. at 4). Perhaps the government, in addition to Genesis, Leviticus, Maimonides and Judge Weinstein's writings as part of its Summer reading list, should also re-read the far more pedestrian ECF Document 73, which includes the following language, obviously overlooked by the government's opposition letter writer:

> The prosecutor has advised the Court that the government will select a number of images and videos it intends to introduce at trial for the Court's review as the "gatekeeper" of the permissible evidence. The defense welcomes the government's self-policing efforts, but nevertheless, in the abundance of caution, makes this motion for a Court direction to the government to specify, well in advance of trial, the "universe" of the computer and documentary evidence it will seek to put into play at the trial, whether by way of proof of the charges in the indictment **or as Rule 404 (b) evidence**.

Defendant Baslan's Omnibus motions Memorandum, dated April 1, 2014 at page 22; Point 4; paragraph 2 (ECF Document 73) (bolded emphasis for the prosecution's benefit).

Additionally, in a letter filed by the defense on February 28, 2014 (ECF Document 55), joining the motion of co-defendant counsel's motion for a trial adjournment in view of the <u>Curcio</u> issues raised by the government, which the government eagerly pounces on to mischaracterize our motion in the alternative either to adjourn or to preclude, I set forth my intention to make " a motion to make the computer files seized from Baslan available for inspection by both defendants and their counsel and **for early disclosure of Brady/Giglio and Rule 404(b) evidence in light of the present trial schedule.**" <u>Id</u>. at 1-2 (bolded emphasis for the government's benefit). Is it necessary for the defense to make the Rule 404(b) requests, filed 4 months ago, and again in its omnibus motions 3 months ago, using the same large lettering employed by John Hancock, as President of the Continental Congress, in signing his name to the Declaration of Independence so that, as he reportedly explained to his fellow signers, the Tyrant King George III could read it without the need for his spectacles?

Finally, at least for the present, the government's holiday hit parade of misstatements includes the assertion that "[t]o the extent the defendant believes he now needs a psychiatric examination, the government notes that over a year ago he requested an order permitting his examination by Dr. N. G. Berrill, which the Court granted (Docket No. 21). " (G.O. at 3, note 2). In the same vein, the government further claims that "[t]o the extent that the defendant is claiming that he will seek a psychiatric expert to opine on whether he is sexually attracted to children, the defendant has been on notice since his arrest that his sexual interest in children may come into play at trial as he was charged with crimes relating to the sexual abuse of children." (G.O. at 3-4, note 4). Sheer nonsense.

The reason Dr. Berrill, whom I respect, was called to psychologically test Baslan involved the vain attempt by my predecessor counsel to persuade the government to drop the prosecution. It would not have been among my top 10 choices of how to go about this simply because I know that the government insisted on the choice of the examiner, which is not meant as an aspersion against the good doctor, and it would have given the government license to insist on a counter-examination by its own expert, as the government has done in the seemingly endless <u>Curcio</u> proceedings and competency issues concerning co-defendant Henry. That is precisely the reason I did not ask the Court for then-unnecessary CJA funding either for Dr. Berrill, or for another competent psychologist of entirely my choice, to continue and complete the psychological testing.

Additionally, the issues raised by the charges in the indictment do not implicate either Baslan's supposed "propensity" to sexually abuse children or the unscientifically-based assumption by the government, as Agent Spivack candidly acknowledged, that Baslan is a pedophile. Those are not elements of the crimes alleged against Baslan, and there is absolutely no evidence, as the search warrant for Baslan's computers alleged would be the case and the subject of the vast computer

search, of any prior pedophilia, sexual attacks on pre-pubescent children or any inappropriate conduct towards such children. Not one iota of such evidence, as the old-timers liked to say.

Instead, it is the government's June 27th announcement of its intent to offer alleged prior acts with post-pubescent teen-aged models over a decade ago that requires the defense to ask for psychological evaluation of Baslan's purported "proclivity" to attack pre-pubescent babies and children to counter such extrinsic evidence. This is not something Baslan knew since his arrest 1-1/2 years ago or which the undersigned knew about until just a week ago with just a week to go before trial. That is something the government foisted at the last minute both upon the defense and the Court, as it was transferring several hundred pounds of computer and other physical exhibits to Your Honor's courtroom in preparation for its blitzkrieg against Baslan. The government cannot have it both ways; it cannot be permitted to force a trial in several days and to include extrinsic evidence of the sort it proposes in such a trial. Either it should be compelled to forfeit its extrinsic evidence, or be held responsible for a trial adjournment permitting adequate defense investigation and preparation, and sufficient time for the Court to make a reasoned and unpressured assessment of the admissibility of such evince not only in accordance with Rule 413, but also in consideration of the factors prescribed by Rules 403, 404(b) and 414.

To the extent that the government has been prejudiced by its carting considerable and heavy physical exhibits to the courtroom in the last several days, it only has itself to blame. To facilitate matters in this era of sequestration, I will gladly and gratis hold the door open for the government as it moves the heavy equipment out of the court en route to its evidence room should the trial be adjourned. Of course, should we go forward on July 14th, with or without the extrinsic evidence, I will withdraw my offer.

d) **What do the cases really say? It's not what the government says:**

The government also completely distorts the supposed "similarity" between the extrinsic act evidence and the charges. True, 15-year old models who look like 25-year old women are "minors" in the eyes of the law. But they are completely different objects of desire than, say, an infant, a 3-year old and an 8-year old. The dissimilarities between minors in different age classes, and the significance of those dissimilarities to what may constitute fair and appropriate extrinsic evidence under Rules 413 and 414 is best exemplified by one of the precedents cited by the government. In United States v. Schaffer, Docket No. 12 CR 430 (ARR) (EDNY Order filed April 18, 2014) (which can be found in that docket as ECF Document 60), Judge Ross admitted extrinsic evidence consisting of portions of 4 videos found in the defendant's office computer as evidence of the defendant's "propensity" under Rule 413 to have committed the crime for which he was to be tried, which involved luring a 15-year old girl across state lines, inducing her to put on a swimsuit for a photo shoot and then sexually assaulting her. What the government finds no room in its letter to mention is that the extrinsic video evidence was of the defendant with girls who appeared to be close to or about the same age as that of the victim of the charged crimes, and who are depicted wearing similar skimpy swimwear to that of the victim of the charged assaults at the time the charged crimes were committed.

In its description of the Schaffer case, the government also conveniently omits the fact that Judge Ross conducted an in camera review of the videos, and also conducted a closed evidentiary hearing in which the two girls depicted in the videos testified. Based on a developed pre-trial record, for which the few days before the scheduled start of trial in this case are clearly insufficient, Judge Ross in Schaffer employed a Rule 403 balancing analysis that featured findings that "the video evidence show[ed] conduct with minors that occurred close in time and that is highly similar

14

in pattern" to the charged conduct. The judge further noted that although the two girls depicted in the videos were younger than the 15-year old girl who was the subject of the charges, one testified that she "believed she was 12 or 13 years old in the video". The other girl "believed" that she was "8 or 9" in the video", which, as Judge Ross put it, "gives cause for more concern". But, as Judge Ross found, the fact that, in reviewing the videos, neither of the girls "appeare[d] identifiably younger than 15" and they both "appeare[d] to be pre-teen or teenage pubescent girls who could be attributed with an age range somewhere between 12 and 16" made any "discernable" age differences "not so inflammatory as to be unfairly prejudicial." Schaffer, Order at 20-21.

The other marked difference with a real distinction between this and Schaffer is that in the latter, the government disclosed its intention to introduce extrinsic evidence, far narrower in scope, as well as similarity of conduct and temporal proximity, than the other act testimony the government wants to introduce in this case, and did so two weeks before Judge Ross conducted the hearing in that case, and at least 3 -1/2 months before that case will be tried. AUSA Tyler Smith is very familiar with the Schaefer case because for over 2 years he was the lead prosecutor in that case, and only recently stepped aside so that he could try this case at the same time that a fellow prosecutor tries Schaffer before Judge Ross.

In reaching the conclusion in Schaffer, Judge Ross cited a number of precedents, including cases cited by the government that permitted extrinsic evidence of the defendant's sexual conduct with other minors, precisely because of the similarities in the ages of the alleged victims in the charged crimes and those in the uncharged or other crimes categories. See, e.g., United States v. Reynolds, 720 F.3d 665, 6780-71 (8th Cir. 2013) (upholding admission of prior acts with 11-rear old in a case involving a 15-year old); United States v. Blazek, 431 F.3d 1104, 1108-09 (8th Cir. 2005) (upholding admission of prior acts with ban 11-year old in a case involving a 15-year old); United

Sates *v.* Breitweiser, 357 F.3d 1249, 1254 (11th Cir. 2004) (upholding admission of evidence involving sexual contact with 13-year-olds in a case involving a 14-year old); United States *v.* Walker, 261 F. Supp. 2d 1154, 1157 (D.N.D 2003) (admitting evidence involving a 4-year-old in a case involving an 8-year-old).

The case law precedents cited by the government suffer from the same flaw as its reasoning that the Court should equate allegations involving teen-aged models with charges involving babies and an 8-year old. Additionally, the government prefers to rely exclusively on general principles quoted from those cases, rather than the actual facts, holdings and reasoning of those cases.

Thus, in United States *v.* Davis, 624 F. 3d 508 (2d Cir. 2010), the Second Circuit upheld the district court's decision to introduce extrinsic evidence of the defendant's 1991 sodomy conviction involving defendant's sexual assault of his daughter, then age 12, and his niece, then age 8. What the government fails to inform the Court is that in Davis, Judge Sullivan precluded the government from introducing several additional prior convictions involving sex crimes by the defendant under the Rule 403 balancing test. The government also forgot to mention that the charged crime for which the one conviction was admitted involved a sexual assault on a child under the age of 14, and that the judge focused on the definition of child in Rule 414, "as a person under the age of 14. The government also omitted the fact that although the judge admitted defendant's prior conviction of the two under-14-year-old children, he limited the potential for unfair prejudice in this evidence by precluding the government to introduce the fact that the defendant's prior victims were his own daughter and niece. Id. At 511-13.

Similarly, in United States *v.* Batton, 602 F.3d 1191 (10th Cir. 2010), the Tenth Circuit upheld the introduction of defendant's 1995 conviction under Rule 414 because, as the district court concluded in applying the rule 403 balancing test, the prior act evince was "neither speculative nor

unclear" because the defendant was <u>convicted</u> of those prior charges through "the adversary process." <u>Id</u>. at 1198. Additionally, because the charges against the defendant involved "grooming and sexually assaulting teenage boys," the 1995 conviction for the exact type of conduct assumed relevance that was not outweighed by the potential for unfair prejudice. <u>Id</u>. Although the government tries to portray allegations of statutory rapes of teen-age female models to the charges involving child molestation of babies and an 8-year-old, its argument is akin to trying to fit a square peg in a round hole. There is no authority for introducing such dissimilar and unproven extrinsic act allegations.

In <u>United States</u> v. <u>O'Connor</u>, 650 F.3d 839 (2d Cir. 2011), the Second Circuit, in a case involving charges that the defendant committed child sex abuse of a 10-year-old girl, affirmed the district court's decision to allow extrinsic evidence in the form of the defendant's own autobiography in which he wrote of his sexual attraction to his "little sister" and other prepubescent children. The district court admitted 4 of the proffered excerpts, excluded 3 others and admitted only part of another. In that case, the defendant, on appeal did not challenge the propriety of the district court's decision to partially grant the government's Rule 413 motion, but complained that the judge did not conduct the necessary Rule 403 balancing test. The Second Circuit, noting that the record disclosed that the required balancing test was actually performed, affirmed. <u>Id</u>. at 853-54. Why the government believes that <u>O'Connor</u> helps its cause is one of those mysteries that I am not equipped to unravel.

In a similar vein, <u>United States</u> v. <u>Seymour</u>, 468 F. 3d 378 (6th Cir. 2006), involved charges that the defendant a member of an Indian reservation, raped a mother and sexually molested her 10-year-old daughter, both of whom were residents of that reservation, while he was drunk and after he forced his way into their residence. Notably, the government disclosed its intention to introduce

this extrinsic evidence under Rule 413 a **full 3 months before trial.** The Sixth Circuit upheld the district court's decision to allow extrinsic evidence of the defendant's 2 prior rapes of women on the reservation. In both prior assaults, the defendant was drunk and removed the victim's undergarments in the same manner as he did in the charged conduct. In one, he forced his way into the victim's residence; in the other, he forced himself on the victim, his sister-in-law, after his unwanted entry into her bedroom. Those facts do not exactly fit the government's argument that the proposed extrinsic acts in this case are similar to the charged conduct.

Finally, the government's reliance on <u>Morris</u> *v.* <u>People</u>, Docket No. 07 Civ. 3418 (E.D.N.Y. Decided March 29, 2008) (Gleeson, DJ), is similarly unavailing. Morris was a habeas appeal under 28 UCS 2254 involving petitioner's complaint that the trial court improperly admitted evidence of his prior sexual assaults of his niece in Belize when she was a child in a prosecution involving his kidnapping, torture and sexual assault of her as an adult in New York. Judge Gleeson applied the standards of state law to deny the habeas petition. In reaching this conclusion, Judge Gleeson held that "it was not an abuse of discretion for the trial court to conclude that that the evidence of Morris's pattern of sexually abusive and threatening behavior towards [the victim] was also significantly probative, and that this probative value outweighed the evidence's prejudicial effect." <u>Order</u> at 7. The inappositeness of that case to the extrinsic evidence the government seeks to introduce in this case speaks for itself.

e) **Conclusion:**

For all the reasons discussed in our July 2nd motion letter and in this reply, the Court should grant either of the alternative remedies the defense asks for: We either go forward on July 14th, as scheduled, without the wholly dissimilar extrinsic evidence the government disclosed its intention to introduce only a week ago; or we should get a substantial adjournment of the trial to permit the defense to prepare for investigations, interviews, psychological testing and evidentiary pretrial hearings contesting the admission of the proposed extrinsic evidence. In view of my own trial commitment before Judge Block, for which there are competing predictions by the government in that case as to whether the trial will take a month to two months, the only available time for me to try this case on an adjourned schedule, subject to the Court's judgment, is in early 2015.

I thank Your Honor for your courtesy and consideration.

Respectfully submitted,

Ephraim Savitt

cc: All Counsel (BY ECF)

19