UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
UNITED STATES OF AMERICA,

- against -

**MEMORANDUM AND ORDER**

13 CR 220 (RJD)

BEBARS BASLAN,

                Defendant.
------------------------------------------------------------ x

DEARIE, District Judge.

       Defendant Bebars Baslan has moved the Court to dismiss the indictment in this matter to remedy a violation of his Sixth Amendment right to counsel occurring when an informant, identified in the parties' motions papers as CS 2, engaged Baslan in conversations after indictment under instructions from the government. (Def.'s Mot. 1, ECF No.73); (Def.'s Mem. Supp. Mot. 11-15, ECF No. 74). Baslan has also requested that the Court compel CS 2's appearance at a hearing to testify in support of that motion. (Def.'s Reply Mem. 19, ECF No. 84). The Court denied that request by electronic order dated June 9, 2014. We now deny the motion.

       Our findings and reasoning are set forth more fully below, but are easily summarized. There is evidence before us that the defendant conspired to obstruct these proceedings through an elaborate fraud on the Court. He now seeks to refashion the means by which the government caught him – recorded jailhouse conversations – into a cudgel with which to kill the proceedings entirely. The Sixth Amendment does not contort in such ways.

## BACKGROUND

The Court assumes familiarity with the background of the case and restates only those facts necessary to decide the motion to dismiss. In brief, CS 2, formerly an inmate at the Metropolitan Detention Center, approached the government with information indicating that Baslan was planning several schemes to obstruct justice. (Gov't Mem. Opp'n 21, ECF No. 81). The schemes included a plan to destroy a data-storage device known as a "DROBO" and blame its destruction on the FBI, along with a plan in which unidentified confederates would exhume children's corpses and place them on the property of a cooperating witness (identified in the motion papers and in the Complaint as CS 1). (Id. at 21-22). In response, the government organized a so-called "taint" team to investigate this suspected obstruction and established a "firewall" between that team and the trial team. (Conference Tr. 12, May 29, 2014); See generally United States v. Yousef, 327 F.3d 56, 166 (2d Cir. 2003) (describing a firewall). The government then instructed CS 2 to continue engaging Baslan. On July 1, 2013 and July 31, 2013, the government provided CS 2 with a recording device. (Gov't Mem. Opp'n 22). Over the course of these two recorded conversations, Baslan discussed certain details of the planned obstruction with CS 2, but also discussed some of his ideas for defending the case. (Id. at 22-30). Those discussions triggered the present motion to dismiss the indictment.

In opposition, the government has conceded (as it must) that it violates the Sixth Amendment anytime it knowingly permits its agents to elicit inculpatory statements from a defendant after indictment, unless the statements pertain solely to uncharged crimes. See Kansas v. Ventris, 556 U.S. 586, 592 (2009) ("Now that we are confronted with the question, we conclude that the Massiah right is a right to be free of uncounseled interrogation, and is infringed at the time of the interrogation."). However, stressing that it only recorded Baslan to investigate

2

the suspected obstruction, the government argues that Baslan's remedy is limited to that set forth in Maine v. Moulton, 474 U.S. 159, 179-80 (1985) and Ventris: the exclusion of any inculpatory statements made during those conversations from the government's case-in-chief.

Baslan takes little comfort from the government's concession, claiming that CS 2 deliberately goaded him into disclosing his defense strategy so thoroughly that the Court must dismiss the indictment. Baslan also claims that the government's suspicions of obstruction were totally unfounded. (Baslan Aff. ¶ 14, ECF No. 73-1 Ex. B); (Def.'s Reply Mem. 14-15). On the contrary, according to Baslan, it was actually CS 2 who urged Baslan to destroy the DROBO. (Baslan Aff. ¶ 9); (Def.'s Reply Mem. 14) ("[A]ny plan to destroy the Drobo was being advocated by [CS 2] . . . ."). The implication is that CS 2 either fooled the government with false claims against Baslan designed to "prove his value to the government," or else that the government conjured up the obstruction schemes to justify a deliberate attempt to "ferret out" Baslan's trial strategy. (Id.) The government denies both allegations with force and with a little bit of umbrage – not surprising, given that the former theory contemplates a sort of blinkered overzealousness, while the latter flatly alleges deliberate prosecutorial misconduct.[1]

At a status conference on May 29, 2014, we expressed this Court's usual preference for developing a full record when called to rule upon allegations that the government deliberately

---

[1] The government also asserts that Baslan's self-professed trial strategy is no such thing, but rather another attempt to obstruct justice by suborning false testimony at trial. (Gov't Mem. Opp'n 30); (Conference Tr. 7) ("[The government does not] concede that it is a defense strategy, we still maintain that these were all false and that his strategy was to suborn perjury."). The government's point is that, without its discovery of actual strategy, there can be no "spy in the camp" violation (see infra pp. 5-6) and consequently no remedy beyond that set forth in Moulton and Ventris. The Court is reluctant to engage that point unless absolutely necessary, agreeing with defense counsel's implication that it invites the Court to make something akin to a finding of guilt on the charged crimes, which is of course a matter properly left for the jury. (Conference Tr. 9). We have therefore taken Baslan's purported defenses at face value and decided the motion on other grounds.

3

interfered with a defendant's right to counsel. See, e.g., United States v. Medunjanin, 2012 WL 1514766 (E.D.N.Y. May 1, 2012). Baslan agreed, repeating his request for a hearing at which he could examine CS 2 to demonstrate that the government's conduct warranted dismissal of the indictment, while the government objected, reiterating that its concession already afforded Baslan all the remedy he could be entitled to under Moulton and Ventris. The Court opted for a middle course, following the lead of United States v. Massino, 311 F. Supp. 2d 309, 310-11 (E.D.N.Y. 2004) and directing the government to provide copies of the two recordings for the Court's review in camera.

In so doing, we purposefully elided the government's argument that Baslan is not entitled to a hearing because he has not sufficiently alleged cognizable prejudice under United States v. Ginsberg, 758 F.2d 823, 833 (2d Cir. 1985). (Gov't Mem. Opp'n 35 n. 5.). The point is well-taken, but we do not read Ginsberg to establish a limitation on the Court's ability to develop a record in these circumstances. Rather, the case simply provides a means of weeding out facially meritless claims (as opposed to this, a factually meritless claim). We also question whether it makes sense to apply Ginsberg with such vigor where, as here, the alleged prejudice remains largely inchoate until trial begins. Besides, unlike the court in Ginsberg (in which testimony would have been required to determine what the informant and the defendant's lawyers discussed at unrecorded joint defense meetings), this Court was able to follow the simple expedient of listening to the recordings. In so doing, the Court could directly ascertain what Baslan and CS 2 discussed and try to resolve the central question of whether Baslan was prodded into these schemes by CS 2 under direction from the government. That question is central because, absent such trickery, the government is correct that Moulton and Ventris set forth the full extent of Baslan's available remedy (as we will explain momentarily). If further inquiry

4

were necessary, the parties could have then examined CS 2 on the question, as well as the contents of his unrecorded conversations with Baslan. Further inquiry is unnecessary.

## ANALYSIS

We first highlight the distinctions between the three types of Sixth Amendment violations raised in Baslan's motion. All arise from Massiah v. United States, 377 U.S. 201 (1964), but differ in substance and possibly in remedy. The first such violation – what one might call a strict liability Massiah violation – occurs whenever the government or its informant deliberately elicits incriminating statements from the defendant after indictment, regardless of whether the government does so in order to investigate possible obstruction, unless the questioning relates solely to uncharged crimes. See Ventris, 556 U.S. at 592; Moulton, 474 U.S. at 180; United States v. Jacques, 684 F.3d 324, 331 (2d Cir. 2012). As the government notes, Moulton and Ventris delimit the remedy for this first species of Massiah violation. Hence the government's concession that it may not use any of Baslan's statements to CS 2 in its case-in-chief.

However, as defense counsel maintains, the case law also recognizes another variety of Massiah interference: the "spy in the camp" or Weatherford violation, so-called because the rule derives from a counter-factual set forth in Weatherford v. Bursey, 429 U.S. 545, 557 (1977). See United States v. Dien, 609 F.2d 1038, 1043 (2d Cir. 1979). This type of Massiah violation can occur in at least two situations, as the court explained in Massino, 311 F. Supp. 2d at 313:

> To establish a [spy in the camp] Sixth Amendment violation, the defendants thus would have to show either that privileged information was passed to the government and prejudice resulted, or that the government intentionally invaded the attorney client relationship and prejudice resulted.

See also Dien, 609 F.2d at 1043 (explaining that, under Weatherford, Sixth Amendment violation occurs when defendant is prejudiced by transmittal of privileged material to the

5

government or by the government's intentional invasion of attorney-client relationship).[2] We can quickly dispense with the first category of Weatherford violation, the passing of privileged information to the government. Unlike, for example, the informant in Ginsberg, 758 F.2d at 832, CS 2 did not listen to conversations or conferences between Baslan and his attorney. Rather, Baslan spoke directly with CS 2 outside counsel's presence.[3]

Our inquiry instead focuses on the latter prong – intentional invasion of the attorney client relationship. The phrase is imprecise. But the Court thinks that, if true, Baslan's striking claim that the government invented schemes to obstruct justice out of whole cloth to justify a deliberate effort to discover his trial strategy would hit the mark. Furthermore, the Court is not convinced that Moulton and Ventris would necessarily circumscribe the full extent of the appropriate remedy in those circumstances, not in view of the general rule that the remedy for a Sixth Amendment violation must be tailored to the injury. See, e.g., United States v. Morrison, 449 U.S. 361, 365 (1981). Other courts have so reasoned, explaining that the potential harm from this type of spy in the camp violation is not the elicitation of inculpatory statements that help prove the charges, but the unfair and potentially decisive tactical advantage the government gains by discovering the defendant's means of defeating the charges. See United States v.

---

[2] At the May 29, 2014 status conference, the government acknowledged some of these distinctions in principle, but maintained that Weatherford simply has no application here: "[i]t's the Government's view that Sixth Amendment violations essentially fall into two separate types. One is a spy in the camp in which the Government has intercepted privileged communications . . . . That has one type of remedy, that's one thing, that's not what happened here. There are no facts to support that that's what happened here." (Conference Tr. 12).

[3] Certain passages in Baslan's papers suggested that he seeks to extend the attorney-client privilege to his discussions with CS 2 because he thought CS 2 was acting as his attorney. However, Baslan's attorney has since confirmed that Baslan advances no such argument: Baslan's point is that his trusting relationship with CS 2 made it easier for CS 2 to infiltrate Baslan's attorney-client relationship and extract trial strategies. (Def's Reply Mem. 19-20); (Conference Tr. 6). At any rate, we note that the argument that Baslan's discussions with CS 2 are themselves privileged finds no support in the case law and is contradicted by the recordings, in which Baslan acknowledges that CS 2 is not an attorney.

6

Danielson, 325 F.3d 1054, 1067 (9th Cir. 2003) ("The problem in this case, however, is not that the government obtained incriminating statements or other specific evidence, but rather that it obtained information about [defendant's] trial strategy."). Indeed, even if CS 2 invented the planned obstruction on his own misbegotten initiative, without the knowledge or encouragement of the government, one might fairly ask whether some additional remedy is appropriate.

In contrast, if the government is correct that this was Baslan's plan to obstruct justice, then the government's plainly "reasonable basis for [its] suspicion of possible obstruction . . . adequately allays any concern that the attorney-client relationship has been improperly invaded." United States v. Simels, 654 F.3d 161, 167 (2d Cir. 2011). Although the excerpts quoted in the government's papers support it on that point (Gov't Mem. Opp'n 22-30), we had qualms about deciding the motion when asked to do so in reliance on those papers alone. No longer.

The Court now recapitulates the recordings in general terms, mindful of the need "not to further publicize what the defendants believe" are sensitive discussions of trial strategy. Massino, 311 F. Supp. 2d at 314. First and foremost, Baslan and CS 2 did indeed extensively discuss plans to obstruct justice, including the plan to destroy the DROBO and then falsely claim that the FBI had done so to eradicate supposed exculpatory evidence contained within. In advancing that plot, Baslan would pivot off of a pro se motion he eventually filed on August 30, 2013, in which he urged the Court to direct the government to conduct an MD-Hash analysis on all electronic devices seized from his residence by the FBI, for the ostensible purpose of ensuring the integrity of the data stored on those devices. (Letter Mot. Preserve Evid., ECF No. 38-1). Baslan's motion noted that the government's seizure inventory is "devoid of any reference to [the DROBO]," but maintained that the DROBO was in the government's possession, citing its appearance in photographs taken at the scene. (Id. at 1). Baslan revealed to CS 2, however, that

7

he had instructed a confederate to remove the DROBO from his apartment and destroy it. Thus, once the government responded to the MD-Hash motion by acknowledging that the FBI did not have the DROBO, Baslan would spring the trap, claiming that the FBI must have destroyed it and then moving to dismiss on the basis of the government's misconduct.

There is no indication in the recordings that CS 2 invented this scheme to destroy the DROBO.[4] Quite the opposite. CS 2 asks Baslan for updates on Baslan's progress and for an explanation of the particulars, which Baslan then provides at great length and in tremendous detail, thereby demonstrating to the Court's satisfaction that these were Baslan's plans, not CS 2's plans. The most conspicuous example comes from the July 31, 2013 recording. In a lengthy colloquy, CS 2 evinced confusion about the scheme to destroy the DROBO and blame its destruction on the FBI. Conceivably CS 2 feigned his confusion to elicit the full details from Baslan. If so, the ruse worked: Baslan responded with an explanation so comprehensive that the Court simply cannot credit his present claim to have had no role in developing the plot. Baslan even confirmed that, should his outside accomplices turn on him (he was certain they would not), the government could never prove that Baslan instructed them to destroy the DROBO and that, even if the government could recover the DROBO's drives, there would be no way for the government to link any recovered data to him. These are the statements of an enthusiastic and confident plotter, not a timorous patsy.

In short, the plot – Baslan's plot – to destroy the DROBO was not a pretext to seek out Baslan's defense strategy. On the contrary, the government had obvious and ample justification for investigating the matter, and the fact that the government has thus far brought no additional

---

[4] We cannot make any similarly unequivocal finding with respect to the scheme to exhume the corpses, partly because that plan is not discussed as much and partly because CS 2 appears to have strung Baslan along, at least in part, by suggesting that he could find people willing to perform that macabre work.

8

charges does not undermine our confidence in that conclusion. Furthermore, as the Second Circuit has indicated, the government's clear justification (perhaps even an imperative) for investigating this potential obstruction of justice goes most of the way to defeating Baslan's claim "that the attorney-client relationship has been improperly invaded." Simels, 654 F.3d at 167. Viewing that justification alongside the government's use of a firewall and the fact that CS 2 overwhelmingly focused his questions on Baslan's efforts at obstruction, rather than the charged crimes, we have no remaining doubt that the government was acting in pursuit of its legitimate law enforcement objectives. See Massino, 311 F. Supp. 2d at 313 ("[T]he stringent firewall procedures proved that the government did not intentionally invade the attorney-client relationship of the defendants.").

Finally, although our conclusion that the government made no attempt to intentionally invade Baslan's relationship with counsel makes it unnecessary to fully analyze any prejudice Baslan may have suffered, we harbor serious doubts as to whether Baslan's relationship with counsel was impacted at all. Baslan confirmed that he never discussed his defense theories with his current attorney and gave no indication that he developed these theories in consultation with either his current or previous attorneys. On the contrary, he told CS 2 that he had discussed the theories with an unnamed rabbi. Moreover, despite his protests, Baslan never really provided much more than a hazy outline of his theories, not the specific strategies the government uncovered in, for example, Danielson, 325 F.3d at 1061-64. Without delving into the degree of prejudice that might justify dismissal of an indictment (we can be sure that it would be quite extensive), the Court can confidently assert that we would not dismiss unless the metaphorical spy actually penetrated the camp. Here, CS 2 barely scouted the surrounding hills.

The entire dispute thus presents what we referred to earlier as a "strict liability" Massiah violation – one in which the government concededly violated Massiah insofar as its informant elicited statements regarding the charged crimes in the course of investigating an attempt to obstruct justice, but for which Baslan's remedy is limited to the exclusion of any inculpatory statements from the government's case-in-chief. Requiring CS 2 to testify in these circumstances would only embark the proceedings on the proverbial fishing expedition – another overused metaphor, perhaps, but appropriate here. We therefore denied Baslan's request for a hearing and deny the motion to dismiss as well.

SO ORDERED.

Dated: Brooklyn, New York
July 10, 2014

/s/ Judge Raymond J. Dearie
_____
RAYMOND J. DEARIE
United States District Judge