1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA,      )
                 Plaintiff,    )   13cr00220
                               )
                               )
V.                             )   United States Courthouse
                               )   Brooklyn, New York
                               )
BEBARS BASLAN,                 )   TUESDAY, JULY 15, 2014
                               )   9:30 a.m.
                 Defendant.    )
_____ )


              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
              BEFORE THE HONORABLE RAYMOND DEARIE
                    UNITED STATES DISTRICT JUDGE


APPEARANCES:
FOR THE GOVERNMENT:   LORETTA LYNCH
                      United States Attorney
                      BY:  TYLER JOSEPH SMITH
                      BY:  TIANA A. DEMAS
                      Assistant United States Attorneys
                      Eastern District of New York
                      271 Cadman Plaza East
                      Brooklyn, New York 11201



FOR THE DEFENDANT:    EPHRAIM SAVITT
                      Attorney At Law
                      260 Madison Avenue, 22nd Floor
                      New York, New York 10016



THE COURT REPORTER:   NICOLE CANALES, RPR, CSR
                      225 Cadman Plaza East
                      Brooklyn, New York 11201
                      cnlsnic@aol.com


Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.
```

Proceedings                                        2

1              (Outside the presence of the jury.)

2         THE COURT:  Good morning.

3         MR. SAVITT:  Good morning, Judge.

4         THE COURT:  Is Mr. Baslan here, by any chance?

5         MR. SAVITT:  Let me see.  I don't think so, Judge

6    let me -- no, he's not.

7         MS. DEMAS:  Your Honor, would you like us to give

8    you a copy of the 3500 and exhibit binders?

9         THE COURT:  Please.

10        Given the fact that the most recent applications are

11   essentially those of Mr. Baslan's, I think that -- I think it

12   prudent that we wait his arrival.  I've asked the marshals to

13   do everything they can to expedite it, and we'll stand by.  If

14   he's still intent on offering a plea to Count 5, if we have

15   the time, we'll take it.  If we don't, we'll proceed and take

16   it at a later point.  But I'm going to defer my brief

17   discussion of these until we have him in our midst, so stand

18   at least until then.

19        Is Gabby around?  Oh, she's getting the jurors.  Can

20   I ask one of you, when he surfaces, to ring my chambers.

21   Somebody will presumably be up in a minute or two, but if not,

22   we just ring my chambers.

23        Do we have a second reporter arranged in the event

24   we have time to take the plea?  I'm starting at 10:00 sharp.

25        How many of the jurors are Long Island residents?

NICOLE CANALES, CSR, RPR

```
                        Proceedings                    3
```

 1    Make a note of that?

 2              MR. SAVITT:  I did as we proceeded.  I lost count,

 3    your Honor.

 4              THE COURT:  Are there many?

 5              MS. DEMAS:  Your Honor, we believe one is.

 6              THE COURT:  Just one?

 7              MR. SAVITT:  Yeah, there were very few, which is

 8    probably right.

 9              THE COURT:  You got lucky.

10              MS. DEMAS:  Some may live in Queens and take the

11    Long Island Railroad, but --

12              THE COURT:  Right.  Okay.  We're going to wait for

13    Baslan to have this discussion.  And is he here?

14              MR. SAVITT:  He's here.

15              THE COURT:  Okay.  I'll stay here, then.

16              MR. SAVITT:  Does he have to get dressed before he

17    comes out or -- I don't want to hold you up, your Honor.

18              THE COURT:  We've got 55 minutes, whatever you want,

19    however you want to do it.  Might as well get him dressed.

20              MR. SAVITT:  Yeah.

21                        (Recess in proceedings.)

22              (Proceedings continued on following page.)

23

24

25

Proceedings                                                    4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Proceedings                                             5

1    (CONTINUING)

2              (Defendant enters the courtroom.)

3              THE COURT:  Are we ready then?  Counsel, come up,

4    please.

5              In addition to the materials that Mr. Savitt

6    tendered last evening, penned by Mr. Baslan himself, I did see

7    and have Mr. Savitt's cover letter, if you will, of July 14th

8    summarizing in two pages the sum and substance of these

9    applications and giving some history.

10             I remain committed to the notion that the

11   overwhelming likelihood is that this similar act evidence is

12   going to come in, certainly under 413.  It is a possibility

13   given the way 414 is drafted that it would be admissible

14   thereto and certainly admissible under 404(b).  The only

15   question remains whether or not there is a legitimate 403

16   concern about the evidence because it goes to the central

17   issue that I anticipate in the case.  I would readily tip the

18   403 balance in favor of admissibility, but we will wait and

19   see, as I said before, and hear the openings, and make a final

20   judgment at that point.

21             With respect to Mr. Baslan's late afternoon

22   submission, I am tempted to do what the Government suggests I

23   do and I am permitted to do, which is essentially ignore them.

24   Mr. Baslan is represented by experienced Counsel who made any

25   number of applications on his behalf who opts not to make many

Proceedings                                         6

1    of the applications that are now before me.  I will be doing

2    him a favor, I think frankly, if I did.  But I have the

3    discretion to consider them and in an exercise of extreme

4    caution, I will certainly review them and consider them, as I

5    have.

6            He is intent on masterminding his Defense; whether

7    that is prudent or not, I guess, remains to be seen, but there

8    is nothing in these applications that I have that warrants any

9    consideration.

10           There are a couple here that I have said all I am

11   going to say for the moment on the Messiah issue.  It is not

12   for me to determine the credibility of a Buffalo witness.

13   That is clearly a matter for the jury and if the issue evolves

14   as I anticipate it will evolve, as I said before, that

15   testimony is readily admissible.

16           In terms of the needs of Mr. Baslan vis-à-vis his

17   defense, I leave that between Mr. Baslan and his attorney.  I

18   have never denied a CJA request for any auxiliary help at all

19   and Mr. Savitt and his colleague have not been shy about

20   making those requests, all in an effort to provide Mr. Baslan

21   with his defense.  So, I really have very little to add to the

22   discussions we have had to date.

23           My final ruling on the admissibility of Buffalo will

24   await that point in the trial when it becomes germane, so I

25   would ask Counsel to refrain from alluding to it in their

VB        OCR        CRR

Proceedings                                              7

1   opening statements, as I'm sure Mr. Savitt will.

2            There was one issue that surfaced as we adjourned

3   last evening and that is a 403 objection to one or two of the

4   images that the Government seeks to offer and described

5   adequately on the record yesterday by Mr. Savitt and that

6   warrants some attention because they are, like all of these

7   images, disturbing and perhaps more disturbing than others.  I

8   would not permit, nor has the Government sought to admit the

9   audio of these incidents, which I am sure -- I have not heard

10  it, I have seen all the images -- I am sure is unimaginably

11  horrific.  That would clearly fall victim to any honest

12  application of 403.

13           The images themselves in my view again, subject to

14  what I hear, do not.  Yes, they are graphic and yes, they are

15  unpleasant, as is almost all of the evidence in the case.  I

16  can't -- what is the old expression -- make a silk purse from

17  a cow's ear or something like that?  I can't change the nature

18  of this case with the nature of the proof and while those two

19  images are in some respects different from others also

20  unpleasant, there will be no mistake here that Mr. Baslan is

21  not charged with that conduct.  It will be clear from the

22  Court's presentation and certainly clear from Mr. Savitt's

23  presentation no one would attempt to suggest otherwise.

24           But the issue, whether we have criminal intent and

25  indeed, what the intent was here, is informed in my view by

Proceedings                                8

1   the very nature of those images however unpleasant they may

2   be.  One who seeks to acquire for whatever purpose, presumably

3   sexual gratification, images of that sort may intend to commit

4   the acts that are alleged in the indictment and so my current

5   thinking on those, although I have considered them carefully

6   and have re-pictured them in my mind, not that it takes a lot

7   of imagination, is to receive them without qualification.

8            Is there anything else?

9            MS. DEMAS:  Your Honor, the Government did want to

10  raise a few issues about the defendant's intention to plead

11  guilty to Count 5 before trial begins.

12           I just want to be clear that the Government's

13  position is that should the defendant choose to plead to that

14  charge, we don't believe that the defendant should be able --

15  permitted to introduce that guilty plea at all unless he takes

16  the stand.  It is hearsay and there is case law to support the

17  fact that a defendant cannot offer the minutes of his plea

18  during the trial unless he takes the stand.

19           If he takes the stand, obviously, he can adopt the

20  statement.  It is not a statement against his penal interest

21  for which an exception would apply because he is not

22  unavailable.  Obviously, he controls whether or not he is

23  going to waive his Fifth Amendment right to testify.  So we

24  would ask that.

25           The Government's intention, if he were to plead, is

Proceedings                                                    9

1   not to discuss that fact at all.  So, we would ask that

2   Counsel be instructed not to raise that issue if the defendant

3   does plead in his opening or at any point during the trial

4   unless and until either A) the Government introduces it as a

5   statement against the defendant's interest or B) the defendant

6   takes the stand.

7           THE COURT:  That doesn't surprise me.

8           Go ahead.

9           MR. SAVITT:  No, it doesn't surprise me and I

10   understand all of the implications.

11           I suppose at some point the jury will get wind of

12   the idea, certainly at the end of trial, irrespective of

13   whether Mr. Baslan takes the stand or whether the Government

14   introduces the statement in some fashion in its case-in-chief.

15   I don't know if there is going to be -- well, I guess there

16   wouldn't be part of a rebuttal case, but whatever it is, I

17   think the jury will figure it out when they only have four

18   couldn't to counts to consider as opposed to the fifth.

19           THE COURT:  I am not so sure.  If they figure out

20   that he's pled guilty?  All sorts of things could have

21   happened that result in my giving them four charges to

22   consider rather than five.

23           MR. SAVITT:  Well, certainly I can argue in my

24   opening statements that that is not an issue that we're

25   contesting.

Proceedings                                    10

1          THE COURT:  That, you can say.

2          MR. SAVITT:  Correct.

3          So, I don't have any concern beyond that with the

4    Government's application.

5

6          (Continued on following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE COURT:  While we're waiting, make sure, be vigilant

2   to make sure there are no jurors in the courtroom.

3          MS. DEMAS:  I can confirm that none of the people in

4   the back are jurors.

5          THE COURT:  I understand that, but on these first

6   days, although they're told where to report, one never knows.

7          MS. DEMAS:  I will have one of the agents keep a

8   lookout.

9          THE COURT:  At last report, at about 20 of 10:00, we

10  have all but two jurors.  I'll have an update momentarily.

11              (Recess in proceedings.)

12         THE COURT:  We're just waiting for the jurors to be

13  brought out; they're being brought up, as I'm told.  I do not

14  have a head count at the moment.

15         You need that screen down?

16         MR. SMITH:  With our third witness, we're going to

17  play audio and video.  We don't need it for the opening,

18  your Honor.

19         THE COURT:  All right.

20         MR. SMITH:  Judge, before the jury comes out, it

21  just occurred to me, in the event the press wants exhibits

22  that are not child pornography, generally, we give them to the

23  press but we ask the Court's permission first.

24         THE COURT:  If they're admitted into the public

25  record, without qualification the press are entitled to them.

1          We're down two.  You heard from them?

2          THE CLERK:  No, the jury clerk is calling them.  I

3    have their numbers upstairs.

4          THE COURT:  But the rest are inside?

5          THE CLERK:  The rest are inside.

6          THE COURT:  Well, as handsome as you all are, I'm

7    going to step outside until we have a full compliment.  The

8    moment we do, we'll be ready to go.

9          THE CLERK:  Judge, we're missing one, now.

10               (Recess in proceedings.)

11         THE COURT:  All right.  We're ready to go.

12         I take it the jury has not been sworn?

13         MR. SAVITT:  Correct, your Honor.

14         MR. SMITH:  Your Honor, one of our witnesses has

15   indicated he may know one of the jurors.

16         MS. DEMAS:  He said he saw her walking in while he

17   was waiting in the hallway.  He thinks they grew up on the

18   same street.  He doesn't know her by name.

19         THE COURT:  Remind me at the break.

20         MS. DEMAS:  Yes, your Honor.

21         MR. SMITH:  Yes, your Honor.

22               (In the presence of the jury.)

23         THE COURT:  All rise.

24         Gabby, hit that, would you.

25         THE CLERK:  I need the swipe.

1              THE COURT:  All right.  Good morning, ladies and

2    gentlemen.

3              THE JURORS COLLECTIVELY:  Good morning.

4              THE COURT:  If you'll please remain standing for

5    just a moment.

6              Is the jury satisfactory to the government?

7              MR. SMITH:  Yes, your Honor.

8              THE COURT:  And to defense?

9              MR. SAVITT:  Yes, your Honor.

10             MR. SMITH:  Your Honor, we appear to be missing

11   someone.

12             THE COURT:  Missing someone?

13             THE CLERK:  Did somebody stay behind?

14             THE COURT:  No, we have the right number.

15             THE CLERK:  The alternate is now Alternate 1, is now

16   on seat three.

17             THE COURT:  Okay.

18             MR. SMITH:  I'm sorry, your Honor.  We have the

19   right number, they're just not in the right positions.

20             THE COURT:  That's all right.  Don't worry about it

21   for now.

22             Swear the jury, please.

23             THE CLERK:  Raise your right hand.  Do each of you

24   solemnly swear that you will well and truly try this case

25   before you and a true verdict render according to the evidence

1    and the law?

2            THE JURORS COLLECTIVELY:  I do.

3            THE COURT:  Please be seated, everyone.  Once again,

4    ladies and gentlemen, good morning.  My name is Raymond

5    Dearie.  I am the judge who will be presiding during the

6    course of this trial.  I have a few preliminarily remarks for

7    you, some instructions, some of which you've probably heard

8    before, and then we'll begin right away with the opening

9    statements of counsel and the government's case in chief.

10            This being the first day, we start late; that's not

11   something we're going to do regularly.  We are very conscious

12   of the fact we have invaded your lives, albeit to perform a

13   vital function, exercise power that the Court does not have,

14   to sit in judgment of another person, a profound

15   responsibility of citizenship.  I can appreciate, during a

16   long day of jury selection, it's somewhat tedious.  It is in

17   many ways the most important point in the trial.  You've

18   assured us that you can decide the issues of fact in this case

19   with complete fairness and impartiality; and that's what this

20   trial is about, to resolve the issues of fact but through the

21   efforts of the jury, in the course of the next couple of days.

22            So we do appreciate the time you've given us

23   yesterday.  We assure you, as we now formally begin the trial,

24   that we will not keep you waiting.  When I say 9:30 or 10:00,

25   we will begin at 9:30 or 10:00.  So we ask you please to

Judge's Preliminary Instructions                    15

1  anticipate the almost inevitable delays associated with travel

2  in and around the City of New York, because we are going to

3  start on time, out of respect for your time and in an effort

4  to move these proceedings along responsibly and stay within

5  the reasonable confines of your schedule time.

6          Let me tell you about our schedule.  We begin most

7  mornings at 9:30 or 10:00.  And I will give you advance notice

8  of the starting time, so if there's any variation, you'll know

9  about it as soon as I do.  I don't anticipate any exceptions,

10  but if there are, for whatever reason, you'll know it as soon

11  as I do.  We conclude the day at about 5:00 o'clock.  I fudged

12  the 5:00 o'clock, not because we'll work past 5:00 o'clock,

13  necessarily, but because occasionally we have a witness on the

14  stand who, if we stay an extra minute, or two or three, we may

15  be able to finish that witness' testimony, particularly if the

16  witness is committed elsewhere.

17          On most days, if not every day, you'll be on your

18  way home by 5:00 o'clock.  We'll take an hour and five minutes

19  for lunch.  We'll take mid-morning break, a mid-afternoon

20  break, brief breaks to allow you and everybody else to get out

21  of the courtroom and relax.  If you've not served as a juror

22  before, you're going to find out that sitting still for long

23  period of time, concentrating, involves an almost physical

24  effort.  You'll be downright tired at the end of the day, I

25  assure you.  I'm going to put you to work.  To give you an

1   opportunity to refresh and be comfortable, we'll take a

2   mid-morning and a mid-afternoon break.

3          My limited responsibilities here are to see to it

4   that we do what we can so that you can discharge your profound

5   responsibility without any distraction, discomfort or anything

6   else.  So if at any time during the course of the trial you're

7   uncomfortable for any reason and you need a quick break, just

8   indicate to the clerk or to me that you need a break, and

9   we'll take a recess.  But we do schedule a break in the

10  mid-morning and mid afternoon, as well as, of course, lunch.

11         A lot of work, as I'm sure you can appreciate, is

12  done in advance of this trial, in large measure, to see to it

13  that all the issues that might come up in the course of the

14  trial are addressed so that we can proceed efficiently and not

15  keep you waiting.  Occasionally there are legal issues that

16  requires the Court's attention that we did not anticipate.  If

17  that happens and we interrupt the proceedings, rest assured we

18  are diligently addressing that issue; we're not entertaining

19  ourselves, and we will resume the proceedings as quickly as

20  it's humanly possible.  Again, we are super sensitive to the

21  time that you've given and will give this Court.  Okay.

22         A couple of suggestions, the temperature in the

23  courtroom sometimes is an issue.  These days the temperature

24  outside is an issue.  Bring a sweater or jacket, something you

25  can put on or take off, as the temperature in the courtroom

Judge's Preliminary Instructions                    17

1   might require.  Again, it's to ensure you're comfortable.  I

2   don't want you sitting there chilled or half asleep because

3   the temperature in the courtroom is 80 degrees.  It's been

4   pretty consistent.  We haven't had too many problems, but

5   anticipate the possibility that the climate in the courtroom

6   might become an issue for all of us.

7          Jurors often ask about note-taking.  All right.

8   It's a common subject.  I have no objection to your taking

9   notes during the course of the trial, none at all.  But there

10  are a number of things I'm required, and good judgment should

11  tell you, about note-taking.  First of all.  As we know from

12  our school experiences, some of us are better note-takers than

13  others.  If you take a note or decide to take notes, they're

14  for your use only, not to be brandished about during the

15  course of your deliberations, as proof positive of what may

16  have happened during the trial or what a particular witness

17  may have said.

18          We have a better source for that; every word that's

19  spoken in this courtroom by anyone is recorded by our faithful

20  court reporter, the only person in the room whose

21  concentration cannot wonder for a second, if you stop and

22  think about it.  And she sits quietly there, doing her job,

23  but is the resource to you and everyone else, if and when you

24  need your recollections refreshed.  If you take notes, they're

25  not to leave the building.

Judge's Preliminary Instructions                18

1    At the end of the day, any note-taker should hand

2    the notes to Gabby or to Ellen, whom you'll meet tomorrow, I

3    guess.  They'll be placed in an envelope.  We'll seal the

4    envelope, sign it and it will be put in our safe overnight and

5    returned to you tomorrow morning.  And understand the act of

6    note-taking is an act of divided attention.  All right.

7    You're taking a note.  We want your attention principally to

8    be on the witness, so be aware of that, and understand the

9    potential risks in note-taking.  And I say that not to

10   discourage you, just to sensitize you to the fact that

11   note-taking can be a little bit hazardous at times.  Okay.

12       So you have our schedule.  As I said, if there's to

13   be any change in the schedule, you'll know it the moment I do.

14   Okay.  Now that you've been selected and sworn, you're not to

15   enter this courtroom ever unless escorted by Gabby or Ellen.

16   Please make sure that you'll report each morning to the jury

17   room, and we will be summoning you at the stated hour to begin

18   our proceedings.  Okay.  If you have any questions about how

19   we conduct the business of the court with or the experience

20   that you're having as a juror, at the end of the trial and the

21   work is done, you'll be given an opportunity to pose those

22   questions to me or anyone else you would like to speak with,

23   but, for now, no discussion whatsoever with anyone connected

24   with the trial.  Okay.

25       So we begin, then, the process of this criminal

Judge's Preliminary Instructions                    19

1    case, about which you've heard a little bit, not much, during

2    the jury selection.  So let me share with you a few further

3    notions that may help you in the course of your duty.  First

4    of all, you're here to administer justice with complete

5    fairness, according to the law, and the evidence and

6    impartiality, without bias, prejudice or sympathy for or

7    against the government or Mr. Baslan.  All right.

8            It's an important case.  The government is charged

9    with the responsibility of enforcing our federal criminal

10   laws, and, of course, to Mr. Baslan, who's charged with

11   serious offenses and is presumed innocent of those charges.

12   I'm not going to go over the Indictment itself.  You've heard

13   a little bit about the charges yesterday.  Counsel may, I

14   assume, to some extent refer to the specific charges in

15   opening statements, if they choose to do so.

16           The defendant has pleaded not guilty, thereby

17   placing at issue the issues in the Indictment.  The purpose of

18   the trial is to determine whether the government meets its

19   burden of proving the defendant guilty of the specific charge

20   beyond a reasonable doubt.  A defendant does not have to prove

21   his innocence, quite the contrary.  The defendant is, as I

22   said, presumed innocent of the charges.  All right.  And that

23   presumption stays with him throughout the trial, throughout

24   your deliberations, until such time, if ever, you as a jury

25   are unanimously convinced of his guilty, with respect to a

1  charge you are considered, so please do bear that in mind.

2          Now, as I said, in just a minute or two we'll have

3  opening statements.  The government will make an opening

4  statement, sort of a preview, if you will, of what they

5  anticipate you're going to hear.  Okay?  Sometimes the

6  evidence will not come in truly chronological order, so the

7  opening statements may be of assistance to you, as we begin

8  the presentation of evidence.

9          What the lawyers say in their opening statements is

10 not, I repeat, not evidence.  All right.  Bear that in mind.

11 What the lawyers say in their opening statement and, indeed,

12 what the lawyers say in their concluding statements, or

13 summations, is not evidence.  All right.  As soon as the

14 opening statements are finished, the government will begin

15 immediately with the presentation of evidence in support of

16 the charges.  When the government finishes that, the

17 presentation, in a couple, a few days or whatever, the

18 defendant has an opportunity to present evidence, but he is

19 not required to do so.

20         The burden is always on the government to prove

21 every element of the offenses charged beyond a reasonable

22 doubt.  The law never imposes on a defendant in a criminal

23 case, the burden of calling any witnesses or introducing any

24 evidence whatsoever.  And, finally, then, when the evidence is

25 complete, you'll hear arguments again from counsel, and, as

Judge's Preliminary Instructions                    21

1   you now know, what they say to you is not evidence.  And I'll

2   have more to say on the subject just before we hear the

3   attorneys' summations.  And after that, I will charge you,

4   instruct you on the law that governs this case.

5           Your verdict must be unanimous with respect to each

6   count.  You have a tremendously important task as jurors;

7   yesterday it was inconvenient to interruption, jury duty, how

8   am I going to get to the courtroom.  You all understand that,

9   but now I tell you, you have a tremendously important task as

10  jurors.  If that is not apparent to you now, it will very,

11  very quickly become so.

12          The Constitution of the United States gives a

13  defendant the right to have you, members of our community,

14  find the issues of fact that are in dispute.  I have no such

15  power.  I have no such authority.  You, and you alone, are the

16  sole judges of facts.  I will try to preside, partially, of

17  course, and not express any opinion concerning the facts.  If

18  at any time, however, I say or do anything that gives you the

19  impression that I have a view, an opinion either about some

20  statement that a witness made, or about the witness himself or

21  herself, rest assured I have no such opinion, number one.

22          And, number two, even if I did, it has no

23  consequence whatsoever.  What I think doesn't matter; it's

24  only what you the jury thinks.  So if you have the impression

25  that I have some sort of an opinion, disregard it.  I say this

Judge's Preliminary Instructions                    22

1    to you, frankly, because years ago jurors would ask, when you

2    said this or did this, were you suggesting to us such and

3    such?  The answer is no.  There are no suggestions, there are

4    no hints, subtle or otherwise, for the jury.  This is your

5    exclusive domain, and I will not impose myself in that regard.

6    Now, obviously, as sole judges of the facts, you will be

7    called upon to determine the witness -- what witnesses you

8    believe and what weight or significance to attach to the

9    testimony of each witness.  Again, your decisions, not mine.

10           Where an objection to a question is sustained, that

11    means that I agree with the legal basis expressed or implied

12    by the objection.  This is not television.  The lawyers, I

13    assure you, will not be getting up and making speeches.  Okay.

14    You may hear the word "objection."  You may hear a numerical

15    reference that's a reference to our Federal Rules of Evidence;

16    you may hear a simple phrase, but you're not going to hear

17    speeches.  For that, I'm called upon to make a legal judgment

18    as to the application of our Federal Rules of Evidence.

19           My rulings on objections by counsel have nothing to

20    do with your role.  Okay.  And so don't read anything into

21    them.  If I sustain an objection, ignore -- if I sustain an

22    objection, ignore the question.  And if any answer had been

23    volunteered, ignore that, too, as I will tell you at the time.

24    If I overrule the objection, that simply means that I don't

25    agree with the lawyer making the objection.  Okay.  And bear

1   in mind the lawyers have an obligation to make objections when

2   they feel that evidence should not be received or is otherwise

3   excludable under our Federal Rules of Evidence.  It's a legal

4   judgment I'm making, I'm not imposing myself on your

5   responsibility.  All right.

6           Now, obviously you may not consider anything you may

7   have read or heard outside the courtroom.  You've just taken

8   an oath to decide the issues of fact based upon the evidence

9   and only the evidence.  So I ask you please be vigilant.  This

10  is a public courtroom.  The press that work in the building,

11  there's always the possibility that there may be a story in

12  your morning paper, maybe a story on your evening news on TV

13  and so forth.  If you come across anything that remotely

14  resembles this case, we ask you to turn your attention away

15  from it.  All right.  It may be accurate.  It may be

16  inaccurate.  In my experience, it's generally a little bit of

17  both.  But one thing it is not, it is not evidence.  And as I

18  said, you've sworn to us that you will decide the issues of

19  fact based upon the evidence and only the evidence.

20          In this Internet world, resist the temptation -- not

21  that I think you're going to find anything, resist, it's

22  critical that you resist the temptation to do any Googling, or

23  searching or anything else about names or anything else you

24  hear in the course of this trial.  It is critical that you

25  abide by that instruction and you refrain from doing that.

Judge's Preliminary Instructions                24

1   Everything we've done up until now and everything we will have

2   done will be jeopardized by a careless, albeit good faith

3   effort, by a juror to look into some aspect of this case

4   online.  We'll squander everything.  It will ruin the

5   proceedings.  I urge you do not engage in any sort of Internet

6   searches that may in any way be related to this trial.  Okay.

7           Now, just so that we understand each other, no

8   statement, ruling, remark I make during the course of the

9   trial again is intended to indicate any opinion as to how you

10  should decide the case or to influence you, for that matter,

11  in any way.  At times, I may ask questions of a witness.  It

12  will be an exception rather than an everyday occurrence.

13  Indeed, I may ask no questions at all, but if I do, again, I'm

14  not sending signals; I may not have understood the witness'

15  response.  At my age, I may not have heard the witness'

16  response.  Okay.  The witness may use a term that we haven't

17  heard before; I'll ask the witness, perhaps, to explain.

18  Whatever the case may be, if I ask a question, it's not a

19  signal to you, I'm just asking for clarification or whatever

20  the case may be.  Okay.

21          And, finally, a couple of rules.  I have to impose

22  them on you; I have to impose them on everybody else.  We

23  don't sequester our jurors here in the federal court.  You'll

24  be going home at night, but you are required by oath to follow

25  these rules first.  Do not discuss the case either among

Judge's Preliminary Instructions                    25

1    yourselves or with anyone else.  There a two parts to that.

2    One is quite obvious; don't talk to anybody about the case,

3    anybody you meet on the street, anybody you associate with the

4    trial, anybody at home.  Perfectly understandable what

5    happened, what's the case about and so forth, perfectly

6    understandable.  You can tell the folks at home I'm on a

7    criminal case, and I'll tell you all about it when the case is

8    over.

9            Again, good faith exchanges kind of information,

10   comments, may have a way of influencing people and we don't

11   want any of that.  All right.  No discussions with anyone

12   about the case.  That's one part.  The other part is a little

13   more interesting.  No discussions among yourselves.  Now that

14   seems a little peculiar, because, after all, that's what

15   juries do; but you won't do that until you've heard all of the

16   evidence, you heard the attorneys' summations, you've heard my

17   instructions, and you are together, alone in the jury room

18   behind a closed door.  At no other time is there to be any

19   discussion about the case and all 12 of you all together.

20   I'll certainly repeat that when the time comes.

21           Resist the temptation, as you take a break, after

22   you've heard something you find interesting, to go into the

23   jury room and say, wow, isn't that something.  Please, folks,

24   you got to hear all of evidence, you got to hear the Court's

25   instructions and attorneys' summations, and all 12 of you have

1    to be together at the same time.  That's the nature of the

2    deliberating process.  Keep an open mind.  If I were limited

3    to four words in these instructions, those would be the four

4    words; keep an open mind, reaching your conclusion only during

5    your deliberations, after you've heard the evidence, these

6    summations and the Court's instructions, and then only after

7    an opened exchange of views with your colleagues on the jury.

8            Do not permit any other person to discuss the case

9    in your presence.  And if anyone does so, despite your telling

10   them not to, you are to report that fact to me as soon as you

11   are able, to Gabby or Ellen, but do not bring it to the

12   attention of your colleagues on the jury.

13           And, finally, we have five, I believe, alternate

14   jurors, obviously gentlemen, ladies -- ladies, I guess it is.

15   We invite your very careful attention, and in case of an

16   unforeseen emergency, or extended absence or other problem,

17   one which has already occurred, we will ask you to take the

18   place of a juror, and you'll be expected, of course, to

19   deliberate and with your fellow jurors.  So please pay strict

20   attention at all times.

21           Please forgive the tutorial tone in my comments.

22   Many of these things are very, very important.  We don't want

23   to jeopardize the effort that's gone into this, effort that

24   you are now a part of, the community of that effort.  We,

25   again, appreciate your time and turn our attention now to the

1    United States Attorney for his opening statement.  Or her

2    opening statement.  Excuse me.

3              Ms. Demas.

4              MS. DEMAS:  On March 19th, 2013, the defendant,

5    Bebars Baslan, and his girlfriend knocked on the door to room

6    765 at the Hyatt Hotel in Jersey City, New Jersey.  At that

7    moment, the defendant was inches away from being able to do

8    what he'd been planning for over a month, sexually molest

9    young children and videotape them.  The defendant went to that

10   hotel room because he thought there were three children

11   inside, a one-and-a-half year old boy named Ellie, a

12   three-and-a-half month old infant named Daniel and a drugged

13   seven-year-old girl named Leah.

14             The defendant believed these three children were

15   inside that hotel room because he had planned all of the

16   details of that night with the man who was Ellie and Daniel's

17   father and Leah's uncle.  Earlier that day, the defendant gave

18   Benadryl to this man, and he told him exactly how much

19   Benadryl to give to Leah so that she'd be passed out by the

20   time the defendant got there.  This seven-year-old girl needed

21   to be passed out because the defendant planned to sexually

22   molest her.

23             Ladies and gentlemen -- these are his words, not

24   mine -- the defendant said that he wanted to, quote, "go down

25   on Leah."  He was going to take pictures of her genitals and

1  videotape his girlfriend and coconspirator, Kristen Henry,

2  performing sex acts on Ellie and Daniel.  There is one thing

3  the defendant did not know; he did not know that Ellie and

4  Daniel's father and Leah's uncle had tipped off the FBI to

5  this disgusting plot and had been recording the defendant's

6  plans for over a month.  So when the defendant and his

7  girlfriend went inside that hotel room with the intention of

8  molesting these three children, the FBI was standing right

9  behind them and arrested them.

10         The defendant's attempt to sexually exploit these

11 three children is why we're here today.  Good morning.  My

12 name is Tiana Demas.  I'm an Assistant U.S. Attorney here at

13 the Eastern District of New York.  Seated at the government's

14 table is Assistant U.S. Attorney Tyler Smith, Special Agent

15 Aaron Spivack of the FBI, and Paralegal Specialist Tareba

16 Torres.  We represent the government.

17         Let me take a step back to about two months before

18 the defendant's arrested.  In late January 2013, the man who

19 is Daniel and Ellie's father and Leah's uncle went to the

20 police and told them about the defendant.  And just to be

21 clear, this is one man; he was the father of two of the

22 children and the uncle of the third.  In February, this man

23 met with the FBI, and he became what is called an "informant."

24 The informant agreed to wear a wire, and he lawfully recorded

25 his conversations with the defendant and the defendant's

1  girlfriend, Kristen Henry, for almost a month.

2       During these conversations, when the defendant did

3  not know he was being recorded, he talks about his evolving

4  plan to molest these three children and then move on to

5  others.  The plan started with the defendant's idea of taking

6  what he called a, quote, "safety picture" of Kristen Henry,

7  his coconspirator, performing oral sex on Daniel or Ellie.

8  The defendant needed this safety picture to guarantee that

9  Kristen Henry wouldn't go to the police and that she wouldn't

10 back out when the defendant moved on to his real goal,

11 drugging and sexually molesting multiple children and taking

12 videos of it.

13      Here is how the defendant describes that safety

14 picture on one of the recordings:  These are his words, not

15 mine.  Quote, "She's just going to be pretending to diaper

16 change him and just take a couple of pictures of her sucking

17 him off.  That's it."

18      This is what the defendant said about how you can

19 sexually molest a child and not get caught.  Quote, "I mean,

20 you could have anal with the kid and it wouldn't be a problem,

21 like won't leave any marks or anything.  Just vaginally, you

22 can't."

23      The defendant also talked about what he was going to

24 do to Leah, the informant's seven-year-old niece.  Quote,

25 "take pictures.  You know, touch.  I'm going to go down on

1    her.  That's pretty much what I want out of the whole thing."

2            And the defendant had no intention of stopping with

3    Leah.  Again, these are his words, not mine.  Quote, "Leah is

4    more of a stepping stone for us to, like, once you do it, then

5    that's it.  The trust is there."

6            The defendant did not just talk about sexually

7    molesting children; he took substantial steps, concrete steps,

8    to achieve this goal.  On March 18th, the defendant learned

9    that the next day the informant was going to be at a hotel in

10   Jersey City with Leah, Daniel and Ellie.  So the defendant got

11   prepared.  He told the CI -- excuse me -- the informant

12   exactly how to drug Leah, the seven year old, so that she'd

13   be, quote, "passed out, asleep," so there would be no chance

14   of her remembering.

15           The defendant said that he would take care of

16   getting the drugs to make sure that Leah was passed out when

17   he molested her.  The defendant said he would get the

18   Benadryl, and he told the informant exactly how much Benadryl

19   to give Leah.  The defendant said that he wasn't going to stay

20   over at the hotel that night because he doesn't want to risk

21   Leah waking up and seeing him or his coconspirator, Kristen

22   Henry.  The defendant even discussed the particular camera

23   that he was going to bring with him to videotape the sexual

24   molestation of these children, a DSLR HD camera that was, in

25   his words, fully charged, fully loaded.

1    And the defendant made clear on these recordings

2    that his face would not be on any of the pictures or videos

3    that he planned to take at the hotel.  He said, quote, "Don't

4    worry, man, no face.  Just like I said, Kristen's face and my

5    dick's face, too."

6         On March 19th, the day after the informant had told

7    him about that hotel in New Jersey, the defendant did exactly

8    what he said he was going to do; he sent Kristen Henry, his

9    coconspirator, to a drug store to buy Benadryl and juice.  The

10   defendant called the informant and told him he had the

11   Benadryl.  The defendant gave the informant the Benadryl and a

12   bottle of orange juice to mix it in so Leah wouldn't be able

13   to taste it.  The defendant told the informant to get rid of

14   the Benadryl after he'd given it to Leah, because having a

15   bottle of children's Benadryl was, in the defendant's words,

16   "very obvious."

17        The defendant told the informant to tell him the

18   address of the hotel on the phone and not to text it.  He gave

19   the informant code words to use on the phone, to indicate to

20   the defendant that the informant was at the hotel with the

21   three kids, as planned.  And the defendant even told the

22   informant that when checking into the hotel, he should leave

23   the kids in the car to avoid suspicion.  Later that night, the

24   informant called the defendant, gave him that code phrase that

25   meant that he was at the hotel with Leah, Daniel and Ellie.

1    You're going to hear the defendant in recorded

2  conversations asking how long it was going to take him to get

3  from his apartment in Brooklyn to that hotel in Jersey City.

4  And within an hour and a half of learning that the informant

5  was at the hotel with the three kids, the defendant and

6  Kristen Henry drove to the hotel, parked their car and went up

7  the elevator with the intention of doing exactly what the

8  defendant said he was going to do, sexually molest these

9  children and take pictures and videos of them.

10    For his conduct, the defendant is charged with four

11  crimes.  The first is traveling with the intent to commit

12  aggravated sexual abuse of a minor less than 12 years of age,

13  and that is the crossing of state lines, from New York to

14  New Jersey, for the purpose of sexually molesting Leah and

15  having Kristen Henry perform oral sex on Daniel.  The second

16  count, conspiracy to sexually exploit a child.  That is for

17  agreeing with Kristen Henry, his girlfriend and coconspirator,

18  to sexually molest, Leah, Daniel and Ellie and to videotape

19  it.

20    The third count is attempt to sexually exploit a

21  child, and that is for attempting or taking a substantial step

22  towards sexually molesting these three children and

23  videotaping them.  The fourth count is attempted coercion and

24  enticement of a minor to engage in illegal sexual activity.

25  That is for using the telephone to coerce these three

1  children, through their guardian, the informant, to engage in

2  sexual activity that is illegal under New York or New Jersey

3  law.

4          During this trial, we will prove beyond a reasonable

5  doubt that the defendant committed these crimes.  We will

6  prove this through physical evidence and witness testimony.

7  You're going to hear the defendant on lawfully recorded phone

8  calls and in-person meetings saying exactly what he was going

9  to do once he got inside that hotel room.  You're going to see

10 the camera he was carrying with him when he went to that hotel

11 room, a DSLA HD camera, fully charged, fully loaded, just like

12 he said.  He also had a laptop with him and an iPhone that was

13 capable of recording videos.  You will see the Benadryl that

14 Kristen Henry, his coconspirator, purchased.

15         You're also going to see text messages between the

16 defendant and Kristen Henry earlier, from the day of their

17 arrest.  You're also going to see the physical evidence that

18 FBI agents seized when they searched the defendant's apartment

19 in Brooklyn at the same time he was being arrested in

20 New Jersey.  They found computers, encrypted hard drives,

21 camera equipment.  You're going to hear from the FBI agents

22 who processed this evidence.  You're going to learn that they

23 broke the encryption on one of the hard drives.  And on this

24 hard drive, there were tens of thousands of images and videos

25 of children being sexually abused, child pornography.  You

1   will see some of these horrific videos and images during

2   trial.  After you have seen and heard all of the evidence, we

3   will ask you to return the only verdict consistent with that

4   evidence, and that is a verdict of guilty on all counts.

5           THE COURT:  All right.  Thank you, Ms. Demas.

6           Mr. Savitt.

7           MR. SAVITT:  Thank you, your Honor.  May it please

8   the Court and Members of the Jury, I have a confession to

9   make, and that confession is that this is a very difficult and

10  hard case for everybody involved in this process.  The charges

11  against my client are serious, beyond any doubt.  The

12  statement by the prosecutor to you, eloquently delivered,

13  might lead you to conclude that my client is guilty and that's

14  it, that he's some sort of a monster that was going to abuse

15  babies and children on March 19th of last year; that his voice

16  is captured on tape speaking to an informant.

17          And there are a lot of tapes.  There are hours and

18  hours of conversation.  Only a few vignettes were presented to

19  you by the prosecutor.  But you're going to see, I can predict

20  and hear, those tapes in full.  It's a very difficult thing

21  for any of us not to rush to judgment when we hear something

22  like this.  It's a very, very hard process when you look at

23  child pornography, which is disgusting, and then look at a

24  defendant seated in this courtroom and say, my goodness, what

25  are we all doing here?  Why go through this process?  This man

Case 1:13-cr-00220-RJD   Document 144   Filed 08/13/14   Page 35 of 134 PageID #: 1150

1   a guilty, he's a monster and that's that.

2          You know, we went through a very difficult and long

3   jury selection process yesterday.  Without getting into

4   details, you saw a lot of jurors were excused.  It's a very

5   difficult case.  It's very difficult to keep an open mind when

6   you've got these kind of charges.  But as Judge Dearie just

7   explained to you, your job is to keep an open mind.  Your

8   responsibility is to judge the case fairly.  Your

9   responsibility is also not to rush to judgment and not to come

10  to any determination until you're all gathered together in the

11  jury room, having heard all of the evidence, all of it, all of

12  it, not just little portions of it and after Judge Dearie has

13  instructed you on the legal principals and rules to guide you

14  in evaluating what really happened on March 19th of last year.

15         Now, as the judge told you, the defense has no

16  burden in any criminal case.  We don't have a burden to even

17  make an opening statement.  We don't have to cross-examine

18  witnesses.  We don't have to introduce evidence.  My client

19  does not have a burden to take the stand.  And, in fact, if he

20  didn't take the stand, you wouldn't be permitted to consider

21  that against him.  Mr. Baslan is taking the stand in this

22  case, ladies and gentlemen.  We are going to put him on for

23  the defense.  We are going to be cross-examining witnesses.

24         And let me give you a few of the defense vignettes,

25  just for your consideration, because this is an opening

1  statement.  It's not a summation, and it's certainly not

2  evidence, and I'm not a witness.  I'm an advocate, just as the

3  prosecutors are an advocate for a party.  How about one

4  vignette, the cooperate for in this case, the father of two

5  babies, the uncle of the little girl, he becomes part of a

6  government sting against my client and against his girlfriend

7  Kristen Henry.  Imagine that, a government cooperator using

8  his own children and niece as bait.

9         Consider the following as well about the cooperator,

10  things that you haven't heard yet from the prosecution, but

11  you will hear, if it doesn't come out on direct examination by

12  the government, you will hear this on cross-examination, this

13  cooperator, Jack, has got a history of psychiatric problems.

14  He has bipolar disorders.  He's on a host of medications for

15  years.  He has a history of violence.  He beats people up.  He

16  lies.  He's on drugs.  He commits sexual assaults against

17  underaged girls.  He was committed to psychiatric institutions

18  on at least five occasions.  He attempted to commit suicide,

19  by his own admission, on eight or nine occasions.  This is a

20  very sick man.  This is the government's witness.

21         The government is going to ask you at the end of

22  this trial to rely on this person and his version of the

23  events and accept that to convict my client.  He's going to be

24  taking the stand in this trial, and I very safely predict, and

25  it will be your job to evaluate him not only on direct

1   examination by the prosecutor but also on cross-examination.

2   Your job will be to determine whether or not he's a reliable

3   witness, whether he lies, whether he's a criminal, whether he

4   himself is a child molester; whether a person so sick and so

5   bizarre and, frankly, so disgusting, who can't tell the truth

6   if it slapped him across the face can be believed to convict

7   anyone beyond a reasonable doubt.

8           Yes, there are tapes out there, and there are other

9   portions of the tapes that will make no sense, because it

10  doesn't fit within the government's strict of what my client's

11  intent was when he crossed state lines.  Jack, the informant,

12  with his two little babies, who are supposed to be part of a

13  plan of molestation and his niece, you can ask yourselves how

14  did it come about Jack to use his own children for this

15  bizarre plan?  I mean, the thought of it:  There's a lot more

16  to this case than meets the eye, and there's certainly a lot

17  more depth and complexity to this case than the prosecutor's

18  very eloquent opening statement would suggest.

19          Consider, for instance, my client and Kristen Henry

20  were boyfriend/girlfriend.  Why would anybody need -- why

21  would he need to have some sort of -- some sort of a blackmail

22  tool over his girlfriend not to go to the police if they're

23  co-conspirators, is they're supposed to be opening up some

24  sort of a business to molest children on a regular basis?  Who

25  needs to have this kind of hammer over a coconspirator?  You

1    know, it doesn't make any sense.  But it will make a lot more

2    sense to you once you've heard answers on cross-examination.

3    Once you've heard the defense case, that will make sense to

4    you; and then you will have not just one side of the coin,

5    you're going to have both sides of the coin to consider.

6          This is not a case where I'm going to ask you

7    whether or not you can believe the government's cooperator.

8    And I take no issue with law enforcement witnesses.  This is a

9    case where you'll be asked to determine what really happened.

10   And I will tell you, as you probably know already, that this

11   is a very bizarre case.  It's disturbing.  It's weird.  And I

12   doubt that you're going to like either the cooperator or my

13   client when this case is over.

14         I will also tell you that in terms of the child

15   pornography found on my client's computer, that you will hear

16   that we're not contesting that.  Obviously we can't contest

17   it.  But from the very moment that my client was arrested on

18   March 9th, he admitted the child pornography, and that's

19   pretty awful for him to have on computer.  You will hear that

20   there are something like 14,000 images, terabytes worth of

21   this type of dirt.  And if you have any person sick enough to

22   look at this stuff, and to download it and to watch it would

23   have to be as old as the biblical Methuselah in over

24   700 years, probably, of day-and-night watching this stuff.  My

25   client didn't watch this stuff day and night.  Some of it was

1   downloaded and watched by Mr. Jack.  But a very keen interest

2   in child pornography.

3            So as you're analyzing the evidence, as you're

4   listening to the witnesses, the first thing you're going to

5   hear is the government's presentation.  The government goes

6   first.  The government makes the opening statement first.  The

7   government has the burden of proof.  After that, we will

8   present a defense case to you, and you will have a choice, an

9   option.  And it's not just a question of whom do you believe,

10  it's a question of whether or not you believe, unanimously,

11  after reviewing all of the evidence, in light of the law as

12  instructed to you by the judge that the government has proven

13  its case against my client beyond a reasonable doubt.

14           And I suggest to you in the final analysis that you

15  will decide the answer is no.  I thank you for your jury

16  service, for the seriousness in which you take this case, for

17  keeping an open mind and for waiting until the process is over

18  before you decide whether the government proved its case.

19           THE COURT:  Thank you, Mr. Savitt.

20           Our first witness, please.

21           MR. SMITH:  Your Honor, if we can approach at

22  sidebar with respect to this witness?

23           THE COURT:  Sidebar.

24           (Sidebar - Outside the presence of the jury.)

25

40

1          MS. DEMAS:  This is the witness who indicated he had

2    seen a juror in the hallway and believed he knew her from

3    growing up, and the Court asked us to raise this at a break.

4          THE COURT:  They can confirm or deny he knows her.

5    After that, I'll inquire do we know the juror.

6          MS. DEMAS:  It's a female juror.

7          THE COURT:  Just go ahead, sir.

8                    (Sidebar concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Torres - Direct - Smith                                    41

1              (In open court - In the presence of the jury.)

2                   THE COURT:  Just go ahead, sir.

3                   MR. SMITH:  The government calls Detective Frank

4       Torres.

5                   THE COURT:  Detective Frank?

6                   MR. SMITH:  Frank Torres.

7                   THE COURT:  Torres.

8                   THE CLERK:  Please raise your right hand.  Do you

9       solemnly state that the testimony you're about to give will be

10      the truth, the whole truth and nothing but the truth?

11                  THE WITNESS:  I do.

12                  THE CLERK:  State your name for the record.

13                  THE WITNESS:  Detective Frank Torres.

14                          FRANK TORRES,

15      called as a witness, by an on behalf of the government, having

16      been first duly sworn, was examined and testified as follows:

17                  THE COURT:  All right.  Sir, have a seat.

18                  THE WITNESS:  Thank you.

19      DIRECT EXAMINATION

20      BY MR. SMITH:

21      Q    Good morning, Detective Torres.

22      A    Good morning.

23      Q    Who do you work for?

24      A    New York City Police Department.

25      Q    What's your title?

1   A      Detective, Third Grade.

2   Q      How long have you been a detective for the New York City

3   Police Department?

4   A      Over six-and-a-half years, plus a year and a half in

5   training.  Eight years total.

6   Q      Are you assigned to a particular location?

7   A      Yes.

8   Q      What's that location?

9   A      The 66 Precinct, located in Brooklyn.

10  Q      What are your duties as a detective assigned to the 66

11  Precinct?

12  A      I investigate all complainants left open to detective

13  squads by patrol.

14  Q      What types of crimes do you investigate?

15  A      Robberies, homicides, assaults, larcenies, and all other

16  types of crimes.

17  Q      Do you interview people who come into the precinct with

18  complaints?

19  A      All the time.

20  Q      Approximately how often do you interview people?

21  A      Almost every day I work.

22  Q      As part of that process, do you regularly observe the

23  demeanor of people you're interviewing?

24  A      Yes, I do.

25  Q      Detective, were you working on January 27th, 2013?

1    A    Yes.

2    Q    Do you remember what your shift was that day?

3    A    I was working at p.m., from 16:00 hours to 01:00 hours,

4    in the morning.

5    Q    Was that 4:00 p.m. to 1:00 a.m.?

6    A    Yes.

7    Q    During that day, did you interview a person who walked

8    into the 66 Precinct?

9    A    Yes.

10   Q    Can you tell the jury how you came to be interviewing

11   that individual?

12   A    I had somebody from the front of the precinct come in

13   that works as a police officer to say that --

14          MR. SAVITT:  Objection, your Honor.

15          THE COURT:  This is just for background.  Overruled.

16          THE WITNESS:  I had a police officer that came into

17   the detective squad and said the gentleman had walked in, that

18   he wanted to make a complaint, and I told him I would be out

19   and I would interview him.

20   Q    Do you remember what his first name was?

21   A    Jack.

22          MR. SMITH:  If we can turn the document camera on

23   for the witness?

24   Q    Showing you what's been marked as Government Exhibit 45,

25   do you see it up on the screen?

1   A    No.

2            MR. SMITH:  If I can approach, your Honor?

3            THE COURT:  Go ahead.  Don't tell me we're having

4   technical problems.

5            THE CLERK:  Nothing.

6            THE COURT:  Identify the document for me, if you

7   would.

8            MR. SMITH:  Government Exhibit 45.

9   Q    Do you recognize that?

10  A    Yes.

11  Q    What is it?

12  A    He's the gentleman who came to the precinct to make the

13  complaint.

14  Q    It's photograph of that gentleman?

15  A    Yes.

16           MS. DEMAS:  Government offers Government Exhibit 45.

17           MR. SAVITT:  No objection.

18           THE COURT:  Received.

19           (Government's Exhibit 45  was received in evidence.)

20           MS. DEMAS:  I'll publish for the jury.

21           THE WITNESS:  It's on, but there's no picture.

22  Q    Now, after Jack came into the precinct, on January 27th,

23  what did you do with it?

24  A    I went out, got Jack and brought him back into the

25  Detective squad room and placed him into the interview room.

1  Q    Was he currently under investigation by the NYPD when you

2  met with him?

3  A    No.

4              THE COURT:  Did you know him at all?

5              THE WITNESS:  No.

6  Q    What did you -- what'd you do after you put Jack in an

7  interview room?

8  A    I conducted an interview.

9  Q    Can you describe -- without going into the details of

10 what he said, can you describe what his physical demeanor was

11 when you were talking to him?

12 A    When he came in, I told him to sit down.  He sat down.

13 He was very agitated.  He was amped up.  I felt he was on

14 something.  He was a little angry, and he kept on trying to

15 stand up.  I told him to sit down, be calm.  And he would

16 punch his hands into his fists, and he was very agitated.

17 Q    Without going into the details of what he told you, was

18 the complaint relating to a specific topic or type of crime?

19 A    Yes.

20 Q    What was the general type of crime?

21             MR. SAVITT:  Your Honor, I object to this.

22             THE COURT:  No, I'm going to permit it.  I mean, I

23 understand the objection.  Statements made by Jack to the

24 detective in the precinct are hearsay.  His statements out of

25 court, they're not to be considered by you for the truth of

Torres - Direct - Smith                           46

1    anything Jack may have said.  This is providing some

2    background to you as to how Jack came to the attention of this

3    detective, the police department, presumably other

4    authorities.  So we're not going to have a lot of statements

5    about what Jack said.  To the extent that anything that the

6    detective said to suggest a statement that Jack may have said,

7    like a topic, for example, is not to be considered by you for

8    the truth of what Jack said.  It's not evidence of that.

9    Okay.

10            Go ahead.  And let's get through this quickly.

11   Q    What was the general topic?

12   A    Sex crime.

13   Q    Did you interview him on one occasion, on that day, or

14   more than one occasion?

15   A    More than once.

16   Q    Approximately how long was the first interview?

17   A    Approximately 30 minutes.

18   Q    What did you do after that 30-minute interview?

19   A    I asked him for his ID.  I told him to stay inside the

20   room, that I would be back in a little bit and asked him a

21   couple more questions.

22   Q    Why'd you do that?

23   A    Usually any person I interview, I just run his

24   background, you know, just to make sure he's not wanted on a

25   warrant.

Torres - Direct - Smith                              47

1    Q    Approximately how long a break did you take?

2    A    About 30 minutes.

3    Q    What did you do after that 30-minute break?

4    A    I came back into the room, and I started another

5    interview with the complainant.

6    Q    What was his demeanor during that interview?

7    A    The same.

8    Q    Did he make any offers to you?

9    A    Yes.

10   Q    What offers?

11   A    He said he wanted to help with the case; he would do

12   anything that was necessary, that he would wear a wire.  He

13   would let them -- he would let anybody go up in his cell

14   phone, like tap his cell phone, to use his cell phone records

15   and assist in any way possible with the case.

16   Q    Did you give Jack any instructions?

17   A    Yes.

18   Q    What instructions did you give him?

19   A    I told him that he's not allowed to contact the

20   perpetrator in any form; physically, by mail, electronic mail,

21   texting.  I did not want him to go over to the guy's house.  I

22   wanted him to have no contact, and I didn't even want him to

23   get somebody to go and talk to the guy either.

24   Q    What, if anything, did you do after you interviewed Jack,

25   on those two occasions, on January 27th?

Torres - Direct - Smith                48

1    A    I called Special Victims, and they told me they don't

2    handle this particular type of case, and they gave me the

3    number to call Vice.

4    Q    What is Vice?

5    A    Vice is a unit that deals with prostitution, organized

6    rings, and sex crimes and so forth.

7    Q    Did you ultimately call Vice?

8    A    Yes.

9    Q    What happened?

10   A    I told them everything that the complainant had told me,

11   and they said okay.  They gave me a log number.  And they told

12   me that they would contact Jack, and that was it.  I wrote the

13   log number down.  I had kept it for a couple of months, and I

14   don't have the log number no more, and I never heard again

15   from Jack or Vice.

16   Q    Did you tell Jack anything after you contacted Vice?

17   A    I told him that, again, not to go and see the perpetrator

18   at all, have no contact and to be ready; that vice will be

19   calling him, and they'll be conducting an interview, and

20   they're taking the case on it and they're going to run with

21   it.

22   Q    Why did you instruct Jack not to contact the perpetrator?

23   A    From what he had told me, I felt that if Jack would go

24   over there, you know, there could --

25             MR. SAVITT:  Objection to this.

NICOLE CANALES, CSR, RPR

1          THE COURT:  I'll permit it.  Go ahead.

2          THE WITNESS:  I felt there could have been some type

3     of physical altercation or something worse could have

4     happened, so I told him to stay away at all costs.

5          MR. SMITH:  No further questions.

6          THE COURT:  Mr. Savitt, any cross?

7          MR. SAVITT:  Yes.

8     CROSS-EXAMINATION

9     BY MR. SAVITT:

10    Q     Good morning, Detective Torres.

11    A     Good morning.

12    Q     You're assigned to the 66?

13    A     Yes.

14    Q     And you told us about events that happened on January the

15    27th of 2013, correct?

16    A     Yes.

17    Q     Did you review any of your reports before testifying here

18    today?

19    A     I have no reports.

20    Q     So you're testifying purely on your memory of events that

21    occurred a year-and-a-half ago; am I right?

22    A     Correct.

23    Q     Since that time, were you involved in any other

24    investigations or nacence (phonetic) investigations that you,

25    ultimately, either conducted or didn't conduct?  Any other

1   cases?

2   A    I catch cases on a regular basis.

3   Q    All right.  So how many cases you had during that last

4   time, in the last year and a half?

5   A    Approximate?

6   Q    Yeah, give me an approximate, please.

7   A    200 plus.

8   Q    All right.  And every case has different details, and

9   different actors and different perpetrators, right?

10  A    Correct.

11  Q    And you remember all of the details of all these

12  200 cases?

13  A    No.

14  Q    Now, let me ask you this, this fellow who came in, the

15  complainant, Jack, had you ever met him before?

16  A    No.

17  Q    Since January the 27th of 2013, you ever meet him again?

18  A    About a week ago, week-and-a-half ago.

19  Q    A week-and-a-half ago.  Where did you meet Jack a

20  week-and-a-half ago?

21  A    I was exiting the D.A.'s Office.

22  Q    You mean the U.S. Attorney's Office, the office right

23  here?

24  A    Yes.

25  Q    And that's across the street, near the courthouse, right?

Torres - Cross - Savitt                                    51

1    A    Yes.

2    Q    And you saw Jack?

3    A    Yes.

4    Q    And was he exiting, or was he coming in?

5    A    He was standing by the door.

6    Q    By which door?

7    A    The door that's locked into the USDA's Office.

8    Q    All right.  So he's waiting to be let in, right?

9    A    Correct.

10   Q    Did you have a conversation with him?

11   A    No.

12   Q    Did you say hi to him?

13   A    Yes, I shook his hand.

14   Q    You shook his hand, and that was it?

15   A    That's it.

16   Q    Apart from shaking Jack's hand a week-and-a-half ago, and

17   what you've told us about that occurred a year-and-a-half ago,

18   you had absolutely no contact with Jack, right?

19   A    None.

20   Q    You weren't involved in an investigation of the case

21   here, were you?

22   A    No.

23   Q    So when you used the word "case" in your direct

24   examination, that's a figure of speech, it's not like you

25   opened the case, right?

Torres - Cross - Savitt                                    52

1   A    I did not open a case, no.

2   Q    And when you used the word "perpetrator," that's sort of

3   police jargon for somebody that the complainant is talking

4   about, right?

5   A    Correct.

6   Q    And so when you use the word "perpetrator," you're not

7   suggesting that somebody committed a crime?  Correct me if I'm

8   wrong, you're suggesting that the complainant is saying that

9   that person committed a crime; am I correct?

10  A    Yes.

11  Q    Now, you said that this fellow Jack was very agitated and

12  very pumped up; am I right?

13  A    Yes.

14  Q    He was angry, correct?

15  A    Yes.

16  Q    Kept on punching his hand into his fists?

17  A    Several times.

18  Q    And you thought that he might be on some sort of a

19  substance?

20  A    Yes.

21  Q    He didn't appear to be normal?

22  A    He appeared to be amped up.

23  Q    Amped up.  And when you say "amped up," are you

24  suggesting that based on your experience he looked like he was

25  on some sort of a drug, at that point, right?

1   A    Yes.

2   Q    And of course you wanted to check up on Jack and to see

3   his background, because not every complainant comes in all

4   amped up; am I right?

5   A    That's true.  I check everyone's, too.

6   Q    And when you checked Jack's background, you knew his last

7   name, though, I would imagine?

8   A    Yes.

9   Q    Did he give you any form of ID?

10  A    I think he gave me his driver's license.

11  Q    When you say you think, are you sure?

12  A    I'm not positive.

13  Q    All right.  But that would be standard operating

14  procedure, right?

15  A    Some type of photo ID, yes.

16  Q    And you checked whether there was a background on him.

17  And was there a background on him?

18  A    Either I checked, or one of my partners that I was

19  working with that day checked.

20  Q    Okay.  Was there any hit?

21  A    He didn't have a warrant.

22  Q    Did he have any priors?

23  A    I don't remember.

24  Q    Did you ask Jack, yes or no, whether or not he was on

25  drugs?

Torres - Cross - Savitt                    54

1   A    No.

2   Q    How long was Jack in this agitated state in your

3   presence, Detective, approximately?

4   A    Most of the time.

5   Q    Most of the time.  Kind of jumping around, and punching

6   his fist in his hand and stuff like that, right?

7   A    While sitting down, yeah.

8   Q    By the way, this, quote unquote, "perpetrator," did he

9   give you the name of a perpetrator?

10  A    Yes.

11  Q    Do you remember the name of the perpetrator?

12  A    No.

13  Q    Do you remember whether or not you or one of your fellow

14  officers ran a background check on the perpetrator?

15  A    I do not remember.

16          MR. SAVITT:  Thank you very much, Detective.

17          No further questions.

18          MR. SMITH:  Couple of things, your Honor.

19  REDIRECT EXAMINATION

20  BY MR. SMITH:

21  Q    Detective, Mr. Savitt asked you about how many cases you

22  had in the past year; do you remember that?

23  A    Yes.

24  Q    Did this particular complaint stand out in your mind

25  apart from those 200 cases?

1    A    Definitely.

2    Q    Why is that?

3    A    From what he told me, some things just -- you just

4    remember.  Certain cases you just don't forget.

5    Q    You said -- you said that you interviewed him on two

6    different occasions on the same day; is that right?

7    A    Yes.

8    Q    Did you compare the two times you spoke to him.

9    A    Yes.

10   Q    Did you find his statements to be consistent?

11   A    Consistent and very detailed.

12        MR. SMITH:  No further questions.

13        MR. SAVITT:  Just very briefly.

14   RECROSS-EXAMINATION

15   BY MR. SAVITT:

16   Q    When you just told us that you found the complainant's

17   statements to be consistent, did you compare that to any other

18   outside proof to see whether or not he's telling you the

19   truth?

20   A    No.

21   Q    So all you had to go by was what it was that the

22   complainant was telling you, right?

23   A    Correct.

24        MR. SAVITT:  No further questions.

25        THE COURT:  Thank you, Detective.  You may step

Torres - Cross - Savitt                                    56

1   down.

2           Next witness, please.

3           THE WITNESS:  Thank you, sir.

4           MS. DEMAS:  The government calls Detective Damon

5   Gergar.

6           THE CLERK:  Do you solemnly swear the testimony

7   you're about to give will be the truth, the whole truth and

8   nothing but the whole truth?

9           THE WITNESS:  I do.

10          THE CLERK:  Please state your name for the record.

11          THE WITNESS:  Detective Damon Gergar, Shell Number

12  2783, NYPD.

13          THE CLERK:  Spell your last name.

14          THE WITNESS:  G-e-r-g-a-r.

15          THE CLERK:  Please be seated.

16          THE COURT:  I'm sorry, G-e-r --

17          THE WITNESS:  And then g-a-r.

18          THE COURT:  G-e-r-g-a-r?

19          THE WITNESS:  Correct.

20          THE COURT:  Damon?

21          THE WITNESS:  Yes, your Honor.

22          THE COURT:  All right.

23                  DAMON GERGAR,

24  called as a witness by and on behalf of the government, having

25  been firs duly sworn, was examined and testified as follows:

NICOLE CANALES, CSR, RPR

Gergar - Direct - Demas                                    57

1    DIRECT EXAMINATION

2    BY MS. DEMAS:

3    Q     Good morning, Detective Gergar.

4    A     Good morning.

5    Q     Who do you work for?

6    A     The New York City Police Department.

7    Q     Do you work in a particular unit within the NYPD?

8    A     Yes, the Vice Major Case Unit.

9    Q     What's your title?

10   A     Detective.

11   Q     What kind of cases does the Vice Major Case Squad handle?

12   A     We handle sex trafficking, human trafficking, underaged

13   prostitution cases.  And I handle the child pornography and

14   pedophile investigations.

15   Q     How long have you been with the Vice Major Case Squad?

16   A     Since January 2009.

17   Q     How long have you been with the NYPD in total?

18   A     Since July of 1999.

19   Q     Did you ever become involved in the investigation of a

20   person by the name of Bebars Baslan?

21   A     I did.

22   Q     How did you first become involved in that investigation?

23   A     I received a complaint from my sergeant that -- had a

24   complainant by the name of Jack, who I initially spoke with.

25   Q     And do you recall the date on which you received that

1  complaint from your sergeant?

2  A    I believe it was February 6th of last year.

3  Q    Of 2013?

4  A    Correct.

5  Q    Now, you mentioned the complainant's name was Jack; was

6  that right?

7  A    Correct.

8  Q    And showing you what's in evidence as Government Exhibit

9  45, do you see this on the screen in front of you?

10  A    Yes.

11  Q    Do you recognize the person in this photograph?

12  A    I do.

13  Q    Who is it?

14  A    That would be Jack.

15  Q    Now, when you received this complaint from your sergeant,

16  did you know from where within the NYPD the complaint had

17  originated, meaning, like, which squad or precinct?

18  A    Yes, it would have been on the original complaint.

19  Q    Do you not recall, sitting here today, which squad that

20  was?

21  A    I believe it was the 66.

22  Q    And are you aware of which NYPD officer or detective

23  first took that complaint?

24  A    Yes.

25  Q    Who?

1   A    I believe it was -- you know, could I look at the

2   original complaint?  I don't want to say the wrong name.

3           MS. DEMAS:  I'm handing the witness what's been

4   marked 3500DG-1.

5           THE WITNESS:  This is my first DD-5, and I just -- I

6   wrote a male complainant visit to the 66 squad on

7   January 27th.  I do not have this detective's name.  It's on

8   the original complaint that was generated by the FOD.

9   Q    Do you think you would remember the detective's name if I

10  asked you?

11  A    Yes.

12  Q    Was it Detective Torres?

13  A    Yes.  Thank you.

14  Q    Now, did you take any actions with respect to this

15  complaint you received February 6th, 2013?

16  A    Yes.

17  Q    What actions did you take?

18  A    I called the complainant, Jack.

19  Q    Did you speak to him?

20  A    Yes.

21  Q    On what day did you first speak to Jack?

22  A    The day I received the complaint, on February 6th.

23  Q    And approximately how long did you speak to Jack on that

24  date?

25  A    We talked a good bit.

1           THE COURT:  This is over the phone?

2           THE WITNESS:  Yes, over the phone, in my office.

3   Minimum 10 minutes.  Probably between 10 and 20 minutes.  It

4   was a good conversation.

5   Q     Without going into the substance of what Jack told you,

6   were there particular people or a person he told you about?

7   A     Yes.

8   Q     What person or people are those?

9   A     The name he told me is Bebars Baslan and his girlfriend.

10  Q     For the sake of clarity, when you say "and his

11  girlfriend," do you mean Jack's girlfriend or Bebars Baslan's

12  girlfriend?

13  A     Bebars' girlfriend.

14  Q     And without going into the substance of what Jack told

15  you, was there a particular crime or crimes that whatever he

16  told you on the telephone related to?

17  A     Yes.

18  Q     What crimes were those?

19  A     Child pornography, sex abuse and child rape.

20  Q     Now, did you give Jack any guidance when you spoke to him

21  on February 6th, 2013?

22  A     Yes.

23  Q     What did you tell him?

24  A     I would have told him to -- if he sees Bebars again, just

25  to act normal; don't do anything that would raise him up, and

Gergar - Direct - Demas                           61

1   don't do anything illegal if you're in the presence of Bebars.

2   Q    Why did you give him those instructions?

3   A    When I initially talked to him, he was very emotional,

4   angry, amped up, very, like, gung ho, so I had to calm him

5   down a little bit, just tell him not to do anything crazy.  I

6   think he wanted to bring him in right away.

7   Q    Did you give Jack -- did you tell Jack what, if anything,

8   you were going to do about the case?

9   A    Yes.

10  Q    What did you tell him?

11  A    I told him I was going to speak to my supervisors and

12  also try to go federal with the case and contact a friend of

13  mine in the FBI; and that I would take it from there, and that

14  I would get back in touch with him when I found out from my

15  boss what exactly they wanted me to do.

16  Q    Now, after you spoke to Jack on February 6th, 2013, did

17  you take any further action with respect to this

18  investigation?

19  A    Yes.

20  Q    What did you do?

21  A    I contacted Special Agent Spivack at the FBI, after

22  conferring with my bosses, if we can go federal with the case.

23  I contacted him, told him what I have, in regards to the

24  conversation I had with Jack, and he expressed interest in

25  taking the case.

NICOLE CANALES, CSR, RPR

Gergar - Direct - Demas                                    62

1    Q    He being Agent Spivack?

2    A    Correct.

3    Q    By the way, do you see Agent Spivack in court today?

4    A    Yes.

5    Q    Where's he sitting?

6    A    Right there with the red tie on.

7              THE COURT:  Sitting at counsel table, indicating

8    Mr. Spivack.

9              Go ahead.

10   Q    Did you eventually get approval from your supervisor to

11   "go federal" with this case or work with the FBI?

12   A    I did.

13   Q    Do you remember when you got that approval?

14   A    I believe it was on June 12th.  May I look at the --

15   Q    Sure.  Did you say June, though?

16   A    I'm sorry.  February 12th.  Just let me double-check on

17   the DD-5.  Correct.  February 12th, I spoke to Special Agent

18   Spivack.

19   Q    Do you recall when you spoke to Special Agent Spivack?

20   A    It was on February 12th.  I don't recall the exact time.

21   Q    And did you speak to Agent Spivack by phone or in person?

22   A    By phone, initially.

23   Q    And what was the next thing that you did, with respect to

24   this case, after speaking to Agent Spivack?

25   A    I was able to coordinate a meeting with the complainant

1  Jack and Agent Spivack.

2  Q    When did that meeting -- or was it supposed to take

3  place, if you know?

4  A    Look at my notes.  It was on February 13th, 2013.

5  Q    When you say set up that meeting, what did you do to set

6  it up?

7  A    I would have asked Agent Spivack when a good time, a date

8  to meet the complainant.  I also would have asked the

9  complainant when a good time is for him, and I just coordinate

10 between them, and they got it done pretty fast.

11 Q    And did you actually attend that meeting the following

12 day, on February 13th, 2013, between Special Agent Spivack and

13 Jack?

14 A    No, I did not.

15 Q    Why is that?

16 A    That day, I actually started my tour, I believe, at

17 2:30 p.m.  We had operations with other members of my team

18 that day, an undercover operation.

19 Q    Meaning, you couldn't do both?

20 A    Correct.

21 Q    And beyond setting that initial meeting between Agent

22 Spivack, and Jack and also speaking with Jack on the phone,

23 did you take any further action with respect to this

24 investigation?

25 A    I did.  I was able to attend a meeting between Jack, and

Gergar - Direct - Demas                                    64

1  Agent Spivack and another agent in the not-so-distant future

2  from that date at FBI headquarters.

3  Q    Did you do any surveillance in connection with this case?

4  A    The day of the arrest, I was out with the FBI Field Team,

5  a couple members from my unit and my sergeant, conducting

6  surveillance at the location.

7  Q    Which location?

8  A    I believe it was Bebars Baslan's residence in Brooklyn.

9  Q    Were you present at all for the defendant's arrest on

10 March 19th, 2013?

11 A    I was.

12 Q    Where were you?

13 A    I was at the hotel in New Jersey with agents of the FBI

14 prior to and during the arrest of Mr. Baslan and his

15 girlfriend.

16 Q    Now, have you had any further involvement in this case

17 beyond March 19th, 2013?

18 A    No, just updates.

19          MS. DEMAS:  I have no further questions.

20          THE COURT:  All right.  Do you have any questions

21 for this gentleman?

22          MR. SAVITT:  Yes, your Honor.

23          THE COURT:  How long are you going to be?  Never

24 mind.

25          We'll take a short break, folks, before we hear the

NICOLE CANALES, CSR, RPR

1    cross-examination.  We had a late start, so we'll take a quick

2    break.  Make sure everybody's comfortable.  Do not discuss the

3    case.  All rise.

4              (Outside the presence of the jury.)

5         THE COURT:  Ten minutes, everybody.

6         (Proceedings continued on the following page.)

PROCEEDINGS                                    66

1           (In open court; defendant present.)

2           (Jury not present.)

3           THE COURT:  Any more information on the previous

4      witness?

5           MR. SMITH:  Judge, Detective Torres is here.

6           (Detective Torres present.)

7           THE COURT:  Does he recognize -- did you recognize

8      a juror, sir?

9           DETECTIVE TORRES:  Yes, sir.

10          THE COURT:  From the neighborhood?

11          DETECTIVE TORRES:  I lived on my block with my

12     parents, like, for 34 years.  She was sitting in that chair

13     right there.

14          THE COURT:  The second row, first chair?

15          DETECTIVE TORRES:  Yes, if I remember.

16          THE COURT:  Do you have -- other than recognize

17     her, did you have any relationship with her?

18          DETECTIVE TORRES:  No, I had no relationship.  I

19     never hanged out with her.  She just lived on the same block

20     as me.  We just say hi and that's it.

21          THE COURT:  And you never had any discussions with

22     her?

23          DETECTIVE TORRES:  No, I even kind of, like,

24     forgot her name, to be honest with you.

25          THE COURT:  Okay.  Appreciate it very much.  Thank

GERGAR - CROSS/MR. SAVITT                    67

1   you.                                                              02:58

2         MR. SMITH:  Thank you.                                      02:58

3         (Witness excused.)                                          02:58

4         (Jury enters courtroom at 11:56 a.m.)                       02:58

5         THE COURT:  We'll get you all organized tomorrow.           02:59

6   It'll work a little more smoothly.  Have a seat, everybody.       03:00

7         Mr. Savitt, your witness.                                   03:00

8         MR. SAVITT:  Thank you, your Honor.                         03:00

9   CROSS-EXAMINATION                                                 02:47

10  BY MR. SAVITT:                                                    02:47

11  Q    It's still morning.  So, good morning, Detective             02:47

12  Gergar.                                                           03:00

13  A    Good morning.                                                03:00

14  Q    You told us about the beginning of your involvement in       03:00

15  this matter.  That occurred on February the 6th, right, of       03:00

16  last year?  Of 2013?                                             03:00

17  A    Correct.                                                     03:00

18  Q    Okay.  Part of that time you had no knowledge about any      03:00

19  of these events or alleged events.  Am I correct?                03:00

20  A    Correct.                                                     03:00

21  Q    And that was the day in which you -- did you meet            03:00

22  Mr. Jack personally or did you have a telephone                   03:00

23  conversation?                                                     03:00

24  A    Telephone conversation.                                      03:00

25  Q    Okay.  And do you recall how long a telephone                03:01

GERGAR - CROSS/MR. SAVITT                    68

1   conversation it was, approximately?                          03:01

2   A    Between ten and 20 minutes.                             03:01

3   Q    And you, in your direct examination testimony, you     03:01

4   describe Jack at least the way he was speaking on the phone, 03:01

5   just correct me if I'm wrong, as emotional and -- am I       03:01

6   right?                                                       03:01

7   A    Yes.                                                    03:01

8   Q    And angry?                                              03:01

9   A    Correct.                                                03:01

10  Q    And amped up?                                           03:01

11  A    Correct.                                                03:01

12  Q    And when you say amped up, does that mean he's like on  03:01

13  a substance or something?                                    03:01

14  A    No, I can't say that.  He was excited.                  03:01

15  Q    Excited?                                                03:01

16  A    Correct.                                                03:01

17  Q    All right.  Now, I take it that you and Detective       03:01

18  Torres did not discuss your testimony before you testified   03:01

19  here today.  Am I correct?                                   03:01

20  A    Correct.                                                03:01

21  Q    You didn't talk to him about your testimony, to        03:01

22  Detective Torres.  Correct?                                  03:01

23  A    I did not talk to him about my testimony.               03:01

24  Q    And Detective Torres didn't talk to you about his      03:01

25  testimony.  Correct?                                         03:01

GERGAR - CROSS/MR. SAVITT                    69

1    A    Correct.                                                03:01

2    Q    And that's the proper thing to do, not to discuss       03:01

3    things with other witnesses.                                 03:02

4    A    Correct.                                                03:02

5    Q    So you each can testify independently of your own       03:02

6    recollections not what somebody told you?                    03:02

7    A    Correct.                                                03:02

8    Q    Okay.  Now, in your conversation with Jack, I would     03:02

9    imagine you didn't record it.  Right?                        03:02

10   A    No.                                                     03:02

11   Q    All right.  And did you expect his call that day on     03:02

12   February 6th of 2013?                                        03:02

13   A    I would have reached out to him.                        03:02

14   Q    Okay.  You reached out to him because of some           03:02

15   complaint.  Am I correct?                                    03:02

16   A    Yes.                                                    03:02

17   Q    And he answered the phone, you had a ten-minute         03:02

18   conversation with him.  Am I right?                          03:02

19   A    Correct.                                                03:02

20   Q    You asked him questions, he gave responses?            03:02

21   A    Yes.                                                    03:02

22   Q    Did you ever meet Jack in person?                      03:02

23   A    Yes.                                                    03:02

24   Q    When was that?                                          03:02

25   A    May I look at my DD5s?                                  03:02

GERGAR - CROSS/MR. SAVITT                    70

1    Q    Sure.

2         THE COURT:  Yes, go ahead.  Just tell us what

3    you're specifically looking at, what you're referring to.

4    A    I met with Jack and Agent Spivack and his partner at

5    FBI headquarters.  It would have been -- let's see, one

6    second.  It would have been on February 26, 2013, at 1200

7    hours.

8    Q    Okay.  And you're looking at a document that's been

9    designated for identification, and correct me if I'm wrong,

10   3500-DG-1?

11   A    I'm not sure how you guys have it documented.  I just

12   have my report.

13   Q    Oh, I see.  And you have the original one.  And it's --

14   is it a six-page report, so I know that we're looking at the

15   same thing while we talk?

16   A    On the top of my report it would say, follow-up number

17   seven.  It starts off, on February 26, 2013, at

18   approximately 1200 hours, I met with Jack, the complainant

19   and Special Agent Spivack at 26 Federal Plaza.

20   Q    Now, you were involved in a conversation with Jack at

21   that point?

22   A    In person, yes, on February 26th.

23   Q    And Agent Spivack was there and another FBI agent.  Am

24   I correct?

25   A    Yes.

GERGAR - CROSS/MR. SAVITT                71

1   Q    Apart from the two FBI agents, yourself, and Jack, was                03:04
2   anybody else present?                                                     03:04
3   A    Not that I recall.                                                   03:04
4   Q    Okay.  And the conversation concerned Jack's                         03:04
5   complaints.  Am I correct?  In general.                                  03:04
6   A    Yes.                                                                 03:04
7   Q    And certain questions were asked of him and he gave                  03:04
8   answers.  Am I right?                                                    03:04
9   A    Yes.                                                                 03:04
10  Q    Now, at that time how long a period of time were you in             03:04
11  contact -- well, what -- were you part of this conversation?             03:04
12  A    On that date?                                                        03:04
13  Q    Yes, on the 26th?                                                    03:04
14  A    I can't say.  At least -- I was there at least for half             03:04
15  hour, probably more; maybe an hour.  I can't recall.                     03:05
16  Q    We'll go with your best recollection.  Were you there               03:05
17  for the entire conversation, as far as you know, whenever it             03:05
18  was -- when Jack was there with FBI officers?                           03:05
19  A    On that date, yes.                                                  03:05
20  Q    How many times did you meet Jack in person?                         03:05
21  A    I would have met him on that date on February 26th and              03:05
22  I had seen him briefly on the date that Mr. Baslan was                   03:05
23  arrested.                                                                03:05
24  Q    Okay.  And Mr. Baslan was arrested on March the 19th,               03:05
25  sometime in the evening?                                                 03:05

GERGAR - CROSS/MR. SAVITT                72

1    A    I believe so, yes.                                    03:05

2    Q    And so was Kristen Henry, if you know?               03:05

3    A    Correct.  Yes, March 19th, correct.                  03:05

4    Q    And this was in New Jersey.  Am I correct?           03:05

5    A    Yes.                                                 03:05

6    Q    Okay.  Now, when you first spoke to Jack on February 03:05

7    the 6th, did you ask him whether or not he had committed any 03:05

8    crimes?                                                   03:05

9    A    I do not recall asking him anything to that effect. 03:05

10   Q    In the conversation that you were part of on the    03:05

11   26th of February, did the topic of whether or not he     03:06

12   committed any crimes come up at all?                     03:06

13   A    I believe so but I can't recollect exactly what.    03:06

14   Q    All right.  Would looking at your report, at your   03:06

15   notes, possibly refresh your recollection?               03:06

16   A    Yes, if I can.                                       03:06

17   Q    And I have it as page three of six, update by the FBI. 03:06

18   A    Yes, I do recall.                                    03:06

19   Q    And do you recall that there were potential charges 03:06

20   that Jack was concerned about?                           03:06

21   A    Yes.                                                 03:06

22   Q    And do you recall, with your memory refreshed by    03:06

23   looking at your report, what they were?                  03:06

24   A    Yes.                                                 03:06

25   Q    And what were they?                                  03:06

GERGAR - CROSS/MR. SAVITT                     73

1   A    I wrote that Mister -- that Jack, excuse me, also                  03:06

2   acknowledged that there might be videos of him having sex              03:07

3   with a 16 year-old-female on Mr. Baslan's computer and that            03:07

4   he understood he will possibly face charges also.                      03:07

5   Q    And do you know whether that was the first time that              03:07

6   Jack said anything about potential criminal exposure that he           03:07

7   would have?                                                            03:07

8   A    I believe he said stuff to the FBI agents when I wasn't           03:07

9   around.                                                                03:07

10  Q    All right.                                                        03:07

11       MR. SAVITT:  All right.  No further questions.                    03:07

12  Thank you.                                                             03:07

13       THE COURT:  Thank you, sir.  Anything further?                    03:07

14       MS. DEMAS:  No, your Honor.                                       03:07

15       THE COURT:  All right.  Next witness.                             03:07

16       (Witness excused.)                                                03:07

17       MR. SMITH:  Government will call Special Agent                     03:07

18  Aaron Spivack.                                                         03:07

19       (Witness takes the stand.)

20

21  **AARON SPIVACK**, called by the Government, having been first

22  duly sworn, was examined and testified as follows:                    01:18

23       THE CLERK:  State your name for the record.                       01:18

24       THE WITNESS:  Aaron Spivack.                                      03:08

25       THE COURT:  All right, go right ahead.                            03:08

1  DIRECT EXAMINATION                                                02:47

2  BY MR. SMITH:                                                     02:47

3  Q    Good morning, Agent Spivack.                                 02:47

4  A    Good morning, sir.                                           03:08

5  Q    For the record, who do you work for?                         03:08

6  A    I work for the Federal Bureau of Investigation.              03:08

7  Q    What's your title?                                           03:08

8  A    I'm a special agent.                                         03:08

9  Q    Do you work in a particular office?                          03:08

10 A    I do, sir.                                                   03:08

11 Q    What office?                                                 03:08

12 A    The New York field office.                                   03:08

13 Q    And are you assigned a particular unit within the New        03:08

14 York field office?                                                03:08

15 A    I am.                                                        03:08

16 Q    What unit is that?                                           03:08

17 A    The Violent Crimes Against Children Squad.                   03:08

18 Q    How long have you been in the Violent Crimes Against         03:08

19 Children Squad?                                                   03:08

20 A    Since approximately 2010.  Four years, approximately.        03:08

21 Q    What types of crimes do you cover as a special agent         03:08

22 with Violent Crimes Against Children Squad?                       03:08

23 A    Our squad is chartered to investigate any and all            03:08

24 federal crimes involving sexual exploitation of children.        03:09

25 That would include child pornography, child prostitution,        03:09

1    enticement cases, kidnapping, things of that sort.                    03:09

2    Q    How long have you been with the FBI, in total?                   03:09

3    A    February, I believe, was eight years.                            03:09

4    Q    What did you do before that?                                     03:09

5    A    I was an intelligence analyst with the FBI.                      03:09

6    Q    And before that?                                                 03:09

7    A    I was a United States Marine.                                     03:09

8    Q    You indicated that one of the things you did was                 03:09

9    enticement cases.  Did you ever do undercover cases?                  03:09

10   A    Yes, sir, I do.                                                  03:09

11   Q    Have you received any training for that?                         03:09

12   A    I have.                                                          03:09

13   Q    What type of training?                                           03:09

14   A    Specifically regarding child exploitation matters,              03:09

15   there's training that I and other undercover agents attend,           03:09

16   which is a training in the workings of on line and recovery          03:09

17   investigations, various platforms that we use to target              03:09

18   individual predators on line, as well as classes on                  03:09

19   vernaculars and different vocabulary used related to child           03:09

20   exploitation cases.                                                   03:10

21   Q    And have you become familiar with slang or vernacular           03:10

22   for sexual terms?                                                     03:10

23   A    Yes, sir, I have.                                                03:10

24   Q    Agent Spivack, are you familiar with the investigation          03:10

25   of the defendant in this case, Bebar Baslan?                         03:10

SPIVACK - DIRECT/MR. SMITH                76

1   A    Yes, I am.                                              03:10

2   Q    What role, if any, did you have with respect to that   03:10

3   investigation?                                              03:10

4   A    I was the case agent.                                  03:10

5   Q    What does it mean to be the case agent of the          03:10

6   investigation?                                              03:10

7   A    Case agents essentially means you're the lead          03:10

8   investigator in charge of the investigation.               03:10

9   Q    When did you first become involved in this particular  03:10

10  investigation?                                              03:10

11  A    I became involved on or about February 13th -- excuse  03:10

12  me, February 12th of 2013.                                 03:10

13  Q    Can you describe for the jury how you first came -- how 03:10

14  the defendant first came to your attention?                03:10

15  A    Yes, sir.  On approximately February 12th of last year, 03:10

16  I received a phone call from a colleague of mine with the  03:10

17  New York Police Department, Detective Gergar.  He had      03:10

18  information from a complainant that he thought I should     03:11

19  hear.                                                      03:11

20  Q    What, if any, action did you take after you spoke to   03:11

21  Detective Gergar in connection with this investigation?    03:11

22  A    Very shortly thereafter that day, if not just an hour  03:11

23  later, even I reached out to Jack, the complainant, after  03:11

24  conferring with Detective Gergar, in that he and the NYPD  03:11

25  were okay with the FBI taking the lead, and I set up a     03:11

1  meeting with Jack for the following day.                          03:11

2  Q    Did you ultimately meet with Jack on that day?              03:11

3  A    On February 12th, no, sir, but on the 13th, the             03:11

4  following day I did.                                              03:11

5  Q    Did you see Government Exhibit 45 when it was up?           03:11

6  A    If that was the photograph?                                 03:11

7  Q    The photograph.                                             03:11

8  A    Yes, sir, I did.                                            03:11

9  Q    Do you recognize the individual in that photograph?        03:11

10 A    I do.                                                       03:11

11 Q    Who do you recognize that to be?                           03:11

12 A    That is Jack, the cooperator.                              03:11

13 Q    At this point when you met with Jack, did the FBI have     03:11

14 an ongoing investigation on him?                                 03:12

15 A    No, sir, we did not.                                       03:12

16 Q    When you met with him on February 13th, what was the      03:12

17 purpose of your interview?                                       03:12

18 A    Purpose was several fold, I suppose.  For any             03:12

19 complainant that comes to the FBI or the NYPD, we bring them    03:12

20 in.  We first hear what they have to say, regarding the         03:12

21 alleged crime.  And we try and determine the validity of the    03:12

22 crime, substantiate it in some capacity.  We also try to        03:12

23 learn a little bit about the individual who is reporting the    03:12

24 crime.                                                           03:12

25 Q    Did Jack provide specific information to you on that       03:12

1    day?                                                          03:12

2    A    Yes, sir, he did.                                        03:12

3    Q    Without going into the details of what he said, did he   03:12

4    provide information that he indicated was about a particular  03:12

5    person?                                                       03:12

6    A    Yes, he did.                                             03:12

7    Q    Who was that person?                                     03:12

8    A    That was the defendant, Bebar Baslan and Kristen Henry.  03:12

9    Q    How did Jack physically appear to you during the course  03:12

10   of that interview on February 13, 2013?                       03:12

11   A    He appeared sober.  He was visibly disturbed and         03:12

12   visibly upset.                                                03:12

13   Q    Did you ask Jack detailed questions during the course    03:13

14   of your interview?                                            03:13

15   A    Yes, I did.                                              03:13

16   Q    Did he answer your questions?                            03:13

17   A    Yes, sir, he did.                                        03:13

18   Q    Did you also ask questions about Jack's own criminal     03:13

19   history during the course of that meeting?                    03:13

20   A    Yes, I did.                                              03:13

21   Q    Did he answer those questions?                           03:13

22   A    Yes, sir.                                                03:13

23   Q    Why did you ask him about his own criminal history?      03:13

24   A    Part of the vetting process, we understand that every    03:13

25   complainant who comes in our door, some of these              03:13

SPIVACK - DIRECT/MR. SMITH                    79

1   complainants have a criminal history, some of them have          03:13

2   various motivations or reasons for coming to the FBI.  So        03:13

3   part of asking these questions is to determine who this          03:13

4   person was and what the information he was reporting was         03:13

5   about.                                                           03:13

6   Q    What, if anything, did Jack tell you when you asked him     03:13

7   about his own criminal history?                                  03:13

8   A    He told me a number of things, to include that he had       03:13

9   had sexual contact with at least three minors, 16 and           03:13

10  17-year-old girls.                                               03:13

11  Q    Did he indicate anything else?                              03:13

12  A    Yes, sir, he did.                                           03:13

13  Q    What else?                                                  03:13

14  A    Drug use as well as a few instances in the past of some     03:13

15  violent activity and then some miscellaneous speeding and        03:14

16  traffic type violations.                                         03:14

17  Q    Did you have any conversations with Jack during that        03:14

18  meeting about steps he'd be willing to take?                     03:14

19  A    Yes, sir, I did.                                            03:14

20  Q    Can you describe those conversations?                       03:14

21  A    Initially I asked Jack about his willingness to record      03:14

22  phone calls, simply phone calls.  He was willing, and he         03:14

23  also indicated that he would be willing to wear a wire, if       03:14

24  decided it was appropriate to have in-person contact.            03:14

25  Q    Did you ultimately ask him to record phone calls?           03:14

SPIVACK - DIRECT/MR. SMITH                80

1    A    Yes, sir, I did.                                      03:14

2    Q    Was that with one particular person or more than one  03:14

3    person?                                                   03:14

4    A    It was with the defendant, Bebar Baslan and potentially  03:14

5    Ms. Henry, if she was to hop on the line but with the     03:14

6    defendant's phone.                                        03:14

7    Q    Is there a specific system that the FBI uses to record  03:14

8    telephone calls?                                          03:14

9    A    Yes, sir, there is.                                  03:14

10   Q    What's it called?                                    03:14

11   A    I don't know the exact definition but it's called the  03:14

12   ITAC system.                                              03:15

13   Q    During the course of your --                         03:15

14           THE COURT:  ITAC?                                  03:15

15           THE WITNESS:  ITAC.  Yes, sir, ITAC.               03:15

16           THE COURT:  Okay.                                  03:15

17           THE WITNESS:  Although, I don't recall what it     03:15

18   stands for.                                               03:15

19   Q    During the course of your eight years with the FBI,   03:15

20   have you become familiar with the way that system operates?  03:15

21   A    Yes, sir, I have.                                    03:15

22   Q    Can you describe a little bit about how that system   03:15

23   works?                                                    03:15

24   A    Yes, sir, I'll trying to make it simple.  The long    03:15

25   short end of it is how the system works is it is a system  03:15

1    designed to record phone calls that is monitored by the FBI,          03:15

2    controlled by the FBI.  So user Jack in this case is                 03:15

3    provided with an account, a unique pin, unique specifically          03:15

4    to him, something that only he would know.  Jack is then             03:15

5    provided with an 888 -- I believe it's an 888 number, which          03:15

6    is our ITAC system.                                                  03:15

7           Jack would call the ITAC system.  He would then              03:15

8    enter in his account number, pin number, verifying who he            03:15

9    was.  The system would then prompt Jack to enter what's              03:15

10   called a header.  And a header is just simply a very short           03:15

11   preamble, stating who he was, the time, the date and the             03:16

12   purpose of the call.                                                 03:16

13          At that point Jack -- the ITAC system would have             03:16

14   prompted Jack to enter in the target number, a number he             03:16

15   wishes to call.  Once that is complete, the ITAC system              03:16

16   calls the target number and will automatically display, on           03:16

17   the caller ID, Jack's phone number, and the entire time this         03:16

18   is recorded.                                                         03:16

19   Q    Did you set up an account with the ITAC system for              03:16

20   purposes of this investigation?                                      03:16

21   A    I did, yes, sir.                                                03:16

22   Q    Did you provide Jack's information with that system?            03:16

23   A    Yes, sir, I did.                                                03:16

24   Q    Is that substantially the same, what you told us now?          03:16

25   A    It is.                                                          03:16

SPIVACK - DIRECT/MR. SMITH                    82

1   Q    How do you actually retrieve calls that are made using          03:16

2   that system?                                                          03:16

3   A    Agents who are utilizing the ITAC system have their own         03:16

4   accounts, and I have mine.  And what I were to do from our           03:16

5   FBI office in Manhattan, I would log into my account, select         03:16

6   the account created specifically for Jack and then I could          03:16

7   retrieve his phone calls in that manner.                             03:17

8   Q    Did you give Jack any other technical instructions              03:17

9   about what the system records and what it doesn't record?            03:17

10  A    Yes, sir, I did.                                                 03:17

11  Q    What instructions did you give him?                             03:17

12  A    The way we have the ITAC system set up is it records            03:17

13  outbound calls, not inbound calls, at least the way that we          03:17

14  had it configured for this particular operation.  And so I           03:17

15  instructed Jack that if the defendant were to call him, he           03:17

16  needed to know that that was not recorded.  So he needed to          03:17

17  do what he could to get off the call, in a natural way,              03:17

18  nothing that was going to cause any suspicion, and then call         03:17

19  the defendant back utilizing the ITAC system so that it              03:17

20  could be recorded.                                                   03:17

21  Q    Where exactly are the calls maintained that are made            03:17

22  using the ITAC system.                                               03:17

23  A    They're maintained at the FBI office at 26 Federal              03:17

24  Plaza in Manhattan New York.                                         03:17

25  Q    In advance of this trial did you retrieve those calls?          03:17

SPIVACK - DIRECT/MR. SMITH                83

1   A    Yes, sir, I did.                                          03:17

2   Q    Let me show you what's been marked as Government         03:17

3   Exhibit 1.                                                    03:17

4            Do you recognize Government Exhibit 1?               03:18

5   A    Yes, sir, I do.                                          03:18

6   Q    What do you recognize it to be?                          03:18

7   A    This is the aforementioned ITAC calls.  This is a CD of  03:18

8   all the calls that Jack made from February to March 2013.    03:18

9   Q    Do the individual file names indicate when calls were    03:18

10  placed?                                                       03:18

11  A    They do.                                                 03:18

12           MR. SMITH:  The government offers Government          03:18

13  Exhibit 1.                                                    03:18

14           THE COURT:  Any objection?                           03:18

15           MR. SAVITT:  No, your Honor.                         03:18

16           THE COURT:  Received.                                03:18

17           (Government Exhibit 1 admitted into evidence.)       03:18

18  Q    Agent Spivack, does the person who makes the call using  03:18

19  the ITAC system have the ability to shut off the recording    03:18

20  during the course of that call?                               03:18

21  A    Not during the call, no, sir.                            03:18

22  Q    Did you test the system before you provided Jack with    03:18

23  user information and pin?                                     03:18

24  A    Of course.  I tested it a couple of times before we      03:18

25  gave it to Jack.                                              03:19

1  Q    Was it operating properly?                        03:19

2  A    Yes, sir, it was.                                 03:19

3  Q    Now, with respect to making the calls themselves, did   03:19

4  you give Jack any specific instructions?               03:19

5  A    I did.                                            03:19

6  Q    What instructions did you give him?               03:19

7  A    Aside from the instructions, the instructions about it   03:19

8  recording outbound calls, I also instructed him to -- that   03:19

9  he could use any phone he needed to, it didn't have to be   03:19

10 limited to his cell phone, because the ITAC system will   03:19

11 display his phone number on it, which is what we tested in   03:19

12 our office.                                            03:19

13 Q    Did you give him any instructions on which calls to the   03:19

14 defendant he should use the ITAC system for?           03:19

15 A    Yes, sir, I did.                                  03:19

16 Q    What instruction?                                 03:19

17 A    I told Jack to record every outbound call, regardless   03:19

18 of the conversation.                                   03:19

19 Q    Did you give him any instructions on -- on what to do   03:19

20 if criminal activity came up?                          03:19

21 A    Yes, sir, I did.                                  03:19

22 Q    What instructions did you give him?               03:19

23 A    With regards to the discussions over the phone or just   03:19

24 regarding any discussion in general, I instructed Jack that   03:20

25 it was okay for him to lie at our direction.  That if he was   03:20

SPIVACK - DIRECT/MR. SMITH                    85

1   on a phone call with the defendant and conversations came          03:20

2   up, he was under our direction, free to engage the defendant       03:20

3   in any type of discussion, even if it would incriminate him,       03:20

4   and it was recorded that I instructed him that it was okay         03:20

5   to lie in this context.                                            03:20

6   Q    Did you give -- on February 13th, did you give Jack any       03:20

7   instructions about the commission of crimes himself during        03:20

8   the course of the investigation?                                  03:20

9   A    Yes, sir.                                                     03:20

10  Q    What did you tell him?                                        03:20

11  A    At this point Jack was instructed he was not authorized       03:20

12  to engage in any elicit activity.                                  03:20

13  Q    Did you make Jack any promises regarding his own              03:20

14  criminal conduct which he told you about?                          03:20

15  A    No promises at all were made.                                 03:20

16  Q    Agent Spivack, was there a call recorded on the ITAC          03:20

17  system, on February 12, 2013?                                      03:21

18  A    February 12th, sir?                                           03:21

19  Q    I'm sorry, February 15th?                                     03:21

20  A    February 15th there was a call.                               03:21

21  Q    And were there any calls connected prior to that call?        03:21

22  A    None other than test calls.                                   03:21

23  Q    During the course of the investigation, did you have an       03:21

24  opportunity to hear the defendant's voice?                         03:21

25  A    Yes, sir.                                                     03:21

SPIVACK - DIRECT/MR. SMITH                    86

1   Q    And just for clarity, have you met Mr. Baslan before          03:21

2   today?                                                             03:21

3   A    Yes, sir, I have.                                             03:21

4   Q    Do you see him here in the courtroom?                         03:21

5   A    I do.                                                         03:21

6   Q    Can you identify where he's sitting and an item of            03:21

7   clothing that he's wearing?                                        03:21

8   A    Yes, sir.  He's sitting at the defense table with a tan       03:21

9   or beige suit.                                                     03:21

10          THE COURT:  Indicating Mr. Baslan.                         03:21

11  Q    Now, with respect to this call you were talking about         03:21

12  on February 15th, have you had an opportunity to listen to         03:21

13  that call?                                                         03:21

14  A    Yes, sir, I have.                                             03:21

15  Q    Whose voices are on that call?                                03:21

16  A    The voices you can hear on the call are that of Jack          03:21

17  and the defendant, Mr. Baslan.                                     03:21

18  Q    And was it -- was a transcription of this call made in        03:21

19  connection with this case?                                        03:22

20  A    Yes, sir, there were transcriptions made.                     03:22

21  Q    Have you had an opportunity to review those?                  03:22

22  A    Yes, sir, I have.                                             03:22

23  Q    And are they accurate?                                        03:22

24  A    They are accurate.                                            03:22

25  Q    Just to clarify, when you said that Jack was allowed to       03:22

SPIVACK - DIRECT/MR. SMITH                    87

1    lie during the course of your investigation, did you give          03:22

2    him any instructions on whether he could say he was               03:22

3    interested in sexual contact with children?                       03:22

4    A    I told Jack that he could indicate that he had a sexual      03:22

5    interest in children.  I told Jack that he was not allowed        03:22

6    to steer the conversation to a direction that it was not          03:22

7    likely to go down but that he was allowed to agree and to go      03:22

8    along with that type of discussion.                               03:22

9    Q    Now, during the course of preparation, were                  03:22

10   transcriptions made for each of the calls the government          03:22

11   intends to play today?                                            03:23

12   A    Yes, sir.                                                     03:23

13   Q    And have you reviewed those?                                 03:23

14   A    I have.                                                       03:23

15   Q    And are they accurate?                                       03:23

16   A    Yes, sir, they are.                                          03:23

17        MR. SMITH:  Your Honor, the government would offer           03:23

18   Exhibit 40 for as a demonstrative in the course of aiding         03:23

19   the jury.                                                         03:23

20        THE COURT:  Forty as an aid?                                 03:23

21        MR. SMITH:  That's correct, your Honor.                      03:23

22        THE COURT:  Any objection, Mr. Savitt?                       03:23

23        MR. SAVITT:  No objection as an aid, and I would             03:23

24   ask the court to instruct the jury of what the purpose of         03:23

25   this is.                                                          03:23

SPIVACK - DIRECT/MR. SMITH          88

1          THE COURT:  I take it Ms. Demas is about to          03:23

2    handout books to you with her assistants.  First of all,          03:23

3    folks, only direct your attention to the exhibit that we are          03:23

4    discussing and that you're asked to refer to.  I'm waiting          03:23

5    until this is done because what I have to say is very          03:23

6    important.  When you have the book, look up at me and I'll          03:23

7    know that we're all on the same page and I can give you the          03:24

8    appropriate instructions.          03:24

9          Everybody have a transcript book?  Apparently not.          03:24

10          Now, does everybody have one?          03:24

11          THE JUROR:  Yes.          03:24

12          THE COURT:  All right.  These transcripts, ladies          03:24

13    and gentlemen, are not evidence.  They're given to you as an          03:24

14    aid in listening to various taped conversations.  The          03:24

15    evidence is what you hear.  And obviously the transcript is          03:24

16    somebody else's rendition of what that person heard.          03:24

17          Now, it may be entirely consistent with what you          03:24

18    hear, but if there is any discrepancy between what you hear          03:24

19    and what appears on the transcript, it's what you hear that          03:24

20    is the evidence in the case.  Okay?  And I don't mean by          03:24

21    giving you this instruction to suggest to you that you're          03:24

22    going to find a lot of errors -- who knows.  It's just very          03:24

23    important that you understand that the evidence consists of          03:24

24    taped recordings and not the transcript.          03:25

25          MR. SMITH:  Your Honor, before I play this call,          03:25

SPIVACK - DIRECT/MR. SMITH                    89

1   we also have setup headphones, to make it a little easier          03:25

2   for people to hear the call, which we would like to handout.       03:25

3           THE COURT:  Okay.  They are wireless?                      03:25

4           MR. SMITH:  They are.                                      03:25

5           THE COURT:  Good luck.  We sometimes have success         03:25

6   with these wireless, sometimes we don't.  If your headphone        03:25

7   is not working, by all means let us know immediately.  You         03:25

8   know, what I'm going to suggest is when everybody is               03:26

9   ready -- take them off.  I don't want anybody's eardrums to        03:26

10  be blown out.  We got to figure out a way to do this a             03:26

11  little bit more efficiently.                                       03:26

12          Does everybody have a headset?  Now everybody has          03:26

13  a headset.  Right?  Leave them off.  We're going to start          03:26

14  the tape, and once the tape is started, I'll ask you to take       03:26

15  them -- move them slowly to your ears.  You'll see there's a       03:26

16  volume gizmo on here.  I just don't want to hurt anybody.          03:27

17          When everybody is hearing, the headsets are                03:27

18  working, we'll stop, rewind and start again.                       03:27

19          You want to start the tape?                                03:27

20          MR. SMITH:  Yes.                                           03:27

21          (Audio played.)                                            03:27

22          THE COURT:  Okay, can you cut that.                        03:27

23          Is everybody able to hear?                                 03:27

24          THE JUROR:  Yes.                                           03:28

25          THE COURT:  All right.  If you will rewind.  You           03:28

1    want the lights dimmed?                                          03:28

2          MR. SMITH:  I'm sorry, I just -- can we turn up            03:28

3    the actual courtroom volume a little bit.                        03:28

4          (Audio played.)                                            03:28

5          MR. SMITH:  Thank you.  I'll start this at the             03:28

6    beginning now.  For the record, this is the                      03:28

7    February 15th call at 7:30 p.m.                                  03:28

8          (Audio played.)                                            03:28

9    Q    Can you just identify whose voice we heard?                 03:28

10   A    The person who just said the scariest dream ever, that      03:29

11   was Jack.                                                        03:29

12         (Audio played.)                                            03:29

13   Q    Can you identify who said, "Well, what kind of scary        03:29

14   dream, man"?                                                     03:29

15   A    That was the defendant.                                     03:29

16         (Audio played.)                                            03:29

17   Q    Agent Spivack, after the call on February 15th, were       03:29

18   there other calls recorded by the ITAC system by Jack?          03:32

19   A    There were, yes, sir.                                       03:32

20   Q    And were there several calls recorded on February 24,      03:32

21   2013?                                                            03:32

22   A    Yes, sir, there were.                                       03:32

23   Q    We'll discuss the next set of calls that we're on.         03:32

24   Were you having any conversations?                               03:33

25   A    Yes, sir, I believe so.  If I may get one of the           03:33

1   binders.  It might help me as well.  Thank you.                03:33

2   Q    Did that help you?                                        03:33

3   A    Yes, sir, it did.  Thank you.                             03:33

4   Q    And were there other calls recorded between              03:33

5   February 15th and February 24th?                              03:33

6   A    Yes, sir, there were.                                     03:33

7   Q    Will the system record a call even if it goes directly    03:33

8   to voice mail?                                                 03:33

9   A    Yes, sir, it does.                                        03:33

10  Q    Were there any calls where there was actually a          03:33

11  conversation?                                                  03:33

12  A    Not until the 24th.                                       03:33

13  Q    Have you listened to that call as well -- first of all,   03:33

14  on the 24th at 6:30?                                           03:33

15  A    Yes, sir, I have.                                         03:33

16  Q    Whose voice is on that call?                             03:33

17  A    The voices on that call are also that of Jack and the    03:33

18  defendant's.                                                   03:34

19  Q    I'm going to play the call.  I'm sorry.  I'm going to    03:34

20  play the call from February 24th at 6:30 p.m., and it's      03:34

21  tabbed in the binders.                                        03:34

22       (Audio played.)                                          03:34

23  Q    Agent Spivack, based on your experience, do you         03:34

24  understand what the word "blow" means?                       03:43

25  A    Yes, I do.                                               03:43

SPIVACK - DIRECT/MR. SMITH                    92

1    Q    What's your understanding?                                    03:43

2    A    Blow in this context refers to oral sex.                      03:43

3    Q    Now, on the call an individual named Ellie came up.           03:43

4    Did that person come up in your investigation?                     03:43

5    A    Yes, sir, he did.                                             03:43

6    Q    Who is that person?                                           03:43

7    A    He is the child, one of the young sons to Jack.               03:43

8    Q    Approximately how old is he?                                  03:43

9    A    Now Ellie is, I believe, one and a half.  At the time I       03:43

10   believe he was three -- or I may have that reversed.  He was       03:43

11   between three months and one and a half.  There's two kids.        03:43

12   I can't off the top of my head recall which one was then           03:43

13   three months and which is then a year and a half.                  03:43

14   Q    As part of your job, have you also -- do you have an          03:43

15   understanding of what the term "suck off" means?                   03:43

16   A    Yes, I do.                                                     03:43

17   Q    What is your understanding?                                    03:43

18   A    Suck off is also another reference to oral sex.               03:44

19   Q    Agent Spivack, was there another call on                      03:44

20   February 24th recorded by the ITAC system?                         03:44

21   A    Yes, sir, there was.                                          03:44

22   Q    And was that at approximately 6:40 p.m.?                       03:44

23   A    That's correct.  Yes, sir.                                    03:44

24   Q    Whose voices are on that call?                                03:44

25   A    Voices on that call are Jack and the defendant,               03:44

SPIVACK - DIRECT/MR. SMITH                    93

1    Mr. Baslan.                                                          03:44

2          MR. SMITH:  Your Honor, I'll now play the call at             03:44

3    6:40p. M. On February 24th, which is in the transcript             03:44

4    binder.                                                             03:44

5          THE COURT:  All right, go ahead.                              03:44

6          (Audio played.)                                               03:50

7    Q    Agent Spivack, earlier in that tape the defendant used        03:50

8    the term "get off."  Do you have an understanding of what          03:50

9    that means, based on your experience?                              03:50

10   A    Yes, sir, I do.                                                03:50

11   Q    What's your understanding?                                     03:50

12   A    "Get off" means to orgasm or ejaculate.                        03:50

13   Q    Now, after that call on February 24th at 6:40 p.m., was       03:50

14   there another call captured by the ITAC system on that day?        03:50

15   A    Yes, sir, there was.                                           03:50

16   Q    And was that call approximately 6:55?                          03:50

17   A    Approximately.                                                 03:50

18   Q    I'd like to play a call from Government Exhibit 1 from         03:50

19   February 24th at 6:55 p.m.                                          03:50

20         (Audio played.)                                               03:50

21   Q    And Agent Spivack, whose voices are captured on this          03:50

22   call?                                                               03:51

23   A    This call is Jack and also the defendant, Mr. Baslan.         03:51

24         (Audio played.)                                               03:51

25   Q    Agent Spivack, if I can just stop for a moment.  Did          03:51

1   the name Steven come up during your investigation?          04:01

2   A    Yes, it did.                                           04:01

3   Q    Who is Steven?                                         04:01

4   A    Steven is the younger brother to Jack.                 04:01

5   Q    Did Steven have any kids?                              04:01

6   A    Yes, he does.                                          04:01

7   Q    Have you met any of his kids?                          04:01

8   A    I have.                                                04:01

9   Q    And what was the first name of the child you met?      04:01

10  A    One child in particular was named Leah.                04:02

11  Q    And approximately how old was Leah in February/March,  04:02

12  2013?                                                       04:02

13  A    I met her, she was eight.  I met her recently.  Last   04:02

14  year she was seven, in March 2013.                          04:02

15            MR. SMITH:   Let's start back up right there.     04:02

16            (Audio played.)                                   04:02

17            THE COURT:  We're going to break now for lunch.   04:02

18            Don't discuss the case, ladies and gentlemen.  We 04:06

19  will resume at 2:10.  Have a pleasant lunch.  All rise.     04:06

20            (Jury exits courtroom at 1:05 p.m.)               04:06

21            THE COURT:  All right, 210, folks.                04:07

22            (Luncheon recess.)                                04:07

23            (Continued on the next page.)

24

25

1

2              A F T E R N O O N   S E S S I O N

3

4                        2:18 p.m.

5            (In open court; defendant present.)

6                  (Jury not present.)

7            THE COURT:  We're waiting for two or three tardy          -08:-

8     jurors.  You know, I can conduct a trial for nine weeks and       05:22

9     not have a single day where any juror is late.  Then I get        05:22

10    another jury, and let's hope -- let's hope this is not            05:22

11    symptomatic of a bigger problem.  Maybe they're caught on         05:22

12    the other side of that thunderstorm.  But that's where we         05:22

13    are.  We're waiting.                                              05:22

14           (Brief pause in the proceedings.)                          05:22

15           THE CLERK:  All rise.                                      05:22

16           (Jury enters courtroom at 2:22 p.m.)                       05:25

17           THE COURT:  All right, please be seated.                   05:25

18           Mr. Smith, go, ahead.                                      05:25

19    BY MR. SMITH                                                      05:26

20    Q    Agent Spivack, when we left off we just listened to a        05:26

21    recorded call from February 24, 2013.  Was there -- were         05:26

22    there subsequent calls the next day?                              05:26

23    A    The next day, sir?                                           05:26

24    Q    Yes.                                                         05:26

25    A    I don't believe there were the next day, no, sir.           05:26

1   There's a chart, I know.  If you have it, it would                    05:26

2   definitely refresh my memory.                                         05:26

3            MR. SMITH:  I'm going to hand up what has been               05:26

4   marked as Government Exhibit 3500-AS-48 and -49.                      05:26

5   Q    Does that refresh your recollection, Agent Spivack?             05:26

6   A    Yes, it does.                                                    05:27

7   Q    Was there a call on the next day?                               05:27

8   A    There was.  On the 25th of February it was a phone              05:27

9   call.                                                                 05:27

10  Q    Was that a substantive call related to the plan that            05:27

11  they had been discussing on the 24th?                                05:27

12  A    No, sir, it was not.                                            05:27

13  Q    Now, following the call on the 25th, did you meet with          05:27

14  Jack again?                                                           05:27

15  A    Yes, sir, I did.                                                 05:27

16  Q    When was that?                                                  05:27

17  A    That was on February 26th, 2013.                                05:27

18  Q    What was the purpose of that meeting?                           05:27

19  A    Purpose of the meeting on the 26th was to bring Jack in         05:27

20  and officially admonish him and sign him up as a cooperator,         05:27

21  as an official cooperator for the FBI.                               05:27

22  Q    What does it mean for someone to be an official                 05:27

23  cooperator for the FBI?                                               05:27

24  A    It means that they're working in an official capacity           05:27

25  for us, to obtain evidence and things of that sort, and              05:27

SPIVACK - DIRECT/MR. SMITH                    97

1    they're doing so at our direction.  And it happens -- it          05:27

2    occurs after some kind of allegation they've made that has       05:27

3    been substantiated in some capacity.                             05:28

4    Q    Was he working in your direction before the 26th?           05:28

5    A    Yes, he was.                                                 05:28

6    Q    You said that you admonished him.  Can you describe         05:28

7    what you mean?                                                    05:28

8    A    Yes, sir.  An admonishment, sir, are basically the dos      05:28

9    and don'ts of working as a cooperator.  There's a list of        05:28

10   things that we read to the cooperator.  There's some things     05:28

11   that cooperators can do at our direction that they would not     05:28

12   be able to do otherwise.  It's basically just a set of rules     05:28

13   and guidelines.                                                  05:28

14   Q    What are the things that you told him he could now do?      05:28

15   A    Jack was given authority by us by the FBI to commit a       05:28

16   couple of acts of elicit activity.  Specifically, Jack was       05:28

17   given permission, authorization, to receive and possess          05:28

18   child pornography, as well as receive and possess narcotics.     05:28

19   Q    One of the things -- what are the things he couldn't        05:28

20   do?                                                              05:29

21   A    Jack was told he couldn't do really anything else.  He      05:29

22   couldn't use narcotics.  He couldn't distribute narcotics.       05:29

23   He couldn't engage in any form of sexual exploitation beyond     05:29

24   possession and receipt of child pornography.  So Jack was        05:29

25   not allowed to distribute child pornography or engage in any     05:29

1    other behavior, other than the admonishments to him.                    05:29

2    Q    Did you give had instructions on what to do if he saw             05:29

3    actual minors in one of these situations?                              05:29

4    A    Yes, sir, I did.                                                   05:29

5    Q    What instructions did you give?                                   05:29

6    A    I instructed Jack that if he were to encounter a                  05:29

7    situation, whether it was over the phone and he learned of            05:29

8    this situation or whether it was in person, where if he               05:29

9    learned that there was a child present, he was to contact me          05:29

10   immediately.  In the case of our ops, where we ran him as a           05:29

11   cooperator wearing a wire, aside from the ability to call             05:29

12   me, we also had code words that I was able to hear in                 05:29

13   realtime.                                                             05:29

14            So if I knew a child was present, we would be able           05:29

15   to take a different course of action.                                 05:30

16   Q    Special Agent Spivack, you indicated a minute ago that           05:30

17   one of the things you told him he was authorized to do was            05:30

18   receive and see child pornography.  Was that at the                   05:30

19   direction of a particular person?                                     05:30

20   A    Yes, it was.                                                      05:30

21   Q    Who was that?                                                     05:30

22   A    It was actually a person.  It was related to the                 05:30

23   defendant, Bebars Baslan and Kristen Henry.                           05:30

24   Q    Was it a general license for him to have child                   05:30

25   pornography?                                                          05:30

1   A    No, sir, it was not.  It was specific to these two                    05:30

2   individuals.                    05:30

3   Q    Up to this point of this meeting on February 16, 2013,                    05:30

4   had Jack done anything on behalf of the FBI, other than                    05:30

5   making recorded telephone calls that we talked about?                    05:30

6   A    No, sir.                    05:30

7   Q    Did you discuss other steps at this meeting?                    05:30

8   A    Yes, I did.                    05:30

9   Q    What other steps did you discuss?                    05:30

10  A    I discussed with Jack taking it a step further and                    05:30

11  meeting Mr. Baslan and Ms. Henry in person and wearing a                    05:30

12  recording device, carrying a recording device at the time he                    05:30

13  would meet with these people.                    05:31

14  Q    Did you give him any instruction about setting up a                    05:31

15  meeting?                    05:31

16  A    Yes, I did.                    05:31

17  Q    What instruction did you give him?                    05:31

18  A    I told Jack that when appropriate, when it was natural                    05:31

19  for he and the defendant, that he should set up a meeting                    05:31

20  any time, day or night, and that we would be there to                    05:31

21  monitor the meeting.                    05:31

22  Q    At this February 26th meeting you had with Jack, did                    05:31

23  you ask him any more questions about his criminal history?                    05:31

24  A    Yes, sir, I did.                    05:31

25  Q    What did you ask him?                    05:31

SPIVACK - DIRECT/MR. SMITH                    100

1    A    Basically went back over a lot of the activity that he          05:31

2    told me in our first meeting.  During our first meeting, a          05:31

3    lot of information that he told me regarding his past, and I        05:31

4    wanted to go over some things in a little bit greater              05:31

5    detail.                                                           05:31

6    Q    Did he provide you with any additional information?           05:31

7    A    Yes, sir, he did.                                            05:31

8    Q    What did he tell you?                                        05:31

9    A    He regarded -- excuse me, it regarded specific                05:31

10   information regarding encounters with three minor females he       05:31

11   had had in the past, 16 year olds and 17 year olds.               05:31

12   Specific information as to who they were, where they were          05:32

13   from, the context behind meeting them, et cetera.                 05:32

14   Q    During the course of this meeting, you assigned him as        05:32

15   a cooperator, did you make him any promises regarding that         05:32

16   prior criminal conduct?                                           05:32

17   A    No, sir, I did not.                                          05:32

18   Q    Did you ever talk to him about a potential resolution         05:32

19   for those crimes?                                                 05:32

20   A    Not so much.  I informed Jack that what he was telling        05:32

21   me I took to be very serious, and that I could not guarantee       05:32

22   anything one way or another, nor could I promise anything.         05:32

23   Q    Was he assigned an operational name?                         05:32

24   A    Yes, sir, he was.                                            05:32

25   Q    What was the name that he was assigned?                      05:32

1   A    I gave him the name Fragilistic.                          05:32

2   Q    Any particular reason?                                    05:32

3   A    Yes, sir.  He and the defendant used this as a code       05:32

4   word on the phone to indicate all clear, essentially.  So      05:32

5   that was the name that I adopted for him as his code word.     05:32

6   Q    After this meeting you had on February 26th, did Jack     05:32

7   ultimately set up a meeting with the defendant?                05:32

8   A    Yes, he did.                                              05:32

9   Q    Were there recorded phone calls on which that meeting     05:32

10  was set up?                                                    05:33

11  A    Yes, sir.                                                 05:33

12  Q    Do you recall what dates those phone calls occurred?      05:33

13  A    Yes, sir.  I believe it was on the 6th of March, 2013.    05:33

14  According to the chart, 6:36 p.m.                              05:33

15  Q    And with respect to those phone calls, was there any      05:33

16  discussion of the plan, other than to set up this meeting?     05:33

17  A    No, sir.  It was simply regarding the meeting.            05:33

18  Q    When was the meeting set for?                             05:33

19  A    It was set for the next day, which was March 7, 2013.     05:33

20  Q    What, if anything, did you do before that meeting?        05:33

21  A    Myself, my partner, my two partners, met Jack in a        05:33

22  parking lot near the defendant's residence.  We then           05:33

23  provided Jack with three recording devices and a               05:33

24  fourth device that allows us to monitor realtime.  The         05:33

25  fourth device did not record actively, it was just a           05:33

SPIVACK - DIRECT/MR. SMITH                102

1   realtime device.                                                        05:34

2         He was given these devices after a brief                         05:34

3   discussion about what we were looking for him to do and some            05:34

4   safety concerns and some code words that we devised in the              05:34

5   event that he was in danger or there was a child present.               05:34

6   Q    You said three recording devices and one device that              05:34

7   transmitted realtime, were these audio recording devices                05:34

8   video or both?                                                          05:34

9   A    Two of the three devices were audio only, the third               05:34

10  device was audio and video.                                             05:34

11  Q    And who activated the devices?                                    05:34

12  A    Myself, my partner, special agent John Robertson.                 05:34

13  Q    Why did you do that?                                              05:34

14  A    We had control of the devices.  The way to turn the              05:34

15  devices on and off is something that we control, where the             05:34

16  switch is located on the device.  It is not necessarily that           05:34

17  obvious to the naked eye.  So it's something we maintain                05:34

18  control over.                                                           05:34

19  Q    Is there a way to determine, after you get the device            05:34

20  back, if it's been turned off and back on?                             05:35

21  A    Yes, there is.                                                    05:35

22  Q    How do you tell?                                                  05:35

23  A    Specific to audio recording.  It will record an entire           05:35

24  session length.  If the audio device is turned off in the              05:35

25  middle of it, it will stop.  And if it is turned back on, it           05:35

SPIVACK - DIRECT/MR. SMITH                    103

1   will create a completely separate session number, session                    05:35

2   ID.                                                                          05:35

3   Q    You indicated that you gave him some specific                           05:35

4   instructions with respect to this meeting on March 7th?                      05:35

5   A    I did.                                                                   05:35

6   Q    Can you describe what those instructions were?                          05:35

7   A    Yes, sir.  Jack was essentially told he was going to                    05:35

8   want him to go into the residence, the defendant's residence                 05:35

9   and Ms. Henry's and just have discussions similar to that of                 05:35

10  what he had on the phone, previous conversations we had been                 05:35

11  listening to.  Throughout the theme, I kind of themed to                     05:35

12  Jack throughout the entire evolution of this, I wanted to                    05:35

13  know specifically what Mr. Baslan was planning to do, who                    05:35

14  these children were, anything about child pornography, where                 05:35

15  he was getting where, where he was maintaining it, things                    05:36

16  like that.  Pretty much anything and everything there was to                 05:36

17  know about this and other potential crimes.                                  05:36

18  Q    Did you give him anything else?                                         05:36

19  A    I did, yes, sir.                                                         05:36

20  Q    What else did you give him?                                             05:36

21  A    I gave Jack a thumb drive, I believe it was a SanDisk                    05:36

22  brand thumb drive.                                                           05:36

23  Q    Why did you do that?                                                    05:36

24  A    Based on previous discussions that we had heard between                 05:36

25  Jack and the defendant, we knew that the defendant had                       05:36

SPIVACK - DIRECT/MR. SMITH                    104

1    possessed child pornography.  I gave Jack a thumb drive that          05:36

2    I had cleaned and wiped myself.  It was a forensically sound         05:36

3    thumb dive.  I knew nothing had been on it.  I provided that         05:36

4    to Jack in the event child pornography had come up.  I think         05:36

5    it was the last conversation he had on the phone, last

6    substantive conversation, the defendant agreed to provide           05:36

7    child pornography.  I wanted Jack to agree if the defendant         05:36

8    was willing.                                                         05:36

9    Q    Now, after you gave him these devices and you turned           05:36

10   them on, what happens?                                               05:36

11   A    Immediately after they were turned on I read what's            05:37

12   called preamble which is basically it's me stating who we           05:37

13   were, where we were, and what we were doing.  Then at that          05:37

14   point I let Jack go.  He got in his car and he drove the            05:37

15   maybe ten minutes to the defendant's residence.                     05:37

16   Q    What happened after he got to the defendant's                  05:37

17   residence?                                                           05:37

18   A    Myself, Agent Robertson, another agent were in a car           05:37

19   parked in such a manner we could see the residence and hear         05:37

20   what was going on, and we observed Jack enter the residence,        05:37

21   and we sat outside and we listened till approximately an            05:37

22   hour, hour and a half, maybe, until the meeting was over.           05:37

23   Q    What was the address that you went to?                         05:37

24   A    It was 1153 Ocean Parkway in Brooklyn, New York.               05:37

25   Q    After -- after the meeting was over what happened?             05:37

1  A    After the meeting was over we watched Jack.  We                05:37

2  observed Jack leave the residence and enter his vehicle.  We       05:37

3  then followed him back to the very same -- we call it the          05:37

4  staging area, very same staging area where we met Jack             05:38

5  before the meeting, at which point I retrieved the devices         05:38

6  from him.  We gave what's called a post-amble.  Same thing         05:38

7  we did before, just at the end of the meeting and then I           05:38

8  turned the devices off.                                            05:38

9  Q    Did you ultimately download those devices?                    05:38

10  A    Yes, sir, I did.                                              05:38

11  Q    And could you tell whether or not they had been turned       05:38

12  off during the course of this meeting?                            05:38

13  A    I was able to tell.                                          05:38

14  Q    Had they been turned off?                                    05:38

15  A    No, sir, they were not turned off.                           05:38

16  Q    Let me show you what's been marked as Government             05:38

17  Exhibit 2 for identification.                                     05:38

18        Do you recognize Government Exhibit 2?                      05:38

19  A    Yes, I do.                                                   05:38

20  Q    What do you recognize it to be?                              05:38

21  A    This is a CD containing the audio and video files taken      05:38

22  from the cooperator Jack on February 7th, 2013.                   05:38

23  Q    How do you know it's that CD?                                05:38

24  A    My handwriting.  My initials are right next to the           05:38

25  label.                                                            05:39

SPIVACK - DIRECT/MR. SMITH                    106

1          THE COURT:  The date was March 7th?                    05:39

2          THE WITNESS:  Yes, sir, March 7th.                    05:39

3          MR. SMITH:  The Government would offer Government       05:39

4    Exhibit 2.                                                   05:39

5          MR. SAVITT:  No objection.                            05:39

6          THE COURT:  March 7th, received in evidence,          05:39

7    Government Exhibit 2.                                        05:39

8          (Government Exhibit 2 was admitted into evidence.)    05:39

9    Q    Now, with respect to these audio and video recordings,  05:39

10   would some of -- was the audio better on some of them than   05:39

11   others?                                                      05:39

12   A    Yes.                                                    05:39

13   Q    Did you do anything to facilitate presentation at       05:39

14   trial?                                                       05:39

15   A    We did.  Yes, sir.                                      05:39

16   Q    What did you do?                                        05:39

17   A    What we did is we took -- one of the audio devices,     05:39

18   audio one, the audio is quite clear.  The audio on the       05:39

19   video, while the video is clear the audio is -- is a little  05:39

20   bit muffled.  So we overlaid portions of audio one -- excuse 05:39

21   me.  We overlaid the entire set of audio one on to the       05:39

22   video.  So you can hear audio one and see the video.         05:39

23   Q    Did you make any changes to the audio?                  05:39

24   A    Not at all.                                             05:39

25   Q    Did you make any changes to the video?                  05:40

SPIVACK - DIRECT/MR. SMITH                    107

1    A    Not at all.                                          05:40

2         MR. SMITH:  The government would ask to show that    05:40

3    combination video, just so it facilitates.               05:40

4         THE COURT:  Okay.  Is there a transcript?           05:40

5         MR. SMITH:  Yes, there is, your Honor.              05:40

6         THE COURT:  Is it one in the book, the March 7th?   05:40

7         MR. SMITH:  That's right, your Honor, March 7th at  05:40

8    5:30.                                                     05:40

9         THE COURT:  If you'll turn to that in your book,    05:40

10   ladies and gentlemen.  Bear in mind my admonitions before 05:40

11   about the limited purpose of these transcripts.          05:40

12        MR. SMITH:  All right.  I just have the entire      05:40

13   video.  So I'll probably try to skip a couple of portions, 05:40

14   your Honor, during the course of the presentation.       05:40

15        THE COURT:  Just direct your attention accordingly  05:41

16   to the appropriate references on the transcript.         05:41

17   Q    Let me start this at the beginning.                 05:41

18        (Audio played.)                                     05:41

19        MR. SMITH:  Judge, I neglected to mention that      05:41

20   during the break we shut off the audio devices.  There is an 05:42

21   on and off switch at the bottom, the volume switch if.  You 05:42

22   move the volume up two to three.                         05:42

23   Q    I'm going to jump forward to 1026, approximately.   05:42

24   Agent, can you just summarize what happened in that      05:42

25   intervening time?                                         05:42

SPIVACK - DIRECT/MR. SMITH                    108

1   A    Yes, sir.  The last ten minutes or so, approximately,    05:42

2   is the cooperator driving to the target residence and this    05:42

3   should correspond to the next portion.    05:43

4             MR. SMITH:  We're on page three.    05:43

5             (Audio played.)    05:43

6   Q    Can you just summarize what happened in the next minute    05:43

7   or so.    05:43

8   A    Yes, sir.  The cooperator used the restroom.    05:43

9             (Audio played.)    05:43

10            MR. SMITH:  Let me jump forward to    05:45

11  approximately --    05:45

12            THE COURT:  I can't hear you.    05:45

13            MR. SMITH:  I'm going to jump forward to    05:45

14  approximately 2511.    05:45

15            THE COURT:  You're making references that don't    05:45

16  correspond to anything we have in front of us.    05:45

17            MR. SMITH:  I'm sorry.  It corresponds to the time    05:45

18  code of the video that should be in front of the jury.    05:45

19            THE COURT:  Well, if they have the video, I beg    05:45

20  your pardon.    05:45

21            (Pause.)

22            THE COURT:  What's happening?    05:46

23            MR. SMITH:  Oh, I'm sorry, your Honor.  I was    05:46

24  waiting for you.  I'll start back up.    05:46

25            THE COURT:  Okay.    05:46

1          (Audio played.)                                          05:46

2          MR. SMITH:  Now I'm just having technical                05:46

3     difficulty.                                                   05:48

4          This is going to skip forward one minute.                06:01

5     Q    Agent Spivack, what are we skipping?                     06:01

6     A    Jack is using the restroom.                              06:01

7          (Audio played.)                                          06:01

8     Q    Agent Spivack, before we go on, the camera clearly       06:01

9     jumps around during the course of that video.  Can the        06:25

10    person using the video recording device see exactly what's    06:25

11    captured?                                                     06:25

12    A    No, sir, you cannot.                                     06:25

13    Q    And did you give Jack any particular instructions about  06:25

14    what to do with that video recording device when he's         06:25

15    leaving the room?                                             06:25

16    A    Yes, I did.                                              06:25

17    Q    What instructions did you give him?                      06:25

18    A    I told Jack that if he was leaving the room for any      06:25

19    reason to go to the bathroom -- for example, I told him to    06:25

20    put the recording device in his pocket and take it with him.  06:25

21    Do not leave it alone with the defendant or Ms. Henry.        06:25

22    Q    Why did you do that?                                     06:26

23    A    Due to our technologies, the device is hidden in a       06:26

24    particular object, and we didn't want the defendant or        06:26

25    Ms. Henry looking at the object a little closer and figuring  06:26

SPIVACK - DIRECT/MR. SMITH                    110

1    out it was actually a hidden camera.                                 06:26

2    Q    Now, Agent Spivack, before we go on, can you just               06:26

3    summarize what the next few minutes of the video consists            06:26

4    of?                                                                  06:26

5    A    Yes, sir.  Approximately the next ten minutes the               06:26

6    camera, the object was placed in front of the TV, they're           06:26

7    watching, and ten minutes, approximately ten minutes of             06:26

8    visual depiction of child pornography is present.                    06:26

9    Q    In advance of this trial, did you take screen shots of          06:26

10   portions of that -- of the recording device video from              06:26

11   March 7th?                                                           06:26

12   A    Yes, sir, I did.                                                06:26

13   Q    Let me show you what's been marked as Government                06:26

14   Exhibit 46A to 46G?                                                  06:26

15         THE COURT:  A to... I'm sorry?                                 06:26

16         MR. SMITH:  A to G.                                            06:27

17         THE COURT:  A to G.                                            06:27

18   Q    Do you recognize those?                                        06:27

19   A    Yes, sir, I do.                                                 06:27

20   Q    What do you recognize them to be?                              06:27

21   A    These are the screen shots of the child pornography            06:27

22   that I took.                                                         06:27

23         MR. SMITH:  Government offers 46A through 46G.                 06:27

24         THE COURT:  Any objection?                                     06:27

25         MR. SAVITT:  Subject to your Honor's ruling, no,              06:27

SPIVACK - DIRECT/MR. SMITH                    111

1    not at this time.                                                        06:27

2         THE COURT:  All right, 46A to 46G admitted.                        06:27

3         (Government Exhibits 46A through 46G admitted into                 06:27

4    evidence.)                                                              06:27

5         THE COURT:  Would you be good enough to tell us                    06:27

6    what specifically you mean by a screen shot?                            06:28

7         THE WITNESS:  Yes, sir.  So what I've done is, as                  06:28

8    the video is displaying the child pornography, I paused the             06:28

9    video, I literally did it, it's a print screen function on              06:28

10   the computer, which just takes an image of essentially what             06:28

11   you see on the commuter, and that is what was on those                  06:28

12   slides in front of me.                                                  06:28

13        MR. SMITH:  Can you -- I'm just asking that the                    06:28

14   overhead just be set, just so the witness can see it at the             06:28

15   moment.                                                                 06:28

16   Q    Can you see that, Agent Spivack?                                   06:28

17   A    I can, yes, sir.                                                   06:28

18   Q    This is 46A.  Can you just describe what's on the                  06:28

19   screen in the image?                                                    06:28

20   A    Yes, sir.  This is a video.  And this particular screen           06:28

21   shot is just the face of what is a prepubescent female who             06:28

22   is engaged in oral sex with a male.                                     06:29

23        MR. SMITH:  The government intends to publish this                 06:29

24   image for five seconds, your Honor.                                     06:29

25        THE COURT:  Go ahead.                                             06:29

SPIVACK - DIRECT/MR. SMITH                    112

1    Are they visible?  Is the image visible?  Not on                  06:29
2  my screen.  Do you see it, Mike?                                    06:29
3          THE CLERK:  Yes.                                            06:29
4          THE COURT:  Ladies and gentlemen of the jury, can           06:29
5  you see that image?  Okay, thank you.                               06:29
6          MR. SMITH:  It's not on there any more.                     06:29
7          THE COURT:  Okay, just for five seconds.  The               06:29
8  government will put it up for five seconds.                         06:29
9          MR. SMITH:  Can you put it back so that the                 06:29
10 witness can see the next image.                                     06:29
11         I have another one.                                         06:29
12 Q    And Agent Spivack, just with respect to 46A, did you           06:29
13 note what time this occurred?                                       06:29
14 A    Yes, sir, I did.                                                06:30
15 Q    And what time is that?                                         06:30
16 A    It was approximately 68 minutes and six seconds into           06:30
17 the video.                                                          06:30
18 Q    I'm going to put up Government Exhibit 46B for the             06:30
19 witness only.  Can you see that, Agent Spivack?                     06:30
20 A    Yes, sir, I can.                                                06:30
21 Q    And can you describe what this depicts?                        06:30
22 A    Yes, sir.  This is another prepubescent girl, under the        06:30
23 age of ten, I believe.  She is engaged in sexually explicit        06:30
24 conduct with an adult male.                                         06:30
25 Q    And did you know what time this occurred?                      06:30

SPIVACK - DIRECT/MR. SMITH                    113

1   A     Yes, sir.                                            06:30

2   Q     The recording?                                      06:30

3   A     Yes, sir.  It was at 71 minutes, 50 seconds.        06:30

4         MR. SMITH:  If we can put that up for the jury for  06:30

5   five seconds.                                             06:30

6         Put it back for the witness.                        06:30

7   Q     Agent Spivack, I'm putting up Government Exhibit 46C. 06:31

8   Do you see that?                                          06:31

9   A     Yes, sir, I do.                                     06:31

10  Q     Can you describe what it depicts?                   06:31

11  A     Yes, sir.  It's the same victim identified in the  06:31

12  previous slide, approximately two seconds later, 71 minutes, 06:31

13  52 seconds.                                               06:31

14        MR. SMITH:  I'll put this up for the jury for       06:31

15  approximately five seconds.                               06:31

16        (Exhibit published.)                                06:31

17        MR. SMITH:  Put it back for the witness.  Putting   06:31

18  up for the witness Government Exhibit 46D.                06:31

19  Q     Agent Spivack, can you describe what this image     06:31

20  depicts?                                                  06:31

21  A     Yes, sir.  These are two prepubescent girls.  They are 06:31

22  performing oral sex on what is described in the video as  06:31

23  cucumbers.                                                06:32

24  Q     Approximately what time of the video did this occur? 06:32

25  A     Seventy-six minutes and 20 seconds.                 06:32

SPIVACK - DIRECT/MR. SMITH                    114

1   Q    And just for clarity, when you're describing these, did        06:32

2   you actually watch this entire recording?                          06:32

3   A    I have, yes, sir.                                             06:32

4         MR. SMITH:  I will publish to the jury, publish              06:32

5   for five seconds.                                                  06:32

6         (Exhibit published.)                                         06:32

7   Q    I show the witness Government Exhibit 46E.  Can you see        06:32

8   that?                                                              06:32

9   A    Yes, sir, I can.                                              06:32

10  Q    And what does that depict?                                    06:32

11  A    It depicts three young children, the two are most             06:32

12  certainly females, the third may actually be a very young          06:32

13  male.  It's very hard to see in the video.  They're all are        06:32

14  prepubescent and they're displaying genitals.                      06:32

15  Q    And what time is this occurring?                              06:32

16  A    This is approximately 77 minutes and 20 seconds.              06:32

17        (Exhibit published.)                                         06:33

18        MR. SMITH:  Let the record reflect that I                    06:33

19  published that to the jury for approximately five seconds.         06:33

20        Put it up for the witness again.                             06:33

21  Q    Agent Spivack, can you see that?                              06:33

22  A    No, sir, I cannot.                                            06:33

23        THE COURT:  All right.  It seems like a good time            06:33

24  to take a break, folks, while we tinker with the machinery         06:34

25  here.  Step inside.  Don't discuss the case.                       06:34

SPIVACK - DIRECT/MR. SMITH                    115

1      We'll resume in about 12 minutes.                    06:34

2      THE CLERK:  All rise.                                06:34

3      (Jury exits courtroom at 3:31 p.m.)                  06:34

4      THE COURT:  All right, ten minutes.                  06:35

5      (Recess.)                                            06:35

6      (In open court; defendant present.)

7      (Jury not present.)                                  06:35

8      THE COURT:  All right, before we resume, I thought   06:35

9  I would alert the jury to the fact that one of the witnesses   06:44

10  has mentioned to us he may have recognized a juror.  And if   06:44

11  there's anybody in the jury that recognizes one of the   06:44

12  witnesses, to bring that to Ms. Mulqueen's attention at the   06:44

13  break and we'll go from there.                          06:44

14      MR. SAVITT:  Yes, sir.                              06:44

15      THE CLERK:  Okay, so we're all set?                 06:44

16      THE COURT:  We are indeed, Ms. Mulqueen.            06:44

17      THE CLERK:  All rise.                               06:44

18      (Jury enters courtroom at 3:44 p.m.)                06:47

19      THE COURT:  Please be seated, folks.  Before we     06:47

20  resume the testimony, one of our witnesses has mentioned to   06:47

21  the court and counsel that he may have recognized a member   06:47

22  of the jury.  So if there is any among you who recognize any   06:47

23  of our witnesses, would you please bring that to the         06:48

24  attention of Ms. Mulqueen at the next break, which will be   06:48

25  the end of the day.  We will resume tomorrow at 9:30 a.m.    06:48

1   sharp.  So please do your very best to be here.  We'll be          06:48

2   ready to go at 9:30 and more about the schedule later on.          06:48

3   Go ahead.                                                          06:48

4           MR. SMITH:  Put it up for the witness only, again.        06:48

5   Q    I have put up 46F.  Do you see that on the screen?            06:48

6   A    I can, yes, sir.                                              06:48

7   Q    And can you describe what it depicts?                        06:48

8   A    Yes, sir.  This is one of the prepubescent females in        06:48

9   the previous exhibit.  This is just a closeup shot of her          06:48

10  genitalia.                                                         06:48

11  Q    And approximately what time in the March 7th video           06:48

12  recording made by Jack did this occur?                            06:49

13  A    This occurred at 77 minutes and 35 seconds.                  06:49

14          MR. SMITH:  If we can publish to the jury.                06:49

15          (Exhibit published.)

16          MR. SMITH:  I published that to the jury for five         06:49

17  seconds only.                                                      06:49

18          Put it back for the witness only.                         06:49

19  Q    This is our last segment, Government Exhibit 46G.  Can       06:49

20  you describe what is depicted in that photo, Agent Spivack?       06:49

21  A    Yes.  I believe this is the same prepubescent girl that      06:49

22  was depicted in the last exhibit.  It's just a little bit         06:49

23  zoomed out just a little bit.                                      06:49

24  Q    What time did this occur in the video recordings?           06:49

25  A    This was approximately 77 minutes, 55 seconds.              06:49

SPIVACK - DIRECT/MR. SMITH                117

1    MR. SMITH:  Publish this last one to the jury.                    06:49

2    (Exhibit published.)                                              06:49

3    MR. SMITH:  I'll just note for the record that we                 06:49

4    published it for approximately five seconds.                      06:49

5    THE COURT:  All right.                                            06:50

6    Q    Now, Agent Spivack, during the course of the time            06:50

7    that -- the approximate ten minutes that you were talking         06:50

8    about that these videos were displayed on the video              06:50

9    recording device that Jack was carrying, was audio also          06:50

10   recording?                                                        06:50

11   A    Yes, it was.                                                 06:50

12   Q    And in preparation for the trial, did you pull that          06:50

13   audion out so we can listen to that without seeing the           06:50

14   video?                                                            06:50

15   A    Yes, I have.                                                 06:50

16   MR. SMITH:  The government will play the audio                    06:50

17   now.  Pick up at page 57 of the transcripts.                      06:50

18   THE COURT:  Five, seven?                                          06:50

19   MR. SMITH:  Five, seven, at the same line                         06:50

20   approximately halfway down.                                       06:50

21   MR. SAVITT:  Your Honor, may I just have a moment                 06:50

22   to get something clear with the prosecutor.                       06:50

23   THE COURT:  Sure, go ahead.                                       06:50

24   (Conferring.)                                                     06:50

25   MR. SAVITT:  Thank you very much, your Honor.                     06:50

SPIVACK - DIRECT/MR. SMITH                    118

1          MR. SMITH:  And I'll just note for the record that                06:51

2     defense inquired whether you can actually hear the child on           06:51

3     the video.                                                            06:51

4     Q    Agent Spivack, are you hearing people talking or the            06:51

5     actual child pornography.                                             06:51

6     A    You're hearing people talking.                                   06:51

7          THE COURT:  When you say people, people who are                  06:51

8     denoted on this transcript?                                           06:51

9          THE WITNESS:  That's correct.  So Mr. Baslan,                    06:51

10    Jack, and Ms. Henry.                                                  06:51

11         MR. SMITH:  Can you set it back to the podium                    06:52

12    position.                                                             06:52

13    Q    Agent Spivack, a person named Kayla came up during the          06:52

14    course of that conversation.  During the course of your              07:12

15    investigation, did you identify anyone named Kayla?                   07:12

16    A    Yes, sir.                                                        07:13

17    Q    Who is that?                                                     07:13

18    A    Kayla is one of Jack's daughters.                               07:13

19    Q    Approximately how old is she?                                    07:13

20    A    Approximately ten years of age.                                 07:13

21    Q    And is there -- now, I've stopped the recording.  Is           07:13

22    there more recording on this device?                                 07:13

23    A    There is.                                                       07:13

24    Q    And can you just summarize what that consists of?              07:13

25    A    Sounds -- what appears to have happened is Jack, the           07:13

1  defendant and Kristen go into a room and there are sounds                    07:13

2  indicative of sexual behavior that can be observed by                    07:13

3  listening to the recordings.                    07:13

4  Q    Is there some period where Jack then leaves?                    07:13

5  A    He does.  You can hear him leave and get into his car                    07:13

6  and drive to our station location.                    07:13

7           MR. SMITH:  Let me just play the very end of the                    07:13

8  call -- I'm sorry, of the recording.                    07:13

9  Q    Agent Spivack, after the audio that we just heard on                    07:13

10 the March 7th recording, were there further telephone calls?                    07:14

11 A    On that night, yes, sir.                    07:14

12 Q    Did they relate to child molestation?                    07:14

13 A    No, they did not.                    07:14

14          MR. SMITH:  If I may approach, your Honor?                    07:14

15          THE COURT:  Yes.                    07:14

16 Q    I've given you what's been marked as Government                    07:14

17 Exhibit 6.  Do you recognize that?                    07:15

18 A    I do.                    07:15

19 Q    What is it?                    07:15

20 A    That's a calendar of January through March of 2013.                    07:15

21 Q    Does it appear to be accurate?                    07:15

22 A    It does.                    07:15

23          MR. SMITH:  The Government offers Government                    07:15

24 Exhibit 6.                    07:15

25          MR. SAVITT:  No objection.                    07:15

SPIVACK - DIRECT/MR. SMITH                120

1         THE COURT:  Received.  HEADER                              07:15

2         (Government Exhibit 6 admitted into evidence.)             07:15

3         THE COURT:  Calendar for what year.                        07:15

4         THE WITNESS:  2013, sir.  January through March.           07:15

5    Q    Agent Spivack, was there another call recorded on the     07:15

6    ITAC system on March 8th, 2013?                                07:15

7    A    There was.                                                 07:16

8    Q    Did you speak to Jack before he made this call?           07:16

9    A    I did.                                                     07:16

10   Q    Before I go forward, did you speak to Jack after that     07:16

11   March 7th meeting, where you heard the recording on?           07:16

12   A    I did.                                                     07:16

13   Q    Could you describe what his demeanor was after you        07:16

14   spoke to him.                                                  07:16

15   A    Jack was visibly upset when we met in the station area.   07:16

16   He was visibly shaken.                                         07:16

17   Q    Now, as to this March 8th call, what, if anything, did    07:16

18   you tell Jack before that call?                                07:16

19   A    As I recall, there had been discussion about a meeting,   07:16

20   as I recall.  We had instructed Jack to not schedule a         07:16

21   meeting for later in the week.  I think the seventh might      07:16

22   have been a Wednesday or Thursday.  I think Jack was trying    07:16

23   to schedule a meeting for that Friday, which we were not       07:16

24   prepared to do.                                                07:16

25   Q    Did you give any instructions to Jack about the manner    07:16

SPIVACK - DIRECT/MR. SMITH                    121

1    in which he should try to cancel this meeting?

2    A    Yes, sir, I did.  I instructed Jack to kind of do what

3    he's been doing, in regards to keeping things natural.  We

4    wanted there to be the opportunity for future meetings, so

5    we didn't want Jack to cancel in such a way that would --

6    what we call, raise up or do something to alert the

7    defendant that Jack may be working for us.  So I instructed

8    Jack to cancel the meeting in a very natural way.

9    Q    And is the call that we're discussing here, the

10   March 8th call at 10:11 a.m.?

11   A    Yes, sir.

12            MR. SMITH:  Play the March 8th call at 10:11 a.m.

13   It's three tabs folder in the transcript binder.

14            (Audio played.)

15   Q    Now, after that, was there another call recorded by the

16   ITAC system on March 8th?

17   A    Yes, sir, there was.

18   Q    Any talk of sexual abuse of children?

19   A    No, sir.

20   Q    What other call is after that?

21   A    March 10th, 2013, at approximately 2:05 p.m.

22            MR. SMITH:  I think that's actually mislabeled in

23   the binders.  Let me play the March 10th call at 2:05 p.m.

24            THE COURT:  March 10th call what --

25            MR. SMITH:  At 2:05 p.m.

SPIVACK - DIRECT/MR. SMITH                 122

1        THE COURT:  2:05 p.m.  I believe it's mislabeled.    07:20

2   I believe the tab indicates that it's at 851.             07:20

3   Q    Agent Spivack, when was the next call in which there  07:20

4   was some discussion of child molestation?                 07:23

5   A    It was on the 12th at 7 p.m.                          07:23

6   Q    Is there a portion of that call that doesn't relate to  07:23

7   child molestation?                                        07:23

8   A    Yes, sir, we cut that out.                            07:23

9   Q    So I would -- I would direct you to -- that was -- was  07:23

10  that March 12th at 7:57 p.m.?                              07:23

11  A    Correct.                                              07:23

12  Q    Okay.  And we're starting in the middle of the call.  07:23

13  Is that right?                                             07:23

14  A    Approximately in the middle of the call.              07:23

15       MR. SMITH:  We'll play the call occurring on         07:23

16  March 12th, 7:57 p.m., which is in the binder under that   07:23

17  tab.                                                       07:23

18       (Audio played.)

19       MR. SMITH:  You can just flip it over to the         07:23

20  witness for a second.  I'm going to put up Government      07:25

21  Exhibit 6, which is the calendar showing March 2013.       07:25

22  Q    All right.  So just to -- progression.  The first     07:25

23  meeting, what day of the week was that?                    07:25

24  A    This was March 7th, this is a Thursday.               07:25

25  Q    And now we're in the following week, we just listened  07:25

1   to call, on which day of the week.                               07:25

2   A    March 12th, Tuesday.                                        07:25

3   Q    What is the next activity in the case following            07:25

4   March 12th?                                                      07:25

5   A    The next activity was a meeting similar to that of the     07:25

6   7th.  Same concept.  This was on March 14th, 2013.             07:25

7   Q    Was there a particular purpose that you had in setting     07:25

8   up this meeting?                                                 07:26

9   A    Yes, sir.                                                   07:26

10  Q    When was that?                                             07:26

11  A    Among our general purpose of trying to identify more       07:26

12  about this plan to exploit children, sexually exploit           07:26

13  children.  We also have information now concerning              07:26

14  encryption, encryption devices, encryption hard drives.  I      07:26

15  wanted to know as much as I could about these encrypted hard    07:26

16  drives.  Where does the defendant maintains his child          07:26

17  pornography and how he encrypts it.                             07:26

18  Q    When you say meetings, was this a meeting between Jack     07:26

19  and the defendant?                                              07:26

20  A    Yes, sir.                                                   07:26

21  Q    What, if anything, did you do before that meeting?        07:26

22  A    Same thing that we did on March 7th.  We set up a         07:26

23  pre-meeting at our staging area with Jack, where we             07:26

24  discussed the concept of operations.  What we wanted Jack to    07:26

25  do.  What we were looking to get out of the meeting, safety     07:26

SPIVACK - DIRECT/MR. SMITH                    124

1   protocols, things of that so the.                                   07:26

2   Q    And after you had that discussion, did you give him           07:26

3   anything?                                                           07:26

4   A    I did, yes, sir.                                               07:26

5   Q    What did you give him?                                         07:26

6   A    This time I gave him a 500 gigabit encrypted hard              07:26

7   drive, an Apricorn brand hard drive, which is a hard drive          07:27

8   that had been recommended to Jack by the defendant.                 07:27

9   Q    And did you give him any instructions about what he was        07:27

10  supposed to do with that hard drive?                                07:27

11  A    Yes, sir.  I instructed Jack that similar to the thumb         07:27

12  drive he had had before, that he was to show Mr. Baslan, the        07:27

13  defendant, that he had this encrypted hard drive and see if         07:27

14  the defendant would be willing to place child pornography on        07:27

15  it.                                                                 07:27

16  Q    Did you give Jack recording devices?                           07:27

17  A    I did.                                                          07:27

18  Q    And how many?                                                  07:27

19  A    I gave him the same number, three -- excuse me, two            07:27

20  audio recordings, and then I also gave him a video audio           07:27

21  recording device except this time it was a little bit              07:27

22  different, a different type of device than we used at the          07:27

23  previous meeting.  And I also gave him the same realtime           07:27

24  recording device that he had had before.                           07:27

25  Q    Who activated those devices prior to the meeting?              07:27

SPIVACK - DIRECT/MR. SMITH                125

1    A    Myself and Agent Robertson.                                07:27

2    Q    After activating the recording devices while meeting       07:27

3    with Jack, what did you do?                                     07:27

4    A    I'm sorry, sir?                                            07:27

5    Q    After you activated the recording devices, what was the    07:28

6    next step?                                                      07:28

7    A    After we activated the recording devices, I then           07:28

8    recorded preamble, sent Jack on his way.  We followed him to    07:28

9    the residence of Mr. Baslan and Ms. Henry.  We again sat        07:28

10   outside and observed -- well, we observed Jack go into the      07:28

11   residence and we were able to listen realtime of the           07:28

12   conversation.                                                   07:28

13   Q    Approximately how long was it?                             07:28

14   A    This one was much shorter.  I believe the total time       07:28

15   was 45 minutes.                                                 07:28

16   Q    And then what happened at the end of that 45 minutes?      07:28

17   A    Similar thing.  Jack left the residence.  We observed      07:28

18   him get into his vehicle.  We followed him back to the          07:28

19   staging area where we did a debrief, and I again issued a       07:28

20   post-amble and turned the recording devices off.                07:28

21   Q    And with respect to this meeting, were you able to         07:28

22   determine whether or not the recorded devices had been          07:28

23   turned off at some point during the meeting?                    07:28

24   A    I checked the recording devices and none of them had       07:28

25   been turned off during the meeting.                             07:28

1      MR. SMITH:  May I approach, your Honor?                    07:28

2      THE COURT:  Yes.                                           07:29

3      (Continued on the next page.)                              07:31

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Spivack - Direct - Smith                    127

1          MS. SMITH:  I've handed Agent Spivack Government

2    Exhibit 3.

3    Q    Agent Spivack, when you retrieved the recording devices,

4    did you at some point download them?

5    A    I did.

6    Q    Looking at Government Exhibit 3, do you recognize that?

7    A    Yes, sir.

8    Q    What do you recognize it to be?

9    A    A CD that I made of the three -- of the two audio

10   recordings and one video recording.

11         MR. SMITH:  The government offers Government

12   Exhibit 3.

13         MR. SAVITT:  No objection, your Honor.

14         THE COURT:  Government 3 is received.

15         (Government's Exhibit 3  was received in evidence.)

16   Q    I now like to -- now, Agent Spivack, prior to trial, did

17   you cut out a couple of parts of the audio recording we're

18   about to listen to?

19   A    Yes, I did.

20   Q    What parts?

21   A    Mainly the parts of the cooperator driving to and from

22   the residence.

23   Q    Did you cut out the cooperator urinating?

24   A    I did, once or twice.

25   Q    Are those cuts indicated on the recording themselves?

1   A    Yes, they are.

2   Q    How so?

3   A    We have inserted an approximately five second gap, so in

4   listening to the recording device, you'll hear conversations,

5   followed by just five seconds of nothing.  That's the gap that

6   we took out of the recording.

7   Q    You indicated there was a video recording device?

8   A    Yes, sir.

9   Q    Was this the same type as the first one?

10  A    No, sir, completely different device.

11  Q    And was this device capable of being manipulated so you

12  can aim it at different locations in a residence?

13  A    Yes, sir.  I mean, in theory, it was.  The way we

14  configured it to the cooperator, didn't really allow for a

15  whole lot of control by the cooperator to point at a

16  particular direction.

17  Q    Did it capture much that was useful?

18  A    No, it did not.

19        MR. SMITH:  I'd like to play the audio from the

20  March 14th recording we just talked about, which is in the

21  binders under a tab that indicates March 14, 2:54 p.m.

22        THE COURT:  All right.  Go ahead.

23        MR. SMITH:  Can you put the audio on?

24             (Audio played for the jury.)

25        THE COURT:  You have follow-up questions on what we

Spivack - Direct - Smith                          129

1    just heard?

2             MR. SMITH:  It's still going, your Honor, just the

3    very end of the recording.

4             THE COURT:  All right.  Go ahead.

5                  (Audio played for the jury.)

6             MR. SMITH:  I have a couple of follow-ups,

7    your Honor.

8             THE COURT:  Quickly.

9    Q    Agent Spivack, following that operation, did you meet

10   with Jack again?

11   A    I did.

12   Q    Did you receive anything from him?

13   A    I did.

14   Q    What did you receive?

15   A    I received the same 500 gigabyte encrypted hard drive

16   that I'd given him before the operation.

17            MR. SMITH:  That's with respect to this day.  I was

18   going to move on to another day.

19            THE COURT:  That's it for our day, ladies and

20   gentlemen.  Make good on my promise to have you home by 5:00.

21   Do not discuss the case.  We resume promptly at 9:30 a.m.

22   tomorrow morning.  I understand there are two of you who rely

23   on the Long Island Railroad.  We'll keep our fingers crossed,

24   and hope for the best and otherwise deal with the problem

25   later on in the week.  9:30 in the morning.  Good night.  Safe

1   home.  See you tomorrow.

2              (Outside the presence of the jury.)

3        THE COURT:  All right.  Sit down for just a second.

4   Obviously you've got more to do with Agent Spivack.  When do

5   you expect to finish with him, Mr. Smith?

6        MR. SMITH:  Probably around noon tomorrow.

7        THE COURT:  And then Mr. Savitt will no doubt have

8   his time with him.  Then who's next?

9        MS. DEMAS:  Your Honor, an individual by the name of

10  Ralph Steven, who is the cooperator -- excuse me -- the

11  confidential informant's brother, and then we have a few

12  records custodians and some FBI witnesses who either processed

13  evidence or were doing surveillance.

14       THE COURT:  I see.

15       MS. DEMAS:  All relatively short witnesses.

16       THE COURT:  Okay.  And so when do you anticipate

17  finishing this direct case?

18       MR. SMITH:  I anticipate we could finish by Friday.

19  Could finish earlier.  It depends quite a lot on Mr. Savitt's

20  crosses.

21       MR. SAVITT:  I'm always the culprit, your Honor.

22       THE COURT:  No, no, sometimes I'm the culprit, and

23  apropos of that, I think it bears noting, vis-à-vis the screen

24  shots that were the subject of some debate, I can imagine any

25  number of ways in which those screen shots could have been

Spivack - Direct - Smith                    131

1   presented with a lot more impact.  I don't say that to

2   criticize, quite the contrary.  I thought the relatively --

3   almost an oximoron, the relatively benign way in which they

4   were presented, including the brief brevity of it, certainly

5   speaks to the question that I had previously resolved of the

6   prejudicial impact of one or two of them overcoming what I

7   think is the significant probative force, just an observation.

8   We were in it and out of it in no time.  And you certainly

9   don't have to agree with me, Mr. Savitt.  But as things go, I

10  think it was handled rather sensitively.  With that, we'll

11  call it a day.

12          I'm available one full hour prior to start of trial.

13  If you need to speak to me for any reason, contact the

14  reporter.  Let my chambers know, and I will be available to

15  you, as I say, for a full hour anytime after 8:30 in the

16  morning.  Have a good night.

17          MR. SMITH:  Your Honor.

18          THE COURT:  Sir.

19          MR. SMITH:  Can I assume we're ending at 5:00 every

20  day, unless you say something beforehand?

21          THE COURT:  5:00?

22          MR. SMITH:  Yeah, just for witness planning.

23          THE COURT:  Yes.

24          MR. SMITH:  Thank you, your Honor.

25          THE COURT:  Yes, 5:00 o'clock.  Thank you.  Good

132

1    night.

2                        (Proceedings adjourned.)

133

1                    I N D E X

2

3  <u>WITNESS</u>                                    <u>PAGE</u>

4

5

6       FRANK TORRES                                41

7       DIRECT EXAMINATION BY MR. SMITH             41

8       CROSS-EXAMINATION BY MR. SAVITT             49

9       REDIRECT EXAMINATION BY MR. SMITH           54

10      RECROSS-EXAMINATION BY MR. SAVITT           55

11      DAMON GERGAR                                56

12      DIRECT EXAMINATION BY MS. DEMAS             57

13      CROSS-EXAMINATION BY MR. SAVITT             67

14       AARON SPIVACK

15      DIRECT EXAMINATION BY MR. SMITH             **74**

16

17

18

19

20

21

22

23

24

25

134

<u>**E X H I B I T S**</u>

Government's Exhibit 45                                    44

Government Exhibit 1                                       83

Government Exhibit 2                                      106

Government Exhibits 46A through 46G                       111

Government Exhibit 6                                      120

Government's Exhibit 3                                    127