134

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2

3    UNITED STATES OF AMERICA,      )
                    Plaintiff,      )    13cr00220
4                                   )
                                    )
5    V.                             )    United States Courthouse
                                    )    Brooklyn, New York
6                                   )
     BEBARS BASLAN,                 )    WEDNESDAY, JULY 16, 2014
7                                   )    9:30 a.m.
                    Defendant.      )
8    _____)

9

10           TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
            BEFORE THE HONORABLE RAYMOND DEARIE
11              UNITED STATES DISTRICT JUDGE

12   APPEARANCES:
     FOR THE GOVERNMENT:   LORETTA LYNCH
13                         United States Attorney
                           BY:  TYLER JOSEPH SMITH
14                         BY:  TIANA A. DEMAS
                           Assistant United States Attorneys
15                         Eastern District of New York
                           271 Cadman Plaza East
16                         Brooklyn, New York 11201

17

18   FOR THE DEFENDANT:    EPHRAIM SAVITT
                           Attorney At Law
19                         260 Madison Avenue, 22nd Floor
                           New York, New York 10016
20

21

22   THE COURT REPORTER:   NICOLE CANALES, RPR, CSR
                           225 Cadman Plaza East
23                         Brooklyn, New York 11201
                           cnlsnic@aol.com

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by Computer-Assisted Transcript.

Spivack - Direct - Smith                                    135

1              (In the presence of the jury.)

2              THE COURT:  Good morning.  Please be seated,

3    everyone.  We are ready to resume with direct testimony of

4    this witness.  Mr. Smith, whenever you're ready.

5              I remind the witness, of course, you've been sworn

6    and you remain under oath.

7              THE WITNESS:  Yes, sir.

8                        AARON SPIVACK,

9    resumes the stand, having been previously duly sworn, was

10   examined and testified further as follows:

11             MR. SMITH:  Can you put on the overhead projector

12   Government Exhibit 6.

13   DIRECT EXAMINATION (CONTINUED)

14   BY MR. SMITH:

15   Q    Spivack, good morning.

16   A    Good morning.

17   Q    I wanted to reorient ourselves to where we left off

18   yesterday.

19   A    Okay.

20   Q    Last thing we did was listen to a recording made on

21   March 14th, 2014, with a recording device that Jack was

22   carrying; do you recall that?

23   A    Yes, sir, I do.

24   Q    And can you just identify what day of the week that was?

25   A    Yes, sir.  March 14th of last year was on a Thursday.

Spivack - Direct - Smith                              136

1   Q    Now, Agent Spivack, at this point in this investigation,
2   how often were you speaking with Jack?
3   A    I was speaking to Jack every day, if not multiple times a
4   day.
5   Q    As your investigation went on, to when you initially met
6   with Jack, on February 13th, 2013, did his demeanor and affect
7   change at all?
8   A    Yes, it did.
9   Q    How so?
10  A    The more Jack was engaging the defendant, the more phone
11  calls I had to make, the more meetings I had him participate
12  in, the more upset he became.  He would become visibly shaken
13  and upset when I would meet him after meeting, after having
14  spoken about his kids and especially after observing child
15  pornography.  He became increasingly agitated with this.
16  Q    Were you giving him instructions about using his own
17  children as lures or bait in connection with this
18  investigation?
19  A    Yes, sir, I did.
20  Q    What instruction did you give him?
21  A    Given that the initial complaint came in that the
22  defendant had an interest in Jack's two children and niece, I
23  instructed Jack that we needed to kind of continue with that
24  theme; that if the defendant was interested in these children,
25  I needed Jack to kind of go along with it, and continue to

1    talk and have discussions regarding his own kids and his

2    niece.  As difficult as it was, I needed him to do that.

3    Q    How did he react to that?

4    A    He was -- Jack was not thrilled, to say the least, with

5    the idea of having to have these discussions, particularly

6    about having to kind of maintain a front and pretend as if he

7    was okay with doing this stuff.  But he also understood the

8    greater good; the more important, the bigger picture.

9                MR. SAVITT:  Object to this, your Honor.

10               THE COURT:  Sustained.  Next question.

11   Q    Were Jack's children or niece ever going to actually be

12   used in connection with this investigation?

13   A    No, they were -- absolutely not.

14   Q    Did Jack ever tell you that he would not take certain

15   actions?

16               MR. SAVITT:  Objection.

17               THE COURT:  I'll permit it.

18               THE WITNESS:  He did.  Yes, sir.  Jack indicated

19   respect to Kayla, his daughter; he was pretty adamant that he

20   did not want her included in this plan.

21   Q    Agent Spivack, I'd like to move on to the recordings.

22   Was there another recording captured on the ITAC device, as in

23   telephone recording, on March 16th?

24   A    Let me look at my chart.  Excuse me.  One second.

25   Q    Can you just identify what document it is that you're

Spivack - Direct - Smith                    138

1    looking for, for the record?

2    A    I'm looking at Government Exhibit 3500-AS-48.  There was

3    a call on the 16th, 12:53 p.m.

4    Q    And in advance of trial, did you edit out a portion of

5    the call?

6    A    I did.

7    Q    What portion?

8    A    The beginning portion, just a minute or two of banter

9    back and forth.

10            MR. SMITH:  If we can switch to the podium, so I can

11   play this audio.  We've handed back out the headsets.  They

12   were all turned off overnight, so there's a button on the

13   bottom.  This is in the exhibit, in Exhibit 40.  It is

14   March 16th at 12:53 p.m.

15            THE COURT:  What happened?

16            Ellie, maybe you can help.

17            MR. SMITH:  I think maybe you should turn the volume

18   up.  I'm just going to start that at the beginning.  This is

19   the March 16th.

20            (Audiotape played for the jury.)

21   Q    Now, Agent Spivack, when was the next call that -- in

22   which they actually were able to converse?

23   A    The next call was -- excuse me.  3/17, at 2:38 p.m.

24   Q    And during this point in the investigation, were you

25   still instructing Jack you wanted him to actually get a copy

Spivack - Direct - Smith                          139

1    of child pornography?

2    A    I did.  Yes, sir.

3    Q    With respect to the call on 3/17, at 2:38, did you cut

4    out portions for the purposes of presenting today?

5    A    We did.  We cut out the first ten minutes or so.

6    Q    Okay.  I'm going to flip in your binder to 3/17, at 2:38.

7                (Audiotape played for the jury.)

8    Q    Agent Spivack, did you at some point start to determine a

9    plan on how you would conclude this investigation?

10   A    Yes, sir.

11   Q    Was that happening, at this point?

12   A    It was.

13   Q    What was the plan?

14   A    At this point, myself, in consultation with my supervisor

15   and other FBI agents, were devising the appropriate plan to

16   end this operation, and that was to set up what's commonly

17   referred to as a sting operation at a hotel.

18   Q    Can you describe what you were going to offer in this

19   sting?

20   A    Yes, sir.  What we were going to offer in this sting were

21   Jack's two young children; a three month old and one and a

22   half year old, as discussed in the plan, as well as Jack's

23   seven-year-old niece, as also discussed in the plan.

24   Q    Were those children ever going to be at this hotel?

25   A    No, they were not.  They were simply going to be implied

1  by Jack, that he was going to take them to the hotel and have

2  was going to have discussions with Mr. Baslan about the use of

3  Benadryl, and things of that sort, and we were going to put

4  the plan in motion to set the stage for a takedown.

5  Q    What hotel?

6  A    It was the Hyatt Hotel in Jersey City, New Jersey.

7  Q    How did you choose that hotel?

8  A    We chose it for a number of reasons.  We wanted a hotel

9  that was far enough away that the evidence would have been

10  overwhelming that Mr. Baslan would have had to travel a

11  significant distance to get there, to actually show what he

12  was doing.  The other reason is, because it was in the state

13  of New Jersey, it would require that he cross state lines to

14  get there.

15  Q    After the call we just listened to, on March 17th, what

16  was the next date that there was any activity in the

17  investigation?

18  A    The next date was on the 18th.

19  Q    And was there a phone call recorded by the ITAC system?

20  A    Yes, sir, there was.

21  Q    Was there any other activity?

22  A    There was another phone call, I believe, as well as we

23  had an in-person meeting.

24  Q    And prior to that meeting, did you meet with Jack?

25  A    Yes, sir, I did.

1    Q    What was the purpose of that meeting?

2    A    The purpose of that meeting, at this point, was to kind

3    of finalize this particular plan, as well as the same things;

4    you know, every time Jack went in, I still had the same kind

5    of requirements for him.  I wanted to know about future

6    potential victims, as they had discussed baby-sitting kids.  I

7    wanted to know the who, the when and those kind of questions,

8    as well as any information he could get for me on child

9    pornography; where Mr. Baslan kept it, how he encrypted it,

10   things of that sort.

11   Q    Prior to that meeting, did you give Jack recording

12   devices?

13   A    Yes, sir, I did.

14   Q    What recording devices?

15   A    I gave Jack the same recording device as I had given him

16   on March 14th, which included two audio-only devices and one

17   audio-video recording device, as well as that fourth device,

18   which allowed me to listen in real time.

19   Q    Who activated those devices?

20   A    Myself and my partner.

21   Q    After you activated those devices, did you give Jack

22   anything else?

23   A    I did.  Yes, sir.

24   Q    What else did you give him?

25   A    I gave Jack the same 500-gigabyte Apricorn hard drive,

Spivack - Direct - Smith                    142

1  encrypting hard drive that they had been discussing, just in

2  the chance we were able to get some child pornography.

3  Q    After you had the meeting with Jack and turned on this

4  recording devices, what did you do?

5  A    We sent Jack in, in the same fashion we had done

6  previously.  We followed Jack in his vehicle, as he got to the

7  defendant's residence.  I sat outside the residence within

8  earshot of the recording device and was able to hear what was

9  going on in real time.

10 Q    Approximately how long did you stay there?

11 A    This wasn't -- well, this was maybe an hour, I think,

12 start to finish, but I don't think he was in there for maybe

13 45 minutes.

14 Q    Did they leave the house, at any point?

15 A    They did, yes, sir.

16 Q    Where did they go?

17 A    This particular meeting, they were in the house for a

18 little while.  Then they ended up wanting to go get coffee, so

19 we ended up following them to -- I believe it was a Dunkin'

20 Doughnuts, maybe a five or ten-minute drive from the

21 defendant's residence.  And we, of course, monitored that

22 meeting, followed them back to the residence, where they

23 continued the meeting.

24 Q    And what happened after Jack left the defendant's

25 residence?

Spivack - Direct - Smith                    143

1   A    After Jack left, we followed Jack back to our staging

2   area, where he was -- gave a post amble to the recording

3   devices; they were turned off, and he gave us a debrief.

4   Q    Did you take those recording devices?

5   A    Yes, sir, I did.

6   Q    Did you ultimately download them?

7   A    I have.

8   Q    Could you determine whether or not they had been turned

9   off during the course of the meeting?

10  A    I was able to determine that none of the devices had been

11  turned off or modified during the meeting.

12            MR. SMITH:  May I approach, your Honor?

13            THE COURT:  Yes, sir.

14  Q    I've handed you what's been marked Government Exhibit 4;

15  do you recognize that?

16  A    Yes, sir, I do.

17  Q    What do you recognize it to be?

18  A    This is a CD containing three device downloads, the two

19  audio, the one video download on March 18th.

20  Q    How do you recognize it to be that?

21  A    It's my handwriting and my initials.

22            MR. SMITH:  The government offers Government

23  Exhibit 4.

24            MR. SAVITT:  No objection.

25            THE COURT:  It is received.  Four in evidence.

NICOLE CANALES, CSR, RPR

1           (Government's Exhibit 4  was received in evidence.)

2    Q    Agent Spivack, immediately prior to this meeting on

3    March 18th, was there a call recorded setting up that meeting?

4    A    Yes, there was.

5    Q    Let me -- and what time was that at?

6    A    I believe that call was -- one second here.  11:45, I

7    believe.

8    Q    Is that 1:45?

9    A    Excuse me.  1:43, I think, p.m.  1:45 p.m., I believe.

10          MR. SMITH:  I'm going to play -- this is actually a

11   little out of order in the binders.  It's two tabs forward.

12   It's at 318, 1:45.

13          (Audiotape played for the jury.)

14   Q    I'm going to skip that.  Let's go straight to the audio

15   from the meeting.  I've got something out of order.  With

16   respect to Government Exhibit 4 that we just looked at, the

17   recording from the meeting, in advance of trial, did you

18   review that?

19   A    Yes, sir, I have.

20   Q    And did you cut certain portions of it?

21   A    Yes, I have.

22   Q    What were those relating to?

23   A    Relating to driving, relating to Jack urinating, mostly,

24   and then maybe just some banter that was unrelated to the

25   substantive part of the case.

1   Q    I'm going to play that recording, which is in the binder,

2   at March 18th, at 1:43 p.m.

3                (Audiotape played for the jury.)

4   Q    Agent Spivack, during the course of that recording, the

5   defendant uses the word "coming."  In the course of your

6   experiences as an agent investigating child exploitation, do

7   you have an understanding what that word means?

8   A    Yes, sir.  It refers to male ejaculation.

9   Q    During the course of the recording, there was also some

10  discussion of a girl named Jackie?  Did you identify someone

11  named Jackie during the course of your investigation?

12  A    Yes, I did.

13  Q    Who did you identify that to be?

14  A    Jackie, one of Jack's other nieces, one of Steven's

15  daughters.

16  Q    Sister of Leah?

17  A    Sister of Leah.  Excuse me.

18  Q    Just for clarity, you indicated earlier that wasn't the

19  entirety of that meeting; is that right?

20  A    That's correct.

21  Q    And that there was driving and also urination?

22  A    That's correct.

23  Q    Were there also some conversations that weren't related

24  to the molestation?

25  A    Yes, sir.

1  Q    And were there conversations about the defendant's travel

2  plans?

3  A    Yes.

4  Q    And Ms. Henry's travel plans?

5  A    Yes.

6  Q    At that point, what was the date that this operation was

7  intended to be concluded?

8  A    At that point, it was still somewhat planned for this

9  week or that week.  However, upon learning information about

10 Kristen potentially baby-sitting kids later in the week, the

11 "op" was set for immediately, the following day.

12 Q    And following that March 18th meeting that we listened

13 to, did you give Jack instructions about how things would

14 conclude?

15 A    Yes, sir, I do.

16 Q    What instructions did you give him?

17 A    As Jack had discussed with the defendant, he had had a

18 hotel planned for the following day.  There were some

19 discussions, however, about Jack stopping by the defendant's

20 residence with his kid.  We obviously instructed Jack that

21 that was not going to happen, obviously, at all; that he

22 needed to figure out a way to alter the plan so that he could

23 logically swing by the defendant's residence and have a

24 meeting but not have the kids with him; he needed to figure

25 out a way that he could get to Jersey City and pick the kids

1    up in route.

2    Q    Was there another call recorded by the ITAC system?  Was

3    the next call on March 19th?

4    A    Yes, it was.

5    Q    Were there several calls on March 19th?

6    A    There were several calls, yes, sir.

7    Q    And was the first one in which there was actual

8    discussion at 1:40?

9    A    Yes, sir, there is.

10           MR. SMITH:  I'd like to play the call at 1:40, on

11    March 19th, which is in the binder under the appropriate tab.

12    Q    And just for the record, is this the complete call that

13    we listen to?

14    A    For the 19th at 1:40, this is the completed call.

15           (Audiotape played for the jury.)

16    Q    Agent Spivack, after that call, on March 19th at 1:40,

17    did you talk to Jack?

18    A    I did.

19    Q    What did you tell him, at this point?

20    A    I told him that he needed to set up that meeting again,

21    figure out a good time to actually meet him, and he also

22    needed to make a couple other calls and we were going to be

23    listening live as he was making the calls.

24    Q    Why were you listening live to these calls?

25    A    As we were now in the final stage while we were setting

1   up the meeting for that night, I wanted to know right away --

2   as Jack and Mr. Baslan were having the conversations, I wanted

3   to know right away what was being said, as opposed to having

4   to go back to the ITAC system to listen to it, since we were

5   now in that kind of a crunch time, so to speak.

6   Q    When was the next call?

7   A    Next call was at approximately 4:53 p.m., on the 19th.

8            MR. SMITH:  I'll play the call at 4:53, on the 19th.

9   Q    Agent Spivack, is this the complete call?

10  A    This is the completed call, yes.

11              (Audiotape played for the jury.)

12  Q    After, this call, on March 19th, at 4:53, did you speak

13  to Jack again?

14  A    Yes, I did.

15  Q    Did you give him any instruction, at this point?

16  A    Same set of instructions, try and set this thing up so we

17  could either meet the defendant, Ms. Henry, at the hotel.  Or

18  if the defendant wanted Jack to swing by his house to retrieve

19  Benadryl, he could do that, but he needed to have an excuse

20  not to have the kids with him, so we were working out those

21  logistics with Jack as these calls were taking place.

22  Q    When was the next call?

23  A    Next call was at approximately 5:05 p.m.

24  Q    5:05 p.m., on March 19th?

25  A    That's correct.

Spivack - Direct - Smith                                149

1   Q    Were you listening to the call live as well?

2   A    I was listening to this call live as well.

3   Q    Is this the complete call?

4   A    Yes, sir, it is.

5   Q    I'll play the call under the March 19th tab, at 5:05 p.m.

6              (Audiotape played for the jury.)

7   Q    On March 19th, was there ultimately a meeting between

8   Jack and the defendant?

9   A    Yes, there was.

10  Q    Before that meeting, was there another call?

11  A    There was.

12  Q    And were you listening to that call live as well?

13  A    Yes, I was.

14  Q    And what time is that call?

15  A    Approximately 5:22 p.m.

16  Q    Play the call from Government Exhibit 1.  It's in the

17  binder March 19th, 5:22 p.m.

18             Is this the complete call?

19  A    Yes, it is.

20             (Audiotape played for the jury.)

21  Q    Agent Spivack, what was the next thing that happened

22  after this call on March 19th?

23  A    We rendezvoused with Jack at the very same staging area

24  we'd been meeting, where he was giving the same recording

25  devices; and we sent Jack in, in the very same fashion we had

NICOLE CANALES, CSR, RPR

Spivack - Direct - Smith                                    150

1    the previous, I think, three times before.

2    Q    What were his instructions, at this point?

3    A    At this point, we understood that the defendant and

4    Ms. Henry were going to be providing (sic) with Benadryl, so

5    his instructions were to just really obtain as much

6    information as he could about what the defendant wanted him to

7    do with regards to the Benadryl.  And it was really just to

8    obtain the Benadryl and have any last discussions before they

9    went to the hotel.

10   Q    And in terms of the devices he had, you said it was the

11   same devices; the two audio-recording devices, a video device

12   and a live-feed device?

13   A    As far as I recall, yes, sir.

14   Q    Did you turn those on?

15   A    Myself or my partner did.

16   Q    And what happened after you turned those devices on?

17   A    Gave a preamble, again, much in the same fashion as I

18   good every single time.  And then Jack was again -- we

19   followed Jack to the residence of Mr. Baslan, where we

20   observed outside as he went into the residence or at least

21   attempted to at first.

22   Q    Did you observe anything else while you were outside the

23   residence?

24   A    Yes, sir.

25   Q    What else did you observe?

1  A    Jack pulled up to the residence.  There was some

2  discussion with Mr. Baslan.  It sounded to us that Ms. Henry

3  was on her way back.  We were there for maybe a minute or two,

4  and Ms. Henry actually drove past us.  Jack moved his car,

5  allowed Ms. Henry to pull into the driveway, and we observed

6  Jack then into the residence.

7  Q    And what happened after you saw him go into the

8  residence?

9  A    We listened through our recording device.  We could hear

10 conversation occurring between them, and then a short time

11 later, Jack exited the residence and we rendezvoused back to

12 our staging area.

13 Q    Did you take back the recording devices?

14 A    Yes, sir, I did.

15 Q    Did you take anything else?

16 A    I did.  I took a -- it was a plastic shopping bag from

17 Walgreen's, and it contained, I as I recall, Tropicana orange

18 juice and a box containing children's Benadryl.

19 Q    I'm going to show you Government Exhibit 5.  Do you

20 recognize Government Exhibit 5?

21 A    Yes.

22 Q    What is it?

23 A    This is a CD of the -- one video and two audio recordings

24 made on March 19th, 2013.

25          MR. SMITH:  The government offers Government

Spivack - Direct - Smith                    152

1    Exhibit 5.

2              MR. SAVITT:  No objection.

3              THE COURT:  It's received.  Five is in evidence.

4              (Government's Exhibit 5  was received in evidence.)

5    Q    Special Agent Spivack, I don't recall if I asked.  Were

6    you able to determine whether the devices had been shut off at

7    all during the course of that meeting?

8    A    Yes, I later -- after downloading the devices, was able

9    to determine that the devices had not been modified or turned

10   off during the meeting.

11             MR. SMITH:  I'd like to play the recording from

12   Government Exhibit 5, which is in the binder as the March 19th

13   tab at 5:47 p.m.

14   Q    And Special Agent Spivack, before I play this, did you

15   cut out some portions of the audio here?

16   A    Yes, sir, I did.

17   Q    Did you cut out some driving in the beginning?

18   A    Yes.

19   Q    And some urination in the middle?

20   A    Yes.

21   Q    And some driving at the end?

22   A    Some driving at the end.

23             (Audiotape played for the jury.)

24   Q    Did you also cut out the period at which Jack moves his

25   car?

NICOLE CANALES, CSR, RPR

1  A    Yes, I have.

2                (Audiotape played for the jury.)

3  Q    Do you know who Jack was speaking with on the phone?

4  A    Yes, I do.

5  Q    Who was he speaking to?

6  A    He was speaking to me.

7                (Audiotape played for the jury.)

8  Q    Agent Spivack, at the very end of that recording, you

9  used the term CHS?

10 A    Yes, sir.

11 Q    What does that term mean?

12 A    It's FBI jargon for Confidential Human Source, another

13 word for informant.

14 Q    When you used that term, who were you referring to,

15 specifically?

16 A    I'm referring to Jack.

17          MR. SMITH:  May I approach, your Honor?

18          THE COURT:  Yes.

19          MR. SMITH:  Handing you Government Exhibits 8 and 9.

20 Q    Do you recognize Government Exhibits 8 and 9?

21 A    Yes.

22 Q    What are they?

23 A    Government Exhibit 8 is the children's Benadryl that was

24 provided to Jack by the defendant and then provided to me.

25 Exhibit 9 is what's left of the Tropicana orange juice that

Spivack - Direct - Smith                        154

1    was also provided to me through the cooperator.

2              MR. SMITH:  Government offers Government Exhibits 8

3    and 9.

4              MR. SAVITT:  No objection, Judge.

5              THE COURT:  Received.

6              (Government's Exhibit 8 and 9  was received in

7    evidence.)

8              MR. SMITH:  Could you flip over to the document cam.

9              THE CLERK:  Certainly.

10             MR. SMITH:  Government Exhibit 9 on the document

11   camera.

12             THE COURT:  Why is the screen not up there?  Thanks.

13             THE CLERK:  Sure.

14             MR. SMITH:  Government Exhibit 8.

15   Q    Special Agent Spivack, can you just read that at the very

16   top?

17   A    Yes, sir.  Children's Benadryl-D, allergy and sinus.

18   Q    Can you read under the directions what amount it

19   indicates if are a child between 6 and 11?

20   A    Children 6 to 11 years, it's 5 milliliters or one

21   teaspoon.

22   Q    Can you read the warnings, the first warning?

23   A    Says do not use to make a child sleepy.

24   Q    And could you also read the very bottom box, the first

25   two items?

NICOLE CANALES, CSR, RPR

Spivack - Direct - Smith                          155

1    A    The when using this product?

2    Q    Yes.

3    A    When using this product, in bold, it says do not exceed

4    recommended does.  The second one is marked drowsiness may

5    occur.

6    Q    Special Agent Spivack, after you collected those two

7    items from the cooperator, what did you do?

8    A    I took those items in my possession, and then I then had

9    the cooperator meet us out at the hotel, Jersey City, New

10   Jersey, the Hyatt Hotel, along with the rest of my team.

11          MR. SMITH:  Could you just put it up for the witness

12   for a moment.

13          THE CLERK:  Certainly.  Just bear with me one

14   second.

15          MR. SMITH:  Government Exhibit 7 for identification.

16   Q    Do you recognize Government Exhibit 7?

17   A    I do.

18   Q    What is it?

19   A    It's a map we created, depicting New York, specifically

20   Staten Island, Brooklyn, Southern Manhattan, and also Jersey

21   and Jersey City.

22   Q    Does it mark particular locations?

23   A    It does.

24   Q    What locations?

25   A    There's a green dot, locating the defendant's residence

1    at 1153 Ocean Parkway, Brooklyn, New York.  There's a red dot

2    on the map that depicts the Hyatt Hotel as two exchange places

3    in Jersey City, New Jersey.

4    Q    Is this an accurate reflection of those locations?

5    A    It is.

6            MR. SMITH:  The government offers Government

7    Exhibit 7.

8            MR. SAVITT:  No objection.

9            THE COURT:  Received.

10            (Government's Exhibit 7  was received in evidence.)

11            MR. SMITH:  Publish to the jury, please.

12   Q   Special Agent Spivack, can you identify again for the

13   jurors that they can now actually see on the exhibit what the

14   green dot or "N" represents?

15   A    Yes, sir.  The green dot, again, is the defendant's

16   residence, at 1153 Ocean Parkway in Brooklyn, New York.

17   Q    Is that the residence that you went to in each of the

18   meetings when you said you followed Jack to his residence?

19   A    That's correct, same residence.

20   Q    What about that red pen or dot?

21   A    That red pen or dot is the Hyatt Hotel at two exchange

22   place in Jersey City, New Jersey.

23   Q    Is there a significance to the dark-blue line separate

24   from the top-left corner of that map?

25   A    Yes, sir.

NICOLE CANALES, CSR, RPR

Spivack - Direct - Smith                    157

1   Q    What is that?

2   A    It's the approximate boarder of New York and New Jersey.

3   Q    And the Hyatt in Jersey City, what state is that?

4   A    State of New Jersey.

5   Q    And so you said that you had Jack meet you at the Hyatt

6   in New Jersey; is that right?

7   A    That's correct.

8   Q    What was the plan?

9   A    The plan, at this point, we had purchased three hotel

10  rooms at the Hyatt Hotel that night.  Two of the rooms were a

11  suit.  They were next to each other; they were connected to

12  each other through a door.  The third room that we had was

13  directly across from one of those rooms, and it was visible

14  via the peephole.  You could see across from it.  You could

15  see the entrance to that room.  The suit was a room for Jack

16  and his kids, who were not present at the time, but that was

17  the setup.  The third room, across from those rooms was for

18  the arresting agents and officers; it was our staging area.

19  Q    You said that Jack's kids weren't present at the time.

20  Were they ever going to be present?

21  A    They were never present at all during the duration of

22  this investigation; they were never going to be.

23  Q    Did you have agents positioned other places in the hotel?

24  A    I did.

25  Q    Where else?

1   A    At -- respective to the hotel, I had agents and officers

2   in the hotel room, as my arresting.  I had an agent posted up

3   in the lobby, to be able to observe the defendant and

4   Ms. Henry entering the hotel.  I also had agents and

5   detectives posted outside the hotel who could observe the

6   defendant and Ms. Henry driving to the hotel.

7   Q    Did you have anyone posted at the residence that we just

8   looked at, the location on the map at, the defendant's

9   residence?

10  A    I did.

11  Q    What, if any, instructions did they have?

12  A    I inserted -- it's just called a fixed surveillance team.

13  It was mostly comprised of police officers, who I had simply

14  observing the defendant's residence.  And their instructions

15  were to just call out if the defendant, Ms. Henry, left, but I

16  specifically instructed them not to follow and not to conduct

17  what's called a mobile surveillance, to stay put.

18  Q    Why was that?

19  A    Many times the defendant discusses his paranoia and how

20  he's super paranoid, very paranoid, and I was concerned that

21  if I had a mobile surveillance team on the defendant that he

22  may be cautious of that, may be trying to look for a tail, and

23  may end up burning or causing our surveillance team to be

24  what's called "made," when they're identified.

25  Q    In advance of that planned operation, did you seek a

1    search warrant?

2    A    Yes, I did.

3    Q    For what?

4    A    I obtained a search warrant for the residence at Ocean

5    52 -- excuse me.   1153 Ocean Parkway, Brooklyn, New York.

6    Q    When did you obtain that search warrant?

7    A    I obtained that search warrant, I believe it was,

8    March 18th, 2013, the day before.

9    Q    Did you have agents standing by for that as well?

10   A    I did.

11   Q    Now, after you had set this up, was there another call

12   recorded over the ITAC system?

13   A    There were.   There was.

14   Q    Just for clarity, you say you got a search warrant for

15   1153 Ocean Parkway.   Whose residence was that?

16   A    The residence belonging to the defendant and Ms. Henry.

17   Q    Did you speak to Jack before this next call?

18   A    I did.

19   Q    What, if any, instruction did you give him at that point?

20   A    Instructions I had given Jack, at this point -- I

21   apologize.   I know there were a couple calls me made.   The

22   instructions were at some point he was giving the instruction

23   that he had picked up his kids, was in route to the hotel and

24   administered the drugs, just as he and the defendant had

25   discussed.

Spivack - Direct - Smith                    160

1          MR. SMITH:  Would you put it back to the laptop?

2          THE CLERK:  Certainly.

3    Q    What time was this next call?

4    A    I believe this next call was at approximately 7:30 p.m.

5          MR. SMITH:  I'd like to play the call on March 19th,

6    at 7:30 p.m.

7    Q    Is this the complete call that we're playing?

8    A    Yes, sir, it is.

9          THE COURT:  After this call, we're going to take a

10   break.

11         THE CLERK:  I'm on the podium laptop.

12         MR. SMITH:  We lost the audio in the courtroom.

13         THE CLERK:  Let me just deny it and that might do

14   the trick.

15         MR. SMITH:  Thank you.

16            (Audiotape played for the jury.)

17         THE COURT:  All right.  I think we'll take a short

18   break, folks.  Step inside.  Don't discuss the case.  We'll

19   resume in about 12 minutes.

20            (Outside the presence of the jury.)

21         THE COURT:  Okay.  Ten minutes.

22               (Recess in proceedings.)

23        (Proceedings continued on the following page.)

24

25

SPIVACK - DIRECT / SMITH                    161

1          (Jury enters courtroom.)

2          THE COURT:  Be seated, everyone.

3    DIRECT EXAMINATION (Continued)

4    BY MR. SMITH:

5    Q    Special Agent Spivack, we just listened to a call from

6    March 19th at 7:30.  Is there anything you wanted to clarify

7    from your testimony?

8    A    Yes, sir, just briefly.  I testified that there were

9    three calls on the 19th that I had listened to in realtime.

10   That last call, I can't be 100 percent certain if I listened

11   to that call live.

12          Once we learned that the cooperator was -- had a

13   meeting with the defendant, my partner and I hightailed it to

14   the staging location, and I can't recall if that third call

15   was one I listened to live or I was briefed on.

16   Q    Now, was there another call on March 19th after the one

17   we just listened to?

18   A    Yes, sir, there was.

19   Q    And do you know where Jack was when that call occurred?

20   A    Yes.  Jack was with me at the hotel, the Hyatt Hotel, at

21   the time this call was made.

22   Q    Just before the break, we also looked at a bottle of

23   orange juice and a package of Benadryl.  What did you do with

24   that after you took it from Jack immediately following the

25   meeting that you had on March 19th?

SPIVACK - DIRECT / SMITH                    162

1   A    It was in my possession until we got to the hotel.  It

2   was in my possession while we were at the hotel.  But once we

3   learned that the defendant was en route, I took the Benadryl

4   and the orange juice and I put it on the -- one of the desks

5   at the hotel or one of the mantels at the hotel, and I left it

6   in there with the cooperator to kind of like -- once we

7   executed -- effected the arrest, I wanted the Benadryl and

8   orange juice to be in the room.

9   Q    And you had indicated earlier the orange juice was

10  partially drunk.  Who drank it?

11  A    The cooperator got nervous and drank some of the orange

12  juice.

13  Q    Let me -- so you indicated there was another call on

14  March 19.  Is this the call at 7:59 p.m.?

15  A    That is correct.

16  Q    And did you listen to this one live?

17  A    Yes, sir -- no, sir.  Live?  Yes, I did, actually.  I

18  think this call was one where I was listening as the

19  cooperator had the phone next to his head.

20  Q    And this was while you were in the hotel room in the

21  Hyatt in Jersey City?

22  A    That is correct.

23           MR. SMITH:  And the government will play the call

24  from March 19th at 7:59.  It's the last tab in the binder.

25  Q    Special Agent Spivack, is this the entire call?

1   A    Yes, sir, it is.

2            (Audio recording played.)

3   Q    Were there further communications between the defendant

4   and Jack after this one we just listened to?

5   A    Yes, sir, there were.

6   Q    Were there any more recordings on the ITAC system?

7   A    No.

8   Q    Why weren't those further communications recorded?

9   A    At this point there were a few calls, two or three calls,

10  very short calls, the defendant calling Jack.  At this point,

11  I was with the cooperator, I was with Jack.

12           Given the current context of the situation, where we

13  were, how quickly things were moving, I did not have time for

14  the cooperator to hang up, call him back and use the ITAC

15  system.  So myself and I believe my partner observed, listened

16  in on the calls as Jack was making them.

17  Q    As Jack was making them or receiving them?

18  A    Or excuse me, as Jack was on the phone with the defendant

19  when the defendant called.

20  Q    What was the general subject of those calls?

21  A    More just all right, I'm here.  I think Jack provided the

22  room number again.  Just kind of those little logistical bits

23  of information.

24  Q    And what was the next thing that happened after you had

25  set up in the room?

1  A    After we're set up in the room and actually before these

2  set of phone calls we talked about, I received notification

3  from my mobile surveillance team in Brooklyn that the

4  defendant and Ms. Henry had left the residence at 1153 Ocean

5  Parkway.

6  Q    What did you do at that point?

7  A    At that point, we were still kind of in our little -- our

8  staging area, getting ready for the operation.  I had a

9  surveillance team still posted outside.  I had an agent still

10 in the lobby of the hotel and they were notified to stand by.

11           Approximately half an hour, maybe 45 minutes later,

12 I received notification from the surveillance team outside the

13 Hyatt Hotel that the defendant's car with him and Ms. Henry in

14 it had arrived.

15 Q    What, if any, instructions did you give Jack with respect

16 to what was going to be happening next?

17 A    I told Jack that I would be observing everything that was

18 going on through the peephole in the other side of the room,

19 so I could see the defendant and Ms. Henry arrive.  Jack was

20 instructed that when the defendant were to knock on his door,

21 he needed to open the door to let them in, and that as soon as

22 the defendant and Ms. Henry crossed the threshold to that

23 room, I would be opening the door to our room, allowing agents

24 and officers to effect the arrest.  I told Jack that he just

25 needed to make sure that that door stayed open in the event we

SPIVACK - DIRECT / SMITH                                    165

1  had some complication.

2  Q    Why did that door need to stay open?

3  A    The concern that if that door shut, we wouldn't be able

4  to get in.  Though we had a key, it obviously would make for a

5  much seamless more operation if we didn't get locked out of

6  the room we were trying to get into.

7  Q    What happened after you learned from the surveillance

8  team downstairs in the Hyatt that the defendant and Ms. Henry

9  were there?

10 A    A short time after receiving that notification that they

11 had arrived at the hotel, I received notification from an

12 agent who I had posted in the lobby of the hotel informing me

13 that the defendant and Ms. Henry, who had bags in their

14 possession, were headed to the elevator, elevator bank of the

15 hotel.

16 Q    Now, in connection with the operation, did you instruct

17 Jack on what you would be doing with him when you went in to

18 arrest the defendant and Ms. Henry?

19 A    Yes, sir, I did.

20 Q    What did you tell him?

21 A    I told Jack that he would be arrested, along with the

22 defendant and Ms. Henry, that he would be taken away into the

23 bathroom and he would be handcuffed and escorted out of the

24 room.

25 Q    After you got that notification from mobile surveillance,

1  did you see anything out of the peephole?

2  A    I did.

3  Q    What did you see?

4  A    A short time after receiving notification, they were

5  heading to the -- "they" being the defendant and Ms. Henry

6  were heading to the elevator bank, I had my hand on the door

7  and I was looking through the peephole and I saw the defendant

8  and Ms. Henry approach the room where Jack was.  I think it

9  was 765.

10 Q    Did they have anything with them?

11 A    Yes, sir, they did.

12 Q    What did they have with them?

13 A    I recall the defendant having a backpack on him, and Ms.

14 Henry had a purse, big purse.

15 Q    Did they appear to have anything in their hands?

16 A    I don't recall if they had anything in their hands or

17 not.  They didn't appear to.  They certainly didn't have

18 anything -- like they weren't filming anything.  They

19 weren't -- if they had anything in their hand, it might have

20 been a bag that they were carrying.

21 Q    What happened after you saw them out of the peephole?

22 A    I observed them knock on the door.  I heard them knock on

23 the door.  And then I observed the door, Jack opening the door

24 to the room, at which point I opened our door and we effected

25 the arrest.

SPIVACK - DIRECT / SMITH                    167

1   Q    And how did you effect the arrest?

2   A    Myself and a number of agents and at least one or two

3   detectives entered the room.  We separated the defendant and

4   Ms. Henry and Jack.  All three were placed in handcuffs and

5   separated, and then very shortly after all three were

6   separated to different rooms.

7   Q    And did you ultimately take them to court the following

8   day?

9   A    Yes, sir.

10  Q    Now, after March 19th, did you see Jack again?

11  A    I did.

12  Q    Did you ever make him any promises with respect to his

13  criminal conduct?

14  A    No, I did not.

15  Q    Did you ever make him any promises?

16  A    I tried to, with respect to therapy.  Jack was very

17  distressed, very distraught over this, and I told Jack that I

18  would do what I could to get him in some kind of therapy

19  program to deal with the discussions he had had and the images

20  he had seen.

21  Q    You indicated that the defendant and Ms. Henry had some

22  things with them.  I'd like to show you some exhibits, Special

23  Agent Spivack.

24  A    Sure.

25  Q    Special Agent Spivack, I've handed you Government

1  Exhibits 10, 11 and 12.  Can you take a look at them?

2  A    Yes, sir.

3  Q    Do you recognize them?

4  A    I do.

5  Q    Starting with 10, what is Government Exhibit 10?

6  A    Government Exhibit 10 is the backpack I seized off the

7  defendant the night of his arrest.

8  Q    I'm sorry.  Actually, I handed you 10, 12 and 18.

9          MR. SMITH:  And the government offers Government

10  Exhibit 10.

11          THE COURT:  Any objection?

12          MR. SAVITT:  No, Your Honor.

13          THE COURT:  It's received.

14          (Government Exhibit 10 received in evidence.)

15          MR. SMITH:  May I publish to the jury, Your Honor?

16          THE COURT:  Go ahead.

17          (Exhibit published to the jury.)

18  Q    Did this backpack have anything in it at the time of the

19  arrest?

20  A    It did.

21  Q    What did it have?

22  A    It had a number of miscellaneous items.  It also had in

23  it a MacBook laptop computer, some camera equipment, the

24  camera we see here, as well as a number of other loose media.

25  Q    Let me show you Government Exhibit 11 for identification.

1    Do you recognize Government Exhibit 11?

2    A    Yes, I do.

3    Q    What is it?

4    A    It's the MacBook laptop that I seized off Mr. Baslan the

5    night of his arrest.

6    Q    How do you recognize it to be that particular laptop?

7    A    It's my handwriting as well as my handwriting of the case

8    number.

9            MR. SMITH:  The government offers Government Exhibit

10    11.

11            MR. SAVITT:  No objection.

12            THE COURT:  It's received.

13            (Government Exhibit 11 received in evidence.)

14    Q    Would you take a look at 12.

15            MR. SMITH:  If I may publish to the jury, Your

16    Honor?

17            THE COURT:  Go ahead.

18            (Exhibit published to the jury.)

19    Q    Do you recognize Government Exhibit 12?

20    A    I do.

21    Q    What is it?

22    A    This is a Sony DSLR camera, HD.

23    Q    And where is it from?

24    A    On the back, it states that it's made in Taiwan.

25    Q    I mean, where did you see it first?

1   A     Excuse me.  This was also seized off of the defendant the

2   night of his arrest.

3              MR. SMITH:  The government offers Government Exhibit

4   12.

5              MR. SAVITT:  No objection.  I'll stipulate that it's

6   made in Taiwan.

7              THE COURT:  12 in evidence.

8              (Government Exhibit 12 received in evidence.)

9              MR. SMITH:  May I publish to the jury, Your Honor?

10             THE COURT:  Yes.

11             (Exhibit published to the jury.)

12  Q     Agent Spivack, did you become familiar with some

13  functions of this camera?

14  A     Yes.

15  Q     Can you just say what type of camera it was?

16  A     It's a DSLR camera.

17  Q     And is it capable of taking photographs?

18  A     Photographs and videos, yes, sir.

19  Q     And we can all agree it's made in Taiwan.

20  A     It was made in Taiwan.

21  Q     Did it have anything in it?

22  A     It did.

23  Q     What did it have?

24  A     I believe it was a 4-gigabit.  I could be wrong on the

25  gigabit size, but I believe it was a 4-gigabit memory card

1    inserted in the camera, as well as a battery.

2              MR. SMITH:  Can you put up the document camera?

3              COURTROOM DEPUTY:  Document, certainly, just for the

4    witness.

5    Q    Let me show you on the monitor Government Exhibit 14.  Do

6    you see that?

7    A    I do.  Eight-gigabit.

8    Q    What is Government Exhibit 14?

9    A    This is the SD card, the memory card that was inserted in

10   the camera at the time.

11             MR. SMITH:  The government offers Government Exhibit

12   14.

13             MR. SAVITT:  No objection.

14             THE COURT:  Received.

15             (Government Exhibit 14 received in evidence.)

16             MR. SMITH:  Publish to the jury, please.

17             THE COURT:  Yes.

18             (Exhibit published to the jury.)

19   Q    You said this was the SD card inserted in the camera.

20   What's an SD card?

21   A    SD card, it's a memory card.  Much like a thumb drive or

22   external hard drive, it allows you to maintain files, in this

23   case photos and videos taken from the camera.

24   Q    Let me show you Government Exhibit 15 just for the

25   witness.

SPIVACK - DIRECT / SMITH                          172

1              COURTROOM DEPUTY:  Okay.

2   Q    Can you see that?

3   A    I can.

4   Q    Do you recognize Government Exhibit 15?

5   A    Yes, I do.

6   Q    What is it?

7   A    That's a 32-gigabit SD card that was also seized off the

8   defendant the night of his arrest.

9              MR. SMITH:  The government offers Government Exhibit

10  15.

11             MR. SAVITT:  No objection.

12             THE COURT:  Received, 15.

13             (Government Exhibit 15 received in evidence.)

14             MR. SMITH:  Publish for the jury.

15             (Exhibit published to the jury.)

16  Q    Was that also seized out of the backpack?

17  A    Yes, it was.

18             MR. SMITH:  I'd like to show Government Exhibit 16

19  just to the jury -- I mean just to the witness.

20  Q    Do you see that, Agent Spivack?

21  A    I do.

22  Q    Do you recognize Government Exhibit 16?

23  A    I do.

24  Q    Where do you recognize it from?

25  A    I recognize it from the night of his arrest, taken from

1    defendant's backpack.  It's a thumb drive.

2              MR. SMITH:  The government offers Government Exhibit

3    16.

4              MR. SAVITT:  No objection.

5              THE COURT:  16 in evidence.

6              (Government Exhibit 16 received in evidence.)

7              MR. SMITH:  Publish to the jury.

8              (Exhibit published to the jury.)

9    Q    What's a thumb drive?

10   A    A thumb drive, or another name is flash drive, it's an

11   external media or mass storage device.

12   Q    I show just for the witness Government Exhibit 17.  Do

13   you see that, Special Agent Spivack?

14   A    Yes, I do.

15   Q    Do you recognize that?

16   A    I do.

17   Q    What is that?

18   A    It's a Skylink modem, portable modem.

19   Q    Where do you recognize it from?

20   A    I also took this off the defendant the night of his

21   arrest.

22             MR. SMITH:  The government offers Government Exhibit

23   17.

24             MR. SAVITT:  No objection.

25             THE COURT:  17 in evidence.

SPIVACK - DIRECT / SMITH                    174

1              (Government Exhibit 17 received in evidence.)

2    Q    What exactly is a Skylink modem?

3    A    Skylink modem, it's a device that allows you to connect

4    to the Internet via cell towers.  So in case of the Hyatt

5    Hotel, for example, whoever had this Skylink didn't need to

6    use the hotel's Internet.  They could use the Skylink and

7    connect to the Internet via cell tower.

8    Q    Putting up Government Exhibit 13, do you recognize that?

9    A    I do.

10   Q    What is it?

11   A    It's a black iPhone, I believe it's a 4, taken from the

12   defendant the night of his arrest.

13            MR. SMITH:  The government offers Government Exhibit

14   13.

15            MR. SAVITT:  No objection.

16            THE COURT:  13 is now evidence.

17            MR. SAVITT:  13, is it?

18            THE COURT:  13.  I thought you said 13?

19            MR. SAVITT:  Yes, Your Honor.

20            MR. SMITH:  13, one-three.

21            THE COURT:  Thank you.

22            (Government Exhibit 13 received in evidence.)

23            MR. SMITH:  If I can have just for the witness

24   Government Exhibit -- I'm going to put up Government Exhibit

25   48 for you.

SPIVACK - DIRECT / SMITH                               175

1           THE COURT:  I can't hear you.

2    Q    Government Exhibit 48 for identification, do you

3    recognize that?

4    A    I do.  Can you turn it on its side?  I want to make sure.

5    There we go.  That's much better.  That's the -- an extra

6    battery, camera battery also taken the night of the arrest.

7           MR. SMITH:  The government offers Government Exhibit

8    48.

9           MR. SAVITT:  No objection.

10          THE COURT:  48 in evidence.

11   Q    And when you say it's an extra camera battery, is that an

12   extra camera battery for the camera we just looked at a moment

13   ago?

14   A    That is correct.

15          MR. SMITH:  If I can have, just for the witness, put

16   up Government Exhibit 49 for identification.

17   Q    Do you recognize Government Exhibit 49?

18   A    Yes, sir, I do.

19   Q    What is it?

20   A    This is a -- it's a piece of material.  It was taken with

21   the camera.  On it, it states something to the effect of being

22   camera equipment.  It's designed to be able to wipe the camera

23   lens.

24          MR. SMITH:  The government offers Government Exhibit

25   49.

SHERRY BRYANT, RMR CRR

SPIVACK - DIRECT / SMITH                          176

1         MR. SAVITT:  No objection.

2         THE COURT:  Received.

3         (Government Exhibit 49 received in evidence.)

4  Q    You said there's some writing on this?

5  A    There are.  There is.

6  Q    Can you just read what it says on there?

7  A    It says:  "Flashpoint by adorama.com, more than a camera

8  store."

9  Q    Are you familiar with the use of this?

10 A    I am.

11 Q    What is it used for?

12 A    It's used to clean the lens to a camera.

13        MR. SMITH:  If I can have just for the witness

14 Government Exhibit 50.

15 Q    Do you recognize that, Special Agent Spivack?

16 A    Yes, sir, I do.

17 Q    What is it?

18 A    This is a device that enables you to take a memory

19 card -- actually, there's sort of two devices in here.  You

20 take a memory card such as the ones that were previously

21 published.  You can insert the memory card in this device and

22 plug it to your computer so you can access that memory card

23 from your computer.

24 Q    Now, I earlier handed you Government Exhibit 18.  Do you

25 see that up there?

SHERRY BRYANT, RMR CRR

1   A    Yes, sir, I do.

2   Q    Do you recognize that?

3   A    I do.

4   Q    What is it?

5   A    It's a purse that was seized off Ms. Henry the night of

6   her arrest.

7           MR. SMITH:  The government offers Government Exhibit

8   18.

9           MR. SAVITT:  No objection, Your Honor.

10          THE COURT:  It is received.

11          (Government Exhibit 18 received in evidence.)

12  Q    Were there items in that purse as well?

13  A    There were.

14          MR. SMITH:  Can you just put this back up.  I may

15  not have published for the jury Government Exhibit 50, which

16  is now in evidence.  And let me just take it out of this bag.

17          MR. SAVITT:  I don't know -- I didn't object to it.

18  I don't know if it was received.

19          THE COURT:  I'm sorry?

20          MR. SMITH:  Government Exhibit 50, the government

21  offers it.

22          THE COURT:  I think it was received.

23          MR. SAVITT:  I'm sorry, Judge.

24          THE COURT:  50 in evidence.

25          (Government Exhibit 50 received in evidence.)

SPIVACK - DIRECT / SMITH                    178

1          MR. SMITH:  Publish for the jury.

2          (Exhibit published to the jury.)

3   Q    So there are two pieces to Government Exhibit 50.  What's

4   the one that says "Sony" on the top, Special Agent Spivack?

5   A    The one that says "Sony," if you tilt it to that side

6   right there, there are several different slots in it.  These

7   slots are designed for SD cards or memory cards of different

8   sizes, micro SD, regular SD, things of that sort.  So they

9   would all fit in there, and you would connect the cord to the

10  computer and you'd be able to retrieve whatever video file or

11  photo file you have on the card.

12  Q    And the other piece?

13  A    The best I can describe this, it's more or less like an

14  adapter.  Actually, I think it even says "CF card adapter" on

15  it.  There we go.  If you flip it to the one side, you can see

16  the illustration there shows that you actually insert a memory

17  card into the slot, and then that is what you could insert

18  into another device to read it.

19  Q    And when you say an SD card, are you talking an item like

20  Government Exhibit 14?

21  A    That's exactly what I'm talking about, yes, sir.

22          MR. SMITH:  I think I've already offered Government

23  Exhibit 18, but just to be sure.

24          THE COURT:  You have, it's in evidence.

25          MR. SMITH:  I'm just going to approach to publish

SHERRY BRYANT, RMR CRR

SPIVACK - DIRECT / SMITH                    179

1   that for the jury.

2            (Exhibit published to the jury.)

3   Q    Now, you said -- I think you indicated there were some

4   items in Government Exhibit 18 in that purse.

5   A    Yes, sir.

6   Q    Were there some electronics in there?

7   A    Yes, there was.

8   Q    What type of electronics?

9   A    Two, if I remember correctly.  There was a cellular

10  phone, another iPhone, as well as a Sony camera.

11           THE COURT:  I think we can expedite this.  You're

12  referring to Government Exhibits 19, 20 and 21?

13           MR. SMITH:  The government offers 19, 20 and 21.

14           THE COURT:  Any objection?

15           MR. SAVITT:  No, Your Honor.

16           THE COURT:  Thank you.  All right, they're in

17  evidence.

18           (Government Exhibits 19, 20 and 21 received in

19  evidence.)

20  Q    I'm just showing Government Exhibit 19.  What was that,

21  Special Agent Spivack?

22  A    That's a white iPhone contained within a case.

23  Q    And Government Exhibit 20?

24  A    A Sony Cybershot camera.

25  Q    And did you become familiar with some of the capabilities

1   of this camera?

2   A    Yes, sir, I did, or was.

3   Q    Is it capable of taking photographs?

4   A    Photographs and videos.

5   Q    And does it indicate on the camera a place of production?

6   A    It does.

7   Q    And was that place outside the United States?

8   A    Yes, sir.  China, I believe.

9   Q    Was there anything in this camera, Government Exhibit 20,

10  at the time of -- that it was seized?

11  A    Yes.  As I recall, there was also an SD card or memory

12  card in it as well.

13  Q    I'll put up 21, which is in evidence.  Is that the SD

14  card or memory card that you were just referring to?

15  A    Yes, sir.  That's actually -- excuse me.  That is the

16  4-gigabit SD card.

17  Q    After seizing these items during the course of the

18  arrest, did you seek a search warrant for them?

19  A    I did.

20  Q    And did you receive that?

21  A    I did.

22  Q    Now, after receiving that search warrant, what, if

23  anything, did you do with the two iPhones that we looked at?

24  A    I turned the two iPhones over to one of our forensic

25  technology specialists, someone who specializes in computer

1   forensics specifically with regards to iPhones, so that he

2   could conduct an extraction of the phones.

3   Q    And what was his name?

4   A    His name is Stephen Flatley.

5   Q    Did you do anything with respect to the SD cards that you

6   seized?

7   A    I did.

8   Q    What did you do?

9   A    I myself processed those.  I'm forensic -- I'm certified

10  in various forms of computer forensics as well.  So I took the

11  SD cards among other items and processed those myself.

12  Q    And did you review the contents?

13  A    I did.

14  Q    When you say you processed them, what do you mean?

15  A    We use a forensic method to process any electronic media

16  device that we recover.  It's done to ensure the integrity of

17  the item we recover, so we do not mess around with the

18  original.  We'll copy a bit-for-bit image of whatever device

19  it is, whether it's a memory card, a phone, a hard drive.

20  We'll copy that over forensically and then we will do a review

21  on that image copy, so, again, not to disturb the original.

22  Q    Did you find anything on those SD cards?

23  A    No, sir.

24  Q    What about the thumb drive that we looked at?

25  A    No, sir.

1  Q    Did you take the same steps with respect to that thumb

2  drive?

3  A    Yes, I did.

4  Q    And did you find anything on it?

5  A    No, sir.

6  Q    We also looked at a laptop that you indicated was taken

7  out of the defendant's backpack.  What, if anything, did you

8  do with that laptop?

9  A    I imaged the laptop hard drive, and then I ran the same

10 exact forensic process I ran on these other devices I ran on

11 this hard drive, the laptop hard drive as well.

12 Q    What does it mean to image the hard drive?

13 A    Take the hard drive out and we do, it's called a

14 bit-for-bit image.  It basically copies the hard drive exactly

15 the same way it's in the laptop onto another drive that I

16 have.

17 Q    And do you have specific tools for that purpose?

18 A    Yes, sir, we do.

19 Q    During the course of your investigation, did you do that

20 process with respect to other evidence that you then acquired?

21 A    Yes.

22 Q    And what other things?

23 A    There are a number of items that were received -- or

24 seized from the residence belonging to the defendant.  I

25 processed -- I personally processed a handful of those items,

1  to include another laptop, another Macintosh laptop, and a few

2  other items as well, some loose media items.

3  Q    Let me approach with Government Exhibit 30.  Do you

4  recognize Government Exhibit 30?

5  A    Yes, I do.

6  Q    Where do you recognize it from?

7  A    This is one of the laptops that was seized from the

8  defendant's residence on the night of his arrest, March 19th,

9  2013.

10        MR. SMITH:  The government offers Government Exhibit

11  30.

12        MR. SAVITT:  No objection, Your Honor.

13        THE COURT:  30 now in evidence.

14        (Government Exhibit 30 received in evidence.)

15  Q    After Government Exhibit 30 was seized, what, if any,

16  steps did you take with respect to this item?

17  A    I ran it through the exact same process I just discussed.

18  I imaged the drive, ran forensic processing tools on it to

19  then be able to search it in a forensically sound way.

20  Q    And did you review the results of the forensic processing

21  of the items that you'd seized?

22  A    I did.

23  Q    Did you do that by yourself or did other agents also

24  assist you?

25  A    Oh, I had assistance from other agents as well.

SPIVACK - DIRECT / SMITH                              184

1   Q    As part of your review of electronic evidence seized from

2   the defendant, did you look for child pornography or child

3   erotica?

4   A    Absolutely.

5   Q    What is child pornography?

6   A    The definition of child pornography is the lewd and

7   lascivious display of the genitals or a sexual act on a minor.

8   In layman's terms, it's visual depictions of a minor engaged

9   in either sexually explicit conduct or depictions of the child

10  genitals.

11  Q    What is child erotica?

12  A    Child erotica is images or videos of children in sexually

13  provacative manners that don't necessarily fit the description

14  of child pornography.  For example, a photograph of a child

15  who's nude, but the photograph is not a display of the child's

16  genitals.

17  Q    Did you ultimately find any child pornography or child

18  erotica on the items that had been seized from the defendant?

19  A    Yes, sir.

20  Q    Approximately how many files consisting of child

21  pornography or child erotica?

22  A    Approximately 76,000 files.

23  Q    How many of those were image files?

24  A    Approximately 74,000 of those were image files.

25  Q    And how many of those were video files?

SPIVACK - DIRECT / SMITH                    185

1    A    The remaining approximately 2,000 files were video files.

2    Q    Were you able to identify any files that also appeared on

3    the March 7th recording made by the confidential informant

4    while he was taking screen shots?

5    A    Yes, sir.

6              MR. SMITH:  One moment, Your Honor.  (Pause.)  No

7    further questions, Your Honor.

8              THE COURT:  All right.  Mr. Savitt, when you're

9    ready.

10              MR. SAVITT:  Yes, sir.

11   CROSS-EXAMINATION

12   BY MR. SAVITT:

13   Q    Good afternoon, Agent Spivack.

14   A    Good afternoon, sir.

15   Q    In the pretrial phase of this case, you and I have met on

16   a couple of occasions; right?

17   A    That is correct.

18   Q    And we had pleasant conversations?

19   A    I would certainly say so.

20   Q    Professional?

21   A    Absolutely.

22   Q    Now, you are the case agent --

23   A    Yes, sir.

24   Q    -- in this particular investigation as well as the trial;

25   am I correct?

1  A    That is correct.

2  Q    And as the case agent, you're familiar with all of the

3  details of the case, from the perspective of the government's

4  investigation?

5  A    I try to be familiar with as many of the details as I

6  can, yes, sir.

7  Q    And do you consider yourself familiar with substantially

8  all the important details of the investigation and the

9  prosecution?

10 A    Yes, sir.

11 Q    And for how long were you involved in this investigation?

12 A    I received first -- the first time I received any

13 information about this was I believe on the 12th of February

14 2013.  So from that point -- I mean, you could conceivably say

15 till today.

16 Q    And on February 12th of 2013, that's when a detective

17 from the New York Police Department contacted you with respect

18 to a complaint; am I correct?

19 A    Yes, sir, that is correct.

20 Q    And the complainant was a fellow named Jack?

21 A    Yes, sir.

22 Q    And you met Jack that day or the following day, February

23 13th of 2013?

24 A    February 13, that is correct.

25 Q    All right.  And where -- you met Jack at your offices?

1    A    Yes, sir.

2    Q    Were there other agents who were present during this

3    meeting?

4    A    There was at least one other agent present.

5    Q    Was that Agent Robertson?

6    A    It was.

7    Q    And I've had conversations with Agent Robertson in the

8    pretrial phases of this case; correct?

9    A    I believe so.

10   Q    In your presence; right?

11   A    Yes.

12   Q    Civil, professional?

13   A    Yes, sir, very much so.

14   Q    At that point, did you and Agent Robertson conduct a full

15   debriefing of Jack?  In other words, did you ask him a lot of

16   questions about his background?

17   A    Yes, we did.

18   Q    And did he provide answers?

19   A    He did.

20   Q    You told us on direct examination yesterday -- and

21   correct me if I'm wrong -- that you asked Jack at some point,

22   I believe it was February 13th of last year, about any

23   criminal history that he may have had.  Did you do so?

24   A    I did.

25   Q    And did he respond that he had sexual contact with at

1   least three minors?

2   A    Yes, sir, he did.

3   Q    And did he give you details about that contact?

4   A    Through the course of me knowing him, he did.

5   Q    Did he also admit to drug use?

6   A    Yes, sir, he did.

7   Q    Did he admit to extensive drug use?

8   A    Yes, sir, he did.

9   Q    Did he, for instance, abuse different kinds of pills that

10  expand or contract or do something to the mind?

11  A    I don't know -- I mean I know he used pills.  I don't

12  know what type of pills, off the top of my head, he used.

13  Q    And these are pills that are -- you really can't use

14  those unless you get a prescription; right?

15  A    As far as I know, yes, sir.

16  Q    He also told you something about his involvement in

17  violent activity?

18  A    He told me about some fights.

19  Q    Fights that he had?

20  A    Yes, sir.

21  Q    Did he tell you the specifics of why he got involved in

22  these fights?

23  A    He did.

24  Q    Did he beat up anybody?

25  A    He did.

1  Q    Did he tell you what the problem was, why he beat that

2  person up?  I mean, yes or no?

3  A    Yes, sir.

4  Q    And he also told us that he told you on February 13th of

5  last year something about some traffic tickets that he may

6  have had or moving vehicle violations.  Am I right?

7  A    I don't recall exactly when he told me that, but that is

8  correct.

9  Q    Did he also tell you about his psychiatric history?

10 A    At some point, yes, sir.

11 Q    Was it during that first meeting?

12 A    I don't recall.  I don't want to -- he may have told me

13 the first meeting or two that he had spent some time, but I

14 don't recall when exactly I knew.

15 Q    Okay.  But at some point -- I take it you had a lot of

16 additional meetings, as you testified, with Jack?

17 A    Correct, correct.

18 Q    And prior to wiring up, prior to signing him up and then

19 wiring him up as a confidential informant, did he tell you

20 that he had a psychiatric history?

21 A    I don't recall, sir.

22 Q    But at some point he certainly told you; correct?

23 A    Yes, sir.

24 Q    And this was during the course of his, let me call it the

25 undercover operations with my client, or before or after, do

1  you recall?

2  A    I don't specifically.  I may have known a few things

3  before, but during certainly wasn't much of a discussion.

4  Q    So is your best recollection -- and, again, I'm not

5  trying to put -- I'm not allowed to put words in your mouth.

6  Did he tell you most about his psychiatric history after the

7  operation, after the arrest of my client and Ms. Henry on

8  March 19th of 2013?

9  A    I'd say a fair way to put it would be that I certainly

10 knew prior to the use of Jack some about his psychiatric

11 issues.  I knew the full scope of them after we were completed

12 with the op.

13 Q    And how did it come about that you learned the full scope

14 of Jack's psychiatric issues?  Why was it that you learned

15 about it after the operation?

16 A    Just through interviews.

17 Q    How many interviews have you had with Jack,

18 approximately?  I know you're not going to be able to give me

19 an exact number.

20 A    Interviews just in a law enforcement capacity or just in

21 total?

22 Q    Okay.  In total.

23 A    It's really hard to say.  During the operation, I was

24 talking to Jack every day.  I wasn't necessarily interviewing

25 him every day.  To quantify that, I mean in terms of a

1    sit-down formal interview, maybe a dozen, just ballpark.

2    Q    And the operation itself, it started sometime February

3    15th; am I right?

4    A    Approximately.

5    Q    Of last year.  It ended March 19th?

6    A    That is correct.

7    Q    So we're talking a little over a month-long series of

8    daily conversations with Jack, some longer, some shorter?

9    A    Yes.

10   Q    Some more detailed, some less detailed?

11   A    Absolutely.

12            MR. SAVITT:  May I have a moment, Your Honor?

13            THE COURT:  Sure.

14            (Pause.)

15   Q    Now, after the operation, you had approximately 20

16   conversations with Jack in your capacity as the case agent; am

17   I right?

18   A    I'm sorry.  After, you said?

19   Q    After the operation.  In other words, after my client's

20   arrest on March 19th of last year.

21   A    I've had how many?

22   Q    Well, I'll ask you.  How many did you have?  I wasn't

23   there, actually.

24   A    Again, I can't quantify a number.  After the operation, I

25   didn't talk to Jack -- I think maybe one other time.  That was

1    to debrief him as a cooperator.  Then I didn't have any

2    conversations with him until recently.

3    Q    When you say recently, how recently are we talking about

4    before this trial?

5    A    Maybe a month.

6    Q    And how many conversations have you had recently with

7    Jack in the last month before the trial began?

8    A    I'm trying to give you the best answer here.  I think

9    I've met with him a half dozen times, maybe a few more.  One

10   or two quick phone calls.  Less than 12, maybe.

11   Q    Okay.  So less than 12, more than 6; right?

12   A    Sure, ballpark.  I can't give you a definitive amount,

13   but that sounds about right.

14   Q    Would it be fair to say that the -- let me withdraw that,

15   because it's jumbled.

16           Where did you meet with Jack?  Was it in the U.S.

17   Attorney's Office?

18   A    Yes, sir.

19   Q    And were prosecutors present?

20   A    They were.

21   Q    And was this in order to prepare him as a potential

22   witness at this trial?

23   A    Yes, sir, it was.  It was that and a debrief of some

24   other things.

25   Q    All right.  And as a potential witness of this trial,

SPIVACK - CROSS / SAVITT                    193

1    would it be fair to say that it would be important for you, as

2    the case agent, and for the prosecutors to know that Jack

3    would, in fact, be a witness who can be understood and who can

4    be believed; am I correct?

5    A    Yes, sir.

6    Q    And that Jack is the kind of a witness on whom you can

7    rely to remember things the way they happened and to testify

8    about those things here in court?

9    A    Yes, sir.

10   Q    And, of course, because Jack was the government's

11   informant in this case, or cooperator, he would be an

12   important witness, wouldn't you say?

13              MR. SMITH:  Objection.

14              THE COURT:  I don't know what the relevance of this

15   man's opinion is on that subject.

16              MR. SAVITT:  Oh, there is relevance to it, Your

17   Honor.

18              THE COURT:  Don't debate it.

19              MR. SAVITT:  I'm sorry, Your Honor.  I didn't hear

20   you.  I thought you asked me.

21              THE COURT:  You heard me because you responded.  I'm

22   telling you don't debate it with me.

23              MR. SAVITT:  Oh, of course not.

24              THE COURT:  I'll permit the witness to answer the

25   question.

SPIVACK - CROSS / SAVITT                          194

1  A    Can you repeat that?  I'm sorry, sir.  I'm not 100

2  percent sure I would know whether or not he'd be -- can you

3  ask it one more time, sir?  I apologize.

4  Q    Let me withdraw that question.  Jack was the only

5  cooperator in this investigation; right?

6  A    Yes, sir.

7  Q    And he was the only person prior to my client's arrest

8  who recorded any conversations with him for the FBI; am I

9  right?

10 A    That is correct.

11 Q    And there were a lot of conversations, all the ones that

12 we heard played through the course of your direct examination

13 testimony, both yesterday afternoon right through the

14 entire -- almost the entire morning today; am I correct?

15 A    That is correct.

16 Q    And these are hours and hours of conversations; am I

17 right?

18 A    Yes, sir.

19 Q    And, of course, the conversations are important evidence;

20 am I correct?

21 A    That is correct.

22 Q    And the person who was wired up was Jack; am I right?

23 A    That is correct.

24 Q    And the person to whom he principally spoke to was my

25 client; right?

1   A    Yes, sir.

2   Q    And you told us that you took meticulous care to make

3   sure that every time that Jack was outfitted with two, three

4   or four recorders, that the recorders were playing throughout

5   the entire conversations to your satisfaction and that Jack

6   didn't play around with them; am I right?

7   A    Yes, sir.  I ensured that the recording devices were not

8   modified from the time that I turned them on to the time that

9   I turned them off.

10  Q    And so, getting to Jack, based on your involvement in

11  this case as the case agent, which means that you're basically

12  responsible, from the FBI's perspective, of the investigation

13  and helping the government prosecute the case, wouldn't you

14  say Jack was an important witness for the government, a very

15  important witness?

16          MR. SMITH:  Objection.

17          THE COURT:  It's the same question we've come back

18  to.  I'm going to permit the witness to respond.  Go ahead.

19  A    I don't know that his direct testimony is all that

20  important.  My opinion, if that's what you're asking, is that

21  the conversations between Jack and the defendant speak for

22  themselves.

23  Q    So your answer is that he's not important?

24  A    No.  I don't know that him testifying in the capacity

25  that I did on behalf of those conversations is important.  I

SPIVACK - CROSS / SAVITT                    196

1   think it's the substance of the conversations which is

2   important.

3   Q    And so correct me if I'm wrong.  I just want to make sure

4   I understand you.  You're saying that it's the tapes that are

5   important, Jack not that important.  Am I right?

6   A    No, sir.  I mean Jack played a very pivotal role, but

7   your question to me was whether or not Jack was important here

8   in this trial.

9   Q    Yes, correct.

10  A    And I don't think that he necessarily is in this

11  capacity.  He was very important to the case.  Is he important

12  here at trial?  I don't think so.  I think his recorded

13  conversations are what's important.

14  Q    Well, did you come to a determination that Jack was not

15  important to this trial because he has a psychiatric history?

16  A    Not at all, sir.  And, again, I don't think that he's not

17  important.  And it certainly wasn't related to that at all.

18  Q    Well, do you think that it would be something that -- in

19  order to complete the record, don't you think that it would be

20  something to complete the story to have Jack testify?

21            MR. SMITH:  Objection.

22            THE COURT:  Sustained.  Let's move on.

23  Q    What kind of psychiatric history does Jack have?

24            MR. SMITH:  Objection.

25            THE COURT:  I didn't hear the full question.

SPIVACK - CROSS / SAVITT                    197

1   Q    What kind of psychiatric history does Jack have?

2        THE COURT:  I'll permit it, if he knows.

3   Q    If you know.

4        THE COURT:  Generally.

5   A    I generally know that Jack has had some issues, suicide

6   attempts, and that he's been treated for depression as well as

7   for some issues of his past.

8   Q    And have you ever looked at some of the psychiatric

9   records, for instance, before this trial?

10  A    I have not.

11  Q    Do you know that they exist?

12  A    I do.

13  Q    Do you know that Jack has been committed to five

14  different mental institutions in the course of perhaps the

15  last five years to seven years?

16  A    It's my understanding, sir.

17  Q    And do you know if Jack tried to commit suicide eight or

18  nine times?

19  A    I don't know what the number was.  I know he tried to

20  commit suicide, or at least he admitted to us that he tried to

21  commit suicide several times.

22  Q    And when you say several times, was it eight or nine

23  times or you just don't remember?

24  A    I don't remember.

25  Q    Now, all of these facts, they came to your attention when

1   Jack was being prepared to testify as a potential prosecution

2   witness in the month before this trial?

3   A    No, sir.  I knew some of these facts with respect to his

4   suicide and with respect to some of his hospital visits as I

5   was signing Jack up.

6   Q    As you were?  I'm sorry, I didn't hear.

7   A    As I was going through the process of opening Jack as a

8   cooperator.

9   Q    And you learned more details as he was being prepared as

10  a potential witness at this trial; am I right?

11  A    That is correct.

12  Q    When was the last time you spoke to Jack?

13  A    I met Ellie and Daniel, his kids, this past weekend,

14  spoke to him then.

15  Q    And was this at your offices, the U.S. Attorney's Office,

16  or at Jack's residence?

17  A    I went to Jack's residence.

18  Q    And did you ask that Ellie and Daniel be present?

19  A    I did.

20  Q    Did you ask them to be present for a reason?

21  A    I wanted to meet his kids, the kids he had been talking

22  about.

23  Q    Did you also meet Jack's niece Leah?

24  A    I did, yes, sir.

25  Q    Did you meet Jack's niece Leah when you met Steven?

SPIVACK - CROSS / SAVITT                      199

1   A    That is correct.

2   Q    His brother?

3   A    Yes, sir.

4   Q    When was the first time that you met Steven?

5   A    The first time I met him or spoke to him?

6   Q    Either one.

7   A    I spoke to Steven -- I can't give you a specific date.

8   It was a few weeks, maybe a couple months after the arrest.

9   So probably around April or June of last year.  Spoke to him

10  once or twice maybe through the year, and then I met him a few

11  weeks ago.

12  Q    When you say "a few weeks ago," it was just about before

13  this trial?

14  A    Leading up to the trial, yes, sir.

15  Q    And did you meet with Steven for a particular purpose?

16  A    Yes, a couple purposes.

17  Q    Well, before we get into the couple of purposes, were

18  these meetings at the U.S. Attorney's Office, at the FBI

19  offices or where?

20  A    The first time I met him in person was at his residence.

21  Q    You had a conversation with him at that time?

22  A    I did.

23  Q    Were other agents present?

24  A    Yes, sir.

25  Q    Agent Robertson?

1   A    No, sir.

2   Q    Oh.  Who was present?

3   A    Agent Adamczyk.

4   Q    Agent Adamczyk, who's sitting right here?

5   A    That is correct, sir.

6   Q    I also had conversations with her that were friendly and

7   professional before the trial?

8   A    Yes, sir.

9   Q    Now, in the last couple of weeks, how many conversations

10  did you have with Steven?

11  A    Three.  Maybe three or four.

12  Q    Okay.  What was the last conversation that you had with

13  him, approximately?

14  A    The last time I spoke to him was a couple days ago.

15  Q    And was the purpose of the last couple of conversations

16  that you had with him -- let me withdraw that.

17       That was in the U.S. Attorney's Office; right?

18  A    No, sir, that was over the phone.

19  Q    Was he in the U.S. Attorney's Office as well?

20  A    Yes, sir, he was.

21  Q    Were you present?

22  A    I was.

23  Q    And how many times?

24  A    I believe twice.

25  Q    In the last couple of weeks?

1    A    Correct.

2    Q    To prepare him as a potential witness?

3    A    That is correct.

4    Q    In connection with information that his brother gave him?

5    A    No, sir, information that he had himself.

6    Q    Any information that Jack gave him?

7    A    I certainly questioned him about that, absolutely.

8    Q    And when did that information first come to your

9    knowledge, more or less?

10   A    It's a good question.  I --

11          MR. SMITH:  Objection to the question as ambiguous.

12          THE COURT:  I don't know what you mean, "that

13   information."

14          MR. SAVITT:  It is ambiguous.

15   Q    The information that Steven related to you about what

16   Jack told him.  In other words, Jack's information to Steven.

17   A    Let me make sure I get that straight.  You want to know

18   when's the time I knew --

19   Q    I can be more explicit, but --

20   A    I'm sorry.  No, I just want to make sure I answer your

21   question right.  Information that Steven told me that he heard

22   from Jack?

23   Q    Correct.

24   A    It was a couple weeks ago.

25   Q    And that was the first time he told you about it?

1  A    It was the first time he told me about it, yes, sir.

2  Q    When you say a couple of weeks ago, are we talking about

3  two weeks?

4  A    Three maybe.  Maybe a month.

5  Q    And prior to that, in the conversations that you had with

6  Steven, he had never told you this information that Jack told

7  him; am I right?

8  A    That is correct.

9  Q    Now, you told us also about the ITAC system; am I right?

10 A    Yes, sir.

11 Q    And this might not be a big deal, but since yesterday did

12 you find out what ITAC stands for?

13 A    No, sir.

14 Q    No, you didn't.  All right.  Well, whatever it is, it's

15 the FBI system that enabled Jack to record his conversations,

16 both by telephone as well as in person with my client during

17 the course of February 15 through March 19th; am I right?

18 A    Sort of, sir.  You are correct on the -- it records phone

19 calls.  But that's not the system that records the in-person

20 meets.  So in person, the recording devices are separate.

21 Phone calls is -- I'm sure the T in ITAC is telephone, but the

22 phone calls are the ITAC system.

23 Q    Okay.  So the ITAC system is for -- as far as you know --

24 not as far as you know, but you know, is for phone calls only;

25 right?

SHERRY BRYANT, RMR CRR

1  A    As far as I know.  I mean, certainly there could be

2  another application for it.  We use it, I use it for phone

3  calls.

4  Q    And you told us that that's an application that is

5  triggered by outgoing phone calls, not incoming phone calls;

6  am I right?

7  A    It has the ability to be triggered for incoming phone

8  calls.  It's a much more complicated system, not a system the

9  ITAC administrators like to use that often.

10  Q    In this case, there were incoming calls, were there not,

11  to Jack's telephone?

12  A    Correct.

13  Q    And were you able to track from whom those calls came?

14  A    Yes, sir.

15  Q    But none of them were recorded?

16  A    That is correct.

17  Q    The only ones that were recorded were Jack's outgoing

18  calls from the cell phone or maybe his home land line; am I

19  right?

20  A    That is correct.

21  Q    And if he had another phone that he didn't report to you,

22  that wouldn't have been recorded on the ITAC system?  I mean

23  theoretically.

24  A    The number called in would have been logged, so I would

25  have known.

1  Q    No, but I meant if Jack was making an outgoing call from

2  another device that he picked up, let's say to B&H Photo, and

3  he made an outgoing call and didn't tell the FBI about it.

4  That certainly wouldn't have been something that ITAC could

5  have picked up; right?

6  A    I mean if he was using the ITAC system, it certainly

7  would have picked it up.

8  Q    And if he wasn't, it wouldn't have been picked up?

9  A    That is correct.

10 Q    Now, there are a lot of, let me call them gaps, in terms

11 of the days on which recordings are made during the period

12 from February 15th through March 19th; am I correct?

13 A    Yes, sir.

14 Q    And those gaps, in some cases five days, a week, there

15 weren't other calls out there or conversations in person that

16 failed to record; am I correct?

17 A    That is correct, to the best of my knowledge.

18 Q    So whatever conversations, as far as you know, that Jack

19 may have had with my client, both in person and by telephone,

20 would have been recorded; am I correct?

21 A    Yes.  Just with the caveat that, as I mentioned before in

22 my direct, that there were calls in to Jack from the

23 defendant.  There were also a couple of outgoing calls of very

24 short duration and which were not recorded.

25 Q    Okay.  But any substantial in duration meetings or calls

SHERRY BRYANT, RMR CRR

1   were recorded, as far as you know?

2   A    That is correct, yes, sir.

3   Q    So some of the gaps that we have there is because, let's

4   say Mr. Baslan was in Vegas for some shoot that was referred

5   to; am I right?

6   A    Yes, sir.

7   Q    And there were other situations where perhaps there was

8   no contact between the two men for perfectly normal reasons;

9   am I correct?

10  A    That is correct.

11  Q    And so we're not missing any important conversations in

12  that period; am I right?

13  A    That is correct.

14  Q    That's as far as you know?

15  A    As far as I know.

16  Q    But if Jack wasn't using the ITAC system, we would be

17  missing it, if he wasn't?

18  A    We would not have them recorded if he -- yes, yes.

19  Q    Or if he had a meeting with my client or anybody else not

20  wearing a wire, not recording it, we wouldn't have that

21  either; am I right?

22  A    That is absolutely correct.

23  Q    You told us that as time progressed, you noticed that

24  Jack was getting more and more agitated, more and more

25  uncomfortable.  Am I correct?

1  A    That's absolutely correct.

2  Q    And let me ask you this:  Do you know whether or not Jack

3  actually showed that he had a violent and agitated nature just

4  before -- just during let's say February of this year?

5            MR. SMITH:  Objection.

6            THE COURT:  I don't understand your question.

7            MR. SAVITT:  I'll rephrase it.

8  Q    Did Jack beat anybody up in February of this year for

9  which criminal charges are outstanding?

10           MR. SMITH:  Objection.

11           THE COURT:  Overruled.

12 A    I know that Jack was involved in a fight.  It may have

13 been February.  If -- I don't know the exact date, but he

14 certainly was involved in a violent altercation this year.

15 Q    And I would imagine that Jack was arrested by the police

16 and charges were lodged against him for assault?

17 A    I don't know the nature of the -- the disposition of the

18 charges.

19 Q    But there were charges?

20 A    My understanding was that he was arrested, but I don't

21 know if charges were filed.

22 Q    And do you know whether he was arrested for beating

23 somebody up?

24 A    It's my understanding that that was the nature of the

25 charge, yes.

SHERRY BRYANT, RMR CRR

1   Q    And he beat this guy up so badly that he had to be taken

2   to the hospital and have staples in his face?  The victim, I'm

3   talking about.

4   A    That's the information that I've heard from Jack.

5   Q    And did Jack tell you why he did such a thing?

6   A    Yes, he did.

7   Q    And did he do so because he thought that the victim that

8   he beat up had raped somebody?

9   A    I don't know if it was rape, but it was certainly a

10  sexual assault of some variety.

11  Q    And the person that he beat up, was that an in-law?

12  A    I don't know who the exact person was.  I mean I've heard

13  the story from Jack, but the exact who's who's I'm not 100

14  percent familiar with.

15  Q    I would imagine that, as a cooperator, Jack reported to

16  you that he was arrested by the New York City Police

17  Department for beating somebody up and putting them in the

18  hospital earlier this year.

19  A    He's not a cooperator of mine anymore, sir, so he's not

20  obligated to let me know when he has contact with the

21  authorities.

22  Q    So the answer is that he's not a cooperator anymore; am I

23  right?

24  A    That is correct.

25  Q    And for that reason, he's not obligated to report when

1  he's -- if and when he's arrested?

2  A    That is correct.

3  Q    And so in this case, he didn't report it, did he?  You

4  found out through other means.

5  A    He eventually -- he did report it, but not certainly at

6  the time of his -- the incident occurred.

7  Q    When did he report it?

8  A    When we brought him in for interviews.

9  Q    That would have been a couple of weeks before this trial;

10 right?

11 A    Yes, sir.

12 Q    And the incident we're talking about happened about five

13 months ago, four months ago, six months ago?

14 A    Again, sir, I'm not 100 percent sure on when it happened.

15 February sounds about right, but I don't know for sure.

16        THE COURT:  Let's move along, Mr. Savitt.

17        MR. SAVITT:  Yes, sir.

18 Q    Now, when you say that he's not your cooperator anymore,

19 what do you mean by that?

20 A    Jack had particular access to a particular bit of

21 information.  And the way cooperations work with individuals

22 is that access is kind of the key element to signing somebody

23 up.  When Jack no longer had that access, he was debriefed and

24 closed as a cooperator.

25 Q    Now, there never was a cooperation agreement, in other

1    words, some sort of a contract between the government and Jack

2    for Jack helping out the FBI; am I correct?

3    A    That is correct, sir, never a contract made with Jack.

4    Q    But was it your understanding that one of the

5    motivations, at least, that Jack expressed was that he might

6    need some help if any charges were brought against him for

7    having sex with children?

8    A    That's actually false.  His initial motivation for coming

9    in had nothing to do with his self interests.

10   Q    I understand that.  I'm asking you about one of his

11   motivations.

12   A    No, sir.  He -- no.  I remember a conversation vividly

13   with Jack where I told him he could go to jail for what he

14   did.  And he said he didn't care, that what he did was one

15   thing, but, in his mind, abuse of infants and toddlers was a

16   completely different line and he was willing to pay the price

17   for whatever he did in order to prevent somebody from doing

18   that.

19   Q    And what exactly is it that he did?

20   A    Jack had sex with 17- and 16-year-old girls, three of

21   them.

22   Q    On more than one occasion?

23   A    I believe so, yes, sir.

24   Q    Multiple occasions?

25   A    I believe so.

SPIVACK - CROSS / SAVITT                    210

1    Q    Videos taken of these -- some of these sexual encounters?

2    A    Videos of the one, maybe two of these girls.

3    Q    All right.  A lot of videos?

4    A    Not a lot.

5    Q    Did he have access to those videos?

6    A    I believe he did, yes, sir.

7    Q    Did he ever show you the videos?

8    A    No, he did not.

9    Q    You didn't ask him about them, did you?

10   A    No, I did.  Let me take that back.  Let me backtrack for

11   a minute.  He said he had them.  Something happened to his

12   computer.  He did not have them anymore he stated, but he

13   provided in great detail who these girls were and what the

14   videos were about.

15   Q    Did you confirm that the details he provided were

16   accurate?

17   A    I was able to confirm some of the details, yes, sir.

18   Q    Did you speak to some of the people that he had sex with?

19   A    Yes, sir, I did.

20   Q    And did they confirm that Mr. -- Mr. Jack, that Mr. Jack

21   was involved in statutory rape of children, by definition?

22   A    They confirmed, yes, that Jack had had sex with them.

23   Q    Did you find out where those videos are today?

24   A    I have since learned where those videos are, yes, sir.

25   Q    And where are they?

SPIVACK - CROSS / SAVITT                211

1   A    It's my understanding -- I'm not -- they're on a device.

2   I don't know if -- I'm sorry, sir, I don't know if I --

3           MR. SMITH:  Can we have a sidebar, Judge?

4           THE COURT:  Yes.

5           (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    212

1              (Sidebar conference.)

2              MR. SMITH:  What I expect Special Agent Spivack

3    would testify to is that we have learned the location of those

4    based on recordings made by Mr. Celani during the course of

5    the jailhouse recordings.  It's not a subject that we can

6    obviously go into in this trial.  So I think he wanted to flag

7    this.

8              THE COURT:  You might want to steer away from it.

9              MR. SAVITT:  Well, I'm learning things every moment,

10   Your Honor.  I'm learning things every moment as time

11   progresses.

12             THE COURT:  Consider yourself educated.

13             MR. SAVITT:  Your Honor, I did want to play a

14   portion of the tape, probably a very small portion of the

15   tape.

16             THE COURT:  Which tape?

17             MR. SAVITT:  The March 7th was not played.  It is

18   not a very savory audio recording.  It is an audio recording

19   of Jack having either self-sex or sex with Kristen Henry, and

20   he was doing that while he had a recorder on him.  And --

21             THE COURT:  I think we heard about that yesterday.

22   Do we have to hear the blow-by-blow?

23             MR. SAVITT:  Only because I don't think we're going

24   to hear very much from Jack beyond this, Your Honor.  And I

25   just want to -- you know, I want the jury to understand what

SIDEBAR CONFERENCE                      213

1    kind of a cooperator we're dealing with.

2         THE COURT:  Well, I think you're doing a good job of

3    getting that across to them.  Ask the agent a question.

4         MR. SAVITT:  Okay, I understand.  I'm glad for the

5    sidebar.  I want to get stuff done.

6         THE COURT:  Okay.

7         (End of sidebar conference.)

8         (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SPIVACK - CROSS / SAVITT                      214

1   Q    Now, in the course of playing the tapes to the jury,

2   there were certain portions, largely irrelevant, that were not

3   played; am I right?

4   A    That is correct.

5   Q    Portions of Jack traveling in a car, for instance?

6   A    Yes, sir.

7   Q    Or Jack frequently -- it looks like he was a frequent

8   flier to the bathroom.  Those were not played; right?

9   A    Frequently is a good word to describe it.

10  Q    And then there was also a portion of a conversation at

11  the end of -- well, it would have been an audio recording that

12  you had heard before the trial, not played for the jury, at

13  the end of the March 7 session, shall we call it, where child

14  pornography was being viewed in my client's apartment; am I

15  right?

16  A    That is correct.

17  Q    And towards the end of that conversation -- and I'm not

18  going to trouble everybody by going back to the books -- there

19  was what you described as it appeared to be sounds of some

20  sort of sexual activity.

21  A    That is correct.

22  Q    And this was a conversation where Mr. Jack, I suppose,

23  had the audio recorder or the transmitter on him?

24  A    He had all the devices still on him.

25  Q    And you were able to hear this in realtime at that point?

1  A    We actually were not.  And this was --

2  Q    Lucky for you.  But you heard it later?

3  A    We heard it later.  We definitely became nervous when --

4  there are bits and pieces when the transmitter cuts out.  It's

5  a line of sight type of transmitter.  So you go into a back

6  room, we kind of lose it.  And there was a segment cut out,

7  and we had -- definitely, the blood was elevated.  I couldn't

8  hear for a few minutes, didn't know what was going on.

9  Q    Now, later on you did listen to that portion; right?

10 A    Yes, sir.

11 Q    And it was clearly oohs and ahs and all sorts of sounds

12 that we'd rather not have to listen to; am I correct?

13 A    There were certainly sounds indicative of some kind of

14 sexual activity.

15 Q    I take it that you must have asked Jack about what was

16 happening; right?

17 A    I did.

18 Q    And did he say that he was involved in sexual activity at

19 that point?

20 A    He did.

21 Q    And this was right after viewing the child pornography?

22 A    This was, yes, right after.

23 Q    And did he tell you why he was involved in sexual

24 activity?

25 A    Yes, sir.  He said that they went to the back room.

1  Mr. -- or the defendant told Kristen Henry to perform oral sex

2  on I think both of them or maybe oral sex on Jack while the

3  defendant had sex with her.  It was some kind of sexual

4  encounter amongst the three of them.

5  Q    And certainly, I mean, you gave certain admonitions to

6  Jack before he started out recording my client; am I right?

7  A    Certain what now, sir?

8  Q    Ad --

9  A    Admonishments, I'm sorry.

10 Q    I'm so sorry.  Admonishments.  And you told him not to

11 engage in illegal activity; am I right?

12 A    That is correct.

13 Q    And this certainly is not illegal; correct?

14 A    Certainly not.

15 Q    But you didn't say, hey, you can have sex whenever you

16 want?

17 A    I didn't say, you can have sex whenever you want.  I also

18 didn't tell him not to.

19 Q    By the way, was he in trouble for doing that with the

20 FBI?

21 A    Was he in trouble for having -- no, sir.

22 Q    Why was it that he sort of became a former cooperator?

23 You said he's no longer a cooperator.

24 A    Yes, sir.  As I just mentioned, Jack had access.  As of

25 March 19th, 2013, Jack no longer had access to an individual

1  planning to molest kids.  So, due to Jack's lack of access to

2  criminal activity, he was closed.

3  Q    Okay.  So he was closed because he no longer had the

4  right to view child pornography, to take narcotics, to do

5  anything of that sort; right?

6  A    He wasn't closed because of that, no, sir.

7  Q    So why was he closed?

8  A    He was closed because he did not have the access to

9  criminal activity, meaning the defendant and Ms. Henry had

10  been arrested.  The people he had been going to who were

11  talking about child pornography, talking about raping young

12  children, since they were arrested he was no longer needed.

13  Q    Okay.  But you did speak to him the last couple of weeks,

14  as we established, as a potential trial witness; am I right?

15  A    That is correct.

16        MR. SAVITT:  Okay.  No further questions.

17        THE COURT:  All right.  Anything further, MR. SMITH?

18        MR. SMITH:  Just a couple, Your Honor.

19  REDIRECT EXAMINATION

20  BY MR. SMITH:

21  Q    Towards the end of Mr. Savitt's questioning, he asked you

22  some questions about March 7.  What was Jack's demeanor after

23  you met with him after the meeting that we heard the portion

24  of the recording on March 7?

25  A    Jack's demeanor was he was very flustered.  He was very

1   upset, mostly, in part, to the child pornography.  But also,

2   there was a drug deal, that he was concerned if he didn't

3   participate in the drug deal that Mr. Baslan, the defendant,

4   would have been very suspicious.

5   Q    Now, Agent Spivack, we went over some of the calls that

6   were recorded by the ITAC system.  Was that every call that

7   was recorded?

8   A    It was not every call.

9   Q    And in between the dates of calls that we listened to,

10  did the ITAC system record telephone calls that ultimately

11  connected to voicemail?

12  A    It did.

13  Q    Are there several of those?

14  A    There are many calls in which it goes to voicemail and

15  that's it.

16  Q    Now, at the beginning, Mr. Savitt asked you some

17  questions about how you would know if Jack was actually using

18  the system.  Did you do anything at any point to confirm

19  whether he was having conversations with the defendant outside

20  of the recording system?

21  A    Yes, sir, I attempted to.

22  Q    What did you do?

23  A    I retrieved what's called toll records.  Phone records is

24  a better way to put it.  I retrieved phone records for Ms.

25  Henry, for Jack, and for the defendant.  I compared those

1   phone records, Mr. -- or excuse me, the defendant's and Ms.

2   Henry's phone records to that of Jack's, and I overlaid those

3   to try and determine if there were any calls that were made

4   outside of our purview, outside of the ITAC recording system

5   or other calls that we knew about.

6           And I was able to determine that there were no

7   substantive calls or no calls of any length of time that were

8   made using these phone numbers outside of my purview.

9   Q    There was a considerable amount of testimony about the

10  fact that at these meetings, you would turn on the recording

11  devices and you would turn them off and take them back.  Why

12  is that?

13  A    These devices, sometimes some of these devices, the

14  on/off switch isn't logical.  It may not be as simple as on or

15  off.  So we don't want our cooperators knowing how to turn

16  them off or on.  Not that we don't trust them, but we don't

17  want anybody to have the ability to know how to modify a

18  device whatsoever.  So my partner, John Robertson and I were

19  the only two to monitor -- to -- excuse me, to turn on or off

20  these devices.

21  Q    Is that so you can be sure you have a complete record?

22  A    To be sure we have a complete record.  It's our forensic

23  way of doing it, to ensure integrity of the recording.

24           MR. SMITH:  No questions.

25           MR. SAVITT:  No questions.  Thank you.

PROCEEDINGS                                    220

1          THE COURT:  All right.  Ladies and gentlemen, before

2    we take our luncheon break, let me share with you a couple of

3    things.  First of all, right after lunch, when we resume,

4    there's going to be an audible announcement.  It's a test of a

5    system, so do not be alarmed, okay?  It should happen shortly

6    after we resume the proceedings after lunch.

7          The other thing is that it appears like -- and I

8    don't know if likely is the right -- there's a strong

9    possibility we will not be sitting on Friday.  We have made

10   substantial progress and I will confirm that with you and with

11   counsel before the day is out.  So bear that in mind.  As soon

12   as I know, for reasons unrelated to the trial, I will share

13   that with you.  Okay?  Have a pleasant lunch.  We'll resume at

14   2:10.

15          (Jury exits courtroom.)

16          (Continued on the next page.)

17

18

19

20

21

22

23

24

25

PROCEEDINGS                              221

1           THE COURT:  All right.  Before we break, what's

2    next?

3           MR. SMITH:  Your Honor, we have Ralph Steven, also

4    known as Steven, the informant's brother.  Then after that,

5    two records custodians, AT&T and Walgreens, and after that an

6    FBI witness who was doing surveillance in the lobby of the

7    Hyatt.

8           THE COURT:  This relates to this letter I just saw

9    about -- a letter application that I just had occasion to read

10   regarding -- you can step down, Mr. Spivack.

11          (The witness steps down from the witness stand.)

12          THE COURT:  Regarding what you propose is an excited

13   utterance?  Is that what --

14          MR. SMITH:  Yes, Your Honor, that's the next witness

15   up.

16          THE COURT:  Have you had a chance to look at it, Mr.

17   Savitt?

18          MR. SAVITT:  Well, I had a chance to look at it,

19   Judge.  I, of course, object to this testimony.

20          THE COURT:  Tell me more about it.  This fellow

21   Jack, as we're referring to him, seems to be excited all the

22   time.  So tell me a little bit more about the circumstances of

23   this -- you folks can be seated if you like -- of this

24   exchange with his brother at 5:00 in the morning.

25          MR. SMITH:  Your Honor, our understanding of this

PROCEEDINGS                                    222

1    circumstance is that on the night immediately following the

2    time that Jack had been at Mr. Baslan's apartment and Mr.

3    Baslan had shown him child pornography on his computer for the

4    first time and had also pulled up a Facebook photograph of

5    Jack's niece Leah and had started masturbating to that.

6              Now, by way of background, this was a -- Jack was

7    there to have sex with Kristen Henry.  Baslan had sex with her

8    as well.  And then it devolved into something else, where the

9    defendant was pulling up photographs on his laptop in an

10   effort to sexually gratify himself.

11             The cooperator left, went immediately to his

12   brother's house.  That's Ralph Steven.  Immediately upon

13   arriving at his brother's house, Jack reported what had just

14   happened.  It's that excited utterance that the government

15   seeks to admit.

16             THE COURT:  What photograph of Leah?  This is a

17   Facebook photograph?

18             MR. SMITH:  It's not a pornographic photograph.

19             THE COURT:  A picture of Leah.

20             MR. SMITH:  Just a picture.

21             THE COURT:  And how old was Leah?

22             MR. SMITH:  Leah at the time was seven years old.

23   She's now eight years old.

24             THE COURT:  Could I ask an initial question.  What's

25   the relevance of it?

SHERRY BRYANT, RMR CRR

PROCEEDINGS                              223

1          MR. SMITH:  Your Honor, the relevance of this is, A,

2    the defendant's intent going -- that he actually did intend to

3    molest this child; B, the fact that what he -- what Jack said

4    then led to this investigation.

5          I think that the defense argument is going to be

6    that this was all sort of made up or led by the cooperator.

7    This is a statement that was made while he was under the

8    stress of the event, for that reason is an exception to the

9    hearsay rule because of its inherent reliability.

10         And, you know, the likelihood that Jack would have

11   at that point in time made up a lie to his brother that's

12   entirely consistent with everything else the jury has heard I

13   think is extremely low.

14         THE COURT:  What's the status of Jack?  I realize

15   he's not formally a cooperator.  He's not a signed-up witness.

16   I take it he's not going to appear as a witness.

17         MR. SMITH:  We do not anticipate calling him as a

18   witness.  But I would note that the analysis under the rule is

19   the same.  It doesn't matter if the witness who made the

20   statement is available or not.

21         THE COURT:  I understand.  I'm satisfying my own

22   curiosity, if you don't mind.

23         And when -- tell me about the passage of time

24   between the incident and the statement to the brother.

25         MR. SMITH:  It's a matter of hours, Your Honor.

SHERRY BRYANT, RMR CRR

PROCEEDINGS                                    224

1          THE COURT:  I don't frankly know why you want to

2     risk an evidentiary ruling -- I'll call it the way I see it --

3     in light of all the tapes I've just been listening to.  How

4     about you, Mr. Savitt?

5          MR. SAVITT:  I don't know exactly when this

6     occurred.  I'm looking all over for a copy of my indictment.

7     Not my indictment, but Mr. Baslan's indictment.

8          THE COURT:  Your indictment will come in due turn.

9          MR. SAVITT:  I'm surprised that I haven't been

10    indicted already, quite frankly.

11         THE COURT:  How does this relate to Jack's

12    appearance at the FBI?  When did that occur?

13         MR. SMITH:  Well, Your Honor, what ended up

14    happening was that Jack first went, as the evidence has come

15    in, to the NYPD.

16         THE COURT:  Right.

17         MR. SMITH:  Then --

18         THE COURT:  I meant the police.  How soon after this

19    conversation with his brother did he go to the police?

20         MR. SMITH:  A week.

21         THE COURT:  A week?

22         MR. SMITH:  Yes.  Which is why we did not seek to

23    admit what Jack said to the police as an excited utterance,

24    because too much time had passed.

25         MR. SAVITT:  Well, it seems to me that, putting

PROCEEDINGS                    225

1    aside the excited utterance part of it, if this is something

2    that occurred, vaguely, sometime in January of 2013, and Jack

3    is excited and upset about viewing child pornography and

4    seeing Mr. Baslan allegedly becoming excited over seeing a

5    young girl's photograph, that it doesn't really inform as to

6    the conspiracy to sexually exploit or the attempt to sexually

7    exploit.

8             THE COURT:  No, it's not intent.  I mean, it has

9    relevance to the question.

10            MR. SAVITT:  I don't -- the relevance might be there

11   if Jack had taken the stand and then he -- assuming that an

12   uncharacteristically --

13            THE COURT:  You're going to get just so far with the

14   absence of Jack at the trial.

15            MR. SAVITT:  No, I understand.

16            THE COURT:  And I wish you well.

17            MR. SAVITT:  I know.

18            THE COURT:  But it doesn't really impact this

19   knowledge.

20            MR. SAVITT:  But this is sort of a back door of the

21   government getting in a statement by Jack without putting him

22   up to be cross-examined.  If Jack's credibility were an issue,

23   I could understand why they would think it was relevant,

24   putting aside whether or not it's admissible.  But given the

25   fact that Jack's not even testifying, this has nothing to do

PROCEEDINGS                                    226

1   with any of the charges as they are framed in the indictment.

2          THE COURT:  I'm not sure I can agree with that.

3          MR. SAVITT:  But beyond that, just a word about

4   excited utterance, I understand that there can be intervals

5   between an event that makes somebody excited and a person to

6   continue to be excited.

7          The problem is we have no way of testing whether or

8   not this actually occurred without some sort of a hearing,

9   perhaps outside the presence of the jury, in order to see

10  whether or not, in fact, it's an excited utterance or maybe

11  it's just Jack on drugs again.  You know, there is

12  reliability, but Jack's not all that reliable.  He's got a

13  psychiatric history.  He's a drug addict.

14         THE COURT:  Wait a minute.  That's not an outlandish

15  suggestion.  Why don't we hear from him first outside the

16  presence of the jury.  That will inform my analysis.  Because,

17  as I understand it, two things occurred that spawned the

18  excitement:  Number one, he's first exposed to the child

19  pornography, number one; and, number two, this incident with

20  the picture of Steven's daughter.

21         MR. SMITH:  Correct, Your Honor, though in reverse

22  order.

23         MR. SMITH:  And they happened almost simultaneously

24  as part of the same situation.

25         THE COURT:  Where was Jack living at the time?

STEVEN - DIRECT / SMITH                           227

1          MR. SMITH:  Jack had recently separated from his

2   wife and was living, I believe, with either his mother or

3   another relative.

4          THE COURT:  Not his brother?

5          MR. SMITH:  No, not with his brother Steven.

6          THE COURT:  Why don't we have him -- take him at

7   2:00.

8          MR. SMITH:  Okay.

9          THE COURT:  Let's hear what he has to say.  Then

10  we'll have some more discussion.

11         MR. SMITH:  Thank you.

12         THE COURT:  Have a nice lunch.  I'll let you know

13  about Friday as soon as I know, and hopefully after lunch.

14         MR. SAVITT:  Thank you.

15         MR. SMITH:  Your Honor, the witness is actually here

16  right now if you would rather hear from him.

17         THE COURT:  Sure, let's put him on.  Hold up.

18         (Witness sworn.)

19         COURTROOM DEPUTY:  Please have a seat.  State and

20  spell your name for the record.

21         THE COURT:  You're referring to this gentleman as

22  Ralph Steven?

23         MR. SMITH:  Your Honor, I'm going to refer to him as

24  Steven, but his full name is Ralph Steven.

25         THE COURT:  Okay.

SHERRY BRYANT, RMR CRR

STEVEN - DIRECT / SMITH                        228

1           THE WITNESS:  Ralph Steven Massre, last name

2    M-a-s-s-r-e.

3           RALPH STEVEN,

4           called by the Government, having been first duly

5    sworn, was examined and testified as follows:

6    DIRECT EXAMINATION

7    BY MR. SMITH:

8    Q    Ralph Steven, just so you understand when you actually

9    testify before the jury, you do not need to say your last

10   name.

11   A    Sure.

12   Q    Ralph, I'm going to skip to some questions about your

13   brother to inform the Court about what happened in late

14   January 2013.  Do you have that in your mind?

15   A    Yes.

16   Q    Okay.  Did there come a point in late January 2013 when

17   your brother Jack came to your house in the very early

18   morning?

19   A    Yes.

20   Q    Can you describe for the Court what your brother's

21   appearance was and how he seemed to you?

22   A    Disheveled, not himself, and he was crying a lot.

23          THE COURT:  I'm sorry?

24   A    He was crying a lot.  He wouldn't stop.

25          THE COURT:  When you say "not himself," could you be

SHERRY BRYANT, RMR CRR

STEVEN - DIRECT / SMITH                         229

1  a little more specific?

2  A    He couldn't find the words he was looking to tell me.  He

3  was very shaky.  He was having a hard time standing.

4            THE COURT:  Okay.

5  A    About it.

6  Q    By way of background, Steven, have there been times when

7  your brother has come to you because he's having some sort of

8  breakdown, like a mental breakdown?

9  A    Yes.

10 Q    Did this seem to be like one of those times or was it

11 something different?

12 A    Different.

13 Q    Okay.  And how was it different?

14 A    When he would come to me with his other problems, he

15 wouldn't be crying.  He wouldn't be having to find his words.

16 He would pretty much bluntly tell me what he was thinking, how

17 he was feeling.

18 Q    And around what time in the early morning was it when

19 Jack came to your house?

20 A    About 5 a.m.

21 Q    Did he call you beforehand?

22 A    I don't believe so.

23 Q    Was it like Jack to show up at your house at 5 a.m.?

24 A    No.

25            THE COURT:  Your house is in the city here

1  somewhere?

2  A    In Brooklyn.

3         THE COURT:  And does he have access to it or did he

4  have to ring the bell or how did he --

5  A    He had to ring my bell.

6         THE COURT:  Did he wake you?

7  A    Yes.

8  Q    Now, did you get Jack to be able to tell you what it was

9  that was bothering him that early morning in January?

10 A    Yes.

11 Q    And could you describe just physically what he was doing

12 before you were able to get him to tell you what was bothering

13 him?

14 A    Shaking, crying, and having a hard time standing.  I

15 asked him to sit on the steps in the hallway at my house.

16 Q    What's the first thing you remember your brother saying

17 to you once you got him to calm down enough to tell you what

18 was wrong?

19 A    He was very apologetic.  He kept saying he was sorry.  He

20 was sorry for not taking action from what he saw.

21 Q    Could you explain to the Court what you mean.  What was

22 he sorry for not -- what did he tell you he was sorry for not

23 doing?

24 A    For not killing Bebars Baslan.

25 Q    Did he tell you why he was sorry for not killing Bebars

1  Baslan?

2  A    He was pleasuring himself to pictures of my daughter.

3  Q    When you say pleasuring himself to pictures of your

4  daughter, what are you talking about?

5  A    He was masturbating.

6  Q    Who was masturbating to pictures of your daughter?

7  A    Bebars Baslan.

8  Q    Did your brother explain how he came to see this and when

9  it had happened in relation to the time that your brother came

10  to your house?

11  A    That evening, he was in the bedroom with Kristen Henry

12  while the door was open, and Bebars was looking through child

13  pornography on his computer and he just told my brother.  And

14  he sat there and pleasured himself while telling him how he

15  wanted to be with my daughter.

16  Q    Did Jack tell you all this on that evening in January?

17  A    Yes.

18  Q    Did it all come out as like complete sentences and

19  paragraphs or did it take some back-and-forth?

20  A    It took him time to bring everything out.

21        THE COURT:  I'm sorry?

22  A    It took him time to get it out.

23  Q    Did you ask Jack any questions about how there came to be

24  child pornography on the defendant's computer?

25  A    I don't believe so.

STEVEN - DIRECT / SMITH                    232

1   Q    Did you give Jack any advice that night?

2   A    To leave it alone, to not call him, go next to him, see

3   him or have anything to do with him.

4        THE COURT:  You live with your family?

5   A    Yes.

6        THE COURT:  Wife and children?

7   A    Yes.

8        THE COURT:  So the first thing you know is 5:00, a

9   doorbell's ringing?

10  A    Yes.

11       THE COURT:  Could you hear him say anything before

12  you answered the door or was he just ringing the bell?

13  A    The door is about 70 to 80 feet from my bedroom.

14       THE COURT:  I see.

15  A    It's a four-family house.

16       THE COURT:  I see.  And as soon as you got to the

17  door and opened the door, did he start to make sounds?

18  A    He was just standing there crying.

19       THE COURT:  I see.  Anything else?

20  Q    How did -- where did your brother end up sleeping that

21  night, do you know?

22  A    I believe at my friend's house next door.

23  Q    Do you know why he slept there?

24  A    I don't believe he was able to go home to his wife.

25  Q    And did anything happen during the night that your

SHERRY BRYANT, RMR CRR

STEVEN - DIRECT / SMITH                    233

1   brother was sleeping next door that you became aware of?

2   A    He peed himself in the bed.

3   Q    How do you know that?

4   A    He came next door that morning to have coffee.  He told

5   me that he peed himself, and I asked him to go clean it up.

6   Q    Did you see any evidence of that the morning after?

7   A    No.  I was with my family.

8   Q    Did Jack ever go get the sheets and bring them to wash at

9   your house?

10  A    He did get the sheets.  I believe he took them to the

11  laundromat around the corner.

12  Q    And did Jack's demeanor change at all throughout the time

13  that you were talking to him about what had happened a few

14  hours earlier that morning?  And I'm going back to the time

15  when you were on the steps and he was visibly upset.

16  A    He calmed down as I assured him it would be okay.

17  Q    Was that at the end?

18  A    Towards the end, yes.

19       MR. SMITH:  That's all I have, Your Honor.

20       THE COURT:  So you met him at the door, you brought

21  him in the house.

22  A    Into the hallway.  I didn't bring him into the house.

23       THE COURT:  So most of this discussion occurred in

24  the hallway?

25  A    Yes.

STEVEN - DIRECT / SMITH                          234

1           THE COURT:  Do you have any questions at all, Mr.

2    Savitt?

3           MR. SAVITT:  No, Your Honor.

4           THE COURT:  Thank you, sir.  Why don't you step

5    down.

6    A    Thank you.

7           THE COURT:  Let me think about this in the next few

8    minutes and I'll see you at 2:00.

9           (Luncheon recess.)

10          (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                        235

1              (Outside the presence of the jury.)

2         THE COURT:  Is the witness readily available?

3         MR. SMITH:  Yes, they're all available, your Honor.

4         THE COURT:  I have a follow-up question for the

5    witness.

6         MR. SMITH:  Sure.

7         THE COURT:  Have a seat, sir.  I just wanted to

8    follow up very briefly.

9         THE WITNESS:  Sure.

10        THE COURT:  And that I'm obligated to remind you,

11   you remain understand oath; do you understand that?

12        THE WITNESS:  Yes.

13        THE COURT:  You told us earlier that you -- of

14   course, you're aware your brother has had some psychiatric

15   problems in his life and from time to time, he's come to you

16   about them.  And you distinguish between his manner or affect

17   when he's come with those sorts of issue, as compared to the

18   particular incident you describe this morning, and you said

19   they were very different.

20        THE WITNESS:  Yes.

21        THE COURT:  Is that fair to say?

22        THE WITNESS:  Yes.

23        THE COURT:  We've also heard some testimony that

24   your brother has from time to time had experience with drugs.

25        THE WITNESS:  Yes.

Proceedings                                          236

1          THE COURT:  So my question really is, is there

2    anything about his appearance and manner on the date that you

3    relate that suggested he may be -- may have been under the

4    influence of some sort of drug, alcohol or anything of that

5    sort?

6          THE WITNESS:  Yes.

7          THE COURT:  Would you explain that.

8          THE WITNESS:  Well, he outright told me that he was

9    doing drugs that evening with Kirsten Henry and Bebars Baslan.

10         THE COURT:  They were doing drugs, as well as

11   engaging in these other activities?

12         THE WITNESS:  Yes.

13         THE COURT:  Was he coherent?

14         THE WITNESS:  Yes.

15         THE COURT:  Despite his excitement, when he spoke,

16   you could understand him?

17         THE WITNESS:  Yes.

18         THE COURT:  Did he appear, at that moment, to be

19   under the influence of drugs in any way?

20         THE WITNESS:  Coming off of them.

21         THE COURT:  Coming off of them.  When you say coming

22   off of them, you mean --

23         THE WITNESS:  Depression kicks in.

24         THE COURT:  I see, which might explain the crying

25   and so forth.

Proceedings                                                    237

1           THE WITNESS:  Possibly.

2           THE COURT:  You also said he apologized to you.

3    Could you elaborate on that.

4           THE WITNESS:  We have a fairly strong bond.  We were

5    raised to protect family, and he felt very bad for that; he

6    didn't do anything, that he let it happen.

7           THE COURT:  When you say let it happen, you're

8    referring to the incident with your daughter's Facebook image?

9           THE WITNESS:  Yes.

10          THE COURT:  I see.  Well, again, I thank you.  If

11   you just step outside and let me confer with the lawyers.

12          THE WITNESS:  Thank you.

13          THE COURT:  Unless anybody has any follow-up --

14          MR. SAVITT:  No, thanks.

15          MR. SMITH:  No.

16          THE COURT:  Anybody else have anything to say?

17   Well, in the way I understand the cases -- and, by the way,

18   there actually is a case that deals with this issue in a

19   slightly different context, *United States Versus Jones,* an

20   opinion out of the Circuit by Judge Casman (phonetic),

21   interestingly enough.  It does seem to me to be a fairly

22   straightforward application of the excited utterance

23   exception.

24          First of all, we have the rather double-barrelled

25   incident that created the excitement.  Bear with me just a

Proceedings                                      238

1    second.  Ever since I appeared before Judge Dueling, God bless

2    his soul, I tend to do what he did.  Although he didn't have

3    to do it, I usually have to do it.

4           Now, as I start at the beginning, excited utterance

5    under the Rule 803, statement relating to startling event or

6    condition made while the declarant was under the stress of

7    excitement that it caused.  Well, we do know there was a

8    startling event, indeed there were two, according to this

9    witness.  It was first the exposure to child porn while with

10   Ms. Henry and defendant.

11          And, second, no doubt more disturbing, was -- is

12   described as the defendant's conduct while looking at a benign

13   photograph of this witness' daughter.  So we certainly have

14   double-barrelled excitement.  And we have the appearance and

15   behavior of Jack, and virtually almost simultaneous connection

16   between the events in question, and his going immediately to

17   his brother's house, where he was not residing, at 5:00 a.m.

18   in the morning, waking the family hysterical; needing to

19   report to his brother what he had observed, including his

20   rather tearful apology at not having immediately taken action.

21          So it has the indicia of reliability, which really

22   undercouraged (phonetic) the exception.  Seems to me to be a

23   classic application of it; spontaneity, the appearance of

24   indicia of reliability; the connection of the events observed

25   and the statements themselves; the condition of the declarant,

Proceedings                                    239

1    all of which, I think, supports the application.  I'm going to

2    permit the testimony.

3                MR. SAVITT:  Your Honor.

4                THE COURT:  Yes, sir.

5                MR. SAVITT:  I understand, your Honor's ruling.

6    Of course we've made our objection on the record.

7                THE COURT:  Yes, sir.

8                MR. SAVITT:  My question remains, to what issues is

9    this testimony relevant?  Even if it does pass the 803 test --

10   and, you know, frankly, I look at some of the case law, pretty

11   broad application and other cases.  I don't believe that they

12   necessarily pertain to this one, but I respect your Honor's

13   ruling, I understand that, but fail to see the relevance to

14   any issue.  It really has nothing to do with any of the

15   charges that remain.

16               THE COURT:  You know, I ask the question initially,

17   and, as I again think about it, it occurred to me that the

18   paramount relevance of it answers the question what was this

19   man intending to do if these children had, in fact, been

20   produced at that facility?  That's the question in the case.

21   And his excitement over a benign photograph of a young child

22   and his actions at the time speak, it seems to me, to that

23   very question.  So I respectfully disagree.  Let's begin.

24               MR. SMITH:  The government calls Ralph Steven.

25               THE COURT:  Place you under oath again, just as you

Proceedings                                                   240

1   were appearing here for the first time.  Okay.

2             THE WITNESS:  Yes.

3             THE COURT:  And we won't use your last name.

4        There was an inadvertent reference to this

5   gentleman's name earlier at the break.  We all agree that will

6   be redacted from the transcript.

7             MR. SMITH:  That's correct, your Honor, although the

8   reference was as to his brother's last name during the

9   questioning of Agent Spivack.  It was the last name, but I

10  don't believe it was to this witness -- I'm sorry.  It's

11  happened twice.

12            THE COURT:  It's happened twice.  I take it, as per

13  our earlier discussions, we're going to redact any reference

14  to the last name.

15            MR. SAVITT:  Yes, understood, your Honor.  That was

16  a slip of tongue, and I tried to catch myself when I was

17  cross-examining Agent Spivack.

18                 (In the presence of the jury.)

19            THE COURT:  Please be seated.

20            MR. SMITH, your witness.

21            MR. SMITH:  Government calls Ralph Stevens to the

22  stand.

23            THE CLERK:  Raise your right hand.  Do you swear or

24  affirm that the testimony you shall give in this case now on

25  trial before this Court and jury will be the truth, the whole

1   truth and nothing but the truth, so help you God?

2             THE WITNESS:  I do.

3             THE CLERK:  Thank you.  Please have a seat.

4             THE WITNESS:  Thank you.

5             THE CLERK:  And you can pull the chair in to make

6   yourself comfortable?

7             THE CLERK:  Please state and spell your name for the

8   record.

9             THE WITNESS:  Ralph Steven, R-a-l-p-h, S-t-e-v-e-n.

10                         RALPH STEVEN,

11  called as a witness, by and on behalf of the government,

12  having been first duly sworn, was examined and testified as

13  follows:

14  DIRECT EXAMINATION

15  BY MR. SMITH:

16  Q    Good afternoon, sir.  Which name do you go by, Ralph or

17  Steven?

18  A    Steven.

19  Q    Where do you live?

20  A    Brooklyn.

21  Q    In what part of Brooklyn?

22  A    Kings County.

23  Q    How old are you?

24  A    Thirty-four.

25  Q    What do you do for work?

Direct - Examination - Demas                    242

1   A     Plumber.

2   Q     Do you know the defendant, Bebars Baslan?

3   A     I do.

4   Q     Do you see him sitting in the courtroom today?

5   A     I do.

6   Q     Can you describe who the defendant is based on where he's

7   sitting and an article of his clothing?

8   A     Sitting over there in what appears to be a black suit.

9   Q     Can you say the color of his tie for clarity?

10  A     Brown.

11        THE COURT:  Indicating Mr. Baslan.

12        Go ahead.

13  Q     When did you first meet the defendant, approximately?

14  A     About four years ago.

15  Q     So that would have been in and around 2010; is that

16  right?

17  A     Yes.

18  Q     And under what circumstances did you first meet

19  Mr. Baslan?

20  A     Through another friend of mine.

21  Q     What is that friend's name?

22  A     Benjamin.

23  Q     What is Benjamin's last name?

24  A     Hio (phonetic)

25  Q     Was it under social or business circumstances when you

Direct - Examination - Demas                                243

1   first met the defendant?

2   A    Social.

3   Q    Did there come a point in time when the defendant lived

4   next door to you?

5   A    Yes.

6   Q    When was that?

7   A    Not too long after meeting him.

8   Q    So around 2010?

9   A    Yes.

10  Q    And approximately how long did the defendant live next

11  door to you?

12  A    About a year, maybe two.

13  Q    Do you have children?

14  A    Yes.

15  Q    What are their first names?

16  A    Jacqueline, Leah and Moshe.

17  Q    How old is Jacqueline?

18  A    Twelve.

19  Q    How old is Leah?

20  A    Eight.

21  Q    How old is Moshe?

22  A    Six.

23  Q    Would it be fair to say all these children were a year

24  younger as of March 2013?

25  A    Yes.

Direct - Examination - Demas                    244

1   Q     In March 2013, how old was Leah?

2   A     Seven.

3   Q     Does Leah get any sort of special services?

4   A     She does.

5   Q     What kind of special services?

6           MR. SAVITT:  Your Honor, I object to this.

7           MR. SMITH:  Your Honor, it's relevant to -- if I

8   could be heard at sidebar, I'll explain the relevance.

9           THE COURT:  Overruled.  Go ahead.

10          THE WITNESS:  She has a CA, somebody who stays with

11  her in her class all the time.  She has ADD.  She's very

12  hyperactive, has a hard time comprehending schoolwork.  She

13  has a tutor every day.

14  Q     With a learning disability; is that fair to say?

15  A     Yes.

16  Q     Do you have any nicknames for your daughter Jacqueline?

17  A     Jackie.

18  Q     Did you become friendly with the defendant during the

19  time he lived next door to you?

20  A     Yes.

21  Q     When he lived next door to you, and I'm speaking about

22  the defendant, about how often would you see him on average?

23  Are we talking daily?  Weekly?  Monthly?

24  A     Daily.

25  Q     Has the defendant ever met your children?

1    A    Yes.

2    Q    Has he met all of your children?

3    A    Yes.

4    Q    Has the defendant ever spoken to you about your children?

5    A    Yes.

6    Q    Could you describe for the jury conversations that you've

7    had with the defendant in the past about your children?

8    A    He would offer to babysit my children so that my wife and

9    I could go out to the movies or grab a bite to eat.

10   Q    Did the defendant offer to babysit your children on one

11   occasion or more than one?

12   A    Multiple.

13   Q    Did you ever take him up on this offer?

14   A    No.

15   Q    Even after you had said no, did the defendant continue to

16   offer to babysit for your children?

17   A    Yes.

18   Q    And was this all during the time when the defendant lived

19   next door to you, or did it also occur after he had moved out?

20   A    It was while he lived next door to me, and I don't recall

21   if he offered after he moved out.

22   Q    Did you ever have conversations with the defendant about

23   the topic of wanting to have something on someone?

24   A    Yes.

25   Q    Could you explain those conversations for the jury?

1  A    He needed to have blackmail on everybody that he came

2  across so that he would have something on them.

3  Q    Who told you this?

4  A    He did.

5  Q    He being?

6  A    I'm sorry.  Bebars Baslan.

7  Q    How did this come up, this conversation?

8  A    He was just talking about work, at one point, when he

9  said he created a backdoor to an enterprise he was doing work

10 for, something that they didn't know about, in case they or

11 whoever it was, he could just pay them off.

12 Q    Did you understand what he meant by a backdoor?

13 A    Yes.

14 Q    What did you understand?

15 A    In computer coding, a backdoor is a way of getting into

16 the program without anybody knowing about it, and you can do

17 whatever you want.

18 Q    Did the defendant ever tell you about blackmail material

19 that he had on other people?

20 A    I don't recall.

21 Q    Did the defendant ever tell you whether he had videos of

22 people?

23 A    Yes.

24 Q    As blackmail material?

25 A    Yes.

Direct - Examination - Demas                                    247

1   Q     Did he ever talk about having videos of ex-girlfriends?

2   A     Yes.

3   Q     Did the defendant ever take a video of you?

4   A     Yes.

5   Q     Can you explain for the jury how that came about?

6   A     I was in my house with my wife.  We had the weekend away

7   from the children.  They were at my in-laws', so we decided to

8   have a little fun.  We drank.  We did get a little drunk, and

9   we were just enjoying each others' company.  We called my

10  brother, called another friend.  We were laughing.  We were

11  having a good time, and somehow Bebars found out, I guess,

12  through Benjamin and invited himself over to my house.  After

13  a minute or two minutes, he took his phone out and was

14  videotaping it as we were acting childish and funny.

15  Q     Do you remember anything about what you may or may not

16  have said during that video?

17  A     Not a hundred percent.  We did -- we may have said that

18  we were on shrooms, based on him asking us to say something.

19  Q     What are shrooms?

20  A     It's a psychedelic mushroom.

21  Q     Were you on shrooms that night?

22  A     No.

23  Q     What was the defendant using to videotape you and your

24  wife that night?

25  A     His iPhone.

Direct - Examination - Demas                    248

1    Q    Did the defendant ever show you the video he had taken of
2    you and your wife?

3    A    No.

4    Q    Have you ever seen it?

5    A    No.

6    Q    Do you remember about how long the defendant stayed at
7    your house that evening when he came over and took that video?

8    A    Possibly ten minutes.

9    Q    And, by the way, were you and your wife fully clothed
10   during this video?

11   A    Yes.

12   Q    Did the defendant ever buy presents for your children?

13   A    Yes.

14   Q    What present or presents did he buy for them?

15   A    A Nintendo Wii game and console.

16   Q    Did the defendant tell you why he had bought this present
17   for your children?

18   A    I believed he mentioned it was for one of their
19   birthdays, but it was not any of their birthdays at the time
20   he gave it to them.

21   Q    Was it near any of your children's birthdays when the
22   defendant came over with this present, this Nintendo Wii?

23   A    I don't believe so.

24   Q    Do you have a brother named Jack?

25   A    Yes.

Direct - Examination - Demas                    249

1    Q    Is he older or younger?

2    A    Older.

3    Q    Did you ever hang out with the defendant and your brother

4    Jack at the same time?

5    A    Yes.

6    Q    Are you aware as to whether your brother Jack and the

7    defendant were friends?

8    A    Yes.

9    Q    Would you call them close friends?

10   A    Yes.

11   Q    Now, I want to direct your attention to an evening in

12   late -- excuse me -- early morning in late January 2013.  Did

13   there come a point that your brother Jack arrived at your

14   house in Brooklyn unexpectedly?

15   A    Yes.

16   Q    Can you explain that to the jury?

17   A    He rang my bell.  He woke me up.  I answered the door,

18   and he came in crying.  He was disheveled, and he was having a

19   hard time finding his words, standing up.  He couldn't get out

20   what it was that he wanted to tell me.

21   Q    Was it normal for your brother Jack to show up at your

22   house at 5:00 a.m. unannounced?

23   A    No.

24   Q    Had he ever done that in the past?

25   A    No.

Direct - Examination - Demas                          250

1    Q    And I believe you said that your brother Jack looked

2    dishevelled.  Can you tell the jury what you mean by that.

3    A    Raggedy.  His clothes were all wrinkled.  He was

4    staggering, crying, no confidence.

5    Q    Did you say crying?

6    A    Yes.

7    Q    Was your brother able to tell you whatever it was that

8    was causing him to be in that state right away?

9    A    Right away, no.

10   Q    What did you have to do to be able to get him to speak to

11   you?

12   A    Console him, roughly, about 15 to 20 minutes, asking him

13   to sit down on the steps of my hallway, and gave him a few

14   more minutes before he did tell me what was going on.

15   Q    Did your brother tell you what was going on?

16   A    Yes.

17   Q    Did he tell you where he had been immediately before

18   coming to your house that night?

19   A    Yes.

20   Q    Where did he say he had been?

21   A    In Bebars Baslan's apartment.

22   Q    Did your brother Jack tell you what it was that caused

23   him to be so upset that evening?

24   A    Yes.

25   Q    Can you tell the jury what he told you?

1  A    He saw him masturbating to pictures of my daughter.

2  Q    Who's him?

3  A    Baslan.

4  Q    And did your brother Jack tell you when that happened in

5  relation to when your brother came to your apartment?

6  A    That evening, a few hours prior.

7  Q    Did your brother explain how the defendant came to be

8  masturbating to pictures of your daughter?  By the way, did he

9  say which daughter?

10  A    Leah, my little one.

11  Q    Did Jack say how he came to be aware that the defendant

12  was masturbating to a photograph of your daughter that

13  evening?

14  A    He did.

15  Q    What did he say?

16  A    They were all sexually active, and Bebars was unable to

17  get himself off, so he went to his computer and he started

18  watching child pornography.  And then he came up across my

19  wife's Facebook page, took pictures of my daughter, and he

20  started masturbating, and he told my brother that he was

21  really liked my daughter.

22  Q    Did Jack say anything to you that night to reflect either

23  what he did or what he wished he had done, at that time?

24  A    He was very apologetic that he didn't kill him.

25  Q    Jack was very apologetic that he did not kill who?

1   A      Bebars.

2   Q      Did he tell you that?

3   A      Yes.

4   Q      Did he tell you that more than once?

5   A      Yes.

6   Q      Now, obviously you've known your brother for many, many

7   years, right?

8   A      Yes.

9   Q      Are you guys are very close?

10  A      Yes.

11  Q      Did your brother Jack have some psychological issues?

12  A      Yes.

13  Q      Is he bipolar?

14  A      Yes.

15  Q      Has he been institutionalized?

16  A      Yes.

17  Q      Does he usually check himself in?

18  A      Sometimes.

19  Q      Have you been to therapy sessions with him?

20  A      Yes.

21  Q      Was the reaction that you saw on this evening, in late

22  January, 2013, consistent with what you had seen in the past,

23  when your brother had had breakdowns, or was it something

24  different?

25  A      Different.

1   Q     How?

2   A     When he had breakdowns, he was able to talk about it; he

3   doesn't cry.  He knows he has a problem, and he approaches me

4   to get advice as to how to resolve it.  This was nothing like

5   that.

6   Q     Now, the pictures that Jack said that the defendant was

7   masturbating to, was it your understanding that in these

8   pictures she was fully clothed?

9   A     Yes.

10          MR. SMITH:  I'd like to approach the witness.

11          THE COURT:  Yes, ma'am.

12   Q     Steven, I put before you what's been marked Government

13   Exhibit 51.  Do you recognize who is in that photograph?

14   A     My daughter.

15   Q     Which one?

16   A     Leah.

17   Q     Fair and accurate depiction of your daughter Leah?

18   A     Yes.

19          MR. SMITH:  Government moves Exhibit 51 into

20   evidence.

21          THE COURT:  Any objection?

22          MR. SAVITT:  Your Honor, may I just ask one question

23   on voir dire?

24          THE COURT:  You may.

25          MR. SAVITT:  Is that a Facebook page picture, if you

1  know?

2          THE WITNESS:  Yes.

3          MR. SAVITT:  Is that the Facebook picture that your

4  brother was talking about that night, if you know?

5          THE WITNESS:  I do not know.

6          MR. SAVITT:  All right.  No objection.

7          THE COURT:  Fifty-one in evidence.

8          (Government's Exhibit 51  was received in evidence.)

9  Q    Did you say Jack also told you something about child

10 pornography?

11 A    Yes.

12 Q    What did he tell you he had seen?

13 A    He has many, many videos of children engaging in sexual

14 activities with adults.

15 Q    Who is the key in that sentence?

16 A    Bebars.

17 Q    Did your brother tell you on the night that he came to

18 your house or morning, I guess, at 5:00 a.m. that he had seen

19 child pornography at the defendant's house that evening?

20 A    Yes.

21 Q    By the way, does your daughter Leah have Celiac disease?

22 A    Yes.

23          (Pause in proceedings.)

24          THE COURT:  As I said, maybe you heard me, we're

25 required during working hours to do this test, which is why we

Direct - Cross - Savitt                    255

1    have to impose that on you.  Obviously this is important

2    equipment, important system.  Thanks for patience.

3            Please continue.

4            MR. SMITH:  I have no further questions.

5            THE COURT:  Mr. Savitt, any questions?

6            MR. SAVITT:  Oh, yes, your Honor.

7    CROSS-EXAMINATION

8    BY MR. SAVITT:

9    Q    Good afternoon, Mr. Steven.

10   A    Yes.  Thank you.

11   Q    Now, you and I have never met or spoken, right?

12   A    Correct.

13   Q    When was the first time that you found out you were going

14   to testify at this trial?

15   A    I believe that would be Monday of last week.

16   Q    Monday of last week.  And prior to that, that would have

17   been a little over a week ago, right?

18   A    Correct.

19   Q    Did you receive a telephone call?  Did you speak to

20   somebody?

21   A    It was presented to me after an interview.

22   Q    With whom?

23   A    With Aaron, the gentleman over there, and I believe

24   Tatiana, the D.A.

25   Q    Okay.  MR. SMITH, who just asked you questions, as well

Direct - Cross - Savitt                     256

1    as Agent Spivack, right?

2    A    Yes.

3    Q    And prior to that time, you had no clue that you were

4    going to testify?

5    A    No.

6    Q    Okay.  What was the last time you spoke to your brother

7    Jack?

8    A    Earlier today.

9    Q    And when was the last time that you spoke about this case

10   to your brother?

11   A    Last week.

12   Q    Before or after you became aware that you were going to

13   testify or both?

14   A    We speak about it from time to time, like, before or

15   after.  We already spoken about it.

16   Q    All right.  You heard, of course, that Mr. Baslan was

17   arrested about a year-and-a-half ago, right?

18   A    Yes.

19   Q    And you knew that your brother Jack was involved in some

20   fashion in this investigation; am I right?

21   A    Yes.

22   Q    And would it be fair to say that you and Jack spoke about

23   this matter, this case, that investigation?

24   A    Yes.

25   Q    And how many times did you do that, approximately?  Well,

1   I know you didn't write it down.

2   A     Not often.

3   Q     When you say not often, are you talking about two times

4   or only one time in the last year and a half?

5   A     Possibly.  I didn't want to know from it.

6   Q     When you say you didn't want to know from it, it was

7   because you were upset, right?

8   A     Yes.

9   Q     When you found out you became a witness, you did speak to

10  your brother last week about the case, didn't you?

11  A     Just to let him know that I was a witness.

12  Q     You didn't tell him the subject of what your testimony

13  was going to be?

14  A     I didn't know.

15  Q     Well, before you testified here today, didn't you go

16  through the kinds of questions and answers that, you know --

17  well, the kinds of questions that you would be asked?

18  A     With the FBI, I did.

19  Q     Okay.  And the topics of your projected testimony; am I

20  right?

21  A     I believe so.

22  Q     Now, you said that you knew Bebars Baslan since 2010 and

23  that he was a neighbor at one time; am I right?

24  A     Yes.

25  Q     And that -- were you friendly with him?

1   A      Yes.

2   Q      And when he lived close to you, how long was he in a

3   particular location?

4   A      About a year or two.

5   Q      Did he live alone or with somebody else?

6   A      With my friend Benjamin.

7   Q      And did you socialize with Mr. Baslan?

8   A      Yes.

9   Q      Did you ever go out together?

10  A      We have.

11  Q      And your brother also socialized; am I correct?

12  A      Yes.

13  Q      Did you know Mr. Baslan before Jack knew him, or was it

14  about simultaneous?

15  A      Before.

16  Q      Did you introduce Jack, in fact, to Mr. Baslan?

17  A      Yes.

18  Q      And when was that?

19  A      Not that long after I met him.

20  Q      Now, you told us that Mr. Baslan asked you and your wife

21  whether he could babysit your children; am I right?

22  A      Yes.

23                      (Pause in proceedings.)

24  Q      Let's see if I can recall the question.  You testified on

25  direct examination that Mr. Baslan asked you whether or not he

1    could babysit the kids, right?

2    A    Yes.

3    Q    And do you remember the first time he asked you?

4    A    I would say not that long after meeting him, after he

5    moved in.

6    Q    Do you recall the occasion on which this occurred?

7    A    We were outside my house.  I was with my wife and

8    children.  They were running up and down the sidewalk.  It was

9    social.

10   Q    When you say it was social, you said -- your testimony is

11   that my client asked whether or not he could babysit your

12   children, right?

13   A    Yes.

14   Q    And so, if I understand you correctly, you're all

15   standing outside your house; am I right?

16   A    Yes.

17   Q    The kids are running up and down?

18   A    Yes.

19   Q    And then Mr. Baslan says can I babysit your children?  Is

20   that how it worked?

21   A    No, he said you guys look like you could use a break.

22   Our children were having fun.  So in a very nonchalant way, he

23   offered to babysit so that my wife and I could go and enjoy

24   our evening.

25   Q    And were you and your wife on your way out to enjoy your

Direct - Cross - Savitt                    260

1   evening?

2   A    No, we were just outside with the children, letting them

3   run around.

4   Q    And you said, gee, I don't think it's a good idea?  Is

5   that what you said?

6   A    I said no.

7   Q    And then was there another time that he asked you?

8   A    Yes.

9   Q    And when was that?

10  A    I believe when he came over my house with Kirsten Henry.

11  My wife and her were in conversation.  She offered to tutor my

12  children, and then he offered to babysit.

13  Q    Now, when did that occur?

14  A    That was in my house a few years ago.

15  Q    And the first time was two years before that?

16  A    No, there was never years between them asking.

17  Q    Well, how much time?  What were the intervals?

18  A    Months, possibly.

19  Q    Months.  And when -- two years ago when -- had you met

20  Kristen Henry by that time?

21  A    At that time.

22  Q    At that time.  And tell us what happened.  How did it

23  come about that they asked whether or not they could babysit

24  your children?

25  A    My wife is a very friendly person, very open, so when she

1  first met Kristen, they were having a regular conversation,

2  getting to know each other.  She said that she was in the

3  Education Department, I believe, and that she was willing to

4  tutor our daughter, roughly, maybe a half hour, 45 minutes.

5  Later it came up in conversation.  I couldn't tell you the

6  context of it.

7  Q    So you're talking about tutoring your daughter; am I

8  right?

9  A    Correct.

10 Q    You're not talking about babysitting, necessarily?

11 A    That was when Kristen Henry was talking with my wife.

12 Q    And your wife told you the substance of that

13 conversation?

14 A    Yes.

15 Q    Have you spoken to your wife recently about this matter

16 before you testified here today?

17 A    No.

18 Q    This is something you recall from what happened about two

19 years ago, right?

20 A    Roughly.

21 Q    Did you find that really odd that somebody offered to

22 tutor your daughter?

23 A    Coming from a female, no; coming from a male, yes.

24 Q    So what you're saying is that months earlier, when Bebars

25 Baslan said, look, I'll take care of the kids playing outside

1  and you can go out and have a good evening, you found that

2  odd, right?

3  A    It was a little odd, yes.

4  Q    And it concerned you, correct?

5  A    Not to the point where I would have thought anything, no.

6  Q    So the answer is it didn't concern you?

7  A    No.

8  Q    At some point did you become concerned?

9  A    Not until I found out what he was about, but otherwise

10 no.

11 Q    So, in other words, you only became concerned after that

12 evening in January of a year-and-a-half ago when your brother

13 came to your house at about 5:00 o'clock in the morning,

14 right?

15 A    Yes.

16 Q    And in retrospect, that made you concerned, and that led

17 you to believe that this whole thing was odd; am I correct?

18 A    I would say so.

19 Q    Okay.  Now, you told us something about my client telling

20 you that he needed to blackmail people?

21 A    Yes.

22 Q    And when did that happen?  When was the first time you

23 heard about that?

24 A    It was in my friend's apartment.

25 Q    When?

1    A    A few years ago.

2    Q    When you say a few years ago, was it 2010?  2011?

3    Approximately 2012?

4    A    Roughly, 2011, 2012.

5    Q    Did you continue being friendly with Mr. Baslan?

6    A    Yes.

7    Q    After he told you that he needs to have some sort of

8    material to blackmail other people, you continued to be

9    friendly with him, right?

10   A    Correct.

11   Q    Were you concerned that you might be blackmailed?

12   A    No.

13   Q    Did he tell you something about having the ability to be

14   able to, for lack of a better expression, invade a computer so

15   that he has something on somebody?

16   A    Yes.

17   Q    Did you understand what he was talking about?

18   A    Yes.

19   Q    And what was he talking about?

20   A    Invading someone else's computer to blackmail them.

21   Q    Well, I mean, did you understand what he meant by that?

22   A    Yes.

23   Q    What did he mean by that?

24   A    He's a programmer; he writes code.  He writes them for

25   people who want to start new businesses or for big

Direct - Cross - Savitt                           264

1   enterprises.

2   Q    Do you know whether or not he did invade anybody's

3   computer system?

4   A    I do not know, no.

5   Q    Did Mr. Baslan have a tendency to exaggerate and to

6   essentially say things that might have been an embellishment

7   meant, let's say?

8   A    Possibly.

9   Q    When you say possibly, how many -- I mean, you were his

10  friend, weren't you, at one time?

11  A    Yes.

12  Q    And you spend a lot of time with him, from time to time,

13  socializing; am I right?

14  A    Yes.

15  Q    And, in fact, there was one time that you told us about

16  when he comes over to your house, and you and your wife have

17  been drinking, and he takes out an iPhone and he asks you to

18  say we're on shrooms, right?

19  A    I don't recall the context of it, no.

20  Q    Well, you testified about it in direct examination.  I'm

21  talking about that particular event.

22  A    Yes.

23  Q    Did I misunderstand you when I asked you whether or not

24  he took a video of you and your wife, at some point, at your

25  house, when you were drunk, and asked you to say we're on

1  shrooms?

2  A    He did.

3  Q    Did you think that was a big joke, or were you concerned

4  that that was maybe blackmail?

5  A    At the time, I didn't think of it.

6  Q    And when did that occur?

7  A    The evening that we were drink.

8  Q    Can we pinpoint a -- perhaps, let's start with a year.

9  What year was it, approximately?

10 A    2012, possibly.  I did ask him to delete it.

11 Q    I'm sorry?

12 A    I did ask him the following day to delete it.

13 Q    Is it because you were concerned that he was going to

14 blackmail you?

15 A    No.

16 Q    Is it because you were concerned that you and your wife

17 were drunk and said we're on shrooms?

18 A    No.

19 Q    Why'd you ask him to delete it?

20 A    Because it wasn't something I wanted to be posted online

21 for my children to see.

22 Q    You didn't want your kids to see you in that state?

23 A    No.

24 Q    Did Mr. Baslan tell you that he was going to show that to

25 your children?

Direct - Cross - Savitt                          266

1   A    No.

2   Q    You told us also that Mr. Baslan brought presents for

3   your kids, right?

4   A    Yes.

5   Q    And you said something about -- I didn't fully hear you,

6   but what was it a Nintendo game of some sort?

7   A    A Nintendo Wii.

8   Q    And what is that?  Not really --

9   A    It's a gaming console that you connect to your television

10  with remote controls.  You can get different forms of

11  children's games that they can play with.

12  Q    And this is -- it's a toy for kids, right?

13  A    Yes.

14  Q    And you also told us on direct examination that

15  Mr. Baslan told you that this is a birthday present, right?

16  A    I believe so.

17  Q    When you say you believe so, do you recall whether he

18  said it, or you're not sure?

19  A    I remember him calling, saying here's a present for your

20  children.

21  Q    A present for your children, right?

22  A    Uh-huh.

23  Q    Not a birthday present, necessarily?

24  A    It may have been.  I do not recall, honestly.

25  Q    What you can honestly recall is that Mr. Baslan buys a

1   Nintendo game for your children, right?

2   A    Yes.

3   Q    What you don't recall is whether this was around the

4   birthday of any of your three children or not, correct?

5   A    It was spring or summer.  It was hot.  It was fairly hot

6   out, so it had to be around my middle daughter Leah's

7   birthday.

8   Q    So when you told us earlier that it wasn't any time near

9   any of your children's birthdays, you made a mistake, correct?

10  A    No, I didn't say that.  I said I didn't recall.

11  Q    So the answer is you really are not clear about any of

12  this, right?

13  A    Not the timing, no.

14  Q    Now, you also told us that in late -- was it late January

15  of 2013, when your brother comes over to your house?

16  A    I believe so, yes.

17  Q    When you say you believe so, you're not sure?

18  A    Not sure of the month.

19  Q    Well, could it have been early or later?

20  A    Could have been.

21  Q    Well, you certainly didn't record this to any

22  authorities, did you?

23  A    Myself, no.

24  Q    Now, at 5:00 o'clock in the morning, he comes over to

25  your house and he rings the bell; am I right?

1   A    Yes.

2   Q    And then you go downstairs, and he's all dishevelled and

3   raggedy; and he's staggering and he's crying, right?

4   A    Yes.

5   Q    And he tells you that earlier that morning, whenever it

6   was, he was over at Mr. Baslan's house; am I correct?

7   A    Yes.

8   Q    Where was Mr. Baslan's residence at that time, if you

9   know?

10  A    Borough Park.

11  Q    In Borough Park?

12  A    In Brooklyn.

13  Q    But where?

14  A    Approximately a mile, mile and a half from my house.

15  Q    Okay.  But I mean what street?

16  A    In the Newtrick (phonetic).

17  Q    Newtrick (phonetic).  By the way, had you ever been to

18  that house?

19  A    My brother has taken me there to give him a ride home.  I

20  never been in the house.

21  Q    Did your brother frequently go to Mr. Baslan's residence

22  on the Newtrick?

23  A    I don't know.

24  Q    You said you gave him a ride from time to time, so you

25  know he had been there on more than one occasion?

1  A    My brother has been there on more than one occasion.

2  Q    Did your brother go to Mr. Baslan -- another of

3  Mr. Baslan's residences after that time, on Ocean Parkway, if

4  you know?

5  A    Yes.

6  Q    And how many times did he do that, if you know?

7  A    I don't know.

8  Q    Were you ever in the Ocean Parkway residence yourself?

9  A    No.

10 Q    Going back to that night in 2013, I gather it was cold

11 outside, so it was winter?

12 A    I didn't go outside; I opened the door and invited him

13 in.

14 Q    Was it winter even though you didn't go outside?

15 A    It was nighttime.  I believe it was winter.

16 Q    You're not sure?

17 A    It was winter.  It was two weeks before he was arrested,

18 before he was reported.  I apologize.  Two weeks before he was

19 reported to the police.

20 Q    How many weeks?

21 A    I believe two.  Two weeks.  Possibly two days.  I can't

22 recall.

23 Q    You don't recall if it was two weeks or two days?

24 A    No.

25 Q    Did you help him report anything to the police?

Direct - Cross - Savitt                           270

1    A    No.

2    Q    Did you ever accompany him to the police?

3    A    No.

4    Q    Did you ever accompany him to any of the psychiatric

5    sessions?

6    A    Yes.

7    Q    How many times did you do that?

8    A    Quite a few.

9    Q    When you say quite a few, can you give us a ballpark?

10   A    20ish.  30ish.

11   Q    During what interval of time?

12   A    Well before anything -- this was possibly one of his last

13   suicide attempts.

14   Q    When you say well before -- let me break this down.  When

15   was his last suicide attempt?

16   A    I don't recall.  A few years ago.

17   Q    Excuse me?

18   A    A few years ago.

19   Q    A few years ago.  2013?  2012?  2011?

20   A    I believe it was before he got remarried.  Four, maybe

21   five years ago.  Maybe six.

22   Q    Why did you accompany your brother to all of these

23   psychiatric sessions?  Is there a reason for that?

24   A    He wouldn't go without me.

25   Q    He was dependent on you?

Direct - Cross - Savitt                                271

1    A    Yes.

2    Q    You told us on direct examination that he's bipolar,

3    correct?

4    A    Yes.

5    Q    Sometimes he may have long periods where he's manic and

6    jumpy; am I right?

7    A    Yes.

8    Q    And then there are long periods where he may be

9    depressed, correct?

10   A    Yes.

11   Q    Kind of low?

12   A    Yes.

13   Q    Did your brother attempt to commit suicide on more than

14   one occasion?

15   A    Yes.

16   Q    Do you know how many times he attempted to commit

17   suicide?

18   A    Six.  Seven.

19   Q    And do you know how many psychiatric institutions he was

20   committed to?

21   A    To my knowledge, two or three.

22   Q    How many times?

23   A    What do you mean by that?

24   Q    How many times did he have to go into a psychiatric ward

25   as an in-patient?

1    A    To my knowledge, two or three.

2    Q    And you told us on direct examination that there was a

3    time that he checked himself in, and there was other times

4    when he didn't?

5    A    Yes.

6    Q    That means that somebody committed him there?

7    A    I believe so, yes.

8    Q    When you say you believe so, do you know who it was that

9    committed him to the institution?  Was it you?

10   A    My father, I believe.

11   Q    I'm sorry?

12   A    My father, I believe.

13   Q    Your father.  And is that because he was suicidal at that

14   time?

15   A    Yes.

16   Q    Was that as a result of attempting to take his life?

17   A    Yes.

18   Q    Did you ever permit your brother to babysit your

19   children?

20   A    No, not that I can recall.

21   Q    You know his children?

22   A    Yes.

23   Q    Do you ever babysit his kids?

24   A    Yes.

25   Q    But he never babysat yours, right?

1   A     I don't believe so, no.

2   Q     Is it because you couldn't trust him?

3   A     No.

4   Q     He never asked?

5   A     He never offered.

6   Q     When your brother came to you that night in the

7   wintertime, where you didn't step outdoors and he was all

8   dishevelled, do you remember the first thing he told you?

9   A     He was sorry.

10  Q     And he kept on saying I'm sorry, I'm sorry, I'm sorry?

11  A     Yes.

12  Q     And then ultimately he tells you that he was over at  Mr.

13  Baslan's house, where he had sex with Kristen Henry, right?

14  A     Yes.

15  Q     And where he watched child pornography?

16  A     Where Bebars watched child pornography.

17  Q     He was having sex with Kristen Henry, and Bebars was

18  watching child pornography?

19  A     He was in the bedroom with Kristen Henry while Bebars was

20  in another room with the door open.

21  Q     With the door open.  And did your brother tell you that,

22  "I saw Bebars Baslan watching child pornography"?

23  A     He said he saw him, yes.

24  Q     Saw him watching child pornography?  That's the question.

25  A     Yes.

1   Q    With children engaged in sex acts, right?

2   A    Yes.

3   Q    And this was the first time that your brother ever saw

4   child pornography?

5   A    I believe so.

6   Q    That means you're not sure, right?

7   A    Correct.

8   Q    Did you ask him?

9   A    No.

10  Q    When you first saw, dishevelled and all that, were you

11  concerned that maybe he was experiencing another setback in

12  terms of being depressed?

13  A    No.

14  Q    Or manic?

15  A    No.

16  Q    How about being on drugs?

17  A    Yes.

18  Q    You were concerned that he was on drugs?

19  A    I wasn't concerned, I knew.

20  Q    You knew your brother abused drugs quite a bit.

21  A    I knew he did them quite a bit, yes.

22  Q    And the kind of drugs that he used included coke?

23  A    Yes.

24  Q    Included all sorts of pills that he shouldn't be taking?

25  A    I don't know about that.

1   Q    Well, he was prescribed a lot of antidepressants and mood

2   stabilizers by his psychiatrist; am I correct?

3   A    Yes.

4   Q    I mean, a lot of pills over the years; am I right?

5   A    Over the years, yes.

6   Q    In order to try to someway contain the affects of his

7   bipolar disorder; am I right?

8   A    I believe so.

9   Q    And when, if you know, did it first come to his attention

10  that he suffering from bipolar disorder?

11  A    At a young age.

12  Q    As a child?

13  A    From what I know, teens.

14  Q    Would it be fair to say, Mr. Stevens, that as a result of

15  your brother abusing drugs, as a result of your brother's

16  bipolar disorder -- or sometimes he was manic, sometimes he

17  was depressed -- that not everything that he said could be

18  relied upon?

19          MR. SMITH:  Objection.

20          THE COURT:  Overruled.

21          THE WITNESS:  I would say so.

22  Q    I'm sorry?

23  A    I would say so.

24  Q    So the night when he comes in, and you're concerned that

25  he's on drugs and he's talking about how sorry he is, you were

1  pretty convinced that he was drugs, right, as you just told

2  us?

3  A    I knew he had taken drugs, yes.

4  Q    And because you've seen him previously after he had taken

5  drugs, right?

6  A    Yes.

7  Q    And when he took drugs, he didn't make much sense, did

8  he?

9  A    He was rational.

10  Q    So after he took drugs, he was always rational?

11  A    For the most part.

12  Q    But this night after taking drugs, he was irrational at

13  first?

14  A    This night after what he saw.  It had nothing to do

15  with -- his performance, his speaking had nothing to do with

16  the drugs he took.

17  Q    Let's get this straight.  You weren't anywhere near

18  Bebars Baslan's house that evening?

19  A    Correct.

20  Q    In fact, you were never in Bebars Baslan -- the Newtrick

21  (phonetic) house, is that what you're talking about?

22  A    Correct.

23  Q    You yourself were never there on a tryst with Mr. Baslan

24  and Ms. Henry, anything like that?

25  A    No, not that I can recall.

1   Q    When you say not that you can recall, were you ever

2   involved in some sort of group sex?

3   A    No.

4   Q    Did you know that your brother Jack was involved in that

5   type of thing?

6   A    After he told me.

7   Q    And the first time he told you was that evening?

8   A    It was a week prior to that.

9   Q    A week prior to that.  And what did he tell you?

10  A    He told me how he had a three-way with Bebars Baslan and

11  Kristen Henry.

12  Q    I'm sorry.  I didn't hear you.

13  A    He told me that he had a three-way with Bebars Baslan

14  and Kristen Henry.

15  Q    And you said okay?  Fine?  Or did you ask him questions

16  about it?

17  A    I didn't really have any questions for him, no.

18  Q    And he didn't elaborate?

19  A    No.

20  Q    A week later, he comes to you early in the morning.  He's

21  somewhat incoherent.  You calm him down, right?

22  A    Yes.

23  Q    How long did it take you to calm him down?  About

24  20 minutes, roughly?

25  A    Roughly.

1  Q    And during those 20 minutes, what was he doing?  Could

2  you describe it for us?

3  A    Crying, trying to get out what he was trying to say.

4  Q    Stammering?

5  A    When he wasn't able to find the words.

6  Q    Well, where did all this action take place, the first

7  20 minutes, within your house?

8  A    Within the hallway of my house, leading to my house.  I

9  live in a four-family apartment.

10 Q    So you have just one of the levels for yourself, and

11 there are other families in that house?

12 A    Two apartments per floor, two floors.

13 Q    I'm sorry.  Two apartments.  Which floor?

14 A    Per floor, two floors.  I live on the first floor.

15 Q    So is the hallway right outside your apartment?  Right?

16 A    Yes.

17 Q    Everybody's sleeping in the house?  It's early in the

18 morning?

19 A    Yes.

20 Q    Is he crying loudly?  Screaming?  What's he doing?

21 A    I didn't invite him into my house.  We spoke in the

22 hallway.  I didn't feel it was necessary to wake up my family.

23 Q    So he was kind of loud?

24 A    No.

25 Q    He was sobbing softly.  What was he doing?  I'm asking

1   you, you were there.

2   A    Sobbing.  It wasn't softly.  It wasn't loud, just --

3   Q    Sobbing for 20 minutes?

4   A    Roughly.

5   Q    Did you say, hey, you're on drugs again?  What's wrong

6   with you?

7   A    I knew that, but it was more than that, because when he

8   was on drugs he could still talk, he could still rationalize,

9   he wouldn't break down like that.

10  Q    So something really bad happened, right?

11  A    Yes.

12  Q    And you told him things are okay, things are okay, tell

13  me -- words to that effect?

14  A    Roughly.

15  Q    And then he says, you know what, I just came back.  A

16  couple hours ago, I was in Bebars' apartment, and while I was

17  having sex with Kristen, he was watching child pornography,

18  right?

19  A    No.

20  Q    What did your brother tell you?

21  A    He kept apologizing.  After he kept apologizing, he said

22  for not killing Bebars Baslan.  And I asked him why.  He said

23  because he saw that he was masturbating to pictures of my

24  daughter, and he didn't do anything.

25  Q    And when did he tell you that Mr. Baslan was watching

1    child pornography?

2    A    That evening.

3    Q    Well, did he tell you whether he watched child

4    pornography before he looked at your daughter's Facebook

5    picture, or after or what?

6    A    He didn't give me a full breakdown of the context, no.

7    Q    So you really don't know whether or not Mr. Baslan,

8    according to your brother, looked at your daughter's picture,

9    and then child pornography and then masturbated, or vice versa

10   or what happened, right?

11   A    I fail to see the difference.

12   Q    I'm asking the question.  You don't know one way or the

13   other?

14   A    Correct.

15   Q    And to you it makes no difference whatsoever, right?

16   A    Whether he masturbated to a picture of my daughter before

17   or after watching other children; is that the question?

18   Q    Yes, that's the question.

19   A    To me, I don't recall, no.  I don't recall if it was

20   before or after.

21   Q    All right.  Now, in fact, your wife has a Facebook page;

22   am I right?

23   A    Yes.

24   Q    And the photograph that you were shown, I believe it was

25   Exhibit 51?

Direct - Cross - Savitt                                    281

1    A    Yes.

2    Q    That's a picture of your daughter?

3    A    Yes.

4    Q    And do you know when that picture was taken?

5    A    She was seven, I believe.  Maybe six.

6    Q    Did you ever ask your brother whether or not he saw

7    Bebars Baslan looking at the very picture that you were shown?

8    A    The picture that was presented to me earlier?

9    Q    Yes.

10   A    No, I don't know what picture it was.

11   Q    So you have no idea what it was that your brother was

12   referring to when he told you that night that Baslan was

13   looking at child pornography and had a picture of your

14   daughter, right?

15   A    When he told me that he brought up a picture of my

16   daughter, I asked him where he got the picture of my daughter

17   from, and he said it was from my wife's Facebook page.

18   Q    I'm asking you whether or not the very picture that you

19   were shown, this picture, which I will only show right here --

20   A    Uh-huh.

21   Q    Okay.  -- is the picture that, according to your brother,

22   Baslan was looking at?  Do you know that one way or the other?

23   A    I don't know.

24   Q    Now, would it be fair to say that at some point during

25   the events that you describe for us, in the early morning

NICOLE CANALES, CSR, RPR

1    hours of some winter night, in 2013, that you felt your

2    brother was coming off drugs or coming down from some sort of

3    high?

4    A    Right.

5    Q    Or low or whatever?

6    A    I'm sorry.  Was there a question?

7    Q    Yes.  The question was whether or not you felt that your

8    brother was coming off drugs at some point that early morning?

9    A    Yes.

10   Q    And did he tell you this report about Bebars Baslan

11   before or after he came down from the drugs; do you recall?

12   A    I don't know.

13   Q    Was the entire conversation in the hallway of -- right

14   outside your apartment?

15   A    Yes.

16   Q    Was there anybody else present?

17   A    His wife.

18   Q    His wife?

19   A    She showed up, possibly, an hour to a half hour, yes.

20   Q    She was part of this conversation?

21   A    Not the beginning part, no.

22   Q    What part of the conversation was she there for?

23   A    It was afterwards, maybe half hour after or an hour after

24   she showed up.  She saw that Jack wouldn't stop crying, even

25   as he was telling me what happened, and then he reiterated the

1    story to her.

2    Q    Same floor?

3    A    Correct.

4    Q    Right outside your apartment?

5    A    Correct.

6    Q    Nobody's awake yet, right?

7    A    Correct.

8    Q    You called his wife.

9    A    No.

10   Q    He called his wife?

11   A    I believe so.  I'm not sure.

12   Q    His wife's name is?  First name?

13   A    Annette.

14   Q    Annette?

15   A    Yes.

16   Q    Did you speak to Annette any time before you testified

17   here?

18   A    Not in regards to this, no.

19   Q    What was the last time you spoke to Annette?

20   A    A couple days ago.  She was with my brother in the car.

21   I said hello.  I don't have a very good relationship with her.

22   Q    You don't get along with her; is that correct?

23   A    No, we get along.  We're civil.

24   Q    But there's no love lost; is that it?

25   A    Correct.

1  Q    And you certainly didn't talk about the case to Annette

2  before you testified here today, correct?

3  A    No.

4  Q    Does she know that you're testifying?

5  A    I don't know.

6  Q    Does your brother?

7  A    My brother knows I'm testifying.

8  Q    When did you tell him?

9  A    As soon as I found out.

10 Q    A week ago?

11 A    Yes.

12 Q    And you spoke to him today?

13 A    I did.

14 Q    What time?

15 A    12:30.

16 Q    On the telephone or in person?

17 A    Telephone.

18 Q    Did he call you?  Did you call him?

19 A    I returned his call.

20 Q    And did the nature of your call have anything to do with

21 your testimony at all?

22 A    He asked if I wanted him to be present.

23 Q    So, in other words, he knew you were testifying here

24 today, correct.

25 A    Yes.

1  Q    And he knew that at least for a full week, because that's

2  when you found out, right?

3  A    Yes.

4  Q    But you never discussed the substance of the testimony

5  with him; is that right?

6  A    I didn't want to.

7          MR. SAVITT:  Thank you very much.  No further

8  questions.

9          THE COURT:  Anything else, MR. SMITH?

10          MR. SMITH:  No, your Honor.

11          THE COURT:  Thank you, sir.  You may step down.

12          THE WITNESS:  Thank you, your Honor.

13          THE COURT:  Next witness.

14          MR. SMITH:  The government calls Ian Goldberg.

15          THE COURT:  Come up here, sir, if you would.  Please

16  raise your right hand.  Do you solemnly state that the

17  testimony you're about to give this Court and jury, in this

18  case on trial, will be the truth, the whole truth and nothing

19  but the truth, so help you God?

20          THE WITNESS:  I do.

21          THE COURT:  Please be seated.  Would you state your

22  name and spell it for the reporter, please.

23          THE WITNESS:  My name is Ian Goldberg, I-a-n,

24  G-o-l-d-b-e-r-g.

25                          IAN GOLDBERG,

Goldberg - Direct - Demas                           286

1   called as a witness, by and on behalf of the government,

2   having been first duly sworn, was examined and testified as

3   follows:

4           THE COURT:  All right.  Thank you, sir.

5           You may inquire.

6   DIRECT EXAMINATION

7   BY MR. SMITH:

8   Q    Good afternoon, Mr. Goldberg.

9   A    Good afternoon.

10  Q    Where do you work?

11  A    Walgreens.

12  Q    Where's that Walgreens located?

13  A    946 Kings Highway in Brooklyn.

14  Q    What part of Brooklyn is that in?

15  A    Millwood (phonetic) area.

16  Q    What's your position?

17  A    Store manager.

18  Q    What kind of store is Walgreens?

19  A    It's a pharmacy.  Retail pharmacy.

20  Q    Do you sell over-the-counter cold medications?

21  A    We do.

22  Q    And what corner is the Walgreens on that you work at?

23  Like, what are the cross streets?

24  A    Kings Highway and Coney Island Avenue.

25  Q    How long have you worked there?

1    A    At that location, four years.

2    Q    What about Walgreens, in general?

3    A    Eight-year.

4    Q    Now, when someone goes to Walgreens and buys an item or

5    items, do they get a receipt?

6    A    Yes.

7    Q    Do those receipts accurately reflect what the person has

8    purchased and paid for?

9    A    Yes.

10   Q    Does Walgreens always issue receipts to people when they

11   buy things there?

12   A    Yes.

13        MR. SMITH:  Showing the witness Government's

14   Exhibit 25X, as in X-ray, and 28.

15        THE COURT:  Thank you.

16   Q    Do you see both of these documents?

17   A    I do.

18   Q    Do you recognize them?

19   A    I do.

20   Q    What are they?

21   A    They're Walgreens receipt from my store.

22   Q    And does Walgreens create receipts at our near the time

23   events recorded, meaning, at or near the time of the purchase?

24   A    Once the transaction's completed, a receipt is generated.

25   Q    Is it a normal practice of Walgreens to keep these

1  receipt records as a normal business practice?

2  A    Records are available for about four months.

3  Q    And just so the record's clear, is this the same receipt;

4  one is the physical receipt, which is 28, and the other one is

5  a photograph of that receipt?

6  A    Yes.

7           MR. SMITH:  The government moves Exhibits 25X and 28

8  into evidence.

9           THE COURT:  Any objection?

10           MR. SAVITT:  No, your Honor.

11           THE COURT:  They are received.

12    (Government Exhibit 25X and 28 were received in evidence.)

13           MR. SMITH:  May I have the document camera?

14           THE COURT:  Mike, can you put that --

15  Q    Can you see this on the screen in front of you,

16  Mr. Goldberg?

17  A    Yes.

18  Q    And, now, could you tell me what the date of this receipt

19  is?

20  A    March 19th, 2013.

21  Q    What's the time stamp on this receipt?

22  A    5:47 p.m.

23  Q    Okay.  And what is the first item listed on that receipt?

24  A    It's a Tropicana orange juice, some pulp, 12-ounce.

25  Q    What is the second item?

Goldberg - Direct - Demas                    289

1    A    A lifelike animal, a little stuffed animal.

2    Q    What is the third item?

3    A    Nesquik strawberry drink.

4    Q    What is the fourth?

5    A    Benadryl-D PE child allergy, liquid grape.

6    Q    Mr. Goldman, when an item is scanned at Walgreens, is

7    there a SKU number on it, S-K-U?

8    A    Yes, a UPC on the package.  Yes.

9    Q    Okay.  What does that UPC number allow you to do?

10   A    We scan the item, and it's linked in our system.

11   Q    Will that item match up to the item number on the

12   receipt?

13   A    Yes.

14   Q    I'm showing you what's in evidence as Government

15   Exhibit 8.  Do you see this?

16   A    Yes.

17   Q    Do you see the item number on the bottom of this package?

18   A    Yes.

19   Q    Does it match the item number on the Walgreens receipt

20   that corresponds to the Benadryl?

21   A    Yes.

22   Q    I'm showing you what's in evidence as Government

23   Exhibit 9.  Do you see this?

24   A    Yes.

25   Q    Is there, I think you called it, an item number on this

1   bottle of orange juice?

2   A    Yes.

3   Q    And does it correspond to the item number of orange juice

4   reflected on this receipt?

5   A    Yes.

6   Q    I'm showing you what's been marked for identification as

7   Government Exhibit 36B, as in boy.  Do you recognize what's

8   depicted in this photograph?

9   A    Yes.

10  Q    What is it?

11  A    That's the exterior of the store that I work at.

12  Q    The Walgreens?

13  A    Yes.

14       MR. SMITH:  The government moves Exhibit 36B into

15  evidence.

16       THE COURT:  Any objection?

17       MR. SAVITT:  No, your Honor.

18       THE COURT:  Thank you.  36B in evidence.

19       (Government's Exhibit 36B  was received in

20  evidence.)

21       MR. SMITH:  Your Honor, I'm just going to publish

22  for the jury now Exhibit 28, which is the physical receipt,

23  not the photograph of it.

24       THE COURT:  Okay.

25  Q    Mr. Goldberg, is it typical for Walgreens receipts to

1    kind of degrade over time?

2    A    Yes.

3    Q    And, I'm sorry, is there any indication on the receipt --

4    I'm going to switch back to the photograph of it -- to show

5    whether this was a cash or credit card purchase?

6    A    The receipt indicates cash.

7              MR. SMITH:  I have no further questions.

8              THE COURT:  Any questions, Mr. Savitt?

9              MR. SAVITT:  No thank you, Judge.

10             THE COURT:  Thank you, sir.  You may step down.

11   Next witness.

12             MR. SMITH:  Government calls Henry Enright.

13             THE CLERK:  Good afternoon.  Sir, I'm going to ask

14   you to please take the stand.  Raise your right hand.  Do you

15   swear or affirm that the testimony you shall give, in this

16   case now on trial before this Court and jury, will be the

17   truth, the whole truth and nothing but the truth, so help you

18   God?

19             THE WITNESS:  I do.

20             THE CLERK:  Thank you.  Please have a seat.  State

21   and spell your name for the record.

22             THE WITNESS:  Henry Enright.  E-n-r-i-g-h-t is the

23   last name.

24

25                    HENRY ENRIGHT,

Enright - Direct - Demas                             292

1    called as a witness, by and on behalf of the government,

2    having been first duly sworn, was examined and testified as

3    follows:

4                  THE CLERK:  Thank you.

5    DIRECT EXAMINATION

6    BY MR. SMITH:

7    Q    Good afternoon, sir.

8    A    Good afternoon.

9    Q    Would you tell the jury who you work for?

10   A    AT&T Mobility.

11   Q    What kind of company is that?

12   A    They provide wireless services.

13   Q    Is it a telephone company?

14   A    Yes.

15   Q    And what's your position at AT&T?

16   A    Custodian of records.

17   Q    What does that mean?

18   A    I verify and authenticate the legitimacy and accuracy of

19   call-detail records and subscriber information.

20   Q    Could you explain to the jury what call-detail records

21   are?

22   A    Sure.  Call-detail records encompasses three sorts of

23   communications; that would be voice call, telephone calls,

24   data usage, such as on a smart phone to access the Internet,

25   and text messages, which the record will reflect as SMS usage.

1    SMS stands for Short Messaging Service.

2    Q    How long have you been a records custodian for AT&T?

3    A    I worked for AT&T for 20 years, and I contracted for

4    four.  And during that time, I probably started testifying

5    around 1995, so I probably done this hundreds of time.

6    Q    Is that what you mostly do, you go certify records --

7    A    Since I been a contractor, that's all I do, yes.

8    Q    What is subscriber information?

9    A    Subscriber information will reflect who the financially

10   liable party is, their address of record.  Often it's the same

11   user information but can be different if the financially

12   liable party designates a user.  It will have the wireless

13   telephone number and what kind of account it is, if it's

14   post-paid or prepaid, things of that nature.

15   Q    Before coming to court today, have you reviewed a series

16   of records that were produced by AT&T in response to a

17   subpoena in this case?

18   A    Yes, I have.

19            MR. DEMAS:  And I'm going to show the witness what's

20   been marked for identification as Exhibits 23A, 23B and 23C.

21   Q    Mr. Enright, are you familiar with these records?

22   A    Yes.

23   Q    Were all of these records made as a normal business

24   practice of AT&T?

25   A    They are.

Enright - Direct - Demas                    294

1   Q     And did these records record events that occurred at or

2   near the time that the -- excuse me.  Do all these records

3   reflect events that were occurring at or near the time

4   reflected in the records?

5   A     They do.

6   Q     And is it a normal business practice of AT&T to maintain

7   these records?

8   A     It is.

9   Q     Were they kept in a normal system of records, a regular

10  system of records?

11  A     Yes.

12        MR. SMITH:  The government moves Exhibits 23A, B and

13  C into evidence.

14        MR. SAVITT:  No objection.

15        THE COURT:  Received.  Thank you.

16        (Government Exhibits 23A, B and C  were received in

17  evidence.)

18        MR. SMITH:  May I publish to the jury on the camera?

19        THE CLERK:  Certainly.

20  Q     On the first page of Exhibit 23B, can you read out who

21  the financially liable party is?

22  A     Yeah, it's a little fuzzy.  I think I can make it out.

23  That's better.  Financially liable party is Bebars Baslan.

24  Q     What's the phone number associated with this account?

25  A     646-288-3317.

1   Q      Now, is there another phone number associated with this

2   same -- I'm sorry -- account?

3   A      Yes.

4   Q      What number is that?

5   A      718-664-8135.

6   Q      And who is listed as the user of that number?

7   A      Kristen Henry.

8   Q      And just so the jury understands, I'm showing you just a

9   page from the toll records.  I'm sorry.  The call detail

10  records.  Can you just explain for the jury what these columns

11  reflect, the different columns?

12  A      Sure.  This particular item we're looking at is the

13  section called "data usage," so it will have -- first column

14  is the line item just because there's many pages, just easier

15  to reference with a line item number.  You have the date and

16  time that they were, in this case, using data, and it's -- the

17  originating number is going to be the same number as the

18  account number on the upper left, ending in 3317.

19         The next column is elapse time.  That's how long

20  they were using data.  The next two columns are -- data usage

21  is measured in kilobytes, so that will be the bytes up and

22  down, which is just downloading and uploading of the

23  information.  The next two columns are -- first one is IMEI.

24  That stands for the International Mobile Equipment Identifier.

25  That's just a serial number on the handset, the mobile phone.

Enright - Direct - Demas                    296

1    The next come up is MD, which stands for International Mobile

2    Subscriber Identifier.  That's the identifying number of the

3    SIM card that resides within a phone, about the size of your

4    thumbnail, that identifies you to the network.  It houses the

5    intelligence of who the subscriber is in their profile.

6              And the next two columns are the same in every time.

7    It's the access point and description of what's going on.

8    They're using data, hooking up to the Internet.

9    Q    And what's mobility usage?

10   A    I don't have anything on my screen.

11   Q    Sorry.  It stands at the top.

12   A    That's just a -- that's just a usage.  That's a generic

13   term.  It's for the usage that the customer is using.  These

14   are raw switch records, so this is not the kind of thing your

15   going to see on a customer's invoice that's mailed to their

16   house.

17   Q    Okay.  Just moving to a different page.  What kind of

18   record is this?

19   A    Okay.  This is -- as I mentioned earlier, this is one of

20   the sections.  This is text messages, upper left-hand corner.

21   Notes.  SMS usage.  SMS stands for Short Messaging Service,

22   the same thing as text messages.  Again, you'll have a line

23   item number.  You'll have a date and time of the text message.

24   The originating party is who is sending the text message.  The

25   terminating number field column is the person receiving the

1   text message.  So in this first example, the top line, the

2   AT&T subscriber ending in 3317 is receiving a text message

3   from a number ending in 6956.  The next two columns IMEI.

4   That word I described.  As you can tell, since it's the 3317

5   account, that's why it says, under the description column,

6   it's an inbound text message.

7   Q    And does AT&T maintain these same types of records for

8   voice calls?

9   A    Yes, they do.

10  Q    Do they look substantially the same as the text message

11  records except there's no in-and-out column?

12  A    Correct.

13  Q    Was this a voice call record?

14  A    Yes, it has voice usage on the upper left as a signifier.

15  Q    Okay.  And could you just explain to the jury what the

16  columns mean, to the extent that they were different than the

17  ones we've already discussed?

18  A    Sure.  In this case, after the date and time of the call,

19  you'll see a column marked seizure time.  If anyone's used a

20  mobile phone, when you press send on your mobile phone to make

21  a telephone call, there's a delay.  And that delay is called

22  "seizure time."  That is the time from when you press send

23  until you capture a voice channel hooking up to AT&T network,

24  and that would include ring time that you hear on the phone.

25  Originating number column signifies the calling party.  We can

1    go over a couple.  The number dialed is who is being called,

2    the "cal ed party."  Usually the number dialed column is the

3    same number in the terminating number column.  The reason it

4    would be different is if the number -- the classic example

5    would be if the number dialed, the number doesn't answer and

6    it's call-forwarded somewhere.  So if it's call-forwarded to

7    voicemail, you'd see a different number or a voicemail number

8    and the terminating number called.

9            The elapsed time is simply the call duration, how

10   long they were talking.  The IMEI, the MD, we already talked

11   about.  Last column is the call description scenario, so I

12   know, in this case that -- I'll wait until you get -- it was

13   another wireless number, because it's a lowercase "M" calling

14   our number, because it's an uppercase "M".  All that means is,

15   is another wireless number from another company called our

16   number, so M to M, lowercase "M" to uppercase "M", and was

17   being directed somewhere.  It's nothing more than that.

18   Q    I've underlined one of the lines under "description."

19   Can you explain what that code means?

20   A    Could you collapse it and move it to my right, if that's

21   possible?  Keep going.  More.  I don't need the line item.  I

22   just want to see -- is this the 331?  Go back to the right.

23           Okay.  So we've got the 3317 number checking his

24   voicemail.  That's what VMC stands for.  They're calling right

25   from their phone, and that 718 number appears to be a

1    voicemail number from AT&T.

2    Q    Can you explain the line below that, what that code is?

3    A    Yes.  The letter "O" is going to signify other.  That

4    means it's typically a landline, not wireless.  So it can be

5    an automated machine.  Typically as a landline number, and

6    then, as you can see, it's -- without even looking if -- where

7    this thing is going.  I know our AT&T customer's being called.

8    And if you look over in the far right, if I'm correct, because

9    you see the number ending in 3317 and the number dialed field.

10            MR. SMITH:  Okay.  Thank you.

11            THE COURT:  Is that it?  Anything, Mr. Savitt?

12            MR. SAVITT:  No, thank you, Judge.

13            THE COURT:  Thank you very much, sir.  You may step

14   down.

15            And with that, we'll take our afternoon break,

16   folks.  Step inside.  Do not discuss the case.  We'll resume

17   in about 12 minutes.

18            (Outside the presence of the jury.)

19            THE COURT:  Okay.  Ten minutes, folks.  Who is next?

20            MR. SMITH:  Elizabeth Roble, an FBI witness.

21            THE COURT:  How are we doing on pace?

22            MR. SMITH:  Your Honor, we're moving very quickly,

23   and we're in -- we have two more witnesses lined up.  We don't

24   really have any more lined up for today.  We could try and get

25   one -- an additional one over here.  We're moving very

1    quickly.

2            THE COURT:  I'm told this story before.  I'll tell

3    it again.  I was sitting in a courtroom over in Southern

4    District.  Judge McMahon was on the bench, and -- may he rest

5    in peace.  I was waiting to be called for a late afternoon

6    calendar, and prosecutors told the judge that they've run out

7    of witnesses and they'd have to resume the following morning.

8    And Judge McMahon, turns to the jury and says, "Ladies and

9    gentlemen, the government has rested its case."

10           MR. SAVITT:  Sounds like the right thing to do.

11           THE COURT:  I think you're ready to rest.

12           MR. SMITH:  We can arrange to have another person

13   come across.

14           THE COURT:  I try to get confirmation for you on

15   Friday that I don't yet have.  As soon as I do, you'll have

16   it.  I guess if we're maintaining a decent pace, it won't be a

17   tragedy to take Friday off.

18           MR. SMITH:  We're proceeding much more quickly than

19   expected.  I think the government probably has, at most,

20   one-and-a-half days of witnesses left.

21           THE COURT:  All right.  Okay.  I'll see you in a few

22   minutes.

23                   (Recess in proceedings.)

24               (Outside the presence of the jury.)

25           THE COURT:  Technical matter.  The government has

Enright - Direct - Demas                          301

1   brought to our attention an error in the transcript by letter

2   of July 13th.  This is the suppression hearing that -- I

3   forget who took it.  Ron Tolkin took it.

4             MR. SMITH:  That's correct.

5             THE COURT:  And Ron Tolkin sent an e-mail, saying he

6   had listened to it and corrected the transcript.  Everybody

7   okay with it?

8             MR. SAVITT:  Yes.  Your Honor, I understand there

9   was an incident yesterday or today, perhaps, where -- today?

10  In the morning, on the way here, another inmate -- another

11  inmate said something to my client, something pejorative about

12  the charges against him, made certain allusions.  I don't know

13  what they are.  My client got into a verbal argument with him.

14            THE DEFENDANT:  There was no verbal argument.  He

15  said something; I kept quiet.  And I'm concerned the MDC

16  thinks I need to be moved to the SHU.  I have no problem.  I

17  don't want to lose access to e-mail and legal research during

18  trial.

19            MR. SMITH:  Your Honor, I can say that I did receive

20  a voicemail from the marshals this morning, informing me that

21  there had been a verbal altercation.  We spoke to the deputy

22  marshal, who was here this morning and is here now, and he

23  also briefed me on it.  My only understanding with respect to

24  what's being done with the defendant for his safety happens in

25  the courthouse.  The marshals are keeping him, between the

NICOLE CANALES, CSR, RPR

1   times that he's brought up to court, in sort of a separate

2   area and during transport.  My understanding is that the

3   marshals are putting him in a section of the bus that is

4   father away from other inmates.  I certainly have no

5   indication from the MDC that they're taking any action to move

6   the defendant to the SHU.  I don't know that I would have any

7   control over it if they did make that decision because MDC

8   always makes, you know, decisions based on the safety of

9   inmates without consulting us first.

10          THE COURT:  You may not have any control, but you

11   have some influence.

12          MR. SMITH:  I can ask --

13          THE COURT:  And I don't want him in the SHU during

14   the pendency of this trial unless it's absolutely essential.

15   From what I read about this brief tete-a-tete on the bus, I

16   would hope that they would understand the man is on trial; he

17   needs to have access to his materials and so forth.  So,

18   please, if you catch wind of any problem --

19          MR. SMITH:  Of course.

20          THE COURT:  -- share my view with them as well, most

21   respectfully.

22          MR. SAVITT:  Thank you, your Honor.

23          MR. SMITH:  Your Honor, would you like us to put the

24   witness on the stand?

25          THE COURT:  Sure.

Roble - Direct - Demas                    303

1           (In the presence of the jury.)

2           MR. SMITH:  The government calls Elizabeth Roble.

3           THE CLERK:  Please raise your right hand.  Do you

4    swear or affirm that the testimony you shall give in this

5    case, now on trial before this Court and jury, will be the

6    truth, the whole truth and nothing but the truth, so help you

7    God?

8           THE WITNESS:  I do.

9           THE CLERK:  Thank you.  Please have a seat.  State

10   and spell your name for the record.  You could pull your chair

11   closer.  Thank you.

12          THE WITNESS:  Elizabeth Roble, E-l-i-z-a-b-e-t-h,

13   R-o-b-l-e.

14                      ELIZABETH ROBLE,

15   called as a witness, by and on behalf of the government,

16   having been first duly sworn, was examined and testified as

17   follows:

18   DIRECT EXAMINATION

19   BY MR. SMITH:

20   Q    Good afternoon.

21   A    Hi.

22   Q    Could you tell the jury who you work for?

23   A    I work for the FBI, Federal Bureau of Investigation.

24   Q    What's your position?

25   A    Special Agent.

Roble - Direct - Demas                                304

1   Q      How long have you been a Special Agent?

2   A      Two years.

3   Q      What section are you currently assigned to?

4   A      I'm currently in the Counterterrorism Division.

5   Q      What did you do before you became an FBI agent?

6   A      I was an attorney.

7   Q      What kind of an attorney?

8   A      Real estate attorney.

9   Q      Now, before you became an FBI agent, did you go through

10  any sort of training?

11  A      Yes.  We went through six months of training.

12  Q      Where was that?

13  A      Quantico, Virginia.

14  Q      And what category did that training cover?

15  A      It covered defensive tactics, surveillance, legal,

16  intelligence.

17  Q      Could you tell the jury a little bit about your

18  surveillance training?

19  A      In surveillance, you spend several days learning how to

20  watch subjects, follow subjects, blend in with the surrounding

21  area, not bring attention to yourself.

22  Q      Why is it important that one not draw attention to one's

23  self during surveillance?

24  A      You don't want to be identified as a law enforcement

25  officer, nor do you want to alert the subject that they are

1   being watched.

2   Q    Now, directing your attention to March 19th, 2013, were

3   you working that day?

4   A    Yes.

5   Q    Did you have a particular assignment on March 19th, 2013?

6   A    Yes, I was supposed to assist in the arrest of Baslan and

7   Henry.

8   Q    Do you see Bebars Baslan in the courtroom today?

9   A    Yes.

10  Q    Can you indicate who he is, based on where he's sitting

11  and an article of his clothing?

12  A    Yes.  He's sitting to my right, in a suit.

13  Q    Can you tell what color tie he has on?

14        MR. SAVITT:  We'll concede the identification.

15        THE COURT:  Thank you, Mr. Savitt.

16        Go ahead.

17  Q    Now, did you have to go to any particular locations in

18  connection with the arrest of the defendant, Mr. Baslan, on

19  March 19th, 2013?

20  A    Yes.  I started off by going to Brooklyn, and then I

21  ended up in Jersey City.

22  Q    What did you do in Brooklyn?

23  A    In Brooklyn, I drove over with John and Aaron, and they

24  met with the CHS; I was sitting in the car watching.

25  Q    When you say John and Aaron, who are you referring to?

1   A    Agents John Robertson and Aaron Spivack.

2   Q    When you say CHS, who are you referring to?

3   A    The source.

4   Q    Do you remember the source's name?

5   A    Jack.

6   Q    Now, how did you get to the -- did you say you went to

7   Jersey City, New Jersey?

8   A    Yes.

9   Q    Where within Jersey City did you go?

10  A    The Hyatt Hotel.

11  Q    How did you get to the Hyatt?

12  A    We drove.

13  Q    Do you remember the approximate time that you arrived at

14  the Hyatt Hotel, on March 19th, 2013?

15  A    It was early evening, maybe around 6:00 p.m.

16  Q    Now, what, if anything, did you do once you arrived at

17  the Hyatt Hotel in Jersey City?

18  A    I went up to the lobby, and then I went all the way up to

19  the rooms where the agents were setting up.  As the evening

20  went on, then I went down to the parking lot area, and maybe

21  around 7:00 or 8:00, I went to the lobby, where I stayed for

22  the remainder of the night.

23  Q    To enter this plaintiff hotel, is the lobby on the floor

24  of the hotel that's the same as the street, or do you have to

25  take some sort of escalator or elevator to get to the lobby?

Roble - Direct - Demas                              307

1  A    You have to take an escalator up from the parking

2  structure to reach the lobby.

3           MR. SMITH:  I'm going to show the witness a series

4  of photographs marked Government Exhibit 22A, 22B, as in boy,

5  22J, as in Jacob, and 22I, as in igloo, and 22E as in egg.

6  Just for the witness only.

7           THE COURT:  A series of photographs, I take it?

8           MR. SMITH:  Yes, your Honor.

9           MR. SAVITT:  I've seen them.  I don't have an

10  objection.

11           THE COURT:  They're received into evidence on

12  consent.

13  (Government Exhibits 22A, 22B, 22J, 22I and 22E were received

14                        in evidence.)

15           MR. SMITH:  Can I publish?

16           THE COURT:  Yes, you may.

17  Q    So now looking at Government Exhibit 22B, can you explain

18  to the jury what's in this photograph?

19  A    This is the escalator leading up to the lobby of the

20  hotel.

21  Q    And did you take that escalator on the day that you went

22  to the Hyatt?

23  A    Yes, I did.

24  Q    Showing you Government Exhibit 22A, do you see that?

25  A    Yes.

NICOLE CANALES, CSR, RPR

Roble - Direct - Demas                                              308

1    Q    What is depicted in this photograph?

2    A    This is the lobby and the bar.  It's where I was sitting

3    for most of the night.

4    Q    Do you see this specific area where you were sitting for

5    the most of the night on this photograph?

6    A    Yes.

7    Q    Can you tough the screen in front of you to indicate

8    where that was?

9    A    Yeah.

10   Q    Should make a mark.

11   A    It's making one, your Honor.

12        THE COURT:  Touch it with gusto.

13   Q    Are you touching the chair, the back of which is second

14   closest to the --

15        MR. SMITH:  Might we be able to change the color to

16   pink or red so that it shows ups?

17   Q    From that seat in the lobby, what did you have a view of?

18   A    I had a view of the escalator coming into the lobby and

19   the elevators of the rooms.

20   Q    Can you sort of draw an arrow indicating the directions

21   of where the elevator was in relation to where you were

22   sitting?

23   A    Yes.  (Indicating.)

24   Q    Thank you.  And the escalator, as you said, was directly

25   in front of your chair?

Roble - Direct - Demas                                              309

1    A    Yeah.

2    Q    Or in the direction in front of your chair?

3    A    Yes.

4    Q    Now, while you were in the lobby, how were you dressed?

5    A    I was dressed in jeans, T-shirts, sneakers and a coat.

6    Q    Nothing identifying you as an FBI agent?

7    A    No.

8    Q    Was that intentional?

9    A    Yes.

10   Q    And what did you do once you sat in that chair in the

11   lobby?

12   A    I just pulled out my phone and pretended to watch my

13   phone, also waiting for the defendant.

14   Q    Were you waiting for the defendant or the defendant and

15   someone else for to arrive?

16   A    The defendant and Henry.

17   Q    Had you seen photographs of these two individuals prior

18   to going to the lobby of the Hyatt Hotel that day?

19   A    Yes.

20   Q    And do you have an understanding of what they looked

21   like?

22   A    Yes.

23   Q    Were you also given a description of their appearances by

24   either the case agent, Agent Spivack, or someone else?

25   A    Yes.

Roble - Direct - Demas                                310

1    Q    Now, did there come a point in time when you saw the

2    defendant and Kristen Henry enter the lobby?

3    A    Yes.

4    Q    From which direction did they enter the lobby?

5    A    They came from the direction of the escalator.

6    Q    And can you describe for the jury what you saw when the

7    defendant and Ms. Henry entered the lobby.  And, by the way,

8    did you see where they went once they entered the lobby?

9    A    Yes, they walked directly to the elevators.

10   Q    Did they make any stops along the way?

11   A    No.

12   Q    Now, how far away from the defendant and Ms. Henry were

13   you, at the closest point?

14   A    Maybe ten feet.

15   Q    You were ever able to see their faces?

16   A    Yes.

17   Q    Could you see their expressions?

18   A    Yes.

19   Q    Could you describe the expression on the defendant's face

20   first and then Ms. Henry's second?

21   A    The defendant was talking to Henry, and Henry was

22   smiling.

23   Q    Were you able to observe Ms. Henry's body language?

24   A    Yes.

25   Q    How would you describe that?

1    A    Nervous excitement.

2         THE COURT:  I'm sorry?

3         THE WITNESS:  Nervous excitement.  Because she was

4    walking quickly.  She was smiling, but she was stiff.  Her

5    arms were stiff, and her hands were fiddling.

6    Q    And what about Mr. Baslan?

7    A    I just remember that he was speaking to Henry.

8    Q    Did you observe any large objects in either of their

9    hands?

10   A    No.

11   Q    Did you observe whether Mr. Baslan was carrying any sort

12   of bag?

13   A    He had a bag over his shoulder.

14   Q    Now, did you participate at all -- once you saw these two

15   individuals enter the lobby from the escalator and go towards

16   the elevator, what, if anything, did you do with respect to

17   your fellow agents?

18   A    Once they got on the elevator, I called Agent Spivack and

19   notified him that they were on their way up.

20   Q    Did you participate at all in the physical arrest of

21   Baslan and Ms. Henry?

22   A    No.

23   Q    Did you have any other involvement in the case that

24   evening?

25   A    I was in the car when they drove Henry to the Brooklyn

Roble - Direct - Demas                               312

1   Detention Center.

2   Q    Was her demeanor different at that point than it was in

3   the lobby?

4   A    Yes.

5   Q    How so?

6   A    I would say she was depressed and quiet.

7   Q    Now, beyond the transportation of Ms. Henry to -- that

8   evening, did you have any further involvement in this case?

9   A    No.

10  Q    And I'm just going to walk you now through the rest of

11  the photographs.  This is 22J.  If you hit the bottom left

12  corner of your screen, it should take away that pink arrow.

13        Now, from here, can you point out the entrance to

14  the elevator area?

15  A    Yes.

16  Q    Putting up Exhibit 22.  I -- sorry.

17        MR. SMITH:  Can you delete that mark again.  Okay.

18  Q    And can you see the entrance to the elevator area from

19  here?

20  A    Yes.

21  Q    Where is it?

22  A    (Indicating.)

23  Q    Now 22E.  Can you tell me what we're looking at here?

24  A    This is a view from the seat I was sitting in, the left

25  seat, and that is the elevator bank.

Roble - Direct - Demas                                313

1    Q      I'm sorry.  Just in case, 22B, what is this?

2    A      This is the escalator going up to the lobby.

3                  MR. SMITH:  I have no further questions.

4                  THE COURT:  Any questions, Mr. Savitt?

5                  MR. SAVITT:  Very few.  Just a few.

6                  (Proceedings continued on following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. SAVITT:

3    Q     Agent Roble.

4    A     Yes.

5    Q     Did I get it right?  Good afternoon.  The photographs

6    that we just saw in the Government Exhibit 22A through E

7    series, are those hotel brochure photos or are they

8    surveillance photos?

9    A     They're a mix.  One is from the hotel brochure and a few

10   others were photographs, I think within the last week.

11   Q     Within the last week.  But nothing from March 19th of a

12   year and a half ago; right?

13   A     Right.

14   Q     Now, you told us that you saw my client and Ms. Henry

15   arriving at the hotel on March 19th; am I correct?

16   A     Yes.

17   Q     Of 2013, I'm sorry.

18   A     Yes.

19   Q     And that was sometime in the evening; am I right?

20   A     Yes.

21   Q     Approximately what, 9:00?

22   A     Approximately, yes.

23   Q     Were you the only agent seated in the lobby area of the

24   Hyatt in Jersey City?

25   A     Yes.

1   Q    And does the Hyatt's lobby offer spectacular views of

2   lower Manhattan and the Statue of Liberty?

3   A    Yes.

4   Q    But at some point, you had a view of my client and Ms.

5   Henry; right?

6   A    Yes.

7   Q    And you saw them talking to each other?

8   A    Yes.

9   Q    And my client, Mr. Baslan, was doing most of the talking?

10  A    Yes.

11  Q    And Ms. Henry appeared to be smiling and excited?

12  A    Yes.

13  Q    And my client appeared to talk and talk and talk; right?

14  A    Yes.

15  Q    Did you hear anything that they were saying to each

16  other?

17  A    No.

18  Q    How far away were they from you when you first saw them?

19  A    About 25 feet.

20  Q    And what was the closest that they came to you,

21  approximately?  I know you didn't measure this stuff.  You

22  know, the closest point.

23  A    About 10 feet.

24  Q    And at that time, was my client still speaking and

25  speaking?

1   A    Yes.

2   Q    But you still couldn't hear what they were saying?

3   A    No.

4   Q    There were other people in the lobby, I gather?

5   A    Yes.

6   Q    So there's a lot of noise and lot of people speaking?

7   A    Yes.

8   Q    And at some point they go into the elevator and go

9   upstairs and you alert Agent Spivack that they're here?

10  A    Yes.

11  Q    By your --

12  A    I called them.

13  Q    You did call them.  Now, in terms of your involvement in

14  this investigation, that's about your entire involvement in

15  your capacity as a surveillance agent that evening; am I

16  correct?

17  A    Yes.

18  Q    Were you also involved in the investigation of this case

19  subsequent to the evening of March 19th of 2013?

20  A    No.

21          MR. SAVITT:  Thank you very much.  No further

22  questions.

23          THE COURT:  All right.  Thank you, Ms. Roble.  You

24  may step down.  Next witness.

25          MR. SMITH:  The government calls Odessa Simms.

1           (Witness sworn.)

2           COURTROOM DEPUTY:  Thank you.  Please have a seat.

3    State and spell your name for the record.

4           THE WITNESS:  Odessa Simms, O-d-e-s-s-a S-i-m-m-s.

5           **ODESSA SIMMS,**

6           called by the Government, having been first duly

7    sworn, was examined and testified as follows:

8    DIRECT EXAMINATION

9    BY MR. SMITH:

10   Q    Good afternoon.

11   A    Good afternoon.

12   Q    Who do you work for?

13   A    Federal Bureau of Investigation.

14   Q    What's your title?

15   A    Intelligence analyst.

16   Q    Can you describe what an intelligence analyst does?

17   A    We provide both operational and analytical support for a

18   particular squad.  I am embedded on Squad C20, Crimes Against

19   Children.

20   Q    What kind of duties do you perform doing that job with

21   respect to that particular squad?

22   A    I do everything from data collection and analysis to

23   investigative support, things like assisting on search

24   warrants or doing checks for particular subjects.

25   Q    What is Squad C20?

SIMMS - DIRECT / SMITH                      318

1   A    Crimes Against Children.

2   Q    What did you do before joining the FBI?

3   A    I was a college professor.

4   Q    What subject?

5   A    I was in the math department, teaching statistics, and

6   the criminal justice department, teaching a variety of

7   courses.

8   Q    What's your educational background?

9   A    I have a Ph.D. in criminal justice and forensic

10  psychology.

11  Q    During the course of your time working at the FBI -- how

12  long have you been an intelligence analyst at the FBI?

13  A    It will be five years in September.

14  Q    During that time, have you participated in the execution

15  of search warrants?

16  A    Yes, I have.

17  Q    Did you receive training at some point from the FBI in

18  the execution of search warrants?

19  A    I did.

20  Q    Approximately how many searches have you been involved

21  in?

22  A    Approximately 20 to 30.

23  Q    Did you participate in the execution of a search warrant

24  on March 19th, 2013?

25  A    Yes, I did.

1  Q    Where was that?  What was the address at which that

2  search warrant was executed?

3  A    I believe it was 1153 Ocean Parkway, Brooklyn, New York.

4  Q    Do you know whose residence that was?

5  A    Bebars Baslan and Kristen Henry.

6  Q    Now, on that day, March 19th, can you describe what you

7  did immediately prior to the execution of that warrant?

8  A    We did what was called a briefing in our squad area in

9  the office, where we received information from the case agent

10 regarding the search.

11 Q    Was there a plan with respect to the timing of that

12 search warrant?

13 A    Yes, there was.

14 Q    What was that plan?

15 A    Once Bebars Baslan and Kristen Henry were in custody with

16 the case agent, we were allowed to go into the entrance and

17 execute the search.

18 Q    Approximately how many agents were going to be involved

19 in that search?

20 A    I believe there was approximately seven agents.

21 Q    After you received that briefing from the case agent, did

22 you at some point go to a site near the location that you

23 intended to search?

24 A    Yes.

25 Q    And what did you do then?

1    A    We waited for a phone call from the case agent.

2    Q    Did you at some point receive a notification from the

3    case agent?

4    A    Yes, we did.

5    Q    Was that an indication that Bebars Baslan and Kristen

6    Henry had been taken into custody?

7    A    Yes.   The case agent called the search team leader and

8    said that both were in custody and we were allowed to enter

9    the premises.

10   Q    Do you remember approximately when that was on March 19?

11   A    Approximately 10:45 that evening.

12   Q    What did you do after the team leader received that

13   notification?

14   A    We attempted to enter the apartment.

15   Q    What steps did you take to attempt to enter the

16   apartment?

17   A    There was a push key lock on the door.  You had to enter

18   in a code.  So we didn't have the code so we had to call back

19   the case agent, and then we tried the code that he provided

20   us.

21   Q    Did you ultimately get into the apartment?

22   A    We did.

23   Q    And what was the first step that was taken after you

24   gained entry to 1153 Ocean Parkway?

25   A    We took what are called entry photos, to present how the

1   apartment looked prior to us conducting a search.

2   Q    Why do you do that?

3   A    To document how we find the location.

4   Q    Do you do anything else as a standard practice in the

5   beginning of a search to memorialize where -- what the place

6   you're searching looks like?

7   A    We also label the rooms, either numerically or

8   alphabetically, so each person involved in the search is

9   identifying each room or area consistently.

10  Q    Do you prepare a document that shows those labels?

11  A    Yes, we do.  A sketch is conducted at the same time the

12  entry photos are being taken.

13  Q    Was a sketch prepared in connection with this search?

14  A    Yes.

15       MR. SMITH:  I'd like to show just the witness

16  Government Exhibit 24.

17       COURTROOM DEPUTY:  24.  Okay.

18  Q    Dr. Simms, do you see that up there?

19  A    I do.

20  Q    Do you recognize Government Exhibit 24?

21  A    Yes.

22  Q    What is it?

23  A    It's a sketch of 1153 Ocean Parkway.

24  Q    And does that generally represent where the rooms in that

25  residence were located?

1   A    Yes.

2          MR. SMITH:  The government offers Government Exhibit

3   24.

4          MR. SAVITT:  No objection.

5          THE COURT:  24 in evidence.

6          (Government Exhibit 24 received in evidence.)

7          MR. SMITH:  Publish to the jury.

8          (Exhibit published to the jury.)

9   Q    Can you identify, Dr. Simms, where on that sketch the

10  entrance is?

11  A    In the bottom right corner, I'm not sure if you can read

12  the words, but it says "front door."  Yes, you just underlined

13  it.  That's where the front entrance is.

14  Q    And as proceed into the space, what's the first room that

15  you get to?  What's the room that is marked A?

16  A    It was an office area.  There's a desk with some

17  electronic equipment on it.

18  Q    And what's next as you go farther back into the

19  residence?

20  A    What's represented by the letter D was what we designated

21  the dining room area.  There's a dining room table up against

22  the wall.  And as you keep working your way back, the upper

23  case B is the living room.  There's a couch and a TV stand.

24  And the lower case b was sort of a hallway that led back

25  towards the kitchen.  And the -- I believe it's a letter D,

1   and then there's another what appears to be a room underneath

2   it that was a closet, and D is the bathroom.

3           And I apologize, I misspoke before.  The uppercase B

4   is actually where you get into the kitchen.  And then the back

5   room, which was designated by the letter C, is the bedroom.

6   Q    And is this drawing to scale?

7   A    No.

8   Q    It's just a rough representation of the space?

9   A    Yes.

10  Q    After somebody creates a sketch and the entry photographs

11  are taken, what's the next step?

12  A    We usually split up into pairs, depending on the size of

13  the location, and we begin the search.

14  Q    And what were you looking for in this case?

15  A    In this case, it was electronic devices, anything that

16  could store digital media.

17  Q    With respect to this search, do you remember if you broke

18  up into pairs or if you searched individually?

19  A    We broke up into pairs.

20  Q    After you break up into pairs to conduct the search, are

21  certain agents responsible for different portions of the

22  residence?

23  A    Yes.

24  Q    And are there specific procedures that you use if someone

25  sees an item that they believe should be seized as evidence?

SIMMS - DIRECT / SMITH                                    324

1   A    Yes.

2   Q    What are the procedures?

3   A    We notify the search team leader that something of

4   interest may have been found, take a picture of it exactly

5   where it was found.  And then if it's not a clear view of the

6   item, we will move it to get a clear picture of the item as it

7   looks in the state that we found it.  And then we'll give it

8   to the search team leader and they will tag it and log it on a

9   receipt.

10  Q    In connection with this search, did you actually search

11  yourself?

12  A    I did.

13  Q    And were you involved in the process of logging items

14  that were seized by other agents?

15  A    Yes, I was.

16  Q    And did you see all of the items that were seized at 1153

17  Ocean Parkway on that occasion?

18  A    Yes, I did.

19  Q    I'd like to show you a few items.  I just brought over

20  Government Exhibits 26 and 27.  Can you take a look at those?

21  A    (Witness complies.)

22  Q    Do you recognize Government Exhibit 26?

23  A    Yes.

24  Q    What is it?

25  A    It is an Apricorn encrypted hard drive.

SIMMS - DIRECT / SMITH                          325

1  Q    Let's make sure we're talking about the right one.

2       Where did you first see that item?

3  A    On the desk in the office area.

4  Q    Of 1153 Ocean Parkway?

5  A    Yes, I'm sorry.

6       MR. SMITH:  The government offers Government Exhibit

7  26.

8       MR. SAVITT:  No objection.

9       THE COURT:  Received.

10      (Government Exhibit 26 received in evidence.)

11 Q    Now, looking at it now, is it in the same condition as

12 when you found it?

13 A    No, it is not.

14 Q    What was the condition when you found it?

15 A    It was fully intact and inside the case that's in this

16 bag.

17 Q    And what condition is it in now?

18 A    It looks like it's in about three pieces and outside of

19 the case, but the case is inside the bag.

20 Q    And Government Exhibit 27, have you seen that before?

21 A    Yes, I have.

22 Q    Where did you see it?

23 A    This was underneath the desk at 1153 Ocean Parkway.

24      MR. SMITH:  The government offers Government Exhibit

25 27.

SIMMS - DIRECT / SMITH                        326

1          MR. SAVITT:  No objection.

2          THE COURT:  Received.

3          (Government Exhibit 27 received in evidence.)

4   Q    Government Exhibit 27, what is that?

5   A    That is an Apple desktop computer.

6          MR. SMITH:  If I can publish for the jury on that

7   document camera Government Exhibit 26 in evidence.

8          (Exhibit published to the jury.)

9   Q    And this was not in pieces the last time you saw it, is

10  that what you said?

11  A    Correct.

12         MR. SMITH:  If I can show just the witness -- I'm

13  sorry, this is in evidence, Government Exhibit 28.

14  Q    Dr. Simms, have you seen that before?

15  A    Yes, I have.

16  Q    Where did you see it?

17  A    I found it on the dining room table of 1153 Ocean

18  Parkway.

19  Q    And for the record, what is it?

20  A    It's a receipt from Walgreens.

21         MR. SMITH:  And if I can show just the witness, I'm

22  putting up Government Exhibit 29.

23  Q    Dr. Simms, can you see that up there?

24  A    Yes, I can.

25  Q    And do you recognize Government Exhibit 29?

SIMMS - DIRECT / SMITH                               327

1   A    Yes.

2   Q    And what do you recognize it to be?

3   A    A printout from B&H Photography for the Apricorn

4   encrypted hard drive.

5   Q    Where have you seen that before?

6   A    It was also on the desk at 1153 Ocean Parkway.

7   Q    This particular piece of paper?

8   A    Yes.

9        MR. SMITH:  The government offers Government Exhibit

10  29.

11       MR. SAVITT:  No objection.

12       THE COURT:  29 in evidence.

13       (Government Exhibit 29 received in evidence.)

14  Q    I've handed you Government Exhibit 30, which is in

15  evidence.  Do you recognize that?

16  A    Yes, I do.

17  Q    Where have you seen it before?

18  A    It was on the coffee table of 1153 Ocean Parkway.

19  Q    Was that seized during the search?

20  A    Yes, it was.

21  Q    And were the other items that we've looked at seized

22  during the search on March 19, 2013?

23  A    Yes, they were.

24  Q    Now, in addition to the items that we just looked at,

25  were more electronics seized?

SIMMS - DIRECT / SMITH                    328

1    A    Yes.

2    Q    Dr. Simms, we're giving you a box which has been

3    designated as Government Exhibit 31.  Can you take a look

4    through that.

5    A    (Witness complies.)

6    Q    Do you recognize the items that are in Government Exhibit

7    31?

8    A    Yes, I do.

9    Q    Where do you recognize them from?

10   A    They were also seized from 1153 Ocean Parkway, various

11   locations.

12          MR. SMITH:  The government offers Government Exhibit

13   31.

14          MR. SAVITT:  No objection.

15          THE COURT:  Received.

16          (Government Exhibit 31 received in evidence.)

17   Q    Dr. Simms, for the record, I'd just like to go through

18   what we looked at in Government Exhibit 31.  I'm just going to

19   hold up a certain piece.  Do you recognize that?

20   A    Yes.

21   Q    What is it?

22   A    It's a Compac laptop.

23   Q    (Displaying.)

24   A    That's an Apple TV.

25   Q    (Displaying.)

SIMMS - DIRECT / SMITH                    329

1  A    I believe it's a charger.

2  Q    (Displaying.)

3  A    Hard drives.  Yes, looks like several hard drives.

4  Q    Hard drives that would fit into a computer of some sort?

5  A    Yes.

6  Q    (Displaying.)

7  A    A video camera.  Sorry, I can't quite see.  Sony video

8  camera.

9  Q    (Displaying.)

10 A    It looks like memory cards and a few thumb drives.

11 Q    (Displaying.)

12 A    It looks like an external hard drive and one hard drive

13 that would fit inside of a computer.

14 Q    (Displaying.)

15 A    I believe that's an iPad case with a keyboard inside.

16 Q    (Displaying.)

17 A    An iPad.

18 Q    (Displaying.)

19 A    And another iPad.

20 Q    (Displaying.)

21 A    I believe another hard drive.

22 Q    (Displaying.)

23 A    Also a hard drive.

24 Q    (Displaying.)

25 A    Those are -- I believe they are hard drives.  I know

SIMMS - DIRECT / SMITH                    330

1    they're media storage devices.

2    Q    (Displaying.)

3    A    I believe that's also a hard drive of some sort.

4    Q    Is that maybe more clear?

5    A    Or maybe an SD card reader.

6    Q    (Displaying.)

7    A    That's a hard drive also.

8    Q    (Displaying.)

9    A    Another hard drive.

10   Q    (Displaying.)

11   A    Apple TV.

12   Q    (Displaying.)

13   A    It's a disk drive for a computer, DVD writer.

14   Q    (Displaying.)

15   A    It's a hard drive, and there are a few iPhones and I

16   believe an iPod.

17   Q    (Displaying.)

18   A    I believe that was a hard drive also.

19   Q    (Displaying.)

20   A    A digital camera.

21   Q    (Displaying.)

22   A    It's a hard drive.

23   Q    And those were all part of Government Exhibit 31.  As you

24   said, those were all seized from 1153 Ocean Parkway?

25   A    Yes, they were.

SIMMS - DIRECT / SMITH                331

1   Q    Now, as part of your procedure, after the entry

2   photographs are taken, what additional photographs are taken?

3   A    Any items that we intend to seize are included in the

4   photographs, and then after that exit photographs are taken

5   once we complete the search.

6   Q    I'm going to hand you what's been marked as Government

7   Exhibits 25A through 25YY.

8   A    (Reviewing.)

9   Q    Do you recognize this?

10  A    Yes, I do.

11  Q    What are they?

12  A    These are the photos from beginning entry photos to

13  evidence seized to exit photos of the search of 1153 Ocean

14  Parkway.

15          MR. SMITH:  The government offers 25A through 25YY.

16          THE COURT:  Any objection?

17          MR. SAVITT:  No, Your Honor.

18          THE COURT:  All right.  Received.  I hope we're not

19  going through every one of them.

20          MR. SMITH:  No, Your Honor.

21          (Government Exhibits 25A through 25YY received in

22  evidence.)

23  Q    I'm going to put up 25A.  What's that?

24  A    It's a picture of the front door from the outside of 1153

25  Ocean Parkway.

1  Q    And I just want to direct your attention to just above

2  the doorknob there.  What is that?

3  A    That is the push key combination lock.

4  Q    And are the ones that we're looking at now the entry

5  photographs?

6  A    Yes.

7  Q    And as you look through them, are they in the order that

8  you described, entry photographs, photographs of evidence

9  seized, and then photographs of the exit?

10 A    Yes.

11 Q    Let me show you 25D.  (Displaying.)  What is that of?

12 A    That's the office area immediately to the left as soon as

13 you walk in the front door.

14 Q    And can you describe, looking at 25D, do you see the site

15 that any of the items that we were just looking at were

16 seized?

17 A    Yes.

18 Q    What items do you see?

19 A    I can see the Apple desktop computer, and I can see the

20 surface where a lot of the hard drives and memory cards and

21 such were seized.  They were on top of the desk.

22 Q    And where in the residence is this located?

23 A    It's immediately to the left after you walk in the front

24 door.

25 Q    25E, can you just describe what that's looking at?

SIMMS - DIRECT / SMITH                    333

1  A    So the office area would be to your left.  It's looking

2  into the living room, what we labeled the dining room, and the

3  dining room table is on your right.  And as you proceed

4  walking straight ahead, you would be heading towards the

5  kitchen and eventually the bedroom.

6  Q    Jumping forward to 25I, what's that?

7  A    It's the right side of the kitchen.

8  Q    And 25J?

9  A    That's depicting the other side or the left side of the

10 kitchen.

11 Q    What is 25M?

12 A    It's the left side of the bedroom.

13 Q    25N?

14 A    That was towards the right side of the bedroom as soon as

15 you walk in the door.

16 Q    Do any of the photographs that I showed you, did those

17 photographs also have accidental photos?

18 A    Yes.

19 Q    Why does the FBI not delete photos that are accidentally

20 taken during a search?

21 A    There are no photos deleted during the search.  Nothing

22 is altered at the time of the search.

23 Q    Let me show you 25R.  What does that depict?

24 A    That's the left side of the desk.  So if you were seated

25 at the desk, it would be the area on the left.  It's just

1    above the Apple desktop that was seized.

2    Q    And have we now moved in to the photographs depicting

3    items that were seized?

4    A    Yes.

5    Q    Were the electronics items in this photo seized?

6    A    Yes.

7    Q    I show you 25S.  What's that in the center of the

8    photograph, the black object?

9    A    That is the Apricorn encrypted hard drive inside the

10   case, and it's on top of the desk.

11   Q    That was the hard drive a moment ago with the keypad?

12   A    Yes.

13   Q    And 25T, what does that depict?

14   A    There's a few hard drives on the right side of the screen

15   underneath that shelf, and there are some CDs as well as a

16   memory card and a thumb drive on top of the shelf.

17   Q    25U, what does that depict?

18   A    To the left of the -- bottom left of the screen, there's

19   a thumb drive and I believe three memory cards, and to the

20   right there's a memory card reader and I believe another hard

21   drive is a little bit behind that.

22   Q    25V?

23   A    Is the desktop Apple computer that was seized, and it had

24   a thumb drive as well as an AirCard sticking out of it.

25   Q    What's an AirCard?

SIMMS - DIRECT / SMITH                        335

1   A    It's a device used to access the Internet, usually like

2   through a mobile network or something like that.

3   Q    And are those the devices in the front of that?

4   A    Yes.

5   Q    I show you 25X.  What does that depict?

6   A    That's the Walgreens receipt that was found on the dining

7   room table.

8   Q    25AA?

9   A    It's the printout from B&H Photo for the encrypted hard

10  drive, the Apricorn encrypted hard drive.

11  Q    And where was that?

12  A    That was on top of the desk.

13  Q    25BB?

14  A    The Apple laptop computer.  It was found on the coffee

15  table in the living room.

16  Q    25EE?

17  A    This was a basket that was found on the shelf underneath

18  the TV stand in the living room.  It had a bunch of electronic

19  devices inside it.

20  Q    25FF?

21  A    Those are all the items that were contained in that

22  basket.

23  Q    Are those items that we looked at in Government Exhibit

24  31?

25  A    Yes.

1    Q      25GG?

2    A      These were also underneath the TV stand.

3    Q      25KK?

4    A      It's a group of hard drives and a group of -- on the

5    upper left-hand side of the picture, and then immediately next

6    to that in the plastic bag were a bunch of memory cards and

7    thumb drives.  They were all contained in that Ziploc bag, the

8    larger Ziploc bag you see.

9    Q      And moving on to 25MM, what's that?

10   A      That is the left side of the bedroom, and it's the

11   beginning of our exit photos.

12   Q      I show you 25UU.

13   A      That's the office area and another exit photo.

14   Q      25XX?

15   A      That's a copy of the search warrant as well as a receipt

16   listing any items that were seized that was left on the dining

17   room table.

18   Q      Why do you leave a copy of the search warrant and

19   receipt?

20   A      We always provide a copy of the search warrant and

21   receipt to document why we came in and what it is that we left

22   with.

23   Q      And 25YY?

24   A      It's the exit photo of the front door.  So that was the

25   final photo we took.

1   Q    Dr. Simms, after the search is complete and you've

2   collected the evidence, after it was complete in this case,

3   what happened to the evidence?

4   A    We secured it in our office area, and then the next

5   morning we secured it in our evidence vault.

6   Q    And were you involved in securing it in the evidence

7   vault?

8   A    Yes, I was.

9   Q    And after that evidence was secured in the evidence

10  vault, did you have any involvement in searching the

11  electronic data on any of that evidence?

12  A    No, I did not.

13         MR. SMITH:  No further questions, Your Honor.

14         MR. SAVITT:  No cross-examination.

15         THE COURT:  Thank you very much.  Thank you.  You

16  may step down.  Anything else?

17         MR. SMITH:  The government calls Stephen Flatley.

18         (Witness sworn.)

19         COURTROOM DEPUTY:  Please have a seat.  State and

20  spell your name for the record.

21         THE WITNESS:  My name is Stephen Flatley,

22  S-t-e-p-h-e-n, Flatley, F-l-a-t-l-e-y.

23         STEPHEN FLATLEY,

24         called by the Government, having been first duly

25  sworn, was examined and testified as follows:

1  DIRECT EXAMINATION

2  BY MR. SMITH:

3  Q     Good afternoon.

4  A     Good afternoon.

5  Q     Could you tell the jury what you do for a living?

6  A     I'm a computer forensic examiner for the Federal Bureau

7  of Investigation, New York Division.

8  Q     And as a computer forensic examiner, what are your duties

9  and responsibilities for the FBI?

10  A     I collect and process digital evidence.

11  Q     What does digital evidence include?

12  A     It includes computers, cell phones, digital cameras, CDs,

13  DVDs, thumb drives, things of that nature.

14  Q     Can you tell the jury your educational background?

15  A     Yes.  I have a bachelor's from Boston College in business

16  and computer science, and training from the FBI.

17  Q     Could you explain that training that you received from

18  the FBI?

19  A     Over the course of approximately a year and a half, I was

20  certified to do the basic forensics on the Windows and Intel

21  systems, your basic Windows systems, then subsequently got

22  certified in cell phones and Macintosh systems.

23  Q     And how long have you been a computer forensic examiner

24  for the FBI?

25  A     For nine years.

1   Q    Can you explain the kind of I guess maybe programs that

2   you use to process evidence as a computer forensic examiner,

3   just a brief overview; then I'll ask you some additional

4   questions.

5   A    A brief overview, the main tool that we use is a program,

6   it used to be called FTK or Forensic Toolkit.  It has now been

7   changed to AccessData Lab or AD Lab, which categorizes and

8   displays various programs and data files that are found on

9   most computers.

10          We also use a tool called FTK Imager, which makes

11  forensic copies of the data.  There's other things for

12  Macintosh systems like BlackLight and Lantern, which is

13  another program for iPhones.

14  Q    Now, did you receive any sort of certifications through

15  the FBI for any of these forensic processing tests or

16  processes?

17  A    Certification, the certification is for the overall

18  platforms.  So it would be a certification to examine Windows

19  and Intel systems and Macintosh systems and cell phones.

20  Q    And did you receive those certifications?

21  A    Yes, I did.

22  Q    Now, I want to start with iPhones.  Can you give the jury

23  just a sort of like forest for trees description of how you go

24  about processing iPhones forensically?

25  A    Forensically.  Processing cell phones forensically is a

1    little different than processing regular computers, because we

2    cannot remove the memory from the cell phone and process it

3    separately like you do in a computer.  So we are forced to

4    interact with the cell phone through its operating system.

5              So, for that reason, we can't -- basically, every

6    time we turn the thing on, we change it a little bit.  We

7    don't alter the contents, but there might be something in

8    there in the operating system that's going to change.  The

9    time will change, other things will change in it, and there's

10   no getting around that, unfortunately.

11             We can circumvent that with computers by removing

12   the hard drive and copying it separately, but we can't do that

13   with cell phones and iPhones.

14   Q    Now, did you receive physical evidence that was seized as

15   part of the investigation of the defendant, Bebars Baslan, to

16   review?

17   A    Yes, I did.

18   Q    And were two of the items that you received an iPhone 4

19   and an iPhone 5?

20   A    Yes, I did.

21   Q    I'm showing you what's been entered into evidence as

22   Government Exhibits 13 and 19.  I just want you to take a look

23   at those and tell me if you recognize them and, two, if you

24   processed them.  You can open them up if you need to.

25   A    All right.  (Reviewing.)  Yes, I processed these phones.

FLATLEY - DIRECT / DEMAS                    341

1  Q    And can you tell the jury, Government Exhibit 13, which
2  iPhone is that one?
3  A    This is the defendant's.
4  Q    And Government Exhibit 19, which one is that one?
5  A    This belonged to Ms. Henry.
6         THE COURT:  These have both been previously
7  received?
8         MR. SMITH:  Yes, Your Honor.
9  Q    Now, starting first with the defendant's iPhone,
10 Government Exhibit 13 --
11        MR. SMITH:  Can I have the document camera activated
12 for the jury?
13 Q    Did you do anything to this device to sort of mark it, to
14 keep track of it, so you knew what you were processing?
15 A    Yes.  Every piece of evidence that I process, I put two
16 stickers on.  One is a unique number with a bar code on it
17 which begins with the letters NY, and the second is a sticker
18 that has the case number and the date and my initials.
19 Q    So actually, I'm going to reverse.  Starting with
20 Government Exhibit 19, which is the Henry iPhone, can you tell
21 the jury what these bar codes represent?
22 A    Yes.  That bar code at the top there which begins with NY
23 is the unique number that I assign the item.  And then the
24 sticker below it is the case number and reflects that number,
25 the unique number I gave it, the date and my initials.

SHERRY BRYANT, RMR CRR

FLATLEY - DIRECT / DEMAS                    342

1   Q    And what is the unique number that was given to

2   Government Exhibit 19?

3   A    NY0013909.

4   Q    And for Government Exhibit 13, what was the unique number

5   that was given to that iPhone?

6   A    NY0013908.

7   Q    And 909, what kind of an iPhone is this?

8   A    That is an iPhone 5.  That's 908.  909 is an iPhone 4S.

9   Q    I'm sorry.  909 is which one?

10  A    That's an iPhone 4S.

11  Q    Okay.  And 908 is an iPhone 5?

12  A    Yes, ma'am.

13  Q    Did you do anything to process these two IPhones,

14  Government Exhibits 13 and 19, the ones known to you with the

15  FBI numbers 909 and 908?

16  A    Yes.  I ran a program against them called Lantern, and

17  subsequently I ran another program against them called

18  BlackLight.

19  Q    So could you explain, starting with Lantern, what you did

20  to process these two phones?

21  A    It's very simple.  You bring up the Lantern program on a

22  Macintosh computer.  You plug the phone into -- while it's on

23  into the computer, and you hit the acquire, and it brings the

24  phone in and processes it, parses out things so that you can

25  make heads or tails of what the stuff is.

1  Q    Now, when you ran these two iPhones, Government Exhibits

2  13 and 19, through Lantern, did you generate some sort of

3  report?

4  A    Yes, I did, an HTML-based report, which is like a common

5  web page.

6  Q    Did you generate one or two reports?

7  A    I generated one per phone.

8  Q    So two total?

9  A    Yes, ma'am.

10 Q    And once you generated those two reports, did you save

11 them on any sort of digital media?

12 A    Yes.  They were saved to either CD or DVD, I can't recall

13 which, however large they were.

14       MR. SMITH:  I'm showing the witness what's been

15 marked as Government Exhibits 42 and 44.

16 Q    Agent Flatley, do you recognize these two CDs or DVDs?

17 A    Yes.  These are DVDs that I created, one a report for

18 13909, which was the iPhone 4S, and 13908, which was the

19 iPhone 5.

20 Q    Did you create both of these disks using the Lantern

21 program?

22 A    Yes, I did.

23 Q    Is the Lantern program reliable?

24 A    Yes, it is.

25       MR. SMITH:  The government moves Exhibits 44 and 42

FLATLEY - DIRECT / DEMAS                    344

1   into evidence.

2          MR. SAVITT:  I don't believe I have an objection,

3   but may I confer just a moment?

4          THE COURT:  Yes, go ahead.

5          (Pause.)

6          MR. SAVITT:  No objection.

7          THE COURT:  42 and 44.  Now, is this 44 and 42,

8   period, or 44 and 42 with corresponding letters?

9          MR. SMITH:  There will be corresponding sections

10  that I pulled off of these, but this is the entire download,

11  so I'm moving these into evidence.

12         THE COURT:  Okay.  They're now in evidence.

13         (Government Exhibits 42 and 44 received in

14  evidence.)

15  Q    Now, was there certain information that the Lantern

16  downloads did not, for whatever reason, capture?

17  A    Yes.  For lack of a better term, it did not -- was not

18  able to parse out the voice memos that were on either phone.

19  Q    What are voice memos?

20  A    It's a recording that somebody makes to remind themself

21  of something, just to take a note instead of writing something

22  down.  You just hit a voice memo and record something to

23  remind yourself.

24  Q    Is it sort of like a Dictaphone, but not -- obviously,

25  newer than that?

FLATLEY - DIRECT / DEMAS                    345

1   A    Yes.

2   Q    Now, did you run these iPhones through any additional

3   programs besides Lantern?

4   A    Yes.  Subsequent after that, I ran it through a program

5   called BlackLight, and BlackLight was able to parse out those

6   voice memos.

7   Q    And once you -- and by the way, these two iPhones that we

8   looked at before, Government Exhibits 13 and 19, after

9   processing them the first time with Lantern, what did you do

10  with them?

11  A    They were returned to the case agent.

12  Q    And in order to process these again with BlackLight, what

13  did you have to do with respect to these phones?

14  A    I had to bring them back, had to charge them up and

15  examine them.

16  Q    So is it correct that the only two times that you ever

17  turned these two phones on was once to run Lantern and once to

18  run BlackLight?

19  A    Yes, ma'am.

20  Q    And in between those times, the phones you had returned

21  to evidence, some sort of storage locker or vault?

22  A    Yes, ma'am.

23  Q    Now, once you ran BlackLight, did you generate an

24  additional report?

25  A    Yes, from BlackLight.

FLATLEY - DIRECT / DEMAS                           346

1   Q    And did you generate one of those for each phone?

2   A    Yes, ma'am.

3   Q    Showing you what's been marked for identification as

4   Government Exhibits 43 and 47, do you recognize these?

5   A    Yes, I do.  These are the BlackLight reports that I

6   generated for the two phones.

7   Q    And that's for the iPhone 4 and the iPhone 5; correct?

8   A    Yes, ma'am.

9   Q    And did you use the BlackLight software to generate these

10  two reports?

11  A    Yes, ma'am.

12  Q    And is the BlackLight software, does it create an app --

13  excuse me, an accurate representation of what was on the

14  iPhone?

15  A    Yes, it does.

16  Q    It doesn't change anything that's on the iPhone, does it?

17  A    No, ma'am.

18          MR. SMITH:  The government moves Exhibits 43 and 47

19  into evidence.

20          MR. SAVITT:  No objection, Your Honor.

21          THE COURT:  Received.

22          (Government Exhibits 43 and 47 received in

23  evidence.)

24  Q    Now, I'd like to ask you about specific things.  Once you

25  did these reports for the iPhones, once you ran these reports,

1    the BlackLight and the Lantern, what exactly do you get to see

2    on a computer?

3    A    Uh, and...

4    Q    How does the information come out, I guess is what I'm

5    asking?

6    A    It's displayed on the screen.  When we run the report, it

7    puts it into an HTML format, which looks like a web page.

8    Q    I'm showing you what's been marked as a subset of

9    Government Exhibit 43, which is in evidence, Government

10   Exhibit 43A.  Can you tell me what we're looking at here?

11   A    This is the BlackLight report that I generated for New

12   York 13908, which I believe is the iPhone 5.

13   Q    I'm going to show you the second page, Government Exhibit

14   43B.

15   A    Yes.  That's the iPhone 5.

16   Q    And that's a phone seized from the defendant, Mr. Baslan?

17   A    Yes, ma'am.

18   Q    And what information does BlackLight give you about the

19   phone, in terms of the page that we're looking at now?

20   A    In the page we're looking at now, it gives you the serial

21   number, the phone number associated with it, the IMEI or the

22   International Mobile Equipment Identifier, which is tantamount

23   to another serial number for the phone.

24   Q    Does it also give you the phone number associated with

25   that phone?

FLATLEY - DIRECT / DEMAS                348

1   A    Yes.  It's down right below the Wi-Fi address.

2   Q    Can you read that for the jury, the phone number?

3   A    The phone number is (646)288-3317.

4   Q    Now, were you able to pull contacts off of the BlackLight

5   report of the iPhone that was seized from the defendant, Mr.

6   Baslan?

7   A    Yes, I was.

8   Q    Okay.  I'm showing you -- and for the record, this has

9   been redacted to take out address information and the last

10  name, but is this otherwise an accurate representation of

11  contact information that you pulled out of the BlackLight from

12  Mr. Baslan's phone?

13  A    Yes, it is.

14  Q    Can you read the first name of that contact?

15  A    It says Andrea.

16  Q    And in the note section here, is there a good deal of

17  information for that particular contact?

18  A    Yes, there is.

19  Q    And in the note section, does that actually go onto

20  another page?

21  A    Yes, it does.

22  Q    Now, I'm putting up on the document camera what's been

23  marked as 43I, and this is also a subset of the BlackLight

24  report that's in evidence.  Can you tell me what we're looking

25  at here?

1    A    It's a contact for a person with the first name of

2    Cortney.

3    Q    Is Cortney spelled in a particular way here?

4    A    I'm sorry, my eyes aren't as good as they used to be.

5    It's spelled C-o-r-t-n-e-y.

6    Q    And is there also information that was in the note

7    section that's been redacted with those boxes?

8    A    Yes, ma'am.

9    Q    Now, looking at Government Exhibit 43K.  I'm sorry, do

10   you mind hitting the left corner of your screen that says

11   clear to take away that pink arrow?  Thank you.

12   A    Sorry about that.

13   Q    Can you tell me what we're looking at here with respect

14   to the BlackLight report of the defendant's telephone?

15   A    This is a text message from Kristen Henry.

16   Q    To whom?

17   A    To the defendant.

18   Q    And could you explain for the jury how this works.  Is it

19   in chron order from top to bottom or bottom to top?

20   A    It goes from bottom to top.

21   Q    I'm sorry, the top, what is the timestamp on the top

22   message?

23   A    I'm sorry, it goes from top to bottom, from earliest to

24   latest.

25   Q    Now, the iMessage that appears at the top of this screen,

1  do you see the timestamp?

2  A    Yes.  It's --

3  Q    What does it say?

4  A    It says 21:42:52 UTC.

5  Q    What is UTC?

6  A    UTC is Universal Time Code.  It used to be called

7  Greenwich Mean Time.

8  Q    And how do you translate Universal Time Code to eastern

9  time?

10 A    You subtract -- for this time frame, you would subtract

11 four hours.  During daylight savings time, you subtract five.

12 Q    And did you, before coming here today, check when

13 daylight savings time occurred in 2013?

14 A    Yes, I did.

15 Q    Okay.  And it was before this date of March --

16 A    Correct.

17 Q    -- 19th?  Now, can you explain for the jury what these

18 messages reflect?  The first one that shows up, it looks like

19 a little squiggly.  What does that mean?

20 A    The squiggly actually, if you look at it, it actually

21 says OBJ, which is object.  So it's sending an object, and the

22 object is reflected in the message below, which is that

23 picture.

24 Q    Sorry.  And could you just please translate for the jury

25 what 21:42 is, in terms of eastern time?  I know you said

1   subtract four, but just explain to them what that math leads

2   us to.

3   A    So that would be 21:42 minus four hours would be 17:42,

4   which is 5:00.

5   Q    5:42 p.m.?

6   A    5:42, yes.

7   Q    I'm sorry.  So you were saying that it sent an object and

8   the object is actually the photograph?

9   A    Correct.

10  Q    And what is that photograph of?  Let me zoom in.  Sorry.

11  A    It's children's Benadryl and children's Nyquil.

12  Q    And who sent that photograph to the defendant, or which

13  phone?

14  A    Kristen Henry.

15  Q    What's the message -- can you read the timestamp of the

16  message that's right after the one that was sent at 5:42 p.m.

17  on March 19th, 2013?

18  A    It's 5:49 p.m. eastern time.

19  Q    And what does that text message say?

20  A    That text message says:  "Sorry, meant to send that pic

21  to my sister."

22  Q    What's a pic?

23  A    Vernacular for picture.

24  Q    And on the final text on this page, who sent that text

25  message or iMessage?

FLATLEY - DIRECT / DEMAS                    352

1   A     The sender was self, which is the defendant.

2   Q     And what's the timestamp on that message?

3   A     It's 5:50 p.m.

4   Q     And what does that text say?

5   A     It says:  "Okay."

6              THE COURT:  I take it you're going to be a few more

7   minutes with this gentleman?

8              MR. SMITH:  More than a few, Your Honor, yes.

9              THE COURT:  So we'll call it a day.  We'll see him

10  in the morning.  We'll see all of you in the morning.  But I

11  do have some information for you.  We are making very good

12  progress, thanks to the cooperation of counsel and their

13  efforts.  I'll have a more detailed report for you on the

14  progress of the case tomorrow.  We will not sit Friday, so

15  you're getting a little rest.  Come Friday, you'll need a

16  little rest.  And we'll work out the schedule tomorrow.  We

17  resume at 9:30 in the morning.  Do not discuss the case.  Have

18  a pleasant evening.  Be safe.  See you in the morning.

19             (Jury exits courtroom.)

20             (Continued on the next page.)

21

22

23

24

25

PROCEEDINGS                                353

1          THE COURT:  You can step down, sir, if you will.
2     We'll see you in the morning.
3          (The witness steps down from the witness stand.)
4          THE COURT:  Let's recap where we are and where we're
5     headed so we get some idea about the schedule tomorrow.
6          MR. SMITH:  We have, by my count, our remaining
7     witnesses are Jason Abramovitz, Dr. Boudaoud, Cortney, and
8     Special Agent Linh Phung.
9          THE COURT:  And do you expect to finish them
10    tomorrow?
11         MR. SMITH:  I expect that we will.
12         THE COURT:  More likely than not?
13         MR. SMITH:  More likely than not.
14         THE COURT:  Okay.  So you'll rest tomorrow.  We'll
15    have the break.  And, Mr. Savitt, you'll be ready first thing
16    Monday.
17         MR. SAVITT:  Yes, Your Honor.  Thank you.
18         MR. SMITH:  Judge, I know that you had indicated
19    that you thought we would be allowed, pursuant to Rule 413, to
20    introduce Cortney's testimony.  I'm not sure if you actually
21    ruled on that yet.
22         THE COURT:  Is Cortney in Buffalo?
23         MR. SMITH:  She's here now, but yes, she is the
24    victim witness.
25         THE COURT:  I've ruled on it.

SHERRY BRYANT, RMR CRR

PROCEEDINGS                               354

1           MR. SMITH:  Okay.

2           THE COURT:  Okay.

3           MR. SMITH:  Thank you, Judge.

4           THE COURT:  See you in the morning.

5           MR. SMITH:  Thank you.

6           MR. SAVITT:  Thank you.  Oh, Your Honor, I have a

7     quick application.  Another housekeeping matter.  My

8     application is for Your Honor to sign an order directing the

9     warden of the MDC to allow my client the clothing that he's

10    wearing, which for the duration of the jury trial, which began

11    this past Monday with an expected length of two weeks.

12    Basically, it's a shirt, a jacket, a pair of pants and a tie.

13          THE COURT:  This is unusual.  What's this about?

14          MR. SAVITT:  It's a clothing order.  The bureaucracy

15    of the MDC requires it.  They honor it.  Otherwise, they

16    dishonor any attempt to bring in --

17          THE COURT:  I have no problem signing, but Ellie has

18    got some information.  Maybe she's worked it out.

19          THE CLERK:  She told me to tell him to make an oral

20    application.

21          MR. SAVITT:  I'll do whatever she says.

22          THE COURT:  He's just done that.  Today is what, the

23    16th?  There you go.  May I see it again, Mike?

24          (Whereupon, the proceedings were adjourned at 5:04

25    p.m. until July 17, 2014 at 9:30 a.m.)

SHERRY BRYANT, RMR CRR

355

1                    <u>I N D E X</u>

2

3     <u>WITNESS</u>                                    <u>PAGE</u>

4

5

6         AARON SPIVACK                           135

7         DIRECT EXAMINATION (CONTINUED)

8         BY MR. SMITH                            135

9         DIRECT EXAMINATION (Continued)

10        BY MR. SMITH                            161

11                                                185

12        CROSS-EXAMINATION BY MR. SAVITT         185

13        REDIRECT EXAMINATION BY MR. SMITH       217

14        RALPH STEVEN                            228

15        DIRECT EXAMINATION BY MR. SMITH         228

16        RALPH STEVEN                            241

17        DIRECT EXAMINATION BY MR. SMITH         241

18        CROSS-EXAMINATION BY MR. SAVITT         255

19        IAN GOLDBERG                            285

20        DIRECT EXAMINATION BY MR. SMITH         286

21        HENRY ENRIGHT                           291

22        DIRECT EXAMINATION BY MR. SMITH         292

23        ELIZABETH ROBLE                         303

24        DIRECT EXAMINATION BY MR. SMITH         303

25        CROSS-EXAMINATION BY MR. SAVITT         314

356

ODESSA SIMMS

DIRECT EXAMINATION BY MR. SMITH                317

DIRECT EXAMINATION BY MR. SMITH                317

STEPHEN FLATLEY                                337

DIRECT EXAMINATION BY MR. SMITH                338

357

1                              **E X H I B I T S**

2

3

4      Government's Exhibit 4                                    144

5

6      Government's Exhibit 5                                    152

7

8      Government's Exhibit 8 and 9                              154

9

10     Government's Exhibit 7                                    156

11

12     Government Exhibit 10                                     168

13

14     Government Exhibit 11                                     169

15

16     Government Exhibit 12                                     170

17

18     Government Exhibit 14                                     171

19

20     Government Exhibit 15                                     172

21

22     Government Exhibit 16                                     173

23

24     Government Exhibit 17                                     174

25

358

Government Exhibit 13                                    174

Government Exhibit 49                                    176

Government Exhibit 18                                    177

Government Exhibit 50                                    177

Government Exhibits 19, 20 and 21                        179

Government Exhibit 30                                    183

Government's Exhibit 51                                  254

Government Exhibit 25X and 28                            288

Government's Exhibit 36B                                 290

Government Exhibits 23A, B and C                         294

Government Exhibits 22A, 22B, 22J, 22I and
22E                                                     307

Government Exhibit 24                                    322

359

Government Exhibit 24                                322

Government Exhibit 26                                325

Government Exhibit 27                                326

Government Exhibit 29                                327

Government Exhibit 31                                328

Government Exhibits 25A through 25YY                 331

Government Exhibits 42 and 44                        344

Government Exhibits 43 and 47                        346