UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

                 -against-

BEBARS BASLAN,
                      Defendant

------------------------------------------------------------X

**13 CR 220 (RJD)**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BEBARS BASLAN'S POST-TRIAL MOTIONS FOR A VERDICT OF ACQUITTAL UNDER RULE 29(c) ON COUNT ONE ON THE GROUNDS THAT THE STATUTE ON WHICH THAT CHARGE IS PREMISED, AS APPLIED TO HIS CASE, VIOLATES THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT AND FOR A NEW TRIAL UNDER RULE 33 ON THE GROUNDS THAT THE GOVERNMENT VIOLATED THE MASSIAH RULE BY SENDING IN AN INFORMANT THROUGH WHOM IT LEARNED THE DEFENSE TRIAL STRATEGY**

Ephraim Savitt, Esq.
*Attorney for Defendant Bebars Baslan*
260 Madison Avenue, 22nd Floor
New York, New York 10016
Tel.: 212-679-4470
Fax: 212-679-6770
Email: Ephraim@Savittesq.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

      -against-

                                      13 CR 220 (RJD)

BEBARS BASLAN,
                Defendant.

------------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BEBARS BASLAN'S POST-TRIAL MOTIONS FOR A VERDICT OF ACQUITTAL UNDER RULE 29(c) ON COUNT ONE ON THE GROUNDS THAT THE STATUTE ON WHICH THAT CHARGE IS PREMISED, AS APPLIED TO HIS CASE, VIOLATES THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT AND FOR A NEW TRIAL UNDER RULE 33 ON THE GROUNDS THAT THE GOVERNMENT VIOLATED THE MASSIAH RULE BY SENDING IN AN INFORMANT THROUGH WHOM IT LEARNED THE  DEFENSE TRIAL STRATEGY**


## PRELIMINARY STATEMENT

    This memorandum is respectfully submitted in support of defendant Bebars

Baslan's post-trial motions for the following relief:

1) Dismissal with prejudice, pursuant to Fed. R. Crim. P. 29 (c) and the "Cruel

    and Unusual Punishments" prohibition of the Eighth Amendment, of the

    Travel Act charge in Count One and his conviction of that charge, on the

    grounds that the 30-year mandatory-minimum sentence prescribed by the

travel Act is so grossly disproportionate in Baslan's case to far less severe punishments meted out for considerably greater offenses to much more culpable offenders as to offend the constitutional protection against uneven and disparate sentencing;

2) Vacatur of the convictions on the remaining counts, pursuant to Fed. R. Crim. P. 33 and the Sixth Amendment's guarantee that a criminal defendant has the right to be represented at trial by counsel free of governmental intrusion, pursuant to the <u>Massiah</u> rule, on the grounds that the pretrial injection by the government of a "spy-in-the camp" jailhouse informant resulted in the government's improper elicitation of the defense strategy from Baslan, thereby giving it an undue advantage at the trial, or alternatively, for a post-trial <u>Massiah</u> evidentiary hearing whereby a full record can be developed on which the Court can confidently determine whether a new trial is warranted.

## THE CHARGES

Bebars Baslan ("Baslan") and his co-defendant (and girlfriend) Kristen Henry ("Henry") were arrested in Jersey City, New Jersey on March 19, 2013. They were subsequently indicted and entered pleas of not guilty to the five counts of the indictment. After Henry was severed as a defendant pending the Court's

2

determination as to her competency to stand trial, Baslan proceeded to trial on July 14, 2014, and was convicted of all counts on July 23, 2014.

Count One of the indictment charged that on or about March 19, 2013, the defendants crossed a state line with intent to engage in a sexual act with minors less than 12 years of age, in violation of 18 U.S.C. §2241(c), 2 and §3551 (Ind. ¶1). The Travel Act imposes a statutory mandatory minimum sentence of 30 years imprisonment. Count Two charged that, between February 1, 2013 and March 19, 2013, the defendants conspired to sexually exploit children in violation of 18 U.S.C. §2251(a), (e) and §3551 (Ind. ¶2). Count Three charged that, between February 1, 2013 and March 19, 2013, the defendants attempted to sexually exploit children in violation of 18 U.S.C. §2251(a), (e), 2 and §3551 (Ind. ¶3). The exploitation statutory provisions set mandatory minimum sentences of 15 years. Count Four charged that, that between February 1, 2013 and March 19, 2013, the defendants attempted to coerce and entice minors to engage in illegal sexual activity in violation of 18 U.S.C. §2422(b), 2 and §3551 (Ind. ¶4). The enticement statute provides for a 10-year mandatory minimum. Lastly, Count Five, to which Baslan entered a guilty plea prior to trial, charged that, between February 1, 2013 and March 19, 2013, Baslan possessed child pornography in violation of 18 U.S.C. §2252(a)(4)(B), §2252(b)(2) and §3551 (Ind. ¶5).. The child pornography statute

3

provides for a mandatory minimum 5 year sentence for the possession of such materials.

## THE TRIAL

The principal evidence against Baslan were his own recorded words on audio tapes procured by means of a wired cooperator referred to at the trial as "Jack." In the weeks leading up to the arrests of Baslan and Henry in the late evening of March 19, 2013, Baslan, at times with Henry's participation, discussed with Jack the feasibility of taking photographs of Jack's two baby sons, then aged 1-1/2 and 3, and his 9-year-old niece as Henry posed in suggestive positions with one or more of the children. Baslan and Henry discussed forming a "babysitting" service with Jack, who "feigned" an avid interest in child pornography and child sex, although it was unclear from the tapes as to whether Baslan/Henry or Jack actually came up with this idea or how this would or could happen. After a viewing of some child pornography videos at Baslan's apartment in early March at the request of Jack, who videotaped part of the session with a hidden recorder provided by the FBI, Jack serendipitously recorded himself in the act of sexual self-pleasuring immediately following his viewing of the child pornography videos, which conflicted with his reported disgust at having to look at child pornography in comments he had made to Agent Spivack.

4

Although the recorded conversations swing wildly from one depicted scenario to another, and yet another, in largely incoherent fashion, the common denominator, as the discussions evolved, was for an experimental "first step" in which Jack was to drive his two baby sons and the young daughter of his brother, who was identified only as "Steven," from Staten Island to a Jersey City hotel where Jack had rented rooms for the evening. The venue of the photo shoot was to have been in Baslan's Brooklyn apartment. But, at the direction of agents, Jack concocted a story that he needed to change the location to a Jersey City hotel because his estranged wife, who lived with his 2 young sons in Staten Island, would turn over the children to him while she was shopping in the Jersey City area. The real reason for the change of venue was to lure Baslan and Henry across state lines in order to subject them to 30-year mandatory minimum sentences under the Travel Act. Plainly, the mandatory minimum 15-year sentences under the child exploitation statute, much less the 10-year mandatory minimum under the enticement statute, were insufficient stakes for the government to deal with in this case, which involved defendants with no prior criminal records and no history of child molestation or endangerment, or even of child pornography possession prior to February 2013, when the Baslan-Jack recorded dialogues began.

The plan, as it were, included keeping the children from experiencing their involvement in an unkosher photo shoot. Jack, who professed concern about the

5

children not being traumatized, as he claimed to have been as a child, by their exposure to actual or feigned touching of private parts, would spike the children's orange juice with over-the-counter children's Benadryl that he had been provided earlier by Baslan. Baslan and Henry would then rendezvous with Jack in the hotel that evening. There Baslan would take photos as, depending on the moment in the dialogues, Henry touched/licked/appeared-to-lick-without-actual-contact the genitalia of Jack's 1-1/2 year-old son as the child was asleep. No discussions were recorded as to whether the plan called for photos of the other 2 children, and but for their presence as sleeping children, there was nothing about them incorporated into the final plan.

Significantly, throughout the recorded conversations, the bulk of which were telephonic, Baslan reiterated to Jack that there would be no "penetration" of the children and that every measure would be taken to assure that none of the children would be aware of the photo shoot or experience any adverse memories as a result. Baslan further stated repeatedly to Jack, who professed to be concerned about Henry becoming an informer, that he wanted to take photos of Henry in a compromising position, in which she would either lick or appear to lick Jack's 1-1/2 year old son for "security" so that she would not be able to turn them in to the police.

When Baslan and Henry arrived at the hotel, they were arrested by FBI agents stationed in the room opposite Jack's. In the government's rebuttal case, FBI Agent Aaron Spivack testified about Baslan's handwritten post-arrest statement, which was the other principal subject of Baslan's unsuccessful pre-trial motions. After a largely discombobulated series of responses by Baslan to his oral questioning, Agent Spivack reduced to writing what he "believed" was truthful in Baslan's far-ranging responses to oral interrogation. Among those statements were Baslan's averments that although he had planned to take photos of Henry with the children in sexually suggestive poses, and might have been interested in, but had not planned to, "going down" on the 9-year old girl, he had "cold feet "about the whole thing by the time he drove with Henry from Brooklyn to the rendezvous with Jack. Baslan also told the agent that if only he and his fellow agents had "waited," rather than arresting him and Henry "immediately," they would have seen that "nothing would have happened."

The government cleverly inserted Steven as a surrogate witness for Jack, who would have been the logical witness to testify about the germination of the "babysitting plan" and the recorded conversations. But Jack was a flawed potential witness. He suffered from a severe case of mania-depression, had attempted suicide numerous times and was institutionalized, at times involuntarily, and on one occasion with Baslan's assistance, to prevent him from killing himself. In fact,

as Baslan testified without rebuttal, he had physically prevented Jack, on more than one occasion, from suicide with an overdose of drugs.  Jack, who was divorced, also had a serious drug problem, and he was a violent character who had an outstanding assault case in Kings County for beating his victim over the head with a metal object, causing serious injuries and hospitalization.

The government, in a substitution just a week prior to trial, therefore inserted Steven, who had his own drug and sex problems, albeit not as pronounced as Jack's, as a hybrid fact/hearsay witness. Steven maintained on direct examination that Baslan had repeatedly offered to babysit his young daughter Leah with Kristen, and that Steven found that "strange." On cross-examination, however, Steven acknowledged that he understood, at the time, that Baslan, as his next-door neighbor, was offering Steven and his wife an opportunity to go out for an evening while he and Kristen watched their kids. He also conceded that Baslan never pressed the point and simply accepted that Steven and his wife preferred to stay home with the children.[1]

Over defense objections, Steven testified that sometime in January 2013, Jack had appeared in the middle of the night at Steven's home completely disoriented, as usual, and crying uncontrollably while repeatedly saying that he

---

[1] Indeed, Baslan never "babysat" Leah. Instead, as his computer records could establish, Steven sent Baslan emails urging Baslan to take Leah for photo shoots to enter the child in a beauty contest. Baslan never took Steven up on the offer. Baslan asks the Court, in a separate application, for CJA funding to copy his hard drive so that he can retrieve Steven's emails.

8

should have killed Baslan for suggesting that he, Baslan, was interested in Steven's 9-year-old daughter. Although Steven acknowledged, on cross-examination, that Jack often presented as an incoherent, hysterical rambler because of his mental disorders, suicidal tendencies and drug use, he maintained that this time Jack was "different," without really explaining why that was so. Steven also acknowledged that for 3 weeks thereafter, neither he nor Jack reported this alleged child sex predator, who was purportedly interested in committing child abuse of his young daughter, to the police. To the contrary, Jack continued to spend time with Baslan and Henry at their apartment in the weeks before Jack finally went in to the local precinct and, as a result, was referred to, and was wired up by, the FBI.

In addition to calling a number of FBI agents, who testified about the extraordinary amount of computer equipment Baslan kept in his apartment, as well as the voluminous, zipped files that were stored in Baslan's external Apricorn hard drive, consisting of 150-250 gigabytes of child pornography, digital image and video materials, among the 10-12 terabytes of non-pornographic digital information that, in the words of one of the government tech expert on cross-examination, was sufficient to fill up several huge government storehouses of hard copy counterparts. As Baslan testified, and the government did not rebut, he had taken the zipped child porn files wholesale from existing child porn sites and "dumped" the files into his home computer memory, then stored the massive

amount of zipped files in the Apricorn hard drive. The zipped files were almost entirely unopened but for the few videos Baslan showed Jack in early March at Jack's request and at the direction to Jack of the FBI.

Despite an agent's denial, on cross examination, that she could not verify whether any of the child pornography images and videos stored by Baslan were of him with child victims, she was compelled to acknowledge that, despite the FBI's nearly year-long investigation and analysis of Baslan's computer files, not one child pornographic image or video clip included either Baslan or Henry. Instead, as she conceded, and the government never tried to suggest otherwise, all of the child pornography stored in Baslan's computer equipment originated on existing child porn websites and not one image or video involved the defendants. Indeed, there was not a scintilla of evidence, to use an antiquated expression, that either Baslan or Henry had ever had improper relations with any child under 12 years of age, or that the "babysitting" plan, whether originated by Jack or the defendants, had any "legs" or that either defendant had ever posed in, or had taken photos or videos of, children in pornographic positions.

In an effort to tar Baslan with having had sex with minors in the past, the government called a dreamy flake of a young woman named "Courtney" to the stand. Courtney, who professed to be an underage aspiring child model 10 years ago in Buffalo, New York, testified that she and other similarly-minded teenage

girls had been lured to Baslan's studio in that city to pose for him, often in an inappropriate manner. Courtney further claimed that she had been drugged by Baslan so that he could have sex with her while she was unaware of what was transpiring.

On cross-examination, Courtney was unable to explain why she had not alerted either her parents or the police to Baslan's unwanted advances, or why she continued to spend time with him socially after the alleged "rapes." Although she claimed that Baslan had tried, several years later, to persuade her to sign an affidavit that she never had sex with him, she could not explain why the man she professed to fear as a dangerous predator never used force or resisted being told by her girlfriend to leave the bar where this encounter supposedly occurred. Courtney had no believable explanation for her silence about Baslan for the previous decade, either. She also transformed, during her cross examination, from an avowed child actress and a lifelong ingénue to an adult actress on some unheard of programs whose recent entertainment credits included being a pole dancer in a Chicago "gentlemen's" jiggle-joint. In her coup-de-grace, Courtney asserted that, "on a scale of 1 to 10'" her acting ability was a "10", although she failed to display that ability during her trial testimony. As a measure of how much stock the jury placed on Courtney's account, she was the only significant trial witness whose testimony was not requested by the jury during its deliberations.

Baslan took the stand. After presenting his extensive background as a computer consultant and photographer, Baslan testified that his goal in proposing the photo shoots to Jack, who had confided to him that he had improperly fondled both his niece and his young daughter, was to get Jack on tape in a compromising position so that the Rabbis in their community would have evidence to force Jack to get therapy for his pedophile acts, as he disclosed in his non-recorded conversations with Baslan. Alternatively, if that did not work, Baslan intended to make the tape available to the police so that Jack would no longer be a threat to himself or to any children, including his own. Baslan also testified that Jack had provided him with a computer that Jack's wife smashed in a fit of range, which contained sex videos of Jack with a 13-year-old girlfriend, and that Jack had a number of teenage girlfriends whom he took advantage of and had sexual relations with.

Because the government had wired up a jailhouse informant against Baslan while the two conversed in the MDC about Baslan's pretrial motions and trial strategy, the government learned of his trial strategy and got a free preview of his testimony months prior to the trial. As we argue below in Point Two, this <u>Massiah</u> violation, which the government conceded prior to trial, was an ongoing process for many months. We respectfully suggest that the ongoing violation should be the subject of a requested evidentiary hearing on the twin issues of the legality of the

government's motivation in insinuating the informant repeatedly even after learning of the fact that prohibited strategic matters about existing charges were being ferreted out from the defendant in that fashion, and the undue prejudice Baslan suffered as a result that tainted the trial proceedings and yielded a constitutionally-flawed verdict.

We begin, however, with Point One, which discusses the applicable Eighth Amendment precedents and principles. In this discussion, we apply those principles to an analysis of the gross disparity between the 30-year draconian mandatory minimum sentence prescribed by 18 USC 2241 (c) on which Count One is premised with the considerably lower sentences, even on the high end, imposed for sex abuse crimes, including crimes against children, in this jurisdiction. We also compare Baslan's potential statutory sentence to sentences for violent crimes in general, including rapes and homicides, as disclosed in a representative sampling of sentencing statistics compiled by the Department of Justice for the most populous jurisdictions across the country, which discloses that Baslan's potential sentence is substantially greater than the median nationwide sentences for violent crimes nationwide. The available federal and state governmental statistical data and a review of sentences imposed within the last several years of sex crimes sentences, particularly sex crimes where children are the victims, disclose that the statutory mandated 30-year punishment, as applied to Baslan, a defendant with no

prior criminal history or any showing of child abuse, much less child sex abuse, and to this case, where no "penetration" was contemplated and no completed crime occurred, is so grossly disproportionate to dramatically-lower punishment for completed sex offenses, including child rape, as to violate the Eighth Amendment's prohibition against Cruel and Unusual Punishment.

## ARGUMENT

### POINT ONE

**THE TRAVEL ACT'S 30-YEAR STATUTORY MANDATORY MINIMUM SENTENCE IS SO GROSSLY DISPROPORTIONATE IN BASLAN'S CASE AS TO VIOLATE THE EIGHTH AMENDEMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT AND REQUIRES DISMISSAL WITH PREJUDICE OF BASLAN'S CONVICTION ON COUNT ONE AS A MATTER OF CONSTITUTIONAL IMPERATIVE**

### a) The gross disparity in punishment:

As discussed fully below, the most recent statistical information issued by the New York State Department of Corrections discloses that the median sentence imposed for sex crimes in general is less than 12 years imprisonment. This finding is in complete harmony with the U.S. Department of Justice's Bureau of Justice Statistics focusing on the 75 most populous counties in the U.S., including New York County, concerning the average sentence of offenders who had actually committed rapes and other sexual abuse on their victims.

According to the latest Sex Offender Registries for Manhattan and all of the state counties in the Eastern District,[2] during the period from July 2000 through early October 2014, the child sex offenses for which 187 actual child sex predators, described as "sexually violent offenders," who had committed <u>violent completed sex crimes against children ranging in ages from 2 to 16 years old</u>, by the use, either individually or as a combination, of "force", "deviate sexual intercourse", "sodomy", "kidnapping", "unlawful imprisonment", and multiple acts of child sex abuse, and/or of actual child rape, were punished by custodial sentences ranging from no higher than 12 years imprisonment to as low as 60 days in the local jail.

Of the 187  sex offenders registered in those 6 counties, no less than 31 child rapists and/or sexual abusers were sentenced either to 1 day in jail or straight probation. (Appendix A at 10-12). 20 other similar offenders received sentences from as high as a year to as low as 60 days in jail (Appendix A at 8-10). An astonishing 71 convicted child predators received sentences ranging from 18 months to 5 years (Appendix A at 3-8). Only 8 of the registered dangerous child sex offenders were sentenced in the 10-12 year range (Appendix A at 1).

By those empirical measures, Baslan's mandatory minimum sentence for Count One would be 2-1/2 times as long as the harshest sentences imposed on state

---

[2]The most recent statistical information from the combined Sex Offender Registries have been reproduced in a chart in Appendix A to this memorandum. The analysis includes statistics from the counties in our district and New York County, which although in the "other district", has the most voluminous state criminal docket in the metropolitan area.

child sex offenders registered in the counties of this district and Manhattan, who had used force to rape their child victims or who had been engaged in a series of rapes and physical assaults against children. That minimum sentence would also be 2-1/2 times as long as the average sentence imposed on sex offenders generally, according to the DOJ study of the sentences imposed in the 75 most populous counties across the United States.

By contrast, Baslan never raped anyone, much less babies or a 9-year old child. The government's star witness as to alleged "priors," Courtney, whose testimony was the only one of the major witnesses the jury did not ask for, leads to the obvious inference that the jury accorded no weight at all to her testimony. The record is entirely bereft of evidence, as distinguished from the unproven "Buffalo allegations," that Baslan ever raped anyone, whether in the statutory or actual sense, or that he had ever molested or hurt a child or that he had even taken photos of a child in a sexually compromising position, whether to market the resulting photos as child pornography or for any other reason. Is it within the constitutionally-permissible range of punishments for a non-predator with no prior child sex abuse misconduct whose stated intention, even measured in a light most favorable to the government, was to aid and abet non-penetration contact with the privates of a sleeping child, to serve 18 years more than the average child rapist?

The question begs the obvious answer: such a disparate result is patently unfair, and certainly from a broad definition of fairness and equal treatment in sentencing. But does the unfair disparity, if Baslan, given no evidence of any prior attempted, contemplated or committed similar acts, is sentenced to the 30-year mandatory-minimum on Count One, rise to the level of an Eighth Amendment violation? The ensuing discussion demonstrates that it certainly and unequivocally does.

It is worth considering, in this analysis, that the median minimum sentence for murder is less than 30 years in New York State, according to the Corrections Department statistics. Ever since the New York State death penalty was declared unconstitutional nearly a decade ago in People v. LaValle, 3 N.Y. 3d 88 (2004), the death penalty has not been imposed in this state, other than in a single federal death penalty prosecution[3]. As a result, New York State has no death penalty and the harshest state sentence for intentional murder is between 20 and 25 years, at the minimum, and life, at the maximum. Although a defendant convicted of multiple murders maybe, but is not necessarily, subject to consecutive punishment, Baslan's sentence would actually exceed the mandatory minimum sentence imposed on murderers in this state. And Baslan not only did not kill anyone, he did not even touch anyone, much less commit, or attempt, or even intend to commit, child rape.

---

[3] Ronell Wilson, convicted in the Eastern District of New York for the double execution of two undercover NYPD detectives, was sentenced to death in his original penalty trial and his subsequent penalty retrial. .Wilson's original death sentence in 2006 had been overturned on appeal because of prosecutorial error on summation.

Moreover, were it not for governmental "gerrymandering" of sentencing exposure by changing the venue of the attempt to Jersey City from Brooklyn, the highest mandatory-minimum sentence Baslan would be facing would be the 15-year mandatory-minimum under the enticement statute. True, the government under prevailing law is permitted to lure a defendant across state lines in order to subject him to the far harsher penalties of the Travel Act. True, under prevailing Second Circuit precedents, there is no sentencing entrapment bar to sentencing a defendant to the statutory mandatory minimum, as there is in other jurisdictions. But this is not a statutory sentencing argument. Instead, it implicates constitutional sentencing fairness principles under the Eighth Amendment.

To be sure, the federal system has the death penalty, reserved for killers who are "the worst of the worst." In the present administration, there has been a significant drop in authorized capital prosecutions from that of prior administrations. Indeed, in a pending case before Judge Block, the Attorney General declined to seek the death penalty for a defendant accused of murdering six victims, some of whom were brutally murdered and at least one of whom was burned to death. He faces a life sentence for those horrible crimes: Baslan faces nearly a life sentence for traveling to New Jersey to take photos of Henry either licking, or feigning that act, the penus of a sleeping child. Does that remotely appear to be even-handed application of justice?

The penalty for murder, under certain federal statutes is mandatory life, and under other statutes is life or a term of years. At first blush, comparing Baslan's inchoate crime of attempted child sexual abuse under the Travel Act to the sentences for murders under the federal sentencing scheme may appear to be uninstructive. But it is not unusual, as in a recent Hobbs Act murder case before this Court, for a defendant found guilty of pulling the trigger and killing a pregnant woman, to be sentenced, for a combination of appropriate mitigating circumstances, to less than the 30 year mandatory minimum Baslan must be sentenced to under the Travel Act. That is not only unfair, under the penumbra of "prevailing standards of justice," but is a violation of the Eight Amendment's protection against cruel and unusual punishment.

**b) The Constitutional Principles:**

In Solem v. Helm, the U.S. Supreme Court enunciated the tripartite rule for appellate courts to use in measuring whether a sentence violates the "cruel and unusual punishments" prohibition of the Eighth Amendment. 463 U.S. at 290-292. The three "objective factors" identified by the Court are: 1) "the gravity of the offense and the harshness of the penalty," 2) "sentences imposed on other criminals in the same jurisdiction," and 3) "sentencing imposed for the same crime in other jurisdictions." Id. Citing Edmund v. Florida, 458 U.S. 782 (1982). In connection

with the second factor, the Court observed, in language particularly pertinent to this case, that "[i]f more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive." Id. at 291.

In deciding whether a particular sentence is unconstitutionally disproportionate, the Court made no distinction between capital punishment and a felony prison sentence. Id. at 298, citing Gregg v. Georgia, 428 U.S. 153, 176 (1976) (opinion of Stewart, Powell and Stevens, JJ.). As the Court put it, "[i]n sum, we hold as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted." Solem, 463 U.S. at 29.

The Court's observation that capital punishment cases are not the only ones where the Eighth Amendment comes into play is particularly important in the Constitutional analysis on this Rule 29 motion for vacatur of Baslan's Travel Act conviction. There is no death penalty for child rape in any jurisdiction since the Supreme Court struck down statutes that provided for such punishment. Kennedy v. Louisiana, 554 U.S. 407 (2008). In New York State, the harshest available penalty for a single homicide is between 20 and 25 years, at the minimum, to life, or between 5 and 10 years less than the mandatory minimum Baslan is facing for Count One. As pointed out above, although the federal system has the death penalty with a mandatory life term as the alternative in certain statutes, such as

20

murder in aid of racketeering, murder with a firearm and hostage-taking, there are

federal statutes, such as the Hobbs Act–related murder statute, for which federal

defendants may be sentenced to "a term of years" rather than life (or death).

Sentencing a defendant for an inchoate crime made possible only by governmental

trickery and for which he has no history altogether to a 30-year mandatory-

minimum, which exceeds the potential punishment under the federal murder

statutes providing, as an alternative punishment, a "number of years" at the

complete discretion of the sentencing court, is no less unfairly disparate than

comparing that 30- year minimum punishment, in Baslan's case, with  the state

mandatory-minimum murder sentence of 20-to-25 years.

There is a significant added dimension of disproportionality in this case,

because, even assuming that Baslan would not have limited the photo pose to

simulated touching, as he said to Jack on the recordings,  this is neither a child rape

case nor even an attempted child rape case. In Kennedy, the  U.S. Supreme Court

struck down a Louisiana capital statute that permitted the possibility of the death

penalty in child rape cases, expanding the prohibition against the death penalty for

rape of an adult woman in the Court's earlier opinion in Coker v. Georgia, 433 U.S.

584 (1977). In the course of its discussion, Supreme Court noted:

> Rape is without doubt deserving of serious
> punishment; but in terms of moral depravity
> and of the injury to the person and the public,
> it does not compare with murder, which

21

> does involve the unjustified taking of human
> life. Although it may be accompanied by another
> crime, rape by definition does not include the death
> of…another person. <u>The murderer kills; the rapist,
> if no more than that, does not…</u>

<u>Kennedy</u>, 554 U.S. at 428, quoting <u>Coker</u>, 433 U.S. at 598 (plurality opinion)
(emphasis added).

The critical distinction drawn by the U.S. Supreme Court between rape and murder in terms of the relative severity of the crimes makes a crucial difference in analyzing the disproportionality of Baslan's punishment for an uncommitted non-rape offense, both as it relates to the average sentences imposed for A-1 felonies in New York State, and as compared with the punishments in other comparable jurisdictions for violent rapes.

As to the issue of deterrence as a factor supposedly justifying a draconian mandatory-minimum 30-year sentence for Baslan, the U.S. Supreme Court in <u>Kennedy</u> aptly noted that equating rape to murder may have a completely opposite effect:

> In addition, by in effect making the punishment for
> child rape and murder equivalent, a State that
> punishes child rape by death <u>may remove a strong
> incentive for the rapist not to kill the victim.</u>
> Assuming the offender behaves in a rational way,
> as one must to justify the penalty on grounds of
> deterrence, <u>the penalty in some respects gives less
> protection, not more to the victim,</u> who is often the
> sole witness to the crime.

22

554 U.S. at 445-446 (emphasis added).

As the highest court of the land recognized, the sentencing goal of deterrence is not served by elevating even a serious non-homicide such as rape to level of severity of intentional murder. By _a fortiori_ reasoning, equating the crime of an inchoate attempted touching of a sleeping child in a New Jersey hotel to an intentional committed rape plainly does not further the sentencing goal of deterrence. Equating the two crimes certainly sends a strong message, and there are some in our society who may welcome that message. But it is the wrong message to send. That message is counterproductive from the perspective of individual or general deterrence and the need to protect potential victims of the same type of crime. The corollary of the message is that touching a child inappropriately will be equated with rape, and rape, in turn, will be punished as severely as murder. In effect, that would impermissibly blur the boundaries between more serious crimes, which deserve greater punishment, and less serious ones, which deserve proportionally-lesser punishment, under the _Solem_ tripartite test.

Given the harsh statutory punishment Baslan faces for the Travel Act conviction, the equivalence of his inchoate non-rape crime with those of intentional rape and of murder would hardly be far-fetched. Yet, as the Court decided in _Kennedy_, the same rationale that applies, in proportional measure, to this case, equating child rape with murder in terms of potential punishment is

23

prohibited by the Eighth Amendment. It should be equally true where a statutory mandatory-minimum results in equating a non-rape attempt with punishment that exceeds, to a considerable degree, the average sentence imposed on multiple-child rape offenders according to the Sex Offender Registries of the counties in the Eastern District of New York and New York County.

As to the sentencing factor of retribution, the Court reasoned that equating murder with rape does not promote that goal, either. The Kennedy opinion, in language equally appropriate to this case, declared that "among other factors we have looked to" in determining whether a certain punishment violates the Eighth Amendment is whether that punishment "has the potential… to allow a community as a whole… to affirm its own judgment that the culpability of a defendant is so serious that the ultimate penalty must be sought and imposed." 544 U.S. at 442, quoting Panetti v. Quarterman, 551 U.S. 930, 958 (2007). True, 30 years may not be the "ultimate punishment." But the Travel Act attempt crime of which Baslan was convicted is certainly not on the same plateau of criminality as child rape, much less murder. Based on a proportionality evaluation, it stands to reason that Baslan's functional equivalent of a murder sentence does not fit into the case that should "allow a community as a whole…to affirm its judgment that the culpability of a defendant is so serious" that a murder sentence "must be sought and imposed." Id.

24

Although, as all appellate courts invariably point out, sentencing courts should be granted "substantial deference," that deference gives way to appellate redress when, as in the case, the sentence  mandated by statute would be  so grossly disproportionate. As measured by the <u>Solem</u> tripartite test, and applying that test's "objective criteria," it is obvious that should such a sentence be imposed: 1) Baslan will have "been treated more harshly than other criminals in the state who have committed more serious crimes;" 2) and that he would have "been treated more harshly than he would have in any other jurisdiction...." 463 U. S. at 303

**c) <u>Applying the Solem tripartite test to the latest sentencing statistics:</u>**

We look to the most recent statistical studies for guidance in evaluating the Constitutional disproportionality of Baslan's 30 year mandatory minimum sentence on Count One. One study conducted by the New York Department of Corrections, published in August 2013, entitled "Statistical Overview - Year 2012 Court Commitments,"[4] compares the sentences meted out in New York State for similar and even more severe crimes and demonstrates conclusively that if Baslan is sentenced to 30 years", he will have been treated more harshly than other

---

[4]The relevant pages of this most recent state sentences statistical study are reproduced in Appendix B.

criminals in the State that have committed more serious crimes." <u>Solem</u>, 463 U.S. at 303.

The other study was published in December 2013 by the U.S. Department of Justice's Bureau of Justice Statistics. It is entitled "Felony Defendants in Large Urban Counties, 2009-Statistical Tables" and it is the is the most recent statistical analysis by the federal government of sentences imposed on felony defendants in the 75 most populous counties across the nation, which includes New York, Queens and Bronx counties.[5] A review of the statistical information in that study reveals that, as the Court found in <u>Solem</u>, Baslan will have "been treated more harshly than he would have in any other jurisdiction" should the Travel Act 30-year sentence be imposed. <u>Id.</u>

**d) Solem Test Prong 1:**

The first prong of the <u>Solem</u> tripartite test, which measures "the gravity of the offense and the harshness of the penalty," 463 U.S. at 292, is easily addressed by the fact that there is no evidence of any prior child sex offenses by Baslan. Neither deterrence nor retribution, as the two most significant sentencing goals, are furthered by sending Baslan to prison for a period of 30 years when his putative child victims were not touched, much less harmed, and where his *mens rea*, at most, was confined to a brief inappropriate touching of a sleeping child's penis,

---

[5]The relevant pages of this Justice Department study are reproduced in Appendix C.

and no "penetration" or other physical harm was ever contemplated. Indeed, it is unclear from the tape evidence whether the improper episode would have been limited to simulated, rather than actual, contact.

### e) Solem Test Prong 2:

The second prong of the <u>Solem</u> test focuses on the "sentences imposed on other criminals in the same jurisdiction," 463 U.S. at 292, with emphasis on a comparison of Baslan's potential 30-year sentence to those convicted of substantially more serious crimes. To conduct that analysis, the New York State Corrections statistics are very illuminating.

That study measures sentences in several ways. It first analyses the "average and median minimum sentence (in months) by crime and felony offender status" for "2012 New Court Commitments" (Appendix B, Table 5.2). For a first felony offender committing intentional murder, the average sentence was 350 months, or 29 years and 1-1/2 months. That means that if Baslan is sentenced to 30 years, his punishment would actually exceed the average murder sentence imposed in the most recent year of that statistical study.

Even considering sentences imposed on first, second and persistent felony offenders <u>who committed murder</u>, the 2012 statistics remain constant. That means that a first time felony offender who did not commit murder and, indeed, committed an inchoate crime without any prior offenses, Baslan will receive a

27

longer sentence than the average murder offender for the year ending just prior to his offence conduct, taking into account that this category also includes persistent violent felony offenders. If that is not impermissibly disparate punishment under the Eighth Amendment, nothing, short of a life sentence, can violate the Cruel and Unusual Punishment prohibition.

Comparing Baslan's potential 30-year sentence to felony offenders sentenced by New York state courts in 2012 for committing rape, the disparity becomes even more pronounced. Thus, his mandatory-minimum sentence would be 235.6 months longer than the average 124.4-month sentence for a first felony rape offender; 211.9 months longer than the average 148.1-month sentence for a second felony rape offender; 30 months longer than the average 300-month sentence for a persistent felony rape offender; and 229.3 months longer than the total average sentence of 130.7 months imposed on all three categories of rape offenders.

Another measure of the recent New York study compares "crime by average minimum sentence by felony offender status" for court commitments during the five-year period 2008-2012. (Appendix B; Table 5.3). The average minimum sentence for murder for a first felony offender during that five-year period was 348.1 months. Baslan's 360 month minimum sentence would be only 11.6 months, just under a year, shorter than the average murder sentence imposed during that 5-

year period, ending just under 3 months before his Travel Act violation which, it

bears repeating, resulted in no one touched, much less, any one murdered..

A more analogous measure of proportional disparity is evident in the fact

that the average minimum rape sentence during that period was 114.4, months,

which is 11-1/2 years. Baslan's 360- sentence would be 254.6 months, or 20-1/2

years, longer than that.

The study's statistical analysis for "crime by average maximum sentence by

felony offender status" for the 2008-2012 period (Appendix B; Table 5.7) bears out

the same disproportionality. The average murder sentence for 2012 was 312.5

months, or 26 years, and the average rape sentence was 146.6 months or 12.2 years

for a first felony offender.

That means that Baslan's <u>minimum</u> sentence would be 47.5 months, or just

about 4 years, longer than the average <u>maximum sentence for murder</u> that year, and

an even more astonishing 213.4 months, or 17.7 years, longer than the average

<u>maximum rape sentence</u> that year.

The numbers for the average maximum murder and rape sentences for the

entire 5-year period are consistent as to the disproportionality of Baslan's potential

mandatory-minimum sentence. His total <u>minimum</u> sentence would be 3-1/2 years

<u>greater than</u> the total average <u>maximum</u> murder sentence of 26.8 years for that

period. It would be a whopping 11.8 years <u>greater than</u> the average <u>maximum</u> rape

sentence for the same 5-year period, ending with the year just under 3 months before he traveled to Jersey City (Appendix B; Table 5.7).

The New York study also measures "crime class by minimum sentence by felony offender status" for the five-year period 2008-2012 (Appendix B; table 5.4). According to that comparative study, Baslan's sentence for an inchoate crime involving, at most, inappropriate touching of a child, would be the equivalent of the minimum state sentences imposed for the most serious offenses, including murder, for the most recent 5-year period statistics available. To reduce this to numbers, Baslan's 30-year sentence would be just a year less than the average A-1 felony sentence in 2008; just 2-1/2 years less than the average A-I felony sentence in 2009; just 1-1/2 years less than the average A-I felony sentence in 2010; just under 2 years less than the average A-I felony sentence in 2011, and just a half year less than the total average A-I felony sentences for the entire 5-year period.

Equally illustrative are the statistics for the "crime class by maximum sentence by felony offender status" for 2008-2012. (A.60; Table 5.8). Without belaboring all the statistics, the table reveals that the total average maximum sentence for A-I felony offenders during that 5-year period was 317.7 months, or

30

26.5 years, which is 42 months, or 3-1/2 years less than Baslan's 30-year sentence would be. (A.60; Table 5.8).[6]

### f) Solem Test Prong 3:

The third prong of the <u>Solem</u> test – comparing Baslan's potential 30-year sentence to those "imposed for the commission of the same crime in other jurisdictions," 463 U.S. at 292 -- is readily satisfied by looking at the latest Justice Department's statistical report issued in December 2013. According to that report, which measures the "length of prison sentence received by defendants convicted of a felony, by most serious conviction offense in 2009" in the 75 largest counties across the nation in terms of population (Appendix C, Table 25), the "mean" or average violent rape sentence was 142 months, or 11.8 years. That would make Baslan's mandatory-minimum sentence 218 months, or a whopping 18.1 years, greater than the average rape sentence in the 75 most populous counties in the United States, including Manhattan, Brooklyn and Queens. Measured by the statistical information for the same jurisdictions, the average murder sentence for 2009 was 373 months, or 31 years. That means that Baslan, who neither murdered nor even touched his putative victims, would be  sentenced to just 1 year less than the average defendant convicted of homicide in the 75 countries across the nation

---

[6]The statistical anomaly of whereby the average minimum A-1 sentence in the 5-year period is actually greater than the average maximum sentence for such crimes is the result of the astronomically-high sentence imposed on in 2012 on Michael Pena, a police officer convicted of the forcible rape of a schoolteacher by threat that he would shoot her with his police automatic pistol if she resisted. That sentence is currently on appeal to the First department on Eighth Amendment and state statutory grounds.

with the highest crime numbers. Comparing the average sentence for all violent offenses of 91 months, or 7.6 years, to Baslan's potential 30-year sentence shows an even greater 4 to 1 ratio disparity, or stated differently, a vast 22.4 year difference.

Given the latest available national Vital Statistics Reports, published May 8, 2013, [7] the life span of the average 30-year old man in this country, as of 2010, is 77.8 years (A.75). Assuming that Baslan, who is presently in his mid-30's, will ultimately reach the average maximum age, despite his serious health problems and incarceration for the next nearly 3 decades in a penitentiary if sentenced to the 30 year mandatory-minimum, he will die just a little over a decade after he is released and deported to Russia, the country of his citizenship. It is quite telling, at least according to the most recently obtained life expectancy studies, that Baslan's mandatory minimum sentence would virtually guarantee that, should he survive his incarceration, he will have just over 10 years statistically before he dies outside of a prison setting. That consequence is demonstrative of the unconstitutional disproportionality of the Travel Act mandatory-minimum punishment. It is the type of punishment on par with that meted out to murderers, and exceeds, in disproportionately-dramatic fashion, by over 250% the average sentence for violent serial sex offenders, including child sex rapists.

---

[7]This report is reproduced in Appendix D.

If those figures do not conclusively demonstrate the gross disproportionality of Baslan's potential sentence for Count One, an anecdotal review of reported sentences for violent offenders, discussed immediately below, will crystallize just how constitutionally disproportionate and unfair his sentence would be by comparison. Those comparative cases were derived from media reports, principally in the New York City metropolitan area, but also from across New York State and around the country.

### g) DOJ Latest Statistics on Travel Act Sentences, and How They Further Demonstrate that, as to Baslan, the 30-year Mandatory-Minimum Violates the Eighth Amendment:

Although not featured, as an individual component, in the _Solem_ tripartite test, it is interesting that, according to the latest DOJ statistics, the "mean" sentences for Travel Act violations under 18 USC 2241(c) for the period 2004-2011 have not exceeded the present mandatory-minimum 30-year sentence that Baslan faces on Count One. What does this "mean", pardon the pun? Without the underlying breakdown of individual sentencing statistics, and recognizing that "mean" means the median number on a horizontal scale, rather than "median" or average, and without any available statistics for the last 2 full years of 2012-2013 (perhaps because the Government's, with the capital G, allotment for statistics corresponds to its allotment for the CJA fund), we can't know for sure.

But we can be certain of several important facts, particularly taking into account that the effective date of the revision of 2241(c), which replaced the punishment provision allowing sentencing courts the discretion to impose "a term of years" with the present mandatory-minimum 30-year punishment for the same category of offenses encompassed by the Travel Act, was November 1, 2007. In that regard, what the punishment revision accomplished was to remove a sentencing court's discretion to tailor the punishment to the specific criminal act committed by a defendant who violates the Travel Act and, in effect, preventing the court from differentiating, in terms of punishment, whether the "aggravated sexual abuse of a minor" committed by the defendant was mere "contact" or touching in a "lascivious manner", or whether the defendant committed actual rape or sodomy, in one of its various forms, by penetration of a minor's sexual organs, or whether the defendant was a first time offender, or attempted to commit the offense for the first time, or was a serial child rapist or was a vicious repeat child predator.

Prior to the establishment of the 30- year mandatory-minimum, a sentencing court was permitted, under the statutory scheme, to effect proportional punishment whereby the defendant who "touches" is not punished as severely as the predator who rapes, or sodomizes or inflicts other physical injuries. Prior to the amended sentencing provision, a sentencing court would have the discretion to differentiate

34

the severity of punishment so that someone committing an inchoate attempt to "touch" is not punished as severely as a dangerous child sex offender who committed multiple completed violent child rapes.  But that discretion has been removed from the sentencing court and given to the discretion of the prosecutor. Although that is true in the case of every mandatory-minimum sentencing scheme, the 30-year provision in the Travel Act, as applied to this case, crosses the line, if you will, in violation of the Eighth amendment.

Today, a serial child rapist who commits multiple rapes of children faces the same mandatory-minimum 30-year sentence as a defendant, such as Baslan, who is convicted of an attempt to take photos of a sleeping child being touched inappropriately by a confederate, such as Henry, with no prior criminal records and no plan to commit either actual rape or sodomy of the child. That is the crux of the fundamental constitutional disparity that for Baslan (and, parenthetically, certainly for Henry), will result in an Eighth Amendment violation should Count One not be dismissed on this motion.

The chart below, derived from the BJS (the statistics branch of DOJ) website, brings the point home with even greater clarity:

| Bureau of Justice Statistics (BJS) Results for Mean prison  sentences for defendants convicted (Results for Title 18 - Crimes and Criminal Procedure ) TITLE and Section: 18 2241 C |
| --- |

| Fiscal Year | Mean Months (Prison) | Counts |
|---|---|---|
| **2011** | 255.18 | 17 |
| **2010** | 227.57 | 14 |
| **2009** | 227.57 | 23 |
| **2008** | 201.84 | 19 |
| **2007** | 172.08 | 25 |
| **2006** | 189.92 | 50 |
| **2005** | 146.74 | 53 |
| **2004** | 141.77 | 57 |

As the chart discloses, the mean sentences for the period 2004-2007 ranged from a low of 141.77 months to a high of 189.92 months, for 185 counts of conviction under this statute. The average mean sentence for that period for the same offense as charged in Count One is 162.6 months. That means that Baslan's potential 30-year sentence is 197.37, or 16.4 years, longer than the average sentences for violation of the same statutory offense during the most recent 8-year period for which statistics are available.

Although there is no reflection in the statistics that differentiates between the predator child sex rapist, on one end of the culpability scale, and the sex offender who "touched" or "fondled" a child, it stands to reason that the predators were not given a free pass by the federal prosecutors while the "fondlers" were the exclusive

targets of Travel Act prosecutions. Although 2008 was the first full year in which the 30-year mandatory-minimum was effective, the mean sentences for that year and the ensuing 3 years for Travel Act violations are all less than 360 months. Obviously, *ex post facto* considerations must have prevented the 30-year mandatory-minimum from being an imperative in many of the post-2008 sentences. The BJS does not offer a breakdown of sentences by the date of the offense conduct so as to enable us to know how many of the sentences were imposed pursuant to the mandatory-minimum scheme put into effect in November 2007. But despite these limitations, the statistical figures are illuminating in exposing the unconstitutional disparity in punishment that Baslan would suffer.

The statistics for 2008 to 2011 follow the same pattern of gross disparity in punishment when contrasted with the 360 month mandatory-minimum that Baslan would be subjected to. The highest mean sentence for that 4-year period is 255.18 months in 2011, and the lowest is 201.84 in 2008. The average mean sentence for the period in which the 30-year mandatory-minimum went into effect is 228.04 months for 73 Travel Act counts of conviction. As with the prior 4 years reflected in the chart, we have no information as to the degree of a defendant's culpability or the level of aggravation of offense conduct. For this period, we have no information concerning whether a particular defendant was sentenced under the revised Travel Act or before the mandatory-minimum became effective, to be able

37

to assign percentages to sentences under the revised Travel Act as contrasted with the statute in effect before the 30 year mandatory-minimum became effective.

Irrespective of whether some of the sentences in the more recent 4-year period included mandatory-minimum punishment, and in what percentage such sentences feature in the total numbers, there is a spike in the average mean sentence for the post-2007 years of 65.44 months, or 5.4 years, above the prior average mean sentence. Yet, at the same time, this increased number remains 131.5 months, or nearly 11 years, less than the mandatory-minimum punishment that Baslan will receive should the dismissal motion be denied.

From every known statistical perspective, disparity in punishment, sufficiently substantial under the <u>Solem</u> tripartite test to rise to the level of an Eighth Amendment violation, becomes compellingly obvious as to require dismissal of Count One under the constitutional protection against Cruel and Unusual Punishment. But if cold statistics are the functional equivalent of the "cold record," the following discussion of media accounts of rape sentences brings into the disparate sentencing analysis the added dimension of illustrative comparisons of punishments meted out for far more culpable offenders than Baslan, who had committed far greater crimes against their (in most cases) multiple victims than Baslan either "attempted" or intended, with considerably-greater harm inflicted on their victims, which is non-existent in Baslan's case, but who, in almost every case,

will be imprisoned for a fractional amount of the term to which Baslan would be sentenced under Count One.

## h) Anecdotal Discussion of Disparate Sentences for More Severe Crimes:

The following discussion offers anecdotal examples from media reports that include descriptions of the perpetrators, offense conduct and resulting sentences. The accounts breathe life, as it were, into the Solem disparity analysis, and illustrate, in vignettes from actual cases that paint pictures for the mind rather than numbers, just how unfair a 30-year sentence would be, not only from a constitutional perspective, which we must demonstrate, and I believe, have demonstrated in this memorandum and its exhibits, but also from the viewpoint of fundamental fairness, as constitutional protections tend to be tethered to, in the proportionate application of justice.

Let's look at some recently reported cases of punishment for child rape. A multiple child rape offender, who pled guilty in state court to 76 charges involving sex with children as young as 8 was sentenced to concurrent 20-year to life terms. *Sentenced in Child Rape Case*, The East Hampton Star (June 22, 2013). Baslan, who plainly did not intend that "penetration" occur and even in the most jaundiced view of the evidence, at most intended to take photos of Henry touching/licking Jack's young son's penis, would have to do 10 years more than a serial child rapist

39

who committed 76 offenses involving actual aggravated child sex abuse and actual rapes.

A defendant with a history of being a sex offender was sentenced to 27-29 years for raping two small children, ages 2 and 4, while his wife held each of them down and pressed her hands on their mouths as her husband raped each of the girls while they were screaming in horror. The wife, who cooperated against her husband, was sentenced to 15 years imprisonment. *15 Year sentence for Woman Who Helped Her Husband Rape Two Girls*, Time Warner Cable News (May 9, 2014). Baslan would be sentenced to a longer period that a vicious child rapist and to twice the term imposed on a heartless accomplice who physically restrained the girls as they were being raped.

A defendant who pled guilty to two counts of raping a child and to a course of sexual conduct against a child was sentenced to 8 years imprisonment. People v. Rought, Memorandum and Order (A.D. 3d Dep't December 15, 2011) (affirming appeal based on alleged involuntary plea, and observing that the sentence was not unduly harsh "considering the serious nature of the present offenses"). Lesson learned: a repeat child rapist gets 22 years less punishment than a defendant who, as the government's evidence established, never actually committed, and never even intended to commit, a child rape offense.

40

Consider the case of a New Rochelle school administrator, who served all of 100 <u>days</u> in jail in 2011 before being released and placed under Kings County probation supervision, as reported in a very recent internet news blog. Although he apparently failed to comply with the state's sex offender registry's requirements under Megan's Law, and thereby violated his probationary conditions, he continues to reside in Brooklyn and work in Manhattan as a free man. The Westchester County DA's office had defended the plea deal because the child rape victim was spared from having to testify and the rapist would be subject to 10-years imprisonment if he violated his probation. *Did J.M.[8] Commit the Perfect Crime? Rape a Child in a New Rochelle School, Move to Brooklyn, Work in Manhattan,* <u>Robert Cox Blog</u> (September 6, 2014). Need we say more about disparity in punishment?

Sentencing Baslan to 30 years for his offense conduct would be at the opposite end of the disparity pendulum from the 3- month, 10-day custodial sentence of a former school administrator who used his position to be a child sex predator who raped <u>at least one</u> of the children in his school. More to the point, sentencing Baslan to 30 years would also violate the prohibition against Cruel and Unusual Punishment.

---

[8] Although he doesn't deserve it, in the interests of caution, the admitted child rapist's name in the blog's caption is replaced with his name initials.

In another comparative example of grossly uneven justice, when measured by a 30-year sentence in this case, consider the case of the five street gang members were sentenced to prison terms of 7 to 21 years, 6 to 18 years and 4 to 10 years, for brutally beating up a 43-year-old woman jogger on the Brighton Beach boardwalk, then dragging her under the boardwalk where they took turns raping her before they kicked her viciously in the head and robbed her of her watch and money. *5 Youths Plead Guilty to Rape and Assault*, <u>New York Times</u> (April 13, 1995). The fractional sentences imposed on the thugs who perpetrated this horrific series of rape, beatings and robbery are in stark contrast to the potential punishment for Baslan on Count One. His putative victims, by contrast, were not raped repeatedly, were not brutally beaten, were not kicked in the head and were not hospitalized. In fact, they were not touched at all.

Consider this latest example of disparity involving the cold-blooded executions in the mid-70s of NYPD officers Waverly Jones and Joseph Piagentini. Black liberation Army members, including Herman Bell, shot down the officers after they had responded to a false domestic violence call at a Harlem housing project, which was a ruse by the BLA to lure police officers to a planned ambush to be killed. Officer Jones was shot in the back multiple times and was executed in cold blood. Officer Piagentini was shot down, then murdered at point blank range

42

with repeated shots from his own gun as he lay helpless on the sidewalk. *The Savage City,* T.J. English, Harper Collins (2011), at pages 322, 330-31, 335-36.

It was reported earlier this year that Bell, one of the assassins, was eligible for parole release last February, just 35 years after his arrest for his horrendous crimes that rocked the city to its foundations. Although I am unaware of whether the cop-killer was actually paroled, and I hope he was not, it is interesting that Officer Jones's son had spoken out in favor of his father's killer's release on the notion that 35 years is punishment enough and that keeping Bell in prison "would be just for revenge." *Kin Split on Freeing Killer.* N.Y. Daily News (January 24, 2014 at page 16). Baslan's minimum sentence would be only 5 years less than that imposed on a cold-blooded executioner whose victims were police officers.

There are legions of cases that offer examples of the gross disparity between the potential Travel Act 30-year mandatory-minimum sentence for Baslan in this case and those imposed on much greater and more prolific criminal violators whose crimes were considerably more severe than was Baslan's inchoate "touching" plan. A sampling of those cases will be presented in bullet-point form.

- Nicholas Brooks, son of a famous composer, was sentenced to 25-years-to-life in Manhattan Supreme Court for brutally killing his girlfriend, a designer, by choking and drowning her in a bathtub. Huffington Post (June 23, 2013).

- A male model who viciously castrated and murdered his "sugar daddy," a well-known Portuguese journalist, by stomping on the victim's face and cutting his testicles off as the victim bled to death, was sentenced in Manhattan Supreme Court to 25-years-to-life. N.Y. Post (December 21, 2012).

- A "remorseless two-time killer" was sentenced in the Manhattan Supreme Court to 25-years to life. He had strangled his first victim, a transgendered lover, to death. Several years later, he heartlessly chocked and beat to death a grandmother in her Harlem apartment before having sex with a hooker on his victim's bed for the next two days. He also slashed a fellow inmate in one of nine assaults against inmates and guards in jail. N.Y. Daily News (July 23, 2013).

- A man convicted of repeatedly raping, abusing and strangling a 16-year old girl, who was a runaway, in his Harlem apartment over the span of 6 months was sentenced to 40 years by a Manhattan Supreme Court judge. DNA info (October 15, 2012).

- A 20-year old woman was sentenced in Brooklyn Supreme Court to a 15-year term for the stabbing to death of her close friend over a Facebook texting "beef," in a crime called the "Facebook murder" by the press. NewsOne, (August 4, 2014).

44

- A Queens private detective who raped his ex-girlfriend and then framed her for a series of fictional crimes for which she landed in jail for 7 months was sentenced to 32 years. The New York Times (January 4, 2012).

- A man who committed two rapes of women as they were sleeping, by climbing into their apartments through windows from rooftops, who was given the dubious moniker "Upper East Side Rapist," was sentenced to a total of 20 years in Manhattan Supreme Court. WCBS News (September 4, 2012).

- A man who had overpowered a woman in her Lower East Side Apartment, before raping and beating her, threatening to rape her roommate, slashing her face with broken glass, then forcing her to accompany him to two ATMs to get cash, was sentenced to 15 years in Manhattan Supreme Court. DNA info (October 23, 2012).

- A foreign hotel guest who sexually assaulted and raped a young woman in his Plaza Hotel room was sentenced to 10 years in Manhattan Supreme Court. Press Release by District Attorney, New York County (June 7, 2012).

- A Rochester, New York man convicted of killing a 17-year old girl and dumping her body in a swimming pool was sentenced to 25-year-to-life by a judge who called the defendant "evil, vile and vicious." Democratandchronicle.com (June 13, 2013).

- A Flushing man who brutally raped a 23-year old woman from China, as she was heading home with groceries, before fatally beating her to death was sentenced to 22 years to life in the Queens Supreme Court. New York News (April 27, 2011).

- A man who brutally raped a Harlem woman, then stabbed her in the face and strangled her to death was sentenced to 25-years to life in Manhattan Supreme Court. DNA info (July 30, 2012).

- An upstate New York man was sentenced to 25 years in prison for brutally raping and attempting to kill a 10-year old girl by choking her and trying to break her neck. N.Y. Examiner (April 28, 2012).

- A U.S. Air Force drill instructor was sentenced by a military court to 20 years after he was convicted of 28 counts of the rapes and aggravated sexual assaults of at least 10 female recruits. Associated Press, Fox News (July 21, 2012). The press termed the case "the biggest sex scandal to hit the U.S. military since the 1990's." Reuters (July 22, 2012).

- A U.S. Marine recruiter who abducted and repeatedly raped an 8-year old girl while keeping her blindfolded in his apartment was convicted after trial, in which the little girl testified, and was sentenced by a Pennsylvania state court judge to 21-47 months imprisonment. Montgomery Media (February 4, 2012).

46

- A New York man was sentenced to 40 years in prison, in a case described as one of the grisliest murders in recent New York City history, after abducting, sexually abusing and murdering an 8-year old boy, Leiby Kletzky, in Brooklyn. In that highly publicized case, a statewide police manhunt resulted in the discovery of little Leiby's body, cut into pieces and stored in the killer's refrigerator in his kitchen. U.S. News, NBC News live services (August 29, 2012).

- A Madison County, New York man was sentenced to 12 years after his conviction at trial of raping a 17-year old girl and for endangering her welfare as a child. Madison County News 10 (September 27, 2012).

- A New York substitute teacher in a Catholic elementary school was sentenced to 7 years in prison for raping a 13-year old female student. WCAX.com (August 24, 2012).

- A man who beat and forcefully raped a 19-year old female Wesleyan student was sentenced in a Middletown, New York Court to 15 months in jail, despite the victim-impact statements at his sentencing of her parents who described how "their bright, motivated and intelligent daughter had been destroyed' by this brutal crime.

- A Milwaukee cop who brutally raped a mother of 2 children was sentenced to 24 years. He was remorseless and did not apologize to the victim at his sentencing. <u>Milwaukee Journal Central </u>(July 30, 2012).

- A New Mexico officer who raped a 16-year old girl, who was a student at a high school which he was assigned to protect, was sentenced to 25 years. <u>Partales, N.M. Newsblog</u> (April 25, 2013).

- A Kentucky police officer, who was sentenced to 12 years for raping a woman in front of her 9-year-old daughter at gunpoint, had his sentence overturned on appeal less than 3 years later and was sentenced to time served on a plea deal. <u>WAVE News</u> (May 21, 2010).

- A Massachusetts police officer was sentenced to 12-to-15 years for repeatedly raping and assaulting a woman in his personal car while parked behind the police station. The sentencing judge termed the sentence, which makes the ex-officer eligible for parole after 10 years, as a "harsh sentence." <u>Eagle Tribune, North Andover, MA</u> (February 4, 2011).

- An ex-Detroit police officer was sentenced to 10 to 15 years imprisonment for a series of rapes of students, whose ages ranged from 10 to 14 years, who had been attending the "at risk children" instruction program that he operated. <u>MLike All Michigan</u> (September 23, 2013).

- A Pennsylvania officer who raped one woman at gunpoint and, in another episode, forced another woman to have sex with him in exchange for not arresting her, was sentenced to a 5-to 10-year term. Phillynews.com (June 8, 2002).

- A San Antonio, Texas police officer was sentenced to 20 years for repeatedly raping a 5-year old girl over a period of months. Inquisitr (November 4, 2012).

- A Florida police officer was sentenced to 9 years after he was convicted at trial for raping a 20-year old woman inside a police station after the officer pulled her car over for a traffic violation. WCTV News (July 22, 2011).

- A Philadelphia cop was sentenced to 6 to 20 years for raping a 14-year old girl. Mugshots.com (December 22, 2013).

- A Wisconsin police officer was sentenced to 2 years for a string of serial sexual assaults, of arrested and detained men, which involved sickening anal cavity searches and touching of genitalia, over the course of 2 years. Police State U.S. A News (December 28, 2013).

- A San Antonio, Texas police officer was sentenced to one year in prison for raping a woman while on duty. Boingnoing (January 19, 2011).

- A California police officer was sentenced to 1 year in jail, with the possibility of reducing his felony conviction to a misdemeanor and avoiding

the sex offender registry requirement, for raping a woman he was taking to jail while on duty. Redding.com.news (September 16, 2011)

- A St. Louis police officer was sentenced to 1 year in jail after forcing a woman, whom he detained in a traffic stop, to have sex with him on the threat of arresting her. Politics, U.S. (January 2, 2014).

- A Cleveland police officer, who threatened to send a female informant to prison unless she gave him oral sex, and then raped her when she refused, was sentenced to a few months' probation. Copblock (December 13, 2012).

Let's try this one on for size in considering whether a 30-yar sentence for a would-be photographer of an adult touching a child's privates should be subject to a 30-year mandatory-minimum. Only 2 weeks ago, Judge Lewis Kaplan of the SDNY agreed to accept a plea agreement that limited the punishment, to a maximum 25-year term, of a confessed al Qaeda spokesman and propagandist named Adel Abdel Bari, who was implicated in a 284-count indictment that included murder charges for the 224 people killed on Aug. 7, 1998, in the twin al Qaida bombings of U.S. embassies in Kenya and Tanzania. Taking into account the terror defendant's 10 years of pretrial detention, that disposition is almost certain to set free that high-ranking al Qaeda member less than 12 years from now to join his fellow rabid terrorists in committing acts of mass murder against

50

innocent civilians, including U.S. citizens, and against U.S. and coalition military personnel fighting the terror leagues in the Middle East, East Africa and elsewhere across the globe. Kaplan Accepts Plea Deal, Prison Term for al Qaida Spokesman, New *York Law Journal* (October 1, 2014).

Although Judge Kaplan had expressed misgivings that such a plea disposition was too lenient, given the defendant's complicity in knowing beforehand of, and conspiring with, his fellow terror group's members' dastardly plan to commit mass murder of hundreds of innocents, including dozens of American embassy personnel, and in addition, had disseminated threats, as an al Qaeda spokesman in the aftermath of the bombings, claiming that repeated similar acts of mass murder would be committed by al Qaeda in the future, the judge decided to defer to the judgment of federal prosecutors in our sister district across the Brooklyn Bridge that the defendant was less culpable than his co-defendants who had a more active role in the African embassy bombings. Yet, it remains a fact that, after the government agreed to drop the terror murder conspiracy and 224 individual counts of murder indictment against him, Bari pled guilty to a three-count information, and had admitted, in his plea allocution, to conspiring with top al Qaida figures Ayman Al Zawahiri and Ibrahim Eidarous "to kill American

51

citizens anywhere in the world," as well as to making threats of future attacks and to conspiring to make those threats.

Bari's 25-year plea disposition stands in stark unconstitutionally-unfair contrast to the 30-year mandatory-minimum punishment that the prosecution in this case, by employing the "sanctioned" artifice of luring Baslan and Henry to New Jersey, obviously decided was appropriate for two offenders with no priors, who apparently planned an "improper touching" episode with no child rape intentions. At no time was the government willing to entertain the notion that a 15-year sentence for Baslan, let alone a 10-year sentence, would by sufficiently strong punishment for his inchoate offense, despite the fact that there is no evidence of his commission of similar planned, much less, actual abuse of young children.

Comparing the agreed-upon 25-year maximum sentence for Bari's mass murder conspiracy with the doubling of the mandatory-minimum for the defendants in this case to the 30-years punishment the government decided was called for in this case is undoubtedly the most egregious example of unfairly disparate justice that anyone can possibly imagine. And yet, this unconstitutional disparity will become reality if Count One is not dismissed on this motion and Baslan gets a longer sentence than the spokesman for al Qaeda who confessed his

conspiratorial involvement in the African embassy bombings and to the 224 murders that resulted from those horrific crimes.

Unquestionably, some of the cases described above, such as the <u>Bari</u> terrorism case and some of the reported child rape cases, are extreme examples of disparate sentencing because they are shockingly lenient. But most of the cases reported by the media, or in reported case law or incorporated in federal and state statistical charts have involved offenses that, to put it mildly, were far more heinous than the Travel Act offense for which Baslan faces 30 years at a minimum. As the Supreme Court instructed in <u>Solem,</u> "[i]f more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive." 463 U.S. at 291. Here, the statistics and anecdotal data disclose more than merely "some indication" that a 30-year sentence for the conduct of which Baslan was convicted on Count One is "grossly excessive." By all reasonable standards, under the <u>Solem</u> tripartite test, such a sentence would plainly rise to the level of prohibited Cruel and Unusual Punishment under the Eighth Amendment. Baslan's conviction on Count One should therefore be vacated and the charged dismissed with prejudice because of the constitutional violation that a 30-year sentence would spawn.

## POINT TWO

**A POST TRIAL EVIDENTIARY HEARING IS NECESSARY FOR THE   COURT TO BE ABLE TO DETERMINE, ON A COMPLETE RECORD, WHETHER THE GOVRNMENT'S INSINUATION OF A JAILHOUSE INFORMANT VIOLATED BASLAN'S SIXTH AMENDMENT TRIAL AND COUNSEL RIGHTS UNDER THE <u>MASSIAH</u> RULE BY ELICITING THE DEFENSE TRIAL STRATEGY AND GIVING THE GOVERNMENT AN UNDUE AND UNCONSTITUTIONAL TRIAL ADVANTAGE THAT THE TRIAL RECORD CANNOT POSSIBLY MEASURE**

### a) The Pre-trial Massiah Motion Proceedings:

Baslan filed omnibus pretrial motions seeking various relief, featuring a motion to dismiss the indictment on Fifth and Sixth Amendment grounds under the <u>Massiah</u> rule based on the government's intrusion, months after Baslan was indicted and months before the trial, of a jailhouse informant, Frederick Celani ("Celani") who engaged Baslan in conversations about his defense motions and trial strategy. Two lengthy conversations, the first on July 1, 2013 and the second 30 days later on July 31st, between Celani and Baslan were recorded by means of a concealed device the government agents placed on the informant at the MDC.

The government sought to justify its sending in of Celani to investigate a supposed obstruction plan that Baslan had been confiding to Celani.  Initially, the obstruction investigation, which the government claims justified Celani's intrusion

into an indicted defendant's strategic plans, took the form of a supposed plot by Baslan to have a confederate destroy a Drobo external hard drive tower device, presumably because the component hard drives that had been attached to the Drobo tower stored additional child pornography or other evidence of Baslan's charged crimes. They did not, as a subsequent intensive government investigation of the Drobo hard drives disclosed.

The amended obstruction investigation was a purported plan by Baslan to "embarrass" the FBI by insisting on a digital examination of all the computer devices the agents had seized from Baslan's residence after his arrest, which did not include the Drobo or its component drives, which the agents inexplicably left behind, after seizing almost everything else that was not edible in the apartment. How the FBI was supposed to have been "embarrassed" by this cockamamie formula is, as the Talmudic scholars might say, an eternal mystery.

Shortly prior to trial, when confronted with the Massiah motion, the government conceded that the Celani- Baslan tapes, and any testimony regarding the discussions on those tapes, would violate the Massiah rule. In making that concession, the government contended, and the Court ultimately agreed, that it was justified in sending Celani to interact with Baslan because it had the right to investigate the evidence it had learned about his purported obstruction plan. However, the government never revealed any of the underlying particulars as to

how it learned of the plan. It also shifted the assumed initial focus of the plan from a plot to <u>destroy inculpatory evidence</u> in the Drobo drives with the assistance of an outside "confederate," to a plan to "embarrass" the FBI by suggesting that agents deliberately <u>destroyed exculpatory evidence</u> in the drives. The shift of position may have been influenced by the fact that in the interim between the first and second obstruction theories, the "confederate" cooperated with the government and turned over the Drobo drives (sans the Drobo external frame) to the FBI and no incriminating evidence was recovered in an exhaustive analysis of several terabytes of digital information that had been stored in the derives.

In any event, the Court, in denying the requested <u>Massiah</u> hearing, accepted the government's position that it did not commit a violation of the rule because it did not deliberately send Celani to Baslan with the aim of "goading" Baslan to speak about his case and his trial strategy. Memorandum and Order filed July 11, 2014 (ECF Document 109) ("Court Mem.") at 2.

As such, under <u>Kansas v. Ventris,</u> 556 U.S. 582 (2009) and <u>Maine v. Moulton,</u> 474 U.S.159 (1985), the Court held that the only remedy for an "undirected" <u>Massiah </u>violation would be to exclude any inculpatory statements made by the defendant to the government's informant from its case-in-chief at the trial, but such inculpatory statements would be permitted to be introduced in a rebuttal case by the government. Court Mem. at 8-9.

Given that the government did not include any of the Celani-derived evidence in its rebuttal case at trial, we take no issue with this prong of the Court's decision. We also do not suggest, given the record, any *ab initio* deliberate intrusion by the government that was an intentional violation of <u>Massiah</u>.

The government's also maintained that it did not violate the "spy-in-the – camp" prohibition by the Celani intrusion into Baslan's trial strategy which, pursuant to the Supreme Court's opinion in <u>Weatherford v. Bursey</u>, 429 U.S. 545 (1977), extended the scope of the <u>Massiah</u> rule to forbid the government from profiting by deriving privileged trial strategy information that a target defendant had with his attorney by means of a planted informant. The Court agreed with the government on this point, as well, without affording Baslan a requested <u>Massiah</u> hearing, and it is as to this second prong that we beg to differ and request a post-trial <u>Massiah</u> hearing, as discussed more fully below.

We also take respectful issue with the Court's pre-trial analysis that absolved the government from the <u>Massiah</u> prohibition by continuing to send Celani to engage Baslan in a discussion of pretrial and trial issues and in developing a defense trial strategy, particularly after the July 1st tape recording disclosed beyond doubt that Celani was pursuing those <u>Massiah</u>-forbidden avenues. In that regard, we ask the Court to re-examine its pre-trial determination that the "spy-in-the-camp" corollary to the <u>Massiah </u>rule was not violated because Baslan did not

57

discuss his trial strategy with his first and current counsel, and instead, only discussed it with a "Rabbi" and that, therefore, the Court had "serious doubts that his attorney-client relationship was implicated at all." Court Mem. at 8.[9] We also respectfully ask the Courts to reconsider its conclusion that "Baslan confirmed that he never discussed his defense theories with his current attorney and gave no indication that he developed these theories in consultation with either his current or previous attorneys." Id.

In email correspondence as early as May 2013 from her first counsel to Henry, counsel described the defense strategy articulated by Baslan in a co-defendant meeting, some 5 months prior to my involvement in the case. As set forth in counsel's email, which we will be glad to make available to the Court and the government (although it already has it), that strategy was to contend that Baslan's intent in engaging Jack in the "reverse entrapment" plan to develop proof for the Rabbis in the community, which would expose Jack as a child molester and pedophile who needed compelled psychological counseling to protect his own and other children. It is evident that this strategy was discussed by Baslan with counsel in the periods preceding and overlapping with the July 2013 recorded Celani-Baslan discussions. It is precisely the testimony that Baslan gave on the stand when he testified.

---

[9]Without naming names or going into particulars, I can assure the Court, from my personal experience, that the fellow Baslan referred to on the tapes, as they say in certain neighborhoods, "ain't no" Rabbi.

In fact, the only time Baslan was heard deviating from a consistent trial strategy is recorded on the tapes, specifically the July 1st recording, and to some extent, repeated in the July 31st recording, where Celani voices his preference for the "documentary" approach over the "investigative" approach to which Celani, apparently an avid reader of 1940's children's mysteries, refers as the "Nancy Drew shit." Tellingly, when Celani opines that no juror would believe the "Nancy Drew shit," a prescient opinion as it turned out, Baslan is heard responding very clearly, "I know. But it's true."

We also ask the Court to re-evaluate whether that the "simple expedient" of listening to two recorded jailhouse discussions was a sufficient record on which to deny Baslan's requested pre-trial <u>Massiah</u> hearing, Court Mem. at 3, and to grant him a post-trial hearing to expand the record. It is beyond cavil, as the well-worn legal expression goes, that Celani engaged Baslan in countless discussions about Baslan's case over the course of much longer than the "one month " period conceded by the government in one of the pre-trial hearing arguments on this subject. It stands to reason, just by dint of the 29-day span between recordings, that a <u>Massiah</u> hearing record would have filled in some important blanks, as it were, in non-recorded discussions during that period alone. But in the absence of a more expansive, and perhaps more accurate, record that only a <u>Massiah</u> hearing would

afford, the factual determinations are reduced to what the government, or perhaps, Celani himself, chose to record.

The Court, in reaching its determination not to grant a hearing, but instead, relying on the tapes, reasoned as follows:

> In so doing, the Court could directly ascertain what Baslan and CS 2 [Celani] discussed and try to resolve the central question of whether Baslan was prodded into these schemes by CS 2 under direction from the government. That question is central because, absent such trickery, the government is correct that Moulton and Ventris set forth the full extent of Baslan's available remedy… If further inquiry were necessary, the parties could have then examined CS 2 on the question, as well as the contents of his unrecorded conversations with Baslan. Further inquiry is unnecessary.

Court Mem. at 3-4.

We respectfully demur and ask the Court to reverse itself on the bases discussed in this memorandum because, in the absence of a hearing, we have no record as to whether "trickery" was employed, perhaps not in the first instance, but more readily in the repeated intrusions into the particulars of Baslan's pretrial motions and trial defense strategies. As an illustration, assuming, against reason, that Celani's first elicitation of trial strategy occurred on July 1, 2013, when the first recording was made, and was repeated only once, on July 31st, the day of the second recording, would not the deliberate elicitation on that day of Baslan's defense strategy amount to "trickery"? By *a fortiori* reasoning, assuming logically that the government was given a preview by Celani, <u>before</u> the July 1st recording,

that Baslan was prone to wax with enthusiasm about his trial strategy in response to Celani's questioning, would not every ensuing intrusion of Celani into discussions with Baslan about trial strategy--even along with "justified" obstruction-related questioning, including both recorded conversations reviewed by the Court prior to denying the requested hearing-- amount to "trickery"? Only a Massiah hearing record can answer that question with reasonable certainty.

Additionally, the Court placed substantial reliance in denying the Massiah hearing prior to trial, in the government's formulation of a "taint team" to insulate the prosecution team from any forbidden information. Court Mem. at 4. As we discuss more expansively below in subsection b, that unfortunately did not happen in this case. In fact, as the capable lead prosecutor candidly acknowledged in pre-trial oral argument, only a "taint prosecutor" had been designated, and that equally-capable prosecutor had decided at an earlier junction, although we still do not know when, that a "taint team" was no longer necessary, although we still do not know why.

Finally, the Court's observation that the Celani-Baslan recordings disclose that Baslan only revealed "general" trial strategy rather than "specific" trial strategy is subject to question on two grounds. The Court reasoned that "Baslan never really provided much more than a hazy outline of his theories, not the specific strategies the government uncovered in, for example, in Danielson …."

61

Court Mem. at 8, referring to  United States v. Danielson, 325 F.3d 1054, 1061-64 (9th Cir. 2003).

First, it is a difficult distinction, indeed, to contrast general and specific trial strategies. In this case, the Jack-Baslan recordings are concededly quite incriminating on their face. If Baslan was truthfully expounding on a plan to commit child sexual abuse, as would be fair to infer from his words on those tapes, and as the jury concluded in convicting him, his discussions with Celani of what his defense would be, specifically, a plan to expose Jack as a repeat child sex abuser, which Celani colorfully called the "Nancy Drew shit," are both "general" as well as "specific." They are general in that there are no specifics as to how and to whom Baslan would "expose" Jack. At the same time, the recorded strategy discussions are specific enough to have given the government an unfair trial advantage in combating the expressed defense strategy. Additionally, a hearing would have cleared up the question of whether Celani turned over Baslan's handwritten notes about the case and his trial strategy, which Celani stole from Baslan after Baslan was moved from the unit, to the government.

An excellent example of such an unfair advantage, for example, would be the government's exclusion of Jack as its primary fact witness at trial, thereby averting a strong defense counter-attack against the government's case with a cross-examination that exhumed his self-confessed history to Baslan, and perhaps

the government, as well, of his repeated child sex abuse, including his videotapes of some of his repeated statutory rapes of teen-aged girlfriends. Such a probing examination of the unreliability of the government's chief, and indeed, only non-hearsay informant about the charged crimes was rendered impossible by the government's substitution of Steven as its hearsay fact witness. Although Steven related only generalized information about his brother's manic-depressive disorder, suicide attempts and heavy drug abuse, he purportedly knew nothing about his brother's sexual abuse of his own children or his brother's history of statutory rapes of teenaged girls.

The second flaw in the Court's analysis on this point, eloquent and scholarly as it is, concerns its distinguishing the <u>Danielson</u> opinion from the record of this case, even in its present form. The <u>Danielson</u> case, where the Ninth circuit remanded to the trial court for a post-conviction <u>Massiah</u> hearing, is, in every salient respect, "on all fours' with our case.

<u>Danielson</u> concerned the defendant's violation of the Lacey Act, which criminalizes the selling and transporting in interstate commerce of a deer without a state-issued tag, which concededly is not one of the more popular prosecutions in the Eastern District of new York. The factual gist of the <u>Danielson</u> case is that the government sent in an informant to the defendant for the purpose of investigating serious obstruction plans by the defendant, and the informant, who was wired,

63

elicited the defendant's incriminating statements on recordings. In the recorded discussions, the defendant, in a general sense, spoke about his plan to bribe one or more jurors at his trial and about his resolve to testify falsely that he had only intended to lease a dead deer, rather than to sell it.

Danielson is distinguishable from this case only insofar as the government did not at all reveal the existence of the incriminating tapes produced by its informant prior to trial until the defendant was about to be cross-examined. In our case, the government turned over the Celani tapes in advance of trial, but only over 3 months after they were produced in July 2013, and only after Baslan, during a proffer session several weeks before the tapes were disclosed, made it evident to both the trial team and the "taint AUSA" that, by then, he had figured out that Celani had been cooperating against him and providing the government with details of their discussions before Baslan was abruptly moved out of the unit. In that regard, MDC personnel had advised Baslan that the reason he was moved out the unit was because of Celani's operation as a jailhouse lawyer.

In every relevant factual category, however, Danielson is completely apposite to our case. As in this case, Danielson involved the following substantially similar factual categories: 1) a claimed obstruction plan by the defendant to give false exculpatory testimony at trial: 2) the government's claimed justification to send its informant to elicit information from the defendant premised

64

on that planned "obstruction"; 3) an informant who effectively became a "spy-in-the-camp" although the defendant allegedly volunteered his trial strategy to him and no privileged counsel-defendant discussions were "overheard" by the informant"; 4) a "taint team" procedure which involved the selective reading by the case agent of purportedly non-<u>Massiah</u> information from the informant's tape transcripts to the prosecutor, but which nevertheless was considered insufficient to wall off any taint because all the case files, including the transcripts, were physically kept in the prosecutor's office: 5) an informant who was not called by the government at trial; 6) information derived from the government's "spy-in-the-camp" which was not introduced at trial; 7) a trial strategy which the defendant described to the informant in general terms by referencing prior similar offenses and remarking that it would be his word against that of the government's trial witness, 8) an obstruction plan the defendant described to the informant, in terms as specific as Baslan employed in his conversations, both recorded and otherwise, with Celani, whereby the defendant confided to the informant his plan to testify falsely in an exculpatory manner that he had conveyed the carcasses as a permitted lease rather than a forbidden sale. <u>Danielson</u>, 325 F.3d at 1060-1065.

In words particularly relevant here, the Ninth Circuit reasoned that although it may have been permissible for the government to send in the informant to learn about the "new crimes" relating to the defendant's obstruction, jury tampering and

juror bribery plans, "[h]owever, once the police learned on December 8 that [the informant] Sava had obtained trial strategy information (and therefore knew that he might learn more such information in future conversations), the prosecution team was on notice of a potential Sixth Amendment violation if Sava, now acting on behalf of the government, continued to have conversations with Danielson." <u>Id</u>. at 1068.

The Ninth Circuit distinguished <u>Weatherford</u> on its facts, concluding that unlike <u>Weatherford</u>, (and, parenthetically like this case), the government continued to send in the informant to learn additional trial strategy information from the defendant after it knew that the informant had embarked on such a mission:

> This case is materially different from *Weatherford*. First, unlike in *Weatherford*, Sava "purposefully intru[ded]" himself into the attorney-client relationship. In *Weatherford*, Bursey and his counsel initiated the meetings and invited Weatherford to attend, and Weatherford would have jeopardized his undercover status by not attending. Further, there was no evidence that Weatherford had initiated conversation on privileged topics. By contrast, Sava initiated conversations with Danielson on privileged matters, and would have jeopardized nothing by not asking the questions that elicited the privileged information.

<u>Id</u>.

It should be remembered that in <u>Danielson</u>, the informant engaged the defendant directly in an improper manner, without the actual presence of counsel, as in a co-defendant setting, by probing repeatedly into attorney-client privileged

66

matters, as Celani was permitted, if not directed, to do in Baslan's case. Yet, that was found, by negative factual inference, to be a "spy-in-the-camp" Weatherford violation in Danielson. As such, the government's distinction between a planted informant who overhears privileged attorney-client discussions, which can give rise to a Weatherford violation, and cases, such as this one (and parenthetically, Danielson and Moulton, among others), where the privileged information was extracted by the informant without counsel's presence, and therefore, according to the government, cannot result in a "spy-in-the-camp" violation, is plainly erroneous.

The Ninth circuit drew an analogy from the line of cases following Kastigar v. United States, 406 U.S. 441 (1972) where the Supreme Court shifted the burden to the government of showing that a defendant who had been granted use immunity to testify in the grand jury, was thereafter indicted on evidence completely independent from the defendant's own partially-immunized grand jury testimony, and the First Circuit *per se* rule in United States v. Mastrioanni, 749 F.2d 900, 908 (1st Cir.1984), which shifts the burden to the government in all cases where a *prima facie* Massiah violation showing was made by the defense. Using that analogy from Kastigar and Mastrioanni, the Ninth Circuit placed the burden of establishing that no Massiah violation occurred squarely on the shoulders of the government in situations, such as that presented in our case, that involved the

informant's inquiries into trial strategy rather than on concrete pieces of potential

evidence. As the Court explained:

> Most Sixth Amendment interference-with-counsel cases involve
> particular pieces of evidence obtained by the prosecution as a result of
> the unconstitutional interference. The evidence is often an
> incriminating statement made to a government informant. *See, e.g.,*
> *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364
> (1986); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12
> L.Ed.2d 246 (1964); *United States v. Harris,* 738 F.2d 1068 (9th
> Cir.1984); *United States v. Shapiro,* 669 F.2d 593 (9th Cir.1982);
> *United States v. Bagley,* 641 F.2d 1235 (9th Cir.1981). In other cases,
> the evidence is physical. For example, in *Brewer v. Williams,* 430
> U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the Sixth
> Amendment violation revealed information that led the police to the
> body of the victim. In cases where the prosecution has obtained a
> particular piece of evidence, such as an inculpatory statement or a
> dead body, we have put the burden on the defendant to show
> prejudice. In *Bagley,* for example, we wrote that "to establish a
> violation of *Massiah* defendant must show that he suffered prejudice
> at trial as a result of evidence obtained from interrogation outside the
> presence of counsel." 641 F.2d at 1238. Placing the burden on the
> defendant in such cases makes good sense, for the defendant is in at
> least as good a position as the government to show why, and to what
> degree, a particular piece of evidence was damaging.

325 F. 3d at 1070.

However, where the focal point of the informant's intrusion crosses the line

into eliciting trial strategy, as it did in this case, the Ninth Circuit held that the

burden of disproving a Massiah violation by the preponderance standard must be

placed on the government because it would be unfair to saddle a defendant with the

68

burden of proof about matters that only the government could possibly know about:

> In cases where wrongful intrusion results in the prosecution obtaining the defendant's trial strategy, the question of prejudice is more subtle. In such cases, it will often be unclear whether, and how, the prosecution's improperly obtained information about the defendant's trial strategy may have been used, and whether there was prejudice. More important, in such cases the government and the defendant will have unequal access to knowledge. The prosecution team knows what it did and why. The defendant can only guess.

Id.

In Baslan's case, the absence of a Massiah hearing prior to trial created the situation where Baslan was left only guessing, until the government pulled the Steven-for-Jack switch, how the government used his disclosed trial strategy to its undue trial advantage. He is still guessing as to whether and how the trial strategy violations unfairly prejudiced him in other subtle, yet unconstitutionally violative, ways. Now that we have a trial record that sheds some light on the issue, a Massiah hearing will further illuminate, on the basis of a complete record, the ultimate question of prejudice, rather than reducing it to guesswork because when trial strategy is targeted, the "question of prejudice is more subtle." Id.

Finally, the Ninth Circuit reversed the conviction, and remanded to the district court for a full Massiah evidentiary hearing, as we urge the Court to do,

before we reach the appellate level, on the issues we raise here. The <u>Danielson</u>

blueprint for the requested hearing, we respectfully submit, should be followed in

the post-trial <u>Massiah</u> proceedings we ask the Court to conduct:

> Under the second step of the [Mastroianni/Kastigar] analysis, the government must introduce evidence and show by a preponderance of that evidence that it did not use this privileged information. Specifically, it must show that all of the evidence it introduced at trial was derived from independent sources, and that all of its pre-trial and trial strategy was based on independent sources. Strategy in this context is a broad term that includes, but is not limited to, such things as decisions about the scope and nature of the investigation, about what witnesses to call (and in what order), about what questions to ask (and in what order), about what lines of defense to anticipate in presenting the case in chief, and about what to save for possible rebuttal. The district court did not apply this standard in its post-trial hearing in this case. We remand to permit it to hold an evidentiary hearing at which this standard can be applied.

<u>Id.</u> at 1074.[10]

Although the Court cited to <u>Danielson</u> in its order denying the requested pre-

trial <u>Massiah</u> hearing, it did so in passing and as an inapposite case which should

be contrasted from ours. We believe, particularly with the benefit of hindsight

provided by the government's altered trial strategy in substituting Steven for Jack,

that this was error, and that the error which inhered in not exposing the

---

[10] On remand, the government and Danielson worked out a disposition whereby Danielson's charge was reduced to a misdemeanor and he was resentenced to time served. Amended Judgment, <u>United States v. Danielson</u>, Case No. CR-99-60035 (D. Or. Filed February 4, 2005). Apparently, the government in that case was unable to satisfy its burden, by the preponderance standard, that the conviction was obtained independently of <u>Massiah</u>-tainted evidence relating to that defendant's elicited trial strategy. .

government's <u>Massiah</u> wound to the sunshine of a full factual record deprived Baslan of a fair trial in violation of his Sixth Amendment counsel rights.

We respectfully urge the Court to reconsider its pre-trial denial of the hearing we had requested and to grant a post-trial hearing whereby a clear record can be made of whether the trial and resulting conviction were tainted by the government's unwarranted intrusion of its "spy-in-the-camp" to mine Baslan's strategic thinking and thereby derive an unconstitutionally-unfair litigation advantage over him. This was exemplified, in concrete terms, by its decision to substitute Steven for Jack, who was the subject of the trial strategy attack that Celani probed Baslan about in both recordings and, as a hearing will establish, did so repeatedly and insistently not only when the recorder was on, but also throughout much of the nearly 6- month period when the two of them were in the same MDC unit. As a factual corollary that we can hear plainly on the recordings, Celani actually directed Baslan as to how to couch his defense, and he also repeatedly urged Baslan to "destroy the Drobo." As events unfolded, it is obvious that Baslan did not follow Celani's advice on either score. But is equally clear, even from the recorded tapes alone, that the government, courtesy of its jailhouse spy and manipulator, had an unfair preview into Baslan's trial strategy and, given the demonstrated competence of the prosecution team, and I say this with respect

and without facetiousness, it stands to reason that the government took advantage of the situation in formulating its counter-defense trial strategy.

It is equally obvious, however, that the same competent FBI agents who were spearheading Baslan's prosecution on the investigative side, and with resounding success it turned out, were also handling the Celani side of the government's campaign against Baslan. It is for that additional reason that the government's designated "taint team," although centered, if not exclusively, on a particularly capable AUSA who was not part of the prosecution team, was not really a "taint team" of any effectiveness so as to avert any <u>Massiah</u> taint to the prosecution. A hearing will establish this additional flaw in the government's <u>Massiah</u> position.

**b)** <u>**The Scope of the Massiah Rule And Its Application To This Case:**</u>

The Sixth Amendment right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings" by the defendant's "indictment, information or arraignment." <u>Kirby</u> v. <u>Illinois</u>, 406 U.S. 682, 689 (1972). When a confession is deliberately elicited by law enforcement in the absence of counsel or

a proper, knowing waiver by an indicted defendant of his right to counsel, such interference between counsel and a defendant violates the Sixth Amendment. Brewer v. Williams, 430 U.S. 387, 399 (1977) (the "Christian burial speech" case).

In Massiah v. United States, 377 U.S. 201, 206 (1964), the Supreme Court established a bright line prohibition against a governmental covert operation designed to elicit statements from an indicted defendant about his pending charges. Massiah's factual background involved an undercover conversation during which the defendant was led into making self-incriminatory statements while riding in a cooperator's car. Accord, Kansas v. Ventris, 556 U.S. at 592 (Massiah is infringed at the time of the uncounseled interrogation); Maine v. Moulton, 474 U.S. at 179-80 (Sixth Amendment right to counsel was violated by the admission at trial of incriminating statements made by defendant to informer after indictment and at the meeting of the two to plan defense strategy for the upcoming trial). The Massiah rule took its most classic form in United States v. Henry, 447 U.S. 264, 269 (1980), where, as in this case, a jail plant, as Celani was, actively engaged the indicted defendant in conversation about his charges. As Moulton establishes, the Massiah rule is violated whenever an informant, as in this case, was permitted to invade the defense camp by engaging a defendant to speak about defense trial strategy even outside a setting, such as a co-defendant meeting, where the informant is injected as a classic "spy-in-the-camp."

As we argued in our pretrial motion, the three significant exceptions to the application of the Massiah rule do not apply in this case. This is not a case where, as in the first exception to Massiah, a jailhouse informant merely reported volunteered or overheard statements by the defendant. See Kuhlmann v. Wilson, 477 U.S. 436, 460 (1986); United States v. Edwards, 342 F. 3d 168, 182 (2d Cir. 2003). To the contrary, as the Celani recordings disclose, Celani actively pursued Baslan in questioning him about the specifics of his defenses to the prosecution, his trial defense strategy and his privileged conversations about the case with his lawyers. Celani also instructed Baslan to keep their own discussions confidential, even from his existing or newly-retained attorneys.

This is also not a situation where the second exception to the Massiah rule applies, the so-called "offense-specific" or "new offense" exception. Although a defendant indicted for one offense, thereby attaching his Sixth Amendment right to counsel for that offense, may nevertheless be the subject of a covert jailhouse informant operation as to another offense for which he has not been charged, McNeil v. Wisconsin, 501 U.S. 171, 175 (1991), that exception also does not apply in this case. Although the government may have been justified in initially sending Celani to Baslan to investigate obstruction, it crossed the line into the prohibited Massiah realm when it allowed Celani to repeatedly question Baslan about the

existing charges and his defense strategy in great detail, and beyond that, to actually counsel Baslan as to particulars of the trial strategy.

Similarly, <u>Massiah's</u> third principal exception applies because it did not "instruct" Celani "to get information about [Baslan] concerning the pending indictment." <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Birbal,</u> 113 F. 3d 342, 346 (2d Cir. 1997) (informant "not instructed" by the police); <u>United States</u> v. <u>Ginsberg</u>, 758 F.2d 823 (2d Cir.1985) (mere presence of a government informant at a status conference does not violate the 6th Amendment).

As demonstrated by the virtually identical discussion of the same topics at the end of July 2013 to that of the beginning of that month, the government plainly knew that Celani was digging deeply into Sixth Amendment-prohibited territory. If the prosecution did not deliberately instruct Celani to cross the line on July 1st, it certainly, at the very least, turned a blind eye to his repeat performance on July 31st. There is no other rational explanation for those indisputable facts.

It is evident just from the only two Celani-Baslan conversations that were recorded that Celani was not sitting in the room with Baslan, day after day for months, merely as a "potted plant." Celani was proactive, in every sense of the word, in extracting the innermost thoughts of Baslan regarding the means and methods of how he intended to defend his case. Moreover, Celani repeatedly offered his advice to Baslan as to which motions would benefit Baslan and as to

the strategic approach that would best defend him against the charges. In effect, the government allowed its jailhouse informant to attempt to become the architect of the defense.

The thought that a "taint team" would have guarded against a direct <u>Massiah</u> violation would have been justified had a real "taint team" actually been put into place and a strict "Chinese wall" erected between the knowledge conveyed to the "taint team" and the information that team allowed to be filtered to the prosecution team free of any <u>Messiah</u> or privileged defense information the targeted defendant had conveyed to the government spy. But that plainly did not happen. It is evident, even on the basis of the present record, that the government failed to follow the "stringent firewall procedures" that would have prevented the unconstitutional invasion of Baslan's Sixth Amendment counsel rights, as expressed so eloquently by Judge Garaufis in <u>United States v. Massino,</u> 311 F. Supp. 2d 309, 313 (E.D.N.Y. 2004),  and cited in the Court's denial of Baslan's pre-trial motion for a <u>Massiah</u> hearing as the basis on which the Court "opted for a middle course" that centered on reviewing and analyzing the two  Celani-Baslan tapes. Court Mem. at 6.

It is not surprising that in the pre-trial motions arguments, the capable lead prosecutor, after weeks of <u>Massiah</u> litigation, for the first time announced that a "taint AUSA" had been appointed for the case. Perhaps the reason for that, as he

disclosed, was because the "taint AUSA" had determined, at some point well before the hearing, that there was no need for that procedure. There was never even a suggestion by the government that a separate "taint agent team" had been established to demarcate what information was Massiah-sanctioned for disclosure to the prosecution team agents. Instead, it can be clearly inferred that the "taint" and prosecution agent "teams" were one and the same.

As the Court observed, federal courts have expanded the Massiah protection in the situation of the proverbial "spy-in-the-camp" in the wake of Weatherford. In that case, the Supreme Court concluded that an informant's attendance at jailhouse co-defendant meetings was not a *per se* Massiah violation because this was not "a deliberate attempt" by the government to invade the defense camp, no information about the meeting was relayed to the prosecution team and no "tainted evidence" was offered at trial. 429 U.S. at 554-59. By plain negative inference, Weatherford stands for the proposition that where these three factors are present, a Massiah violation will have occurred.

In its pre-trial arguments, the government attempted to dodge the Weatherford analysis because it contended that this was not a "spy-in-the-camp" situation. The Court took a different approach in reaching the same conclusion by finding that "the simple expedient of listening to the recordings" would determine "the central question" whether Baslan's remedy was confined to precluding the

government from using the <u>Massiah</u>-derived evidence against him, under <u>Ventris</u> and <u>Moulton</u>, from its case-in-chief at trial (Court Mem. at 4).

We respectfully urge the Court to reverse itself and allow us to make a complete factual record, by means of a post-trial <u>Massiah</u> evidentiary hearing, on the basis of which the Court can determine whether the <u>Weatherford</u> standards were violated in this case and, derivatively, whether Baslan is entitled to a new trial prosecuted by another team unfamiliar with the <u>Massiah</u>-tainted evidence. That is the appropriate test to employ, we respectfully submit, in order to determine whether the verdict should stand or whether a new trial is warranted so that a taint-free verdict can be obtained, and if a conviction should again ensue, that this time it is free of any doubt about compromising Baslan's Sixth Amendment right to counsel.

As discussed in detail in subsection a above, this case bears the same factual earmarks, and for that reason should yield the same legal conclusion, as <u>Danielson</u>, where the Ninth Circuit remanded the case post-conviction to the district court for a <u>Massiah</u> evidentiary hearing to determine whether the defendant suffered undue prejudice as a result of the government's sending in a "wired" cooperator who recorded privileged defense information, including the defendant's trial strategy. 325 F.3d at   .

By contrast, this case is entirely distinguishable from <u>Mastrioanni</u>, which <u>Danielson</u> relied upon, by negative inference, in fashioning the remedy we seek on this motion, where the First Circuit affirmed the defendant's conviction, holding that the <u>Massiah</u> rule exception applied because the government merely authorized a recently-turned cooperating defendant to attend jailhouse co-defendant meetings for his own safety, did not wire him up or instruct him to elicit information from co-defendants and did not use any information it obtained from the cooperator. 749 F.2d at 908.

It is plain on the existing record alone that the following facts can either be established or inferred with some assurance: 1) the government sent Celani to Baslan to elicit information from him deliberately; 2) there was no "safety" issue for Celani; 3) the government wired-up Celani for at least the two July recordings that it turned over, albeit belatedly, in terms of Rule 16(a) requirements; 4) the government, notwithstanding its claim that there was no deliberate effort to use Celani to violate Baslan's rights under <u>Massiah</u>, certainly knew, just by listening to the July 1st conversation, that Celani was delving headlong into forbidden <u>Massiah</u> territory with Baslan after that point; 5) despite that, the government continued to use Celani as a spy-in-the camp, without any constitutionally required limitations; 6) the government continued to obtain privileged and forbidden information in this fashion; 7) government did not set up an actual functioning "taint team" to review

79

and screen the Massiah-tainted information from the prosecution team; and, finally, 7) the government learned, in some detail, Baslan's defense trial strategy in relation to the existing charges in violation of the Sixth Amendment.

In conclusion, the government cannot dodge this Constitutional bullet simply by the expedient of not having called Celani as a trial witness and not having introduced any of the specific information derived from the Celani-Baslan tapes at trial. Instead, as Danielson pointed out, in reasoning particularly apt to our case, there is no way that a trial court can measure the unfair prejudice resulting from the government's elicitation through a planted informant from a defendant of his trial strategy without a full evidentiary hearing. This situation is different from, and requires a more exacting analysis on the basis of an evidentiary hearing, than the case where the informant elicits specific admissions from the defendant. The extraction of specific facts from a defendant can be far more readily analyzed in the context of, for example, recorded conversations, and can be obviated by the preclusion of such admissions by the government from its case-in-chief. The extraction of trial strategy, by contrast, does not lend itself to such a neat expediency.

Instead, the government's Constitutionally-prohibited intrusion, via Celani, into Baslan's privileged trial strategy information may have irremediably compromised Baslan's right to a fair trial as the "fruit of a poisonous tree" under

80

the Wong Sun doctrine. The only appropriate remedy, at this post-trial stage, is to hold an evidentiary hearing to develop a full record, one which is not limited to hearsay-laden testimony of federal agents, but where Celani's testimony, and Baslan's, would be presented and tested by competing examinations. Only through such a meaningful hearing will there be no misapprehension as to the fundamental question of whether a Massiah-forbidden Sixth Amendment violation permeated the trial as a result of an undue strategic advantage derived by the government or whether the government's position, as ultimately adopted, in  substantial part, in the Court's pre-trial denial of the requested hearing, should prevail.

### c) Why The Court Should Reconsider Its Pre-trial  Denial of the Massiah Hearing and Grant Such a Hearing at this Time:

Shortly prior to trial, when confronted with the Massiah motion, the government conceded that the Celani- Baslan tapes, and any testimony regarding the discussions on those tapes, would violate the Massiah rule. The Court accepted the government's argument that it did not violate the "spy-in-the–camp" prohibition by the Celani intrusion into Baslan's trial strategy which, pursuant to the Supreme Court's opinion in Weatherford, extended the scope of the Massiah rule to forbid the government from unfairly profiting by deriving privileged trial strategy information that a targeted defendant had with his attorney.

We believe that a pre-trial <u>Massiah</u> hearing would have established, and the post-trial <u>Massiah</u> hearing which we now seek will establish, that the "embarrassment" plan was concocted, in the main, if not exclusively, by Celani, who encouraged Baslan to adopt the plan and then took this to the government as evidence that he had uncovered another obstruction scheme by Baslan for which he should get a reduction in his sentence. In fact, as a hearing will establish, Baslan's *pro se* MD-Hash analysis motion, which the Court cited as evidence that Baslan had hatched the "embarrassment" plan, was actually drafted by Celani, with Baslan's input as to the computer terminology.

As such, although, as the Court observed in its denial of the pre-trial <u>Massiah</u> hearing, that there "is evidence before us that the defendant conspired to obstruct these proceedings through an elaborate fraud on the Court" (Court Mem. at 1), it is hardly free from doubt that Celani, who ultimately failed to achieve a cooperation letter to reduce his sentence, was not a pivotal conspirator in the plot. It stands to reason that Celani, who had drafted the triggering HD-Hash motion, complete with case law citations and in fairly-readable form for a jailhouse abogado, and thereafter, actually urged Baslan to file the motion *pro se* before I was initially retained as Baslan's counsel, would have hoped to benefit himself by "pulling the wool" over two sets of eyes—Baslan' and the government's. Celani, a lifelong fraudster and risk-taker, understood that by exposing the "embarrassment"

plan to the government as Baslan's exclusively, he might win the gamble to further his own interests as a cooperator. A post-trial <u>Massiah</u> hearing will establish Celani's manipulation in formulating and enabling an obstruction to arise in the first place whereby the FBI would supposedly be "embarrassed" into admitting that it had destroyed computer evidence when, in fact, no rational fact-finder would have accepted such a bone-headed contention.

But whether the obstruction was Celani's idea or Baslan's alone is not the issue we raise in this post-trial motion. Assuming, for argument's sake, and giving deference to the Court's factual findings in denying a pre-trial <u>Massiah</u> hearing, that this revised, largely metaphysical obstruction scheme was actually originated exclusively by Baslan, that nevertheless would not give the government license to use a justified intrusion of its informant to engage with, and get evidence from, an indicted defendant about possible new or other crimes, such as Baslan's obstruction scheme, and then deliberately allow that informant also to elicit information from Baslan about his trial strategy in defending against the charged crimes.

Nevertheless, it is plain, just from the two only recordings that Celani made, at the government's direction, out of the multitude of conversations he had with Baslan at the MDC over the course of at least a half year between March 2013, when Baslan was arrested, and November 2013, when the two were separated, that

Celani repeatedly and determinately elicited defense trial strategy from Baslan. It is equally evident from the recordings that the government knew about Celani's penetration into the Massiah territory after listening to the July 1st tape, but nevertheless allowed Celani to commit a second Massiah violation by sending him wired up against Baslan just over 4 weeks later. But it strains credulity, as another overused expression goes, that those were the only two forays by Celani across the Massiah bright-line division.

To the contrary, it is fair to conclude, even in the absence of a Massiah hearing record, that Celani shared this information, not only by means of the tapes, but undoubtedly in direct meetings with FBI agents, and perhaps prosecutors who were on the government's trial team. But we can only establish what actually happened either from a government disclosure or from a hearing, neither of which we were granted. Even more significantly, as both the July 1st and July 31st tapes establish, Celani was front and center in discussing trial defense strategy with Baslan. Celani was overheard advising Baslan which of the two permutations of the defense trial strategy, one of which Celani aptly named "the Nancy Drew shit" and the other to which he referred as the "documentary," was the more persuasive.

These were not merely the words of an informant who was forced to give such advice because if he declined to do so, his cover would be blown. This was the deliberate plan of a government "plant", effectively a "spy in the camp," who

84

not only demanded money, food and other prison amenities from Baslan, as a jailhouse "client," as he did from several other "clients," but who undoubtedly was hoping for a reward by the government that would lead to a reduction of his sentence. His hoped-for reward never materialized for reasons still undisclosed, but which, we can confidently infer, cannot possibly be a testament to Celani's reliability as an informational source.

It is immaterial whether Baslan solicited Celani's advice at the outset of their relationship, or whether Celani approached him. It is similarly immaterial whether the government sent Celani in to Baslan *ab initio*, or whether, as is more likely, Celani was the first to approach the government with the revelation of Baslan's "obstruction scheme." What is essential to remember, in analyzing the merits of Baslan's motion for a post-trial <u>Massiah</u> hearing, is that the two tape recordings we have establish three important facts.

The first is that Celani was aggressively eliciting trial strategy from Baslan and that Celani went a step further by actually counseling him as to the better approach to the trial strategy Baslan should take. The second fact, as is also evident from the recordings, is that Celani was probing Baslan as to his otherwise privileged conversations with both his then-current counsel and with me, as I was in the process of being retained as his successor counsel. The third fact is that, 30 days later, despite the prosecution team's awareness that Celani had crossed the

line into forbidden Massiah territory, it sent Celani back to Baslan with a recorder and Celani crossed the line yet again into forbidden Massiah territory by, in almost identical fashion, eliciting from Baslan his strategic thinking and again advising Baslan of the better approach to take in fashioning his trial defense.

That is why the Court, in its opinion, which characteristically is well-researched and well-presented on a level that I could never hope to approach, nevertheless relies on an assumption of fact that is erroneous. Baslan in his affidavit in support of his pre-trial Massiah motion, stated that Celani had instructed him not to reveal to his attorneys the ongoing discussions that Baslan was having with Celani. But that does not mean that Baslan had no discussions about trial strategy with his former counsel, or with me as I was being "groomed" to take over the task of representing Baslan, during the time span that included the two July recorded conversations.

As referenced above, a hearing will establish that Baslan had extensive trial strategy discussions with his lawyers and at co-defendant meetings. Although, to be sure, he failed to tell me about the particulars of his conversations with Celani and, as the recordings make clear, Celani actively discouraged Baslan from disclosing their discussions to his lawyers, Baslan's strategic discussions with Celani were reflective of the privileged trial strategy discussions he had with me

throughout the period as his potential counsel. That is why the "spy-in-the-camp" rubric applies to the government's intrusion of Celani into Baslan's trial plans.

Although in <u>Weatherford</u>, the "spy-in-the-camp" analysis was generated by the informant's "forced' attendance at a co-defendant meeting, this corollary prohibition of the <u>Massiah</u> rule is certainly not limited to that factual situation, To the contrary, the "spy-in-the-camp" prohibition applies to situations, such as the Celani-Baslan dialogues, where a government plant deliberately elicits attorney-client privileged matters, even in the absence of defense counsel, and it applies with even greater certainty, as the <u>Danielson</u> opinion sets forth with exceptional clarity, when the privileged information concerns the overall defense for an upcoming trial. <u>See, e.g., Moulton</u>, 474 U.S. at 179-80, where the Supreme Court overturned a verdict on the basis of a <u>Massiah</u> violation in a setting where, as in <u>Danielson</u> and in this case, an informant elicited defense strategy information directly from the defendant and not in the context of overhearing privileged communications at a co-defendant meeting.

It bears emphasizing that the expansive, and sometimes exhaustive, statements that Baslan made to Celani were not limited to the 4 hours of recordings made by Celani for the government at the book-end dates of July 2013. Although the topics discussed throughout the period of Celani's active "spy-in-the-camp" role, which the prosecutor described to the Court prior to trial as a month-long

series of discussions, may have been encapsulated in those recordings, the discussions along those prohibited lines were certainly not limited to the only two days when the prosecution decided to wire Celani up, or perhaps the only two days in which such recordings were successfully developed.

We should be mindful that the government managed to preserve, in *haec verba*, only two Celani-Baslan jailhouse conversations in recordings, of the hundreds of discussions between the two in the several months preceding, the interim period between, and the several months following, those discussions. That is the reason why we don't know much about the following topics, and cannot answer the following questions, among others that may yet come to mind at the requested <u>Massiah</u> hearing:

1) What did Celani say to the government that justified its intrusion of him as a jailhouse informant?; 2) What instructions were given to Celani in approaching and finding out information from Baslan?; 3) Who gave those instructions?; 4) What were the reports that Celani made to the government as to his discussions with Baslan?; 5) To whom did Celani make those reports?; 6) Did members of the prosecution team learn of those reports?; 7) When did the prosecution decide to form a "taint team "or, more appropriately, a "taint AUSA"?; 8) Was there a separate FBI "taint team" at any time, or did the same investigating agents deal with Celani?; 9) What information prompted the formulation of the

"taint team"; 10) Why was it decided that a "taint AUSA" was no longer necessary?; 11) Who made that decision?; 12) What steps did the prosecution take to ameliorate the <u>Massiah</u> violation that, as it later conceded, occurred during the course of the Celani-Baslan discussions?; 13) How did the prosecution team decide when to record conversations with Baslan by means of planting a hidden recording device on Celani? 14) Why didn't the prosecution arrange to record earlier Celani-Baslan conversations? 15) Why didn't the prosecution arrange to record any such discussions during  the 30-day gap between the two recorded ones?; 16) What instructions, if any, did the prosecution give Celani after first learning of his strategy discussions with Baslan?; 17) Was the recorded July 1, 2013 discussion that first reported one to include strategic discussions?; 18) What steps, if any, did the prosecution take to avoid a repetition of strategic discourse by Celani?; 19) Why did the prosecution not continue to wire Celani up against Baslan after July 31st?; 20) Did Celani continue to report on his continued conversations with Baslan in the months following the second recording?; 21) What information did he report?; 22) Did Celani turn over any of Baslan's notes and files that he stole from the MDC locker to the government?; 23) Why didn't Celani merit a 5K1.1 letter for his services?; 24) Why did the government opt to substitute Steven for Jack

just before the trial?; 25) Did that decision have any connection to information that Celani learned from Baslan and that he then conveyed to the government?

These are unanswered questions that can only be addressed by an expanded factual record developed through a post-trial <u>Massiah</u> evidentiary hearing. We therefore take respectful and deferential issue with the Court, in denying the pre-trial hearing, when it stated:

> The entire dispute thus presents what we referred to earlier as a "strict liability" Massiah violation - one in which the government concededly violated Massiah insofar as its informant elicited statements regarding the charged crimes in the course of investigating an attempt to obstruct justice, but for which Baslan's remedy is limited to the exclusion of any inculpatory statements from the government's case-in-chief. Requiring CS 2 [Celani] to testify in these circumstances would only  embark the proceedings on the proverbial fishing expedition – another overused metaphor, perhaps, but appropriate here. We therefore denied Baslan's request for a hearing and deny the motion to dismiss as well.

Court Mem. at 10.

We do not seek to fish aimlessly in the hope that we can get a "bite" and thereafter "cook up" another basis for appeal in future proceedings.  Instead, the expedition we are urging is to explore the depths of the government's uncharted waters in the deep realms to which the <u>Massiah </u>rule applies, and to seek the answer to the ultimate question we raise in this motion; to wit, whether the government's conceded <u>Massiah</u> violation, particularly of ferreting out and thereafter undermining Baslan's trial strategy requires a new trial with all of his Sixth

90

Amendment counsel rights uncompromised.  In short, we are asking for a process whereby the integrity of the proceedings that resulted in his conviction can be fully and appropriately explored and determined.[11]

---

[11] I acknowledge that considerable research conducted by paralegal Tamara Podgorskaya in assisting me to prepare the arguments in this memorandum and her helpful comments in helping me to edit its content.

CONCLUSION

For the reasons stated in this Memorandum and its exhibits, the Defendant Bebars Baslan respectfully requests that the Court grant the following relief on his post-trial motions:

Baslan's post-trial motions for the following relief:

1) Dismissal with prejudice, pursuant to Fed. R. Crim. P. 29 (c) and the "Cruel and Unusual Punishments" prohibition of the Eighth Amendment, of the Travel Act charge in Count One and his conviction of that charge, on the grounds that the 30-year mandatory-minimum sentence prescribed by the travel Act is so grossly disproportionate in Baslan's case to far less severe punishments meted out for considerably greater offenses to much more culpable offenders as to offend the constitutional protection against uneven and disparate sentencing:

2) Vacatur of the convictions on the remaining counts, pursuant to Fed. R. Crim. P. 33 and the Sixth Amendment's guarantee that a criminal defendant has the right to be represented at trial by counsel free of governmental intrusion, pursuant to the Massiah rule, on the grounds that the pretrial injection by the government of a "spy-in-the-camp" jailhouse informant resulted in the government's improper elicitation of the defense strategy from Baslan, thereby giving it an undue advantage at the trial, or

alternatively, for a post-trial <u>Massiah</u> evidentiary hearing whereby a full

record can be developed on which the Court can confidently determine

whether a new trial is warranted.


Dated: New York, New York
       October 13, 2014




                                              Respectfully submitted,




                                              Ephraim Savitt, Esq.
                                              *Attorney for Defendant*
                                              *Bebars Baslan*
                                              260 Madison Avenue
                                              Suite 2200
                                              New York, N.Y. 10016
                                              Tel:212-679-4470
                                              Fax: 212-679-6770
                                              Ephraim@savittesq.com



Cc: Clerk of the Court (RJD)
    All counsel (by ECF)