*1*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,    :  13-CR-220(RJD)
                             :
                             :
                             :
        -against-            :  United States Courthouse
                             :  Brooklyn, New York
                             :
BEBARS BASLAN,               :
                             :
        Defendant.           :  Thursday, May 29, 2014
                             :  12:30 p.m.
                             :
                             :
                             :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE RAYMOND J. DEARIE
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:     LORETTA E. LYNCH, ESQ.
                        United States Attorney
                        Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201
                        BY: TYLER J. SMITH, ESQ.
                            TIANA A. DIMAS, ESQ.
                            Assistant United States Attorneys

For the Defendant:      EPHRAIM SAVITT, ATTORNEY AT LAW
                        Attorney for the Defendant -
                        Bebars Baslan
                            260 Madison Avenue
                            22nd Floor
                            New York, New York 10016
                        BY: EPHRAIM SAVITT, ESQ.
                            NATASHA D. MAROSI, ESQ.

Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                 Official Court Reporter
                 Telephone: (718) 613-2487
                 Facsimile: (718) 613-2694
                 E-mail:  Anthony_Frisolone@nyed.uscourts.gov

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

*Status Conference*                                    3

1          (In open court.)

2          (Defendant present in open court.)

3          COURTROOM DEPUTY:  All rise.  The United States

4    District Court for the Eastern District of New York is now in

5    session.   The Honorable Raymond J. Dearie is now presiding.

6          (Honorable Raymond J. Dearie takes the bench.)

7          COURTROOM DEPUTY:  Calling criminal cause for

8    status conference in Docket No. 13-CR-220, *United States of*

9    *America against Bebars Baslan.*

10             Counsel, please note your appearances for the

11   record.

12          MR. SMITH:  For the United States of America,

13   Assistant United States Attorney Tyler J. Smith and Tiana

14   Dimas.

15             Good morning, your Honor.

16          MR. SAVITT: Ephraim Savitt and Natasha Marosi for

17   Bebars Baslan.

18             Good morning, your Honor.

19          (Defendant enters the courtroom at 12:33 p.m.)

20          COURTROOM DEPUTY:  We are on this afternoon for a

21   status conference.  This is United States versus Baslan,

22   Docket No. 13-CR-220.

23             Can I ask the attorneys to note their

24   appearance beginning with counsel for the Government.

25          MR. SMITH:  Tyler Smith and Tiana Demas for the

*Status Conference*                                              *4*

1    United States.

2              Good afternoon, your Honor.

3              MS. DIMAS:  Good afternoon.

4              MR. SAVITT:  Ephraim Savitt and Natasha Marosi for

5    Mr. Baslan who is present.

6              THE COURT:  Good afternoon.  I think I made myself

7    clear in picking up the tab for co-counsel in matters such as

8    this.  I simply don't need for both of you to be here.  I

9    don't know how many times I'm going to say that but there you

10   have it.

11             Happy to have you but I can't justify paying

12   two lawyers for a conference like this and I'm not going to.

13   I've said it before.

14             All right.  We're scheduled for a hearing in

15   about two weeks on motions to suppress statements as well as

16   the *Massaiah* issue, I will call it that for lack of a better

17   way of putting it.

18             I guess the open question there is whether we

19   should conduct a hearing in any event.  And my attitude is:

20   Always better to have a record of things than not although

21   the Government makes an argument that, given its concession

22   that the statements required by the informant not be used by

23   the Government in its case-in-chief moots the necessity of a

24   hearing.  May moot.

25             I'm not comfortable with that because,

*Status Conference*                                      **5**

1    ultimately, what's alleged here is that the Government acted

2    purposely to penetrate the defense camp and to gain

3    information.

4              MR. SMITH:  Your Honor, if I could be heard on

5    that?

6              THE COURT:  Yes.

7              MR. SMITH:  The Government doesn't think a hearing

8    is necessary essentially because of what your Honor said.  We

9    concede the *Massaiah* violation, it was a necessary part of

10   investigating other criminal conduct.

11             And the Supreme Court has indicated that the

12   Government is entitled to investigate defendants even after

13   indictment who are committing other crimes, that's what we

14   did here.  And the remedy for that is that the Government is

15   not allowed to use statements taken in violation of *Massaiah*

16   at trial.  We concede that we won't do that.

17             As the Supreme Court said in <u>Kansas v.</u>

18   <u>Ventris</u>, we are allowed to use them as impeachment in the

19   event that the defendant testifies; that's what we asked for

20   here.  Given that, we've essentially conceded all the things

21   that the defense claims it needs a hearing for:  To determine

22   whether or not we did something to penetrate the fact that

23   the defendant had its Sixth Amendment rights attached.

24             THE COURT:  You certainly haven't conceded that.

25             MR. SMITH:  That.

*Status Conference*                                      **6**

1          THE COURT:  You purposely sought to penetrate the

2    defense camp.

3          MR. SMITH:  The Government doesn't we don't concede

4    that we got any privileged material, and I don't think

5    there's an allegation that we got material that was

6    privileged.

7               I think the allegation in the defense reply is

8    a claim that communications between the defendant and the

9    Government's C.I. should be subject to some type of

10   "attorney-client privilege lite" because he considered him a

11   trusted advisor and counselor.  The defendant doesn't point

12   to any case saying that.

13         THE COURT:  That won't convince me.  I don't think

14   that's --

15         MR. SAVITT:  That's not my argument.  I mean, I can

16   make obtuse arguments but that's not one of them.

17         MR. SMITH:  To the extent that the claim is we

18   found out some defense strategy that we're taking advantage

19   of, the defendant, again, doesn't point to any case

20   indicating that there would be any remedy for that other than

21   what the Government already has indicated that we shouldn't

22   be allowed to use those documents.  Nor, can he point to any

23   prejudice, nor does he allege anything that would amount to

24   prejudice because, after this happened, the defendant

25   proffered with the Government in the presence of his counsel

*Status Conference*                                    7

1  at which he indicated that his defense was that he was

2  investigating the Government's C.I. and intended to make a

3  documentary.  We can provide a report of that proffer to the

4  Court.

5              So all of the things that he claims the

6  Government learned that he believes constitute a defense

7  strategy, which we don't concede that it is a defense

8  strategy, we still maintain that these were all false and

9  that his strategy was to suborn perjury.  But to the extent

10  he thinks that we have gained some advantage by learning

11  those things he told us those things so there's no prejudice.

12       MR. SAVITT:  Your Honor, I should point out that

13  the *Massaiah* violation which the Government seems to indicate

14  was, you know, they're not -- they're basically conceding

15  occurred before that proffer.  By that time, my client was

16  aware that Salani had certainly been planted there by the

17  Government.  So there's a cause and effect here.  It's not as

18  if we've waived anything.

19       THE COURT:  I'm a little uncomfortable.  I fully

20  accept everything you say except that I don't see the

21  attorney-client privilege.  There's no such claim.

22              The claim here, if anything, is that there was

23  a due process violation.  If the Government intentionally

24  wired up an informant for the purpose of learning about the

25  defense, that concerns me and I'm not quite sure I can agree

1   with you that there's no remedy to that but the suppression

2   of any statements that the defendant may have made in the

3   course of those discussions.  That's how I read ultimately

4   read the defense argument.  Everything you said I'm in

5   agreement with.

6                MR. SMITH:  I'd just like to point the <u>Maine v.</u>

7   <u>Moulton</u> in which is case, the Government wired up an

8   informant who had telephone conversations with an indicted

9   defendant and then engaged in a strategy meeting with the

10  indicted defendant over the course of some length of time.

11  They discussed the facts of the case, the defendant's

12  strategy for getting an acquittal.  Part of that discussion

13  was the creation of a false alibi.  And, in that case, there

14  was no indication that the situation was a *Kastigar*-type

15  situation where the prosecution couldn't continue.  In that

16  case, the Court held, and I can give you have the cite, it's

17  in our papers.

18                THE COURT:  I've read it.  In fact, I have it here.

19                MR. SMITH:  Okay.  And, in that case, the

20  Government then used those statements at trial in the same

21  manner that it did in *Massaiah* and the Court overturned the

22  conviction and granted a new trial at which those documents

23  were not present.  And that's been the remedy in every case

24  in which there is a *Massaiah* violation.

25                The defense itself cites to <u>United States v.</u>

*Status Conference*                                                    9

1    Henry in which the Government did the same thing:  Following

2    a trial where the Government had admitted in its

3    case-in-chief statements taken in violation of a defendant's

4    Sixth Amendment rights, the Court overturned the conviction.

5                But, if you look at the Fourth Circuit

6    decision which was affirmed by the Supreme Court, they

7    remanded to the district court for a new trial that was the

8    remedy -- a trial without those statements being used.

9                And I guess the Government would say that

10   without any cases indicating that this is the type of

11   situation in *Kastigar* where we're learning some defense

12   strategy permeates a prosecution so much that it can't go

13   forward, there's no additional basis for a hearing where we

14   concede that he should get the remedy that is set forth by

15   the Court for exactly this type of thing in similar cases.

16        MR. SAVITT:  The only difference here, of course,

17   is that we're talking about the entire defense strategy.  I

18   understand that the Government's position is that any defense

19   strategy would be false other than if we agreed with them

20   that we're guilty.

21                It's really a specious argument.  The question

22   here is:  Why did the Government send in an informant to an

23   indicted defendant.  The informant was then recorded on at

24   least two occasions and he spoke on multiple occasions.  And,

25   in two days of the same month of last July, on the 1st and

1   then on the 31st again, he's going through the entire trial

2   strategy, motion strategy, and he's even dictating what he

3   believes is the best trial strategy for my client.

4           I mean, the Government knew that he was going

5   through all of this.  There would seem to be no boundaries

6   set by the Government as to what their informant can ask.

7   And just to simply say, okay, we violated the Sixth Amendment

8   but we're not going to use it on the direct case, and there

9   are no other sanctions, I mean, that's a very nice argument

10  but I'm concerned here about my client's trial.

11          THE COURT:  It also has a lot of support in the

12  case law.

13          MR. SAVITT:  I understand that it has support in

14  the case law but we're talking about the entire trial

15  strategy here.

16          MR. SMITH:  I just wanted to -- the defense calls

17  into question why we would do that and I think we've set

18  forth we were investigate obstruction of justice.  Part of

19  the things we got --

20          THE COURT:  Can I ask you a question?  How does it

21  serve your interests or anyone's interests for that matter

22  not to have a full factual record of this?  You know what I

23  mean?  That's just the way I approach these issues.

24          I understand your argument and you may be

25  right, I'll take a look at <u>Maine v. Moulton</u>, but for the

1    benefit of everyone including the court above, doesn't it

2    make sense to have a full factual record of what happened?

3              MR. SMITH:  There's not a factual issue in dispute.

4    We've conceded that there is a remedy for this that the

5    Supreme Court has set and we've conceded that that is

6    appropriate here.  If the Government were arguing that this

7    fell under some exception in *Massaiah* such than we should be

8    able to use these statements, we would agree that a factual

9    record is necessary because that's a question of fact.

10             THE COURT:  Your view is that no matter how -- bear

11   with me if I characterize it this way just so I can make my

12   point.  No matter how directed, no matter what the level of

13   government involvement is here, let me speak hypothetically.

14             I have a case, I can't believe how -- I can't

15   imagine how somebody is going to defend this case.  But I got

16   a guy in jail, I'll wire him up and tell him to go, I want to

17   know how this case is going to be defended.  I'm going to

18   wire up my friend, my source, get him in there buddy up to

19   the defendant, and hopefully get to talk about the case now

20   and maybe I'll learn something about the defense.

21             Your view is that under <u>Maine v. Moulton</u> and

22   this whole line of cases that the only remedy available to

23   the Court should that somewhat outrageous conduct take place.

24   I don't question the legitimacy of the investigation not for

25   a second, okay?  You did what any responsible prosecutor

1    would have done and should have done.  But the genesis of

2    this, okay, was this just the Government's reaction to what

3    is reported to them as an attempt to obstruct justice, or was

4    this a government-initiated effort to penetrate the defense

5    camp and learn the theory of the defense?  To me, they're

6    very different.

7            MR. SMITH:  And I'll note for the Court because

8    it's not in our papers, the Government did employ a taint

9    team.  We don't concede it's necessary.  The investigation

10   was conducted by a taint AUSA, supervised by a separate

11   supervisor who had a separate appellate division attorney

12   assigned for the purpose of review.  And it was their

13   decision to pass the information that's been passed to the

14   prosecution team.

15            It's the Government's view that

16   Sixth Amendment violations essentially fall into two separate

17   types.  One is a spy in the camp in which the Government has

18   intercepted privileged communications either by having a

19   cooperator who attends joint defense meetings, or I guess, in

20   one case, the Government had someone pose as a secretary for

21   an attorney, for the indicted defendant's attorney, and they

22   get privileged communications as to the defense strategy.

23   That has one type of remedy, that's one thing, that's not

24   what happened here.  There are no facts to support that

25   that's what happened here.

***Status Conference***                                                    **13**

1          A separate thing is unprivileged

2    communications where the defendant himself tells someone else

3    and, as defendants are informed, often informed at

4    arraignment in this court, the defendant can't have

5    privileged communications with anyone who is not their

6    attorney and then should expect those statements will be used

7    against them.

8                  That's what happened here and the Supreme

9    Court has been clear that the question is not one of good or

10   bad faith on the Government when you have these

11   non-privileged communications.  The question is -- the remedy

12   is simply that the Government can't use them in its

13   case-in-chief and in determining that the Supreme Court

14   weighed the two interests:  The Government's interest in

15   investigating crimes against the defendant's Sixth Amendment

16   rights and that's how they came out.

17          THE COURT:  I'll look at it again.

18                  Let me ask you this question although how many

19   hours of tapes are there?

20          MR. SMITH:  I've never listened to the tape myself

21   but I believe it's approximately two hours.

22          THE COURT:  That's it?  And how many separate

23   conversations?

24          MR. SMITH:  Two.  Two recorded conversations.

25          THE COURT:  We're only talking about two

1    conversations in the span of some six hours?

2          MR. SAVITT:  Actually our team has listened to

3    them.  It's between six and seven or eight hours.  It's a

4    long -- there are long conversations.

5          MR. SMITH:  I'll take the defense's word for it on

6    the length.  I have not listened to them myself entirely

7    because we had a separate team for this purpose.

8          THE COURT:  You can appreciate my discomfort, I

9    note.

10          MR. SMITH:  I can, your Honor.  I can certainly

11    appreciate your discomfort.  I guess what we'd ask -- it

12    seems like if there were a different remedy for this, there

13    would be a case saying that this falls into a different camp

14    than the things that happened in *Massaiah*.  But *Massaiah* is

15    quite clear that the remedy is that the Government can't use

16    the evidence in its case-in-chief.

17          THE COURT:  But the cases by implication suggest

18    that there is a point out there where if the Government

19    reaches it in terms of their conduct, due process

20    considerations would kick in sufficient to terminate the

21    prosecution.  I'm not saying that happened here.  The whole

22    question is whether or not we have this guy testify.

23              Throughout those cases, in all of these cases,

24    if you read them, suggest that there is an outlier.  There is

25    an area where the conduct may become so egregious, if you

**_Status Conference_**                                    **15**

1   will, that it might require a more compelling remedy.  I'll

2   take a look at it again and I will let up know.

3          MR. SMITH:  We would ask that if the Court decides

4   that a hearing is necessary, and if there is a separate body

5   of cases, we certainly reviewed the cases the defense cited

6   we reviewed the cases in the _Massaiah_ field.  If there's a

7   separate body of cases, we may have missed that since this

8   was captioned as a "spy in the camp violation," a _Massaiah_

9   violation by the defendant.  But to the extent there is a

10  hearing, we would ask that it be extraordinarily limited and

11  not be an opportunity simply for the defense to have a shot

12  at a potential government witness but be limited to what

13  directions that individual was given as far as --

14         THE COURT:  I think that's the only relevant part

15  of it.  It's the only relevant part.  If we had a hearing,

16  that's where the relevance is.  How did this get started?

17  What was the Government's role in it?  Who initiated the

18  conversations, et cetera.

19             There are three possibilities:  Mr. Baslan

20  shot his mouth off thinking this guy was somebody he could

21  talk to; the Government, the other end of the spectrum, is

22  the Government, as I hypothesized, wired up the informant to

23  try to get information of a possible defense; and the hybrid

24  is that the informant, on his own, seeking an opportunity for

25  whatever consideration he might thereafter garner goes around

1    the facility trying to have conversations with people in the

2    hopes of producing something of value to the Government, that

3    happens as well.

4              So I think the only relevance in such a

5    hearing would be the area that you've just addressed.  How is

6    it initiated?  How did it get started?  What was said is

7    unimportant to me.

8              MR. SMITH:  Your Honor, I would like to then

9    indicate for the court that for the purposes of that we'd

10   like the taint AUSA to handle questioning of that witness.

11   And since neither Ms. Dimas nor I were involved, that's

12   Mr. Polemeni was the taint AUSA for purposes of this case.

13             THE COURT:  Who?

14             MR. SMITH:  Robert Polemeni.

15             THE COURT:  Yes.

16             MR. SMITH:  Who, I believe, was a clerk for your

17   Honor.

18             THE COURT:  I believe he was.

19             MR. SAVITT:  I just saw him down the hallway, your

20   Honor.

21             THE COURT:  I believe he was but alert him.  Let me

22   just think this through once more and you'll hear from me by

23   the end of the week which is tomorrow.

24             What else?  I was greeted with an epistle this

25   morning because.  I don't know if you've seen it.

**_Status Conference_**                                              **_17_**

1          MR. SMITH:  The Government has.  We have some

2     thoughts on it.

3          THE COURT:  I'm happy to I don't know whose

4     application it is.  Is it Mr. Savitt's application or

5     Mr. Baslan's application?  The trial is going to proceed on

6     schedule, and if you'd like to say anything I'd be happy to

7     hear it.  This Rule 16 business has come up every single time

8     we meet.  And every single time we meet, the Government has

9     said, and there's been no dissent from the defense, this

10    material is available, come see it, make the arrangements.

11              Has anything changed in that regard.

12         MR. SAVITT:  We've made arrangements to see at

13    least the what we consider the important materials tomorrow

14    with the prosecution.

15         MR. SMITH:  That's right.

16         MR. SAVITT:  The only problem I have, not with the

17    prosecution, I understand their position, but my client does

18    have, it seems to me, a right under Rule 16(a) to see it as

19    well.

20         THE COURT:  To see it?

21         MR. SAVITT:  To see it, yes.

22         MR. SMITH:  The Government agrees.

23         MR. SAVITT:  Okay.

24         THE COURT:  We had this discussion last time.  We

25    all agreed as a matter of common sense.

*Status Conference*                                                 **18**

1          MR. SMITH:  For the purposes of record, the

2     Government sent out discovery on May 9, 2013, in which we

3     indicated we had material protected by the Adam Walsh Act

4     which we couldn't distribute and indicated we would be happy

5     to provide to.

6               On June 9th, the defendant claimed we failed

7     to provide that material.

8               On June 21st, the Government responded; we

9     cited the law.  We indicated a procedure by which we would

10    copy the material a bit-for-bit copy with for the defendant

11    and produce him into a proffer room so he could review it

12    himself.

13              We've had that come up again and again.

14              November 2013, the Government actually sent a

15    copy of all the non-Adam Walsh Act material to MDC to

16    facilitate the defendant's review.  In March 2014, defense

17    counsel asked to review the Adam Walsh Act material for the

18    first time.

19              We, again, we indicated the procedure by which

20    they could view it and also offered that they could view a

21    copy that had been processed by the Government's forensic

22    software to try to help facilitate things and make it more

23    easier for them to determine what they wanted to look at.  We

24    have now set that up, they indicated they wanted to review

25    the March 7, 2013, video made by the C.I. which contains

1    child pornography and a sample of child pornography found on

2    the defendant's computers.

3              We're set to meet for that purpose tomorrow.

4    If they would like other material, we are happy to facilitate

5    that in as speedy a way as we can and firearm the Adam Walsh

6    Act requirements.

7              MR. SAVITT:  The only thing is all of this is going

8    to cost all of this a lot of money because we have to buy

9    drives or storage, computer storage, units the name of which

10   I don't even know but I understand that it's going to be

11   costly.  I'm trying to really cut costs here, I really am.  I

12   want my client to be able to see it when we see it.  We don't

13   need copies of child pornography.  I, mean that's not

14   necessary.  We don't need to have a special --

15             THE COURT:  What's the difference here?

16             MR. SAVITT:  The problem is that we just need --

17   we'd like to view the materials together with our client.

18             THE COURT:  There's a procedure.  How does the

19   Government's procedure inhibit that in any way?  He'll have

20   to be brought here.

21             MS. DIMAS:  Your Honor, it seems that what the

22   defendant wants is access to the physical computers that were

23   seized from him.

24             MR. SAVITT:  No.

25             MS. DIMAS:  That's what the Government is not

*Status Conference*                                              **20**

1   willing to do.

2           MR. SAVITT:  We don't ask for that.

3           MS. DIMAS:  We offered to make a bit-for-bit copy

4   of everything and bring him in for as many proffers as he

5   wants.

6           MR. SAVITT:  We don't need the copies of all that

7   stuff.  We're conceding it's child pornography.  We want to

8   see certain files in the computer that my client deems is

9   important.  I mean, he would know his own files better than

10  I, certainly.  And there's no need to make these copies at a

11  vast expense of the CJA fund, we don't need that.

12          MR. SMITH:  This is the mechanism that's been used

13  in this court and courts across the country because there is

14  there is no easy way to tell if a defendant has access to the

15  originals, to something that's not a copy.  There's no easy

16  way to fell if they've changed it.  The Government can

17  maintain the evidence.  We are willing to give an exact

18  duplicate to the defense so that it can do whatever it wants

19  but we know what we have what is originally seized.  That's

20  why this mechanism exists.

21          MR. SAVITT:  It's going to cost either the

22  Government or the CJA fund a lot of money for no reason

23  whatsoever.

24          THE COURT:  It is what it is.  It has to be done

25  for the man to exercise his rights.

*Status Conference*                                    21

1          MR. SAVITT:  Then we'll make an application.  I

2   thought it would be easier and more cost effective.  He's not

3   going to touch anything, he just wants to view it together

4   with us tomorrow or next week, whenever.

5          THE COURT:  I don't understand where the parties

6   disagree here.  Explain this to me.

7          MR. SMITH:  If he would like to view it in the

8   presence of an agent, that we can arrange.  We'll let him

9   view the copy on our computer.  Our concern is with the

10  potential for alteration and we were trying to establish, I

11  mean, the procedure exists so that we can provide a copy that

12  the defense can review not in our presence and have whatever

13  discussion they want to have.  If he wants to view it with an

14  agent present to make sure that nothing gets changed the

15  Government is happy to facilitate that.  We're trying to make

16  this as easy as possible.

17         THE COURT:  Don't leave this courthouse today

18  without having whatever that mechanism is established and

19  agreed to with a date and a time.

20             This is silly, this case has been over a year

21  old.  We're going to trial in, when is it, in July?

22         MR. SAVITT:  July 14th, your Honor.

23         THE COURT:  Flag Day.

24         MR. SAVITT:  Flag Day.

25         MR. SMITH:  The Government, in Mr. Baslan's last

1    letter, he indicates that there are materials on his computer

2    that are exculpatory that only he can access.  We'd like to

3    flag this issue now.

4                    As the Government has indicated a variety of

5    times, the material on his computers was heavily encrypted

6    and we ask that to the extent that he's going to use material

7    on those computers at trial that he be required to provide it

8    to us pursuant to Rule 16, and that the Court not consider

9    that because we have an encrypted copy that we can't view

10   that it is the same as us having that material.

11              MR. SAVITT:  If we don't have access to it, it's

12   sort of a Catch-22.  How can we use things that we don't have

13   access to?

14              THE COURT:  You can have all the access you want,

15   we just arranged it.  You have a reciprocal discovery

16   obligation.

17              MR. SAVITT:  Absolutely, your Honor, I'm well aware

18   of that.

19              THE COURT:  Anything else?

20              MR. SMITH:  Not from the Government, your Honor.

21              MR. SAVITT:  Not from the defense, your Honor,

22   other than if we can have a copy of today's transcript

23   pursuant to CJA.

24              THE COURT:  Okay.  Yes, of course, be my guest.

25                   So what day are we convening, Ms. Mulqueen.

1          COURTROOM DEPUTY:  June 11th at 9:30.

2          MR. SMITH:  Your Honor, we'd like to clarify for

3     purposes of suppression hearing since they are issues

4     outstanding, which I don't think either party are necessarily

5     requesting a hearing, we intend to present evidence as to

6     voluntariness as to Mr. Baslan's statements and we will await

7     your Honor's order with respect to the extent of a hearing

8     relating to potential *Massaiah* issues.

9          THE COURT:  Presumably, that witness is readily

10    available.

11         MR. SMITH:  I don't know where he is.  We'll make

12    him readily available.

13         THE COURT:  Make sure.  Thank you very much.  I'll

14    see you next time.

15         (Defendant exits from courtroom at 12:59 p.m.)

16         (WHEREUPON, this matter was adjourned to June 11,

17    2014, at 9:30 a.m.)

18                         *   *   *

19                    CERTIFICATE OF REPORTER

20
      I certify that the foregoing is a correct transcript of the
21    record of proceedings in the above-entitled matter.

22

23

      _____
24    Anthony D. Frisolone, FAPR, RDR, CRR, CRI
      Official Court Reporter
25