TJS:TAD
F. # 2013R00381

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                                            Docket No.  13–CR-220 (RJD)

BEBARS BASLAN *et al.*,

           Defendant.

– – – – – – – – – – – – – – – – – –X


MEMORANDUM OF LAW IN OPPOSITION TO
<u>BEBARS BASLAN'S POST-TRIAL MOTIONS</u>



LORETTA E. LYNCH
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201



Tyler J. Smith
Tiana A. Demas
Assistant U.S. Attorneys
    (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 3

FACTS ............................................................................................................ 4

    A.  Background to the FBI's Investigation of Baslan and Henry ....................................... 4

    B.  Consensually-Monitored Telephone Calls and Meetings Between Jack, Baslan and Henry ............................................................................................................ 5

    C.  The Search of Baslan's Apartment .......................................................... 10

    D.  Baslan's Post-Arrest Statement ............................................................... 11

    E.  Baslan's Obstruction of Justice .............................................................. 12

    F.  Baslan's Proffer .................................................................................. 16

    G.  Evidence at Trial ................................................................................ 17

ARGUMENT .................................................................................................... 21

I.   THE COURT SHOULD DENY BASLAN'S PREMATURE EIGHTH AMENDMENT CHALLENGE TO HIS SENTENCE ............................................................. 21

    A.  Baslan Lacks Standing to Challenge the Constitutionality of His Sentence ......... 22

    B.  A Sentence of 30 Years is Not Grossly Disproportionate to the Crime of Crossing State Lines with the Intent of Sexually Molesting Three Children Under Age 12 25

        1.  Legal Standard: the Narrow Proportionality Principle in Adult Term of Years Cases ..................................................................................... 25

        2.  A Sentence of 30 Years or More is Not Grossly Disproportionate to the Defendant's Crime ................................................................... 31

II.  THE GOVERNMENT DID NOT INTRUDE THE DEFENDANT'S ATTORNEY-CLIENT RELATIONSHIP ................................................................... 37

    A.  The Government Violates the Sixth Amendment Where It Intentionally Invades the Defense Camp and the Defendant is Prejudiced ............................... 38

    B.  The Government Neither Improperly Invaded the Defendant's Relationship With His Attorney Nor Learned Confidential Defense Strategy ................................ 40

        1.  The Government's Use of a Confidential Informant Was Justified ..................... 41

2.  Baslan's Claim is Also Deficient Because the Information Received by the
Government Neither Impacted His Attorney-Client Relationship or Constituted
Confidential Defense Strategy Information ......................................................... 43

3.  The Defendant Was Not Prejudiced by the Government's Obstruction
Investigation ...................................................................................................... 47

C.  The Defendant Is Not Entitled to a Hearing............................................................. 51

CONCLUSION........................................................................................................................ 53

## PRELIMINARY STATEMENT

The government respectfully submits its opposition to the defendant Bebars Baslan's ("defendant" or "Baslan") post-trial motion, filed on October 13, 2014 (the "Motion" or "Def. Br.").  In the Motion, Baslan seeks: (1) dismissal with prejudice of Count One of the Indictment (crossing state lines with the intent of sexually molesting a child under age 12) and vacatur of his conviction on that charge, on the grounds that the yet-to-be-imposed 30-year mandatory mandatory minimum sentence would be cruel and unusual punishment in violation of the Eighth Amendment; and (2) vacatur of Baslan's convictions on all remaining counts on the grounds that the government violated Baslan's Sixth Amendment right to counsel, or, in the alternative, a post-trial Massiah evidentiary hearing. For the reasons set forth below, the court should deny the Motion in its entirety.

As a threshold matter, Baslan lacks standing to challenge his sentence on Count 1 because he has not yet been sentenced.  Even assuming that the Court were to sentence Baslan to 30 years or more on Count 1, Baslan still may lack standing to challenge his sentence if he is sentenced pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") rather than 18 U.S.C. § 2241(c), or if the Court sentences Baslan to 30 years or more on one of the other counts of which Baslan was convicted.  In the event the Court reaches the merits of Baslan's Eighth Amendment claim, the Court should deny this portion of the Motion because a sentence of 30 years is not grossly disproportionate to the crime of crossing state lines with the intent of sexually molesting three children under age 12.

Baslan's claims that his case must be dismissed due to a Sixth Amendment violation fails because the government did not intrude on his attorney-client relationship or

learn confidential defense strategy and, regardless, the defendant was not prejudiced. The

defendant's request for a hearing on the Sixth Amendment violation fails because he has not

alleged specific facts that would entitle him to relief, as required by the Second Circuit to

mandate a hearing.

FACTS

A.    Background to the FBI's Investigation of Baslan and Henry

In late January 2013, an individual, identified at trial as "Jack," arrived at his

brother's house in the middle of the night, waking his brother.    Jack was disheveled and

crying.  Jack's brother, Ralph, testified that Jack "was having a hard time finding his words"

and "couldn't get out" what he wanted to say.  (Trial Transcript "TT" 249:11-23.)  When

Jack finally got his words out, Jack told his brother that he was upset because he had just

been at the defendant, Bebars Baslan's, house and had seen Baslan masturbating to a

Facebook photograph of Ralph's daughter, Leah.  (TT 250:22-251:10.)  Jack told his brother

that he had seen Baslan watching child pornography on his laptop, and then Baslan pulled up

a photograph of Leah from the Facebook page of Ralph's wife.  Baslan began masturbating

to the photo of Leah and told Jack that he really liked Leah.  (TT 251:15-21.)

On January 27, 2013, Jack walked into the 66th Precinct of the New York City

Police Department ("NYPD") and said he wanted to make a complaint.  He was then

interviewed by Detective Torres from the precinct's Detective squad.  (TT 41:23-44:15.)

Jack was agitated and, over the course of two interviews that day, reported the details of a

sex crime, involving Baslan.  Jack also offered to help the police by wearing a recording

device or making monitored calls.  After taking Jack's statements, Detective Torres referred

the case to the NYPD's Vice unit.  (TT 45:9-48:15.)

4

On February 6, 2013, Detective Gergar from the Vice Major Case Squad contacted Jack.  He interviewed Jack again regarding the crimes that Jack had reported to Detective Torres.  (TT 57:5-60:19.)  During this interview, Detective Gergar advised Jack to act normally around Baslan.  (TT 60:20-61:6.)  Detective Gergar then contacted Special Agent Aaron Spivack of the Federal Bureau of Investigation ("FBI") and arranged for him to meet Jack; this meeting occurred on February 13, 2013.  (TT 62:10-63:18, 77:2-4.)  During the meeting Special Agent Spivack again interviewed Jack regarding Baslan's crimes.  He also asked Jack whether he would be willing to make recorded telephone calls or wear a recording device.  Jack said he was willing to do either.  (TT 79:17-24.)  Over the course of the next month, Jack made numerous recorded telephone calls and in-person recordings with Baslan and Baslan's girlfriend, Kristen Henry.

**B.    Consensually-Monitored Telephone Calls**
       **and Meetings Between Jack, Baslan and Henry**

Between February 13 and Baslan's arrest on March 19, Jack made over 40 recorded telephone calls to Baslan.  (Government Exhibit ("GX") 1.)    During these recorded telephone calls, Baslan described a detailed plan to have Henry take sexually explicit photographs with Jack's eighteen month-old child.   Eventually, Baslan asked Jack to instead provide his own two or three-month-old son for Henry to sexually abuse while Baslan took pictures.  Baslan also indicated that Henry was interested in sexually abusing Leah, Jack's seven-year-old niece.  Baslan indicated that they could drug her with Dramamine or Benadryl so that she would be passed out and would not be aware that she was being sexually abused.   After several calls, Baslan and Jack also agreed that Jack would bring his three-month-old son, eighteen-month-old son and Leah to a meeting with Baslan

and Henry at a New Jersey hotel in early March, so that Baslan and Henry could take pictures of them being sexually abused.

Jack also made audio and video recordings of in-person meetings with Baslan and Henry on March 7, March 14, March 18, and March 19.  (GX 2-5.)  On March 7, 2013, after being equipped by the FBI with audio recorders and a video recorder, Jack met with Baslan and Henry at an apartment in Brooklyn that Baslan and Henry shared.  (TT 101:18-105:15.)  During the meeting, Jack recorded Baslan and Henry discussing the plan to babysit children so that Baslan and Henry could sexually molest them.  Henry described her interest in children and her ability to gain access to children using her references as a babysitter. (GX 2.)  During that meeting, Baslan also used his computer to access child pornography, which he played on his television while Henry and Jack were present.  (GX 2, GX 46A-G, TT 110:9-116:25.)  The videos, some of which were captured on Jack's video recording, appeared to depict prepubescent girls being vaginally and orally penetrated by adult men's penises.  Henry commented regarding one of the child pornography videos that it was the "hottest one."  Baslan described to Jack that the child pornography in his residence could be accessed on his iPad, iPhone, and television, and that the devices were accessing the child pornography from a central location.   Baslan also told Jack that had created an encryption system for the child pornography that was "unhackable."  (GX 2.)

At the direction of the FBI, Jack later canceled the planned meeting in New Jersey with Baslan and Henry.  (TT 120:25-121:8.)  The meeting was reset for March 19, 2013 at a hotel in Jersey City, New Jersey.  On March 18, 2013, Jack met with Baslan and again recorded the meeting.  (GX 4.)  During the conversation, they discussed their planned

meeting in New Jersey.  Jack confirmed he would be bringing the three victims.  During the

course of the conversation, Baslan and Jack had the following exchange:

| | |
|---|---|
| JACK: | What's the game plan? What's Kristen into? |
| BASLAN: | She's going to come and do whatever we tell her to do. That's it. |
| JACK: | She's going to do whatever we tell her to do?  Really, it's like that? |
| BASLAN: | Well, yeah. |
| JACK: | So, we're going to have a whole lot of fun? |
| BASLAN: | Yeah.  That's really about it.  We're just going to have fun and then I don't know.  We'll finish having fun and we'll come back. |
| JACK: | Yeah, I have to leave there because I have work in the morning. |
| BASLAN: | We won't stay there overnight.  Because we don't want to risk her waking up and seeing us.  Once we're done, we'll leave. |
| JACK: | I'm not kicking you out or anything. |
| BASLAN: | No, no, no, I wouldn't want to. I mean why should she even see us. |
| JACK: | Yeah, exactly, how am I going to explain that? |
| BASLAN: | Right, right.  And I was thinking that when we do that deed, we'll all wear, like, ski masks and then we'll have a movie with ski masked robbers running playing in the living room, so if she gets scared we just pull out turn off the light, disappear and then you'll be sitting on the couch watching a ski mask movie.  Oh honey what happened did this movie get in your head again? |
| JACK: | Um, you're going to bring the camera, by the way? |
| BASLAN: | Of course. |
| JACK: | The HD one, right? |
| BASLAN: | Of course, I have a DSLR HD I'm going to bring, fully charged, fully loaded. |
| JACK: | What's DLL-uh-uh? |
| BASLAN: | It's like a photo camera that takes videos. |
| JACK: | But no faces. |
| BASLAN: | Of course not, well except Kristen. |
| JACK: | Ok. Not even accidentally, alright? |

7

BASLAN:    Don't worry, man, like I said, just Kristen's and my dick's face.

(GX 4.)

Later during the conversation, Baslan asked Jack to bring Jack's 3-month-old

son to Baslan's apartment, so that he could take a sexually explicit photograph of Henry with

the child before the meeting at the New Jersey hotel.  Baslan and Jack then discussed what

Baslan planned to do with Jack's niece, stating:

BASLAN:    Like I said, we can take it easy tomorrow, just get, I'm going to
           bring her and we get Leah, take a few pictures, something like
           that or whatever and we just, that would be our first time and
           we'll take it further next one.

JACK:      How far do you want to go?

BASLAN:    Not too far. Take pictures. Touch and then go down on her.
           That's pretty much what I want out of it.

JACK:      You just want to go down on her?

BASLAN:    Yeah. Nothing else, I mean.

JACK:      For now?

BASLAN:    Because I don't know anything else about her, she's you know,
           what else can I do, we'll figure out as we get more advanced in
           this but the first time around, that's more than enough.

(GX 4.)

Baslan also indicated during the above conversation that sexually abusing

Jack's eight-year-old was more of a "stepping stone" and that Baslan would "take a lot of

pictures and videos."  He also said: "We'll have a good amount of pictures and videos of

Leah herself and then we can just use it as jerk-off material or whatever."  When asked about

whether Baslan had made progress on gaining access to other children, Baslan indicated that

he was "working on it" and that Henry would be meeting a woman about babysitting in a few

days.  (GX 4.)

On March 19, 2013, Jack placed a recorded call to Baslan at the direction of the FBI and indicated that he would not have time to bring the children to Baslan's residence, so that Henry could take a sexually explicit photograph with one of them.  Baslan and Jack agreed that he would go to Baslan's residence to pick up the drugs that would be used to incapacitate the eight-year-old, then Baslan, Henry and Jack would meet at the New Jersey hotel.  During recorded conversations that day, Baslan and Jack also agreed on a code word that would indicate that Jack had the children at the hotel and that Baslan and Henry could travel to New Jersey to sexually abuse them.  (GX 1.)

During the early evening of March 19, 2013, Jack drove to Baslan's and Henry's residence in Brooklyn, which was under surveillance by law enforcement.  Jack was equipped by the FBI with electronic monitoring devices including audio recorders and a video recorder.  (TT 149:21-151:18.)  After Jack arrived, Baslan indicated to Jack that Henry would be arriving with the drugs.  (GX 4.)  Shortly after that, law enforcement officers observed Henry driving back to Baslan's residence.  Baslan, Henry, and Jack then went inside Baslan's residence and had a short discussion regarding the drugs.  Baslan advised Jack to give Leah more than the recommended dose of Benadryl and to hide the flavor by putting the drug in orange juice, which Henry had also purchased.  (GX 4.)  Jack then left and immediately met with law enforcement officers.  Jack gave law enforcement officers Benadryl and orange juice that Henry had just provided to him.  (TT 151:15-18.)

Later during the evening of March 19, 2013, Jack placed a recorded call to Baslan and provided the code word indicating he was with children.  Jack also told Baslan the address of the hotel and room number.  (GX 1.)  At approximately 9:00 p.m. on March 19, 2013, Baslan and Henry arrived at the hotel in Jersey City, New Jersey.  (TT 314:14-22.)

9

Shortly after Baslan and Henry arrived at the room (the number to which Jack had previously provided to Baslan), law enforcement officers entered the room and arrested Baslan and Henry.  (TT 166:3-167:6.)

Unbeknownst Baslan and Henry, no children were present.  At the time of Baslan's arrest, Baslan was carrying a backpack.  During a search of the backpack incident to Baslan's arrest, agents discovered, among other things, a Sony DSLR digital camera, a laptop computer, an 4-gigabyte memory card, an 8-gigabyte memory card, a 32-gigabyte memory card, a flash storage drive, an extra camera battery, a camera lens cloth and a memory card reader.  Henry was carrying a purse, which also contained a camera and a memory card.  (TT 168:5-180:16.)

C.    The Search of Baslan's Apartment

On March 19, 2013, just after Baslan and Henry's arrests, agents executed a search of their home pursuant to a warrant.  (TT 318:23-320:11.)   Pursuant to the warrant, agents seized numerous items, including: an Apple desktop computer; a Macbook laptop computer; an Apricorn encrypted external hard drive; a Walgreens receipt dated March 19, 2013 at 5:47 p.m., for Benadryl, orange juice, "life like animals," Strawberry Nesquik and trash bags; and numerous other electronic devices and storage media. (TT 324:22-330:22.)

Computer forensic specialists found numerous encrypted files on the seized items.  (TT 394:10-395:17; 396:6-397:13.)  Specialists from the FBI's Cryptology Unit were able to partially decrypt the Apricorn hard drive.  (TT 474:1-478:13.)   On the drive, agents discovered approximately 76,000 images and videos of child pornography, including some of the child pornography the defendant had shown to Jack on March 7, 2013.  (TT 494:15-506:21.)

D.    <u>Baslan's Post-Arrest Statement</u>

After Baslan and Henry had been placed under arrest, agents took Henry to another area of the hotel so that each defendant could be advised of their <u>Miranda</u> rights separately.  (TT 621:9-622:5.)  Once Baslan had been separated from Henry, Special Agent Spivack and another agent advised Baslan of his rights, which Baslan waived.  (TT 622:6-14.)

During the course of that interview, Baslan told the agents that he was there to have a sex party with Jack and Henry and that they were going to smoke marijuana.  (TT 623:3-9.)  When Special Agent Spivack asked him about the children (who Baslan believed were present in another room), Baslan said that the kids were going to be used as "props" and that "hypothetically" someone could come to a hotel to do one thing and then change their mind.  (TT 623:19-624:1.)  During the interview, Baslan admitted to downloading and masturbating to child pornography.  (TT 625:14:22.)  He also indicated that if the agents had waited, they would have seen that he wouldn't do anything and that he had cold feet.  (TT 626:4-10.)  The defendant did not claim, at any point, that he was investigating Jack or producing a documentary.  (TT 625:7-11.)

Agents then asked Baslan if they could memorialize the interview on paper so that it was clear that what Baslan told the agents was accurate.  Baslan agreed.  Agent Spivack handwrote a statement, which he provided to Baslan to review.  Baslan read the statement aloud.  Agents also informed Baslan that he could make any changes, corrections, or additions to the handwritten statement.  (TT 626:24-629:12.)  Baslan signed the written statement, which was two pages long, and reads as follows:

11

I, Bebars Baslan, was arrested at the Hyatt hotel in Jersey City, NJ. I have been told that I have been placed under arrest and have been advised of my rights, which I have waived. I agree to talk to the FBI voluntarily and have not been made any threats or promises.

I came to the Hyatt with the intent to engage and have Kristen engage [CS 1]'s 2 month old boy, his one and a half year old boy, and his 8 year old [redacted to remove victim information] in sexually explicit conduct. However, I had cold feet and was not going to go through with it. I suggested Benedryl (sic) so that the kids would be sleeping.

I planned on "going down" on [redacted to remove victim's name], the 8 year old, but had cold feet. We were also going to take photos and videos.

I have a sexual interest in children, and have watched child porn on few occasions, and have masturbated to the child porn.

I have links on my computer to the child porn which I will provide to the FBI. My child porn is on an encrypted hard drive at home. I also use a 256 bit encryption, but I can't provide the password at this time. I have provided the FBI with passwords to my computer and phone.

I have never harmed a child nor have I sexually abused a child in the past.

I want to talk to someone about my options, I am fully willing to cooperate.

(GX 55.)

Baslan added the final paragraph of his confession (which he initialed) and

signed the confession.    (TT 631:1-9, 15-22.)

E.    Baslan's Obstruction of Justice

Following his arrest, the government learned that Baslan had engaged in

activities to obstruct justice while incarcerated. In June 2013, an inmate at the Metropolitan

Detention Center ("MDC"), who is referred to here as "CS 2" for consistency, approached

the government indicating that he had information regarding Baslan's efforts to obstruct justice. The government debriefed CS 2 on June 26, 2013. During the debriefing, CS 2 advised the government that Baslan had told him, among things, that the FBI had left an electronic storage device, known by the brand name "DROBO," which is comprised of five hard drive bays and is capable of storing 16 Terabytes of data, in his apartment. CS 2 indicated that a friend of Baslan's had gone to his apartment and taken it, and that Baslan wanted to know what would happen to him if he instructed the friend to destroy it. CS 2 also told the government that Baslan was considering multiple ways to frame Jack so that the witness's credibility could be attacked at trial. One of Baslan's plans involved having friends file false affidavits with the Court claiming that Jack had embezzled money from them. Another one of Baslan's plan involved having a friend claim that Jack had had inappropriate sexual contact with her young children.

After the initial debriefing, in order to learn more about Baslan's plans, on two occasions the government provided CS 2 with a recording device and instructed him to record his discussions with Baslan. Prior to CS 2 acting affirmatively on behalf of the government, a "taint" team was established. A separate Assistant United States Attorney was assigned to review the material originating from CS 2's actions. In addition a supervising Assistant United States Attorney and a Deputy Chief in the United States Attorney's Office Appellate Section were assigned to supervise and assist the obstruction investigation. Neither were involved in the supervision of the team prosecuting the instant case. The FBI also assigned separate agents to handle CS 2's proactive cooperation.

On July 1, 2013, and then again on July 31, 2013, CS 2 recorded conversations with Baslan. During these conversations, Baslan discussed several plans to obstruct justice.

For example, Baslan discussed his plan to have friends file affidavits falsely claiming that Jack had embezzled money from them.  Baslan also discussed a plan in which he attempted to defraud the Court and claim the FBI had destroyed evidence that Baslan himself had destroyed.

> As this Court described the recordings:
>
> Baslan and CS 2 did indeed extensively discuss plans to obstruct justice, including the plan to destroy the DROBO and then falsely claim that the FBI had done so to eradicate supposed exculpatory evidence contained within. In advancing that plot, Baslan would pivot off of a *pro se* motion he eventually filed on August 30, 2013, in which he urged the Court to direct the government to conduct an MD–Hash analysis on all electronic devices seized from his residence by the FBI, for the ostensible purpose of ensuring the integrity of the data stored on those devices. (Letter Mot. Preserve Evid., ECF No. 38–1). Baslan's motion noted that the government's seizure inventory is "devoid of any reference to [the DROBO]," but maintained that the DROBO was in the government's possession, citing its appearance in photographs taken at the scene. (Id. at 1). Baslan revealed to CS 2, however, that he had instructed a confederate to remove the DROBO from his apartment and destroy it. Thus, once the government responded to the MD–Hash motion by acknowledging that the FBI did not have the DROBO, Baslan would spring the trap, claiming that the FBI must have destroyed it and then moving to dismiss on the basis of the government's misconduct.
>
> There is no indication in the recordings that CS 2 invented this scheme to destroy the DROBO. Quite the opposite. CS 2 asks Baslan for updates on Baslan's progress and for an explanation of the particulars, which Baslan then provides at great length and in tremendous detail, thereby demonstrating to the Court's satisfaction that these were Baslan's plans, not CS 2's plans. The most conspicuous example comes from the July 31, 2013 recording. In a lengthy colloquy, CS 2 evinced confusion about the scheme to destroy the DROBO and blame its destruction on the FBI. Conceivably CS 2 feigned his confusion to elicit the full details from Baslan. If so, the ruse worked: Baslan responded with an explanation so comprehensive that the Court simply cannot credit his present claim to have had no role in

14

> developing the plot. Baslan even confirmed that, should his outside accomplices turn on him (he was certain they would not), the government could never prove that Baslan instructed them to destroy the DROBO and that, even if the government could recover the DROBO's drives, there would be no way for the government to link any recovered data to him. These are the statements of an enthusiastic and confident plotter, not a timorous patsy.

Baslan, 2014 WL 3490682, at *4.

In the recordings, Baslan made clear that he was being careful not to tell his lawyer Ephraim Savitt the details of his MD5 Hash Motion because he did not want to admit to Mr. Savitt that he possessed the very evidence (i.e., the DROBO), that he was planning on accusing the FBI of destroying. Specifically, Baslan indicated that he didn't "want to admit to Ephraim at this time that I have the evidence" and that his "problem is how to relay that message to Ephraim without telling him I know because I can't tell him I know." (July 1, 2013 recording.)

Baslan also described to CS 2 outlines of two possible stories he would tell to the jury at trial, what were referred to in the recordings as: the "Nancy Drew" idea and the documentary idea. Baslan initially described that he would claim that the reason why he agreed to meet with Jack at the New Jersey hotel was because he was "investigating" Jack's criminal activities; in his words, he was a modern-day Nancy Drew. Baslan told CS 2 that when he proposed the idea to a rabbi he was consulting, Rabbi Freund, the rabbi was not convinced that it was the best defense; in particular, Rabbi Freund was concerned that Baslan would be charged with obstruction of justice if he claimed he had been investigating Jack. As a result, Baslan pivoted and determined that, instead, he would claim that he was producing a documentary to memorialize Jack's interest in child pornography. According to

Baslan, Rabbi Freund thought the idea was "brilliant" because, unlike the "Nancy Drew" idea, it was protected by the First Amendment.  (July 1, 2013 recording.)

Due to its ongoing investigation of obstruction of justice, the government did not immediately produce the recordings made by CS 2 to Baslan.  On November 21, 2013, after one of Baslan's co-conspirators in the obstruction plot had been arrested and another had fled the country, the government produced the recordings to Baslan.

F.    Baslan's Proffer

At the request of Baslan's attorney, on October 31, 2013, pursuant to a written proffer agreement and in the presence of his attorney, Ephraim Savitt, Esq., Baslan was interviewed by the government.  During the course of the interview, Baslan made a number of claims regarding the events leading to his arrest.  Specifically, Baslan stated that Jack had confessed having sexual experiences with minors to Baslan and Henry.  Baslan indicated that Jack had admitted to having sex with many underage girls.  Baslan said that Jack had a video recorder secretly installed in his bedroom closet, which he used to record himself having sex with women, including underage girls.  Baslan stated that he had viewed one of these videos and had a copy of it on his computer.  Baslan said that he and Henry initially wanted Jack to get help.  They later decided to produce a documentary to memorialize Jack's interest in child pornography and sex with children.  Henry and Baslan eventually wanted to "expose" Jack.  Baslan claimed that the DROBO contained materials relating to this documentary.  Baslan also claimed that one aspect of the documentary was downloading a large volume of child pornography.

Baslan claimed that he did not go to the police or FBI regarding Jack's alleged interest in children for three reasons: (1) Baslan and Henry were using a significant amount

of drugs, including cocaine, at that time; (2) Baslan is part of a Jewish community that does not go to the cops; (3) initially, Baslan and Henry wanted Jack to get help, and later, only wanted to expose Jack.  Baslan also claimed that he had several e-mails he sent to himself regarding recordings he made of Jack for the documentary.  Baslan said that Jack talked about "securing" Henry and that it was Jack's idea to meet at the hotel to "secure" Henry.  Baslan stated that he planned to photograph Jack at the hotel for his documentary and use this photograph to either compel Jack to get help or Baslan would provide it to law enforcement.  Baslan said that on the night of his arrest, he was unable to tell Special Agent Spivack about the documentary because Special Agent Spivack was "hot-headed." (Report of Proffer, attached as Exhibit A[1].)

G.    Evidence at Trial

At trial, the government presented the evidence described above, with the exception of any evidence concerning or derived from CS 2 and Baslan's proffer statements.  Baslan elected to present a case in his own defense and called two witnesses: himself and his ex-wife, Maryana Kowal.  After explaining his international upbringing, his educational background, professional experience, hobbies and partial marital history (TT 526-33), Baslan explained his relationship with Henry, his co-defendant, and Jack.  (TT 534-37.)  Baslan detailed Jack's suicide attempts, Baslan's efforts to prevent Jack from overdosing by sticking his finger down Jack's throat, and finally, Jack's supposed interest in underage children.  (TT 535-37.)  In Baslan's telling, it was Jack, not Baslan, who, while at Baslan's apartment and

---

[1] This exhibit is not included with the electronically filed copy of this brief because it identifies the cooperating witnesses last name (and, therefore, the identity of the intended victims in this case).

under the influence of "Oxycodone and a cocktail of other drugs," first stated that he was interested in children. (TT 537.) According to Baslan, Jack then "pulled out his iPad and he had a stash of child pornography on there, including what I remember was a picture of a daughter and a picture of his niece and a few other people that I don't know." (Id.) According to Baslan, Jack passed out and later woke up and left. (Id.) Baslan believed this conversation with Jack took place between December 2012 and January 2013. (Id. at 538.) Baslan added that Jack had told him that he had a girlfriend who performed oral sex on Jack's baby while Jack had sex with her. (Id.)

After acknowledging that he had listened to all of the recordings that Jack had made both before and during trial, Baslan stated that he had had conversations with Jack before the recordings started, and that those earlier conversations made it clear that it was Jack's idea to sexually molest his own children. (TT 540-41.) Baslan testified that he and Henry initially had planned "to go to one of the rabbis in the community and get [Jack] committed," because "in the Jewish community . . . we don't go to the police, we try to resolve issues locally through the rabbinical court and so on." (TT 542-43.) Anticipating that the rabbi "would want proof" of Jack's sexual interest in children and implying that a rabbi had, in fact, "demanded proof," Baslan and Henry initially planned to "wire up [Jack's] iPad . . . get a video feed off of what he's watching and try to get him even to go in the back room when we downloaded the child porn." (TT 543.) According to Baslan, Jack "was reluctant," so the iPad video feed idea never came to fruition. (Id.)

Eventually, Baslan "devised this thing where [Jack] would drop off his kid, [Henry] pretends to take him to the back room and I sit and talk to him about it . . . whatever and we have a video of him coming into the house and a video of him dropping off the kids,

and, et cetera." (TT 544.) But, Jack "said no and he wanted to go to the hotel instead and it progressed." (T 544, 550-51.) Baslan explained that the plan then changed to Baslan acting as though he was setting up Henry to take a photograph of her in a sexually compromising position with one of Jack's infant sons before going to the New Jersey hotel:

> In the script you hear me saying to him, Kristen will stay outside, while Kristen takes one of the kids to the bathroom and you know, pretends that – takes a few minutes and walks out.
>
> In the meantime, I would wire him up, you know, with him coming in the house, dropping off the kids and me and him will talk. That is as good as proof as I need.

(TT 551.) According to Baslan, on the day he was arrested, Jack "at the last minute" said that he did not have time to stop by Baslan's apartment before going to the New Jersey hotel with the kids. (TT 552.) "At this point in time, especially being on coke, the paranoia hits, you start freaking out. I set up this situation, it's getting out of control." (TT 552-53.) The plan then changed to having Kristen Henry switch out the Benadryl that Jack was supposed to administer to his 7-year-old niece with a "health juice" of the same consistency, but in the stress of the moment, that did not work either, and Henry gave Jack the Benadryl. (TT 553-54.) Finally, the plan changed to Baslan and Henry going to the New Jersey hotel to meet Jack and the kids with the purpose of "tak[ing] a picture of what was going on, like two kids sleeping, one kid groggy and one kid sleep or whatever." (TT 554.) Then, Henry would walk out of the room, "and as soon as she walks out, I will come find Jack and then he will have five, six minutes to empty out the hotel room. Deliver the kids to their – back home or whatever. Or he is going to jail." (Id.) However, Baslan's final plan did not work either, as he and Henry were arrested by FBI agents. (Id.)

Baslan admitted to having possessed child pornography and that he had pled guilty to that crime before trial.  (TT 544.)   According to Baslan, his possession of massive quantities of child pornography was, in fact, altruistic, because he planned to "reverse hash-tag" the files to enable law enforcement agencies such as the FBI to figure out the source of the child pornography.  (TT 545, 547.)  Baslan admitted knowing that it was illegal to download child pornography, but he was "willing to take that risk as part of the greater good."  (TT 575.)

On cross examination, Baslan testified that by February 2013, he genuinely believed that Jack was a child molester and that he had actually molested his own children in the past.  (TT 578.)  Baslan also was aware that Jack had "seven or eight" children, and that he had access to his two infant children.  (TT 579.)  Although Baslan was concerned about the safety of Jack's infant children and Baslan knew the mother of these children, Baslan never expressed any concerns to her.  (TT 580.)  Nor did Baslan ever tell the police, the FBI or "any authority whatsoever" that Jack was molesting his children.  (TT 592-93.)

Baslan testified that he did tell a rabbi about his suspicions that Jack was a child molester.  (TT 580.)  When asked the rabbi's name, Baslan asked the court "do we have to say it one the record, your honor?"  (Id.)  When asked to spell the rabbi's name (Leibovitz), Baslan could only recall the first three letters and phonetically pronounced the rest.  Baslan admitted that he did not have Rabbi Leibovitz's name saved in his iPhone, in spite of the fact that Baslan had no fewer than five other rabbi's names saved in his phone. (TT 581.)  Baslan testified that he had never been to Rabbi Leibovitz's temple or shul.  (Id.) When pressed, Baslan was "not certain" which temple or shul Rabbi Leibovitz was associated with.  (Id.)  According to Baslan, when he went told Rabbi Leibovitz that "there's

20

a community member who is engaging in – may be engaging in activities with children and would I be allowed to go to the police for it, and he said no. . . . But he said if it's true, then we'll deal with it." (TT 582.) According to Baslan, the rabbi said: "give me the proof." Id.

As part of his truth-gathering, Baslan decided to combine his "investigation" of Jack with an ongoing "documentary" about "sexuality," and "American abuse," "which ended up encompassing Jack, once Jack popped in with that case." (TT 571-73.) In spite of the fact that a documentary requires film, Baslan never recorded any visual or audio footage of Jack discussing his supposed interest in children. (TT 583.)

<u>ARGUMENT</u>

I.    THE COURT SHOULD DENY BASLAN'S PREMATURE
      <u>EIGHTH AMENDMENT CHALLENGE TO HIS SENTENCE</u>

The first fifty-three pages of Baslan's post-trial motion are devoted to the argument that Baslan's yet-to-be-imposed sentence for his conviction under 18 U.S.C. § 2241(c) violates the Eighth Amendment because this statute's 30-year mandatory minimum sentence would be cruel and unusual punishment. As a threshold matter, Baslan lacks standing to challenge the constitutionality of his sentence because Baslan has not suffered any actual injury: he has not yet been sentenced to a 30-year mandatory minimum. In the event that the Court sentences Baslan to a period of incarceration greater than 30 years, and that sentence is based on the Sentencing Guidelines, Baslan's "injury" would not be fairly traceable to the 30-year mandatory minimum penalty associated with 18 U.S.C. § 2241(c).

Even assuming, for the sake argument, that Baslan has standing to challenge the constitutionality of the 30-year mandatory minimum, the Court should deny Baslan's motion on the merits.  A sentence of 30 years (or more) is not grossly disproportionate to the

crime of crossing state lines with the intent of sexually molesting three minors under age 12. Each federal appellate court that has considered whether 18 U.S.C. § 2241(c) violates the Eighth Amendment's prohibition of cruel and unusual punishment has held that it does not.

A.    Baslan Lacks Standing to Challenge the Constitutionality of His Sentence

The Court should deny Baslan's Eighth Amendment challenge to his yet-to-be-imposed sentence on Count I of the Indictment because Baslan lacks standing to make this challenge.  First, Baslan has not yet suffered any actual injury because he has not been sentenced.   Second, Baslan cannot show his hypothetical sentence is fairly traceable to 18 U.S.C. § 2241(c)'s 30-year mandatory minimum penalty as opposed to the Sentencing Guidelines or the other three statutes that he was convicted of violating each of which carry carry terms of imprisonment of ten and fifteen years to life.   Baslan therefore currently lacks standing to challenge the constitutionality of his sentence.  The Court should deny this portion of his Motion.

The judicial power of federal courts, under Article III, Section 2, of the Constitution, extends only to the cases and controversies specified therein.  The doctrine of standing is an essential part of the "case or controversy" requirement.  See Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992).  "In essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975).  The "irreducible constitutional minimum" requirements of standing are as follows:

> First, the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of — the injury

> has to be fairly traceable to the challenged action of the
> defendant, and not the result of the independent action of some
> third party not before the court.  Third, it must be likely, as
> opposed to merely speculative, that the injury will be redressed
> by a favorable decision.

Lujan, 504 U.S. at 560 (internal quotation marks, alterations and citations omitted).

Moreover, "each element [of standing] must be supported in the same way as any other

matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of

evidence required at the successive stages of the litigation."  Id. at 561.

      For a party to have standing to challenge the constitutionality of a particular

statute, the statute must have an adverse impact on that party's own rights.  "As a general

rule, if there is no constitutional defect in the application of a statute to a litigant, he does not

have standing to argue that it would be unconstitutional if applied to third parties in

hypothetical situations."  Cnty. Court of Ulster Cnty. v. Allen, 442 U.S. 140, 154-55 (1979).

      Thus, "in the criminal sentencing context . . . a defendant does not have

standing to mount a constitutional challenge to the application of a statute, if that application

did not adversely affect his sentence—that is, cause his sentencing outcome (i.e., his

sentencing  injury)."  United States v. Ramos, 695 F.3d 1035, 1049 (10th Cir. 2012) (holding

that defendant lacked standing to mount Eighth Amendment challenge to 5-year mandatory

minimum of federal child pornography distribution statute, 18 U.S.C § 2251(b)(1), because

defendant was sentenced to 87 months pursuant to the U.S.S.G., and his sentence was not

"fairly traceable to" the 5-year mandatory minimum); United States v. Robinson, 241 F.3d

115, 122 (1st Cir. 2001) ("The principal problem with the appellant's thesis is that she lacks

standing to mount the challenge.  Her sentence was not premised on the five-year mandatory

minimum set out in section 841(b)(1)(B), but, rather, on the applicable sentencing guidelines").

   Because Baslan has not yet been sentenced, he lacks standing to challenge the constitutionality of that sentence. The following hypothetical situations show why Baslan lacks standing. First, the Court could decline to impose the 30-year mandatory minimum on Count 1, an unlikely outcome, but one not without precedent in this district. See United States v. C.R., 792 F. Supp. 2d, 343, 509-10 (E.D.N.Y. 2011) (Weinstein, J.) (sentencing defendant who pleaded guilty to distribution of child pornography to a term of imprisonment of 3 years, even though the mandatory minimum was 5 years, on the grounds that 5 years' imprisonment would constitute cruel and unusual punishment), rev'd, 731 F.3d 204, 222 (2d Cir. 2013). If the court were to impose a sentence of less than 30 years on Count 1, then the defendant would have no actual injury traceable to 18 U.S.C. § 2241(c)'s 30-year mandatory minimum. Second, the Court could sentence Baslan to a term of imprisonment of 30 years or more based on the Sentencing Guidelines. Notably, the United States Probation Department's Presentence Investigation Report dated October 15, 2014 ("PSR") calculates the defendant's adjusted offense level for Count 1 to be 40, which corresponds to a range of imprisonment of 292-365 months. (PSR ¶ 79.) Should the Court sentence the defendant to more than 360 months on Count 1 (which is encompassed by the applicable Guidelines range of 292-365 months), then the defendant's sentence—his "injury"—would not be fairly traceable to the 30-year mandatory minimum.

   Relatedly, Baslan's adjusted offense level for Counts 2 and 3 (which counts are calculated together and adjusted for multiple victims) is 44. (PSR ¶¶ 81-101, 112.) Any Guidelines level above 43 carries a presumptive range of imprisonment of life. If the Court

were to sentence the defendant 360 months or more for Counts 2 and 3—which sentence obviously would not be based on the 30-year mandatory minimum of Count 1, as Counts 2 and 3 carry mandatory minimums of only 15 years—then the defendant's "injury" also would not be traceable to 18 U.S.C. § 2241(c), and he would lack standing to challenge the constitutionality of the statute.  For these reasons, the Court should deny Baslan's Eighth Amendment challenge to 18 U.S.C. § 2241(c) as untimely.

> B.    A Sentence of 30 Years is Not Grossly Disproportionate
> to the Crime of Crossing State Lines with the Intent of
> <u>Sexually Molesting Three Children Under Age 12</u>

Should the Court decide to reach the merits of Baslan's Eighth Amendment challenge to his yet-to-be-imposed sentence for his conviction under 18 U.S.C. § 2241(c), the Court should deny Baslan's motion because a sentence of 30 years is not grossly disproportionate to the crime of crossing state lines with the intent of sexually molesting three children, ages 2-3 months, 18 months and 7 years.  Indeed, every federal appellate court that has considered this precise issue has held that 18 U.S.C. § 2241(c)'s 30-year mandatory minimum does <u>not</u> constitute cruel and unusual punishment.

> 1.    Legal Standard: the Narrow Proportionality
> <u>Principle in Adult Term of Years Cases</u>

The Eighth Amendment contains a "narrow proportionality principle" that "does not require strict proportionality between crime and sentence," but "forbids only extreme sentences that are 'grossly disproportionate' to the crime.'"  <u>Harmelin v. Michigan</u>, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in the judgment); <u>see also</u> <u>United States v. Yousef</u>, 327 F.3d 56, 163 (2d Cir. 2003).  "[O]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have

been exceedingly rare." Ewing v. California, 538 U.S. 11, 21 (2003) (internal quotation marks omitted) (rejecting Eighth Amendment challenge to a sentence of 25 years for the theft of golf clubs worth $1,200 under California three strikes law)[2]; see also Harmelin, 501 U.S. at 995-96 (upholding a sentence of life without parole for possessing 672 grams of cocaine); Hutto v. Davis, 454 U.S. 370, 370, 375 (1982) (per curiam) (rejecting Eighth Amendment challenge to 40 year sentence for possessing with intent to distribute 9 ounces of marijuana and distribution of marijuana); Rummel v. Estelle, 445 U.S. 263, 265 (1980) (upholding sentence of life with possibility of parole for a defendant's third nonviolent felony: obtaining money by false pretenses).

In the past century, the Supreme Court has invalidated a term of years sentence for an adult offender on gross disproportionality grounds exactly three times. In Weems v.

---

[2] In recent years, the Supreme Court has extended the analysis it previously had applied only in death penalty cases to life sentences without the possibility of parole for juvenile defendants. See Graham v. Florida, 560 U.S. 48 (2010) (invalidating, on Eighth Amendment grounds, a sentence of life without parole for a juvenile offender who did not commit homicide). In both capital and juvenile life without parole cases, the Court has used categorical rules (not applicable here) to define Eighth Amendment standards.

The first set of classifications under the categorical rule analysis considers the nature of the offense; the second considers the characteristics of the offender. In cases turning on the nature of the offense, the Court has concluded that imposing the death penalty against individuals who committed non-homicide crimes is unconstitutional. See Kennedy v. Louisiana, 554 U.S. 407, 447 (2008); Enmund v. Florida, 458 U.S. 782 (1982); Coker v. Georgia, 433 U.S. 584 (1977). In cases turning on the characteristics of the offender, the Court has adopted categorical rules prohibiting the death penalty for defendants who committed their crimes before age 18 or who are mentally retarded. See Roper v. Simmons, 543 U.S. 551 (2005); Atkins v. Virginia, 536 U.S. 304 (2002). In Graham, the Court extended the categorical approach to a life without parole sentence for a juvenile offender who did not kill or intend to kill. Graham, 560 U.S. at 82. In Miller v. Alabama, 132 S. Ct. 2455, 2469 (2012), the Court further extended this categorical approach to mandatory life without parole sentences to juvenile defendants convicted of homicide crimes, holding that such sentences violated the Eighth Amendment. The Court has never applied the categorical approach to a case where, as here, the offender is an adult and the sentence is a term of years.

United States, 217 U.S. 349, 358 (1910), the Court held that the defendant's sentence to

*cadena temporal* and *cadena perpetua* constituted cruel and unusual punishment that was

disproportionate to his crime of falsifying a public record.  *Cadena temporal* and *cadena*

*perpetua* required the defendant to "always carry a chain at the ankle, hanging from the

wrists" and to "be employed at hard and painful labor, and shall receive no assistance

whatsoever from without the institution."  Weems, 217 U.S. at 364.

      In Robinson v. California, 370 U.S. 660, 667 (1962), the Court invalidated, on

Eighth Amendment grounds, the defendant's 90-day sentence for the crime of being a drug

addict.  In Robinson, the Court took issue with the fact that the statute at issue made the

"'status' of narcotics addiction a criminal offense, for which the offender may be prosecuted

'at any time before he reforms.'"  Id. at 667.  Noting the unlikelihood that "any State, at this

moment in history, would attempt to make it a criminal offense for a person to be mentally,

ill, or a leper, or to be afflicted with a venereal disease," the Court held that the defendant's

sentence was cruel and unusual punishment and suggested that *any* term of imprisonment for

a status crime would be unconstitutional.  Id. ("Even one day in prison would be a cruel and

unusual punishment for the 'crime' of having a common cold.")

      Finally, in  Solem v. Helm, 463 U.S. 277, 303 (1983), the Court held that a

sentence of life without the possibility of parole for "uttering a 'no account' check for $100"[3]

---

    [3] The relevant state statute under which Solem was convicted made it a crime to: ". . . with intent to defraud, pass[] a check drawn on a financial institution knowing at the time of such passing that he or his principal does not have an account with such financial institution, is guilty of a Class 5 felony."  Solem, 463 U.S. at 281 n. 5 (internal citation omitted). Helm's actual conduct was explained to the state court prior to his guilty plea as follows:  "'I was working in Sioux Falls, and got my check that day, was drinking and I ended up here in Rapid City with more money than I had when I started. I knew I'd done something I didn't

violated the Eighth Amendment where the defendant was a recidivist whose prior crimes were all nonviolent.  <u>Id.</u> at 281. [4]  In determining that life without parole was grossly disproportionate to the crime of issuing a "no account" check, the Court noted that the defendant's crime "was one of the most passive felonies a person could commit," involving "neither violence nor threat of violence to any person," and that " the $100 face value of Helm's 'no account' check was not trivial, but neither was it a large amount."  <u>Id.</u> at 296. Nor did the Court think that the circumstances of the defendant's prior offenses justified the sentence of life without parole for passing a worthless check:

> [the defendant's] prior offenses, although classified as felonies, were all relatively minor.  All were nonviolent and none was a crime against a person.  Indeed, there was no minimum amount in either the burglary or the false pretenses statute, and the minimum amount covered by the grand larceny statute was relatively small.

<u>Id.</u> at 296-97.  As to the severity of the defendant's sentence, the Court recognized that life without parole was the most severe sentence that could be imposed in South Dakota, where the defendant was convicted, and which state did not have capital punishment.  <u>Id.</u>

The <u>Solem</u> Court noted that when reviewing sentences under the Eighth Amendment, courts should be "guided by objective factors."  <u>Solem</u>, 463 U.S. at 290. However, the only mandatory objective factor the Court identified was: "the gravity of the

---

know exactly what. If I would have known this, I would have picked the check up.  I was drinking and didn't remember, stopped several places.'"  <u>Id.</u> at 281.

[4] The defendant in <u>Solem's</u> prior felonies included three third-degree burglary convictions, obtaining money under false pretenses, grand larceny, and driving while intoxicated.  <u>Solem</u>, 463 U.S. at 280 & n.1,  n.2.  The Court noted that all of Helm's prior felonies "were nonviolent, none was a crime against a person, and alcohol was a contributing factor in each case."  <u>Id.</u> at 280.

offense and the harshness of the penalty." Id. at 291. The Court then suggested a number of factors that "might be helpful" and that courts "might find [] useful" to consider, including "sentences imposed on other criminals in the same jurisdiction" and "sentences imposed for the same crime in other jurisdictions." Id. at 291-92.

Eight years after Solem was decided, the Court in Harmelin upheld a sentence of mandatory life without parole for a first-time offender who was convicted of possessing 672 grams of cocaine. Harmelin, 501 U.S. at 994-96. The Court held that:

> [s]evere, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history. . . . There can be no serious contention, then, that a sentence which is not otherwise cruel and unusual becomes so simply because it is "mandatory."

Id.

Justice Kennedy's concurring opinion in Harmelin, joined by two other justices, sets forth the Court's controlling opinion with respect to the principle of proportionality to be applied in Eighth Amendment challenges to sentences. See Marks v. United States, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as the position taken by those members who concurred in the judgments on the narrowest grounds.") The Harmelin Court recognized "that the Cruel and Unusual Punishments Clause encompasses a narrow proportionality principle" that applies to non-capital sentences, although the "precise contours" of this principle "are unclear." Harmelin, 501 U.S. at 997-98 (Kennedy, J., concurring in part and concurring in the judgment).

Surveying its prior Eighth Amendment decisions, the Harmelin Court gleaned "some common principles that give content to the uses and limits of proportionality review." Id. The first principle is "that the fixing of prison terms of specific crimes involves a substantive penological judgment that, as a general matter, is 'properly within the province of legislatures, not courts.'" Id. (quoting Rummel, 445 U.S. at 275-76). Thus, "reviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." Id. The second principle is that "the Eighth Amendment does not mandate adoption of any one penological theory." Id. at 999 (recognizing that "competing theories of mandatory and discretionary sentencing have been in varying degrees of ascendancy or decline since the beginning of the Republic"). The third principle is that "marked divergences both in underlying theories of sentencing and in the length of prescribed prison terms are the inevitable, often beneficial, result of the federal structure." Id. For this reason, the fact that "a State has the most severe punishment for a particular crime does not by itself render the punishment grossly disproportionate." Id. at 1000. The fourth principle is that "proportionality review by federal courts should be informed by 'objective factors to the maximum possible extent.'" Id. (quoting Rummel, 445 U.S. at 274-75). The Harmelin Court noted that the "most prominent objective factor is the type of punishment imposed," such as the "highly unusual *cadena temporal*" punishment in Weems and the death penalty. Id. On the other hand, reviewing courts "lack clear objective standards to distinguish between sentences for different terms of years." Id.at 1001. For this reason, "outside of the context of capital punishment, successful challenges to the proportionality of particular sentences [are] exceedingly rare." Id. (quoting Rummel, 445 U.S. at 272).

30

Applying these four principles, the <u>Harmelin</u> Court upheld the defendant's sentence of life without parole for possessing 672 grams of cocaine.  <u>Id.</u> at 1004.  The <u>Harmelin</u> Court rejected the notion that it was required to conduct a "comparative analysis between petitioner's sentence and sentences imposed for other crimes in Michigan and sentences imposed for the same crime in other jurisdictions."  <u>Id.</u> (clarifying that "<u>Solem</u> is best understood as holding that comparative analysis within and between jurisdictions is not always relevant to proportionality review").  Rather, "intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality."  <u>Id.</u> at 1005.[5]

2.    A Sentence of 30 Years or More is Not Grossly
Disproportionate to the Defendant's Crime

Assuming that the Court sentences Baslan to 30 years or more on Count 1, such a sentence would not be grossly disproportionate to his crime of crossing state lines with the intent of sexually molesting three children, ages 7, 18 months and 2-3 months. Baslan's crime is on the opposite end of the criminal spectrum from the "most passive" crime of uttering a "no account" check in <u>Solem</u> or being a drug addict in <u>Robinson</u>.  <u>See</u> discussion <u>supra</u> at pps. 26 to 28.  The evidence at trial, which included hours of consensually monitored recordings between Baslan and a confidential informant named Jack,

---

[5] In light of the <u>Harmelin</u> Court's clear statement that the <u>Solem</u> tripartite test is not controlling, the defendant's reliance the <u>Solem</u> test is disingenuous at best.  <u>See</u> Def. Br. at pp. 19-53.  Equally devoid of support in Supreme Court precedent is the defendant's contention that in reviewing the constitutionality of a sentence, the Court makes "no distinction between capital punishment and a felony prison sentence."  (<u>Id.</u> at 20.)  To the contrary, the Court consistently has applied a different analysis to Eighth Amendment challenges to sentences of death.  <u>See</u> n.1 <u>supra</u>.

showed in disgusting clarity exactly what Baslan intended to do to these children. (See GX 1-5 and 40.)

During the recorded conversations, Baslan stated that he wanted his girlfriend, Kristen Henry, to "blow" or "suck off" Jack's 18-month-old son, Ellie, while Baslan took photographs. (GX 1; GX 40 at 2/24/2013, 6:30). After Baslan had taken photographs of Kristen Henry performing oral sex on Ellie, he planned on moving to the "next step" of sexually molesting drugged children through a babysitting service that he and Kristen Henry would run:

BASLAN:     And the other stuff is all gonna be when the person is passed out so it's not gonna be anything where like what happened to us.

JACK:       Like, oh you're saying like with the babysitting gigs you were gonna do the roofies so it won't affect them…

BASLAN:     Exactly they're gonna be, yeah, yeah, -

JACK:       Okay

BASLAN:     well well trust me, all that I'm doing is nothing's gonna be, no memories, nothing, it's just you know.

(GX 1; GX 40, 2/24/2013 at 6:55).

Three weeks later, Baslan went into more detail about a specific child he plans to molest under the guise of "babysitting."

JACK:       You have one of your friends that said she wants Kristen…

BASLAN:     No, it's really like a person I know from the community that wants Kristen to babysit and she said like even it'll be easier she can like, I said, well she's busy so she said "no, she can hang out here during the day," just that Kristen would take her back home at night and stay with her.

JACK:       Oh like you'll, she'll let you bring the kid here.

BASLAN:     Yeah.

| JACK: | Really? |
|---|---|
| BASLAN: | For seven days. |
| JACK: | For seven days? And then take the kid at night. |
| BASLAN: | That kid is a total, like I told you, I had you know, like didn't care.  That, that kid would do it willingly, like you could tell. |
| JACK: | You could tell the kid… |
| BASLAN: | (UI). |
| JACK: | How old's the kid? |
| BASLAN: | Seven. |
| JACK: | Seven? |
| BASLAN: | Yeah. |
| JACK: | Girl I take it? |
| BASLAN: | Yeah. |
| JACK: | What gives you that impression?  Like what made, what she did that makes you think… |
| BASLAN: | You can tell, you can tell how she's eyeing out.  You can tell that she's being sexual.  You can tell right away man, when I was at that age I was too, I looked at older people in that way. I told you, this thing even about your daughter.  If you hadn't went and blown up her cover, I'm 90% sure that she did it to, to initiate with you, if she's already initiated it with kids of her peers.  It's just basic psychology, like reading a book will tell you. |

(GX 2; GX 40 at 3/7/2014 Body Wire.)

But before drugging and sexually molesting children by opening a "babysitting service," Baslan planned to drug and sexually molest Jack's 7-year old niece and sexually molest Jack's 18-month-old son and his 2-3 month-old son.  After discussing his plans for over a month, Baslan instructed Jack to drug Leah, the 7-year-old, by giving her children's

33

Benadryl at least an hour before Baslan and Henry arrived at the New Jersey hotel where they were supposed to meet Jack and the children.  Earlier that same day, Henry bought the Benadryl at a nearby Walgreens.  Baslan then gave the Benadryl to Jack while instructing him on the dosage to give Leah so that she would be "passed out."  (GX 4; GX 40 at 3/18/14 Body Wire.)  Baslan explained exactly what he wanted to do to Leah while she was passed out.

> JACK:         How far do you want to go?
>
> BASLAN:    Not too far.  Take pictures, you know touch.  I'm gonna down on her. That's pretty much what I want out of the whole thing.
>
> JACK:         You just want to go down on her?
>
> BASLAN:    Yeah, nothing else for now.
>
> JACK:         For now.
>
> BASLAN:    Yeah, I don't know anything else about her.  She's you know, what am I, what else can I do?  We'll figure out as we get more advanced in this, but the first time around, that's more than enough.
>
> . . .
>
> BASLAN:    For me, I think like if I go down on her, I'm gonna end up cumming, like, it's like going to be so intense it's like, you know.  Yeah.  I think it's gonna be absolutely awesome. (UI)

(GX 4; GX 40 at 3/18/13 Body Wire.)

On the evening the molestations were supposed to take place, Baslan drove with Kristen Henry from Brooklyn to New Jersey for the purpose of sexually molesting Jack's niece and sons.  Through no fault of his own, Baslan was unable to actually molest the children, as he was instead arrested by FBI agents when he crossed the threshold to Jack's hotel room.

34

While it should be clear from the above discussion of Baslan's crime that a sentence of 30 years is not a grossly disproportionate punishment, any possible doubt on the matter is put to rest by the Eleventh Circuit's decision in United States v. Farley, 607 F.3d 1294 (11th Cir. 2010).   In Farley, the defendant was convicted after a bench trial of violating 18 U.S.C. § 2241(c).  Id. at 1314.  Farley, like Baslan, had lengthy and explicit online communications with an adult about molesting that adult's child.  Id. at 1301-06.  In Farley's case, the adult was really an undercover law enforcement officer, whereas Baslan was communicating with a confidential informant.  Id. at 1306.  Farley, like Baslan, took the substantial step of crossing state lines (by flying from Dallas to Atlanta) to meet the mother of the child he planned to molest as well as the supposed child herself.  Id. at 1307.  At trial Farley, like Baslan, took the stand in his own defense and contested that he actually intended to molest a child.  Farley claimed his online communications with the undercover officer were fantasy; Baslan claimed he was "investigating" Jack and planned to report him to a rabbi once he had gathered sufficient evidence that Jack was a child molester.  Id. at 1312-13.

In advance of sentencing, the district court in Farley asked the parties to brief the constitutionality of the 30-year mandatory minimum sentence to which Farley was subject.  Id. at 1319.  Prior to imposing sentence, the district court found that the 30-year sentence was grossly disproportionate to Farley's crime and sentenced him to 235 months imprisonment, approximately 10 years below the mandatory minimum.  Id. at 1324.  The Eleventh Circuit reversed.  Id. at 1344.

The Farley court first found that the defendant's 30-year sentence did not give rise to an inference of gross disproportionality.  Id.  Noting that the sentence in Harmelin was

"life imprisonment without parole, the second most severe penalty under the law," that Farley's crime was "as bad or worse than the one Harmelin committed," and that "a thirty-year sentence is less severe than one of life imprisonment," the Eleventh Circuit held that "it necessarily follows that a sentence of thirty years is not grossly disproportionate to Farley's crime." Id. As a consequence, the court saw no reason to compare Farley's sentence to sentences authorized or required by other statutes in the Eleventh Circuit or in other jurisdictions. Id. The court in Farley also noted that "while it is true that Farley, through no fault of his own, was unable to inflict [] harm on an actual victim, the same could be said of Harmelin," insofar as the 672 grams of cocaine Harmelin was convicted of possessing were seized by the police. Id. Finally, the court in Farley examined the "serious problem" of sexual abuse of children in the United States, and the use of the internet to facilitate that abuse, and stating: "we would find any suggestion that child abuse is a nonviolent crime as absurd as the Supreme Court found the same suggestion about possession of 672 grams of cocaine." Id. at 1345.

The reasoning of Farley applies with equal force here. Baslan was convicted of violating the same statute as Farley, and the facts of Baslan's case are markedly similar to Farley's. A sentence of 30 years is simply not constitutionally disproportionate to the crime of crossing state lines with the intent of sexually molesting a child under the age of 12.[6]

_____

[6] The Second Circuit also has rejected Eighth Amendment challenges to child pornography sentences. See United States v. Puglisi, 458 Fed. Appx. 31, 36 (2d Cir. 2012) (rejecting Eighth Amendment challenge to 15-year mandatory minimum sentence for attempted production of child pornography ); United States v. Rivera, 546 F.3d 245, 255 (2d Cir. 2008) (no "inference of gross disproportionality" arose from mandatory life sentence for recidivist offender for production of child pornography); Reingold, 731 F.3d at 221

Other federal appellate courts have similarly held that a sentence of 30 years for violating 18 U.S.C. § 2241(c) is not grossly disproportionate to the crime.  See, e.g., United States v. Schumaker, 479 Fed. Appx. 878, 886 (11th Cir. 2012) (holding that 30-year sentence for violating 18 U.S.C. § 2241(c) does not violate the Eighth Amendment); United States v. Lyons, 363 Fed. Appx. 485, 485 (9th Cir. 2010) (mandatory minimum sentence of 30 years for violating 18 U.S.C. § 2241(c) was not cruel and unusual punishment); United States v. Lamere, 337 Fed. Appx. 669, 672 (9th Cir. 2009) (same).  For the reasons stated above, the Court should therefore deny Baslan's Eighth Amendment claim.

## II.    THE GOVERNMENT DID NOT INTRUDE THE DEFENDANT'S ATTORNEY-CLIENT RELATIONSHIP

In his post-trial motion, Baslan again argues that the government intentionally invaded his attorney-client relationship by using a confidential informant to gain information about Baslan's plans to obstruct justice.  He argues that he is entitled to dismissal of the indictment in its entirety on this basis.  This claim fails because: (a) the government did not intrude on any attorney-client relationship, let alone improperly, or derive "confidential defense strategy" as a result of the confidential informant's actions; and (b) the defendant cannot show prejudice.  As an alternative to outright *vacatur* of his conviction, the defendant requests a hearing.  However, even taken as true, the defendant's motion fails to allege specific facts that would entitle him to such a hearing.

---

(mandatory minimum sentence of 5 years was not grossly disproportionate to the crime of distributing child pornography).

A.    The Government Violates the Sixth Amendment Where It Intentionally
      Invades the Defense Camp and the Defendant is Prejudiced

While the Supreme Court has acknowledged that it is "entirely proper [for the government] to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted," it has also determined that where this investigation involves contact between a confidential informant and a defendant regarding charged offenses the Sixth Amendment is violated. United States v. Massiah, 377 U.S. 201, 207 (1969).  However, as this Court has recognized, there are different types of Sixth Amendment violations.  See United States v. Baslan, No. 13 CR 220 RJD, 2014 WL 3490682, at *2 (E.D.N.Y. July 11, 2014).  When the government or its informant elicits incriminating statements from a defendant following indictment, his only remedy is the suppression of those statements.  See Maine v. Moulton, 474 U.S. 159, 180 (1985) (holding that "incriminating statements pertaining to pending charges are inadmissible at the trial . . . [where] the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel"); see also Kansas v. Ventris, 556 U.S. 586, 594 (2009) (holding that an "informant's testimony, concededly elicited in violation of the Sixth Amendment, [is] admissible to challenge [a defendant's] inconsistent testimony at trial).

The Supreme Court also recognized in Weatherford v. Bursey, 429 U.S. 545, 557 (1977) that the Sixth Amendment is violated where the government intentionally invades the defense camp.  The Second Circuit has identified that such a violation, which this and other courts have termed a Weatherford violation, may occur where "privileged information [obtained by the government's confidential informant] had been passed to the government or

38

[where] the government had intentionally invaded the attorney client relationship" and there is prejudice to the defendant.  United States v. Dien, 609 F.2d 1038, 1043 (2d Cir. 1979) adhered to on reh'g, 615 F.2d 10 (2d Cir. 1980); see also United States v. Massino, 311 F. Supp, 2d 309, 313 (E.D.N.Y.2004).

Recognizing the limited remedies for "simple" Massiah claim, the defendant contends that the government invaded the defense camp and that, accordingly, the violation is of the type described in Weatherford.  In neither his pre-trial nor post-trial motions does the defendant claim that the confidential informant was involved in conferences between the defendant and his attorney.  Rather, the defendant's argument at both phases has been that the confidential informant improperly invaded his relationship with his attorney and learned confidential defense strategy, which prejudiced him.  The government does not concede that a defendant's voluntary statements, outside the presence of his attorney, to a confidential informant about his defense strategy constitute a violation of Weatherford.[7]  However, even

---

[7] Weatherford itself dealt with a situation in which a confidential informant was present during a meeting between the defendant and his counsel.  Weatherford, 429 U.S. at 548-49.  The Weatherford decision notes, in determining there was no Sixth Amendment violation in that case, that the confidential informant did not pass to the prosecuting attorney "any details or information regarding to [the defendant's] trial plans, strategy or anything having to do with the criminal action pending against [the defendant]."  However, later in the decision the Court states that the outcome may be different if  the confidential informant passed "the details of the [attorney-client] conversations about trial preparations."  Id. at 554. There is no indication that the Weatherford Court meant the same standards to be applied to information regarding defense strategy outside the presence of attorneys.  That reading of Weatherford is underscored by the Court's decision eight years later in Maine v. Moulton, 474 U.S. 159, 159 (1985).  In that case, following an indictment, a cooperating witness had numerous communications with the defendant, at government direction, in order to obtain additional evidence.  This culminated in a "lengthy" meeting between the cooperator and defendant which "consisted of a prolonged discussion of the pending charges," including "what actually had occurred, what the State's evidence would show, and what [the defendant and cooperator] should do to obtain a verdict of acquittal."  Id. at 165-66.  None of these

assuming that such a situation could constitute a <u>Weatherford</u> violation, the defendant fails to make out any of the required elements of a such a claim.

     B.    <u>The Government Neither Improperly Invaded the Defendant's Relationship With His Attorney Nor Learned Confidential Defense Strategy</u>

       For the government to commit a <u>Weatherford</u> violation, it must "intentionally invad[e] the attorney client relationship." <u>Dien</u>, 609 F.2d at 1043. While, as this Court has pointed out, that phrase leaves some description to be desired, courts have set out several guideposts. First, the defendant's relationship with his counsel must actually be implicated. Second, where the government's use of a confidential informant was "justified . . . there can be no violation of the sixth amendment without some communication of valuable information derived from the intrusion to the government." <u>United States v. Ginsberg</u>, 758 F.2d 823, 833 (2d Cir. 1985); <u>see also</u> <u>United States v. Simels</u>, 654 F.3d 161, 168 (2d Cir. 2011) (holding that investigating obstruction offenses was a "sufficient justification" for potentially interfering with attorney-client relationship). Courts have also held that, where a defendant's claim is based on the provision of defense strategy information, it must be *confidential* defense strategy. <u>See</u> <u>United States v. Irwin</u>, 612 F.2d 1182, 1189 (9th Cir. 1980) (holding that there was no <u>Weatherford</u> violation regarding confidential informant's passing of defense strategy to the government where "defense counsel had revealed the

---

conversations involved the defendant's attorney. At trial, the government introduced these conversations. Addressing the Sixth Amendment violation, the Supreme Court affirmed the lower court's decision that the introduction of the defendant's statements violated <u>Massiah</u> and the lower court's order that a new trial be held, in which those communications would be excluded. Nowhere does the <u>Moulton</u> decision indicate that the fact that the cooperator was probing "trial strategy" requires a more far reaching remedy than the exclusion of evidence required by <u>Massiah</u>. In fact, the <u>Weatherford</u> decision was not cited at all by the <u>Moulton</u> Court.

nature of the defense in his initial conference with the prosecutor"); Massino, 311 F. Supp. 2d at 315 (finding no Weatherford violation because "no privileged defense strategy was communicated"); see also Dien, 609 F.2d 1038, 1043 (no Weatherford violation where, *inter alia*, "the conversations alleged to have been passed on to the government were not confidential"). This is logical because where the confidential informant only learns strategy information that the defendant has already revealed his relationship with his attorney is not implicated nor could he be prejudiced.

In the current case,  the government's use of a confidential informant was justified to uncover his obstruction plots and  the government did not intrude on the attorney-client relationship or learn "confidential defense strategy" because the information the government learned was not related to Baslan's trial defense or was not "confidential."  The government, therefore, did not invade the defense camp.

1.    The Government's Use of a Confidential Informant Was Justified

The government use of a confidential informant to question Baslan post-indictment was the result of specific allegations that he intended to obstruct justice.  As described above, the government first learned of Baslan's obstruction in June 2013, when CS 2, an inmate at MDC who was not previously cooperating with the government, approached the government.  In late June 2013, the government debriefed him and learned about specific plans Baslan was making.  First, that Baslan intended to destroy an electronic storage device that had been at this apartment at the time of the FBI's search, the DROBO.  Second, that Baslan was considering multiple ways to frame the government's cooperating witness, Jack, so that Jack's credibility could be attacked at trial, including by having friends file false

affidavits with the Court claiming that the cooperating witness had embezzled money from them.

The Second Circuit has previously held that just such an obstruction investigation justified even more significant intrusion on the attorney-client relationship.  In United States v. Simels, 654 F.3d 161 (2d Cir. 2011), the government had a confidential informant meet with a defendant's lawyer to specifically discuss his strategy in an ongoing case.  The government had begun this investigation after the attorney had misrepresented himself to prison officials in order to meet with one of the government's potential witnesses.[8] The Second Circuit held that this information provided the government with "a substantial basis" to intrude on the attorney-client relationship and affirmed the district court's denial of the defendant's motion.  Id. at 168.  The court also noted that "no privileged information was passed to the Government."  Id.

In the present case, the government's reasons for conducting an obstruction investigation were even stronger than in Simels.  While in Simels, the government's Sixth Amendment violation originated with one false statement that did not even directly indicate an attempt to obstruct justice, here the defendant himself laid out multiple plans to both falsely smear a cooperating witness and commit a fraud on the Court.  CS 2's initial reports to the government included at least one of the exact plans that Baslan again discussed with CS 2 on the covert recordings; specifically, a plan to destroy the DROBO and attempt to pin its destruction on the government.  As the Court found, the recordings made by CS 2 make clear that this was not a plot cooked up by the government or CS 2.  Rather, "CS 2 asks

---

[8] The attorney had claimed that he was representing the potential witness.

Baslan for updates on Baslan's progress and for an explanation of the particulars, which Baslan then provides at great length and in tremendous detail." Baslan, 2014 WL 3490682, at *4. "These were Baslan's plans, not CS 2's plans." Id. As the Court previously found, this plan presented the government with a "clear justification (perhaps even an imperative) for investigating this potential obstruction of justice." Id. Nothing in Baslan's newest filing alters this justification or provides a basis for the Court to change it analysis of the origin of the government's investigation.

> 2.    Baslan's Claim is Also Deficient Because the Information Received by the Government Neither Impacted His Attorney-Client Relationship or Constituted Confidential Defense Strategy Information

Even assuming that a Weatherford violation can be premised upon a defendant, rather than his counsel, providing privileged defense strategy information to a third party outside the scope of privilege, there can be no violation here because the information that Baslan was providing did not impact his attorney-client relationship and was not confidential. First, the defense strategy consisted entirely of his own ideas, not the result of any confidential communications with his counsel or counsel's work product. Its revelation was, therefore, unrelated to his attorney-client relationship. Second, his supposed defense strategy was not confidential because it was revealed to the government by Baslan himself before Baslan was aware of CS 2's recordings.

It is without question that a Sixth Amendment violation must relate in some way to an "intentional inva[sion of] the attorney client relationship." Dien, 609 F.2d at 1043; see, e.g., United States v. Warshak, No. 1:06-CR-00111, 2007 WL 4410237, at *12 (S.D. Ohio Dec. 13, 2007) (rejecting claim because defendant had not "linked any of the discussions to which they refer to discussions with defense counsel" and did not show

prejudice).  Here, there is no violation because the "strategy" that Baslan describes in his

papers was not a plan formulated with counsel.  As the Court noted, "Baslan confirmed that

he never discussed his defense theories with his current attorney."  Baslan, 2014 WL

3490682, at *5.  This fact is also apparent from the jailhouse recordings during which Baslan

indicates that he is not discussing his plans with his attorney.[9]  Is it not even clear whether

the ideas Baslan conveyed to CS 2 ever became a strategy he jointly agreed on with his

counsel.  Indeed, one of the "strategies" identified by the defendant in his current motion—

his strategy "to contend that Baslan's intent in engaging Jack in the 'reverse entrapment' plan

to develop for the Rabbis in the community (Def. Br. at 58)—received little, if any mention,

from his counsel in either of his jury addresses.  (See TT 34:7-39:18 (opening statement);

674:8-692:18 (summation)).

　　　　　　Nor were these "strategies" confidential.  In the weeks after his arrest, Baslan

himself revealed his claim that he was setting Jack up over telephone calls made from the

MDC's recorded telephone system to individuals other than his attorney.  For example,

during an April 2, 2013 call, Baslan stated that "I just thought I would be smarter than the

system and that I would take the law into my own hands, that's what happened and

somebody set me up.  I was trying to set him up, I was trying to set him up, but he set me up

first, that is all." (April 2, 2013 12:11 p.m. call at 5:05.)[10]  On April 7, 2013, Baslan stated

during a call from the MDC that "I was trying to trap somebody and I got myself trapped in

the middle instead."  (April 7, 2013 7:16 p.m. call at 3:35)  Later during the same call, he

---

[9] "I don't want to admit to Ephraim at this time that I have the evidence;" "My problem is how to relay that message to Ephraim without telling him I know because I can't tell him I know."  (July 1, 2013 recording.)

[10] A CD containing these calls is attached as Exhibit B.

indicated that "the guy who is setting me up has a long history of this." (Id. at 5:18.) During an April 8, 2013 call, Baslan stated "everybody knew, they're like, shoot, they're mad at me, like why the hell did you try to play detective, why the hell did you get yourself involved in this, why didn't you just report. You know who that guy is, remember, the guy I told you for three years I'm helping him get over suicide and OD'ing and all that stuff . . . He got arrested with a big charge. He had confessed to me that he had those desires and then, um, set me up." (April 8, 2013 1:25 p.m. call at 4:00.) Later in that call he indicated "I wanted to go trap that guy, to call a Rabbi on him." (Id. at 7:39.) In short, Baslan described the idea of the "reverse sting," over telephone lines he knew were recorded, months before CS 2 contacted the government.

Baslan made these "strategies" even more apparent during an October 2013 proffer with the government. While this proffer occurred after CS 2's recordings were made, those recordings had not yet been disclosed to the defendant because the investigation of Baslan's obstruction was ongoing. During the proffer, Baslan stated that after Jack confessed to Baslan that Jack had had sex with a number of underage girls, Baslan and Henry initially wanted Jack to get help. They later decided to produce a documentary to memorialize Jack's interest in child pornography and sex with children. Henry and Baslan eventually wanted to "expose" Jack. Baslan also provided details about the minors that Jack engaged in sexual activity with. (See Report of Proffer, attached as Exhibit A; see also TT 650:18-22 (cross-examination of Special Agent Spivack regarding the proffer).) Nor were these claims new to the government. Jack himself had provided information about his own criminal history before becoming a confidential informant for the FBI. (TT 78:18-79:10.)

45

Additionally, as the Court noted, to the extent these "strategies" were revealed to CS 2 by Baslan, Baslan provided little more than a "hazy outline of his theories."  Baslan, 2014 WL 3490682, at *5.  As he did in his pre-trial motion, the defendant cites the Ninth Circuit's decision in United States v. Danielson, 325 F.3d 1054 (9th Cir. 2003), in support of his request for dismissal.  While for the reasons indicated above, the government has doubts about whether Danielson squares with Supreme Court precedent, as this Court noted, it is also distinct from the present case on its facts.  In Danielson, the government became aware of a defendant's plot to obstruct justice and used a confidential informant to question the defendant about that plot outside the presence of his lawyer.  In those ways, Danielson is identical to the present case.  However, in Danielson, the confidential informant probed for specific details regarding the defendant's planned defense.  He asked again and again about Danielson's trial, including what Danielson would testify to.  He even asked Danielson about Danielson's conversations with his counsel.  Unsurprisingly, he learned specific details of Danielson's defense as a result and passed them directly to the law enforcement officers working on the case.  The defense strategy he was provided by Danielson was the exact defense used by Danielson at trial.  Significantly, the government also failed to notify Danielson in any manner before trial of the recordings or its obstruction investigation.

The specific strategy learned by the informant in Danielson and the manner in which he learned it are nothing like the general "strategies" that Baslan alleges CS 2 learned. For example, it should come as no surprise to any criminal practitioner that one of a defendant's strategies will be to attack the credibility of the government's cooperating witness.  It was certainly no surprise to the government that the defendant would attack Jack's credibility at trial, irrespective of the defendant's claims that the government learned

this would be one of his "strategies" at trial only through CS 2's actions.  Of equal import, the recordings made by CS 2 make clear that to the extent he learned any "strategy" it was not the result of the type of probing sanctioned in <u>Danielson</u>.  Rather, he directed his questions towards Baslan's obstruction plots.  Because the defendant's claimed "strategies" did not relate to his attorney-client relationship, were not confidential, and were not specific, there can be no <u>Weatherford</u> violation.

3.    The Defendant Was Not Prejudiced by the Government's Obstruction Investigation

Even if the defendant could establish that the government invaded his attorney-client relationship, his <u>Weatherford</u> claim would still fail because he was not prejudiced by the government's use of a confidential informant.  The defendant does not, and cannot, claim that the government used evidence at trial obtained as a result of his statements to the confidential informant.  Rather, the defendant makes general claims that the government's access to his supposed trial strategy amounted to an "unfair advantage."  However, the claimed advantage he outlines does not amount to "prejudice" under Second Circuit precedent.

It is well-established in this Circuit that "unless 'the conduct of the Government has . . . been . . . manifestly and avowedly corrupt,' a defendant must show prejudice to his case resulting from the intentional invasion of the attorney-client privilege." <u>United States v. Schwimmer</u>, 924 F.2d 443, 447 (2d Cir. 1991) (quoting <u>United States v. Gartner</u>, 518 F.2d 633, 637 (2d Cir. 1975)); <u>see also</u> <u>Dien</u>, 609 F.2d at 1043 (Weatherford violation requires invasion of attorney-client relationship "and resulting prejudice"); <u>Ginsberg</u>, 758 F.2d at 833 (same).  This prejudice must result from more than "the mere

47

'tangential[ ] influence[ ] [that privileged information may have on] the prosecutor's thought processes in . . . preparing for trial.'" Schwimmer, 924 F.2d at 446 (quoting United States v. Mariani, 851 F.2d 595, 600 (2d Cir.1988) (alterations in the original)).  The defendant cannot show and has not even alleged prejudice of this nature.

Firstly, the government did not make any use of information obtained from CS 2 at trial.  CS 2 did not testify.  The recordings he made were not played.  The DROBO was not introduced into evidence or even mentioned.[11]  The government did not even use Baslan's obstruction scheme during the course of its cross-examination of him.  (TT 562:9-603:22.)  Nor does the defendant claim that any of the evidence offered against him at trial—which was properly focused on his pre-arrest actions and post-arrest statements[12]—was derived from CS 2's actions.

Rather, the defendant's complaint is that the government may have used its knowledge of his alleged "strategy" in "subtle ways."  (Def. Br. at 69.)  The only example the defendant provides of any "unfair advantage" is the government's decision not to call Jack as a witness.  (Def. Br. at 62.)  The defendant claims that this "avert[ed] a strong defense counter-attack that exhumed [Jack's] self-confessed history to Baslan . . . of his repeated child sex abuse, including his videotapes of his repeated statutory rapes of teen-aged girlfriends."  (Id. at 63.)  The defendant argues that "[s]uch a probing examination of the unreliability of the government's chief, and indeed, only non-hearsay informant about the charged crimes was rendered impossible" by the government's decision not to call him.  (Id.)

---

[11] The government went so far as to caution the Court during a sidebar when defense counsel was moving towards opening the door to that evidence.  (TT 212:1-12.)

[12] Defense counsel did also solicit information about the defendant's proffer during Special Agent Spivack's rebuttal testimony.

The defendant's claim ignores the facts that a) the defendant was fully able to call Jack to testify and chose not to; and b) there was ample, uncontradicted testimony regarding Jack's prior crimes and mental history at trial.

The defendant cannot dispute that he had a constitutionally-protected right to call Jack during the defense case. His counsel admitted as much in his trial summation. (TT 691:12-14 ("Could we have called Jack? I suppose. What so we could see him unravel on the stand?).) The defense made a choice not to call Jack, presumably for strategic reasons. (TT 691:14-16 ("The Government decided not to call him, why should we. They have to prove the case, not we. It's their responsibility, not ours.")) The defendant was certainly not precluded by the government's obstruction investigation from seeking his testimony.

There was also ample testimony at trial regarding Jack's prior crimes and mental health history despite the fact that he was not called by either party. During his direct examination, Special Agent Spivack testified that Jack had admitted to "sexual contact with at least three minors, 16 and 17-year old girls." (TT 79:8-10.) On cross-examination, defense counsel elicited more information about Jack's history, including his sexual contact with at least three minors, extensive drug use, and prior acts of physical violence. (TT 187:25-189:23.) He went into specific detail regarding Jack's prior statutory rapes and production of child pornography featuring 16 and 17-year-olds. (TT 209:16-211:2.) The Court also permitted defense counsel—over government objection—to delve into Jack's psychiatric history in detail. (TT 196:23-197:24.) Defense counsel also elicited—again over government objection—information about a physical altercation Jack had had in February of 2014. (TT 206:8-208:15.) Defense counsel again probed Jack's psychiatric history during his cross-examination of Jack's brother. During that examination, the defense elicited

testimony about the nature of Jack's mental illness, his psychiatric hospitalizations, and his suicide attempts.  (TT 270:2-272:17.)  Jack's brother also testified to Jack's use of narcotics.  (TT 274:20-276:11.)  In short, the government's decision not to call Jack did not prevent the defense from eliciting details about his criminal history or potential credibility.  Baslan cannot, therefore, show prejudice, even if he could establish that the government's strategy was the result of information it learned during its obstruction investigation.

Nor does the defendant's speculation that the government may have "used his disclosed trial strategy to its undue trial advantage" (Def. Br. at 69), constitute "prejudice."  The defendant cites approvingly to various cases that analogized the prejudice analysis used in the Weatherford context to the government's use of immunized testimony, which the Supreme Court addressed in Kastigar v. United States, 406 U.S. 441 (1972).  Importantly, contrary to the decisions that the defendant cites in other circuits, the Second Circuit has never applied Kastigar's burden shifting in the Massiah/Weatherford context.  Instead, the Second Circuit has held again and again that it is a defendant's duty to show prejudice due to a Sixth Amendment violation.  See Schwimmer, 924 F.2d at 447 ("defendant must show prejudice"); United States v. Sanin, 113 F.3d 1230 (2d Cir. 1997) ("a defendant must show that he has suffered prejudice"); United States v. Bin Laden, No.  98 CR 1023 (KTD), 2005 WL 287404, at *5 (S.D.N.Y. Feb. 7, 2005) aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93 (2d Cir. 2008) ("[defendant] must thus prove that he provided prejudicial information to the informant and that this information was used during the prosecution of his case").  However, even under the strict Kastigar test, the defendant's claims would fall short.  In that context, the Second Circuit has rejected the idea that a defendant is constitutionally "prejudiced" where the immunized testimony only influences

50

"the Government's thought process or questioning of witnesses."  United States v. Rivieccio, 919 F.2d 812, 815 (2d Cir. 1990); see also Mariani, 851 F.2d at 601 (2d Cir. 1988) (holding that government's use of immunized testimony for "non-evidentiary" purposes did not prejudice the defendant); see also United States v. Mauro, 846 F. Supp. 245, 252 (W.D.N.Y. 1994) ("The Second Circuit has emphasized that the primary focus of Kastigar's prohibition on direct or indirect use of immunized testimony is on evidentiary use.")  In United States v. Schwimmer, the Second Circuit applied the same reasoning to a claim that the government intruded the defendant's attorney-client relationship.  924 F.3d 443.  In affirming the district court's denial of the defense motion for dismissal, the Second Circuit relied on the fact that "any influence on the government's case by information obtained at the interviews or from the [privileged] workpapers was 'wholly conjectural and insubstantial.'"  Id. at 446.  The defendant cannot show and does not allege anything more than the type of "tangential influence" that did not amount to constitutional prejudice in Schwimmer.  His Weatherford claim should, therefore, be denied.

C.    The Defendant Is Not Entitled to a Hearing

"A defendant's claim of a *Massiah* violation does not automatically require an evidentiary hearing."  United States v. Miller, 116 F.3d 641, 665 (2d Cir. 1997).  Even where the government allows a confidential informant to attend meetings between a defendant and his attorney, the Second Circuit has held that "assuming that the government has not interfered with the attorney-client relationship deliberately, the defendant bears the burden of 'alleg[ing] specific facts that indicate communication of privileged information to the prosecutor and prejudice resulting therefrom.'"  United States v. Aulicino, 44 F.3d 1102, 1117 (2d Cir. 1995) (quoting United States v. Ginsberg, 758 F.2d 823, 833 (2d Cir.1985));

United States v. Barret, 824 F. Supp. 2d 419, 452 (E.D.N.Y. 2011) ("In order to require a

hearing on [Massiah] claim, the defendant bears the burden of alleging specific facts

indicating the existence of such a violation").  In Ginsberg, 785 F.2d  at 833, the Second

Circuit made clear that the same standard applies wherever the government's intrusion into

an attorney-client relationship is justifiable, as is the case here, stating:

> We therefore hold that, to require a hearing on a claimed sixth
> amendment violation resulting from unintentional or justifiable
> presence of a government informant or agent at an attorney-
> client conference, a defendant must allege specific facts that
> indicate communication of privileged information to the
> prosecutor and prejudice resulting therefrom. Allegations that a
> prosecution witness testified concerning privileged
> communications, that prosecution evidence originated in such
> communications, or that such communications have been used
> in any other way to the substantial detriment of the defendant
> would meet this standard.

Ginsberg, 758 F.2d 823, 833 (2d Cir. 1985) (emphasis added).

Conculsory and speculative allegations are insufficient to meet this burden.  A

defendant's "statement that he had no way of knowing the extent of any prejudice defendants

might have suffered, supported only by speculation that [he] 'may well have been severely

prejudiced' [is] insufficient to require a hearing." Aulicino, 44 F.3d at 1117.  "A hearing

may not be granted simply because a defendant assumes that he was prejudiced by, or that

the Government unfairly benefited from, the use of an informant." Bin Laden, 2005 WL

287404, at *6.  Here, the defendant has done little more than through up his hands and say

that he may have been prejudiced in some way.  The one concrete allegation he makes

regarding a prejudicial effect of the Sixth Amendment violation—the government's decision

not to call Jack—is rebutted by the trial record.

In the pre-trial phase, this Court used a hybrid approach, in which it decided the defendant's motion after listening to the recordings made by the confidential informant. Baslan, 2014 WL 3490682, at *2 (citing United States v. Massino, 311 F. Supp, 2d 309, 310–11 (E.D.N.Y. 2004)).  There is nothing in the defendant's current submission that makes the Court's prior approach any less appropriate.

CONCLUSION

For the foregoing reasons, the defendant's motion should be denied.

Dated:      Brooklyn, New York
            November 24, 2014

                                   Respectfully submitted,

                                   LORETTA E. LYNCH
                                   United States Attorney
                                   Eastern District of New York
                                   Attorney for Plaintiff
                                   271 Cadman Plaza East
                                   Brooklyn, New York 11201


                       By:   /s/ Tyler J. Smith
                             Tyler J. Smith
                             Tiana A. Demas
                             Assistant United States Attorneys
                             (718) 254-6186/6116