# EPHRAIM SAVITT

*Attorney at Law*

260 MADISON AVENUE                                                                                   (212) 679-4470
22ND FLOOR                                                                                      FAX:   (212) 679-6770
NEW YORK, NEW YORK 10016                                                  EMAIL:EPHRAIM@SAVITTESQ.COM
WWW.SAVITTESQ.COM

December 14, 2014

**BY ECF**
HONORABLE RAYMOND J. DEARIE
U. S. District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re: <u>United States v. Bebars Baslan</u>
       <u>Docket No. 13 CR 220 (RJD)</u>

Dear Judge Dearie:

  This letter is respectfully submitted to file Defendant Baslan's objections to the Presentence Report and the PSR Addendum's recommendation ("PSR"), as well as a sentencing submission. Another letter is being prepared as Baslan's reply to the government's opposition to his post-trial motions Additional points and arguments relevant to Baslan's sentencing, which I may develop after consultation with him, will be set forth in a third brief sentencing submission, if warranted, by the December 19th filing deadline for sentencing memoranda, without repetition of the arguments already made in Baslan's Rule 29c/33 submissions and in this letter.

a) **<u>The Sentencing Recommendation:</u>**

  Let's start with the gargantuan 45-year prison term advocated by the Probation Office in the Addendum. Obviously, Baslan's crimes of which he was convicted are very serious. Concededly, crimes involving child sex abuse, whether contemplated, attempted or completed, have become the subject of

1

increasingly severe federal sentencing guidelines and enhanced statutory mandatory minimum punishments. In particular, the most extreme example of this trend is the Travel Act, 18 USC §2241(c), which we contend in our Rule 29 (c) motion, provides unconstitutionally-disparate punishment in its 30-year mandatory-minimum provision as to Baslan and should therefore result in the vacatur of his conviction on Count One because it fails to distinguish between degrees of culpability and acts in imposing that across-the-board mandatory sentencing penalty.

The same flaw the inheres in the Travel Act's one-size-fits-all statutory scheme is evident in the Addendum's reasoning in urging a 45-year term which would literally dwarf the average sentences that have been meted out across the country for child rapists and child molesters and in many cases, serial child rapists and predators, as well as murderers. Baslan fits into none of these categories. The government's intensive and comprehensive investigation into Baslan's past reveals no prior acts, contemplated or otherwise, that Baslan committed against children under the age of 12, which is the ceiling age triggering the Travel Act's application.

Yet, the Addendum recommends imposition of the functional equivalent of a life sentence for a 37-year old man like Baslan, as to whom there is not a scintilla of evidence that he ever sexually abused or even inappropriately touched or even said an unkind word to an under-12 year-old child. In fact, although neither the government in its Rule 29(c)/33 opposition memorandum nor probation in its PSR or its Addendum take notice of the fact that in the recorded conversations shortly before his arrest on March 19, 2013 with the confidential source "Jack," Baslan explicitly told him that there would be no "penetration" of a child and that he would make sure to avoid any psychological harm to any of the children. Instead, Baslan described the scope of the contemplated conduct as limited to the "licking," "touching" or the feigning of such actions ("we can make it look like…") by Kristen Henry with Jack's 18-month old baby while he took photographs.

That is a far cry from the unregenerate, irredeemable recidivist portrayed by the government and probation in its call for draconian punishment in the Addendum that is almost double that of the mandatory-minimum murder sentences in New York State and 15 years greater than that prescribed as mandatory in the federal narcotics-related murder statute for such homicides. It is a full 30 years in excess of the mandatory minimum punishment that a trio of Brooklyn denizens, in the most recently reported child sex crime case in our district, are facing, according to our own Daily News reporter John Marzulli in Saturday's paper. *3 LURED KIDS TO SEX RING: Feds: Web key B'klyn horror*, NY Daily News, December 13, 2014, at page 5.

In that latest case, as Mr. Marzulli reported, "[t]he sickos solicited girls between the ages of 12 and 15 to have sex with men and pole dance at parties, authorities said." Id. What makes Baslan deserving of twice as much mandatory punishment as the ringleaders of a website-solicited female child prostitution ring where multiple children, including those who would fit the definition of a "child' within the scope of the Travel Act, were raped and molested by the sicko adult male clients of the ring, described by one of the ringleaders as including "lawyers, doctors, teachers, whatever"? Is it because Baslan drove to New Jersey at the manipulative request of the informant as part of the FBI sting? Or because Baslan, from the MDC, later arranged for the destruction of the Drobo device in order to embarrass the FBI? Or because he was a latter-day Svengali, who manipulated women like Kristen Henry? Or because he spoke about a "babysitting service" in his recorded diatribes with Jack, for which not a speck of concrete evidence exists to show that this puffery was an actual plan that was contemplated or for which any efforts had been made?

Do all these supposed aggravating factors rise anywhere near the level of an actual, ongoing and apparently well-staffed child prostitution ring in which children girls as young as 12 and no older than 15 years of age were lured in Fagan-like fashion by heartless manipulative criminals to become the

victims of multiple adult sex fiends? And does the exposure of self-proven child sex predators, who have actually demonstrated that they prey on the most vulnerable victims in our society and have turned immature children into sex objects and prostitutes at such tender ages, to only half of the punishment Baslan faces under the Travel Act and an astonishingly disparate one-third of the punishment recommended by probation in the Addendum promote the sentencing goals of personal and general deterrence, rehabilitation and the deserved segregation from society in an evenhanded and fair manner? Does this grossly disproportionate treatment, where greater offenders who actually committed multiple child sex crimes with multiple child victims in an unspeakably disgusting manner, yet face substantially less mandatory punishment, generate respect for the law and a public confidence in its fair and just administration? The question suggests the obvious answer.

    It is important for the Court to be made aware that Baslan, in the course of recent co-defendant meetings conducted very ably by my colleague Ms. Stafford, had urged Ms. Henry to agree to take a dispositional strong punishment (for her) in the form of a 10-year mandatory-minimum sentence rather than to risk the 30-year mandatory sentence he is facing. He did that not because such a disposition was beneficial to him, but only because he wants Ms. Henry, whom he truly loves, to have another lease on life that he may very well will not be able to achieve.

    As for Baslan's drug-fueled references to a planned "babysitting service" for which literally no steps were taken and, if one were to analyze the facts properly, was not even a feasible proposition in the strictly religious neighborhood where he resided, is reminiscent of the psychotic rantings of the fearsome so-called "cannibal cop", whose conviction was thrown out by the SDNY Judge who presided over the trial because there was no evidence, other than the defendant's words, that he seriously intended to kidnap, kill, cook and eat multiple women. The dismissal took into account that the defendant had described actual women, including his own wife, as well as many others whose identities he had

4

discovered in researching the NYPD website, and whose movements he actually surveilled. Yet, in United States v. Valle, Docket 12 CR 47 (PGG) (SDNY June 30, 2014) (Memorandum Decision and Order), Judge Paul Gardephe granted his rule 29 dismissal motion after finding that the 'cannibal cop" was speaking as a psychotic who expressed his dark thoughts without any real intent to carry them out. As the Judge found, "[o]nce the lies and fantastical elements are stripped away, what is left are deeply disturbing misogynistic chats and emails written by an individual obsessed…." Id. at page 7. Deeply disturbing, yes; evidence of an intended plan, not necessarily. Particularly where no concrete steps were taken and no real possibility existed to achieve such a goal.

If a person who is completely unaware of the trial evidence would read the Addendum, he/she would conclude that Baslan is a long-time serial child rapist, at the very minimum, and more likely is a child sex predator who must have caused substantial physical and psychological harm to multiple child victims. Yet neither is a true inference to reach. Instead, the uninformed reader would be shocked to learn that there were no actual victims and that the plan involved no more than mere touching, at most.

The Addendum describes that Baslan possessed "one of the largest collections of child pornography ever recovered…" (Addendum page 3). Yet, on cross-examination, an FBI agent conceded that those files were largely "zipped" and unopened, and that his downloading of the zipped files occurred only a little over a month before Baslan's arrest, when he was discussing his ability in the recorded discussions, at Jack's request (and at the agents 'direction), to provide Jack with child pornography materials. Another agent acknowledged on cross-examination that as far as the FBI understood, all the files were downloaded from existing internet files, rather than homegrown productions in which Baslan or anyone he photographed interacted with children. That concession has never been challenged or disavowed by the government.

5

In addition, the Addendum contends "that the defendant's predatory nature is not reserved for one group of victims, but rather….he prays upon a wide range of vulnerable victims, from infants to young women." (Id.) Well, that has got to be one of the most egregious forms of hyperbole ever displayed in a PSR.

The "prior class of vulnerable victims," refers to two Buffalo female models with whom Baslan allegedly had sex when they were in their teens, at times consensually' and reportedly on occasion, when they were under the influence of drugs and alcohol. Those events occurred over 9 years before the instant offense, which involves another vulnerable class of victims, children under the age of 12, for which there is no prior similar conduct altogether.

Moreover, at trial, the vulnerable, yet non-complaining "teenage victim class," turned out to be limited to 2 young women, one of whom flatly refused to testify at trial. With half of the "class" opting out, the rest of the class was represented by one Courtney, a rather unstable personality, as she conclusively established during her testimony. She described herself as a "child actor" on direct, yet had to concede that she blossomed recently into a "pole dancer" in a Chicago jiggle joint. It is small wonder that of the fact witnesses at trial, including Baslan, Courtney was the only one whose testimony the jury did not ask to review during deliberations. That discloses the complete lack of reliability that the jury placed in Courtney's account as did the fact that many of the jurors openly laughed as she made her last assertion on cross-examination that, as an "actress", she considered herself a "10" on a scale of "1 to 10."

For those reasons, the Addendum's conclusions that Baslan's "penchant for seeking out the most vulnerable in society presents a unique danger to the community…" and that he had "engaged in some of the most reprehensible conduct imaginable in our society: children - and extremely young ones," are not only grossly exaggerated: they are nothing short of astonishing. At the very least they are certainly

6

unreliable as the foundation on which to run a 15-year sentence consecutive to a 30-year sentence to lock up a defendant, who never was proven to have hurt, molested or even inappropriately touched, a child, or anyone else, for that matter, -- for the rest of his life.

Not only is there no evidence that Baslan raped or would have raped or caused the rape of a "child' within the definition of the Travel Act that would require a 30-year mandatory minimum sentence, but the "best evidence" in this case, the recorded discussions, disclose that Baslan explicitly assured Jack that no such activity was contemplated. In addition, although the statutory punishment covers inchoate attempts, such as Baslan was charged with, the fact is that if this had not been an FBI sting operation, the most that would have happened, even in the light most favorable to the government, is that an 18-month old boy's privates would have been touched in some fashion. That does not rise to the level of rape and certainly is grossly disproportionate to the 45-year "murder" sentence advocated in the Addendum.

Baslan's reported statement that he fantasized about "going down" on Jack's 8-year old niece--even had this expressed fantasy resulted in that act, rather than in having "cold feet," as Baslan told agents in his post-arrest statement--is not the genre of crime that requires a sentence double that of the state mandatory murder sentence. Such an act is criminal and deplorable, but certainly does not rise to the level of murder.

Neither the over-the-counter children's Benadryl, which is neither an intoxicant nor a dangerous drug, nor the idle talk of starting a "babysitting service," for which no evidence exists as to its seriousness or even feasibility, changes the extraordinary disparity in punishment caused by a lifetime sentence for a first-time offender with no proven, or even articulable, history of similar criminality.

Instead, as we argue in Baslan's post-trial motions memorandum, and will supplement to some extent in our response to the government to be filed shortly, the 30-year mandatory minimum required

7

by the Travel Act conviction is so unfairly disproportionate as to require dismissal of Count One and the vacatur of the conviction on that Count based on Eighth Amendment grounds. Although the government correctly points out that Eighth Amendment dismissals are exceedingly rare, we respectfully contend that this case is the exceedingly rare one to which the protection against "cruel and unusual punishment" applies.

At a minimum, however, should the Court disagree, the Addendum's recommended 45-year sentence is premised on a generalized and entirely-inaccurate description of both the offense conduct and the offender. It is not the kind of argument that should be accepted, based solely on the trial record and the evidence, even as expressed in the government's submissions, because it vastly overstates the severity for the offense conduct and confers the offender with an exaggerated degree of culpability and supposed future dangerousness. The proportionately appropriate sentence in this case should be no longer than 15 years, not 30 years and certainly not 45 years.  Such punishment is appropriately reserved for recidivist serial sex predator offenders whose crimes merit it, not a first time offender of an inchoate offense whose aim, at worst, was inappropriate contact, not penetration, sodomy or rape, and who has no prior proven history of criminality altogether.

b.    **The Challenges to the PSR:**

**pp. 21-24; paras. 41-57-- "Rape of Minors in Buffalo, NY"**

These allegations are an exposition of the improper and, as to Courtney, disbelieved allegations regarding Baslan's alleged rapes, wither statutory or by artifice, of two underage "models" in Buffalo that allegedly occurred over 9 years before the offense conduct. The PSR's attempt to rely on these unverified allegations to portray Baslan has having engaged in a 'continuous course" of child sex predatory conduct has no support in the credible evidence in the record. Glaringly absent from this theory is the fact that for an over 9 years period, literally nothing can be said about Baslan's activities,

other than he held a succession of computer-related jobs in Buffalo, and Chassidic-related video gigs in Brooklyn. We therefore move to strike the Buffalo and "continuous course of conduct" allegations as unproven and, in any event, so attenuated from the charges of conviction, both temporally, as well as in terms of the so-called victim "class," as to be excluded as a factor in the sentencing calculus.

**pp. 24-26, paras 58-64 - "Marriage Fraud":**

To a lesser degree of perniciousness, the PSR's unproven allegations as to Baslan's "marriage fraud" should have no bearing on the sentencing calculus in this case, are unproven and should also be stricken.

**pp 25-26 - "Fraudulent Possession of Documentation":**

We are hard pressed to contest seizures of identification and tax documents in Baslan's apartment that belong to others. For reasons unknown, neither "marriage fraud" nor "fraudulent possession of documentation" was injected into the trial record as impeachment materials against Baslan, where they possibly would have had some relevance to the issues. More importantly, there is no evidence that Baslan ever attempted to use these documents either to assume a different identity or to commit a fraud.

As to Ms. Dedovets' allegation in paragraph 64 that Baslan had embezzled $18,000 from her, Baslan contests her allegation and asks that they be stricken from the PSR.

**pp. 26-27 - "Victim Impact":**

Concededly, the child victims of child pornography found on the internet would not be victims at all but for the customers for such disturbing materials. Baslan accepted responsibility for the massive child pornography "zipped" files that were extracted from his computer. Immediately aftyer his arrest, he provided agents with the access code and location of those files. Although the children in such photos and videos are, in a general sense, victims of everyone who possesses and distributes, Baslan never actually victimized any children, did not "unzip" and open more than a handful of files, which he only

9

did for Jack's benefit as the FBI-provided video camera was recording, and he did not distribute the pornography to anyone but Jack, who bugged Baslan repeatedly to provide him with child pornography, as the FBI agents had instructed Jack to do.

**pp 27-28, paras 67-69 - "Obstruction of Justice":**

Although Baslan maintains that he did not testify untruthfully, it is the rare case indeed where a defendant who takes the stand and is convicted does not suffer the consequence of a 2-level upward adjustment for obstruction of justice. We are also at a distinct disadvantage to challenge the allegation that Baslan attempted to obstruct justice by persuading a friend to destroy the Drobo device, given the Court's pretrial factual findings, in denying Baslan's pretrial Massiah motion, that he had committed that act as an attempted fraud on the Court.

**pp. 28-32, paras 72-124: "Offense Level Computation":**

The PSR's guidelines computation is unsurprisingly complex and skewed in a manner that prejudices Baslan to an even greater degree than had the proper computation been employed. The PSR's computation produces an "off the charts" total offense level of 46 (43 is the ceiling and corresponds to a life sentence), yielding an advisory life sentence.

Granted, the child pornography guidelines are reflective of the draconian punishment statutorily prescribed across-the-board for offenders ranging from serial child rapists with a history of predatory behavior to a first-time offender involved in nothing more heinous than the inappropriate touching of a child if he/she had the misfortune or misjudgment to commit that act after crossing a state line.

In light of Baslan's conviction, the applicable advisory guidelines, employing a proper grouping analysis, unlike as in the PSR, results in a total offense level of 42, which yields a sufficiently disparate sentencing range of 30 years to life.

The guidelines calculus we employ agrees, albeit regretfully, with the PSR calculations for the Counts 1 and 4 in paragraphs 73-79 under USSG §2G2.1. That means that an offense level of 40 pertains to both counts, which are grouped together under §3D1.2 (b) and (c). We take issue, however, with paragraph 80, in which the PSR employs a "multiple victims" application pursuant to §2G2.1(d)(1). To be sure, where the evidence supports the existence of multiple victims, whether charged or not, that provision requires separate guidelines treatment for each victim, thereby boosting the grouping units, as the PSR did to produce astronomic offense levels of life imprisonment.

Yet, more is required than simply proof, plainly accepted by the jury, that Baslan crossed state lines in an attempt to commit child sex crimes. To make the multiple victims analysis stick, there should be same showing that the evidence accepted by the jury was that Baslan committed an attempt against multiple victims. The verdict sheet asked the jury whether it found that Baslan committed each charge against <u>a minor child</u> under the age of 12. No special verdict request was made as to any finding of multiple victims. Of course, there is no requirement for such a request under <u>Apprendi</u> because the statutory punishment under the travel Act, in yet another constitutional flaw, does not differentiate between a single and multiple victims. Hence, no factual findings were made by the jury as to whether the attempt involved one victim - Jack's 18-month-old-son, two victims - either sons, or three victims - all 3 children. The recorded conversations offer snippets of evidence that can fit any one of these 3 possibilities. But the best evidence from the tapes, particularly the discussions on the day of the offense conduct, supports only the inference that Baslan was only interested in photographing Henry with the 18-month-old baby, and that the older son and 8-year-old niece would be sleeping in another room while the offensive photo-shoot took place.

We also disagree with the PSR's guidelines analysis as to Counts 2 and 3 in paragraphs 81-87. The same guideline §2G2.1 applies to these counts as to Counts 2 and 3. The base offense level of 32 is

11

increased by 4-levels in the PSR under §2G2.1(b)(1)(B), instead of 2 levels under §2G2.1(b)(1)(A) (involving "sexual contact"). However, subsection (b)(1)(B) does not apply to counts 2 and 3. By its terms, the 4-level increase only applies to "(i) the commission of a sexual act; and (ii) conduct described in 18 U.S.C. §2241(a) or (b)." Id.

§2241(a) relates to the use of a "force or threat" against another person to commit "aggravated sexual abuse." There was neither any evidence of a "force or threat" nor even an allegation that those methods had been employed or were contemplated.

§2241(b) relates to the crime being committed either by "render[ing] another person unconscious" or "administer[ing] to another person by force or threat of force, or without knowledge or permission of that person, a drug, intoxicant or other similar substance…" Id. Even in the light most favorable to the government, the over-the-counter children's Benadryl would have induced Jack's 8-year-old niece into drowsiness and sleep, rather than knocking her out to the point of being unconscious. The children's Benadryl is not a "drug or intoxicant" in the sense that the plain meaning of the statute contemplates.

It was entirely unclear from the inconsistent Baslan babbling on the tapes that any sexual act was to involve the niece altogether. In any event, the "substantial impairment" element that §2241(b) contemplates is directed specifically to a person who is capable of otherwise "appraising" or "controlling" his/her "conduct," and not a 1-1/2-year-old-child or an 8-year-old child. That is why children under the age of 12 fall into the §2241(c) provisions. In short, §2241(b) does not apply, and neither does the 4-level increase under §2G2.1(b)(1)(B) . Yet the PSR erroneously engrafts the 4-level enhancement in the guidelines calculus to produce a level 42 for counts 2 and 3, rather than the level 40 that actually applies.

Counts 1 and 4 are grouped together at a level 40, and the same is true for counts 2 and 3. The resulting grouping units are 2, corresponding to a 2-level increase and a 42 adjusted offense level.

As to count 5, the possession of child pornography, the PSR correctly employs §2G2.2, but incorrectly applies a 5-level enhancement, in paragraph 105, for "engag[ing] in a pattern of activity involving a minor." §2G2.2 (b)(5). As we discussed, the trial evidence discloses no such "pattern," notwithstanding Buffalo Courtney's sworn, yet obviously ignored testimony. In the absence of a "pattern," the child pornography possession guideline results in a level 33, which is 7 levels below those of the other counts.

Also unsupported by the trial evidence is the PSR's 4-level enhancement, in paragraph 104, under §2G2.2 (b)(4) for an "offense involv[ing] materials that portrays sadistic or masochistic conduct or other depiction of violence." Granted, the one video shown at trial was extremely upsetting. The same can be said, to an even greater degree, about depictions of an adult male penis masturbating into child's face or a dog licking a baby girl's sex organ, which gratefully, we were not exposed to at trial. But nothing in the obscene materials described, as far as I can recall, involved "sadistic or masochistic conduct or other depictions of violence," in the plain meaning of those words. Abhorrent, and disgusting, certainly; violent, sadistic or masochistic, no evidence to support that theory.

That further drops the adjusted offense level to a 29, or a full 11 levels below the other 4 counts. Per §3D1.4 (c), count 5 should be entirely "disregarded" in the grouping calculus because it yields an offense level that is "9 or more levels less serious than the Group with the highest offense level." Id. The total offense level produced is a 42, corresponding to a guideline range of 360 months.

Unfortunately, given the exaggerated punishment framework that fails to distinguish among different degrees of severity of the offense conduct and the seriousness of the offender, which is the best that a strict, but proper, guidelines analysis offers. Because the guidelines calculus is but the first of 3

steps prescribed by the seminal <u>Booker</u> opinion, the other 2 steps being the consideration of departures recognized in the Sentencing Guidelines and the statutory factors provided by 18 U.S.C. §3553(a), the guidelines sentencing range should, most respectfully, be reduced to a level that allows for a non-guidelines sentence of 15 years, which is strong punishment for a first-time offender who has no history of any type of child abuse, much less "aggravated sexual child abuse," as Count One charges, and whose "plan," as it were, would have not gone beyond the inappropriate actual or pretended touching or licking of an 18-month old child's penus for inappropriate photos.

    Had the "plan" been geographically confined to Brooklyn, as originally contemplated, Baslan would be facing no greater mandatory minimum punishment than 15 years for the "sexual child exploitation" charges in Counts 2 and 3. In plain terms, were it not for the fact that Baslan and Henry drove through the Holland Tunnel to rendezvous in New Jersey with Jack and his 2 sons and niece, the Travel Act would not have been applicable. The only reason they went to New Jersey, rather than keeping the action in Brooklyn, as originally planned, is the result of the government artifice in luring them across state lines to subject them potentially to 30 year mandatory punishment. Although artifice to satisfy the geographical crossing requirement of the Travel Act is perfectly legal, the very essence of Baslan's offense conduct really had no connection to the kind of depraved conduct for which the Travel Act was primarily designed, specifically, the child sex predator who either takes his/her child victims to another state to avoid detection or travels to other states to victimize children so as not to be recognized with "unnatural" company on his/her home turf.

    Granted, should the Court deny Baslan's Rule 29(c) motion to dismiss Count One, and reject our argument that a 30-year sentence is constitutionally disproportionate for a first-time offender with no actual or even arguable prior conduct involving less than 12-year old children, the victim class to which

14

the 30-year mandatory-minimum under the Travel Act pertains, Baslan will be sentenced to that mandatory-minimum.

But, we respectfully maintain, the guidelines analysis should also encompass the §5K2.0 departures for overstatement of the offense conduct, as well as the statutory factors that permit sentencing courts to imposed reasoned justice within their objective discretion, rather than the subjective, exaggerated and politically-driven exorbitant child sex guidelines, which afford no balancing test that insure proportionate punishment that fits the crime and the offender, rather than lumping into one category the predatory child rapist who has repeated his crime with multiple victims together with an offender who, at most, would have taken concededly awful photos of his girlfriend licking the penis of Jack's 18-month-old son. Should the Court decide that the disparity in punishment prescribed statutorily cannot be remedied, we ask, at the very least, that the Court temper the "guidelines plus" Booker formula to produce non-disparate results for counts 2 and 3 that do not exceed their 15-year mandatory minimums, and for count 4 that does not exceed its 10-year mandatory minimum, and for count 5 that does not exceed the sentence for count 4. We also respectfully ask for concurrent sentences to be imposed, rather than the outlandishly inappropriate 45-year sentence that, in most cases, elevates Baslan above the "worst of the worst" offenders who have committed multiple murders. The very idea that such a sentence is not as harsh as life imprisonment, as suggested in the Addendum and by the government, is as blind to reality as the recommended sentence is blind to the facts and the law. Imposition of disparate and unnecessarily harsh punishment, as advocated by probation and the government, is the very antithesis of the equal protection and due process guarantees that "blind justice" stands for.

I thank Your Honor for your courtesy and convey my best wishes for the holiday season.

                Respectfully Submitted,

              _____/S/_____
                 Ephraim Savitt

Cc: Clerk of the Court (RJD) (By ECF)
   All Counsel (By ECF)

Bebars Baslan (By U.S. Mail)