

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SD:TJS/TAD
F.#2013R00381

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 26, 2015

By Hand and ECF

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:    United States v. Bebars Baslan, 13-CR-220 (RJD)

Dear Judge Dearie:

The government submits this letter in connection with sentencing, currently scheduled for February 3, 2015 at 3:00 p.m. On July 15, 2014, the defendant, Bebars Baslan, pled guilty to Count Five of the above-captioned indictment, charging him with possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).  On July 24, 2014, the defendant was convicted, following a trial, of the remaining four counts of the indictment, charging him with crossing state lines to engage in sexual conduct with a minor under 12 years old, conspiring to sexually exploit a child, attempting to sexually exploit a child, and attempting to coerce or entice a child to engage in illegal sexual activity, in violation of 18 U.S.C. §§ 2241(c), 2251(e), 2251(a), and 2422(b).  On October 15, 2014, the Probation Department issued a Pre-Sentence Investigation Report ("PSR") correctly calculating the defendant's Sentencing Guidelines range of imprisonment as life.  The Probation Department recommended that the defendant be sentenced to an aggregate term of imprisonment of 45 years.  As set forth below, the government agrees with the Probation Department and asks that the defendant be sentenced to 45 years of imprisonment.

I.    Factual Background

The defendant's criminal conduct came to the attention of law enforcement when an individual, referred to at trial as "Jack," reported to New York City Police Department ("NYPD") that the defendant and his girlfriend, Kristen Henry, were plotting to sexually abuse children.  (PSR ¶ 4.)  Shortly thereafter Jack became a confidential informant for the Federal Bureau of Investigation ("FBI") and made numerous telephone and in-person recordings of the defendant and Henry.   During these conversations, the defendant discussed his plans to sexually abuse children.  (PSR ¶ 5.)

Between February 13, 2013 and the defendant's arrest on March 19, 2013, Jack made over 40 recorded telephone calls to the defendant and recorded in-person meetings on four days.  During these recorded telephone calls and meetings, the defendant described a detailed plan to have Henry take sexually explicit photographs with Jack's eighteen month-old child.   Eventually, the defendant asked Jack to instead provide his own two or three-month-old son for Henry to sexually abuse while the defendant took pictures.  The defendant also indicated that Henry was interested in sexually abusing Leah, Jack's seven-year-old niece.  The defendant indicated that they could drug Leah with Dramamine or Benadryl so she would be "passed out" and would not be aware that she was being sexually abused.  After several calls, the defendant and Jack also agreed that Jack would bring his three-month-old son, eighteen-month-old son and Leah to a meeting with the defendant and Henry at a New Jersey hotel in early March, so that the defendant and Henry could take pictures of them being sexually abused.  The defendant said that he intended to "go down" on Leah, which is slang for performing oral sex.  The defendant also told Jack that sexually abusing Jack's niece was more of a "stepping stone" and that the defendant would "take a lot of pictures and videos."  He also said: "We'll have a good amount of pictures and videos of Leah herself and then we can just use it as jerk-off material or whatever."  (PSR ¶¶ 6-10.)

On March 19, 2013, the defendant attempted to bring his plan to fruition.  That afternoon, he gave Jack a bottle of children's Benadryl , which Henry had purchased earlier that day at a nearby Walgreens.  The defendant also gave Jack a bottle of orange juice to mix the liquid Benadryl into to disguise the flavor.  The defendant instructed Jack to give Leah more than the recommended dose of Benadryl.  Later that evening, Jack called the defendant and provided him an agreed upon code word that indicated Jack had the children and they were heading to the hotel, located in Jersey City, New Jersey.  The defendant and Henry arrived at the hotel approximately 90 minutes later and went to the room number provided by Jack.  FBI agents the arrested the defendant and Henry.  (PSR ¶¶ 11-13.)  When arrested, the defendant and Henry possessed two digital cameras, a computer, and extra camera accessories suitable for downloading photographs from a digital camera to a computer.

Following his arrest, the defendant was advised of his <u>Miranda</u> rights, which he agreed to waive.  The defendant then told the agents that he, Jack, and Henry were going to have a "swing" party and use the children as "props," but the defendant got cold feet.  He also admitted to telling Jack that he intended to start a babysitting service as a cover to drug and abuse children.  The defendant admitted to downloading child pornography on his home computer.  (PSR ¶¶ 15-17.)  He signed a written statement indicating that he had suggested using Benadryl to drug the children and planned on "going down" on Jack's niece, Leah.  (PSR ¶ 19.)

Simultaneous to the defendant and Henry's arrest, FBI agents executed a search of their shared residence pursuant to a warrant.  Agents found numerous pieces of computer equipment, including a fully encrypted external hard drive.  Agents were able to decrypt the hard drive and found over 76,000 files containing images and videos of child pornography.  (PSR ¶¶ 27-28.)

2

Shortly after his arrest, the defendant began attempting to obstruct justice. First, he tried to destroy a piece of computer equipment that agents had inadvertently left at his home. This device, known as a DROBO, is comprised of five hard drives and capable of storing 16 Terabytes of data. Once ensured that the DROBO had been destroyed, the defendant claimed that the FBI had seized and destroyed the DROBO because it contained exculpatory evidence.

After learning of this plot, the government on two occasions provided a recording device to an inmate in the defendant's unit (hereinafter "CI 2"). On the two occasions when CI 2 recorded their conversations, the defendant discussed several plans to obstruct justice. He suggested having people falsely file claims that Jack had defrauded them. The defendant also discussed a plan to have people falsely claim that Jack had abused their children. He talked about having his friend, Tobala Tessler, destroy the DROBO so he could then claim the government had destroyed it. Tessler was subsequently arrested. During a proffer after her arrest, she told the government that she had destroyed the casing of the DROBO at the defendant's direction. Tessler did not, however, destroy the hard drives, which she gave to the FBI. Tessler's account is consistent with a July 31, 2013 recorded conversation between the defendant and CI 2, during which the defendant stated that he "actually told Toby to go to [a friend of the defendant's] house, take [the DROBO], and destroy it," and that Tessler destroyed the "casing." During her proffer, Tessler disclosed that the defendant had asked her to have her friends make negative statements about Jack. Tessler also said that the defendant specifically asked her to obtain affidavits from people claiming that Jack had molested their children.

During his conversations with CI 2, the defendant said there was encrypted material on his computer that the FBI would be unable to even identify because it was "stuff that they've never seen before." (July 1, 2013 recording.) The defendant described methods he had developed for covertly transmitting messages and files across the internet so that they could not be intercepted by law enforcement. The defendant suggested that his technique for transmitting files would leave no trace on an individual's computer and was so secure that he would "guarantee you can go fuck a baby, split it in half and eat it and film it and put it in your computer and even God would not be able to get that computer file." (Id.) The defendant also told CI 2 that if the defendant could get time alone with his computer, he would be able to extract a file that would win his case. (Id.) (The defendant later sought access to his computer and was visibly upset when agents allowed him to view his original computer, but would not allow him to privately access the original evidence.)

The defendant told CI 2 that he had two possible stories for trial: the first was that he was investigating Jack, and the second was that he was making a documentary about Jack being sexually interested in children. (PSR ¶¶ 35-38.) At trial, the defendant testified that he was investigating Jack, and he then decided to combine that investigation with a preexisting documentary project on American sexuality, which he intended to call "Darker Shades of Grey." (Trial Transcript "TT" 544-583.) The defendant also testified that as part of his investigation/documentary, he had made recordings of Jack which would have corroborated his story, but the FBI intentionally destroyed these recordings. (TT 587-89). Notably, the

3

defendant never stated that he was investigating Jack or making a documentary when he spoke to agents on the night of his arrest, or at any other time between his arrest and October 2013, when he proffered with the government.

II.        The Defendant's PSR Objections

The defendant objects to a number of paragraphs of the PSR detailing, inter alia, his rape of minors in the Buffalo, New York area, his fraudulent prior marriage, his possession of tax and identification documents belonging to a variety of people, and his obstruction of justice. The defendant objects that various facts are either unproven or irrelevant and should not be included in the PSR. In addition, the defendant objects to various enhancements that were applied to arrive at the sentencing range of life. As explained in more detail below, all of the defendant's arguments are without merit.

A.        Legal Standard

In the Second Circuit, a sentencing court's discretion is "largely unlimited either as to the kind of information it may consider, or the source from which it may come." United States v. Sisti, 91 F.3d 305, 312 (2d Cir. 1996). In connection with sentencing, the Court may consider, inter alia, uncharged conduct, acquitted conduct, and previously considered conduct. This has been the law since the outset of sentencing under the United States Sentencing Guidelines. See, e.g., United States v. Rodriguez-Gonzalez, 899 F.2d 177, 182 (2d Cir. 1992) (sentencing court considered evidence that defendant used and carried a firearm during offense even though defendant had been acquitted of firearms charge); United States v. Watts, 519 U.S. 148, 154 (1997) (holding that lower evidentiary standard at sentencing permits sentencing court's consideration of acquitted conduct); Witte v. United States, 515 U.S. 389, 399-401 (1995) (noting that sentencing courts have traditionally considered wide range of information without the procedural protections of a criminal trial, including information concerning criminal conduct that may be the subject of a subsequent prosecution); Nichols v. United States, 511 U.S. 738, 747-48 (1994) (noting that district courts have traditionally considered a defendant's prior criminal conduct even when the conduct did not result in a conviction).

"[D]isputed facts relevant to sentencing . . . need to be established only by a preponderance of the evidence." United States v. Concepcion, 938 F.2d 369, 388 (2d Cir. 1992) cert denied, 510 U.S. 856 (1993). In fact, any information may be considered at a Fatico hearing, so long as it has sufficient indicia of reliability to support its probable accuracy. Watts, 519 U.S. at 157; Nichols, 511 U.S. at 748. This is a significantly lower evidentiary standard than the "beyond a reasonable doubt" standard required for conviction. Due process rights are not violated where the sentencing court relies on information outside of the charged offense or that is derived from other proceedings so long as the defendant "ha[s] an opportunity to respond in order that the court not rely on misinformation." Concepcion, 983 F.2d at 387-88. For example, in United States v. Tracy, 12 F.3d 1186, 1203 (2d Cir. 1993), the Second Circuit upheld the sentencing court's use of evidence presented at a related trial. Similarly, in United States v. Carmona, 873 F.2d 569, 574 (2d Cir. 1989), the Second Circuit upheld the sentencing court's use of testimony from a trial in which the

4

person sentenced was not a defendant.  A wide breadth of factual information can and should be considered at sentencing.

Additionally, the Second Circuit has long upheld a permissive evidentiary standard in connection with proof of facts at sentencing.  In resolving factual disputes at sentencing, the court is free to consider hearsay evidence both in testimony and written affidavits.  See United States v. Martinez, 413 F.3d 239, 243-44 (2d Cir. 2005).  See also Sisti, 91 F. 3d at 312 ("The sentencing court's discretion is largely unlimited either as to the kind of information it may consider, or the source from which it may come.") (internal quotes omitted, alteration in Sisti); U.S.S.G. § 6A1.3, comment ("Written statements of counsel or affidavits of witnesses may be adequate under many circumstances."); see also Williams v. New York, 337 U.S. 241, 247 (1949) (sentencing judges should not be denied information pertinent to sentence by rigid adherence to rules of evidence); Fed. R. Evid. 1101(d) ("These rules . . . do not apply to miscellaneous proceedings such as . . . sentencing.").

As set forth below, the challenged paragraphs should remain in the PSR because the veracity of those statements has been proved by a preponderance of the evidence.  The Court can give the defendant's history whatever weight it is due in fashioning a just sentence.

B.      The PSR Challenges

PSR Paragraphs 41 to 57:  Defendant's Rape of Minors in the Buffalo Area

The defendant seeks to strike paragraphs relating to his sexual abuse of minors in 2005 and 2006.  The defendant claims that these paragraphs have not been proven by a preponderance of the evidence and that they are so far removed that they are irrelevant to the charged crimes.

The defendant's prior sexual assault of minors whom he drugged is relevant to showing his propensity to commit sexual assaults of minors and his dangerousness.  As indicated above, in the context of sentencing, the government need only prove a fact by a preponderance of evidence for the court to rely on it in sentencing.  See Concepcion, 938 F.2d at 388.  Here, the evidence surpasses that burden.

First, one of the victims, identified as "Cortney" during the trial, testified that she had met the defendant in the Buffalo area when she was 15 years old.  Cortney was a model and the defendant was a photographer.  Cortney testified that she had been invited to a photography shoot with her friend Andrea, also 15, at the defendant's studio.  When Cortney arrived she saw the defendant "being sexually intimate" with Andrea. (TT 421-423.)  During the photography shoot that ensued, the defendant posed Cortney and Andrea in sexually suggestive ways.  The defendant promised Cortney that he could make her famous.  Cortney kept doing photo shoots with the defendant as a result of those promises.  Cortney felt close

to the defendant and eventually told him that she had been sexually abused by a family member years earlier.  A few days after that, shortly before Cortney's 16th birthday, the defendant took her to a bar and bought her an alcoholic drink.  After Cortney drank it, the next thing that she remembered was being in the defendant's studio while he was penetrating her with his penis.  Cortney was a virgin at the time.  (TT 430-434.)   Cortney testified that she witnessed the defendant sexually abuse several other underage girls at his studio.  (TT 438-440.)  Cortney also testified that, years later, the defendant came to a coffee shop that she was at and asked her to sign something, but she refused to sign it.  (TT 447-448.)

At trial, the government introduced documentary evidence corroborating portions of Cortney's account.  First, the government introduced photographs of Cortney with a copyright mark stating "Bebars Baslan."  Cortney identified these as photographs that the defendant had taken of her while she was underage. (TT 445-447; Government Exhibits ("GX") 52A-52E.)  The government also recovered three draft affidavits from the defendant's computer, one with Cortney's name, another with Andrea's name, and a third with the name of a friend whom Cortney had seen the defendant sexually abuse.  The affidavits had creation dates in 2009, which was consistent with the timeframe during which Cortney recalled the defendant coming to the coffee shop and asking her to sign something.  Each affidavit stated essentially the following:

> My name is Cortney [REDACTED] I am 19 years old. I currently reside at _____.
>
> On or about November 2005, I came to work with Bebars Baslan as a model in photography. Mr. Baslan has been and to this day conducts himself in a very professional manner.
>
> We always had a chaperone present during all photography shoots in which I was involved. All photography shoots were appropriate to my age at the time.
>
> We never had a romantic relationship, and at no time did Mr. Baslan solicit my affections. He has never solicited nor suggested that we engage in any active physical intimacy, nor have we ever had intimate relations of any kind.
>
> I, Cortney [REDACTED], being first duly sworn on oath according to law, deposes and says that she has read the foregoing AFFIDAVIT, that the matters stated herein are true to the best of her information, knowledge and belief.

6

The affidavits included a signature line and place for a notary's signature.  (GX 37A-37K.)
When presented with the affidavit bearing her name at trial, Cortney recognized the
document as the piece of paper the defendant had asked her to sign in 2009.  (TT 447-48).

       The government submits that the above testimony and corroborating evidence
demonstrates by a preponderance of the evidence that the defendant sexually assaulted
minors years before his arrest in the instant case.  There is therefore no reason to strike
paragraphs 41 to 57 of the PSR.

### PSR Paragraph 58: Defendant's Marriage Fraud

       The defendant also objects to a PSR paragraph detailing his several attempts to
gain citizenship.  He calls the facts in the paragraph "unproven," but does not otherwise
dispute the accuracy of these facts. (Def. Ltr. at 9.)  The government does not object to
removing the title "marriage fraud" from paragraph 58.  However, the information contained
in that paragraph comes directly from the defendant's Alien file ("A-file").  There is no
reason to strike the information itself, as it is relevant background information on the
defendant and is consistent with his attempt to obstruct justice in this case.[1]

### PSR Paragraphs 59-64: Defendant's Possession of Documents

       The defendant also asks the Court to strike paragraphs in the PSR relating to
documents he had in his residence, specifically original birth certificates, immunization
records, certificates of paternity, W-2 wage and tax statements, social security cards, driver's
licenses, passports, visas, and W-4 Employee Withholding forms. (Def. Ltr. at 9.)   The
defendant does not dispute that he possessed these documents; he simply claims that they are
irrelevant for sentencing.  The Court is entitled to consider this evidence, even if it does not
relate directly to the charged crimes or other crimes, in determining an appropriate sentence.
Sisti, 91 F.3d  at 312.  The paragraphs relating to the defendant's possession of documents
should remain in the PSR.

       The defendant also challenges an allegation in paragraph 64 that he stole
$18,000 from Albina Dedovets.  The government does not object to removing paragraph 64
from the PSR.

### Paragraphs 65-66: Victim Impact Statements

       The defendant challenges the inclusion of victim impact statements relating to
the victims depicted in the child pornography seized from his computer equipment.  While
the defendant concedes that "the victims of child pornography found on the internet would
not be victims at all but for the customers for such disturbing materials," he claims that

---

[1] The defendant's A-file has been submitted to the Court under seal; defense counsel
received a copy of the A-file as part of discovery in this case.

because he did not "unzip" the files he downloaded and only opened files "for Jack's benefit as the FBI-provided video camera was recording," these victim impact statements are immaterial to the present case. (Def. Ltr. at 9-10.) This argument is similar to the defendant's sworn allocution, during his plea to Count Five, where he indicated that he only saw the child pornography when "we were showing the stuff with Jack and Jack, the informant, had provided me names of things he was interested in and I played them." (Transcript of Plea on July 15, 2014 at 22:7-10.) At trial, the defendant claimed that the first time he had seen the child pornography was during the tape recorded meeting on March 7, 2013. (TT 549:21-22 "I looked at it first time actually watching -- in fact that day on the tape.") This claim is also verifiably false.

        The defendant had not only watched the child pornography he downloaded prior to Jack's in-person recordings on March 7, 2013, but he also displayed intimate knowledge of scenes depicting the sexual abuse of prepubescent children. During the recorded meeting, the defendant starts a variety of videos. Jack does not direct him which videos to watch. The defendant also indicated that he had seen them before. During the 20-some minutes that they watched child pornography, the defendant made the following statements:

| | |
|---|---|
| BASLAN: | But you would be surprised of how much um…how many videos are of girls and their moms. |
| . . . | |
| BASLAN: | Like she isn't the best girl that's, like there are much hotter girls that are into it and all that stuff… |
| . . . | |
| BASLAN: | Yeah, she yells at him too and it's hot, but not yet, not yet. . . . |
| . . . | |
| JACK: | This, that's one that's like Korea or Taiwan and shit right. |
| BASLAN: | (Unintelligible) yeah that's like the biggest collection of all of them. |
| JACK: | Is it all from Taiwan? |
| BASLAN: | Yeah. |
| . . . | |
| JACK: | That's the one with the yogurt? |
| BASLAN: | She ends up going down on her. |
| JACK: | The girl's like not even three. |

> BASLAN:    She ends up like going down on her.
>
> JACK:      The little girl does, goes down on the mom?
>
> BASLAN:    The mom goes down on her.

(March 7, 2013 recording.)

In another conversation with Jack, the defendant notes: "There's one thing I notice, that all the guys all do anal first, they don't do vaginal unless the kid is willing and it's that kind of situation." (March 18, 2013 recording.)

The above conversations demonstrate the defendant's knowledge of his child pornography collection as a whole ("she isn't the best girl, there are much hotter girls") and his specific knowledge of the upcoming events in individual videos within his collection ("she yells at him too and it's hot"; "she ends up going down on her"; "the mom goes down on her"). Notably, the defendant's comment that "the mom goes down on her" refers to the "yogurt" video, which the Court reviewed in connection with pre-trial motions and which Henry commented was her "favorite" during a recorded meeting with Jack. The defendant's description of what was to come in that video matches up precisely to what the video actually depicts; a toddler age girl being given oral sex by an adult woman who appears to be her mother. The defendant's intimate knowledge of these videos belie his repeated claims that he never viewed the videos. The children in these videos are the defendant's victims.

While the defendant's role in their victimization pales in comparison to his role in the attempted victimization of Jack's children and niece, their harm is real and should not be ignored. As the Seventh Circuit has noted, "[C]hild pornography directly victimizes the children portrayed by violating their right to privacy" United States v. Sherman, 268 F.3d 539, 547 48 (7th Cir, 2001). "[C]hildren . . . suffer profound emotional repercussions from a fear of exposure, and the tension of keeping the abuse a secret. . . . [C]oncern for the welfare of the children who are used to create pornography is part of the public concern over child pornography." United States v. Shutic, 274 F.3d 1123, 1126 (7th Cir. 2001) (citations omitted). This lasting harm is no mere supposition by the court.

As the victim of the Vicky series—one of the dozens of child pornography series with an identified victim found on the defendant's computer—has stated:

> I live every day with the horrible knowledge that many people somewhere are watching the most terrifying moments of my life and taking grotesque pleasure in them
>
> . . .
>
> I feel totally out of control. They are trading around my trauma like treats at a party, and it feels like I am being raped all over again by every one of them.
>
> . . .

> So many nights I have cried myself to sleep thinking of a
> stranger somewhere staring at their computer with images of a
> naked me on the screen. I have nightmares about it often.

The government asks that the Court consider each of the victim impact statements, and recognize the lasting harm caused by the trading of child pornography in fashioning the defendant's sentence, including any order of restitution for the victims who have sought it.

Paragraphs 67-69: Obstruction of Justice

The defendant also objects to the PSR's inclusion of facts relating to his obstruction of justice, both through his pre-trial conduct and perjury during trial. The facts relating to the defendant's pre-trial attempts to obstruct justice by destroying evidence and committing a fraud on the Court have already been reviewed by the Court in detail. After reviewing the recordings made by CI 2, the Court ruled, in no uncertain terms, that "the defendant conspired to obstruct these proceedings through an elaborate fraud on the Court." United States v. Baslan, 2014 WL 3490682, at *4.

As discussed above, the defendant also attempted to falsely tarnish the government's informant, Jack, with the aid of the same co-conspirator. Finally, he testified falsely at trial. The defendant's conduct merits the upward adjustment for obstruction.

C.    Guidelines Calculation

The defendant also challenges the Probation Departments calculation of his advisory Guidelines range at level 46, which carries a range of imprisonment of life. The defendant objects to the PSR's grouping analysis for Counts Two and Three, claiming that that the Probation Department should not have treated each victim separately because there was no special verdict form at trial establishing that the jury found an intent to abuse each of the three victims. Such a special verdict form is unnecessary. The defendant's conspiracy to abuse all three children constitutes relevant conduct, pursuant to U.S.S.G. § 1B1.3, whether or not specifically found by the jury. In fact, the defendant concedes that New Jersey v. Apprendi, 530 U.S. 466 (2000), requires the jury to find beyond a reasonable doubt facts that could increase the statutory maximum sentence, but does not require the jury to find facts that affect only the Sentencing Guidelines range.

The defendant argues that he "only" intended to photograph Henry with the 18-month old child and that he did not conspire to produce child pornography of the other children. This claim is false. In the earliest recorded communications, the defendant reveals his intent to produce child pornography featuring Jack's 16-month-old-son, Ellie. The object of the conspiracy later changed to abusing Jack's 3-month-old son, Daniel, and Jack's 7-year-old-niece, Leah. In connection with the initial child pornography or "safety picture' he intended to produce, the defendant stated:

> BASLAN:    Like I said, just park your car, we'll go, I'll bring him inside and just take two pictures and send her, send him out, and then you're good to go.

10

| | |
|---|---|
| JACK: | Ellie or Daniel? |
| BASLAN: | Daniel I mean, Daniel. |
| JACK: | The two-month-old. |
| BASLAN: | Yeah, the younger one.  I keep mixing up, the, the younger one. |
| JACK: | Daniel is the two month old, Ellie is the sixteen month. |
| BASLAN: | For the picture, for the picture it doesn't make a difference, with the younger one. |
| JACK: | It doesn't matter if he's a year and a half or two months, that's what you're saying? |
| BASLAN: | Yeah, yeah exactly. |

(March 18, 2013 recording.)

In connection with his plans to create child pornography of Leah, the defendant had the following conversation:

| | |
|---|---|
| BASLAN: | Nothing.  With Leah, after the first couple of times to just get it out of my system.  Leah is more of a stepping stone for us to like, once you do it, then that's it, the trust is there.  And it's over. |
| JACK: | To release the inhibition? |
| BASLAN: | Right, exactly. |
| JACK: | Mm-hm. |
| BASLAN: | But you know, take a lot of pictures and videos and you know, whatever. |
| JACK: | But no faces. |
| BASLAN: | No, her, her.  Her though. |
| JACK: | You can't give her the camera, not for one second. |
| BASLAN: | No, no but I want Leah's full face, body… |
| JACK: | Leah?  You want Leah's full face and body? |
| BASLAN: | Just full picture for us to whatever. |

(March 18, 2013 recording.)

. . .

11

BASLAN:    And we'll just have good amount of pictures, of Leah, herself and then we could just use it as you know, jerk off material or whatever. And then the next one we would…

.  .  .

BASLAN:    But tomorrow definitely no penetration, we'll like you know, we'll build a library of, of you know pictures and a video, and whatever and it'll be cool.

.  .  .

BASLAN:    Poses, yeah. Still though I don't want to take too much because you know I don't want to move her too much. I just want her to be like, top naked or whatever.

JACK:    Also, just the way she is, not move around?

BASLAN:    Move around a little, but you know. Open up the legs, close ups, whatever. Just, you know. Just you know, nothing too, you know, just within reason of not getting her too awake. Anyway, she always just sleeps with underwear nothing else on, so.

JACK:    Yeah. So how would you…you take the pictures with her underwear on or off?

BASLAN:    Off.

JACK:    Off?

BASLAN:    Of course.

JACK:    Then won't the, the Benadryl will keep her asleep?

BASLAN:    Yeah, yeah. It will keep her asleep.

(March 18, 2013 recording.)

As is clear from the above excerpts, the defendant attempted and conspired to sexually abuse three separate victims: Ellie, Daniel and Leah. Thus, the Probation Department correctly applied the grouping analysis as it was required to do under the Guidelines. See U.S.S.G. § 2G2.1(d)(1)("If the offense involved the exploitation of more than one minor, Chapter Three, Part D (Multiple Counts) shall be applied as if the exploitation of each minor had been contained in a separate count of conviction.")

Turning to the defendant's specific objections to the offense level computation in the PSR: the defendant does not deny that for Counts One and Four, the correct Guidelines level is 40. He does, however, take issue with Probation's calculation of his Guidelines level for Counts Two, Three and Five. As explained below, the PSR contains the correct

12

Guidelines range and the Court should reject the defendant's objections because they are not based in law or in fact.

For Counts Two and Three, the Guidelines calculation for the counts involving Leah starts with a base offense level of 32 under U.S.S.G. §2G2.1, which the defendant does not contest. (Def. Ltr. at 12). The defendant also does not dispute that he is subject to a 4-level enhancement because his intended victims were all under age 12, bringing his offense level to 36. The defendant does object to the 4-level enhancement under §2G2.1(b)(1)(B), which applies if the offense involved: "(i) the commission of a sexual act; and (ii) conduct described in 18 U.S.C. § 2241(a) or (b)." U.S.S.G. § 2G2.1(b)(2)(B). (Def. Ltr. at 12).

The defendant objects to this enhancement based on the theory that administering a high dosage of children's Benadryl to a seven-year-old girl does not qualify as "administer[ing] to another person . . . without the knowledge or permission of that person, a drug, intoxicant, or other similar substance." 18 U.S.C. § 2241(b). (See Def. Ltr. at 12 (claiming that "the children's Benadryl is not a 'drug or intoxicant' in the sense that the plain meaning of the statute contemplates.")) The entire point of drugging Leah with Benadryl was to ensure that she would be, in the defendant's words, "passed out." The defendant points to no case denying this enhancement on the basis that the "drug, intoxicant, or other similar substance" used was an over-the-counter medicine such as children's Benadryl, which is known to cause extreme drowsiness. In United States v. Wheaton, 358 Fed. Appx. 742, 743 (7th Cir. 2010), the district court applied the same 4-level enhancement where the defendant used over-the-counter cough syrup to drug her five-year-old twin daughters before she and her boyfriend took pornographic pictures of them, and the Court of Appeals affirmed the sentence. The Probation Department was therefore correct in applying the 4-level enhancement under § 2G2.1(b)(1)(B), and the defendant's total offense level for Counts Two and Three (with the additional 2 points for obstructing justice), is 42 for the Leah counts and 40 for the Ellie and Daniel counts.[2]

The defendant also objects to the calculation of his total offense level for Count Five, possession of child pornography. He first objects to the 4-level enhancement that applies "if the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence." (See Def. Ltr. at 13); U.S.S.G. § 2G2.2(b)(4). The defendant admitted during his plea allocution that he possessed a collection of child pornography that contained over 74,000 images and 2,000 videos. (Transcript of Plea on July 15, 2014 at 21). The Second Circuit has held that the unit of prosecution in a child pornography case is the entire collection. United States v. Polouizzi, 564 F.3d 142,155 (2d Cir. 2009). Within the defendant's vast collection of child pornography were a number of videos and images that portray sadistic or masochistic conduct or other depictions of violence. Scores of images and videos in the collection depict children being penetrated, both vaginally and anally, by either

---

[2] The Probation Department correctly calculated the defendant's total offense level for Counts II and III for John Doe 1 and John Doe 2 to be 40 because the defendant did not discuss drugging the infant and toddler boys, so the lower 2-level enhancement under § 2G2.1(b)(2)(A) applies.

adult penises or objects.  For example, the following video appears in the defendant's collection: "PHTC – 6 yo drugged and ass raped.mpg."  This video depicts a nude girl who appears to be approximately 6 years old lying on a bed with what appears to be a towel over her eyes.  The camera focuses on the girl's vagina and then an adult male hand appears.  The hand begins masturbating the adult male's penis.  The adult male rubs his penis on the girl's vagina and penetrates the girl's anus.  The Second Circuit has upheld the application of the 4-level enhancement where a child is being penetrated on the theory that: "the subjugation of a young child to a sexual act that would have to be painful is excessively cruel and hence is sadistic within the meaning of § 2G2.2(b)(3)."  United States v. Delmarle, 99F.3d 80, 83 (2d Cir. 1996).   The 4-level enhancement for sadistic or masochistic material therefore applies.

Equally unavailing is the defendant's objection to the 5-level enhancement under § 2G2.2(b)(5) for "engag[ing] in a pattern of activity involving the sexual abuse or exploitation of a minor." (Def. Ltr. at 13).  The defendant apparently believes that the only basis to apply this enhancement would be if the Court credited Cortney's testimony (and the corroborating evidence) that the defendant had sex with Cortney when she was fifteen and sixteen.  While there is ample basis to credit this testimony, the charged offenses themselves demonstrate a pattern of activity involving the sexual abuse or exploitation of a minor.[3]  The defendant had an enormous child pornography collection, as explained above.  He then spent nearly two months conspiring to sexually molest two toddler boys and a seven-year-old girl.  The defendant did not intend to stop with those three children; rather, he intended to use Leah, the seven-year-old as a "stepping stone" before sexually molesting even more children.  Clearly, the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor, and the 5-level enhancement applies.  The total offense level for Count Five was correctly calculated as 38.

For the reasons stated above, the Probation Department correctly calculated the defendant's Total Offense Level as 46, which carries a range of imprisonment of life, and the Court should adopt this calculation at sentencing.

III.     Sentencing

    A.     Legal Standard

The Sentencing Guidelines are advisory, not mandatory.   United States v. Booker, 543 U.S. 220, 258-60 (2005).  In Booker, the Supreme Court held that sentencing courts must consider the Guidelines in formulating an appropriate sentence.  Id.  In Gall v.

---

[3] The Application Note to § 2G2.2(b)(5) makes clear that the defendant's conduct in the case at bar is relevant: " 'Pattern of activity involving the sexual abuse or exploitation of a minor' means any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation: (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct."

United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted) (emphasis added).  Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  Title 18, United States Code, Section 3553(a) provides in pertinent part:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set for in paragraph (2) of this section.  The court, in determining the particular sentence to be imposed, shall consider:
>
> (1) the nature and circumstances of the offense . . . ;
>
> (2) the need for the sentenced imposed --
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; . .
>
> (D) to provide the defendant with needed educational or vocational training; medical care, or other corrections treatment in the most effective manner; . . . .

### B.  A Sentence of 45 Years is Just

The government agrees with the Probation Department that a sentence of 45 years' imprisonment is sufficient, but not greater than necessary, to serve the ends of justice in this case given the defendant's conduct, his broad-ranging attempts to obstruct justice, and his complete lack of remorse or acceptance of responsibility for his crimes, which continues to this day.

The defendant's crimes are among the most serious that come before the Court.  The defendant attempted to drug and sexually abuse children as young as 3 months old.  He intended to take photographs and videos of the children being sexually abused for his own sexual gratification.  The defendant described his motivation as follows: "for me, I think like if I go down on [Leah], I'm gonna end up cumming, like, it's like going to be so intense it's like, you know.  Yeah.  I think it's gonna be absolutely awesome."  (March 18,

15

2013 recording)  During the same conversation, the defendant explained what he intended to do with the photographs and videos of Leah's abuse: "And we'll just have good amount of pictures, of Leah, herself and then we could just use it as you know, jerk off material or whatever.  And then the next one we would…"  (Id.)  Nor were the charged crimes the sum total of the defendant's plans.  In recorded conversations, the defendant described Leah as "the first one" and a "stepping stone" in his plans to sexually abuse other children.  He told Jack that he had a plan where his girlfriend, Henry, could find other children whom she could "babysit" as a cover for her and the defendant sexually abusing them.

While Count One carries a mandatory minimum of 30 years' imprisonment, a sentence of 30 years is not sufficient to protect the public, specifically children, from the defendant.  Were the Court to impose only the mandatory minimum, the defendant would be released from prison in his early sixties, with credit for good conduct time.  At that age, the defendant would still be capable of sexually molesting children.  A 45 year sentence would substantially lessen that probability.

The defendant asks the Court to believe that the worst harm the defendant would have caused is that "an 18-month old boy's privates would have been touched in some fashion," and that the defendant would not have "raped or caused the rape of a 'child'." (Def. Ltr. at 7.)  This is starkly at odds with the evidence.

The defendant's interest in children—his view of them as sexual playthings that should be subject to his desires—is not something that the government needs to speculate about.  The defendant repeatedly has described his view of children:

> BASLAN:    Yeah, something like that.  Like I told you, if the kid wants it, it's not even, it's not even, it's, it's simple, but you have to have a kid that wants it.  And then you don't have to worry about it.

(March 18, 2013 recording.)

The defendant expounded on how it was safer to have anal sex with a child than vaginal sex because vaginal sex causes "tearing," which would leave evidence.

> BASLAN:    No, I mean not about that in particular, just more of like, if she was a kid that's willing, it wouldn't be a problem, per se.
>
> JACK:      How the fuck do you know a kid that's willing?  How do you pick that up, like?
>
> BASLAN:    Plenty, you can pick it up.  A lot of kids do, I mean, I was…when I was their age, I was willing.  I know a lot of, I mean... From the stuff that I've seen online, from the stuff, there's a lot more stuff online where the girls is like all, all for it, more than even the guy.
>
> JACK:      Really?

16

BASLAN:    Yeah.  Cause from my few experiences, I never acted out or anything, but more than once I've had a situation where the kid is totally willing.

JACK:    I don't know.  I wouldn't, I'd be too afraid if they're awake.

BASLAN:    If the kid is willing though, they, it wouldn't be a problem.

JACK:    It's not a problem?

BASLAN:    No, cause they're gonna want it.  Trust me, next time they see you they're gonna be like attacking you, wanting more.

JACK:    Really?

BASLAN:    Yeah. So, but still like, you know uh, but in a different situation, yeah I mean you could have anal with a kid and it wouldn't be a problem.  Like won't leave any marks or anything.  Can't just, vaginally you can't because that becomes very…

JACK:    Will tear.

BASLAN:    Yeah, but anal yeah.

JACK:    Anal you can have, vaginal you can't?

BASLAN:    Uh huh.  There's one thing I notice, that all the guys all do anal first, they don't do vaginal unless the kid is willing and it's that kind of situation.

JACK:    Because that's proof.

BASLAN:    Yeah, yeah.  You can see that immediately.  Anal you can't, I mean…

JACK:    There's no tearing.

BASLAN:    No.  Especially if the person is relaxed.  And then um, especially when the kid, on a good day, I mean you're outputting there just as much as, size-wise.  Take one huge dump and you're like (UI) …

(March 18, 2013 recording.)

        The defendant also explained how he would engage in sexual relations with children he knew, like Jack's 7-year-old niece and 12-year-old daughter.

BASLAN:    No trust me. I have scenarios for every single possibility that we have.

JACK:    What do you mean?

BASLAN:    Like for Leah how we would do it, if it was your daughter how would we do it with her, I would actually have her talk about, I would have

17

some time with her and not do anything, just have her talk.  I'd record it, but have her talk.

JACK:        Who?

BASLAN:      Your daughter.

JACK:        My daughter, [name redacted].

BASLAN:      I would have her talk and tell me about her grandfather's experiences and it would make her admit, if she was thought about you or, whatever, whatever and then I'd push it away for you.  It's like very easy.  A lot simpler than you think.

(March 18, 2013 recording.)

The defendant's demonstrated interest in sexually abusing children and his disregard for the harms it causes requires the imposition of a significant sentence to deter the defendant and to protect the public from his future crimes.  Such a sentence is all the more necessary because the defendant has taken no responsibility for his actions and has, at every opportunity, sought to obstruct these proceedings, lie about his own involvement in the charged crimes, and minimize what he and Henry were going to do.

The defendant's danger to the community is even more pronounced because he does not act alone.  He has an uncanny ability to convince others—particularly women—to take part in his criminal schemes.  In the charged conspiracy to sexually abuse children, the defendant involved his girlfriend, Kristen Henry.  Following his arrest, the defendant convinced Tobala Tessler, a woman he had known for approximately one year, to destroy evidence on his behalf.  He even bragged to CI 2 that neither Tessler nor Henry would cooperate against him.  (July 31, 2013 recording ("CI 2: So you think they'll lie for you no matter what? BB: Right. CI 2: You really believe that at the bottom of your heart?  BB: I believe that – that 90% they're going to. You've seen with Kristin. You've been thinking she's going to flip this whole time and she hasn't. CI 2: Alright.  BB: Strange right?")).

For these reasons, the government requests that the Court sentence the defendant as follows: 45 years on Count One, to run concurrently to all other counts; 30 years on Count two, to run concurrently to Counts One, Four and Five and consecutively to Count Three; 15 years on Count Three, to run concurrently to Counts One, Four and Five, and consecutively to Count Two; 45 years on Count Four, to run concurrently to all other counts; and 20 years on Count Five, to run concurrently to all other Counts.

IV.      Conclusion

For the reasons stated above, the government requests that the Court adopt the findings and recommendations contained in the PSR and sentence the defendant to 45 years' imprisonment.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:      /s/ _____

Tyler J. Smith
Tiana Demas
Assistant U.S. Attorneys
(718) 254-6186/6116

cc:      Ephraim Savitt, Esq. (by ECF)
Victoria Aguilar, Probation Department (by email)