UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,


                    vs.
                                                    Case No.      13-Cr-220 (RJD)

BEBARS BASLAN,


                    Defendant.

_____


**MEMORANDUM OF LAW IN SUPPORT OF BEBARS BASLAN'S MOTION
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A) FOR A REDUCTION OF SENTENCE**


                                        FLORIAN MIEDEL, ESQ.
                                        MIEDEL & MYSLIWIEC LLP
                                        80 Broad Street, Suite 1900
                                        New York, NY 10004
                                        Tel: (212) 616-3042

                                        *Attorney for Bebars Baslan*

## INTRODUCTION

On February 27, 2015, this Court sentenced Bebars Baslan to a term of imprisonment of 36 years, following his conviction after trial for charges of crossing state lines to sexually exploit a child, possession of child pornography, and related counts.  Mr. Baslan's conduct, his behavior during and after the trial, and his seeming lack of remorse persuaded the Court that Mr. Baslan was likely beyond redemption, and its sentence reflected that sentiment.  While 36 years was an extraordinary sentence in light of the fact that the primary charge – crossing state lines with the intent to sexually exploit a young child – was a sting operation that was never going to occur, the Court had become convinced that Mr. Baslan was "one of the few folks that I've come cross, with due respect, Mr. Baslan –– and I hope it changes –– that has to be put away. And in my way of thinking, there are not that many who do, certainly not for this length of time. But we have to protect others from folks like you." Sentencing Transcript at 23, Exhibit A.

It is rare that a sentencing court has the opportunity to take a second look, a chance to re-evaluate whether the original sentence, extraordinary as it was, remains warranted under the circumstances and continues to comport with justice.  The First Step Act, and the Second Circuit's interpretation of that statute, provide the Court with such an opportunity.  The burden rests heavily on the defendant, as it should.  But if the defendant can establish extraordinary and compelling reasons for why a sentence reduction may be appropriate, and such a reduction is consistent with the factors set forth at 18 U.S.C. § 3553(a), a court has the discretion to reduce a formerly imposed sentence in the interests of justice.

It seemed perhaps inconceivable in 2015, but Bebars Baslan has taken exceptional steps in prison to change himself.  As will be detailed at length below, his transformation has been remarkable, and is continuing.  Although rehabilitation *alone* cannot serve as the basis of a

sentence reduction under 18 U.S.C. § 3582, it can, in combination with other factors, be part of the "full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). The horrific impact the COVID-19 pandemic has had on federal prisoners in general, and Bebars Baslan specifically, serves as such an extraordinary and compelling reason, as it has for numerous inmates across the country.

We want to be clear at the outset: Mr. Baslan is not seeking compassionate *release*. Rather, for the reasons set forth below, we respectfully and sincerely urge the Court to consider Mr. Baslan's tremendous efforts toward rehabilitation during the last six years, along with the appalling circumstances of the COVID pandemic and its effect on Mr. Baslan, to conclude that extraordinary and compelling reasons exist to *reduce* Mr. Baslan's sentence to one that now comports with fairness, justice, and the sentencing factors of 18 U.S.C. § 3553(a).

## FACTUAL BACKGROUND

Bebars Baslan and his co-defendant, Kristen Henry, were arrested on March 19, 2013, as they were entering a hotel room in Jersey City, New Jersey, with the intention of sexually abusing three children under the age of 12. An FBI confidential source had persuaded Baslan and Henry that he would bring these children (to whom he claimed to be related) to the hotel and Baslan could photograph and videotape Henry engaging in sexual acts with the children, and perhaps to participate himself. *See* Presentence Report (PSR) at ¶ 11, Exhibit B.[1]

Baslan and Henry had been discussing this plan with the confidential source for several days. *Id.* at ¶¶ 8-9. They also planned to give the children sedatives so that they would not be

---

[1] The PSR will be redacted from the publicly filed version of this memorandum.

aware of what was happening. *Id.* at ¶ 11. Earlier on the evening of March 19, 2013, the source visited Baslan and Henry at their residence in Brooklyn, where Baslan gave him Benadryl and orange juice to provide to the children. *Id.* at ¶ 12. Baslan, Henry, and the source agreed that the source would call with a pre-arranged signal when he was at the hotel in New Jersey with the children, and Baslan and Henry would then meet him there. *Id.* at ¶ 11. The FBI arranged for the plan to include the crossing of state lines to trigger the provisions of 18 U.S.C. § 2241(c), which carries a mandatory minimum sentence of 30 years.

Upon his arrest, Mr. Baslan admitted to FBI agents that he had planned to sedate the source's two children with Benadryl so that they would be asleep, and then have Henry engage in sexual conduct with them. However, in his post-arrest statement, Mr. Baslan claimed that he had "gotten cold feet" and was not actually going to go through with the plan. Mr. Baslan also admitted to having viewed and possessing child pornography and provided FBI agents with access to his home. *See id.* at ¶ 19. The FBI recovered a large cache of child pornography from Mr. Baslan's apartment. *See id.* at ¶¶ 25, 27.

Bebars Baslan was ultimately indicted on five counts, which included the Travel Act violation, 18 U.S.C. § 2241(c), along with conspiracy to sexually exploit a child, 18 U.S.C. § 2251(e), attempted sexual exploitation of a child, 18 U.S.C. § 2251(a) (e), and attempted coercion and enticement of a minor, 18 U.S.C. § 2422(b). He was also charged with possession of child pornography, 18 U.S.C. § 2252(a)(4)(B), for material he had on his home computer. Mr. Baslan faced statutory sentencing ranges of 30 years to life on count 1, 15 to 30 years on counts 2 and 3, 10 years to life on count 4, and 0-20 years on count 5. *See* PSR at p. 3.

Throughout the period leading up to his trial, Mr. Baslan made clear through his attorney that he would be prepared to plead guilty to the charges in the indictment, including those with 15-year mandatory minimums, if the government were to dismiss the Travel Act

charge, Count 1. *See* Ephraim Savitt Affirmation, attached to Govt. Opposition, ECF No. 271, at 16 ("…the government rejected my repeated offers that he was prepared to accept a plea deal on the condition that the government agreed to the dismissal of the top count.").

Because the government never agreed to dismiss that count, Mr. Baslan proceeded to trial. However, between the time of his arrest in 2013 and his trial in the following year, Mr. Baslan also tried to concoct a series of schemes to avoid taking responsibility for his actions and to prevail at trial. As the prosecutor stated at sentencing, during this time Mr. Baslan "had no qualms about engaging other people to help him lie, about falsely accusing the government of destroying his exculpatory evidence, about submitting false statements to the Court, about testifying falsely." Sentencing Transcript at 18, Exhibit A. Indeed, at the trial Mr. Baslan presented what the Court called an "absurd defense," easily rejected by the jury. *Id.* at 22.

Between verdict and sentencing, Mr. Baslan submitted a multitude of *pro se* motions, accused the government, the MDC, and his own lawyer of misconduct, and in the whole behaved as someone who had little regard for the Court and seemingly no appreciation of the seriousness of his crimes. Not surprisingly, the Court concluded, based on all the evidence before it, that even though there was no proof that Mr. Baslan had ever molested a child, his stated intention of doing so, along with his extensive possession of child pornography, the tape recordings of him discussing all the ways a child could be sexually abused, and his reprehensible conduct more generally, no mercy was warranted:

> And the evidence on that score is compelling. Frankly, revolting. You know, I take no great pleasure in sentencing anybody. I particularly take very little pleasure in imposing lengthy sentences, be they mandatorily-imposed or not. Too many of them, I take home with me and I can't get rid of them. But not this one. Not this one…[y]ou're one of the few folks that I've come cross, with due respect, Mr. Baslan -- and I hope it changes -- that has to be put away. And in my way of thinking, there are not that many who do, certainly not for this length of time. But we have to protect others from folks like you. Those are harsh words. The evidence in this case leaves me no other way to characterize it. There's very little to say.

5

*Id.* at 22-23.  The Court imposed a 36-year sentence on Count 1.  The sentences on the other counts followed suit – 36 years on Count 4 to match the sentence on Count 1, and the statutory maximum terms of 30 years on Counts 2 and 3.  The Court also imposed the statutory maximum sentence of 20 years on Count 5, the child pornography count, to which Mr. Baslan had pled guilty right before trial. *Id.* at 27; Judgment, Exhibit C.

On February 22, 2021, for exhaustion purposes, Mr. Baslan filed a request with the warden of his Bureau of Prisons facility for compassionate release/reduction. That request was denied by the warden on February 26, 2021.  *See* Request for Compassionate Release; Denial, Exhibit D.

## ARGUMENT

I.   **Extraordinary and Compelling Reasons Under 18 U.S.C. § 3582(c)(1)(A)(i) Exist to Warrant a Reduction in Bebars Baslan's Sentence**

### A.  Legal Standard

Section 603(b) of the 2018 First Step Act, titled "Increasing the Use and Transparency of Compassionate Release," amended 18 U.S.C. § 3582(c)(1)(A) to provide district courts with authority to reduce sentences in cases presenting extraordinary and compelling reasons. Previously, only the BOP could make such motions. The amendment removed the BOP as the compassionate release gatekeeper because it too infrequently opened the gate. *See, e.g.*, Dep't of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*, at 11 (Apr. 2013) ("The BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered."). *Available at* https://oig.justice.gov/reports/2013/e1306.pdf.

As a result, compassionate release or sentence reduction motions can now be brought directly to the district court under 18 U.S.C. § 3582(c)(1)(A). As the Court well knows,

> compassionate release empowers courts to reduce a defendant's term of imprisonment in certain cases when "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). A court may grant compassionate release when (1) a petitioner has exhausted administrative remedies; (2) "extraordinary and compelling reasons warrant [ ] a reduction" of the originally imposed sentence; (3) a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and (4) the factors outlined in 18 U.S.C. § 3553(a) weigh in favor of a reduction. *Id.*

*United States v. Vasquez*, No. 08-CR-00065 (RJD), 2021 WL 681174, at *1 (E.D.N.Y. Feb. 22, 2021).

In determining whether "extraordinary and compelling reasons" exist, the Court is "free[ ] … to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v, Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). Although 28 U.S.C. § 994(t) states that "[r]ehabilitation … *alone* shall not be considered an extraordinary and compelling reason," (emphasis added), rehabilitation in combination with other factors can serve as sufficient reasons for the reconsideration of a prior sentence. Indeed, as the Second Circuit made clear in *Brooker*, "[rehabilitation] arguments may also interact with the present coronavirus pandemic, which courts around the country, including in this circuit, have used as a justification for granting some sentence reduction motions." *Brooker*, 976 F.3d at 238. *See also United States v. Rodriguez*, 2020 WL 5810161, at *4 (S.D.N.Y. Sept. 30, 2020) (JSR) ("But as the Second Circuit recognized in last Friday's decision, while rehabilitation alone is insufficient, it can interact with the present coronavirus pandemic to create an extraordinary and compelling reason for a sentence reduction.") (citing and quoting *Brooker*).

Once the Court finds that extraordinary and compelling reasons under 18 U.S.C. § 3583(c)(1)(A) exist, the Court must then consider whether a reduction would comport with any

applicable policy statement issued by the Sentencing Commission,[2] and, more importantly, with the sentencing factors set forth at 18 U.S.C. § 3553(a).

### B. The COVID-19 Pandemic and its effect on Mr. Baslan, combined with his exceptional efforts at rehabilitation, establish extraordinary and compelling reasons for a sentence reduction

#### 1. COVID-19

At this point, more than a year after the onset of the COVID-19 pandemic, this Court needs no convincing of the devastating effect the pandemic has had on the country generally, and on those locked up in this country's prisons more specifically. The COVID virus hit U.S.P. Tucson, Mr. Baslan's facility, particularly hard. According to the BOP's own statistics, since the onset of the pandemic, 890 inmates at U.S.P. Tucson have tested positive for COVID and eventually recovered. *See* [BOP: COVID-19 Update](). The penitentiary houses 1260 inmates; in other words, over 70% of inmates at U.S.P. Tucson contracted the virus, in addition to 118 staff members. Even worse, 10 inmates have so far died from the virus at U.S.P. Tucson. *See id.*

The facility's unsurprising response to these massive outbreaks was to lock the entire inmate population down. For more than one year, Mr. Baslan and his fellow inmates have, for most hours in the day, been locked into their tiny cells – experiencing a kind of imprisonment that in normal times is reserved for those who seriously violate prison rules. For more than a year, Mr. Baslan has had limited access to the outdoors, to exercise, to programming, to the

---

[2] The applicable policy statement "essentially restates the requirements of the compassionate-release statute, adding only that a sentence reduction is warranted only if '[t]he defendant is not a danger to the safety of any other person or to the community.'" *United States v. Torres*, 2020 WL 2815003, at *8 (S.D.N.Y. Jun. 1, 2020).

kinds of experiences that make prison bearable.  It has been an absolutely horrific time, and certainly not the kind of incarceration the Court envisioned when it sentenced Mr. Baslan more than six years ago.  *See e.g. Rodriguez*, 2020 WL 5810161, at *3 (internal citations omitted) ("the federal prisons, as prime candidates for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal.").

The pandemic alone, which is far from over, has convinced some courts that the dire threat posed by the coronavirus to those in prison, especially to those incarcerated in facilities where the virus has taken hold, to be "extraordinary and compelling" under 18 U.S.C. § 3582(c)(1)(A)(i).  *See e.g. United States v. Ozols*, No. 16-Cr-692 (JMF) at 2 (S.D.N.Y. June 2, 2020) ("as numerous courts have concluded, the threat of COVID-19 to those in prison constitutes an extraordinary and compelling reason for compassionate release."); *United States v. Pena*, No. 15-CR-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) ("As this Court has explained, the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals.").

Many more courts have concluded that the COVID-19 pandemic combined with a defendant's high-risk conditions recognized by the CDC may constitute extraordinary and compelling reasons.  *See e.g. United States v. Cato*, No. 16-CR-326 (ARR), 2020 WL 5709177, at *4 (E.D.N.Y. Sept. 24, 2020) (collecting cases). Mr. Baslan suffers from health conditions that increase his risk of serious illness if infected with COVID-19. For one, he is afflicted with chronic asthma and uses an inhaler on an as-needed basis.  *See* Baslan Medical Record Excerpt, Exhibit E.[3]  Despite several unsuccessful rounds of vaccination since childhood, Mr. Baslan is

---

[3] This exhibit is redacted in the publicly filed version of this memorandum.

also diagnosed with a chronic Hepatitis B infection. Luckily, his case has remained dormant for several years, but could flare up again without warning. Compounding these concerns is Mr. Baslan's rheumatoid arthritis (RA). RA is a chronic autoimmune disorder that causes painful inflammation of the joints and other body parts, which Mr. Baslan has lived with for at least the past 7 years. In mid-March 2021, Mr. Baslan began treatment of his RA using Orencia (Abatacept), a prescription immunosuppressant injected once weekly to decrease swelling and temporarily relieve pain. *See id.* According to the CDC, "[p]eople with weakened immune systems are at higher risk of getting severely sick from [COVID-19]."[4] To make matters worse, as Mr. Baslan's body adjusts to immunosuppression, he could experience reactivation of his chronic Hepatitis B infection with potentially serious consequences. According to one journal article, "Patients with active or inactive disease or resolved HBV [Hepatitis B] infection are at risk for reactivation with immunosuppressive therapy use. HBV reactivation varies from a clinically asymptomatic condition to one associated with acute liver failure and death."[5]

As noted, the COVID pandemic is one of the full slate of factors the Court can consider. However, in combination with his exceptional rehabilitative efforts detailed below, as well as other factors such as the length of his sentence and his deportation from this country at the conclusion of his term, the COVID related factors serve as extraordinary and compelling reasons to reduce Mr. Baslan's sentence.

---

[4] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/immunocompromised.html.

[5] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4119588/.

2.  *Rehabilitation*

As will be documented extensively below, Bebars Baslan has used his almost six years at the federal penitentiary in Tucson, Arizona, better than most.  But not that long ago, Mr. Baslan was a repugnant man who had committed repugnant acts he failed to acknowledge and express remorse for.  He deserved a long prison sentence.  How transformative could his rehabilitative efforts really be?

I urge the Court to begin its evaluation by reading Mr. Baslan's letter to the Court.  *See* Exhibit F.  To me, who did not know Mr. Baslan in 2013-2015, it reads as an authentic expression of a man who has begun to come to terms with his crimes, with his own character, and is passionately dedicated to improving himself.  To the Court, without the benefit of seeing the evidence that supports his transformation, and still cognizant of Mr. Baslan's talents as a manipulator, the letter may read as less genuine.  Whether it does or does not, I then urge the Court to immerse itself in the documentary evidence of Mr. Baslan's efforts in prison – his participation in programs dedicated to self-improvement, drug treatment, sex offender treatment, his mentoring of other inmates, his matriculation in all kinds of classes available to him, his artistic pursuits, and much more. I urge the Court to read the letters submitted by his fellow inmates, who can most closely describe the person Mr. Baslan has become, and those by his counselors who have witnessed his progress firsthand.  Lastly, I urge the Court to read Mr. Baslan's letter again.  Hopefully, in light of all the other information available to the Court, the letter will resonate and will offer a window into Mr. Baslan's soul that will persuade the Court that he deserves a second chance. That had the Court been able to see back in 2015 what Mr. Baslan was capable of under the right circumstances, the sentence might not have been as harsh.

Mr. Baslan arrived at U.S.P. Tucson in 2015 nearing 40 years old and not expecting to be released until his early 70s. The transition to prison life was not easy. As he described in his letter to the Court, Mr. Baslan began participating in programming with the wrong intentions and attitude. *See* Exhibit F. But slowly, over time, Mr. Baslan's activities began to change him. The rehabilitative programs started to have their desired effect, as did Mr. Baslan's willingness to look into himself, to try to understand the issues and circumstances that had brought him to this point in his life. As is evident in the attached letters from fellow inmates, peer mentors, counselors, and other prison staff, Mr. Baslan has truly devoted himself to exercising his creativity, intellect, and spirituality, addressing his history of substance abuse, analyzing and understanding the consequences of his past behavior, and forging strong relationships between and with his peers. Based on this evidence, one can conclude that even though it seemed hardly conceivable in 2015, Bebars Baslan appears to be on the road toward rehabilitation and transformation.

### (a) *Mr. Baslan Participates in the Challenge Program*

Perhaps most indicative of Mr. Baslan's efforts is his passionate dedication to the Challenge Program, first as a participant and now as a mentor. According to the Bureau of Prisons First Step Act Approved Programs Guide, "inmates [in the Challenge Program] participate in interactive groups and attend community meetings while living in a housing unit separate from the general population. In addition to treating substance abuse disorders and mental illnesses, the program addresses criminality, via cognitive-behavioral challenges to criminal thinking errors." [6]

---

[6] *See* https://www.bop.gov/inmates/fsa/docs/fsa_program_guide_202010.pdf.

Participating in the Challenge Program entails living for one year in a unit separate from the general population, with mentors and other participants.  Mr. Baslan started in the Challenge Program in 2016, with the intention, as he confessed in his letter, of "faking it."  *See* Exhibit F.  This was not lost on his counselors, who noted that while Mr. Baslan "demonstrated an eagerness to perform well in the Program," he "did not experience the application of the Criminal Thinking Errors until the end of Phase I, when he actually began to recognize the Errors in his own thought patterns, past and present. Mr. Baslan began to request feedback, but would sometimes question it or have difficulty accepting it."  *See* Exhibit G, Challenge Treatment Summary.

Still, with time, Mr. Baslan began to make considerable personal progress as he advanced through the program. His counselor writes: "In Phase II, Mr. Baslan demonstrated the ability to utilize RSA's and the 5 Rules of Rational Thinking to both past and present situations. He began to use the tool on a regular basis and also volunteered to assist peers with their recoveries by assisting them with learning how to use the tool[s]. Mr. Baslan reported improved clarity in his thinking processes and was able to avoid criminal behavior." As part of Mr. Baslan's progress, his counselor observed a heightened sense of self-awareness about him: "He reported that he recognized a historical presence of Mollification and Entitlement in his thinking. […] He also demonstrated an increased desire for transparency and asked his peers to hold him accountable if they observed him engaging in criminal activity or entertaining Criminal Thinking Errors." *Id.*

In the last phase of his participation in the Challenge Program, Mr. Baslan truly embraced and began to embody the program's rehabilitative philosophy. His counselor writes: "In Phase III, Mr. Baslan experienced a significant amount of empathy for his victims and all of those impacted by his criminal behavior. He was visibly moved in several groups and expressed

remorse and understanding of the impact of his past actions. He experienced emotions of

sadness and guilt and processed these emotions in Process group." His counselor also noted

specific improvements in Mr. Baslan's thought patterns: "He received feedback from his peers

in a calm manner and questioned the feedback less than he had earlier on in the Program. [...]

He continued to discuss the consequences he experienced due to his criminal actions and shared

these consequences openly with the Community. By the end of Phase III, Mr. Baslan exhibited

a strong understanding of the Criminal Thinking Errors in his own thought processes and the

ability to use tools to correct them." *Id.*

### (b) *Mr. Baslan's Progress in the Challenge Program is Evident to His Counselors*

It is also notable that Mr. Baslan consistently sought to help his peers achieve their

goals in the Program.  His counselor reports that Mr. Baslan's relationships with his peers and

mentors grew stronger and more meaningful as he advanced through the program. "In Phase

II, Mr. Baslan maintained active participation in the Community via serving as a visible

member in unit committees. He also served on several peers' Accountability Teams as well as a

Healthy Ally to assist in resolving conflicts on the unit. [...] By the end of Phase II, Mr.

Baslan had completed a person-to-person pull-up as well as a self-pull-up. He also successfully

completed an Action Plan with his own Accountability Team and was a supportive member of a

peer's Accountability Team." *Id.*  A pull-up is an accountability technique introduced and

practiced in the Challenge Program in which a peer calls out a fellow peer for criminal or

erroneous conduct in front of the entire Challenge community. Daily pull-ups incentivize

inmates not to engage in criminal behavior, since their peers will call them out. Mr. Baslan has

wholeheartedly embraced the practice of pull-ups and encourages his peers to do the same.

By the time he reached the last phase of the program, he had found a true home for himself in the program. According to his counselor, "In Phase III, Mr. Baslan increased his overall participation via joining the Topics Group committee, along with maintaining his membership to the Art & Fitness committees. He continued to actively contribute to group discussions and would regularly demonstrate caring to peers via providing constructive feedback and support. Mr. Baslan also presented in Community Morning Meeting and would represent the Challenge Program with a positive attitude after hours on a consistent basis. He regularly reached out to peers, completed all homework assigned, and would volunteer to assist staff with duties, such as cleaning the unit, preparing for institutional tours, planning unit events, etc." *Id.* In other words, Mr. Baslan began taking advantage of his opportunity to contribute meaningfully to a positive, social, and therapeutic environment.

His counselor also wrote of the progress Mr. Baslan made in addressing his history of substance abuse during his year in the program. "Mr. Baslan was able to identify many of the consequences he had experienced due to his past substance abuse and committed to maintaining his sobriety. In Phase II, Mr. Baslan worked on managing his emotions in lieu of escaping them or self-medicating. He identified emotional triggers in Process groups, including fear, perceptions of inadequacies, discomfort with discomfort, etc. In Phase III, Mr. Baslan continued to maintain his sobriety and also provided support to several peers with their substance abuse recoveries. He identified the self-serving components in his past drug use [and] reflected on the manner in which substance abuse contradicts his current values and goals." *Id. See also* Exhibit H, Challenge Community Learning Achievement certificates.

(c)  <u>*Mr. Baslan's Success as a Peer Mentor Earns Praise from Challenge Program National Coordinator*</u>

Mr. Baslan graduated from the Challenge Program in December 2017. Since then, he continues to reside in and contribute to the Challenge community as a peer mentor. Dr.

15

Meredith Mitstifer, now the BOP's national coordinator of the Challenge Program, had the pleasure of overseeing the entire duration of Mr. Baslan's participation and mentorship in the program before assuming her new title in November 2020. In her case note, Dr. Mitstifer describes Mr. Baslan's role: "Given his commitment to both himself and the MTC [Modified Therapeutic Community], Mr. Baslan was selected as a mentor [...]. The role of mentor consists of various responsibilities which include but are not limited to: assisting [6-10] new participants with the MTC mission, attitudes and core values of the program, daily community meetings, monthly supervision, facilitating process groups for both wait and complete status members, assisting treatment specialists with journal groups, facilitating successful mediations within community members, and remaining discipline free." *See* Exhibit I, Case Note from Dr. Mitstifer.

Dr. Mitstifer has effusive praise for Mr. Baslan: "In addition to his strengths, [Mr. Baslan] clearly demonstrates an ability to effectively balance his roles so his self-care is not compromised and he maintains an excellent peer model to the MTC. His reliability and maturity are a community asset. Mr. Baslan continues to be an active participant in his own treatment and genuinely works to improve his character daily. He is able to acknowledge errors in his thinking patterns which led to his incarceration, and demonstrates this growth and change by assisting others to do the same. Mr. Baslan also continues to demonstrate an excellent institutional record with no discipline while continuing to reside in a high-security setting. This pattern of good conduct over a long period of time validates his commitment to following the rules and doing the right thing." *Id.*

### (d) Peer Mediation and Conflict Resolution

One of the techniques Mr. Baslan and other Challenge Program participants use to resolve conflict is called peer mediation. Mr. Baslan describes his role as a mediator, one of his

many responsibilities as a mentor in the Challenge program: "Imagine two inmates in a high security institution [… who] threatened each other with bodily harm, most likely [the mediator breaks] up an almost fight. The mediator then meets with them separately [a] few time[s], [they] process their emotions, [the mediator] coaches them to assertively express their needs and [tells them] what they could have done better. Then [the mediator] set[s] up a joint meeting […] to reach a resolution. I love doing mediation, [in] a busy week [I do] 3-4 mediations." Exhibit J, Mr. Baslan's description of mediation. *See also* Exhibit K, Mediation Committee certificates. Helping other inmates resolve their conflicts peacefully has been a highly rewarding experience for Mr. Baslan.

One fellow inmate and peer at U.S.P. Tucson writes of Mr. Baslan's influence in leading mediations: "Mr. Baslan empowered myself and many others to join the Mediation Committee. He assisted our training in the use of Party-Directed Mediation wherein we help others to seek peaceful resolutions. Through valuable skillsets such as assertive communication, empathic listening, [S]ocratic questioning, and role-owning, we empower others to resolve future conflicts on their own without resorting to violence or aggression. Mr. Baslan has taught many impactful classes such as his 'Empathy' class where he teaches others what empathy is and why it's so important, the value of understanding and compassion and guides people to see the full extent the ripple effect of their crimes had [sic.] on others. He doesn't just teach, he leads by example. An example I work hard to follow." *See* Exhibit L, Letter from James Spiotto II.

*(e)  Mr. Baslan's Peers Acknowledge His Positive Influence on the Community*

It is clear from the letters submitted on Mr. Baslan's behalf by fellow inmates and peers in the Challenge Program that he offered a substantial amount of support and positive influence to them.  One former mentee writes, "I am blessed to have witnessed Mr. Baslan's journey through treatment and grateful to have had him as a close friend. I personally view Mr. Baslan

as the model of responsibility and humility I aspire to be in the future." *See* Exhibit M, Letter from Christopher Cavna. Another writes, "In the capacity of a mentor, Bebars has shown himself to be an excellent role model to program participants and other mentors, myself included. His enthusiasm and empathy to help others is invaluable. […] He shares his unique and successful adaptation to prison life and guides others to find their own success through meaning and purpose. He believes in the power of change, because he has experienced it." *See* Exhibit N, Letter from Steven P. Arthur.

Yet another former mentee writes, "Mr. Baslan is one of my safe harbors. He's someone I can trust to be honest an[d] objective with me. He's demonstrated that he's willing to put as much effort, if not more[,] into my treatment as I'm willing to put into my own. Not only does this community rely on Mr. Baslan, we depend on him to guide an[d] advi[s]e us, especially in difficult situations. […] I witness him on a daily basis assist[ing] others with the core values of the program, facilitat[ing] successful mediations within the community, help[ing] treatment specialist[s] with their journal groups. […] He's inspired me to become part of the solution, not the problem. He taught me when I didn't like what I see, to change the way I'm looking at it. He's been very supportive to me, even when I struggle the most. I'm grateful to have met him." *See* Exhibit O, Letter from Desmond Stowers.

Still two more of Mr. Baslan's former mentees have written attached letters regarding Mr. Baslan. One writes, "[Mr. Baslan] became a major piece in my change. [He] has helped me work [through] my PTSD, aggressive behavior issues. […] Mr. Baslan continues to be there for me. I am genuinely grateful for the time & effort Mr. Baslan has invested in my life. […] [He] leads with integrity [b]y holding other members in the program accountable for negative behavior. […] Mr. Baslan is dedicated to identifying his mistakes & thinking errors and puts forth immense effort to change them." *See* Exhibit P, Letter from Lemajani Voa. Last,

and perhaps most impressive of the testimonials of Mr. Baslan's former mentees, is that of Randy Gometz, an ex-member of the original Aryan Brotherhood, a violent white supremacist gang. When he first got to the Challenge Program, Mr. Gometz writes, "[m]ost [of the participants and mentors] were afraid of me. There were only 3 men who were the exceptions, and Baslan was the one in front and leading the others. […] I can tell you he is a kind, compassionate, empathetic, generous, caring, helpful, intelligent, and highly respected man in both the eyes of staff and inmates alike. I tell you this candidly: without his help I'd have crashed out of this program almost on a weekly basis. And it's not just with me either. It's with anyone in need. […] He's genuinely the poster boy for the BOP to ask the Appropriations Committee of Congress to finance more Challenge Programs throughout the country." *See* Exhibit Q, Letter from Randy Gometz.[7]

Mr. Baslan's fellow peer mentors similarly recognize Mr. Baslans's positive influence. One, who is also Mr. Baslan's former cell mate, writes, "I was inspired by Baslan's vulnerability, empathy, seemingly ceaseless willingness to help others and his desire for personal growth. […] I am grateful to have found meaning and purpose in my life and to have a positive effect on others in such a negative environment. I thank Mr. Baslan for helping lead [me] and so many others down a road of personal redemption […]." *See* Exhibit L. Another fellow peer mentor writes, "[Mr. Baslan] is very self-aware and empath[et]ic with others. […] I see Mr. Baslan working to better himself daily [by] working with difficult people and using his own example to assist others in their recovery. […] [He] provides outstanding guidance and is a model for others to follow. […] He has mastered many emotional self-regulation skills and is

---

[7] I strongly urge the Court to read this letter in its entirety.  It is one of the most remarkable reference letters I have ever come across.

very conscious of how his past behavior ha[s] affected his victims." *See* Exhibit R, Letter from Scott Herrick.

One of Mr. Baslan's mentors when he first joined the Challenge Program reflects on the transformation he has seen in Mr. Baslan: "Over the course of 4 years, Mr. Baslan mas made tremendous progress in his treatment. Most not[a]bly, he has developed a willingness to be open and honest about his struggles and treatment needs, as well as a humbleness to receive help. This has not only enabled him to build a repe[r]toire of effective coping skills and a comprehensive Recovery Maintenance Plan, but has also served as a model for others to be vulnerable in their treatment. […] He is a careful listener and exercises great empathy when mentoring others. He is sought out by many for his relatability, sound advice, and equally matched vulnerability. He is usually the first person I go to when I need help or just a listening ear." *See* Exhibit S, Letter from David Ettlinger. It is a testament to Mr. Baslan's resilience, hard work, and empathy that he now provides emotional support to those who supported him when he first joined the program.

As these letters demonstrate, Mr. Baslan has touched many lives since becoming a mentor in the Challenge Program. Those who have known him for years attest to the genuine and significant progress he has made implementing the program's philosophy and practices in his daily life. Mentees and fellow mentors alike acknowledge his empathy, courage, and dedication to improving the lives of his fellow community members. His rehabilitation through the Challenge Program has been, and will continue to be, fulfilling and successful.

*(f)  Mr. Baslan's Self-described Lessons from the Challenge Program*

Although it may have started that way, Mr. Baslan's continued dedication to the Challenge community was not a ploy to earn praise. He detailed his transformative experience in the Challenge community in an article published in the Challenger Newsletter (a prison-wide

periodical containing inmate-submitted articles describing and promoting the Challenge Program). He writes: "The realization took place as I started my journey of self-reflection and opened myself to feedback from my Challenge program peers.  As my view of self became more accurate, I started to understand my limitations and how often I pushed myself in the past to unhealthy levels in order to avoid potentially painful subjects. . . .Guilt and remorse surfaced.  I began to see my old behavior in a new context.  Things that were a source of pride became points of pain and regret.  I realized how I hurt others.  I would stay up for hours at night reflecting on my life in horror, as though in surprise; as though this was new."  Exhibit T, Mr. Baslan's newsletter article.

Mr. Baslan's commitment to change is also reflected in introspective observations he wrote on "Anger Management and Sexual Offending," recorded as part of his participation in the Challenge Program: "As I learn to regulate my emotions, and resolve or accept inner conflicts that lead to anger, I would be more others-centered and keep in mind the needs of others. I would remain as I am now: averse to harming others. As my self-esteem improves, healthy relationships are easier to form, and are very fulfilling. I am focusing on character development rather than sexual pursuits in order to validate my self-value." *See* Exhibit U.

### (g) _Mr. Baslan Has Taken Advantage of All Programming Available to Him_

The Challenge Program, however, has not been Mr. Baslan's only source of personal growth since his incarceration. In 2017, he volunteered to help with several elements of the Inmate Health Fair, an annual health and fitness competition organized by the prison's recreation staff. Mr. Baslan organized the performance of a live inmate band, painted a mural to be used as a backdrop in a photo booth, participated as an instructor in several exercise groups, and encouraged high rates of participation in the Health Fair. That year, the inmates collectively lost over 2,200 pounds during the fair. For the next two years, Mr. Baslan was

named the Lead Inmate Coordinator and formed a committee of inmates to facilitate various functions and take on leadership roles. In 2018, Baslan's Health Fair partnered with "El Tour de Tucson," an indoor cycling competition, and managed to make a substantial anonymous donation to a children's charity. *See* Exhibit V.

Mr. Baslan has also volunteered for therapeutic programs outside the Challenge community. He is currently on the waitlist for a spot in the year-long residential Sex Offender Treatment Program (SOTP) at U.S.P. Tucson and has completed all of the adjunct therapeutic and treatment groups offered to individuals on the waitlist. *See* Exhibit W. He has also completed several ancillary modules to the Challenge Program. In July 2018, he completed the Criminal Thinking module, in October 2018, the Communication Skills module, in February 2019, the Pre-Treatment Journal module, and in May 2019, the Anger Management module. *See* Exhibit X. Mr. Baslan also participated in a 14-hour Victim Impact Class. *See* Exhibit Y.

One of the programs to which Mr. Baslan has contributed significantly is called "Angry All the Time: An Emergency Guide to Anger Control," which is a peer-led ancillary group of the Challenge Program for "people in the community who struggle(d) with anger or violence," according to Mr. Baslan. After completing the program in November 2018, Mr. Baslan became a graduate participant to model conduct to newcomers, and in May 2019 became a facilitator. He currently manages the group and helps train peer facilitators. *See* Exhibit Z.

Since his arrival at U.S.P. Tucson, Mr. Baslan has also taken extensive advantage of the prison's creative and educational programming. In 2015, he completed classes on watercolor painting, yoga, and acrylic painting (two classes); in 2016, classes on drawing (two classes), beading (two classes), art history (two classes), piano, charcoal drawing, watercolor painting (a second class), and drawing dynamic shadows; in 2017, classes on the Middle East, Russian Tsars, and islands; in 2018, a class on financial peace, and in 2020, classes on personal

development, leadership, preparing for release (two classes), and money management. *See* Exhibit AA, recreational programming certificates.

Mr. Baslan has contributed his considerable creative talents to several events at U.S.P. Tucson. In August 2015, he served as the videographer for Inmate Inclusion Day and in August 2016, he participated in the Inmate Inclusion Day skit, talent show, and musical performances. From April 2018 to June 2019, he contributed over 150 hours to painting a mural in the chapel, and in April 2019, he sang in U.S.P. Tucson's first ever concert choir performance. *See* Exhibit BB, documents relating to Inmate Inclusion Day, Health Fair, and creative programming. Furthermore, Mr. Baslan has taken advantage of faith-based courses available through the Orthodox Christian Prison Ministry. In August 2017, he completed a "Seeker of Truth correspondence course;" in September 2019, a course on the preaching of the Apostles, and in December 2019, a course on the Orthodox Christian Catechism. *See* Exhibit CC, religious studies certificates.

Notably, Mr. Baslan also voluntarily completed both U.S.P. Tucson's drug education program as well as the Non-Residential Drug Abuse Treatment Program, a 12- to 24-week program designed for inmates who are either waiting to be placed into RDAP (Residential Drug Abuse Program) or who do not qualify for RDAP. *See* Exhibit DD, NRDAP and drug education certificates. Mr. Baslan's deportation status and charges of conviction likely disqualify him from participating in RDAP; however, he has benefitted greatly from NRDAP and plans to submit for RDAP regardless of his eligibility.

(h) *Mr. Baslan's Connection to Spirituality*

Mr. Baslan has also connected strongly with his spirituality in recent years. In February 2019, he completed the nine-month Threshold Program, designed to "build[] nine strong foundations for a spiritual life at [U.S.P.] Tucson," and in November 2019 completed his first

nine-month term as a mentor in the Threshold Program, assisting new participants in learning the foundations for a spiritual life. *See* Exhibit EE. He has also worked in the U.S.P.'s Chapel for several years, first as an orderly and then as Library Assistant. Chaplain J. Dominguez wrote in August 2019 that Mr. Baslan "took on tasks with decisiveness and expediency, often taking initiative and rarely requiring supervision. [...] Under every circumstance, [Mr.] Baslan acts with tact and professionalism towards staff and inmates. [...] Respectable work ethic and a true desire to become an asset to society make him an asset to any hardworking team." Exhibit FF.

In July 2020, Supervisory Chaplain S. Martin wrote a glowing review of Mr. Baslan's work and character: "Few [inmates] are as dedicated and caring as Mr. Baslan. [...] He has developed into a man of understanding by evaluating his past action, taking responsibility and then having the courage to change. [...] He is an example for others to follow and many men seek his advice when they have difficulty working through challenging situations. [...] Mr. Baslan's desire to improve is constant. He was moved to [...] serv[e] as a Threshold leader, which is designed to prepare inmates to make better decisions, enhance community reentry, and encourage[] positive life changes. [...] I wish I had more orderlies like Mr. Baslan. He is smart, personable, and dedicated. I know that he has a bright future ahead of him." *See* Exhibit GG.

The head orderly at the chapel, who has known Mr. Baslan since 2015, was also full of praise. "After witnessing Bebars Baslan's commitment to faith, sobriety, sexual purity, self-improvement, and service, I invited him to join our carefully selected chapel crew. [...] [Baslan] used his gift and skills to improve our chapel. He painted the entire chapel and decorated it with beautifully impressive murals. He organized our audio and video equipment, [and] assisted to create a video self-study program that benefits inmates of all religions.

Finally, for his outstanding performance, Bebars Baslan was selected by the Supervisor Chaplain for the coveted job of Chaplain Librarian (his current job). [...] I am convinced, based on what I have seen, of the transformation and rehabilitation that Bebars Baslan has achieved." *See* Exhibit HH, Letter from Arturo Ochoa.

### (i)  *Mr. Baslan is a Model Inmate*

As the Court is likely aware, with the enactment of the First Step Act in 2018, all federal inmates were assessed using the PATTERN instrument to determine recidivism risk. Mr. Baslan was determined by this tool as exhibiting minimal risk to reoffend. *See* Exhibit II. As his chaplains and counselors correctly point out, Mr. Baslan does not have a single disciplinary infraction since he entered the Bureau of Prisons. He currently qualifies for housing in a medium-security facility but has remained at high-security U.S.P. Tucson voluntarily, in order to continue to reside in the Challenge community unit.

***

In sum, contrary to the reasonable expectations of this Court and probably all who knew him six years ago, Mr. Baslan has exhibited nothing short of exemplary behavior during his time at U.S.P. Tucson.  Despite being a sex-offender in a maximum-security penitentiary, he has managed to avoid conflict, has studiously followed the rules and conformed his behavior to institutional norms, and has thereby avoided receiving even a single disciplinary infraction.  He has transformed into a genuine believer in the rehabilitative powers of group therapy, introspection, education, and spirituality. Not only has he worked on his own attitude and thinking process, he has also devoted his time through mentorship in the Challenge Program and the Threshold Program to assisting others to do the same. He looks forward to spending the next period of his incarceration coaching a new group of peers at a new facility through the

25

Challenge Program and touching as many lives thereafter as he can. *See* Exhibit F, Mr. Baslan's letter to the Court.

Mr. Baslan's outstanding rehabilitative efforts, in combination with the unparalleled devastation and fear wrought by the COVID pandemic inside of this country's prisons, and its particular effect on him, meet the extraordinary and compelling reasons standard of 18 U.S.C. § 3582(c)(1)(A). Indeed, recognizing that rehabilitation alone was precluded by statute as a sufficient reason under § 3582, the Second Circuit in *Brooker* all but invited district courts to combine exemplary rehabilitation with pandemic related factors to meet the § 3582 standard. *See Brooker*, 976 F.3d at 237–38 ("Moreover, these arguments may also interact with the present coronavirus pandemic, which courts around the country, including in this circuit, have used as a justification for granting some sentence reduction motions.").

A recent decision by Judge Rakoff in the Southern District is instructive because it addressed the same issues raised here. Using *Brooker* as a model, Judge Rakoff reduced the mandatory life sentence imposed on the defendant in 2004 for a brutal torture murder to 30 years. *See United States v. Rodriguez*, No. 00 CR. 761-2 (JSR), 2020 WL 5810161 (S.D.N.Y. Sept. 30, 2020). The court based its conclusion on three grounds. First, Rodriguez was clinically obese and suffered from Type II diabetes, conditions that placed him at greater risk of serious illness if he contracted the virus. *See id.* at *3. Second,

> the effects of the pandemic, Rodriguez's health, and his rehabilitative efforts in the pandemic, aside from posing a threat to Rodriguez's health, has made Rodriguez's incarceration harsher and more punitive than would otherwise have been the case. . . . For someone with Rodriguez's health profile, the risk of suffering severe health consequences if he contracts COVID-19, coupled to the severe conditions imposed by the concomitant lockdowns and restrictions that are necessary to ensure Rodriguez's safety, means that the actual severity of [Rodriguez's] sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing. While insufficient on its own, this second factor also weighs in favor of a finding of extraordinary and compelling reasons.

*Id.* (internal citations omitted). Third, "and here highly relevant, the overwhelming evidence of Rodriguez's total rehabilitation weighs strongly in favor of a finding of extraordinary and compelling reasons." *Id.* at *4. Citing to a mass of letters by fellow inmates, and, most importantly, prison staff, the Court concluded that it was "clear that Rodriguez has used his twenty years in prison not just to better himself but also to better his community." *Id.* A similar conclusion could be reached here.

## II.    A Sentence Reduction is Consistent with the Sentencing Considerations of 18 U.S.C. § 3553(a)

If the Court agrees that extraordinary and compelling reasons exist to reduce Mr. Baslan's sentence, it must next determine whether, and if so, by how much it should reduce the sentence. In so doing, the Court must consider what kind of reduction is appropriate in light of the sentencing factors of 18 U.S.C. § 3553(a). This is a decision that sits entirely in the Court's capable hands. The government will undoubtedly oppose this motion, arguing that the sentencing factors in § 3553(a)(2)(a-c) – providing just punishment, affording adequate deterrence, and protecting the community from the defendant's future crimes – overwhelm all others. It is worth noting, however, that nothing has changed since 2015 to make Mr. Baslan's case *more* serious. Since then, circumstances have changed significantly, but only in Mr. Baslan's favor – including his spotless prison record, his rehabilitative and personal growth, and his experience of having to endure the horror of the COVID pandemic inside a prison. Thus, the only question is whether the sentencing factors favored by the government must lead to the inexorable conclusion that Mr. Baslan's 36-year sentence is sufficient and not greater than necessary, *despite* the powerful evidence provided here that he is transforming himself, feels tremendous remorse and guilt, and has taken substantial steps toward redemption. We

strongly urge the Court to determine that in light of the evidence now before the Court, a 36-year sentence *is* greater than necessary to satisfy the requirements of 18 U.S.C. § 3553(a).[8]

No one, least of all Bebars Baslan, is arguing that the eight years he has spent in prison are sufficient, or that his rehabilitation is complete. But the person whom this Court, in 2015, believed was likely beyond redemption, in fact appears to have begun the painful and lengthy process of clawing his way back. The years, and in particular his participation in these therapeutic programs, have allowed Mr. Baslan to think, to examine himself, to consider how he could have perpetrated such reprehensible crimes. Words of remorse often ring hollow, and a journey toward redemption is a long one, but Mr. Baslan appears to be putting in the work, the therapy, analysis, self-evaluation required to come to grips with his crimes, and to try to live a decent and productive life.

Most of the time, sentencing courts determine the likelihood of rehabilitation and redemption only prospectively, with the hope that it will occur. Here, the Court can see for itself the dramatic shift Mr. Baslan has undertaken, and the commitment he has demonstrated for the last six years to live a good and meaningful life, despite the circumstances he finds himself in. When the Court sentenced Mr. Baslan in 2015, its disgust with him and his crimes was palpable. But even in its stern imposition of a very long sentence, the Court expressed a glimmer of hope that while Mr. Baslan appeared to be beyond redemption and had to be put away, "I hope it changes." Sentence Transcript at 23, Exhibit A. What we hope to have demonstrated here is that Mr. Baslan is doing his part to validate the Court's glimmer.

---

[8] Simply for the sake of comparison, the mean federal sentence for murder in the federal courts in 2019 was 255 months, and for sexual abuse was 205 months. *See* 2019 Annual Report and Sourcebook of Federal Sentencing Statistics (ussc.gov)

## <u>CONCLUSION</u>

For the reasons set forth above, we respectfully urge the Court to conclude that Bebars Baslan has offered extraordinary and compelling reasons to warrant a sentence reduction under 18 U.S.C. § 3582(c)(1)(A), and that a sentence reduction is consistent not only with 18 U.S.C. § 3553(a) and the applicable policy statement, but also with justice.

Dated: New York, New York
       April 5, 2021

                                        Respectfully Submitted

                        By:

                                        _____/s/ Florian Miedel_
                                        Florian Miedel, Esq.
                                        MIEDEL & MYSLIWIEC LLP
                                        80 Broad Street, Suite 1900
                                        New York, NY 10004

                                        *Counsel for Bebars Baslan*