EXHIBIT A

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -------------------------------------x
     UNITED STATES OF AMERICA,
 3                                         13 CR 220(RJD)
             versus
 4                                         U.S. Courthouse
     BEBARS BASLAN,                        225 Cadman Plaza East
 5                                         Brooklyn, NY 11201
                       Defendant.
 6   -------------------------------------x

 7        TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING HEARING

 8          BEFORE THE HONORABLE RAYMOND J. DEARIE

 9             UNITED STATES DISTRICT JUDGE

10                       APPEARANCES

11   For the Government:    LORETTA LYNCH
                            UNITED STATES ATTORNEY
12                          EASTERN DISTRICT OF NEW YORK
                            271 Cadman Plaza East
13                          Brooklyn, New York 11201
                            BY: TYLER SMITH, ESQ.
14                          Assistant United States Attorney

15


16   For the Defendant:     EPHRAIM SAVITT, ESQ.
                            260 Madison Avenue
17                          22nd Floor
                            New York, New York 10016
18


19   Also present:          Leslie Lockwood, USPO

20


21   Court Reporter:        LISA SCHMID, CCR, RMR
                            Official Court Reporter
22                          225 Cadman Plaza East
                            Brooklyn, New York 11201
23                          Phone:  718-613-2644
                            Fax:  718-613-2379
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

```
 1              THE CLERK:  We're on this afternoon for a sentence.
 2   This is USA versus Bebars Baslan, Docket Number 13 Crim 220.
 3   Mr. Baslan is defendant number one.
 4              Can I ask the attorneys please to note their
 5   appearances, beginning with counsel for the government?
 6              MR. SMITH:  Tyler Smith for the United States, and
 7   with me at counsel table is Special Agent Aaron Spivack.  Good
 8   afternoon, Your Honor.
 9              MR. SAVITT:  Good afternoon, Your Honor.  Ephraim
10   Savitt for Mr. Baslan, who is standing right next to me, as
11   Your Honor sees.
12              THE DEFENDANT:  Good afternoon, Your Honor.
13              THE COURT:  You're ready to proceed, Mr. Savitt?
14              MR. SAVITT:  I believe so, Your Honor.
15              THE DEFENDANT:  (To Mr. Savitt) I need to talk to
16   you for a minute.
17              MR. SAVITT:  My client just asked if I could -- if
18   he could just have a minute to talk with me.
19              THE COURT:  One more accommodation to your client
20   wouldn't be out of the ordinary.  Go ahead.
21              MR. SAVITT:  Thank you, your Honor.  May we?  Oh,
22   I'm sorry.
23              THE COURT:  And don't waste your minute.
24              MR. SAVITT:  (Confers with the defendant.)
25              THE COURT:  Did Ms. Leslie -- did you have an
```

LISA SCHMID, CCR, RMR

```
 1    appearance -- do we have your appearance on the record?

 2              MS. LOCKWOOD:  No.

 3              THE COURT:  You're going to take care of that?

 4              MS. LOCKWOOD:  Leslie Lockwood from the Probation

 5    Department.

 6              (Pause in proceedings.)

 7              THE COURT:  Ready to proceed, Mr. Savitt?

 8              MR. SAVITT:  We are now, Your Honor.

 9              THE COURT:  All right.  Mister -- hold on just a

10    second.  You're going to say something about this?

11              MR. SMITH:  Yes, Your Honor.  In preparing for

12    today's proceeding, we noticed a mistake that we believe

13    exists in the transcript relating to a comment of the Court,

14    actually, during the testimony of the witness, Courtney, which

15    occurs on the last page of what I've just handed up.

16              THE COURT:  I have no idea what it was in reference

17    to, but I know I didn't say it.

18              MR. SAVITT:  The buzz thing, yeah.

19              MR. SMITH:  Right.  As it reads, it says, "I don't

20    know if she's getting her buzz on or hurting herself."  I

21    believe that what the Court actually said was, "I don't know

22    if she's helping herself or hurting herself."

23              MR. SAVITT:  That would sound a lot like more like

24    you, Your Honor, than the former.

25              THE COURT:  I appreciate that.  So we'll note that
```

```
1    correction for the record, page 444 of the trial record, at

2    the conclusion, I would say of the direct testimony of the

3    witness, Courtney.

4            Okay.  Thank you for pointing that out.  I would

5    have had a heart attack if I had came across it myself.

6            Mr. Baslan, before we go any further, let me just

7    remind you that with respect to your conviction, the jury has

8    found you guilty with respect to four of the five counts.  You

9    have an absolute right to appeal your conviction to a higher

10   court.  Assuming your continuing eligibility, if you are

11   interested in that regard, I believe counsel fees will be paid

12   by the court under the authority of the Criminal Justice Act.

13   Do you understand that, sir?

14           THE DEFENDANT:  Yes, sir.

15           THE COURT:  This is what -- it would be my

16   impression that you intend to file a notice on your client's

17   behalf?

18           MR. SAVITT:  I will file a notice on my client's

19   behalf, and we've discussed representation before the

20   appellate court.  I know that he wants another counsel.  So I

21   will make a motion to the Second Circuit with his consent to

22   that end.

23           THE COURT:  I leave that up to you and your

24   colleagues in the Second Circuit.

25           MR. SAVITT:  Yes, sir.
```

LISA SCHMID, CCR, RMR

```
 1              THE COURT:  All right.  Technically, we begin, of

 2    course, with the report itself.  Before we get to the

 3    Guidelines calculation, there are a couple of issues that the

 4    defense took exception to, which the government acknowledged

 5    it may be meaning the reference to marriage fraud in paragraph

 6    58, which will come out.  And there is also a reference to the

 7    allegation in paragraph 64 that he stole $18,000 from Albina

 8    W. Duvis?

 9              MR. SAVITT:  Duvis.

10              THE COURT:  The government has no objection to

11    removing paragraph 64.

12              So as far as the Guidelines calculation, I don't

13    know how compelling the analysis is for purposes of today, but

14    we are instructed to begin there, so we'll begin there.

15              There have been a couple of exceptions voiced by

16    Mr. Savitt to the calculation.  I think Probation got it

17    right, and absent the need to have any extended discussion

18    about it, I'll leave it at that and we can move on.

19              Mr. Savitt?

20              MR. SAVITT:  Yes, Your Honor.  This subject -- this

21    case has been the subject of a lot of sentencing-related

22    submissions on both sides.  I know that Your Honor has been

23    inundated with various submissions.

24              THE COURT:  As recently as this morning.

25              MR. SAVITT:  Yes, Your Honor.  And I concede that
```

1    this submission was made by me twice, actually -- once this

2    morning, once this early afternoon.

3            And the one thing that I wanted to make sure is that

4    the record contains not only the submissions by the attorneys

5    in this case, but also Mr. Baslan's pro se submissions in

6    their entirety. Now, I believe that Your Honor has seen all of

7    them at this point.  I just want to make sure that they're

8    filed.

9            THE COURT:  The only one that I'll take

10   responsibility of filing is the rather thick one I received

11   earlier this week, his pro se filing.

12           MR. SAVITT:  Yes, Your Honor.

13           THE COURT:  I'll see to it that that's docketed with

14   the Clerk of the Court.

15           MR. SAVITT:  Well, my client has not changed any of

16   the substantive aspect of that submission, but in his efforts

17   to be as careful as possible, he noticed that there were a lot

18   of misspellings and he corrected the misspellings and he

19   wanted to make sure that the corrected version is filed.  I

20   know Your Honor has read the previous.

21           I took it upon myself not to file at the last moment

22   the corrected version, because I know that Your Honor is on

23   trial and I know that there are no substantive differences and

24   I didn't want to confuse the situation.

25           THE COURT:  If his concern is about filing a cleaner

LISA SCHMID, CCR, RMR

```
 1    copy of the same submission --

 2              MR. SAVITT:  Yes, Your Honor.

 3              THE COURT:  -- I have no quarrel with that, provided

 4    I have his assurance that it is just that, a version from

 5    which misspellings or typos have been removed, with no

 6    additional substantive additions.

 7              THE DEFENDANT:  Yes, Your Honor.  Just a couple of

 8    embarrassing misspellings, where instead of "makeshift," it's

 9    something else that sounds the same, but a couple of things

10    like that.

11              THE COURT:  Where is that document?

12              THE DEFENDANT:  I put everything together here.

13              THE COURT:  Ellie, would you be good enough?

14              THE CLERK:  Certainly.  (Complies.)

15              THE DEFENDANT:  This overrides --

16              THE COURT:  I don't need that now.

17              THE CLERK:  Okay.

18              THE COURT:  I've got copies of it here.

19              MR. SAVITT:  It also includes the sentencing letter

20    that I filed with my cover letter to the Court by Mr. Baslan.

21              THE COURT:  I have that, too.

22              MR. SAVITT:  Yes.  And I believe it's the same, but

23    in the interest of just caution, we have submitted another

24    copy, Your Honor --

25              THE COURT:  Well --
```

```
1              MR. SAVITT:  -- along with the memorandum.

2              THE COURT:  -- fair enough.  Well, obviously, we

3    find ourselves in very difficult circumstance here, but with

4    preliminary matters aside, I will turn it over to you,

5    Mr. Savitt.

6              MR. SAVITT:  Yes, Your Honor.  Your Honor, I

7    apologize.  My client has another submission that Your Honor

8    has not read, and that does not impact on the sentencing

9    proceeding whatsoever.

10             He wants to preserve an argument regarding

11   ineffective assistance of counsel, and I'm hard-pressed, not

12   having read it or since I'm the subject of that particular

13   submission, to take any position that would necessarily agree

14   with one or the other.  What he asked me to do is ask the

15   Court's permission to file this ECF, so that it's part of the

16   record on appeal, as well.

17             THE COURT:  I find it --

18             MR. SAVITT:  I haven't read it, Your Honor.

19             THE COURT:  -- curious.  It's generally something

20   that's handled collaterally --

21             MR. SAVITT:  Yes, a 2255.

22             THE COURT:  -- sometimes with new counsel, they

23   appear.  Their understandable desire is to have a full record.

24   So whether he files before me or doesn't file before me isn't

25   going to affect anything.  But he's at liberty to tender
```

1  whatever he wants to here in the district court.  Once I've

2  signed the judgment, the case is beyond -- past me.  So I'll

3  leave it at that.

4  　　　　　THE DEFENDANT:  Would it be filed now or before the

5  judgment?

6  　　　　　THE COURT:  (To Mr. Savitt) It's only -- we knew,

7  you know, let's be honest.  Sooner or later, you were going to

8  be the target and indeed you are for the time being, as we

9  went through the history of this case from time to time.

10  　　　　　MR. SAVITT:  Yes, Your Honor.

11  　　　　　THE COURT:  You would be targeted.

12  　　　　　MR. SAVITT:  Yes, Your Honor.

13  　　　　　THE COURT:  The decision to aim at you and then not

14  aim at you and so forth, we have been through that.  There's

15  no reason to repeat it.  It's inevitable you'll be the target

16  again, as will a whole bunch of us.  That's fine.

17  　　　　　MR. SAVITT:  Right, Your Honor.  Well, the

18  transcript of these proceedings are certainly going to be part

19  of the appellate record, and Mr. Baslan has in his hands a

20  document with a number of exhibits that perhaps if -- I know

21  that he wants to have it filed now.

22  　　　　　I would caution that perhaps he should discuss that

23  with appellate counsel at some future point and see whether or

24  not it might make more sense for him to file it at that point.

25  To the extent that he's concerned about waiving any arguments,

LISA SCHMID, CCR, RMR

```
 1   I don't believe he's waiving any arguments.  He's already made
 2   certain submissions and statements on the record where, as
 3   Your Honor put it, I was the target.  And I understand his
 4   position.  I don't necessarily agree with it, obviously, but I
 5   do understand.
 6           THE COURT:  What does he want to do?  He wants to
 7   file it here?
 8           MR. SAVITT:  Yes, Your Honor.
 9           THE COURT:  Ellie?
10           THE CLERK:  Yes, sir?
11           THE COURT:  Take the document.
12           THE CLERK:  (Complies.)
13           THE COURT:  I think your suggestion is the better
14   one.  He would be well-advised to confer with appellate
15   counsel before he does anything to further any claim he may
16   press either on appeal or on collateral attacks, but that's
17   his decision to make and it will be shown that he's willing
18   and anxious to make his own decisions.
19           Okay.  Let's get down to the heart of the matter,
20   which is a more difficult question.  We're dealing with an
21   ominous thirty-year mandatory minimum sentence.  I'm going to
22   cut through it all.  The question really is, given what's
23   before me, given this trial record, given the proof that was
24   adduced, what if anything do I do beyond that?
25           The government has pressed for a substantial
```

1   sentence in accordance with the recommendation of Probation

2   beyond the thirty-year limit.  So the question is where within

3   that range of 30 to 45 years or for that matter, life

4   imprisonment this Court should find as a judgment.

5           And with that, I'll turn it over to you.

6           MR. SAVITT:  Well, Mr. Baslan will certainly have an

7   opportunity, I want to assure him, to address the Court.

8           THE COURT:  Of course.

9           MR. SAVITT:  I've made Mr. Baslan's position as well

10  as my own.  They're the same, as far as this question is

11  concerned, Your Honor.

12          Now that our post-trial motions have been denied by

13  the Court that we've argued against an imposition of a

14  thirty-year sentence based on Eighth Amendment grounds, and

15  all that's preserved for the record.

16          So now we're at a position whether or not it should

17  be 30 years or more, and our position, quite obviously, would

18  be that 30 years is more than enough in this case, given the

19  fact that Mr. Baslan has literally no prior history of any

20  criminality -- and putting the Buffalo allegations aside just

21  for a moment --

22          THE COURT:  The what allegations?

23          MR. SAVITT:  The Buffalo, New York --

24          THE COURT:  Oh, that's preserved.

25          MR. SAVITT:  -- those women.

LISA SCHMID, CCR, RMR

```
 1                THE COURT:  I don't know why there is such a focus

 2   of such attention in that regard in the sentencing.  I can

 3   tell you right off the bat, they've got nothing to do with my

 4   judgment here.

 5                MR. SAVITT:  Excellent.

 6                THE COURT:  It's ancient history.  I heard the

 7   testimony of the woman who testified here.  She addressed a

 8   very minor point in the presentation of the defense, this

 9   so-called "journalism defense."  As far as I'm concerned, it's

10   got nothing to do with today's proceeding.

11                MR. SAVITT:  Thank you, Your Honor.  In that case,

12   Your Honor -- Your Honor is certainly as familiar with the

13   proof in this case as the rest of us are.

14                And what happened in this case, of course, is not

15   something that I could argue should lead to any mitigation.

16   But by the same token, it's not just the question that nothing

17   happened.  I understand, having been before this Court and

18   many other courts that an attempt is equal in certain cases

19   such as this one to a completed act.

20                But if we look at his background, he's never done

21   anything like this before.  The U. S. Attorney and the FBI,

22   I'm sure, conducted -- I have no question about it, knowing

23   the caliber of the people involved in this case -- conducted a

24   very exhaustive and extensive examination of Mr. Baslan's

25   past, and there were certain things that were included in the
```

1    pre-sentence report, some of which, with the government's

2    consent, were just stricken by Your Honor.  And there were

3    these Buffalo allegations, which Your Honor is not

4    considering.

5              So given the record in this case, to sentence

6    Mr. Baslan to more than 30 years really is an extremely

7    disproportionate punishment for the offender and frankly, for

8    the offense itself, which is a horrible offense.  Your Honor,

9    I can understand that.  But by the same token, 30 years is a

10   massive sentence.  Forty-five years is twice the mandatory

11   minimum murder sentence in New York state.

12             In another case -- and I can compare the two cases,

13   where another client of mine was sentenced by Your Honor.  He

14   also faced life in jail.  He shot a woman who was pregnant and

15   I believe he did so accidentally, but it was felony murder and

16   the statute permitted a number of years to be imposed as

17   opposed to life, and he certainly didn't get anything close to

18   45 years -- and he killed somebody and he kept on robbing

19   people and, you know, I felt for him.  But those are terrible

20   crimes.

21             Mr. Baslan's crime, although unforgivable in a real

22   sense, nevertheless was a crime that occurred without any

23   precedent in his past.  And frankly, we're not all together

24   clear whether or not if, indeed, this were not a sting

25   operation, exactly what would have transpired or what the

future would have held.  I'm not sure about that.

       But certainly, the past is clearly something that

speaks in Mr. Baslan's favor here, and I am reliant upon the

Government's investigation where they came up with nothing, in

fact, that was even remotely similar to the conduct --

the offense conduct in this case.  I'm sure they would have if

it existed.  But -- because I know their investigation was

thorough.  I mean, they went all the way up to Buffalo and all

around.  This was a multi-year investigation, and I credit

them with conducting a very good investigation.

       So given all these factors, Your Honor, 30 years is

more than enough in this case, and I beseech Your Honor not to

impose a sentence that is in excess of the mandatory minimum

as required by the Travel Act Statute.

       THE COURT:  Sir?

       MR. SMITH:  Your Honor, since the moment that

Mr. Baslan was arrested, he has attempted to evade

responsibility for his actions.  On the night of his arrest,

he offered to go to Russia if they would just let him go.

After that, he offered to find child pornographers for the

Government if we would make some deal with him.

       Almost immediately after arrest, he began engaging

in a widespread attempt to obstruct justice that involved not

just himself, but other people, a willingness to commit a

fraud on the Court, and then he testified falsely at trial,

1    and he's continued making false representations to the Court

2    until literally today, when he submitted the last submission

3    in connection with sentencing.

4          Some of these are obvious clear lies, like his

5    continuing indication that he never viewed the child

6    pornography he watched with the government's informant until

7    the day that he viewed it, despite various statements that

8    made clear that was false.

9          And I just want to respond briefly to his latest

10   submission because the government hasn't had any opportunity

11   to put in a submission in writing to that.  The defendant

12   makes much of whether or not he's a pedophile, but ultimately,

13   that's not an issue in the case.

14         What matters here is his conduct, and the evidence

15   in the case is that on March 18th, in a recording March 18th

16   before his arrest, he indicated that wanted to commit the

17   offense because it was taboo and that's the reason that it

18   would be interesting.

19         It's clear that he amassed one of the largest

20   collections of child pornography that the New York Field

21   Division of the FBI has seen.  It's clear that he intended to

22   create his own child pornography and that he certainly had the

23   technical skills to distribute child pornography, if that was

24   something he was going to do in the future.  It's simply

25   immaterial whether or not he meets the definition of

1  pedophile.  What's at issue is his conduct, the conduct of

2  trying to sexually abuse children and the fact that he lied

3  and lied and lied and lied afterwards, to avoid

4  responsibility.

5          I want to note that the defendant indicates that the

6  Government has fully decrypted the computers that he had.

7  That's not correct.  We have not fully decrypted his

8  computers.  As he indicated in tape recordings made by the

9  government's CI in prison, he identified that there were

10  things on the computers that wouldn't even appear to be

11  encrypted to the government.  We've also identified locked

12  containers that have never been decrypted.

13          And I think it's notable that throughout his own

14  submission, in his own statements, the one thing he doesn't

15  mention are the hours and hours of recordings that were made

16  of him talking about sexually abusing children.  The Court is

17  certainly aware of them.  We played them here at length.  They

18  were discussed at length.

19          And on all of those recordings, what's heard is

20  Baslan, not the government's CI, directing the scheme to abuse

21  children, Baslan talking at length about how to molest

22  children, how to do it both physically, what sexual acts you

23  can commit on a child, how to do it emotionally, how you would

24  encourage a child to be willing to engage in sexual acts with

25  an adult.

1          And his latest submission continues his lies.  He

2    again indicates that this was a plan to entrap the

3    government's CI, who he describes as a monster who was

4    molesting children.  He would have had the jury believe and

5    the Court believe that he was merely playing along with what

6    the government CI was trying to do.

7          And during this, part of that playing along was the

8    defendant telling the CI how to molest his own daughter,

9    providing the CI with Benadryl and instructions on how to

10   incapacitate a seven-year-old, who in the defendant's latest

11   submission, the defendant claims the CI to have been

12   interested in sexually abusing.  These claims should hold no

13   more -- and they were rightly rejected by the jury because

14   they continued to be ridiculous.  They continued to be a

15   scheme, both to attempt to pervert justice and to accept no

16   responsibility for his actions.

17         And ultimately, the mandatory minimum sentence for

18   the act of traveling across state lines to abuse a child under

19   12 is 30 years.  The defendant is not similarly situated to

20   someone who's committed only that crime and then accepted

21   responsibility, someone who's committed that crime and

22   admitted that they have a problem, who has accepted that they

23   need help.

24         The defendant should be punished more severely

25   because he had no qualms about lying after he committed that

```
 1   crime.  He had no qualms about engaging other people to help
 2   him lie, about falsely accusing the government of destroying
 3   his culpatory evidence, about submitting false statements to
 4   the Court, about testifying falsely, and even beyond the
 5   things that were at issue at trial, his conduct in this case,
 6   which is heinous, the things that he described in detail about
 7   molesting children.
 8            The Government believes that the Court should send a
 9   message to other defendants and to this defendant, that this
10   conduct of attempting to obstruct justice will not stand, and
11   that he should be punished more severely not just as to an
12   indication that his underlying crimes are heinous, but also
13   because since then, he's done nothing but attempt to
14   manipulate and lie.
15            And it's for that reason that the Government
16   believes that Probation was correct to recommend a sentence of
17   45 years, which is still less than the Guidelines range of
18   life, which applies in this case.  And the Government asks
19   that that sentence be imposed and be imposed in the manner
20   that the Government requested in its sentencing memorandum.
21   Thank you, Your Honor.
22            THE COURT:  Mr. Smith, thank you.
23            Mr. Baslan?
24            THE DEFENDANT:  If I may, Your Honor, I would just
25   want to correct a few things.  I'm not doing it out of luck,
```

 1   remorse or anything.  I just want an abstract conversation or

 2   discussion about what I just heard.

 3            Obviously, this came in last minute and I didn't

 4   have a chance to hear the government's response or respond

 5   back to it.

 6            THE COURT:  You are the last person in the world who

 7   should be worried about complaining about last minute

 8   submissions, but go ahead.

 9            THE DEFENDANT:  Your Honor, I would have loved to

10   even do them beforehand.  I wrote a letter to Mr. Savitt

11   today, telling him that in MDC since post-trial, we get one

12   hour a week to go to law library, maybe one-and-a-half hours.

13   Then within that time, we have to make photocopies and

14   everything else.

15            When we come to the unit, we're allowed to log in on

16   the computer for one hour to write and one hour to log off.

17   That's not including countdowns and so on.  So -- and I even

18   brought to the Court a list of all my login minutes for the

19   past couple of months to show him that I've used every single

20   hour of the day possible.  It's not about slacking.

21            I mean, I wish I had help doing the submission, but

22   I didn't.  We had not spoken since -- well, actually we did

23   not meet, minus the 15 minute meeting and a 30 minute meeting

24   before the sentencing with Mr. Savitt since my trial had taken

25   place.  I'm not making blame.  It's just the fact of what had

1    happened.

2              THE COURT:  I beg your pardon?  Say that again?

3              THE DEFENDANT:  I have not seen Mr. Savitt for more

4    than one 15 minute and a 30 or 40 minute meeting since trial.

5    That's a fact.  It's not a blame.  I'm not saying anything.

6    I'm -- just it happened that way.

7              And the reason why I decided to continue -- and I

8    submitted some emails to Your Honor -- that I got a promise

9    from Mr. Savitt that we will, you know, work together on

10   issues.  The issues for me -- I don't even know if what I did

11   was good for me or not good for me.

12             I felt -- again, not a blame -- Mr. Savitt had much

13   health issues that I'm not, you know, saying that's in his

14   control.  I did feel abandoned, as far as I have a lot of

15   issues and points that I wanted him to sit down with me and

16   discuss them, which did not happen.  Even the submissions,

17   I've not seen or reviewed any of the submissions minus the

18   first one, but not with Mr. Savitt.

19             And from what I heard right now with Mister -- from

20   AUSA Smith, he brings out a lot of points which avoid any of

21   the points that are brought up in my submission.  I tried in

22   my submissions to be factual, to present evidence to

23   everything I said.  I tried to be respectful.  I did not at

24   all assert remorse or no remorse or defense or no defense.

25   I'm trying to turn a new leaf, and I was very sincere about my

1    submission.

2           That's it.  I mean, I guess, you know, I'm not

3    qualified to be able to argue with a formidable person like

4    Mr. Smith.  So I just put myself on the mercy of this Court

5    and I, again, I feel very bad and I sincerely tried.

6           I've been pushing Mr. Savitt and Ms. Stafford to try

7    to make a deal to waive appeal rights if that would benefit

8    Kristen, and that was a very sincere offer and sincere effort,

9    and my message -- the two letters that I wrote to Your Honor

10   do, in all honesty, reflect how I feel, the conclusion nine

11   and the sentencing letter submitted today.

12          THE COURT:  Well, I don't know where to start.  I'll

13   keep it simple.

14          I hope that those responsible parties who in the

15   future will -- I'm confident that will review the trial

16   record.  In all these submissions that I've read and now

17   having read and reread, it's almost as if we didn't have a

18   trial.  It's almost as if we had no testimony.  It's almost as

19   if there were no tapes.  There were no discussions.  That's

20   where my focus is today.

21          I'm not concerned about Buffalo.  I'm not even

22   concerned about Jack, who was essentially destroyed without

23   making an appearance.  But there's one thing we can say about

24   Jack.  But for Jack, we wouldn't be here today.  You'd be out

25   free, doing God knows what.  So say what you want about Jack.

LISA SCHMID, CCR, RMR

1    This isn't about Jack.  It's about the trial record.  It's

2    about those tape recordings.  It's about the demonstrated lies

3    that you can derive from those recordings, and this absurd

4    defense that you presented that the jury readily rejected.

5    And you're going to continue to point fingers at MDC and the

6    U. S. Attorney and no doubt, Mr. Savitt, Courtney, Jack and

7    everybody else.

8            I'm not concerned about it.  I'm not here to decide

9    if you're a pedophile or an archangel.  I sentence you on the

10   basis of your conduct, very straight forward.  I don't have

11   the authority, the power -- nor should I -- to judge you as a

12   man.  I judge you based upon what you have done and by what

13   you attempted to do.  Period.  End of discussion.

14           And the evidence on that score is compelling.

15   Frankly, revolting.  You know, I take no great pleasure in

16   sentencing anybody.  I particularly take very little pleasure

17   in imposing lengthy sentences, be they mandatorily-imposed or

18   not.  Too many of them, I take home with me and I can't get

19   rid of them.  But not this one.  Not this one.

20           Say what you like.  Out of all these other enemies

21   that you've defined, I am concerned about your conduct,

22   reprehensible conduct -- conduct that keeps punishing these

23   victims every day.  The murder victim rests in peace.  These

24   victims never have that opportunity.  You've got to stop and

25   think about that.  So it's not your charm.  It's not your

1    sense of being a victim.  It's just about the evidence.

2            No matter what I do, frankly, no matter how

3    aggressive the Government or the FBI is, right?  We can't do

4    anything about the impact of this type of criminal activity on

5    the victims.  We just can't.  We're powerless.  We can try to

6    deter it, as they do appropriately.

7            So it's very unsatisfying.  But you're one of the

8    few folks that I've come cross, with due respect,

9    Mr. Baslan -- and I hope it changes -- that has to be put

10   away.  And in my way of thinking, there are not that many who

11   do, certainly not for this length of time.  But we have to

12   protect others from folks like you.  Those are harsh words.

13   The evidence in this case leaves me no other way to

14   characterize it.  There's very little to say.

15           I'm going to impose sentence as follows:  On your

16   plea of guilty to Count 5, I'll impose a sentence of 20 years

17   imprisonment.  Special assessment on all counts, totaling

18   $500, lifetime supervised release.

19           On your -- the jury having found you guilty on

20   Counts 1, 2, 3 and 4, I sentence you as follows:  On Count 1,

21   36 years imprisonment; on Count 2, 30 years imprisonment; on

22   Count 3, 30 years imprisonment; on Count 4, 30 years

23   imprisonment, those sentences to run concurrently.  There will

24   be no fine.

25           With respect to the issue of restitution, I'll enter

1  an extended order.  I find restitution to Jenny in the amount

2  of $25,000; restitution to Angela in the amount of $16,000.

3  As I said, the subsequent order will issue with respect to my

4  specific findings relative to the submissions made on their

5  behalf.

6         Special assessments, I have already announced.  Is

7  there anything else?

8         MR. SAVITT:  Just for my clarity, perhaps the --

9  Your Honor, the Count 5, the 20 years is imposed concurrently

10 to --

11        THE COURT:  All sentences concurrent.

12        MR. SAVITT:  All sentences concurrent?

13        THE COURT:  Right.

14        Now, special conditions of your supervised release:

15 You'll participate in mental health treatment, which may

16 involve the treatment for sexual disorders.  In terms of what

17 you do in prison, as I understand it, Mr. Baslan, that's up to

18 you.  That will tell us something.

19        Did I not say Angela?  Did I not name Angela?

20        MR. SMITH:  I believe you said $16,000 for Angela.

21        THE COURT:  Jenny and Angela.  The first one -- the

22 higher amount for Jenny and the second amount for Angela.

23        MR. SAVITT:  (Nods head affirmatively.)

24        THE COURT:  Mental health treatment.

25        I don't want any contact whatsoever with, obviously,

```
 1    any of the victims.  That goes without saying -- anyone under
 2    the age of 18, unless a responsible adult is present.  If you
 3    cohabit with anyone who has minor children, you're to give
 4    full notice to that person about your criminal history.
 5              You'll submit your property, your residence, papers,
 6    vehicles, computers to search and will notify anybody with
 7    whom you live of that condition.
 8              These specific conditions are, as you know,
 9    specifically delineated in the Probation Department's
10    recommended sentence:  Not to use a computer to access
11    pornography of any kind and you'll submit your computer for
12    forensic search and monitoring as directed by the Court.
13              Is there anything else?
14              MR. SMITH:  Did Your Honor -- I don't know that you
15    have indicated sex offender registration, which would be
16    mandatory.  It's in the Probation report.
17              THE COURT:  As required by law, I'll make it a
18    condition of supervised release.  It's required independently
19    by law, sex offender registration in any jurisdiction wherein
20    you reside.
21              MR. SAVITT:  Would Your Honor consider recommending
22    designation to the Otisville facility, where I understand
23    there is a --
24              THE DEFENDANT:  Sex offender.
25              MR. SAVITT:  A sex offender treatment.  There may be
```

LISA SCHMID, CCR, RMR

```
 1   --
 2              MS. LOCKWOOD:  No, I don't think.
 3              THE COURT:  Not to my knowledge.
 4              MS. LOCKWOOD:  There may be a group.  Devens is a
 5   more comprehensive program, and he will be considered for such
 6   a program probably as it gets closer to his release.  But
 7   anywhere he's designated, they should have at the very least a
 8   group or some type of treatment he can attend.
 9              THE COURT:  I'm going to leave that matter to the
10   officials --
11              MS. LOCKWOOD:  Yes, please.
12              THE COURT:  -- of the Bureau of Prisons in
13   consultation with the Court and the Department of Probation.
14              Anything else?
15              MR. SAVITT:  Yes, Your Honor.  May we have a copy
16   pursuant to CJA of these proceedings?  And I'll forward them
17   to Mr. Baslan together with the Notice of Appeal that I will
18   file for him.
19              THE COURT:  Of course.
20              Mr. Smith, anything else?
21              MR. SMITH:  One second, Your Honor. (Consults with
22   Ms. Lockwood.)
23              Your Honor, the Court has obviously imposed its
24   sentence, but the Government would ask that you impose 36
25   years instead of 30 on Count 4, running concurrently to the
```

```
 1    other counts.

 2              THE COURT:  What did I do?  Did I misspeak?

 3              MR. SMITH:  You imposed 30, Your Honor.  You imposed

 4    36 years on Count 1.

 5              THE COURT:  Right.

 6              MR. SMITH:  And 30 on the remaining counts.  Count 4

 7    also carries a maximum sentence of life.  The Government would

 8    ask that you impose 36 years on that count.

 9              THE COURT:  I did misspeak.  Let's review it.  Count

10    1, 36 years; Count 2, 30 years; Count 3, 30 years; Count 4, 36

11    years; Count 5, 20 years.

12              Thanks for bringing that to my attention.

13              MR. SMITH:  All to be run concurrently?

14              THE COURT:  All to run concurrently.

15              Anything else?

16              MR. SMITH:  Nothing from the government.

17              MR. SAVITT:  I don't believe.  Nothing from the

18    defense.  Thank you, Your Honor.

19              THE COURT:  Good day.

20              (Proceedings concluded.)

21

22

23

24

25
```

LISA SCHMID, CCR, RMR

EXHIBIT B

⌈Redacted⌉

EXHIBIT C

AO 245B    (Rev. 10/2011 EDNY) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

### Eastern District of New York

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| BEBARS BASLAN | ) | Case Number:  CR 13-220-01 (RJD) |
| | ) | USM Number: 80637-053 |
| | ) | EPHRAIM SAVITT, ESQ. |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)     five(5).

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)    one(1), two(2), three(3) and four(4).
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 2241(c) | Travel with Intent to Commit Aggravated Sexual Abuse of a Minor less that 12 years of age. | 3/19/2013 | 1 |

The defendant is sentenced as provided in pages 2 through     8     of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____    ☐ is    ☐ are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

2/27/2015
Date of Imposition of Judgment

/s/ Judge Raymond J. Dearie

Signature of Judge

RAYMOND J. DEARIE                      U.S.D.J.
Name of Judge                             Title of Judge

3/10/2015
Date

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
           Sheet 1A

DEFENDANT:  BEBARS BASLAN
CASE NUMBER:  CR 13-220-01 (RJD)

Judgment—Page  __2__  of  __8__

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 2251(e) | Conspiracy to Sexually Exploit a Child. | 3/19/2013 | 2 |
| 18 U.S.C. 2251(a), 18 U.S.C. 2251(e) | Attempted Sexual Exploitation of a Child. | 3/19/2013 | 3 |
| 18 U.S.C. 2422(b) | Attempted Coercion and Enticement of a Minor to Engage in Illegal Sexual Activity. | 3/19/2013 | 4 |
| 18 U.S.C. 2252(a)(4)(B) and (b)(2) | Possession of Child Pornography. | 3/19/2013 | 5 |

| | Judgment — Page | 3 | of | 8 |
|---|---|---|---|---|

DEFENDANT:  BEBARS BASLAN
CASE NUMBER:  CR 13-220-01 (RJD)

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

THIRTY-SIX(36) YEARS.    (SEE PAGE 4)

☐ The court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m.   on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
           Sheet 2A — Imprisonment

DEFENDANT: BEBARS BASLAN
CASE NUMBER: CR 13-220-01 (RJD)

Judgment—Page __4__ of __8__

## ADDITIONAL IMPRISONMENT TERMS

DEFENDANT IS HEREBY COMMITTED TO THE CUSTODY OF THE UNITED STATES BUREAU OF PRISONS TO BE IMPRISONED FOR A TOTAL TERM OF THIRTY-SIX(36) YEARS AS FOLLOWS:

COUNT 1:    THIRTY-SIX(36) YEARS;

COUNT 2:    THIRTY(30) YEARS;

COUNT 3:    THIRTY(30) YEARS;

COUNT 4:    THIRTY-SIX(36) YEARS;

COUNT 5:    TWENTY(20) YEARS,

SENTENCES IMPOSED TO RUN CONCURRENTLY WITH EACH OTHER.

DEFENDANT: BEBARS BASLAN

CASE NUMBER: CR 13-220-01 (RJD)

Judgment—Page __5__ of __8__

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

LIFE.    (SEE PAGE 6)

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

☑ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. *(Check, if applicable.)*

☐ The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

☐ The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*

☐ The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

   or if such prior notification is not possible, then within forty eight hours after such change;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
            Sheet 3C — Supervised Release

Judgment—Page __6__ of __8__

DEFENDANT: BEBARS BASLAN
CASE NUMBER: CR 13-220-01 (RJD)

## SPECIAL CONDITIONS OF SUPERVISION

1) The defendant shall participate in a mental health treatment program, which may include participation in a treatment program for sexual disorders, as approved by the Probation Department. The defendant shall contribute to the cost of such services rendered and/or any psychotropic medications prescribed to the degree he is reasonably able, and shall cooperate in securing any applicable third-party payment. The defendant shall disclose all financial information and documents to the Probation Department to assess his ability to pay. As part of the treatment for sexual disorders, the defendant shall participate in a polygraph examination(s) to obtain information necessary for risk management and correctional treatment;

2) The defendant shall not have contact with any of the intended victims; this means that he shall not attempt to meet in person, communicate by letter, telephone, email, the Internet, or through a third party, without the knowledge and permission of the Probation Department;

3) The defendant will not associate with any child(ren) under the age of 18, unless a responsible adult is present and he has prior approval from the Probation Department;

4) If defendant cohabitates with an individual who has minor children, the defendant will inform that other party of his prior criminal history concerning his sex offense. Moreover, he will notify the party of his prohibition of associating with any child(ren) under the age of 18, unless a responsible adult is present;

5) The defendant shall submit his person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner;

6) The defendant shall comply with the sex offender registration requirements mandated by law;

7) The defendant is not to use a computer, Internet capable device, or similar electronic device to access pornography of any kind. The term "pornography" shall include images or videos of adults or minors engaged in "sexually explicit conduct" as that term is defined in 18 U.S.C. § 2256(2). The defendant shall also not use a computer, Internet capable device or similar electronic device to view images of naked children. The defendant shall not use his computer to view pornography or images of naked children stored on related computer media, such as CD's or DVD's and shall not communicate via his computer with any individual or group who promotes the sexual abuse of children;

8) The defendant shall also cooperate with the U.S. Probation Department's Computer and Internet Monitoring program. Cooperation shall include, but not be limited to, identifying computer systems, Internet capable devices, and/or similar electronic devices the defendant has assess to, and allowing the installation of monitoring software/hardware on said devices, at the defendant's expense. The defendant shall inform all parties that access a monitored computer, or similar electronic device, that the device is subject to search and monitoring. The defendant may be limited to possessing only one personal Internet capable device, to facilitate Probation Department's ability to effectively monitor his Internet related activities. The defendant shall also permit random examinations of said computer systems, Internet capable devices, similar electronic devices, and related computer media, such as CD's, under his control.

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
           Sheet 5 — Criminal Monetary Penalties

DEFENDANT:  BEBARS BASLAN                          Judgment — Page ___7___ of ___8___
CASE NUMBER:  CR 13-220-01 (RJD)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $ 500.00 | $ | $ 41,000.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| "Jenny" | $25,000.00 | $25,000.00 | |
| "Angela" | $16,000.00 | $16,000.00 | |
| **TOTALS** | $ 41,000.00 | $ 41,000.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
           Sheet 6 — Schedule of Payments

DEFENDANT:  BEBARS BASLAN
CASE NUMBER:  CR 13-220-01 (RJD)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑ Lump sum payment of $ ____500.00____ due immediately, balance due

     ☐ not later than _____ , or
     ☐ in accordance   ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

**B**  ☐ Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C**  ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**  ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

     Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

EXHIBIT D

BASLAN, Bebars
Register Number: 80637-053

This is in response to your Request to Staff wherein you request consideration for a Compassionate Release/Reduction in Sentence, based on Debilitated Medical Conditions, specifically; asthma, rheumatoid arthritis, hypertension, and vitamin D deficiency.

A review of your circumstance indicates you were sentenced to a 36-year sentence for Travel with Intent to Commit Aggravated Sexual Abuse of a Minor Less than 12 Years of Age. Conspiracy to Sexually Exploit a Child, Attempted Sexual Exploitation of a Child, and Attempted Coercion and Enticement of a Minor to Engage in Sexual Activity. Your current projected release date is November 21, 2043, at which time you will begin a Life term of supervision. Additionally, you have an active detainer with Immigration and Customs Enforcement and are subject to Deportation.

In order to be considered for a Compassionate Release based on a Debilitated Medical Condition, you have to have an incurable, progressive illness and be completely disabled or capable of only limited self-care and confined to a bed or chair more than 50% of waking hours.

After a consultation with USP Tucson's medical department, they confirm your medical conditions are being appropriately managed and treated and you are not disabled or experience limited self-care.

Lastly, due to the nature and circumstances of your offense and considering your active detainer, as well as the impact your offense had on your victims, a release at this time would minimize the severity of your offense.

Based on the above, your request for Compassionate Release is denied. If you are dissatisfied with this response you may utilize the administrative remedy process.


D. Colbert, Warden                          2/26/2021
                                            Date

# Application for Compassionate Release

Bebars Baslan
#80637-053

I Grounds:

a. Medical issues:

Applicant currently struggles with;

Asthma and difficantly breathing.
Prescribed medications:
- Albuteral sulfate Inhaler. (90 mcg)
- Atrovent Inhaler. (17 mcg)
  Mometasone furoate Inhaler.
- Montelukast Sodium pills. (10 mg)
- Fluticasone propionate. (50 mcg)

Rehumatiod Arthiritis. Medication:
Hydroxychloroquine. No longer working and to be
replaced by amune suppresant. (200 mg)

Hypertension. Medication:
Linsinaprie (20 mG)

Vitamine D deficincy. Medication:
- Cholecaliferol (2000 unit)

Applicant struggles with sleeping issues and chronic back
pain issues. Struggles with progressive pain with hands and
fingers.

Additionally medical communicated that thy will be testing for gluten allergy.

Despite of applicants best efforts workout and meditation is becomming progressivly difficult.

6. Rehabilitation Efforts:

- Challeng program. Graduated, currently was selected as a mentor.
- Adjunct Sex offender treatment 4 courses.
- None residential Drug treatment.
- Threshold, graduated and was selected as a mentor.
- Voction Impact class.
- Succude Companion.
- Variouse education, Recreation, and wellness classes.

- Currently had a Minimum risk assessmnt per Pattern tool (first step act)
- Remains shot-free
- pm social attitude towards staff and inmates.
- Continued employment.

## II  Release Plan:

Applicant will be deported to home country upon realease.

Applicant's parents commit to provide permanent residence (owned appartment), plus minum 1 year living expenses.

Applicant has an extensive background in computer programing (skill still current), plus exprience in graphic design. Additionally during incarsiration applicant learned oil paint, with skill level profient for employment (canvas projects and large scale murals)

Applicant has a strong support network on the outside.

Please Consider
my Application
Thank you.

Bebars Baslan
# 80637-053
feb-22nd-2021

# EXHIBIT E

⌈Redacted⌉

# EXHIBIT F

Honorable Judge Dearie,

The only thing I rememer about my sentecing is that I was disconnected, belived that I was not heared. Trying to unhear what was being said, waiting to talk, feeling like it was not helping ... then being stone-faced during "36 Years" and the way you looked at me.

During my direct appeal I had to look over the sentencing transcript, but was very uncomfortable reading it, annoyed, angry I still put it out of my head soon after.

At some point I joind the Challenge program with some agendas: One, certificate will help me go home sooner; Two, I would have them certify that 'you' and 'everyone else' was wrong about me; Third, being me was becomming hard, I was tired of it, it was taking more effort to stuff everything down than living.

My intial approch to the program was to fake it, stay put together, show only what I wanted. That did not work. Within few month I was addressed about this, being manipulative and held accountable. I was not unique or special, they new my type.

"Faking it" in the program leads to isolation and lonliness. Even when I was able to maintain the appearance of doing well and keeping it together I would see the real me in others who were being held accountable.

Eevery week day the entire community and staff attend the morning meeting. One mic stand and rows of community members

sitting in front of it. One of the meeting segments is for accountability (we call it The Pullup Process), where one community member can openenly address the behavior of anither member. (anything from breaking small rules, being dishonest to drugs, violance, and inappropriate sexual misconduct including pictures, magazine, and acts).

Some, when being addressed take responsability. Others buck, argue the languge used in addressing them, deflecting to other's behaviours "look what everyone else is doing", take a victim stance "they are out to get me", and fixate on unimportant details in hopes of invalidating the process (and gloss over the behavior)

We typically hold few members accountable each day, and on avarage once a week we have a member refusing to take responsability which inevitably compounds their problem leading to further consequences.

One day a guy was pulled up for being manipulative : covering up his drug usage for months. He pulled up the whole gammet of excuses. That day, for the first time, instead shaking my head at "his stupidity" I saw myself, how I acted during the case I thought about everything you said to me at my sentencing. How it described a long pattern of behaviors I struggled with.

I taped two pages from the sentencing transcript on top of my bunk. Afterward, often durning morning meetings, I would remember how you looked at me then. I could imagine you saying "This is you". I do not know how to describe it other than tasting shame.

③

The hardest thing for a person like me was to see myself for who I really was. Without my layer of self deception there was nothing protecting me from the ugly truth. But that is what I needed to do to stop inflicting harm.

With new values I started to view the past with new context. Acts that brought pride in there time, now bring shame and remorse. Covering the full scope from criminal acts to how I treated "often used" others, to plain selfishness.

An example that relates to your boner is when the government played excepts of child abuse videos to the jury and you stopped it after couple of videos. I took the victim stance "if the judge couldn't handle it, how could the jury" as I claimed foul in my direct appeal.

I failed to consider that a decent person would have a hard time witnessing the abuse in those videos, yourself and jury, many who were parents. Instead I sought to turn it against you rather than having empathy with those who were further victimised by my actions.

My realizations and change came in steps. I started enjoying positive and healthy friendships. I started being more other centered. I noticed the value I put on openness and honesty and that it became hard for me to lie. The day I was chosen to be a mentor I was more proud than ever before. I wanted to write and thank you, I heard what you said, and for all it's worth I am working hard to show that your words were not wasted on me.

④

I do not know how to express how sorry I am. I can offer remorse by focusing on change; by working hard to help others, to do whatever I can to make up towards what I have done.

Thank you,

Bebars Baslan

EXHIBIT G

**SENSITIVE BUT UNCLASSIFIED**

# Bureau of Prisons
## Psychology Services
### Challenge -Treatment Summary

| | | | | | | |
|---|---|---|---|---|---|---|
| Inmate Name: | BASLAN, BEBARS | | | | Reg #: | 80637-053 |
| Date of Birth: | 05/22/1977 | Sex: | M | Facility: TCP | Unit Team: | UNIT D2 |
| Date: | 12/08/2017 12:23 | Provider: | Moraila, Amy CTS | | | |

## Diagnostic Impression

Mr. Baslan has a diagnosis of Adjustment Disorder noted in BEMR records, a history of polysubstance abuse, and a history of sex offense.

## Psychosocial History

Mr. Baslan is a 40-year-old white male currently serving a 36 year sentence due to the convictions of Travel with Intent to Commit Aggravated Sexual Abuse of a Minor Less Than 12 Years of Age, Conspiracy to Exploit a Child, Attempted Sexual Exploitation of a Child, and Attempted Coercion and Enticement of a Minor to Engage in Sexual Activity. Mr. Baslan is projected to release on July 29, 2044. He has served 3 years and 10 months of his sentence. This is Mr. Baslan's first prison term.

Mr. Baslan was born on May 22, 1977 in Tripoli, Libya. Mr. Baslan has one younger brother. Mr. Baslan's father was a pediatrician stationed in Libya at the time of his birth. Mr. Baslan reports that his father's occupation required the family to move often, but that his family was comfortable financially. He reports that all of his needs were met and denies any type of abuse during his childhood. He reports that both of his parents were appropriately affectionate, supportive, and nurturing. Mr. Baslan reports that he grew up in a generous household that, "valued kindness". Mr. Baslan explained that his parents valued helping others and tried to instill caring for others and helping those less fortunate in their children.

Mr. Baslan's parents are still living, retired, and reside in southern Russia. Mr. Baslan reports that his parents are very supportive and that his relationship with both of his parents has always been excellent. Mr. Baslan's brother is a dentist and resides with his parents. Mr. Baslan reports that he is very close to his brother as well, despite their significant age difference.

Mr. Baslan attended school in several countries, dependent on where his father was stationed. Mr. Baslan always received high grades and reports that he enjoyed learning. Mr. Baslan first entered the United States at the age of 18. He left to Syria and successfully earned his Bachelor's degree in psychology. He later earned a second Bachelor's degree in Russia in computer technology. After earning his Bachelor's degree, Mr. Baslan resided in New York and worked as a videographer and information technology consultant. During this time, he would travel back and forth throughout Europe and Russia for various job assignments. For the majority of his work history, Mr. Baslan was self-employed and he reported that his income would often fluctuate.

Mr. Baslan reports that his family's transient lifestyle assisted him in having a high level of cultural competence. He is able to speak several languages fluently, including English, Russian, Arabic, Hebrew, and Adyghian. Mr. Baslan reports that although he is not an American citizen, he feels, "pretty Americanized" and is very comfortable in American society.

Mr. Baslan has been married four times and divorced three times. He does not have any children. He reports that he is currently married and that he communicates with his wife regularly via mail. He believes his spouse to be a positive influence and reports that she is supportive.

Criminal history:
Mr. Baslan is currently serving a 36 year sentence due to the convictions of Travel with Intent to Commit Aggravated Sexual Abuse of a Minor Less Than 12 Years of Age, Conspiracy to Exploit a Child, Attempted Sexual Exploitation of a Child, and Attempted Coercion and Enticement of a Minor to Engage in Sexual Activity. Mr. Baslan does not have any other convictions on his criminal record or prior incarcerations.

Substance abuse:
Mr. Baslan reports that he has a history of alcohol, marijuana, cocaine, and ecstacy use. He reports that he first began to abuse these drugs in his early 30's. He identifies marijuana and cocaine to be his primary drugs and states that at the

| Inmate Name: | BASLAN, BEBARS | | | Reg #: | 80637-053 |
|---|---|---|---|---|---|
| Date of Birth: | 05/22/1977 | Sex: | M    Facility: TCP | Unit Team: | UNIT D2 |
| Date: | 12/08/2017 12:23 | Provider: | Moraila, Amy CTS | | |

time of his arrest for the instant offense, he was using the drugs daily. Mr. Baslan reports that he would use marijuana, "so that it would help me sleep" and cocaine, "to be more productive".

Mr. Baslan believes that his drug use negatively impacted his ability to make decisions and think rationally. He also believes that it negatively affected his finances. Mr. Baslan denies ever participating in any substance abuse treatment prior to being incarcerated, however he has taken substance abuse classes while in BOP custody.

Mental health:
Mr. Baslan was diagnosed with Adjustment Disorder while in BOP custody and recently has been prescribed Fluoxetine to assist with managing his reported symptoms of anxiety and sadness.

## Course of Treatment

Overall Progress:
Mr. Baslan became active in the Challenge community soon after his arrival to the unit. He contributed to the unit via painting murals, participating in Unity Day activities, and planning upbeat activities. He was able to memorize the 8 Attitudes and Program Philosophy early in Phase I and demonstrated an eagerness to perform well in the Program. He regularly checked in with staff and Mentors to inquire about areas in which he could improve and to receive feedback. By the end of Phase I, Mr. Baslan had become an active member of the Art and Health & Fitness committees. He also provided support to peers who wanted to quit the program would encourage them to remain in the unit.

In Phase II, Mr. Baslan maintained active participation in the Community via serving as a visible member in unit committees. He also served on several peers' Accountability Teams as well as a Healthy Ally to assist in resolving conflicts on the unit. At times, Mr. Baslan received feedback from his peers that he was over involved or would sometimes receive input that he was "putting on an act" or "trying to be a therapist". During these times, Mr. Baslan would approach staff, Mentors, and peers to receive feedback about his approach, body language, and word choices in effort to improve the quality of his interactions with his peers. By the end of Phase II, Mr. Baslan had presented several Topics groups and had also completed Healthy Ally sessions of his own with a peer with whom he had conflict.

In Phase III, Mr. Baslan increased his overall participation via joining the Topics Group committee, along with maintaining his membership to the Art and Health & Fitness committees. He continued to actively contribute to group discussions and would regularly demonstrate caring to peers via providing constructive feedback and support. Mr. Baslan also presented in Community Morning Meeting and would represent the Challenge Program with a positive attitude after hours on a consistent basis. He regularly reached out to peers, completed all homework assigned, and would volunteer to assist staff with duties, such as cleaning the unit, preparing for institutional tours, planning unit events, etc.

Criminal Lifestyle:
Mr. Baslan was able to memorize the 8 Attitudes by the beginning of Phase I. In the Orientation journal, he reported that he understood the concept of RSA's, but did not begin to actually apply the tool until the end of Phase I. Mr. Baslan also was able to memorize the Criminal Thinking Errors without difficulty, exhibiting an ability to learn quickly. Similar to RSA's, he did not experience the application of the Criminal Thinking Errors until the end of Phase I, when he actually began to recognize the Errors in his own thought patterns, past and present. Mr. Baslan began to request feedback, but would sometimes question it or have difficulty accepting it.

In Phase II, Mr. Baslan demonstrated the ability to utilize RSA's and the 5 Rules of Rational Thinking to both past and present situations. He began to use the tool on a regular basis and also volunteered to assist peers with their recoveries by assisting them with learning how to use the tool. Mr. Baslan reported improved clarity in his thinking processes and was able to avoid criminal behavior. He reported that he recognized a historical presence of Mollification and Entitlement in his thinking. He was able to He also demonstrated an increased desire for transparency and asked his peers to hold him accountable if they observed him engaging in criminal activity or entertaining Criminal Thinking Errors. By the end of Phase II, Mr. Baslan had completed a person-to-person pull up as well as a self-pull up. He also successfully completed an Action Plan with his own Accountability Team and was a supportive member of a peer's Accountability Team.

In Phase III, Mr. Baslan experienced a significant amount of empathy for his victims and all of those impacted by his criminal behavior. He was visibly moved in several groups and expressed remorse and understanding of the impact of

| Inmate Name: | BASLAN, BEBARS | | | | Reg #: | 80637-053 |
| Date of Birth: | 05/22/1977 | Sex: | M | Facility: TCP | Unit Team: | UNIT D2 |
| Date: | 12/08/2017 12:23 | Provider: | Moraila, Amy CTS | | | |

his past actions. He experienced emotions of sadness and guilt and processed these emotions in Process group. He also relied on the use of Program tools, such as Attitude Checks and RSA's to assist him in examining his thoughts. He received feedback from peers in a calm manner and questioned the feedback less than he had earlier on in the Program. He decided to use the lessons of his past behavior to motivate him to demonstrate positive behavior in the future. He continued to discuss the consequences he experienced, due to his criminal actions and shared these consequences openly with the Community. By the end of Phase III, Mr. Baslan exhibited a strong understanding of the Criminal Thinking Errors in his own thought processes and the ability to use tools to correct them.

Substance Abuse:
Mr. Baslan was transparent about his substance abuse history and recovery goals from the beginning of his arrival to the Challenge unit. Prior to beginning journals, he already began volunteering support and feedback to peers who struggled with substance abuse issues, including providing encouragement during Morning Meeting, volunteering to be a member of Accountability Teams, and offering positive encouragement. By the time he was in Phase I, Mr. Baslan was able to identify many of the consequences he had experienced due to his past substance abuse and committed to maintaining his sobriety. Mr. Baslan also discussed his past substance abuse in several Process groups and realized that connected to his substance abuse was his overall feeling of fear and a lack of self-confidence in his ability to cope with stressful situations.

In Phase II, Mr. Baslan worked on managing his emotions in lieu of escaping them or self-medicating. He identified several emotional triggers in Process groups, including fear, perceptions of inadequacies, discomfort with discomfort, etc. Mr. Baslan learned about RSA's and the 5 Rules of Rational Thinking and how they can be utilized as relapse prevention tools. He processed and identified emotional triggers in order to strengthen his emotional exploration skills. He also worked on improving his assertive communication and co-dependency issues. He received feedback from peers regarding his social interactions and friendship style. By the end of Phase II, Mr. Baslan was working on utilizing support-seeking and being more comfortable showing others his emotional self in lieu of solely his intellectual self, which was outside of his comfort zone.

In Phase III, Mr. Baslan continued to maintain his sobriety and also provided support to several peers with their substance abuse recoveries. He identified the self-serving components in his past drug use in journal group and reflected on the manner in which substance abuse contradicts his current values and goals. Mr. Baslan also exhibited an increased ability to articulate his emotions and process them and was observed encouraging peers to explore their emotions as well.

Other-Healthy Boundaries:
Mr. Baslan began socializing with others immediately upon his arrival to the Challenge unit. He began to engage in committees and unit activities on a regular basis. He also began to learn appropriate group etiquette in Phase I. Mr. Baslan began to become heavily engaged in the recovery of several of his peers. While he received positive recognition for his caring, he also received feedback from peers regarding his co-dependency and the need for healthy boundaries in friendships. Mr. Baslan initially had difficulty understanding the feedback received and did not fully recognize the co-dependency behaviors that hes identified.

In Phase II, Mr. Baslan completed the Violence Prevention journal and learned about his past actions, his use of Criminal Thinking Errors, and the manner in which he abused inter-personal boundaries. He discussed his understanding of the negative impact his actions had on others and expressed a great amount of remorse. During this time, he also got into a conflict with a close friend who was in the Program. Mr. Baslan experienced a significant amount of emotional pain from the conflict and was encouraged to go through the conflict resolution process to address the issues in a healthy manner. After Mr. Baslan did so, he reported that he learned a great deal about his expectations of others, friendships, boundaries, and trust. Mr. Baslan also reported that he was able to recognize some of the components of his peers' feedback regarding co-dependency in his behaviors. In one group discussion, Mr. Baslan reflected and stated, "I guess I do realize that I have a need to feel wanted. I can see some of that now".

By Phase III, Mr. Baslan reported that he was more comfortable with feedback and did not view it as an attack. He continued to make connections between his appearance to others and his desire to control the perceptions that others have of him. Mr. Baslan realized the importance he placed on wanting to be viewed in a positive light by others and that

| Inmate Name: | BASLAN, BEBARS | | | Reg #: | 80637-053 |
| Date of Birth: | 05/22/1977 | Sex: | M    Facility:  TCP | Unit Team: | UNIT D2 |
| Date: | 12/08/2017 12:23 | Provider: | Moraila, Amy CTS | | |

he only had control over himself. Mr. Baslan continued to work on both establishing and maintaining healthy relationships with peers that were void of expectations and reciprocities. He worked on "turning it back to self" when experiencing conflict with others, in effort to examine his own beliefs and would apply the RSA tool to assist him in thinking rationally.

## Strengths and Weaknesses

Strengths:
Mr. Baslan has demonstrated the ability to communicate in several languages, has a tremendous desire to learn, is artistically inclined, has a desire to build strong inter-personal friendships, and enjoys teaching others. Mr. Baslan also enjoys planning events that others can enjoy, is extroverted and comfortable in the community environment, and can speak articulately. Mr. Baslan has also developed strong relapse prevention skills and is able to apply corrective thinking strategies when he is in emotionally heightened states.

Weaknesses:
Mr. Baslan reports that expressing his vulnerabilities continues to be uncomfortable for him and he prefers to discuss intellectual topics. Mr. Baslan also continues to struggle with co-dependency issues and low self-esteem. He reports having a need for other's approval and still struggles with grieving his incarceration.

## Recommendations for Further Treatment

It is recommended that Mr. Baslan continue to reside in a recovery community that enforces healthy boundaries and promotes pro-social activities. It is also recommended that Mr. Baslan continue to utilize CBT tools that assist him in challenging negative beliefs he has about himself. Mr. Baslan would also benefit from continual substance abuse recovery support in effort to further strengthen his relapse prevention skills.

## Prognosis

Prognosis: Fair

Completed by Moraila, Amy CTS on 12/08/2017 12:37

**Reviewed by Mitstifer, Meredith PsyD/Challenge Coordinator on 12/11/2017 09:14**

EXHIBIT H

# CHALLENGE COMMUNITY LEARNING ACHIEVEMENT

is presented to:

## Bebars Baslan

For

Successfully completing the course
Communication Development

September 2018

*A. Evans, Challenge Treatment Specialist*

# CHALLENGE COMMUNITY
# LEARNING ACHIEVEMENT

is presented to:

## BEBAP BASLAN

For:

Your advancement in Forward Thinking Philosophy.
You have reached the level of:
**APPRENTICE**

January 2018

*H. Evans, Challenge Treatment Specialist*

Pupil  Apprentice  Scholar  Theortician  Philosopher  Guru  Sage

EXHIBIT I

**Bureau of Prisons**
**Psychology Services**
**Challenge - Administrative Note**

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | BASLAN, BEBARS | | | Reg #: | 80637-053 |
| Date of Birth: | 05/22/1977 | Sex: | M      Facility: TCP | Unit Team: | UNIT D2 |
| Date: | 11/17/2020 09:59 | Provider: | Mitstifer, Meredith | | |

**Comments**

This administrative note serves to outline Mr. Baslan's contributions to the Challenge Program's Modified Therapeutic Community at USP Tucson. Challenge is a residential modified therapeutic community program where inmates engage in half day programming for a minimum of 500 hours, over an average 12-16 month period. Mr. Baslan successfully completed the program in December 2017. After completion of the program, Mr. Baslan continues to reside in the community where his contributions are observed as commendable.

Mr. Baslan played an integral role as a Challenge Program graduate, consistently demonstrating effective listening, processing and communication skills. Mr. Baslan has voluntarily participated in community committees including Topic Group, Health & Fitness, Audio/Sound crew, Art and Mediation. Mr. Baslan volunteers himself to participate on accountability teams for his peers and was assigned leadership role as Chairman of a new committee (Topic Group). Mr. Baslan has successfully led painting classes for the MTC and contributed to murals in the unit.

Given his commitment to both himself and the MTC, Mr. Baslan was selected as a mentor and has remained in the residential setting as such to present time. The role of mentor consists of various responsibilities which include but are not limited to: assisting new participants with the MTC mission, attitudes and core values of the program, daily community meetings, monthly supervision, facilitating process groups for both wait and complete status members, assisting treatment specialists with journal groups, facilitating successful mediations within community members, and remaining discipline free.

Mr. Baslan additionally served as an inmate Suicide Prevention Companion since September 2017. He was previously employed by Recreation where he assisted with the coordination of health fairs for the general population. In addition to his strengths, he clearly demonstrates an ability to effectively balance his roles so his self-care is not compromised and he maintains an excellent peer model to the MTC. His reliability and maturity are a community asset.

Mr. Baslan continues to be an active participant in his own treatment and genuinely works to improve his character daily. He is able to acknowledge errors in his thinking patterns which led to his incarceration, and demonstrates this growth and change by assisting others to do the same. Mr. Baslan also continues to demonstrate an excellent institutional record with no discipline while continuing to reside in a high security setting. This pattern of good conduct over a long period of time validates his commitment to following the rules and doing the right thing.

Copy placed in inmate file due to length of time in program and serves as update.

Completed by Mitstifer, Meredith PsyD/Challenge Coordinator on 11/17/2020 10:04

EXHIBIT J

9. We do "party directed Mediation" to resolve conflict in The challenge program. (similar process to corporate world) I was invited to Join the comittee in 2017, and remaind on it as a mentor. Here is an example of the Conflict resolution process: Imagin two inmates in a high security institution (Although we are a drop-out penitentiary, we still have non-sex offenders and our share of fights and murders) they threatened each other w/ bodily harm, most likely we broke up an almost fight. The mediators then meets w/ them seperatly few time, process thier emotions, coaches them the assertivly express thier needs and what they could have done better. Then set up a joint meeting w/ the mediator to reach a resalution) I love doing mediation + on a busy week 3-4 miations.

EXHIBIT K

# Certificate of Participation



is presented to:

## Mr. Baslan

For being an Audio Technician for the Reality M.T.C. Skit Showcase
Presented by the Challenge Program Mediation Committee

On October 30, 2018

Your demonstration of the attitudes of
Willingness, Responsibility, and Caring are greatly appreciated.

T. Green
Challenge Treatment Specialist

M. Mitstifer
Challenge Coordinator

# Certificate of Achievement



is presented to:

## Mr. Baslan

In Honor of Your

## Second Place

Finish in the Reality M.T.C. Skit Showcase
Presented by the Challenge Program Mediation Committee

On October 6, 2017

Your demonstration of the attitudes of Willingness, Responsibility,
and Caring are greatly appreciated.

T. Green
Challenge Treatment Specialist

M. Mitstifer
Challenge Coordinator



EXHIBIT L

To whom it may concern,

My name is James Spiotto II and I first met Mr Baslan when I came to the Challenge Program in 2017. We became cell mates in 2018 while I was going through the program. Coming from a rough background, poor education and low self-esteem I didn't have much hope for my future. I had just came to the Challenge Program to try for the certificate. Mr Baslan changed that.

We first began bonding over our shared remorse of our crimes and past wrong doings. I was inspired by Baslans vulnerability, empathy, seemingly ceaseless willingness to help others and his drive for personal growth. His influence played a major role in my decision to make a change in my life and truely apply myself to the Challenge Program and all the programs that followed.

Mr Baslan empowered myself and many others to join the Mediation Committee. He assisted our training in the use of Party-Directed Mediation wherein we help others to seek peaceful resolutions. Through valuable skillsets such as assertive communication, empathic listening, socratic questioning and role-owning, we empower others to resolve future conflicts on their own without resorting to violence or aggression.

Mr Baslan has taught many impactful classes such as his 'Empathy' class where he teaches others what

empathy is and why it's so important, the value of under-
standing and compassion and guides people to see the
full extent the ripple effect of their crimes had on
others. He doesn't just teach, he leads by example.

An example I work hard to follow. I am proud to say
that after I completed the Challenge Program at the end of
2018, I was selected to stay and I remain to this day.
Now, like Mr Baslan, I help work with others who are
seeking to make positive changes in their lives.

I am grateful to have found meaning and purpose in
my life and to have a positive effect on others
in such a negative environment. I thank Mr Baslan
for helping lead myself and so many others down
a road of personal redemption and I pray
that all this is taken into consideration when
judgment is cast upon him.

Thank you for your time

Sincerly,

# EXHIBIT M

To Whom it May Concern

I have had the pleasure of knowing Mr. Baslan as a friend, Mentor, and fellow group therapy member over the past five years.

In 2016 Mr. Baslan began group therapy within a therapeutic community which has a central focus on cognative behavioral therapy. This type of therapy requires the client to seek personal accountability and explore victom impact. In the time I have known Mr. Baslan he has made major strides in areas such as empathy, victom impact, spirituality, interpersonal relationships and accountability.

By far the biggest area of personal improvement for Mr. Baslan has been his selfless focus on improving the lives of the people around him. After completing the challenge program in 2017 Mr. Baslan grew to become a role model and leader within the therapeutic community. It was because of this growth that Mr. Baslan was appointed as a peer mentor in 2019. As a member of the peer mentor body Mr. Baslan has maintained a caseload of 8 to 10 program participants guiding them through treatment & displaying important skills such as empatic listening, conflict resolution, program workload assistance, and all around shoulder to cry on.

I am blessed to have witnessed Mr. Baslans journey through treatment and greatful to have had him as a close friend. I personally view Mr. Baslan as the model of responsability and humility I aspire to be in the future. I wish Mr. Baslan the best of luck and pray for an opportunity for the community to benifit from the posative person he has become.

Sincerely

Christopher S. Cauna
Senior Peer Support
FCC/USP Tucson Challenge Program

EXHIBIT N

To whom it may concern,

I met Biebars Baslan when he interjected himself into a conversation I was having about an art history correspondence course I was taking. In that single action he committed at least three of the cardinal sins of prison etiquette; I knew right then I was going to like this man very much. He hadn't adopted the arbitrary, ridiculous, and self-defeating behaviors that are prevalent in prison culture. A culture punctuated by drugs, pornography, and other nefarious deeds that operate as the inmate's analgesic.

That was five years ago, and not only does he continue to reject the easy escapism that prison offers, he has sought out and participated in the rehabilitative opportunities available to him. Most recently, Biebars, enrolled in the "Challenge Program," a modified cognitive behavioral community, where he has demonstrated a willingness to share and examine his failures, and recieve the psychological treatment tools to fundamentally reorient his thoughts and behaviors that led him to incarceration.

So impressed with his transformation and aptitude, the certified treatment staff and

DR. MITSTIFER, THE PROGRAM COORDINATOR, SELECTED, BEBARS BASLAN, TO REMAIN IN "CHALLENGER," AFTER GRADUATING, AS A PEER MENTOR. THIS IS A HIGHLY VALUED POSITION OF CONFIDENCE, THAT, BECAUSE OF THE LEVEL OF ACCOUNTABILITY THE "CHALLENGER PROGRAM" MAINTAINS, COMES WITH A HIGH RISK OF BODILY HARM. MENTORS ARE OFTEN EXPOSING BEHAVIORS OF PARTICIPANTS THAT INCLUDE DRUGS, VIOLENCE, AND SEXUAL ACTS. IN THE CAPACITY OF A MENTOR, BEBARS HAS SHOWN HIMSELF TO BE AN EXCELLENT ROLE MODEL TO PROGRAM PARTICIPANTS AND OTHER MENTORS, MYSELF INCLUDED. HIS ENTHUSIASM AND EMPATHY TO HELP OTHERS IS INVALUABLE. BEBARS CANDOR AND AUTHENTICITY ENABLES HIM TO REACH INMATES FROM VARIOUS BACKGROUNDS: DOCTORS TO GANG MEMBERS. HE SHARES HIS UNIQUE AND SUCCESSFUL ADAPTATION TO PRISON LIFE AND GUIDES OTHERS TO FIND THEIR OWN SUCCESS THROUGH MEANING AND PURPOSE. HE BELIEVES IN THE POWER OF CHANGE, BECAUSE HE HAS EXPERIENCED IT.

BEBARS BASLAN IS NOT A COMPLETE WORK, BUT PRISON IS NO LONGER THE RIGHT PLACE FOR HIM. HE HAS GAINED ALL THE WISDOM THIS PLACE IS LIKELY TO IMPART. BEBARS IS SELF-MOTIVATED, HE BEGAN HIS REHABILITATION WITH NOTHING TO GAIN BUT THE SATISFACTION OF KNOWING THAT TODAY HE IS CLOSER TO BEING THE MAN HE WAS INTENDED TO BE.

STEVEN P. ARTHUR #65313-097

# EXHIBIT O

When I first met Mr. Baslan, he was an established leader in the Challenge Program's Modified Therapeutic Community, as a graduate who had successfully completed the program. I immediately noticed how caring he was and how often he assited his peers while continuing to pesonally grow an accomplish his own goals an objectives. After completion of the program, Mr. Baslan was selected as a Mentor without hesitation. Mr. Baslan is one of my safe harbor's. He's someone I can trust to be honest an objective with me. He's demonstrated that he's willing to put as much effort, if not more into my treatment as i'm willing to put into my own. Not only does this community rely on Mr. Baslan, we depend on him to guide an advice us, especially in difficult situations. He's a very responsible and valuable resource, who is held to high standards. I witness him on a daily basis assist other's with the core value's of the program, facilitate successful mediations within the community,

help treatment specialist with their journal groups. And that only outlines some of the contributions he make. I respect Mr. Baslan's leadership an I expect him to continue to be an example to follow. He's been an inspiration to me. He's inspired me to be apart of the solution, not the problem. He taught me when I didnt like what I see, to change the way i'm looking at it. He's been very supportive to me, even when I struggle the most. I'm grateful to have met him

Respectfully,
Mr Desmond Stowers
Mr Desmond Stowers
# 72S5-171

# EXHIBIT P

HONORABLE JUDGE DEARIE.                    12-15-20

YOUR HONOR, MY NAME IS Lemasani Voa.
I AM WRITING YOU THIS LETTER IN REGAURDS TO
MR. BASLAN. I WOULD FIRST Like to TELL YOU ABOUT
MYSELF. I AM 44 yrs. OLD, I WAS AN ACTIVE GANG
MEMBER FOR 26 yrs. ALSO STRUGGLED WITH ALCOHOL
& DRUG ADDICTION. DURING THOSE 26 yrs. I WAS
CONVICTED OF Crimes Ranging FROM PUBLIC INTOXICATION TO
DRUG DISTRIBUTION, ROBBERY, AND GUN CHARGES. IN THAT
STATE OF SELF DESTRUCTION I ENCOURAGED MY 13
YEAR OLD Son TO JOIN THE GANG I WAS IN.
WHILE On FEDERAL PROBATION. Upon RETURNING BACK
TO PRISON MY Son LEFT THE GANG AND ASKED
ME TO DO THE SAME. I WANTED TO CHANGE BUT
I DID NOT KNOW HOW. IN 2017 I CAME TO
THE CHALLENGE PROGRAM. THIS IS WHERE I MET
MR. BASLAN.. MR. BEBARS BASLAN HAS BEEN A MENTOR
TO ME & His Role in MY Life AS A MENTOR HE
BECAME A MAJOR piece in MY CHANGE. MR. BEBARS
BASLAN HAS HELPED me WORK MY PTSD, AGGRESSIVE
BEHAVIOR ISSUES. THE WHOLE YEAR I Spent AS A
PARTICIPANT in THE PROGRAM MR. BEBARS
BASLAN GAVE me SUPPORT & ASSISTANCE. EVEN NOW
IN 2020 BOTH BASLAN & MYSELF ARE MENTORS
in THE PROGRAM. MR. BASLAN CONTINUES TO
Be THERE FOR ME. I AM GENUINELY GRATEFUL
FOR THE TIME & EFFORT MR. BASLAN HAS INVESTED

in my LiFE. I would like you to know THAT MR. BASLAN WORK WITH myself + OTHERS is Commendable. MR. BASLAN NOT ONLY HELPS + LEADS HERE in THE PROGRAM. MR. BASLAN LEADS WITH INTEGRITY. By HOLDING OTHER MEMBers in THE PROGRAM ACCOUNTABLE FOR NEGATIVE BEHAVIOR. AS Well AS Him HOLDING HIMSELF ACCOUNTABLE. MR. BASLAN IS DEDICATED TO IDENTIFYING HIS MISTAKES + THINKING ERRORS AND PUTS FORTH IMMIENGE EFFORT TO CHANGE THEM.

IN CLOSING, I AM ASKING you TO SEE MR. BEBARS BASLAN FOR THE MAN He IS TODAY. ALSO FOR you TO KEEP IN MIND THE DEDICATION MR. BASLAN HIS OWN PERSONAL CHANGE + ASSISTING OTHER MEN IN THEIR CHANGE. MR. BASLANS PASSION FOR HELPING OTHERS HAS INSPIRED ME.

THANK you FOR your TIME AND UNDERSTANDING.

Respectfully,

LEMASANI Voi

EXHIBIT Q

Today we'll both be doing something we never expected would happen in our very different lives: For you to be reading, and for me to be writing, a letter extolling the character of a sex offender. To illustrate how unusual this action will be, you'll need to know more about who's on the other end of this pencil.

I came into The Federal Bureau of Prisons ("BOP") in 1974 when I was 18 years old with 3 concurrent 15 year sentences for bank robbery. I've not been out since. That means I turned a parollable 15 year sentence under the "old law" into 44 years of uninterrupted incarceration. For this to happen you can rightly assume I was one of the bad guys. As I'm sure you already know all too well, the majority of criminals have committed many more offences than they've been convicted of, and the same holds true for crimes committed while in prison. And like I said, I've been in here for a long time. Infer from that what you will, but I was a member — now ex-member — of the original Aryan Brotherhood ("AB"), which means I was involved in some unindicted violence, along with multiple consecutive sentences that I've been convicted. Most likely I'll die in prison. For most of my time in prison, i.e., 35 years, was served first at USP Marion when it was a Level 6. super-

2

max, and then at the Level 6 supermax that replaced it in Florence, CO ("ADX"), when I finally took a stand and refused to murder a man that had been ordered by the Commission. This occurred in 1995, and as a result of that I dropped out, debriefed, and answered every question put to me honestly about the AB in particular and other criminal organizations in general. The information I provided included 3 unsolved murders, drug trafficking, money laundering, code breaking keys, weapons in prison and out, and connections with militias, Odinists, KKK, the Dixie Mafia, Skinheads, Irish gangs in Boston and New York, "Identity Christians," and white supremacy groups of every kind. Because I refused to testify on all of the above, the BOP refused to transfer me out of the ADX. For the last 6 years I was there I shut down and quit talking entirely as I circled the drain of suicide.

As a consequence of the BOP losing and settling a lawsuit (about warehousing prisoners with or without mental illnesses for years, often decades, after prolonged periods of model behavior), I was the poster boy for both classes of plaintiff, and I was in the first group transferred out of the ADX and sent to open a newly created mental illness program at the prison in Atlanta. After 4 years I completed the program and was then trans-

3

ferred here to Tucson because it was unsafe to send me anywhere else. This, then, was how and why a man with my background ended up in a facility with 74% of the population being sex offenders. I hope it goes without saying the BOP wouldn't have put me around people with "open season" written all over their backs in the not-so-good old days because it would have ended — instantly — in violence. But I've put that life, and those thoughts, behind me. I've been in open population for over a year now, around pedophiles, with truly mon- strous and multiple acts of hands-on sexual assault in their rap sheet without so much as giving them a dirty look. In my view, that indicates a true sea change has occurred in my life.

When I first came into The Challenge Program (where I met Baslan) I was completely out of my element. I didn't know what to think, say, or do around here. Neither did they. When it became known who I was, what I've done, and where I came from, they gave me a wide berth. Most were afraid of me. There were only 3 men who were the exception, and Baslan was the one in front and leading the others. Not surprisingly, I had a hard time adjusting because this program, and the sex offenders in it, is uncharted waters to me. Excluding the crimes they

4

were sentenced for, the majority of these men— the _overwhelming_ majority —had never even been arrested before. They were, and remain, total squares. Each of us looked at the other as being prototypical pariahs. They're atypical to everything I've known about criminals and convicts, and none of them exemplified this more than Baslan.

When we first began communicating it was awkward in the way all new experiences are: with caution and curiosity. Since then, we've learned we have similar interests in philosophy and theology, which isn't what one sees, hears, or talks about very often. For us, these subjects transcend mere passion and are more closely related to pure obsession. One of the more unknown and unexpected facts about the time I was imprisoned at the ADX is that I was tonsured a Rassaphoros monk in The Eastern Orthodox Church; a thing not done in the 2,000 year history of the church, i.e., making someone a monk while they were still locked up. The amount of study, reading, praying, and practices are truly daunting, and Baslan was one a few men who knew and would appreciate the effort and commitment. It wasn't long before I thought of him as a friend.

Baslan, though, is different from me in several significant

5

ways. He more than anyone else makes The Challenge Program a success story. He's a workhorse, e.g., he graduated from the program, but is staying on just to help others to complete it without pay; he teaches several different self-help classes and group meetings, he's a chapel orderly and aide in interfaith religious services; he's on numerous committees and meetings to provide some expertise and guidance both on an individual and communal level; and as a human being I can tell you he's a kind, compassionate, empathetic, generous, caring, helpful, intelligent, and highly respected man in both the eyes of staff and inmates alike. I tell you this candidly: without his help I'd have crashed out of this program almost on a weekly basis. And it's not just with me either. It's with anyone in need.

 Now I said all this to say what? That he's not a convicted sex offender? No, you more than anyone knows he's not some innocent who's been wrongly imprisoned. What I can — and do — say is that if there's any good in coming to prison for any number of terrible crimes, then Baslan has gotten the best that any prison has to offer. Although I don't know the kind of man he was at the time of his crimes — or his trial and sentencing — I know the person he is today. He's genuinely the poster boy

6

for the BOP to ask the Appropriations Committee of Congress to finance more Challenge Programs throughout the country.

Before considering anything this letter says, think about the kind of man who's writing it. When was the last time a judge heard a ranking AB member — ex or otherwise — praise a sex offender for being more than a pin cushion in a murder case? Do you not know what people like me did to sex offenders involved — in any way — with child pornography? This, more than anything, speaks to Baslan's character. If his current behavior can persuade a person like me to view him as an example of reformation and excellence, it begs the question of why someone like you shouldn't re-examine the efficacy of keeping him imprisoned.

Randy Gometz

Randy Gometz

#35556-118

US Penitentiary

PO Box 24550

Tucson, AZ

85734

# EXHIBIT R

To whom it may Concern,

    I am writing this letter on behalf of mr. Bebars Baslan. I have served for five years as a peer Mentor in the Challenge program at the United States Penitentiary in Tucson, Arizona. I have had the opportunity to witness Mr. Baslans progression through the program and would like to share my observations.

    Mr. Baslan came to the Challenge Program in 2015 and I'm not sure that he realized how his actions affected other people. He seemed to lack emotion and Caring for other peoples feelings. He didn't always Communicate his wants or needs Clearly and I don't believe that he had Come to terms with his Criminal behavior.

    Today, I am glad to Say that he has made great strides in his treatment. I have watched him grow dramatically as he progressed through this program. He is very Self-aware and empathic with others. He uses numerous Coping Strategies to work through difficult emotions. His emotional Self-regulation has taken a monumental turn for the better and he has accepted his role in his Criminal behavior.

    I see mr. Baslan working to better himself daily. I see him working with difficult people and using his own example to assist others in their recovery. After Serving for a number of years as a program graduate, he was named as a peer Mentor in the Challenge Program. This role Comes with a Caseload of up to fifteen people

who are dependant on his guidance to progress through the program. Mr. Baslan provides outstanding guidance and is a model for others to follow.

Mr. Baslan has served on the Mediation Committee which is designed to provide a platform for inmates to resolve conflict. This is a complicated job in a United States Penitentiary. Mr. Baslan has become a skilled mediator and many people look to him for advice in difficult situations. He works with numerous accountability teams, community members, and staff members to help people on a daily basis.

Mr. Baslan is not perfect. He still has his challenges but I believe that he is prepared to deal with adversity as it comes. I believe that he has an effective recovery plan, which addresses his criminal conduct. He has learned to manage his treatment issues with multiple cognitive interventions. He has mastered many emotional self-regulation skills and is very conscious of how his past behavior have affected his victims. It is with a clear heart and mind that I would recommend Mr. Baslan for release into the community.

Respectfully Submitted,

Scott A. Herrick
Peer Mentor

# EXHIBIT S

page 1 of 2

To Whom It May Concern,

I have known Mr. Bebars Baslan since 2015, about a year before he joined the Challenge Program, a residential treatment unit, at USP-Tucson. At the time, I was a mentor in the Challenge Program after my successful completion in 2015.

Our casual acquaintance turned into a friendship once he joined the program in 2016. Over the course of 4 years, Mr. Baslan has made tremendous progress in his treatment. Most noteably, he has developed a willingness to be open and honest about his own struggles and treatment needs, as well as a humbleness to receive help. This has not only enabled him to build a repetoire of effective coping skills and a comprehensive Recovery Maintanance Plan, but has also served as a model for others to be vulnerable in their own treatment.

After his graduation from the Challenge Program, Mr. Baslan was also selected as a mentor due to his gains in treatment and leadership skills. As a fellow mentor, I have had the pleasure of seeing Mr. Baslan develop his compassion for and insight into his fellow peers' needs. He is a careful listener and exercises great empathy when mentoring others. He is sought out by many for his relatability, sound advice, and equally matched vulnerability. He is usually the first person I go to when I need help or just a listening ear. Together, we've worked and continue to work

page 2 of 2

through our shame, remorse, and repentance. And whether he is mentoring an individual, leading small group discussions, or presenting a treatment topic to the entire community, Mr. Baslan engages with sincerity and courage.

It has been a pleasure and honor to work with Mr. Baslan and witness his growth in the Challenge Program. I and many others are fortunate to have his support in our ongoing growth and recovery.

Sincerely,
DAVID ETTLINGER
ID# 94454-038
David Ettlinger
December 16, 2020