MEB:ADW
F. #2019V02366

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                         Docket No. 13–CR-220 (RJD)

BEBARS BASLAN,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X


THE GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO THE
DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE OR REDUCTION OF
SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

JACQUELYN M. KASULIS
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Andrew Wang
Assistant U.S. Attorney
    (Of Counsel)

### TABLE OF CONTENTS

Preliminary Statement.................................................................................................... 1

Background ...................................................................................................................... 1

I.    The Defendant's Offense Conduct and Sentencing ................................................ 1

II.   The Defendant's Post-Arrest Obstruction of Justice ............................................. 4

III.  The Defendant's Prior Conduct ............................................................................. 5

      A.  Rape of Minors in Buffalo, New York ............................................................. 5

      B.  Fraudulent Possession of Documentation ........................................................ 6

IV.   The Defendant's Sentence ..................................................................................... 6

V.    The Defendant's Health and Circumstances at His Facility .................................. 6

VI.   The Defendant's Request for Relief ....................................................................... 7

Legal Standard ................................................................................................................ 8

Argument ...................................................................................................................... 10

I.    The Defendant Fails to Demonstrate Extraordinary and Compelling Reasons That Warrant a
      Sentence Reduction............................................................................................... 10

      A.  The Defendant's COVID-19 Concerns Do Not Warrant A Sentence Reduction ............. 10

      B.  The Defendant's Purported Rehabilitation Does Not Warrant A Sentence Reduction .... 14

      C.  The Defendant Has Failed to Demonstrate that His Circumstances Satisfy the Criteria Set
          Forth in U.S.S.G. § 1B1.13 ......................................................................... 15

II.   The Section 3553(a) Factors Weigh against A Sentence Reduction for the Defendant ......... 17

      A.  The Nature and Circumstances of the Offenses............................................... 17

      B.  The History and Characteristics of the Defendant........................................... 18

      C.  The Need for the Sentence to Reflect the Seriousness of the Offenses, Promote
          Respect for the Law, and Provide Just Punishment...................................... 19

      D.  The Need to Deter Criminal Conduct and Protect the Public .......................... 19

CONCLUSION.............................................................................................................. 20

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to defendant Bebars Baslan's motion pursuant to 18 U.S.C. § 3582(c)(1)(A) for a reduction of sentence. See ECF No. 286 ("Def. Mot."). In his submission, the defendant seeks a reduction of his 36-year sentence just seven years after his convictions at trial for devising a scheme to sexually abuse several minor children and to record his planned actions.[1] See Def. Mot. at 3; ECF No. 192 ("Judgment"). Specifically, the defendant claims the COVID-19 pandemic and his rehabilitative efforts while in prison together constitute "extraordinary and compelling reasons" that justify a reduced sentence. Def. Mot. at 2-3.

The defendant is wrong. While the pandemic has caused significant hardship nationwide, including in prison facilities, it has not impacted the defendant to a degree justifying early release. Nor is he at particular risk of contracting COVID-19, given that he has been fully vaccinated. As to his purported rehabilitation, the defendant's efforts—if true—are not so extraordinary so as to justify his early release. Finally, consideration of the 18 U.S.C. § 3553(a) factors further demonstrates that his sentence should remain unchanged. For all of those reasons, as described below, the Court should deny the defendant's motion.

BACKGROUND

I.     THE DEFENDANT'S OFFENSE CONDUCT AND SENTENCING

The defendant is serving a 36-year sentence for devising and attempting to carry out a scheme in coordination with co-defendant Kristen Henry ("Henry"), to sexually abuse three minors. Pre-Sentence Investigation Report, dated March 23, 2015 ("PSR") ¶ 4. The defendant,

---

[1] The defendant also pled guilty to one criminal count of possession of child pornography prior to the commencement of trial.

who was born on May 22, 1977 (PSR ¶ 126), is a non-citizen.  Henry, who was born on April 1, 1987, is a citizen of the United States.  The investigation began after agents from the Federal Bureau of Investigation (the "FBI") received information from a confidential informant ("the CI") on February 13, 2013 that the defendant and Henry planned to open a babysitting business in which they would drug and sexually abuse the children under their care.  Id.  At the time  of the conduct, the defendant was approximately 35 years old, and Henry was almost 26 years old.

After delivering this information to the FBI, the CI recorded numerous phone calls and in-person meetings between himself and the defendant from February 13, 2013 to March 19, 2013.  Id. ¶¶ 4-13.  Initially, the defendant described a detailed plan to have Henry take sexually explicit photographs with the CI's 18-month-old child ("John Doe 1").  Id. ¶ 4.  Later, the defendant asked the CI to provide the CI's three-month-old son ("John Doe 2") for Henry to sexually abuse while the defendant took pictures.  Id. ¶ 9.  The defendant also informed the CI that both he and Henry were interested in sexually abusing the CI's eight-year-old niece ("Jane Doe 1").  Id. ¶¶ 5, 9-10.  The defendant indicated that they could drug Jane Doe 1 with Dramamine so she would not be aware that she was being sexually abused.  Id. ¶ 5.

After several calls, the defendant and the CI agreed for the CI to bring John Doe 1, John Doe 2, and Jane Doe 1 to a New Jersey hotel, where the defendant and Henry would sexually abuse the minors and take pictures of their actions.  Id. ¶ 8-9.  The defendant said that he intended to "go down" on Jane Doe 1, which is slang for performing oral sex.  Id. ¶ 9.  The defendant informed the CI that the defendant's sexual abuse of the CI's niece was more of a "stepping stone" and that the defendant would "take a lot of pictures and videos" of the abuse. Id. ¶ 10.  The defendant also told the CI that they would "have a good amount of pictures and videos of [Jane Doe 1] herself and then we can just use it as jerk-off material or whatever."  Id.

On March 19, 2013, the defendant attempted to bring his plan to fruition.  Id.
¶ 11.  The CI drove to the defendant's residence in Brooklyn, New York early in the evening.  Id.
¶ 12.  There, the CI was given a bottle of Benadryl, which Henry had purchased earlier that day
from a nearby Walgreens pharmacy and would be used to sedate Jane Doe 1.  Id. ¶¶ 12, 24-25.
Later that evening, the CI called the defendant and provided him with an agreed-upon code word
indicating that the CI was at the New Jersey hotel with the children.  Id. ¶¶ 11, 13.  After arriving
at the hotel, the defendant and Henry proceeded to the room number that the CI had provided to
them, whereupon law enforcement officers arrested the defendant and Henry.  Id. ¶¶ 11-13.
When arrested, the defendant and Henry possessed two digital cameras, a computer and extra
camera accessories suitable for downloading photographs from a digital camera to a computer.
Id. ¶ 13.

Following his arrest, the defendant was advised of and waived his Miranda rights.
Id. ¶ 14.  Thereafter, the defendant told the agents that he, Henry, and the CI planned on having a
"swing" party, for which the children would serve as "props," but that he then got cold feet.  Id.
¶¶ 14-15.  The defendant also admitted both to telling the CI that he planned to arrange a
babysitting business and to downloading child pornography on his home computer.  Id. ¶ 17.
The defendant then signed a written statement admitting that he suggested using Benadryl to
drug the minors, planned on performing oral sex on Jane Doe 1, intended to take photographs
and videos of the encounter, and had a sexual interest in children.  Id. ¶ 19.

In addition to arresting the defendant and Henry, FBI agents searched their shared
Brooklyn residence pursuant to a warrant.  Id. ¶ 25. There, the agents seized various electronic
devices, including several laptop computers, multiple external and internal hard drives, and a
video camera.  Id.  Computer forensic specialists later discovered numerous encrypted files on

the seized devices, including approximately 76,000 images and 2,000 videos of child pornography.  Id. ¶¶ 27.

On April 17, 2013, a grand jury sitting in this District returned an indictment charging the defendant and Kristen Henry with traveling with intent to commit aggravated sexual abuse of a minor under the age of 12, in violation of 18 U.S.C. § 2241(c) (Count One); conspiring to sexually exploit a child, in violation of 18 U.S.C. § 2251(e) (Count Two); attempting to sexually exploit a child, in violation of 18 U.S.C. §§ 2251(a) and (e) (Count Three); and attempting to coerce or entice a child to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b) (Count Four).  See ECF No. 12.  Separately, the defendant was charged with possessing child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2) (Count Five).  Id.

On July 15, 2014, the defendant pled guilty to Count Five of the indictment.  On July 24, 2014, following a jury trial, the defendant was convicted on Counts One through Four of the indictment.

## II.    THE DEFENDANT'S POST-ARREST OBSTRUCTION OF JUSTICE

Following his arrest but before the commencement of his trial, the defendant made several attempts to obstruct justice and frame the government's CI.  PSR ¶¶ 29-30.  After receiving a tip from an inmate at the defendant's detention facility ("the inmate") about the defendant's various plans, the government provided the inmate with a recording device to record his conversations with the defendant.  Id. ¶ 30.  During one of the recorded conversations, the defendant informed the inmate that he had devised a scheme which involved having friends file false affidavits with the Court claiming that the CI had embezzled money from them.  Id. ¶ 29. In a separately recorded conversation, the defendant divulged his plan to falsely link the CI to a child molestation ring by having the remains of two deceased children dug up and planted in the

4

CI's home.  Id. ¶ 30.  The defendant then planned to place an anonymous tip alerting law

enforcement to the CI's home once the remains were planted.  Id.

   In addition, the same inmate informed the government that the defendant had

instructed a friend to go to the defendant's apartment to retrieve an electronic storage device that

the FBI had not seized during its search of the defendant's residence.  Id. ¶¶ 29, 33.  Thereafter,

the defendant attempted to obstruct justice by filing a motion that alleged that the FBI had seized

the device and that he required access to it as part of his defense "because it contained

'exculpatory defense data.'"  Id. ¶ 32.  However, the defendant knew the FBI was not in

possession of the device, and he sought to use the motion as part of his "scheme to destroy the

[device] and falsely accuse the FBI of destroying exculpatory evidence."  Id. ¶ 33.  Ultimately, in

a recording between the inmate and the defendant on July 31, 2013, the defendant admitted that

his friend had in fact destroyed the device.  Id.

III. THE DEFENDANT'S PRIOR CONDUCT

  A. Rape of Minors in Buffalo, New York

   While preparation for the defendant's trial was underway, the FBI separately

interviewed two young women from Buffalo, New York, who alleged that around 2005 and

2006, the defendant repeatedly raped them when they were teenagers and almost always

recorded the incidents on camera.  PSR ¶¶ 41-57.  The victims' families had hired the defendant

to take photographs of the victims to advance their modeling careers, thereby granting the

defendant access to them.  Id. ¶ 41.  At trial, one victim testified that when she and a friend were

15 and 14 years old, respectively, the defendant directed them to touch each other in a sexual

manner while he took photographs.  Id. ¶ 43.  The 15-year-old victim also testified that she

witnessed the defendant have sex with the 14-year-old friend.  Id.  Both victims stated that the

defendant plied them with drugs and alcohol and then raped them on several occasions.  Id. ¶¶

44-45, 52-54.  In fact, one victim claimed that she and the defendant had "sex 'countless' times" in the year-and-a-half after they had first met.  Id. ¶ 56.  The defendant also recorded his sexual interactions with these victims on numerous occasions and even used the recordings as blackmail material against one of the victims.  Id. ¶¶ 44, 54.

      B.    <u>Fraudulent Possession of Documentation</u>

      When the FBI searched the defendant's apartment, agents recovered numerous documents that belonged to individuals other than the defendant and Henry.  PSR ¶ 59.  In particular, "the documents included, <u>inter alia</u>, original birth certificates, immunization records, certificates of paternity, W-2 wage and tax statements, social security cards, driver's licenses, Russian passports, visas (issued in Russia)[,] and W-4 Employee's Withholding Allowance Certificate."  <u>Id.</u>  One of the defendant's victims from Buffalo, New York, also discovered various forms of identification with different names for the defendant at his apartment.  Id. ¶ 48.

## IV.   <u>THE DEFENDANT'S SENTENCE</u>

      On February 27, 2015, the Court sentenced the defendant to 36 years of imprisonment.  <u>See</u> Judgment at 3-4.  This sentence reflected the following separate terms of imprisonment on the counts of conviction, with all terms to run concurrently: Count One (36 years); Count Two (30 years); Count Three (30 years); Count Four (36 years); and Count Five (20 years).  Id. at 4. The defendant is currently projected to be released from custody on November 21, 2043, after which he will face a life term of supervision and be deported to his home country.  <u>See</u> Def. Mot., Exh. D.

## V.   <u>THE DEFENDANT'S HEALTH AND CIRCUMSTANCES AT HIS FACILITY</u>

      According to the defendant's medical records, the defendant is 44 years old and suffers from some minor health issues which are all treated by the BOP—specifically, rheumatoid arthritis, Hepatitis B and asthma, among other ailments.  The defendant receives

weekly injections of medication to manage his rheumatoid arthritis.  The defendant's Hepatitis B is undetectable, and he has an inhaler to manage his asthma.

The defendant has never been diagnosed with COVID-19.  Indeed, the defendant is fully vaccinated against COVID-19.  On January 7, 2021, the defendant received his first dose of the Pfizer-BioNTech vaccine.  He received his second dose of the vaccine on January 28, 2021. The defendant is currently housed at United States Penitentiary Tucson ("USP Tucson").

VI.    THE DEFENDANT'S REQUEST FOR RELIEF

On February 22, 2021, the defendant filed a request with the U.S. Bureau of Prisons ("BOP") for compassionate release.  See Def. Mot., Exh. D.  The BOP denied the defendant's request four days later.  Id.  The defendant then filed the instant motion with the Court.

## LEGAL STANDARD

Section 3582 permits the Court to "reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The relevant Sentencing Commission policy statement is United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 1B1.13.[2] That statement provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," id. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," id. § 1B1.13(2); and "the reduction is consistent with this policy statement," id. § 1B1.13(3).

The application notes to Guidelines Section 1B1.13 provide three instances where "extraordinary and compelling reasons" may exist: (A) the defendant has a serious medical condition, such as a terminal illness; (B) the defendant is, among other things, at least 65 years old and seriously deteriorating; or (C) the defendant's family circumstances have changed such that the defendant is the only available caregiver for a minor child or incapacitated spouse.

---

[2] In United States v. Brooker, 976 F.3d 228 (2d Cir. 2020), the Second Circuit held that § 1B1.13 is not binding on district courts. See Brooker, 976 F.3d at 237. The government respectfully submits that Brooker was wrongly decided. As set forth in the government's brief to the Second Circuit in Brooker, in 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission the authority to define the term "extraordinary and compelling reasons." The First Step Act altered only the procedural mechanism in § 3582(c)(1) and did not revoke the authority delegated to the Commission in § 994(t), or purport to expand the basis for compassionate release beyond the categories identified by the Sentencing Commission in the application note to U.S.S.G. § 1B1.13. In any event, for the reasons discussed herein, the defendant has failed to identify "extraordinary and compelling reasons" for a sentencing reduction, even under Brooker.

U.S.S.G. § 1B1.13 app. note 1(A)–(C).  The application notes also allow a catchall condition where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  Id. at app. note 1(D); see also United States v. Traynor, No. 04- CR-582 (NGG), 2009 WL 368927, at *1 (E.D.N.Y. Feb. 13, 2009) (Section 3582(c)(1) "applies . . . to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the circumstances of the prisoner.").

Regardless of the defendant's theory of why "extraordinary and compelling reasons" for release exist, Section 3553(a) factors are relevant to whether release is warranted. See 18 U.S.C. § 3582. The mere existence of "extraordinary and compelling reasons" does not compel compassionate release if the Court determines that the Section 3553(a) factors warrant continued imprisonment.  See, e.g., United States v. Gotti, 433 F. Supp. 3d 613, 615 (S.D.N.Y. 2020) ("It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification.  He is simply eligible for a sentence modification.  The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances."); accord United States v. Efrosman, No. 06-CR-95 (NGG), 2020 WL 4504654, at *2 (E.D.N.Y. Aug. 5, 2020).

As the proponent of release, the defendant bears the burden of proving that "extraordinary and compelling reasons" for his release exist.  See United States v. Butler, 970

F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); United States v. Tranese, No. 17-CR-559-2 (CBA), 2021 WL 25371, at *1 (E.D.N.Y. Jan. 4, 2021) ("In general, the defendant bears the burden of demonstrating his eligibility for compassionate release."); United States v. Elliott, No. 17-CR-128 (ARR), 2020 WL 4381810, at *3 (E.D.N.Y. July 31, 2020) (same).

ARGUMENT

The Court should deny the defendant's motion for a sentence reduction.  As a threshold matter, the defendant fails to demonstrate extraordinary and compelling reasons for such a reduction because (1) he is not particularly at risk due to COVID-19, (2) his purported rehabilitation does not rise to the level of justifying early release, and (3) he has failed to satisfy the criteria set forth in U.S.S.G. § 1B1.13.  Separately, the 18 U.S.C. § 3553(a) analysis weighs against a sentence reduction.  For all of those reasons, as described in detailed below, the Court should deny the defendant's motion.[3]

I.    THE DEFENDANT FAILS TO DEMONSTRATE EXTRAORDINARY AND COMPELLING REASONS THAT WARRANT A SENTENCE REDUCTION

A.    The Defendant's COVID-19 Concerns Do Not Warrant A Sentence Reduction

The defendant's COVID-19 concerns do not present extraordinary and compelling reasons for a sentence reduction because he is not particularly at risk from COVID-19.  The defendant asserts that he suffers from asthma, Hepatitis B, and rheumatoid arthritis and that he consequently faces an increased risk of contracting COVID-19.  See Def. Mot. at 9-10. To support his argument, the defendant cites to two Southern District of New York cases for the proposition that the COVID-19 pandemic alone may constitute extraordinary and compelling

_____

[3] The government does not dispute that the defendant has exhausted his administrative remedies.

reason for a reduced sentence. See id. at 9 (citing United States v. Ozols, No. 16-CR-692 (JMF), 2020 WL 2849893, at *1 (S.D.N.Y. June 2, 2020) and United States v. Pena, 459 F. Supp. 3d 544, 551 (S.D.N.Y. 2020)).  The defendant also relies on United States v. Cato, No. 16-CR-326 (ARR), 2020 WL 5709177 (E.D.N.Y. Sept. 24, 2020), for the proposition that the COVID-19 pandemic may constitute extraordinary and compelling reasons where a defendant has high-risk medical conditions.  See id.

In the first instance, the cases on which the defendant relies are distinguishable. For example, in Ozols, the court granted the defendant's motion for compassionate release after the defendant had served approximately three-fourths of his sentence.  See 2020 WL 2849893, at *2.  And in United States v. Pena, the court granted the defendant's compassionate release request after he had completed nearly two-thirds of his sentence. See 459 F. Supp. 3d at 547. Here, the defendant has served less than a quarter of his sentence.

Indeed, Ozols and Pena are inconsistent with many other decisions issued by courts in the Second Circuit, some of which involved defendants with serious underlying medical conditions.  See, e.g., United States v. Ambrosio, No. 17-CR-522 (GRB), 2021 WL 2144760, (E.D.N.Y. May 26, 2021) (denying application of defendant who had a history of kidney and heart issues and had contracted COVID-19); United States v. Ramos, No. 93-CR-360 (NGG), 2020 WL 7488908 (E.D.N.Y. Dec. 21, 2020) (denying defendant's request despite her diagnosis of stage IV rectal cancer with metastasis to the lungs); United States v. Lombardo, No. 17-CR-318 (JMA), 2020 WL 6118821 (E.D.N.Y. Oct. 16, 2020) (denying application where defendant suffered from obesity, bronchitis, asthma, and lung damage from multiple stab wounds); United States v. Jaquez, No. 17-CR-415 (PAC), 2021 WL 857364 (S.D.N.Y. Mar. 8, 2021) (denying request of obese and asthmatic defendant); United States v. Corin, No. 10-CR-391-64 (CM),

2020 WL 5898703, at *3 (S.D.N.Y. Oct. 5, 2020) (denying defendant's request even though defendant suffered from "chronic bronchitis, and upper respiratory infections due to a 2007 stab wound which left [him] with a collapsed lung").

In any event, whatever the reasoning in Ozols, Pena and Cato – all of which pre-date the widespread availability of COVID-19 vaccines – the proposition that COVID-19 presents extraordinary and compelling reasons as to essentially any incarcerated individual proves too much. Indeed, even if that argument were valid, it cannot apply here because the defendant is fully vaccinated. As reflected in his medical records, the defendant has never contracted COVID-19, and he received his second dose of the Pfizer-BioNTech COVID-19 vaccine on January 28, 2021. According to the Centers for Disease Control and Prevention, the Pfizer-BioNTech COVID-19 vaccine is more than 90% effective at preventing symptomatic infection, even among individuals with underlying medical conditions.[4] Moreover, even if the defendant were to contract COVID-19, his risk of severe disease is virtually non-existent, particularly, where, as here, the defendant is relatively young and only 44 years old.[5]

---

[4] See Sara E. Oliver et al., *The Advisory Committee on Immunization Practices' Interim Recommendation for Use of Pfizer-BioNTech COVID-19 Vaccine—United States, December 2020*, CDC (Dec. 18, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6950e2.htm?s_cid=mm6950e2_w (Pfizer vaccine is more than 92% effective at preventing symptomatic infection among individuals with underlying medical conditions).

[5] See Pfizer, *Pfizer and BioNTech Confirm High Efficacy and No Serious Safety Concerns Through Up To Six Months Following Second Dose in Updated Topline Analysis of Landmark COVID-19 Vaccine Study*, (Apr. 1, 2021, 6:45 AM), https://www.pfizer.com/news/press-release/press-release-detail/pfizer-and-biontech-confirm-high-efficacy-and-no-serious (finding that the Pfizer-BioNTech vaccine is 100 percent effective against severe disease by the CDC definition)

These widespread trends extend to USP Tucson, where the defendant is currently housed.  The defendant cites the previous high infection rates of COVID-19 at USP Tucson in support of his motion.  See Def. Mot. at 8.  However, as of July 8, 2021, USP Tucson had zero inmates and only one staff member with open positive cases of COVID-19.  See BOP, COVID-19 Vaccine Implementation, https://www.bop.gov/coronavirus/ (last visited July 8, 2021).  Relatedly, according to BOP COVID-19 vaccine implementation statistics, more than three-fourths of inmates at FCC Tucson are fully vaccinated against COVID-19. [6]  See id.  In other words, the defendant faces very little risk from COVID-19 not only because of his own vaccinated status, but also because the pandemic has largely abated within his own facility.[7]

For all of the foregoing reasons, neither COVID-19 nor the defendant's underlying medical conditions present extraordinary and compelling reasons for early release.  The Court should therefore deny the defendant's motion on those grounds.

---

[6] COVID-19 vaccination data is only available for the entirety of FCC Tucson, which includes USP Tucson and FCI Tucson.  FCC Tucson currently has about 1363 inmates, and BOP data show that 1199 inmates have been fully vaccinated at that facility.

[7] Relatedly, the public health landscape has vastly improved since Ozols, Pena and Cato were decided.  See CDC, *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory*, https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases (last visited July 8, 2021).  For example, the national seven-day moving average of daily new COVID-19 cases was approximately 27,000 on the day Pena was decided (May 8, 2020), approximately 22,000 on the day Ozols was decided (June 2, 2020), and approximately 46,000 on the day Cato was decided (September 24, 2020).  See id.  By comparison, as of July 7, 2021, the national seven-day moving average for new COVID-19 cases is fewer than 15,000.  Id.  These striking improvements in the COVID-19 landscape are no doubt the result of the widespread availability and uptake of COVID-19 vaccines in this country.  Indeed, according to the CDC, approximately two-thirds of the nation's adults have received at least one dose of a vaccine. See CDC, *COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited July 8, 2021).

B.    The Defendant's Purported Rehabilitation Does Not Warrant A Sentence Reduction

Nor does the defendant's purported rehabilitation warrant a sentence reduction. In his motion, the defendant extensively discusses his involvement as a participant and mentor in various rehabilitative programs while in prison.  See Def. Mot. at 12-21.  However, as the defendant concedes, he has undeniable "talents as a manipulator," id. at 11, and the government respectfully submits that the Court should evaluate the defendant's claims of rehabilitation through that lens.  Indeed, both the defendant's offense conduct and his related conduct proven at trial demonstrate a pattern of vicious predatory behavior and dishonesty.  For example, the trial evidence showed that the defendant was the main interlocutor with the CI, that the defendant planned the sexual abuse that he attempted to commit at the New Jersey hotel, and that co-defendant Henry – who was almost a decade younger than the defendant – largely followed the defendant's lead.  Years earlier, the defendant saw the modeling aspirations of two teenaged girls as an opportunity to give them drugs and alcohol, rape them repeatedly and even use recordings of the rape as blackmail.  What is more, the defendant concocted elaborate post-arrest schemes to frame the CI and to file a perjurious motion with the Court regarding the FBI's supposed destruction of exculpatory information.  In assessing whether the defendant has been truly rehabilitated to any degree, the Court should consider the defendant's demonstrated ability to lie, manipulate and pervert the justice system towards his own ends.

Additionally, even assuming arguendo that the defendant has genuinely been rehabilitated to some degree, rehabilitation alone is not an extraordinary and compelling reason for early release.  See 28 U.S.C. § 994(t) ("Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" justifying a sentence reduction).  Indeed, several courts in this District have found that rehabilitation does not necessarily warrant a

14

sentence reduction, even where a defendant has served a substantial portion of his sentence.  See, e.g., United States v. Figueroa, No. 04-CR-515 (KAM), 2020 WL 6873433, at *4-5 (E.D.N.Y. Nov. 23, 2020) (denying compassionate release motion despite defendant's "commendable achievements" towards rehabilitation, where defendant committed serious narcotics crime and had served about 151 months of a 262-month sentence); United States v. Vailes, No. 16-CR-297 (AMD), 2020 WL 3960505, at *3 (E.D.N.Y. July 13, 2020) (denying compassionate release motion, despite fact that defendant had "served a substantial portion of his sentence" and had "made rehabilitation efforts"); see also United States v. Sanchez, No. 08-CR-789-1 (RJS), 2020 WL 2571074, at 2 (S.D.N.Y. May 21, 2020) (denying compassionate release motion of defendant who had five years left on a 240-month sentence to serve, where motion was "based exclusively on his purported rehabilitation while incarcerated").  Thus, even if the Court were to credit the defendant's claims of rehabilitation – which it should not – such rehabilitative efforts would not be a basis for a reduced sentence.

C.     The Defendant Has Failed to Demonstrate that His Circumstances Satisfy the Criteria Set Forth in U.S.S.G. § 1B1.13

The Court should also deny the defendant's motion because the defendant has not satisfied the criteria set forth in U.S.S.G § 1B1.13.  Although section 1B1.13 is not binding in this District, this Court has stated that section 1B1.13 "provides some useful guidance" on what constitutes an extraordinary and compelling reason for a reduced sentence.  United States v. Markou, No. 08-CR-399 (RJD), 2020 WL 6945923, at *2 (E.D.N.Y. Nov. 25, 2020).  Application note 1 to section 1B1.13 sets forth a series of specific extraordinary and compelling reasons justifying a reduced sentence.  See U.S.S.G. § 1B1.13 Application Note 1.  None of those reasons applies in this case.

15

First, application note 1(A) specifies certain medical conditions that may warrant a sentence reduction.  Specifically, extraordinary and compelling reasons exist if "[t]he defendant is suffering from a terminal illness" or is suffering from an impairment "that substantially reduces [his] ability . . . to provide self-care within the environment of a correctional facility and from which he is not expected to recover."  U.S.S.G. § 1B1.13 Application Note 1(A).  The defendant does not claim, nor do his medical records indicate, that he suffers from a terminal illness or is incapable of providing self-care.  Furthermore, as explained earlier, even in the unlikely event that the defendant should contract COVID-19 while incarcerated, his risk of a severe outcome is virtually zero.  In any event, even assuming arguendo that COVID-19 were a serious threat to the defendant's health, the language of application note 1(A) requires that the defendant is actually suffering from a terminal disease or severe impairment, not simply that he faces the risk of contracting such a disease.  Therefore, the defendant does not satisfy the criteria set forth in application note 1(A).

Second, application note 1(B) provides that extraordinary and compelling reasons may exist if "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."  U.S.S.G. § 1B1.13 Application Note 1(B).  The defendant is only 44 years old, has not asserted any serious deterioration in his health due to aging, has served less than 10 years in prison and has not served at least 75 percent of his sentence.  Accordingly, the defendant does not satisfy the criteria set forth in application note 1(B).

Third, application note 1(C) states that extraordinary and compelling reasons exist either (1) if the caregiver of the defendant's minor children has died or become incapacitated or

(2) if the defendant's spouse or registered partner has become incapacitated, and the defendant is the only available caregiver to his or her spouse or registered partner.  U.S.S.G. § 1B1.13 Application Note 1(C).  Because the defendant is unmarried and has no children, the defendant does not meet the criteria established in application note 1(C).

Finally, application note 1(D) provides that extraordinary and compelling reasons may exist even if the defendant fails to satisfy the conditions of application notes 1(A)-(C), so long as the Director of the BOP finds that there is "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 Application Note 1(D).  For the reasons stated earlier, neither the risk of COVID-19 to the defendant nor his purported rehabilitation satisfy the requirements of application note 1(D).  Indeed, the BOP denied the defendant's compassionate release motion.

## II.    THE SECTION 3553(a) FACTORS WEIGH AGAINST A SENTENCE REDUCTION FOR THE DEFENDANT

Even if the defendant can meet his burden to establish extraordinary and compelling reasons for a reduced sentence—which he cannot—the 18 U.S.C. § 3553(a) sentencing factors weigh against a sentence reduction.  In his motion, the defendant points only to his supposed rehabilitation as evidence that he deserves a sentence reduction in accordance with Section 3553(a).  See Def. Mot. at 27-28.  Noticeably absent from the defendant's motion is any actual analysis of the Section 3553(a) factors.  As described below, all of those factors weigh against reducing the defendant's sentence.

### A.    The Nature and Circumstances of the Offenses

The nature and circumstances of the defendant's offenses weigh heavily against a sentence reduction.  See 18 U.S.C. § 3553(a)(1).  The defendant was the mastermind behind a scheme to procure and sexually abuse three children under the age of nine, including an infant.

In particular, the defendant not only planned to perform oral sex on the eight-year-old victim (Jane Doe 1), but also planned on drugging her with Benadryl so she would not be aware of what was taking place.   The defendant also planned to photograph and record both himself and co-defendant Henry sexually abusing each of the three children.  The defendant intended to use these pictures and videos as "jerk-off material" and indicated that his plan to sexually abuse Jane Doe 1 was merely a "stepping stone."  Compounding the defendant's already heinous crimes, the defendant possessed approximately 76,000 images and 2,000 videos of child pornography.  In short, as this Court noted at sentencing, the circumstances of the defendant's offenses were "revolting" and "reprehensible."  ECF No. 286, Exh. A ("Sentencing Tr.") at 23:15, 22.  Based on the severe nature and circumstances of the defendant's offenses, the Court should deny the defendant's motion for a sentence reduction.

B.     The History and Characteristics of the Defendant

The history and characteristics of the defendant further demonstrate that a sentence reduction is unwarranted.  See 18 U.S.C. § 3553(a)(1).  Setting aside the abhorrent offenses of conviction, the defendant's previous exploitation and rape of two minors in Buffalo show that the defendant has not only attempted to sexually abuse children, but in fact previously did so.  In addition, the defendant is a proven liar and manipulator.  His post-arrest efforts to obstruct the prosecution against him were breathtaking, even going so far as to recruit the help of third parties to frame the CI for embezzlement, concoct a plan to dig up the remains of dead children and plant those remains in the home of the CI, and to file a motion with the Court to assert false claims of evidence destruction.  When weighed against the defendant's dubious claims of rehabilitation, the defendant's long track record of predation and deception weighs in favor of denying his motion.

C.    <u>The Need for the Sentence to Reflect the Seriousness of the Offenses, Promote Respect for the Law, and Provide Just Punishment</u>

A reduction to the defendant's sentence would not reflect the seriousness of his offenses, promote respect for the law, or provide just punishment.  <u>See</u> 18 U.S.C. § 3553(a)(2)(A).  In the time since the defendant was sentenced, nothing has diminished the seriousness of the defendant's offenses, which the Court itself recognized were "revolting," Sentencing Tr. at 23:15, or the need to provide just punishment.  Indeed, as the Court noted at sentencing, a murder victim "rests in peace," whereas the victims of the defendant's conduct will "never have that opportunity" because the defendant's conduct "keeps punishing these victims every day."  <u>Id.</u> at 23:20-24.  Nor would a sentence reduction promote respect for the law.  To the contrary, a sentence reduction based on the defendant's questionable claims of rehabilitation less than one fourth of the way into his sentence would undermine respect for the law.  <u>See</u> <u>Figueroa</u>, 2020 WL 6873433 at *5 (reduction of 262-month sentence would not promote respect for the law, where defendant had served about 151 months and asserted rehabilitation).  Ultimately, reducing the defendant's sentence would diminish the gravity of the defendant's actions and subvert the goals of the original sentence, including levying a punishment that fits the seriousness of his crimes.

D.    <u>The Need to Deter Criminal Conduct and Protect the Public</u>

The need for general and specific deterrence and to protect the public could not be stronger, and those factors weigh in favor of upholding the defendant's original sentence.  <u>See</u> 18 U.S.C. § 3553(a)(2)(B)-(C).  Because cases involving the sexual exploitation of children "cause[] great harm to some of the most vulnerable members of our society," courts should uphold punishments like the defendant's in order to generally deter others from engaging in similar criminal behavior.  <u>United States v. Pabon</u>, No. 17-CR-312 (JPC), 2021 WL 603269, at *5

(S.D.N.Y. Feb. 16, 2021); <u>see</u> Sentencing Tr. at 24:15-24.  In addition, this Court recognized the need for specific deterrence when it remarked at sentencing that while the Court was "powerless" to "do anything about the impact of this type of criminal activity on the victims," the Court could "try to deter it[.]"  Sentencing Tr. at 24:2-6.  To that end, the Court concluded that the defendant was "one of the few folks that . . . has to be put away" in order "to protect others from folks like [the defendant]."  <u>Id.</u> at 24:7-12.  Those circumstances have not changed.  The defendant was a danger to the public and to children specifically, and he remains so to this day.  The need for deterrence and to protect the public counsels against a sentence reduction for the defendant.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the Court should deny the defendant's motion for a sentence reduction.

Dated:    Brooklyn, New York
          July 9, 2021

Respectfully submitted,

JACQUELYN M. KASULIS
ACTING UNITED STATES ATTORNEY
Eastern District of New York
Attorney for Plaintiff
271 Cadman Plaza East
Brooklyn, New York 11201

By:    /s/ Andrew Wang
       Andrew Wang
       Assistant United States Attorney
       (718) 254-6311